23-1251

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| JARED POLIS, in his official capacity as Governor of the State of Colorado, | |
| Defendant - Appellant, | |
| v. | |
| ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA, | |
| Plaintiffs - Appellees. | |

On Appeal from the United States District Court, District of Colorado
The Honorable Phillip A. Brimmer
Chief District Judge
District Court Case No. 23-cv-01077-PAB

**APPELLANT'S REPLY BRIEF**

PHILIP J. WEISER
Attorney General
MICHAEL T. KOTLARCZYK *
Senior Assistant Attorney General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: 720-508-6349
E-Mail: mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record
*Attorneys for Governor Polis*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

REPLY ARGUMENT ...................................................................................... 1

I.  Plaintiffs' declarations do not establish standing entitling them to a preliminary injunction. ................................................................................ 1

II. Plaintiffs have not demonstrated a likelihood of success at *Bruen*'s first step. ..... 4

    A.  Courts may not create new implied rights under the Second Amendment. .... 4

    B.  Plaintiffs' support for an acquisition right under the Second Amendment is from the late 19th century, a time when States simultaneously prohibited those under 21 from acquiring guns. ............................................................ 7

    C.  History is relevant to both steps of *Bruen*. ...................................................... 9

    D.  SB23-169 is a presumptively lawful regulation. ........................................... 13

        1.  The Court should reject Plaintiffs' attempts to nullify *Heller*'s category of presumptively lawful regulations. ............................................... 13

        2.  SB23-169 is a presumptively lawful condition and qualification on the commercial sale of arms. ............................................................. 15

III. The Governor has carried the burden of demonstrating a historical tradition relevantly similar to SB23-169. ............................................................. 17

    A.  SB23-169 is justified by unprecedented societal concerns that were not present at the Founding. ................................................................. 17

    B.  Laws passed by nearly half the states in the 19th century, which build off of a tradition dating to the Founding, demonstrate a clear historical tradition relevantly similar to SB23-169. ............................................... 18

IV. The other preliminary injunction factors favor vacating the preliminary injunction. ............................................................................................ 21

CONCLUSION ............................................................................................ 22

# TABLE OF AUTHORITIES

**PAGES**

**CASES**

*Brown v. BATFE,*
2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023) ............................................................ 2

*Colo. Outfitters Ass'n v. Hickenlooper,*
823 F.3d 537 (10th Cir. 2016) ................................................................. 1, 2

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...............................................3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 18

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) .................................................................... 7, 8

*Fraser v. BATFE,*
672 F. Supp. 3d 118 (E.D. Va. 2023) .................................................. 2, 6, 20

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014) ...................................................................... 2

*Lane v. Rocah,*
2024 WL 54237 (S.D.N.Y. Jan. 4, 2024) .................................................. 2

*Lara v. Comm'r Pa. State Police,*
91 F.4th 122 (3d Cir. 2024) ................................................................ 11, 12

*Luis v. United States,*
578 U.S. 5 (2016) ...................................................................................... 5

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .................................................................................. 3

*McDonald v. Chicago,*
561 U.S. 742 (2010) ................................................................................ 18

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ................................................................................ 14

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose,*
618 F. Supp. 3d 901 (N.D. Cal. 2022) ...................................................... 8

*NRA v. BATFE,*
700 F.3d 185 (5th Cir. 2012) ..................................................................... 2

*NYSRPA v. Bruen*,
  597 U.S. 1 (2022) ................4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21

*Peck v. McCann*,
  43 F.4th 1116 (10th Cir. 2022) .................................................................... 1, 2

*Rhode v. Bonta*,
  2024 WL 374901 (S.D. Ca. 2024) ..................................................................... 9

*Rocky Mountain Gun Owners v. Polis*,
  2023 WL 8446495 (D. Colo. Nov. 13, 2023) ................................................... 21

*State v. Calicutt*,
  69 Tenn. 714 (1878) ......................................................................................... 18

*State v. U.S. EPA*,
  989 F.3d 874 (10th Cir. 2021) ............................................................................ 7

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ......................................................................... 7, 8

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ......................................................................... 1, 2

*United States v. Huitron-Guizar*,
  678 F.3d 1164 (10th Cir. 2012) ...................................................................... 12

*United States v. Kennedy*,
  225 F.3d 1187 (10th Cir. 2000) ...................................................................... 20

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir. 2023) ...................................................................... 14

**STATUTES**

Colo. Rev. Stat. § 2-4-401 ............................................................................... 16

S.B. 169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023)...... 1, 2, 3, 8, 13, 15, 16, 17, 18, 21

**CONSTITUTION**

U.S. Const. amend. II ...........................................4, 5, 6, 7, 8, 9, 10, 11, 12, 18, 19, 20, 21

U.S. Const. amend. VI ....................................................................................... 5

U.S. Const. amend. XIV .................................................................................. 12

**REPLY ARGUMENT**

**I.** **Plaintiffs' declarations do not establish standing entitling them to a preliminary injunction.**

To establish injury-in-fact in a pre-enforcement challenge, Plaintiffs agree a court asks the question: have the plaintiffs shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute"? Ans. Br. 8-9 (quoting *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022)). The answer here is an unequivocal "No." The district court specifically found that the Plaintiffs declarations "do not state that they will purchase firearms after the law goes into effect[.]" Ex. A to Op. Br. ("Order") 12 n.6. Instead, Plaintiffs declared a "present intent" to purchase guns two months before SB23-169 would have potentially proscribed their conduct. Plaintiffs did not state they intended to purchase guns after SB23-169 became effective or that SB23-169 would have prevented them from purchasing the guns they desired two months earlier.

Plaintiffs' conclusory declarations also lack any supporting facts that would otherwise suggest Plaintiffs' pre-enforcement intent was sufficiently "concrete" for standing purposes. *See Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). Plaintiffs rely heavily on *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (vacated for re'g en banc). Ans. Br. 12-13. But even in *Teter* the plaintiffs supported their intent with specific facts: (1) they described the specific weapon they desired to purchase, (2) they had purchased that same weapon in the past, and (3) they disposed of it when

1

Hawaii enacted the law. *Id.* at 942–44; *see also Peck*, 43 F.4th 1132 (plaintiff's "present desire" sufficient when "[v]iewed in tandem" with facts that she had previously violated statute, she described the type of future statements she would make, and explained why her particular job would likely lead her to make similar future statements).

Plaintiffs' failure to provide any supporting facts for the pre-enforcement intent also distinguishes the present case from the other cases Plaintiffs cite. The Plaintiffs here did not state that they have previously purchased guns or used guns. *See NRA v. BATFE*, 700 F.3d 185, 191 (5th Cir. 2012) (individual plaintiff described his past and intended use of desired handgun); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 958 (9th Cir. 2014) (plaintiffs sought hollow-point ammo for guns they already purchased). They have not described which guns they intended to purchase. *See Lane v. Rocah*, No. 22-CV-10989 (KMK), 2024 WL 54237, at *2 (S.D.N.Y. Jan. 4, 2024) (plaintiff described in detail specific gun he desired to purchase). And Plaintiffs have not described any steps they have actually taken to purchase guns. *Fraser v. BATFE*, 672 F. Supp. 3d 118, 121 (E.D. Va. 2023) (plaintiff actually attempted to purchase handgun, but was denied); *Brown v. BATFE*, No. 1:22-CV-80, 2023 WL 8361745, at *6 (N.D.W. Va. Dec. 1, 2023) (same).

Plaintiffs argue that they can wait till trial to show a "concrete plan" to violate SB23-169. Ans. Br. 7. While *Colorado Outfitters* was decided at trial, nothing in *Colorado Outfitters* suggests this standard only applies to trials and not preliminary

injunctions. Instead, the requirement to show a "concrete and particularized" injury is the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs cannot show a concrete injury without a concrete intent to engage in conduct that would violate SB23-169. Plaintiffs mistake the requirement to show a concrete plan with the evidentiary burden needed to substantiate a concrete plan at "successive stages of the litigation." *Id.* at 561. Plaintiffs must establish standing "with the manner and degree of evidence required" at the preliminary injunction stage. *Id.* But this does not mean—as Plaintiffs argue here—that they can wait until trial to offer any specific facts that would support their planned intent.

Plaintiffs incorrectly argued that the Governor has "concede[d]" other standing issues. Ans. Br. 10. Instead, it is Plaintiffs' failure to provide any supporting facts for standing that obscures whether Plaintiffs can meet other standing requirements, such as demonstrating a constitutional interest or redressability. For example, without knowing the guns Plaintiffs intend to purchase, a court cannot know whether it is SB23-169 or federal law that prohibits the transaction. Those under 21 cannot purchase handguns, "the quintessential self-defense weapon," *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008), because of federal law not SB23-169. Op. Br. 18. Without knowing whether Plaintiffs already own guns for self-defense, a court cannot know whether SB23-169 affects a constitutional interest. Plaintiffs have thus failed to establish standing.

**II.    Plaintiffs have not demonstrated a likelihood of success at *Bruen*'s first step.**

    **A.    Courts may not create new implied rights under the Second Amendment.**

Plaintiffs failed to carry their burden at *Bruen*'s first step that would justify the extraordinary remedy of a preliminary injunction. Plaintiffs presented *no* evidence that the Second Amendment's plain text guarantees a right by those under 21 to purchase guns. Plaintiffs made no textual argument that the Second Amendment covered their conduct. Instead, Plaintiffs made a one-sentence argument before the district court that "[t]he right to keep arms necessarily implies the right to acquire arms." App. Vol. I at 69. On appeal, Plaintiffs do not contest that they presented no evidence at *Bruen*'s first step, and that they instead are seeking the Court to recognize a right only "implied" by the Second Amendment—not one included in its text. Ans. Br. 33–34.

The Governor's Opening Brief demonstrated why Plaintiffs' implied-rights approach is inconsistent with *Bruen* and *Heller*, inconsistent with the problem *Bruen* sought to solve, and makes *Bruen* an impossible test in practice. Op. Br. 24-29. Plaintiffs offer almost no response to these three arguments and instead double-down on their claim that rights can be implied under the Second Amendment. Ans. Br. 33-37. They are mistaken.

First, Plaintiffs have a fundamental problem with their implied-rights approach: it is not the legal standard adopted in *Bruen* or *Heller*. *NYSRPA v. Bruen* demands that the Plaintiffs first demonstrate "the Second Amendment's plain text covers [the] individual's

conduct." 597 U.S. 1, 17 (2022). Plaintiffs did not even attempt to meet that legal

standard here. The "test" is one "rooted in the Second Amendment's text, as informed by

history." *Id.* at 19. *Heller* described "a court's interpretive task" as "the examination of a

variety of legal and other sources to determine the *public understanding* of a legal text[.]"

554 U.S. at 605. While Plaintiffs continue to advocate for an implied-rights approach to

the Second Amendment, that is clearly not the "plain text" analysis required under *Bruen*

or *Heller*. *Bruen*, 597 U.S. at 17. Plaintiffs have not pointed to any passage in *Bruen* or

*Heller* that would permit a court to imply rights covered by the Second Amendment.

Instead of pointing to any support for implied rights in *Bruen* or *Heller*, Plaintiffs

cite to Justice Thomas's concurrence in *Luis v. United States*, 578 U.S. 5, 26 (2016) (J.,

Thomas, concurring), a Sixth Amendment case issued prior to *Bruen*. Ans. Br. 34.

Thomas's *Luis* concurrence was not the opinion of the Court in *Luis* or precedential here.

Instead, *Bruen* adopted a "plain text" approach, requiring plaintiffs to first demonstrate

their proposed conduct is "rooted in the Second Amendment's text, as informed by

history." 597 U.S. at 19.

Second, Plaintiffs' implied-rights theory is also at odds with the overall thrust of

*Bruen* and *Heller*. These cases adopted "text and history" as the limiting principle when

both "defining the character of the right" and "suggesting the outer limits of the right[.]"

*Bruen*, 597 U.S. at 22. *Bruen* adopted a text and history standard because it found it

"more legitimate, and more administrable, than asking judges to make difficult empirical

judgments about the costs and benefits of firearms restrictions." *Id.* at 25 (quotations omitted).

Plaintiffs' argument suggests that Second Amendment plaintiffs have no real burden under *Bruen*. They can come to court and argue without evidence that their conduct is implied somewhere in the Second Amendment's penumbras. They only need to appeal to their individual judge's "[c]ommonsense" on what the scope of the right should be. Ans. Br. 33 (quoting *Fraser*, 672 F. Supp. 3d at 128.). The "Constitution presumptively protects that conduct[,]" *Bruen*, 597 U.S. at 24, and the law fails if the government cannot justify it with substantial historical evidence.

Constitutional rights are not as standardless as Plaintiffs would have it. Plaintiffs' implied-rights approach provides no limiting principle at all to the Second Amendment. Obviously, different individuals will disagree on what rights might be implied or ancillary to the Second Amendment. But *Heller* rejected these freestanding approaches, taking out of the hands of "even the Third Branch of Government—the power to decide on a case-by-case basis[,]" and replacing them with a "text and history" test. *Bruen*, 597 U.S. at 22-23.

*Bruen* emphasized that this "text-and-history test" does not mean judges answer these "questions in the abstract." *Id.* at 25 n.6. Instead, the same evidentiary requirements and party presentation principles apply in Second Amendment cases as in all other cases. *Id. Bruen* did not relieve Second Amendment plaintiffs of the need to

present their own evidence and to "make a clear and unequivocal showing [they are] entitled to" a preliminary injunction. *State v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quotations omitted).

Third, if implied rights are permitted at *Bruen*'s first step, *Bruen*'s text-and-history test simply breaks. It means plaintiffs and judges could find implied Second Amendment rights based on modern interpretations that are inconsistent and unconnected with the text's historically fixed meaning. At *Bruen*'s second step, this could mean the government must engage in a historical-goose-chase to find a comparable restriction on the right in a historical period much earlier than the historical period the right allegedly existed. At the very least, the historical burdens under *Bruen*'s first and second steps should be congruent. The government should only need to prove a historical restriction as far back in time as a plaintiff can show the public understanding of the Second Amendment's text covered the conduct.

**B.      Plaintiffs' support for an acquisition right under the Second Amendment is from the late 19th century, a time when States simultaneously prohibited those under 21 from acquiring guns.**

Plaintiffs also fail to address that their historical support for a general acquisition right under the Second Amendment springs from a single source—late 19th century history. *See* Op. Br. 29-31. Their Answer Brief cites *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) and its progeny (including *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017). Ans. Br. 34–36. But *Ezell* and *Teixeira* based this general acquisition right on legal commentary that post-dated the Civil War. *Ezell*, 651 F.3d at 704 (citing

Thomas Cooley); *Teixeira*, 873 F.3d at 678 (citing an 1871 Tennessee Supreme Court decision).

Plaintiffs do not even attempt to grapple with this contradiction at the core of their case. *See* Ans. Br. 32–37. Plaintiffs ask the Court to recognize an acquisition right based on pre-*Bruen* cases that only found such a public understanding of the Second Amendment after the Civil War. Plaintiffs then demand that the Court ignore the Governor's evidence from that same period—namely, that nearly half the States at that time had enacted some prohibition on those under 21 acquiring guns. *See* Op. Br. 47–49; App. Vol. 2 at 246–286. Indeed, the same historical sources relied on in *Ezell* and *Teixeira* found that States could regulate gun purchases by those under 21. Op. Br. 30–31. Plaintiffs have not carried their burden at *Bruen*'s first step when the earliest public understanding they can point to for a general acquisition right also included the public understanding that gun purchases by those under 21 could be limited.

To try and avoid this issue, Plaintiffs ask the Court to go up a level of abstraction. They argue that at *Bruen*'s first step they only need to show a general right to acquire guns, not that the Second Amendment covers a right for those like them under 21 to acquire guns. Ans. Br. 36–37. But that is not the case they brought. At *Bruen*'s first step, courts must "must first identify and delineate the specific course of conduct at issue." *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) (citing *Bruen*, 597 U.S. at 31–32). Plaintiffs do not assert that SB23-169 prohibits

those *over* 21 from acquiring guns. Their Complaint asserted that the law was unconstitutional because it "prohibits persons over the age of 18 but under the age of 21 from purchasing a firearm." App. Vol. 1 at 9. It is not a "rhetorical device" to look at the conduct Plaintiffs alleged in their Complaint. *See* Ans. Br. 37; s*ee also Rhode v. Bonta*, --- F.Supp.3d ---, 2024 WL 374901, at *5 (S.D. Ca. 2024) (court looks to whether "Plaintiffs' allegations of constitutional wrong" are covered by the text).

The Governor's history expert Brennan Rivas explained that it was not until after the Civil War that pistols were widely available for sale in America due to major technological improvements in manufacturing, transportation, and sales distribution networks. App. Vol. 2 at 359-63; 371-72. It is not surprising that there appears to be little on the public understanding of the Second Amendment's application to sales transactions prior to this time. However, when some legal commentators recognized an acquisition right after the Civil War, they simultaneously recognized that States could restrict sales of guns to those under 21.

**C.    History is relevant to both steps of *Bruen*.**

Plaintiffs attempt to make up for their failure to present any evidence on the Second Amendment's meaning by arguing that *Bruen*'s initial "plain text" step involves no historical inquiry. Ans. Br. 23-27. This is directly at odds with *Heller*. Courts are instructed to interpret the text as "known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577. How can the Plaintiffs show what the founding generation

understood the Second Amendment's text to mean without looking to history? *Heller* called it a "textual analysis," *id.* at 578, but consulted a multitude of 18th and 19th century sources to establish the initial scope of the text. *Id.* at 579-600.

*Bruen* confirmed that history informs the first, "plain text" step. When *Bruen* analyzed whether the text covered the *Bruen*-plaintiff's conduct, it cited to *Heller*'s extensive historical review of the meaning of the text. *Bruen*, 597 U.S. at 31–33 (citing *Heller*, 554 U.S. at 580, 584, 592). Clearly the *Bruen* court thought history was important at *Bruen*'s first step or it would not have needed to look back to *Heller*'s lengthy historical analysis.

Plaintiffs' claim that *Bruen*'s first step analysis was short is also a red herring. Ans. Br. 26–27. A lengthy analysis was not needed for two reasons. First, the government "conced[ed]" that the text covered a right to public carry, making a lengthy step-one analysis unnecessary. 597 U.S. at 33. Second, *Bruen* noted that *Heller* had already reviewed the historical sources and concluded that the text covered a right to "carry weapons in case of confrontation" in the home. *Id.* at 32. This made the question of public carry outside the home easy, based on the same historical sources as *Heller*. *Id.* But this does not mean *Heller*'s historical analysis can answer more distant questions like gun purchases by those under 21. *Heller* did not "clarify the entire field" on the Second Amendment, 554 U.S. at 635, leaving it up to parties in future cases to present historical evidence on the meaning of the text. *Bruen* also "decide[d] nothing about … the

requirements that must be met to buy a gun" or federal law prohibiting "the sale of a handgun to anyone under the age of 21." 597 U.S. at 72–73 (Alito, J., concurring).

The Governor is not attempting to shift his burden at *Bruen*'s second step to Plaintiffs. Instead, Plaintiffs must carry some initial burden to set the table and demonstrate their claimed Second Amendment right has a basis in the public understanding of the text. Only "[w]hen" *Bruen*'s first step is satisfied does "then" the second step apply. *Bruen*, 597 U.S. at 24. The district court got this wrong below, finding "that the Governor ha[d] not shown a 'historical tradition of firearm regulation'" in its analysis of *Bruen*'s first step. Order 25. The district court confusingly said that the Governor's evidence supporting that "states *could have* regulated 18-to-20 year olds" during the founding at *Bruen*'s first step was insufficient because the Governor had not first satisfied *Bruen*'s second step. *Id.*

This Court should also not adopt the Third Circuit's limiting of *Bruen*'s first step in *Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024). Three other Courts of Appeals, and a different Third Circuit panel, have looked to history when analyzing *Bruen*'s first step. Op. Br. 28-29. *Lara* also specifically addressed whether history should be used to interpret the meaning of "the people" at *Bruen* step one. 91 F.4th at 130. Interpreting "the people" may require a different approach than when interpreting whether conduct is covered by the substance of the right. *Heller* clearly demonstrated that the words "Keep and Bear Arms" are interpreted through a historical lens. 554 U.S. at

581–595. By contrast, *Heller* did not clearly explain how courts should interpret the words "the people." *See United States v. Huitron-Guizar,* 678 F.3d 1164, 1169 (10th Cir. 2012) (describing interpreting the words "the people" as "large and complicated," but suggesting it requires a review of "the understanding of the age of 1787 in determining the right's scope.").

*Lara* also rejected history because applying "rigidly limited [] eighteenth century conceptual boundaries" could imbue the scope of the Second Amendment with anachronistic views on race and sex. 91 F.4th at 131. But in that case history is not the problem, the problem is arbitrarily limiting what American history may be considered. If *Lara* also looked to the Second Amendment's understanding after the Fourteenth Amendment, as *Heller* did, it easily could have concluded that "the Second Amendment gave freed blacks the right to keep and bear arms." *Heller*, 554 U.S. at 614–16.

Although the government does not have the burden at *Bruen* step one, the Governor presented unrebutted historical evidence from *both* the Founding era and 19th century on the text's scope. Op. Br. 19–20. The Governor did not argue that history at *Bruen*'s first step must be limited to eighteenth century conceptual boundaries. Founding era evidence on the Second Amendment rights of those under 21 was later confirmed in the 19th century. *Id.*

**D.    SB23-169 is a presumptively lawful regulation.**

**1.    The Court should reject Plaintiffs' attempts to nullify *Heller*'s category of presumptively lawful regulations.**

In Plaintiff's view, Ans. Br. 16–17, even "presumptively lawful" regulations must now be evaluated under *Bruen*'s second step, where the "Constitution presumptively protects that conduct." 597 U.S. at 24. Plaintiffs are fighting against Supreme Court and Tenth Circuit precedent when they argue *Heller*'s "presumptively lawful" regulations are presumptively unconstitutional. Op. Br. 41–43. This would eliminate the "presumptively lawful" category altogether, a category *Heller* said was not "exhaustive" and the very "tools" that "[t]he Constitution leaves the" States to combat modern problems of gun violence. 554 U.S. at 627 n.26, 636.

Plaintiffs do not cite any court that has invalidated the "presumptively lawful" category in the way they desire. Ans. Br. 16–18. Plaintiffs' claim that *Bruen* overruled *Heller* on this point is disproved by *Bruen* itself. *Bruen* directly references "sensitive places," one presumptively lawful category. 597 U.S. at 30. *Bruen* casts no doubt on the "lawfulness" of sensitive places despite *Bruen* finding little support in 18th or 19th century history for such restrictions. *Id.* Instead, *Bruen* stated that courts can apply this category of "sensitive places" to uphold the constitutionality of modern sensitive places. *Id.* This confirms after *Bruen* that "presumptively lawful" regulations are not subject to the presumptively unconstitutional standard at *Bruen*'s second step.

Moreover, as this Court recently recognized, "six of the nine Justices pointed out that *Bruen* was not casting any doubt on" *Heller*'s presumptively lawful regulations. *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023). Plaintiffs claim "*Vincent* had nothing to do with" *Heller*'s other presumptively lawful categories, such as conditions and qualifications on the sale of arms. Ans. Br. 22. Yet, *Vincent* clearly answered the question of whether *Bruen* eliminated presumptively lawful regulations. *Bruen* could not have done so because a majority of Supreme Court specifically affirmed them. And none of these six Justices endorsed Plaintiffs' view that some categories survive *Bruen* while others do not.

Plaintiffs also stretch reason by arguing that a "presumptively lawful" regulation means it is "categorically exempt from constitutional scrutiny," Ans. Br. 16, or "free from any constitutional restraints," *id.* at 18. Of course, presumptions are rebuttable. Plaintiffs' hyperbole tries to establish a legal presumption as some foreign concept that must be distrusted. Courts apply burden shifting presumptions in all types of legal cases. *See, e.g*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Federal courts are well-equipped to address challenges to "presumptively lawful" regulations.

*Bruen* even provides a framework for how lower courts should address "presumptively lawful" regulations. In upholding the constitutionality of "shall-issue" statutes, *Bruen* noted that "any permitting scheme can be put to *abusive ends*." 597 U.S. 38 n.9 (emphasis added). Thus, even as to presumptively lawful regulations, "we do not

rule out constitutional challenges." *Id.* For example, plaintiffs can continue to bring an

"as-applied challenge" and show that the presumptively lawful regulation "does not

operate in that manner in practice." *Id.* at 80 (Kavanaugh, J., concurring).

### 2. SB23-169 is a presumptively lawful condition and qualification on the commercial sale of arms.

Plaintiffs claim that *Heller*'s presumptively lawful and longstanding "conditions

and qualifications on the commercial sale of arms" category is limited to only regulations

on those "in the business of selling firearms." Ans. Br. 20. But that requires reading

words into *Heller* that are simply not there. *Heller* did not say that "regulations on

commercial dealers" are longstanding, but conditions on the *sale* transaction itself. The

most natural meaning of a "qualification" or "condition" is a standard that must be met

for the sale to occur. SB23-169 is a qualification on the *sale* of guns by preventing

licensed gun dealers and private sellers from "mak[ing] or facilit[ing] the sale" of a gun

to someone who has not reached the age of 21. App. Vol. 1 at 16.

At the very least, the government can use restrictions on sales to ensure guns are

sold only to "law-abiding, *responsible* citizens" or "ordinary, law-abiding, *adult*

citizens[.]" *Bruen*, 597 U.S. at 26, 31–32 (emphasis added). Plaintiffs argue that SB23-

169 is not like the "shall issue" regulations *Bruen* found constitutional. But they

incorrectly assert that the "shall issue" regulations only include things like "background

checks" that "prove[s] they are law-abiding." Ans. Br. 21. *Bruen* upheld other types of

qualifications included within "shall issue" statutes unrelated to whether the individual

was "law-abiding," such as requiring "firearms safety course[s]," 597 U.S. at 38 n.9, or "a mental health records check, and training in firearms handling and in laws regarding the use of force," *Id.* at 80 (Kavanaugh, J., concurring).

Where *Bruen* drew the line on whether a qualification was "constitutionally problematic" is where it "grants open-ended discretion to licensing officials[.]" *Id.* at 79. SB23-169 is the most definite and objective qualification to ensure guns are sold only to responsible adults. Here, Colorado has set that age limit consistent with its long-held view that 21 is the default age of majority, Colo. Rev. Stat. § 2-4-401(6), and consistent with our better 21st century understandings of adolescent development. *See* Op. Br. 39-40.

Plaintiffs never find a consistent position on the issue. They argue that "the State can set some age limit for the purchase of guns[,]" Ans. Br. 63, but that the State cannot create an age limit based on "an arbitrary dividing line such as majority status[,]" *id.* at 49. Plaintiffs assure the Court that "surely there is" an appropriate age limit. *Id.* at 63. But they never say what that age limit is, nor do they explain how a state can find it. These line-drawing questions are inherently subject to legislative determinations and Colorado's choice to draw the line at the age of majority fits comfortably within the Supreme Court's presumptively lawful category of limits on the commercial sales of firearms.

**III.** **The Governor has carried the burden of demonstrating a historical tradition relevantly similar to SB23-169.**

**A.** **SB23-169 is justified by unprecedented societal concerns that were not present at the Founding.**

Plaintiffs assert that Colorado faces no more challenges with gun violence than what was present in 1791. Ans. Br. 56-58. They label Colorado's arguments "ludicrous" because "[s]urely the Founders knew all about the foibles of 18-to-20-year-olds." *Id.* at 57. Of course, Plaintiffs cite no evidence in support of this statement—there is none in the record. Today, guns are now the leading cause of death among 18-to-20-year-olds in Colorado. App. Vol. 1 at 115. As amicus Denver Public Schools stated, "DPS students are more likely to die from gun violence than any other cause." Brief of Amicus Curiae Denver Public Schools, December 14, 2023, at 1.

In contrast to Plaintiffs' lack of evidence on the issue, the Governor offered unrebutted expert evidence that gun violence was not a pressing issue at the Founding. Op. Br. 51-52. The Governor's expert, historian Brennan Rivas explained that America did not experience its first gun crisis until the late 19th century. App. Vol. 2 at 348–68. Dramatic technological and societal changes after the Civil War led to a proliferation of weapons and state laws restricting gun sales to those under 21. *Id.* at 368–72. Plaintiffs' unsupported assertions do not overcome the evidence in the record. Because SB23-169 exists to address a problem that was "not [] the same as those that preoccupied the Founders in 1791," the relevant inquiry is whether SB23-169 is "relevantly similar" to past regulations. *Bruen*, 597 U.S. at 27-29.

**B. Laws passed by nearly half the states in the 19th century, which build off of a tradition dating to the Founding, demonstrate a clear historical tradition relevantly similar to SB23-169.**

Between 1855 and 1897, nineteen jurisdictions—representing nearly half the states at the time—passed laws that restricted gun sales to those under 21. Op. Br. 47–49. There is only one known contemporary legal challenge to these laws—which rejected that the Second Amendment covered gun purchases by those under 21, *see State v. Calicutt*, 69 Tenn. 714 (1878)—confirming the robust public understanding that these state laws did not offend the Second Amendment. *Id.*

Plaintiffs do not even attempt to distinguish the similarity of these past laws and SB23-169. Ans. Br. 54. While the Governor only needs to point to a "historical analogue" in the record, these 19th century state laws are "dead ringers" for SB23-169. *Bruen*, 597 U.S. at 30. The only way Plaintiffs can succeed on their claim is by getting the Court to ignore the evidence and this period of history. *Bruen*, *McDonald*, and *Heller* do not require the Court to ignore this evidence. To the contrary, each case examined 19th century evidence to determine the scope of the Second Amendment. *See Bruen*, 597 U.S. at 60; *McDonald v. Chicago*, 561 U.S. 742, 770-78 (2010); *Heller*, 554 U.S. at 605.

Plaintiffs instead argue that 19th century evidence "is not relevant" to the meaning of the Second Amendment. Ans. Br. 40. The Supreme Court has never so held and has always examined such evidence when interpreting the Second Amendment. The Court has instead directed the inquiry into 19th century evidence to focus on whether the later evidence "contradicts" earlier evidence. *See Bruen*, 597 U.S. at 36 (earlier evidence

controls if "later history contradicts"); *id.* at 66 ("late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").

But these 19th century laws do not contradict earlier evidence. To the contrary, those under 21 were not adults in the 18th century and generally lacked the right to contract. Op. Br. 45-46. Plaintiffs' reliance on an "absence" of laws restricting firearm sales to those under 21 is thus misplaced. Ans. Br. 59. There was little need for laws restricting the ability of those under 21 to contract for firearms when they lacked legal capacity to contract for anything other than necessities like food and shelter. *See* App. Vol. 1 at 162-63.

In short, the Governor is not asking the Court to apply a different meaning for the Second Amendment that existed in 1870 than was present in 1791. To the contrary, the proliferation of age restrictions enacted by states in the 19th century is consistent with the diminished legal status of minors at the time of the Founding. College was one of the few areas where those under 21 had independence from their parents at the time of the Founding, and many colleges expressly prohibited students from possessing firearms. App. Vol. 2 at 240-43, 287-92.

Plaintiffs attempt to argue that colonial era militia laws establish an individual right to keep and bear arms by minors. Ans. Br. 43-47. But a duty to serve in the militia does not establish that any individual had a right to keep and bear arms separate from

militia service. The district court properly rejected this argument, agreeing with the Governor "that service by 18-to-20 year olds in militias does not prove that such persons had an unfettered right to possess firearms outside of militias. *See* Order 36; *see also Fraser*, 672 F. Supp. 3d at 138 ("The Court is also cognizant of the Eleventh Circuit's admonition not to confuse the legal *obligation* to perform militia service with the *right* to bear arms.").

Nor can Plaintiffs cite any evidence in the record concerning these militia laws. Plaintiffs cite a law review article written by two Second Amendment advocates—one of whom has also authored an amicus brief in this case—but this only highlights Plaintiffs' failure of proof. This Court must "decide [this] case based on the historical record compiled by the parties," not based on a battle of law review articles. *Bruen*, 597 U.S. at 25 n.6; *see also United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court."). And the only evidence in the record on this point flatly contradicts Plaintiffs' militia theory. The Governor's expert, Saul Cornell, explained how militia laws further show the lack of autonomy of minors, as their service was at the government's insistence and under their parents' supervision. App. Vol. 1 at 178-82. In short:

> Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.

*Id.* at 168.

## IV. The other preliminary injunction factors favor vacating the preliminary injunction.

Plaintiffs offer little support that the other equitable requirements for an injunction—irreparable harm and public interest—favor them other than to reiterate their view that SB23-169 violates their constitutional rights. But "[r]educing the analysis for preliminary injunctions into a simple inquiry on the merits is antithetical to the equitable nature of such relief." *Rocky Mountain Gun Owners v. Polis*, --- F. Supp. 3d ---, 2023 WL 8446495, at \*21 n.25 (D. Colo. Nov. 13, 2023). Plaintiffs argue that although *Bruen* did not arise in the context of a preliminary injunction and said nothing about the preliminary injunction factors, it somehow abrogated longstanding jurisprudence about how plaintiffs may obtain preliminary relief. *See* Ans. Br. 64-65. It did no such thing. While *Bruen* announced a new test to determine the merits of a Second Amendment challenge—a test that Plaintiffs here cannot satisfy—it did not alter the equitable requirements a plaintiff must meet in order to preliminarily enjoin a validly-enacted law before a trial is even held. Such plaintiffs still must show irreparable harm and that the public interest favors the injunction.

As argued in the Opening Brief, Plaintiffs cannot make either showing here. Op. Br. 59-62. The public interest in particular is not even close. The Governor's unrebutted expert opined that SB23-169, if allowed to be enforced, will "likely reduce the number of firearm homicides, nonhomicide violent crimes, suicides, and accidental firearms injuries

in Colorado." App. Vol. 2 at 399. If this preliminary injunction is permitted to continue before a full trial on the merits has even been held, there will be more deaths and injuries from firearm violence.

## CONCLUSION

This Court should vacate the preliminary injunction and remand for further proceedings.

Dated: March 13, 2024.

PHILIP J. WEISER
Attorney General

*s/   Matthew J. Worthington*
*Michael T. Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6349
Email: mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Governor Jared Polis*
*Counsel of Record

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 13, 2024, I served a true and complete copy of the foregoing **Appellant's Reply Brief** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

<u>*s/ Carmen Van Pelt*</u>
Carmen Van Pelt

**Word Count and Typeface**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) (excluding items listed under Fed. R. App. P. 32(f)) because

    this brief contains 5,498 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

    this brief has been prepared in a proportionally spaced typeface (thirteen-point Times New Roman) using Microsoft Word.

Date: March 13, 2024.

                    *s/ Matthew J. Worthington*
                    MATTHEW J. WORTHINGTON
                    Assistant Attorney General