

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 8/14/2023

☐ Pro Se    ☒ Retained    ☐ CJA    ☐ FPD    USA or other
☐ Federal Agency
(Appeal Fee Exempt)

Case No: 23-cv-01077-PAB-NRN    ☐ Amended Notice of Appeal
☐ Other pending appeals
Date Filed: 08/11/2023    ☐ Transferred Successive
§2254 or §2255
Appellant: Jared S. Polis    ☐ Supplemental Record

Pro Se Appellant:
☐ IFP forms mailed/given    ☐ Motion IFP pending    ☐ Appeal fee paid
☐ IFP denied    ☐ Appeal fee not paid

Retained Counsel:
☐ Appeal fee paid    ☒ Appeal fee not paid    ☐ Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals. Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by:  s/ J. Torres
Deputy Clerk

Rev. 8/17/2017

cc:     Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 8/17/2017

APPEAL,JD1,MJ CIV PP,NDISPO

## U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23–cv–01077–PAB–NRN
### *Internal Use Only*

| | |
|---|---|
| Rocky Mountain Gun Owners et al v. Polis | Date Filed: 04/28/2023 |
| Assigned to: Chief Judge Philip A. Brimmer | Jury Demand: None |
| Referred to: Magistrate Judge N. Reid Neureiter | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**Rocky Mountain Gun Owners**　　　　represented by　**Barry Kevin Arrington**
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
303–205–7870
Email: barry@arringtonpc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tate Mosgrove**　　　　represented by　**Barry Kevin Arrington**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Adrian S Pineda**　　　　represented by　**Barry Kevin Arrington**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jared S. Polis**
*in his official capacity as Governor of the State of Colorado*　　　　represented by　**Grant T. Sullivan**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6349
Fax: 720–508–6038
Email: grant.sullivan@coag.gov
*ATTORNEY TO BE NOTICED*

**Matthew John Worthington**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6124
Email: matt.worthington@coag.gov
*ATTORNEY TO BE NOTICED*

**Michael T. Kotlarczyk**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6187
Fax: 720–508–6041
Email: mike.kotlarczyk@coag.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/14/2023 | 44 | ORDER by Chief Judge Philip A. Brimmer on 8/14/2023 re: 43 defendant's Unopposed Motion for Expedited Briefing on Motion to Stay the Preliminary Injunction Order is **GRANTED**. Plaintiffs shall file a response to 42 The Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal (Dkt. 37) on or before **Tuesday, August 15, 2023**. Text Only Entry(pabsec, ) (Entered: 08/14/2023) |
| 08/11/2023 | 43 | Unopposed MOTION to Expedite *Briefing on Motion to Stay the Preliminary Injunction Order* by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 08/11/2023) |
| 08/11/2023 | 42 | MOTION to Stay re 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1, Declaration of Baumgart)(Sullivan, Grant) (Entered: 08/11/2023) |
| 08/11/2023 | 41 | NOTICE OF APPEAL as to 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis (Worthington, Matthew) (Entered: 08/11/2023) |
| 08/11/2023 | 40 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE. A Scheduling Conference is set for 9/25/2023 at 2:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. By Magistrate Judge N. Reid Neureiter on August 11, 2023. (rvill, ) (Entered: 08/11/2023) |
| 08/10/2023 | 39 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter for **non–dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 8/10/2023. Text Only Entry (pabsec, ) (Entered: 08/10/2023) |
| 08/07/2023 | 38 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Jared S. Polis. Jared S. Polis answer due 8/28/2023. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/07/2023 | 37 | ORDER by Chief Judge Philip A. Brimmer on 8/7/2023, re: The Portion of 12 Plaintiffs Motion for Preliminary Injunction brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED. ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23–169. **ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits. **ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c). **ORDERED** that 34 Plaintiffs' Motion for Temporary Restraining Order is **DENIED as moot**. (jtorr, ) (Entered: 08/07/2023) |
| 08/07/2023 | 36 | RESPONSE to 34 MOTION for Temporary Restraining Order filed by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/03/2023 | 35 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 8/03/2023. Defendant may file a response to 34 Motion for Temporary Restraining Order on or before **Monday, August 7, 2023, at 12:00 p.m.** Text Only Entry (pabsec, ) (Entered: 08/03/2023) |
| 08/03/2023 | 34 | MOTION for Temporary Restraining Order by Plaintiffs Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Proposed Order (PDF Only))(Arrington, |

| | | |
|---|---|---|
| | | Barry) (Entered: 08/03/2023) |
| 07/18/2023 | 33 | RESPONSE to 32 Supplement/Amendment *and Notice of Additional Supplemental Authority* by Defendant Jared S. Polis. (Attachments: # 1 Exhibit A, Oregon Firearms Federation v. Kotek Decision)(Worthington, Matthew) (Entered: 07/18/2023) |
| 07/15/2023 | 32 | SUPPLEMENT/AMENDMENT to 30 Reply to Response to Motion by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 11th Cir Order Vacating Bondi)(Arrington, Barry) (Entered: 07/15/2023) |
| 07/13/2023 | 31 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners All parties do not consent.. (Arrington, Barry) (Entered: 07/13/2023) |
| 07/12/2023 | 30 | REPLY to Response to 12 MOTION for Preliminary Injunction filed by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 07/12/2023) |
| 07/10/2023 | 29 | NOTICE *of Three Related Cases* by Defendant Jared S. Polis (Sullivan, Grant) (Entered: 07/10/2023) |
| 06/29/2023 | 28 | RESPONSE to 12 MOTION for Preliminary Injunction filed by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1; Cornell Declaration, # 2 Exhibit 2; Spitzer Declaration, # 3 Exhibit 3; Rivas Declaration, # 4 Exhibit 4; Steinberg Declaration, # 5 Exhibit 5; Historical Analogues)(Worthington, Matthew) (Entered: 06/29/2023) |
| 06/26/2023 | 27 | ORDER by Chief Judge Philip A. Brimmer on 6/26/2023 re: 26 defendant's Unopposed Motion to Exceed Page Limits is **GRANTED**. Defendant shall file a response to 12 Motion for Preliminary Injunction **that shall not exceed 25 pages**, and plaintiffs may file a reply in support of their motion **that shall not exceed 15 pages**. Text Only Entry(pabsec, ) (Entered: 06/26/2023) |
| 06/23/2023 | 26 | Unopposed MOTION for Leave to File Excess Pages by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 06/23/2023) |
| 06/22/2023 | 25 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 6/22/2023. Defendant shall respond to plaintiffs' Motion for Preliminary Injunction [Docket No. 12 ] on or before **June 29, 2023**. Plaintiffs may file a reply in support of their motion on or before **July 13, 2023**. Text Only Entry (pabsec, ) (Entered: 06/22/2023) |
| 06/21/2023 | 24 | Order of Transfer. This case is closely related to Case No. 23−cv−01076−PAB, with one of the same plaintiffs and the same defendant in each case and common questions of fact and/or law. Clerk shall transfer this case to Chief Judge Brimmer. All future pleadings shall be designated as 23−cv−01077−PAB. ORDERED by Judge John L. Kane on 6/21/2023. (angar, ) (Entered: 06/21/2023) |
| 06/13/2023 | 23 | ORDER granting 21 Unopposed Motion for Tate Mosgrove to Appear Electronically at July 6 Hearing. Plaintiff Tate Mosgrove is allowed to appear electronically for the Evidentiary Hearing on the Motion for Preliminary Injunction on July 6, 2023, beginning at 9:30 a.m. Plaintiffs' counsel and Mr. Mosgrove are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC. Please contact Ms. Abiakam on or before June 30, 2023. Ordered by Judge John L. Kane on 6/13/2023. Text Only Entry(jlksec) (Entered: 06/13/2023) |
| 06/13/2023 | 22 | MINUTE ORDER. In light of the reassignment of this case to Senior District Judge John L. Kane [#15], the Scheduling Conference set for August 28, 2023, at 11:00 a.m. is VACATED. By Magistrate Judge Kristen L. Mix on June 13, 2023. Text Only Entry (klmlc1, ) (Entered: 06/13/2023) |
| 06/13/2023 | 21 | MOTION for Leave to *Allow Mosgrove to Appear Electronically at July 6 Hearing* 17 Minute Order,, by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 06/13/2023) |
| 06/12/2023 | 20 | NOTICE of Entry of Appearance by Matthew John Worthington on behalf of Jared S. PolisAttorney Matthew John Worthington added to party Jared S. Polis(pty:dft) (Worthington, Matthew) (Entered: 06/12/2023) |

| 06/12/2023 | 19 | NOTICE of Entry of Appearance by Michael T. Kotlarczyk on behalf of Jared S. PolisAttorney Michael T. Kotlarczyk added to party Jared S. Polis(pty:dft) (Kotlarczyk, Michael) (Entered: 06/12/2023) |
|---|---|---|
| 06/12/2023 | 18 | NOTICE of Entry of Appearance by Grant T. Sullivan on behalf of Jared S. PolisAttorney Grant T. Sullivan added to party Jared S. Polis(pty:dft) (Sullivan, Grant) (Entered: 06/12/2023) |
| 06/12/2023 | 17 | MINUTE ORDER. An Evidentiary Hearing on Plaintiffs' Motion for Preliminary Injunction 12 is set for July 6, 2023, beginning at 9:30 a.m. The parties are DIRECTED to file their Witness and Exhibit Lists for the hearing on or before June 29, 2023. Counsel and the parties are expected to attend the hearing in person. The parties shall note on their Witness Lists whether it is anticipated any witness will testify via video teleconferencing. Ordered by Judge John L. Kane on 6/12/2023. Text Only Entry (jlksec) (Entered: 06/12/2023) |
| 06/09/2023 | 16 | MINUTE ORDER. Defendant is DIRECTED to file a Response to Plaintiffs' Motion for Preliminary Injunction 12 on or before June 22, 2023. Any Reply is due on or before June 28, 2023. The parties are DIRECTED to call chambers JOINTLY at (303) 844–6118 to set a date and time for the preliminary injunction hearing. The Court has availability on June 29th, July 5th, or July 6th for the hearing. Plaintiffs are DIRECTED to provide notice of this Order to Defendant without delay. Ordered by Judge John L. Kane on 6/9/2023. Text Only Entry (jlksec) (Entered: 06/09/2023) |
| 06/09/2023 | 15 | CASE REASSIGNED pursuant to 14 Minute Order. This case is randomly reassigned to Judge John L. Kane and drawn to Magistrate Judge Kristen L. Mix. All future pleadings should be designated as 23–cv–01077–JLK. (Text Only Entry) (csarr, ) (Entered: 06/09/2023) |
| 06/08/2023 | 14 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on June 8, 2023. This matter is before the Court sua sponte. This case was assigned to a United States Magistrate Judge pursuant to D.C.COLO.LCivR 40.1(c). Although a signed Consent/Non–Consent Form has not yet been filed, Plaintiff has filed a Motion for Preliminary Injunction 12 . See D.C.COLO.LCivR 40.1(c)(2)(a) (discussing assignment of cases in which a motion for injunctive relief has been filed). Accordingly, IT IS HEREBY ORDERED that this case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a). (csarr, ) (Entered: 06/09/2023) |
| 06/08/2023 | 13 | WAIVER OF SERVICE Returned Executed by Adrian S Pineda, Rocky Mountain Gun Owners, Tate Mosgrove. Jared S. Polis waiver sent on 6/7/2023, answer due 8/6/2023. (Arrington, Barry) (Entered: 06/08/2023) |
| 06/07/2023 | 12 | MOTION for Preliminary Injunction by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration)(Arrington, Barry) (Entered: 06/07/2023) |
| 06/02/2023 | 11 | SUMMONS issued by Clerk. (alave, ) (Entered: 06/02/2023) |
| 05/31/2023 | 10 | SUMMONS REQUEST as to Jared S. Polis re 9 Amended Complaint by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 05/31/2023) |
| 05/26/2023 | 9 | AMENDED COMPLAINT against Jared S. Polis Attorney Barry Kevin Arrington added to party Adrian S Pineda(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove, Adrian S Pineda.(Arrington, Barry) (Entered: 05/26/2023) |
| 05/09/2023 | 8 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 05/09/2023. IT IS HEREBY **ORDERED** that Motion 3 is **GRANTED**. The Complaint 2 , which Plaintiffs state was inadvertently filed shall be deemed **WITHDRAWN**. The correct Complaint in this case is 1 in the docket.(alave, ) (Entered: 05/10/2023) |
| 05/08/2023 | 7 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge Kristen L. Mix on 05/08/2023. Proposed Scheduling Order due 8/21/2023. Scheduling/Planning Conference set for 8/28/2023 11:10 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (Attachments: # 1 Continuation of Main Document, # 2 Continuation of Main Document) (alave, ) (Entered: 05/09/2023) |

| 04/28/2023 | 6 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (blaws) (Entered: 04/28/2023) |
|---|---|---|
| 04/28/2023 | 5 | Case assigned to Magistrate Judge Kristen L. Mix. Text Only Entry. (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 4 | Administrative Notice: Duplicate filing fee received. Financial notified and a refund is pending. (Text Only Entry) (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 3 | MOTION to Withdraw Document re 2 Complaint by Plaintiffs Tate Mosgrove, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 04/28/2023) |
| 04/28/2023 | 2 | **WITHDRAWN** COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC−9072445), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) Modified on 5/10/2023 pursuant to Minute Order 8 . (alave, ). (Entered: 04/28/2023) |
| 04/28/2023 | 1 | COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC−9072435)Attorney Barry Kevin Arrington added to party Tate Mosgrove(pty:pla), Attorney Barry Kevin Arrington added to party Rocky Mountain Gun Owners(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) (Entered: 04/28/2023) |

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
     Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of Colorado,
     Defendant.

---

### NOTICE OF APPEAL

---

Defendant Jared Polis, the Governor of the State of Colorado, hereby gives notice of his

appeal to the United States Court of Appeals for the Tenth Circuit from the District Court's

August 7, 2023 order, which enjoined the Governor "and his officers, agents, servants

employees, and all persons in concert or participation with them . . . from enforcing SB23-169."

*See* Dkt. 37; *see also* 28 U.S.C. § 1292(a)(1) (courts of appeal have jurisdiction over district

court orders ranting an injunction).

Dated: August 11, 2023

                    PHILIP J. WEISER
                    Attorney General

                    *s/ Matthew J. Worthington*
                    *Grant T. Sullivan*, Assistant Solicitor General*
                    *Michael T. Kotlarczyk,* Senior Assistant Attorney General*
                    *Matthew J. Worthington*, Assistant Attorney General*
                    1300 Broadway, 6th Floor
                    Denver, CO 80203
                    Telephone: (720) 508-6000
                    Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
                    matt.worthington@coag.gov
                    *Attorneys for Defendant Governor Jared Polis*
                    *Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2023, I served a true and complete copy of the foregoing **NOTICE OF APPEAL** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

<u>s/ Carmen Van Pelt</u>
Carmen Van Pelt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**ORDER**

---

This matter comes before the Court on the Motion for Preliminary Injunction [Docket No. 12] of plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove, and Adrian S. Pineda. Defendant Jared S. Polis, in his capacity as the Governor of the State of Colorado (the "Governor"), filed a response opposing plaintiffs' motion. Docket No. 28. Plaintiffs filed a reply. Docket No. 30.

**I. BACKGROUND**

**A. Findings of Fact**

Plaintiffs challenge the constitutionality of Senate Bill 23-169 ("SB23-169"), which was passed by the Colorado General Assembly and which amends Sections 18-12-112 and 18-12-112.5 of the Colorado Revised Statutes, a provision in the Colorado Criminal Code regulating private firearm transfers. Docket No. 9 at 1, ¶ 1; Colo. Rev. Stat. § 18-12-112. The Governor signed the bill on April 27, 2023. Docket No. 9 at 1, ¶ 1. SB23-

169 becomes effective[1] "at 12:01 a.m. on the day following the expiration of the ninety-day period after final adjournment of the general assembly."  SB23-169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023).  Colorado's General Assembly adjourned on May 8, 2023.[2]

Section 18-12-112, as amended by SB23-169, provides:

> (2)(e) A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (f) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm.

Colo. Rev. Stat. § 18-12-112.  "A person who violates a provision of [Section 18-12-112] commits a class 2 misdemeanor."  *Id.* at § 18-12-112(9)(a).  Relevant provisions of Section 18-12-112.5 as amended provide:

> (a.3) A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (a.5) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm
>
> . . . .
>
> (b) Transferring or selling a firearm in violation of this subsection (1) is a class 1 misdemeanor.
>
> (c) Purchasing a firearm in violation of this subsection (1) is a class 2 misdemeanor.

---

[1] The parties are not consistent as to when they claim SB23-169 goes into effect, indicating August 4, August 7, and August 8, 2023.  *See* Docket No. 9 at 1, ¶ 1; Docket No. 12 at 1; Docket No. 28 at 1; Docket No. 30 at 14; Docket No. 36 at 2 n.1.

[2] The Court takes judicial notice of the date that the Colorado General Assembly adjourned.  S. J., 74th Gen. Assemb., 1st Reg. Sess. at 1489 (Colo. 2023), https://leg.colorado.gov/sites/default/files/2023_senate_cumulative_journal.pdf.

*Id*. at § 18-12-112.5.  Sections 18-12-112 and 18-12-112.5 make exceptions for sales to persons under twenty-one years old if the purchaser is an active-duty member of the United States Armed Forces, a peace officer who is "on duty," or a person "certified by the P.O.S.T. Board."[3]  *Id*. at §§ 18-12-112, 18-12-112.5.  As noted by the Governor, 18-to-20 year olds may still possess and use firearms.  Docket No. 28 at 3.  And they may acquire, inherit, or receive as gifts firearms from family members.  *Id.*

RMGO is a nonprofit organization that "seeks to defend the right of all law-abiding individuals to keep and bear arms."  Docket No. 12-1 at 1, ¶ 3.  RMGO has members between 18 and 20 years old who desire and intend to purchase firearms for lawful purposes, including self-defense in their homes.  *Id*. at 1-2, ¶¶ 3-4.

Mr. Mosgrove is a citizen of Colorado and is older than 18, but younger than 21.  Docket No. 12-2 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."  *Id.*

Mr. Pineda is a citizen of Colorado and is older than 18, but younger than 21.  Docket No. 12-3 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm

---

[3] "The following peace officers shall meet all the standards imposed by law on a peace officer and shall be certified by the peace officers standards and training board, referred to in this article as the 'P.O.S.T. board': A chief of police; a police officer; a sheriff; an undersheriff; a deputy sheriff; a Colorado state patrol officer; a town marshal; a deputy town marshal; a reserve police officer; a reserve deputy sheriff; a reserve deputy town marshal; a police officer or reserve police officer employed by a state institution of higher education; a Colorado wildlife officer; a Colorado parks and recreation officer; a Colorado police administrator or police officer employed by the Colorado mental health institute at Pueblo; an attorney general criminal investigator; a community parole officer; a public transit officer; a municipal court marshal; and the department of corrections inspector general."  Colo. Rev. Stat. § 16-2.5-102.

for lawful purposes, including self-defense in [his] home." *Id.*

## B. Procedural History

Plaintiffs filed this action on April 28, 2023. Docket No. 1. Plaintiffs amended their complaint on May 26, 2023. Docket No. 9. The amended complaint adds Mr. Pineda as a plaintiff and brings one claim on behalf of all plaintiffs alleging that the restrictions in SB23-169 "infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment." *Id.* at 6, ¶ 20. Plaintiffs seek a declaratory judgment, injunctive relief, and damages for the individual plaintiffs. *Id.* at 6-7, ¶¶ 23-26. On June 7, 2023, plaintiffs filed a motion for preliminary injunction requesting that the Court preliminarily enjoin the enforcement of SB23-169 arguing that the bill is unconstitutional under the Second Amendment.[4] Docket No. 12 at 1, 17. On August 3, 2023, plaintiffs filed a motion for a temporary restraining order seeking the same relief. Docket No. 34.

## II. LEGAL STANDARD

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs

_____

[4] The parties did not request a hearing. *But see* Docket No. 12 at 1-2 ("Plaintiffs submit this motion hoping that it will be briefed and argued prior to the effective date of the law."). The decision whether to hold a hearing on a preliminary injunction is within the discretion of the Court. *Buentello v. Boebert*, 545 F. Supp. 3d 912, 914 n.1 (D. Colo. 2021) (citing *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014) (unpublished), and *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision)). As the material facts are not in dispute, other than the historical section for which declarations have been attached, the Court exercises its discretion not to hold a hearing on plaintiffs' motions.

4

from irreparable injury that will surely result without [its] issuance" and "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258, 1267 (10th Cir. 2005); *see also Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1197 (D. Colo. 2009) ("injunctive relief can only be obtained for current or prospective injury and cannot be conditioned on a past injury that has already been remedied"). "[C]ourts generally will refuse to grant injunctive relief unless plaintiff demonstrates that there is no adequate legal remedy." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (3d ed. 2023).

To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

## III. ANALYSIS

### A. Standing

"[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction." *Russell v. Fin. Cap. Equities*, 158 F. App'x 953, 955 (10th Cir. 2005) (unpublished) (quoting *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996)). Moreover, if a court believes there is a standing issue, it "is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir.

2005) (citation omitted); *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537,

543 (10th Cir. 2016) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94

(1998)) ("a federal court can't 'assume' a plaintiff has demonstrated Article III standing

in order to proceed to the merits of the underlying claim, regardless of the claim's

significance").  Each plaintiff must have standing to seek each form of relief in each

claim. *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).  Therefore, the

Court will begin by examining each plaintiffs' standing to seek injunctive relief.

### 1. Pre-Enforcement Challenge

Plaintiffs seek to enjoin enforcement of SB23-169 as unconstitutional.  Docket No. 12

at 17.  Because SB23-169 had not taken effect at the time of filing, plaintiffs are bringing

a pre-enforcement challenge.  The Governor argues that plaintiffs' declarations "simply

repeat a legal conclusion that they 'desire to purchase a firearm . . . and [they are] or

soon will be precluded from purchasing a firearm by SB23-169.'  This is not enough to

preliminarily enjoin the law or even establish standing."  Docket No. 28 at 8 (citations

omitted).  Plaintiffs do not respond directly to the Governor's standing argument. *See*

Docket No. 30 at 14.  Instead, plaintiffs state:

> The State argues that because the law is not effective until August 8,
> 2023, the Plaintiffs are not at this moment entitled to a preliminary
> injunction.  Plaintiffs do not disagree, as they explained in their motion [].
> Plaintiffs filed their motion prior to the effective date of the statute so that
> the issues would be fully briefed prior to that date so that the Court would
> be able to proceed in a more deliberate fashion rather than all at once on
> August 8.  Obviously, Plaintiffs will require an injunction to vindicate their
> constitutional rights when the statute does become effective.  The point of
> the State's argument is thus unclear.

*Id*. (citation omitted).  The Court understands plaintiffs' argument to be that, although

plaintiffs filed their preliminary injunction motion well in advance of the statute's effective

date, plaintiffs are not seeking to enjoin the statute before that date, but rather plaintiffs
challenge the statute as of the date it goes into effect.  *See id.* at 13-14.

The Supreme Court has stated that, "standing is to be determined as of the
commencement of the suit."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5
(1992); *see also Nova Health Sys.*, 416 F.3d at 1154-55.  "Where, as here, the original
complaint has been super[s]eded by an amended complaint, we examine 'the amended
complaint in assessing a plaintiff's claims, including the allegations in support of
standing.'  Nevertheless, 'standing is determined at the time the action is brought . . .
and we generally look to when the complaint was first filed, not to subsequent events' to
determine if a plaintiff has standing."  *S. Utah Wilderness Alliance v. Palma*, 707 F.3d
1143, 1152-53 (10th Cir. 2013) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253-54 (10th
Cir. 2007)).  The Court will evaluate the allegations in the amended complaint to
determine plaintiffs' standing to seek injunctive relief as of April 28, 2023, the time of
filing.

### 2. Legal Standard for Standing

To establish Article III standing, a plaintiff must allege "that (1) he or she has suffered
an injury in fact; (2) there is a causal connection between the injury and the conduct
complained of; and (3) it is likely that the injury will be redressed by a favorable
decision."  *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v.
Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).  In order to show the first element of
standing, a plaintiff must show he has "suffered an injury in fact – an invasion of a
legally protected interest which is (a) concrete and particularized, and (b) actual or
imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560-61 (internal

quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339

(2016) ("Injury in fact is a constitutional requirement."). An injury is particularized if it

affects the plaintiff in "a personal and individual way." *Spokeo*, 578 U.S. at 339 (citation

omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist;" it must be

"real," not "abstract." *Id*. at 340. Furthermore, "[a] federal court's jurisdiction . . . can be

invoked only when the plaintiff himself has suffered 'some threatened or actual injury.'"

*Warth v. Seldin,* 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S.

614, 617 (1973)).

    "[T]he proof required to establish standing increases as the suit proceeds. At the

pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice, while on summary judgment, the plaintiff must set forth by affidavit

or other evidence specific facts, . . . which for purposes of the summary judgment

motion will be taken to be true." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th

Cir. 2023) (internal citations and quotations omitted). At the preliminary injunction

stage, plaintiffs must make a "'clear showing' that they have standing." *Hobby Lobby

Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J.,

concurring) (quoting *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))), *aff'd sub nom. Burwell

v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

    Where, as here, a plaintiff seeks prospective relief such as an injunction, "the plaintiff

must be suffering a continuing injury or be under a real and immediate threat of being

injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

"The threatened injury must be certainly impending and not merely speculative." *Id.*

(quotations and citation omitted).

In some narrow circumstances, a plaintiff may seek prospective relief for a law he

fears may be enforced against him in the future. *See, e.g.*, *Bronson*, 500 F.3d at 1108-

09. A pre-enforcement challenge can be brought against an existing law under which

plaintiff has previously been prosecuted, against an existing law under which plaintiff

has not been prosecuted, or in some rare cases before an enacted law is enforced.

*See, e.g.*, *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947-48 (10th Cir. 2001)

(evaluating a pre-enforcement challenge to a statute before it took effect); *Winsness v.*

*Yocom*, 433 F.3d 727, 733 (10th Cir. 2006) (evaluating a pre-enforcement challenge to

a statute that plaintiff had not been cited or prosecuted under); *Virginia v. American*

*Booksellers Ass'n, Inc.*,[5] 484 U.S. 383, 387-88, 392 (1988) (evaluating a pre-

enforcement challenge to a statute that had been enacted but before the statute was

made effective). Consistent with the usual standing requirements described above,

---

[5] In *American Booksellers*, 484 U.S. at 387-88, the Court examined a First
Amendment claim where plaintiffs alleged harm was chilled speech. A "chilled speech"
claim differs from a "pre-enforcement challenge," but both can be used in a First
Amendment context to establish an injury-in-fact that is sufficient to obtain prospective
relief. *See Rio Grande Found.*, 57 F.4th at 1160 (observing a "lessening of prudential
limitations on standing" for "chilled speech or pre-enforcement challenges" (citations
omitted)). A chilled speech claim also requires showing a credible threat of
enforcement. *Id.* The Court, however, finds no Tenth Circuit precedent applying the
"chilled speech" test outside of a First Amendment context. The Court's order should
not be interpreted as extending the "chilled speech" test to a Second Amendment claim;
instead, the Court relies on "chilled speech" cases for their value in demonstrating a
credible threat of prosecution for a pre-enforcement challenge.

courts have held that, for a threat of enforcement to be sufficient for Article III injury, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

### 3. RMGO Standing

An organization has standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Organizations may assert standing in their own right when, for instance, a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, such as when the organization faces a drain on its resources or when the defendant's actions "have perceptibly impaired" the organization's ability to carry out its mission. *Id.* at 379. An association also has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

RMGO does not provide grounds for its own standing. Plaintiffs state that RMGO "seeks to defend the right of all law-abiding individuals to keep and bear arms" and that it specifically "represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms."

10

Docket No. 12-1 at 1, ¶ 3.  Plaintiffs provide no evidence or argument that SB23-169 has made it difficult for RMGO to fulfill any of its essential goals or that SB23-169 has caused a drain on RMGO's resources.  Accordingly, RMGO fails to show standing in its own right to seek an injunction.

RMGO may also establish standing on behalf of its members.  RMGO, however, fails to show the first requirement for establishing standing in this way, namely, that its members would have standing to sue in their own right.  In *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), the Court observed that organizational plaintiffs must "identify members who have suffered the requisite harm."  This is accomplished when, through allegations or competent evidence, a plaintiff "name[s] the individuals who were harmed" or shows "*all* the members of the organization are affected by the challenged activity."  *Id.* at 498-99 (citations omitted).  Plaintiffs do not identify any individual members of RMGO, much less any individual member who is affected by SB23-169. *See* Docket No. 12-1.  RMGO claims it "has members who reside in Colorado who are between the ages of 18 and 20" who intend and "desire to lawfully purchase a firearm for lawful purposes including, self-defense in their home," *id.* at 1, ¶¶ 3-4, but does not claim that this is true regarding every member of RMGO or even regarding every Colorado member of RMGO.  *See id.*  Although RMGO could presumably identify individual members it references, a "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Nova Health Sys.*, 416 F.3d at 1154 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990)). Plaintiffs have not met their burden, *see Colo. Outfitters Ass'n*, 823 F.3d at 543, to show that RMGO has standing in its own right or that it has standing based on its members'

11

standing.  The Court may go no further, *id.* at 543-44, and will deny plaintiffs' motion to the extent it is brought on behalf of RMGO.

### 4. Individual Plaintiffs

Mr. Mosgrove and Mr. Pineda (the "Individual Plaintiffs") seek prospective relief and, therefore, to meet the injury-in-fact requirement of Article III standing, they must show a continuing or imminent injury.  *Tandy*, 380 F.3d at 1283.  Because the Individual Plaintiffs seek to enjoin a law pre-enforcement, the Individual Plaintiffs can establish an injury sufficient to establish standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder."  *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward*, 321 F.3d at 1267).

### a.  Injury in Fact

First, Mr. Pineda and Mr. Mosgrove must show an intention to engage in a course of conduct arguably affected with a constitutional interest.  Their declarations indicate that both intend to purchase a firearm for the purpose of self-defense in their homes.[6] Docket No. 12-2 at 1, ¶ 2; Docket No. 12-3 at 1, ¶ 2.  The Supreme Court has ruled that

---

[6] In *Colo. Outfitters Ass'n*, 823 F.3d at 551, the Tenth Circuit found that plaintiffs in a Second Amendment case lacked standing based on not having "concrete plans to engage in conduct" that violates the challenged statute.  Here, the Individual Plaintiffs state they intend to purchase firearms, but do not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, or that they have taken any steps to prepare to purchase firearms.  *See* Docket No. 12-2; Docket No. 12-3.  At this phase of the proceedings, the Individual Plaintiffs have done enough to make a "clear showing," *Hobby Lobby Stores, Inc.*, 723 F.3d at 1185, that they intend to purchase firearms, but the Court does not pass on the Individual Plaintiffs' showing for purposes of other stages of the case.

"the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).  The Governor argues that the Second Amendment does not extend to the right to purchase a firearm as opposed to the right to "keep" and "bear" firearms.[7]  Docket No. 28 at 7.  Based on Mr. Mosgrove's and Mr. Pineda's representations that the purchase is at least partly for self-defense, the Court finds the Individual Plaintiffs' proposed course of conduct is "arguably affected with a constitutional interest," *Babbitt*, 442 U.S. at 298, under the Second Amendment.

Next, the Individual Plaintiffs must show that their conduct is proscribed by statute. *Id.*  Mr. Mosgrove and Mr. Pineda do not state whether they seek to purchase a firearm through a licensed gun dealer or through a private sale, *see* Docket No. 12-2 at 1; Docket No. 12-3 at 1, but SB23-169 criminalizes both for 18-to-20 year olds.  *See* Colo. Rev. Stat. §§ 18-12-112, 18-12-112.5.  Purchasing a firearm from either a licensed gun dealer or a private party would constitute a class two misdemeanor under SB23-169

---

[7] The Governor raises his argument about the right to purchase firearms in the merits portion of his brief.  The test for determining whether a plaintiff has suffered an injury arguably affected by a constitutional interest for Article III standing purposes is different from the test for the likelihood of success on the merits prong of a preliminary injunction. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 (8th Cir. 2021) ("The standard reaffirmed in *Susan B. Anthony List* does no work for Plaintiffs beyond the standing context.  Although related, our analysis of whether Plaintiffs have standing on their First Amendment claim at this stage in the litigation is separate from our analysis of whether the claim is likely to prevail on the merits.").  The Court nevertheless addresses the Governor's argument to the extent it can be construed to challenge the Individual Plaintiffs' standing.

because both the Individual Plaintiffs were under the age of 21 at the time of filing.[8] Therefore, the Court finds that the Individual Plaintiffs have demonstrated their proposed course of conduct is proscribed by statute.

Finally, the Individual Plaintiffs must establish a credible threat of prosecution. The Tenth Circuit has recognized "at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *Peck*, 43 F.4th at 1132 (quotations and citation omitted). "[A] plaintiff need not risk actual prosecution before challenging an allegedly unconstitutional criminal statute." *Bronson*, 500 F.3d at 1107. The most credible threats of prosecution exist in "pre-enforcement claims brought after the entity responsible for enforcing the challenged statute actually threatens a particular plaintiff with arrest or even prosecution." *Id.* at 1108. "These claims can be juxtaposed with" those cases where "affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute prevents a 'threat' of prosecution from maturing into a 'credible' one, even when the plaintiff previously has been arrested under the statute." *Id.*

---

[8] Mr. Mosgrove and Mr. Pineda state they were under 21 as of June 2, 2023, Docket No. 12-2 at 2; Docket No. 12-3 at 2. The Court has no indication that the Individual Plaintiffs have turned 21 since June 2, 2023, but, moving forward, this question will be relevant to determining whether any requests for continuing injunctive relief are moot. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 326 (4th Cir. 2021).

14

Here, the statute is new, there is no evidence of an assurance that the statute will not be enforced, and there is no indication that the statute is moribund based on a change in controlling law.  *Cf. Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) ("Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing." (citing *Babbit*, 442 U.S. at 301-02)).  For the purpose of a preliminary injunction, the Individual Plaintiffs have made a clear showing of a credible threat of prosecution.[9]  Accordingly, the Individual Plaintiffs have shown an injury-in-fact sufficient to establish Article III standing.

### b.  Causation and Redressability

To establish the second and third elements of Article III standing, the Individual Plaintiffs must show "there is a causal connection between the injury and the conduct complained of; and [] it is likely that the injury will be redressed by a favorable decision." *Ward*, 321 F.3d at 1266 (citation omitted).  Neither party addresses causation or

---

[9] Some courts require individualized threats of enforcement for cases asserting rights other than those guaranteed by the First Amendment.  *See, e.g.*, *Angelo v. District of Columbia*, --- F. Supp. 3d ----, 2022 WL 17974434, at *4 (D.D.C. Dec. 28, 2022) ("binding D.C. Circuit case law demands more [evidence of a credible threat] than does [*Babbit*] — at least where the plaintiff presents a non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings.  In those contexts, plaintiffs must establish that the threat of prosecution is not only credible, but also imminent.  In other words, plaintiffs bringing a preenforcement challenge must demonstrate that their prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution." (internal citations, alterations, and quotations omitted)).  Neither party addresses the relevant standard in this circuit.  Finding no evidence this is the standard in the Tenth Circuit, the Court will decline to apply this requirement.

15

redressability.  *See generally* Docket No. 12; Docket No. 28.  The Court finds the Individual Plaintiffs have established both.

    Relevant to establishing causation, the Individual Plaintiffs allege the Governor "will enforce the unconstitutional provisions of the law against Plaintiffs."  Docket No. 12 at 3, ¶ 4.  The Governor argues that, for purposes of Eleventh Amendment immunity as described in *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013), "he does not 'have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty,'" but states that he waives his Eleventh Amendment immunity. Docket No. 28 at 3 n.2.  The Court notes that, in determining causation in an analysis of whether a party has standing, "there is a common thread between Article III standing analysis and *Ex parte Young*[, 209 U.S. 123 (1908)] analysis."  *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013).  The Governor's comment on his lack of a particular duty to enforce SB23-169 could be interpreted as an attack on the causation element of the Individual Plaintiffs' standing because the two inquiries are related.  The Court, however, finds that the Governor "possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute" because "[t]he Colorado Constitution states that the 'supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.'"  *Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013) (quoting Colo. Const. Art. IV, § 2), *aff'd in part sub nom. Colo. Outfitters Ass'n*, 823 F.3d at 554-55.  Enjoining the enforcement of SB23-169 would redress the Individual Plaintiffs' injuries by removing the alleged violation of their Second Amendment rights.  *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 978

16

(10th Cir. 2020).

## B. Likelihood of Success on the Merits

In order for the Court to grant a plaintiff's motion for a preliminary injunction, the

plaintiff must demonstrate "a likelihood of success on the merits." *RoDa Drilling Co.*,

552 F.3d at 1208.

> The purpose of a preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be held.  Given this
> limited purpose, and given the haste that is often necessary if those
> positions are to be preserved, a preliminary injunction is customarily
> granted on the basis of procedures that are less formal and evidence that
> is less complete than in a trial on the merits.  A party thus is not required
> to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Progress Development*

*Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).  The Individual Plaintiffs raise a facial

challenge to the validity of SB23-169.[10]  As stated above, the amended complaint brings

one claim on behalf of all plaintiffs alleging that the restrictions in SB23-169 "infringe on

---

[10] The Individual Plaintiffs do not explicitly state that they bring a facial challenge as
opposed to an as-applied challenge in their motion for preliminary injunction.  *See*
Docket No. 12.  The Individual Plaintiffs indicate they are challenging the statute in both
ways in their amended complaint.  *See* Docket No. 9 at 6, ¶ 23 ("SB23-169 is
unconstitutional on its face or as applied").  It is unclear what the Individual Plaintiffs' as-
applied challenge is and, for purposes of this motion, the Court presumes the Individual
Plaintiffs' challenge is facial because SB23-169 has not been enforced against any of
the Individual Plaintiffs.  *See Colo. Outfitters Ass'n*, 24 F. Supp. 3d 1050, 1058 n.8 (D.
Colo. 2014) ("Challenges to the constitutionality of statutes can take two forms.  There
can be a challenge as to how the law has actually been applied to a plaintiff (an 'as-
applied' challenge) or, there can be a challenge based solely on its language and
anticipated applications (a 'facial' challenge).  Here, because the statutes have not been
enforced against any Plaintiff, only facial challenges have been asserted."), *vacated and
rev'd on other grounds, Colo. Outfitters Ass'n*, 823 F.3d at 554-55.

the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment."  Docket No. 9 at 6, ¶ 20.

### 1. Legal Framework for Second Amendment Claims

On June 23, 2022, the Supreme Court announced its decision in *Bruen*, 142 S. Ct. 2111.  The Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Id.* at 2122.  In evaluating a Second Amendment claim, the Court declined to adopt the two-step approach the courts of appeal had developed, in which, "at the second step, courts often analyze how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."  *Id.* at 2122, 2126 (quotations and citations omitted).  *Bruen* held that the "two step test" has one step too many and that means-end scrutiny of laws that infringe upon Second Amendment rights is not supported by the Court's opinions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Bruen*, 142 S. Ct. at 2117-18.

*Bruen* states that the appropriate test for applying the Second Amendment is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  In order to determine whether the plain text of the Second Amendment covers a plaintiff's conduct, a court must determine whether plaintiff is "part of 'the people' whom the Second Amendment protects" and if the firearms at issue are "weapons 'in common

18

use' today for self-defense."[11]  *Id.* at 2134 (quoting *Heller*, 554 U.S. at 580, 627).  Next, a court determines whether the plaintiff's "proposed course of conduct" is protected by the plain text of the Second Amendment.  *Id.*  After determining that a plaintiff's conduct is covered, the burden shifts to the government to demonstrate that the challenged regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id.* at 2135.

To perform the inquiry into the Nation's historic tradition, *Bruen* states the text of the Second Amendment must control over later history that contradicts the text.  *Id.* at 2137. *Bruen* also states that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Id.* at 2138.  *Bruen* did not resolve this debate because it was not necessary for purposes of examining the challenged statute, observing only that it "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id.* at 2137-38.

Since the Supreme Court's ruling in *Bruen*, few courts have addressed the evidentiary burdens necessary to preliminarily enjoin a law on Second Amendment

---

[11] The Governor observes that federal law already prohibits licensed gun dealers from selling shotguns and rifles to anyone under 18 years old and selling all other firearms to anyone under 21 years old.  Docket No. 28 at 3 (citing 18 U.S.C. § 922(b)(1)).  The effect of SB23-169 would be to limit 18-to-20 year olds' ability to purchase shotguns and rifles from licensed gun dealers and to prohibit 18-to-20 year olds from purchasing any firearm in private sales.

grounds.  On the likelihood of success on the merits prong, the Governor argues that, because *Bruen* is silent on who carries the burden of establishing that the proposed conduct falls within the plain text of the statute, the Individual Plaintiffs should bear the burden.  Docket No. 28 at 6 n.3.  Courts that have considered this issue have ruled that, in order for plaintiffs to carry their burden on the likelihood of success on the merits prong, plaintiffs must show their conduct is covered by the Second Amendment and that plaintiffs' burden remains unchanged for the remaining three prongs of the preliminary injunction requirements.  *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, --- F. Supp. 3d. ----, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022), *appeal dismissed*, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Baird v. Bonta*, --- F. Supp. 3d. ----, 2022 WL 17542432, at *5–6 (E.D. Cal. Dec. 8, 2022).  The Court agrees with the analysis in *Oregon Firearms* and *Baird* and will analyze the Individual Plaintiffs' motion by allocating burdens in the same way.

### 2.  Scope

First, the Individual Plaintiffs must establish that their proposed conduct falls within the scope of the Second Amendment.  *Bruen*, 142 S. Ct. at 2129-30.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  The Individual Plaintiffs state that their proposed course of conduct is to "purchase firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.

### a.  Right of the People

In determining whether their proposed conduct is within the scope of the Second

Amendment, a threshold question is whether the Individual Plaintiffs are part of "the people" the Second Amendment protects. *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3rd Cir. 2023) (en banc). Neither *Heller* nor *Bruen* defines the scope of the phrase "the people" because it was undisputed that the plaintiffs in each case were a part of "the people." *Id.* The Second Amendment "codifies a 'right of the people.'" *Heller*, 554 U.S. at 579. *Heller* states that in every other instance where the unamended Constitution and Bill of Rights references a right of "the people" that the right is exercised individually and belongs to "all members of the political community, not an unspecified subset." *Id.* at 579-81 (citing U.S. Const. Amends. I, IV). Thus, *Heller* began "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. *Bruen* states that it is undisputed that "ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *See* 142 S. Ct. at 2134.

The Governor argues that "the people" does not include 18-to-20 year olds based on a "textual-historical" inquiry of how the term "the people" was used in 1787. Docket No. 28 at 10-11. First, the Governor argues that 18-to-20 year olds were considered minors without full legal protections when the Second Amendment was adopted (which the Court will refer to as the "founding era") and that 18-to-20 year olds were only recognized as part of the political community in the late 20th century. *Id.* at 11. Second, the Governor argues that the age of majority at the time the Second Amendment was adopted by Colorado was 21 and nothing prevents Colorado from using its long-held age of majority at 21 to regulate firearm purchases. *Id.* Finally, the Governor argues that declining to engage in a textual-historical inquiry into the meaning

21

of the words "the people" defies *Heller's* holding; therefore, this Court should not rely on cases that do not perform such inquiry. *Id.* at 12.

The Individual Plaintiffs argue that, under *Heller*, "the people" applies to all Americans, that comparison to other provisions of the Constitution reveals that the Second Amendment does not include an age limit, and that, because 18-to-20 year olds were required to serve in militias at the time of the Bill of Rights' adoption, it would be inconceivable to conclude they had anything but full rights regarding firearms. Docket No. 30 at 6-8.

Recently, in *Range*, 69 F.4th 96, the Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in 18 U.S.C. § 922(g)(1). *Range* ruled that "the people" included felons. *Id.* at 103. The court provided four reasons why it believed felons were included in "the people": (1) references to law-abiding responsible citizens in *Heller*, *McDonald*, and *Bruen* were dicta because criminal history was not at issue in those cases, (2) other provisions of the Constitution that reference "the people" include felons and there is no reason to read the Second Amendment differently, (3) acknowledging permissible restrictions on the right to keep and bear arms for a group of people does not mean they are not a part of "the people," and (4) the phrase "law-abiding" is too broad to be understood as a part of the Second Amendment because it "devolves authority to legislators to decide whom to exclude from 'the people.'" *Id.* at 101-03.

In *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. Aug. 25, 2022), the court ruled that 18-to-20 year olds are part of "the people" under the Second Amendment. The court observed that the Second Amendment does not

include an age restriction, unlike other parts of the Constitution that list an explicit age restriction such as the requirement in Section 2 of Article I that members of the House of Representatives be at least 25 years old, the requirement in Section 3 of Article I that senators be at least 30 years old, and the requirement in Section 1 of Article II that the president be at least 35 years old.  *Id.*  As in *Heller*, the court compared definitions of "the people" in other constitutional amendments, which have been held to include 18-to-20 year olds, to bolster its conclusion that "the people" in the Second Amendment includes 18-to-20 year olds.  *Id.* at 748-49.  Specifically, the court observed that the First and Fourth Amendments extend their protections to 18-to-20 year olds.  *Id.*  The court also looked at individual rights guaranteed by the Constitution that are not specifically a "right of the people," observing that the Fifth and Fourteenth Amendments include 18-to-20 year olds and that, in the context of the Eighth Amendment, "the Supreme Court has said that where 'a line must be drawn,' '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood.'"  *Id.* at 749 (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)).  Finally, the court reasoned that, because *Heller* interpreted the prefatory clause of the Second Amendment to announce that the purpose of the Amendment is to "prevent elimination of the militia" and because 18-to-20 year olds could be required to join a militia, "[i]t would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn."  *Id.* at 749-50 (quoting *Heller*, 554 U.S. at 599).

In *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012), the Tenth Circuit considered whether the Second Amendment extends to non-citizens.  The court

cautioned against reading "an unwritten holding into *Heller*" by interpreting *Heller's* reference to "citizens" as conclusive as to whom "the people" refers because the issue was not before the Court in *Heller* and because "the question seems large and complicated."  *Id.* at 1169.  The court declined to pass on the question without the benefit of a full record and adversarial argument.  *Id.*

The Governor states minors under 21 did not have "full legal rights" and that 18-to-20 year olds "did not enjoy significant legal rights at the founding."  Docket No. 28 at 11-12. The Governor argues that "[o]nly in the late 20th century did our Nation recognize 18-to-20-year-olds' role in the political community with First Amendment protection and the right to vote under the Twenty-Sixth Amendment."[12]  *Id.* at 11.  The Governor cites a declaration prepared by historian Saul Cornell[13] (the "Cornell report") to support the claim that 18-to-20 year olds were not recognized as being part of the "political community" until the late 20th century.  *See id.* (citing Docket No. 28-1 at 23-24).  The Cornell report states that, because 18-to-20 year olds were considered minors, it is

---

[12] The Governor cites Justice Thomas' concurrence in *Morse v. Frederick*, 551 U.S. 393, 410 (2007).  Docket No. 28 at 11.  In *Morse*, Justice Thomas opined that in his view "the history of public education suggests that the First Amendment, as originally understood, does not protect student speech in public schools."  551 U.S. at 410-11. Justice Thomas' concurrence does not argue that children or students outside of schools were not part of "the people" referenced in the First Amendment and instead describes speech in public schools as exempted from First Amendment restrictions. *See id.*  Justice Thomas' concurrence supports historical readings that limit the rights of minors, but does not support excluding minors from the Constitution's provision of individual rights granted to "the people."

[13] Dr. Saul Cornell is "the Paul and Diane Guenther Chair in American History at Fordham University in New York City."  Docket No. 28-1 at 2.

anachronistic to assume that, at the time of the founding, they had a legal right to keep and bear arms.  Docket No. 28-1 at 14.

The Court is persuaded by the reasoning in *Range* and *McCraw* that an interpretation of "the people" in the Second Amendment should begin with the assumption that every American is included.  In reaching this conclusion, the Court is careful not to read *Heller* or *Bruen* as limiting to whom "the people" refers.  Moreover, the Court finds that the Governor has not shown a "historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, of 18-to-20 year olds during the founding era, as opposed to him citing evidence supporting an argument that states could have regulated 18-to-20 year olds because they lacked rights as minors.  Thus, the Court finds that the Individual Plaintiffs have shown a likelihood of success on the merits on the question of whether the Second Amendment applies to 18-to-20 year olds.

### b. Proposed Conduct

Next, the Individual Plaintiffs must show that the plain text of the Second Amendment covers their conduct.  *Bruen* ruled that the Second Amendment covers "carrying handguns publicly for self-defense," and *Heller* and *McDonald* ruled that the Second Amendment covers "possess[ing] a handgun in the home for self-defense."  *Bruen*, 142 S. Ct. at 2122.  The Governor argues the Individual Plaintiffs' course of conduct is not protected by the Second Amendment because there is no Second Amendment right to purchase firearms.  Docket No. 28 at 7-8.  The Individual Plaintiffs, on the other hand, argue that the right to keep and bear arms impliedly includes a right to acquire arms. Docket No. 30 at 1.

The Court must first decide what the Individual Plaintiffs intend to do to exercise their

25

alleged Second Amendment rights.  The Individual Plaintiffs categorize their proposed course of conduct as "purchas[ing] firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.  Mr. Mosgrove has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[14]  Docket No. 12-2 at 1, ¶ 2.  Mr. Pineda has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[15]  Docket No. 12-3 at 1, ¶ 2.  Thus, based on the declarations, the Court finds that the Individual Plaintiffs have a stated intention to purchase firearms, in an otherwise lawful manner, not having any felony or misdemeanor convictions, for lawful reasons including self-defense in their homes.

The second question is whether the Second Amendment's right to "keep" and "bear" arms extends to the Individual Plaintiffs' intended conduct.  The Individual Plaintiffs claim the right to keep firearms necessarily implies the right to acquire arms.  Docket No. 12 at 5.  The Individual Plaintiffs claim that it is settled law that Constitutional rights protect closely related acts necessary to their exercise and that purchasing firearms is necessary for keeping and bearing arms.  Docket No. 30 at 1.  Additionally, the Individual Plaintiffs argue that a total prohibition on a right is not necessary to show a

---

[14] Mr. Mosgrove does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-2 at 1, ¶ 2.

[15] Mr. Pineda does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-3 at 1, ¶ 2.

right is infringed.  *Id.* at 2.  The Governor argues that the Individual Plaintiffs have made an insufficient showing that the right to keep arms includes a right to buy firearms. Docket No. 28 at 7-8.  Additionally, the Governor argues the Individual Plaintiffs have not shown that their right to self-defense is burdened because SB23-169 has not gone into effect and therefore the Individual Plaintiffs still have the ability to purchase firearms.[16]  *Id.* at 8.

Several courts have ruled that the right to keep arms necessarily includes a right to acquire arms.  *See, e.g., Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (quotations and citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."); *United States v. McNulty*, --- F. Supp. 3d. ----, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase, sell, or otherwise transfer firearms in order to keep oneself properly armed."); *Renna v. Bonta*, 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023) ("the right to keep arms, necessarily involves the right to purchase them."), *appeal filed*, No. 23-55367 (9th Cir.

---

[16] This argument is more appropriately considered in evaluating whether the Individual Plaintiffs have shown that they face irreparable harm absent a preliminary injunction, and the Court will address the Governor's argument in its discussion of the irreparable harm prong.

Apr. 20, 2023).

The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct. *See Teixeira*, 873 F.3d at 677; *Ezell*, 651 F.3d at 704. For purposes of a preliminary injunction, the Individual Plaintiffs have sufficiently demonstrated a likelihood of success in showing their proposed conduct is covered by the plain text of the Second Amendment.

### 3. Historical Tradition

The Court has found that the Individual Plaintiffs' proposed course of conduct, purchasing firearms for self-defense in the home, is covered by the plain text of the Second Amendment. Under *Bruen*, the government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. Thus, for purposes of this case, the Governor has the burden of establishing that SB23-169 is "consistent with the Nation's historical tradition of firearm regulation" such that the Individual Plaintiffs' conduct "falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg*, 366 U.S. at 50 n.10).

#### a. Presumptively Lawful Regulations

First, the Governor argues that SB23-169 falls within one of the categories of firearm regulations that the Supreme Court has found to be presumptively lawful, namely, "conditions and qualifications on the commercial sale of arms." Docket No. 28 at 8-10. The Governor relies on *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124-25 (10th Cir. 2015) (citation and quotations omitted), where the court opined that the presumptively

28

lawful categories of regulations identified by *Heller* cannot be ignored since the Tenth

Circuit is "bound by Supreme Court dicta almost as firmly as by the Courts' outright

holdings, particularly when the dicta is recent and not enfeebled by later statements."

As a result, the Governor argues that *Bonidy* "demonstrates that courts cannot

disregard *Heller's* carve outs."  Docket No. 28 at 10.  The Individual Plaintiffs respond

that, in light of *Bruen*, it is inappropriate to presume a regulation is lawful as that would

improperly shift the burden to the Individual Plaintiffs to point out why a law is

unconstitutional.  Docket No. 30 at 3.

    In *Heller*, the Court states:

> Although we do not undertake an exhaustive historical analysis today of
> the full scope of the Second Amendment, nothing in our opinion should be
> taken to cast doubt on longstanding prohibitions on the possession of
> firearms by felons and the mentally ill, or laws forbidding the carrying of
> firearms in sensitive places such as schools and government buildings, or
> laws imposing conditions and qualifications on the commercial sale of
> arms.

> We identify these presumptively lawful regulatory measures only as
> examples; our list does not purport to be exhaustive.

554 U.S. at 626-27 & n.26.  In *Bruen*, Justice Kavanaugh filed a concurring opinion,

joined by the Chief Justice, that repeated *Heller's* description of presumptively lawful

regulations and noted that Justice Alito's concurring opinion in *McDonald* used the

same description.  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

    The Court rejects the Governor's argument that SB23-169 is presumptively lawful for

two reasons.  First, the Court disagrees with the Governor's reading of *Heller* as

exempting certain types of regulations at the first step of the *Bruen* test.  *Bruen* does not

suggest that a different test applies to certain categories of laws or regulations.  *Id*. at

2132-33.  Rather, *Bruen* is clear that the government must justify the constitutionality of

any law regulating conduct covered by the plain text of the Second Amendment.
Justice Kavanaugh's concurrence also does not state that regulations falling into the
"presumptively lawful" categories should be subject to a different test.  *See id.* at 2162.
Additionally, the Court disagrees with the Governor's reading of *Bonidy* to the extent it
suggests a different test for "presumptively lawful" regulations.  Acknowledging *Bonidy's*
admonition not to ignore the language of *Heller* as dicta, the Court reads *Heller* to
provide examples of laws or regulations that lawfully limit or qualify rights under the
Second Amendment in a way that aligns with the Nation's historical tradition of firearm
regulation.

Second, the Governor fails to show that SB23-169 falls into the category of
commercial regulations described by *Heller*.  Regulations of the commercial sale of
arms have been described as "condition[s] or qualification[s]" that "affect[] only those
who regularly sell firearms."  *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir.
2016).  SB23-169 does not base its prohibitions on 18-to-20 year olds because 18-to-20
year olds, as a group, regularly sell firearms.  Rather, SB23-169 categorically bans an
entire group of law-abiding citizens from purchasing firearms based on age.
Additionally, the Court is not persuaded that the pre-*Bruen* cases the Governor cites,
*see* Docket No. 28 at 9, suggest a different outcome for age-based firearm restrictions[17]

---

[17]  In *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489-91 (W.D. Pa. 2021), the court
decided age-based restrictions are longstanding and presumptively lawful without
evaluating whether the Nation's historic tradition of firearm regulations had similar
analogues specific to the challenged regulations.  In *Mitchell v. Atkins*, 483 F. Supp. 3d
985, 992-93 (W.D. Wash. 2020), *vacated*, 2022 WL 17420766 (9th Cir. Dec. 2, 2022),
the court concluded that the regulation on gun purchases by 18-to-20 year olds fell
outside the ambit of the Second Amendment in part because of the presumed

because these cases presume the lawfulness of the category of restriction and, as a result, do not follow the test for Second Amendment cases discussed in *Bruen*.

### b. Tradition of Age Based Regulations

*Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but provided "two metrics" to determine whether a regulation is within the Nation's historical tradition, namely, "how and why" the regulations burden a law-abiding citizen's right to armed self-defense. *Bruen*, 142 S. Ct. at 2132-33. *Bruen* acknowledged that:

> Analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

The Governor argues that SB23-169 is consistent with the Nation's past history of firearm regulation because: (1) "[t]his Nation has a longstanding history of placing age-restrictions on firearm purchases," and (2) "[m]id-to late-19th Century history 'is relevant'

---

lawfulness of age-based regulations. In *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. at 2127 n.4, the court upheld age-based firearm restrictions because, "[a]t a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety."

31

to understanding the Second Amendment's scope."  Docket No. 28 at 13-23.  The Governor claims that the Nation has a longstanding history of placing age restrictions on firearm purchases and, in support, cites English common law, founding era restrictions, evidence of the conception of founding era militias, pre-Civil War restrictions, and post-Civil War restrictions on gun possession and ownership.  Docket No. 28 at 13-18.  The Court addresses each time period in turn.

### i. Founding Era Laws

The Governor cites English common law to support the proposition that 18-to-20 year olds were not considered full adults and lacked legal contract authority, only having the capacity to be bound by contract for essentials like food, clothing, and lodging.  *Id.* at 14.  The Governor states that the American colonies followed the English common law in imposing legal limitations based on age.  *Id.*  As a result, the Governor argues that, because 18-to-20 year olds did not have full contractual rights at the founding, they did not have unfettered commercial rights which would extend to purchasing firearms.  *Id.*

In *Bruen*, the Court states:

> As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights.  The common law, of course, developed over time.  *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 533 n.28 (1983); *see also Rogers v. Tennessee*, 532 U.S. 451, 461 (2001).  And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution.

*Bruen*, 142 S. Ct. 2136.  The Court further observed, "in interpreting our own Constitution, it is better not to go too far back into antiquity for the best securities of our liberties, unless evidence shows that medieval law survived to become our Founders'

law." *Id.* (internal citations, quotations, and alterations omitted).

The Cornell report opines that:

> Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians . . . . There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).

Docket No. 28-1 at 21 (citing John E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L.Q. 449 (2008); Elizabeth Pleck, *Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present* (1987)). The Cornell report further opines that in the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and in protecting the interests of minors, demonstrating that, previously, minors had more state supervision over their commercial activity than any other legal entity in the founding era. *Id.* at 23 (citing Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2012)).

In support of the claim that parents' control over minors, consistent with English common law, continued into the founding era, the Cornell report provides evidence that, in the founding era, regulations on minors' ability to enter into contracts were commonplace because minors fell under their parents' authority. *Id.* at 22-23. The Cornell report and the Governor, however, do not identify any evidence that contractual restrictions on minors under the English common law or from the founding era were directed specifically at the acquisition of firearms by minors or whether the purchase of a firearm by 18-to-20 year olds, or anyone else, typically involved a contract, which limits the weight of this evidence in determining whether such evidence forms a

pertinent historical analogue to restrictions on 18-to-20 year olds' right to keep and bear arms.  *See McCraw*, 623 F. Supp. 3d. at 755 (observing that "the age of majority — even at the [f]ounding — lacks meaning without reference to a particular right . . . . Instead, the relevant age of majority depends on capacity or activity." (citation omitted)).

The Governor states that gun safety regulations at the time the Second Amendment was adopted disarmed specific groups of people for safety reasons.  Docket No. 28 at 14.  For instance, founding era laws provided for "disarmament of those refusing to swear an oath of allegiance to the Nation or those who participated in Shays' Rebellion." *Id.* (citing *Nat'l Rifle Ass'n of America, Inc.*, 700 F.3d at 200).  Additionally, the Governor identifies rules at certain colleges that prohibited 18-to-20 year old students from possessing or discharging firearms on campus, noting that "college campuses were one of the few places in founding era society where 18-to-20 year olds lived outside of direct parental authority."  *Id.* at 15 (citing Docket No. 28-2 at 15-16, Declaration of Robert Spitzer[18]).

Colonial laws that disarmed persons who presented a risk of danger to the state or to the country are not analogous to a categorical ban on a segment of society that has not professed hostility to the state or to the nation.  *Cf. Range*, 69 F.4th at 104-105 (ruling "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of

---

[18] Dr. Robert Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland with expertise on "the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues."  Docket No. 28-2 at 2-3.

a similar group today.  And any such analogy would be 'far too broad.'" (quoting *Bruen*, 142 S. Ct. at 2134)).  Additionally, college codes of conduct that banned possession of firearms on campuses are not analogous to SB23-169.  The Spitzer Declaration does not indicate that college rules prohibited students from using or possessing firearms because of their age.  *See* Docket No. 28-2 at 15-18.  Such rules could just as easily have been based on their status as students living together in dormitories and are more comparable to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Bruen*, 142 S. Ct. at 2118, than a prohibition on purchasing firearms applicable to a category of people.  *See Fraser v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F. Supp. 3d ----, 2023 WL 3355339, at *20 (E.D. Va. May 10, 2023) (observing that "universities' regulations limiting the ability of students to carry firearms on campus are not 'analogous' to the wholesale prohibition on 18-to-20-year-olds from purchasing firearms manifest in the statutes and regulations here at issue").  Thus, the Court finds that the Governor has not identified founding era gun laws that are analogous to SB23-169.

### ii. Founding Era Militia Laws

The Governor argues that militia service during the founding era does not demonstrate a right by 18-to-20 year olds to purchase firearms and "instead demonstrate[s] the extensive control that States had over 18-to-20-year-olds in early America."  Docket No. 28 at 16.  The Governor points out that minors participating in militias acted under the supervision of adults, that parents often supplied firearms for their minor children's participation in militias, and that militia members possessed firearms in "coordinated and rigorous military service, distinct from everyday civilian life."

35

*Id.*  The Cornell report opines that:

> Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.

Docket No. 28-1 at 28.  The Cornell report highlights 18-to-20 year olds' participation in militias as a duty under supervision by patriarchal authority frameworks that regarded minors as existing under the authority of their fathers.  *Id.* at 26-27.  The report notes that minors were regarded as being similar to "madmen" and "idiots."  *Id.* at 27 (quoting John Fauchereaud Grimké, *The South Carolina Justice of the Peace*, 117 (1788)).

The Court agrees with the Governor that service by 18-to-20 year olds in militias does not prove that such persons had an unfettered right to possess firearms outside of militias.  *See* Docket No. 28 at 16; *see also Fraser*, 2023 WL 3355339, at *15 ("The Court is also cognizant of the Eleventh Circuit's admonition not to confuse the legal *obligation* to perform militia service with the *right* to bear arms.").  The Governor's argument, however, does not carry his burden to show an analogous restriction on the sale of firearms to 18-to-20 year olds.

### iii. Post Second Amendment Ratification Regulations

The Governor argues that the Court cannot ignore 19th century history and focus only on founding era history because *Bruen* did not determine whether courts should look for historical analogues in founding era history or history at the time the Fourteenth Amendment was ratified.  Docket No. 28 at 21-23.  The Governor observes that *Bruen* declined to address "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in

1868 when defining its scope (as well as the scope of the right against the Federal Government)" because it ruled that public understanding of the right to keep and bear arms did not differ between 1791 and 1868 in any relevant way. *See* 142 S. Ct. at 2138.

*Bruen* observed that courts "must []guard against giving postenactment history more weight than it can rightly bear," that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," and that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2136-37 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *Heller*, 554 U.S. at 614).

The Governor identifies several restrictions on the use of firearms by minors after the ratification of the Bill of Rights. Docket No. 28 at 17-18. The Governor identifies the following pre-Civil War firearm laws involving minors: (1) a law from New York City in 1803 that held parents liable for the unlawful discharge of firearms by minors, *id.* at 17 (citing Docket No. 28-2 at 8-9); (2) laws from cities in Delaware in 1812, South Carolina in 1817, and Connecticut in 1835 that similarly imposed liability on parents for unlawful discharge of firearms by minors, *id.* (citing Docket No. 28-2 at 9); (3) laws passed in Kentucky in 1853, 1859, and 1860 that penalized selling gunpowder to those under fifteen without parental consent and selling certain weapons including pistols to minors and to any "slave, or free negro," *id.*; Docket No. 28-2 at 8-9; Docket No. 28 at 17; (4) a law from Alabama in 1856 that fined "anyone who sold, gave or lent a pistol or fighting

knife to a minor," Docket No. 28 at 17; Docket No. 28-2 at 10 (citing 856 Ala. Acts 17,

To Amend the Criminal Law, §1); and (5) a law from Tennessee in 1858 "prohibiting

selling, giving, or lending to a minor a pistol, fighting knife or 'like dangerous weapon.'"

Docket No. 28 at 17 (quoting Docket No. 28-2 at 9-10).

The description of the first two examples of firearm laws the Governor identifies

reveals that certain cities prohibited discharging firearms within city limits and shifted

liability to parents when minors discharged firearms.  *See* Docket No. 28-2 at 8-9.

These laws are not properly characterized as "restrictions on the use of firearms by

minors."  Docket No. 28 at 17.  These statutes regulate the discharge of firearms by the

general population and shift liability to parents for minors' tortious use of firearms.

The last three examples of laws that the Governor identifies can be properly

construed as prohibitions on minors' possession or purchase of firearms.  The Court

largely agrees with *Fraser's* analysis on these laws:

> Thus, by the eve of the Civil War, only three states had passed any form
> of restrictions on the ability of minors to purchase firearms and each of
> these was passed 65 years or more after the ratification of the Second
> Amendment.  This legislation therefore tells us nothing about the
> Founders' understanding of the Second Amendment.

*Fraser*, 2023 WL 3355339, at *21 (citations omitted).  Without any confirmation in the

form of founding era regulations, the Court does not consider three pre-Civil War

regulations as strong evidence of the "public understanding of the right to keep and bear

arms" at the time the Second Amendment was ratified.  *Bruen*, 142 S. Ct. at 2138.

Finally, the Governor identifies post-Civil War regulations that some states adopted

by the early 20th century.  Docket No. 28 at 17-18.  The Governor represents that, by

1900, 18 states and the District of Columbia adopted laws regulating firearm sales to

those under the age of 21 and that shortly thereafter 45 states had laws restricting the sale of firearms to minors. *Id.* at 17. The Individual Plaintiffs argue that, of the 17 post-Civil War laws the Governor identifies, *see* Docket No. 28-5 at 2-9*,* one did not prohibit the purchase of firearms, one is from a state that "operated under a fundamental misunderstanding of the right to bear arms," one was from a Western state that should be disregarded as overly restrictive under *Bruen*, and that seven other laws were adopted by States with no Second Amendment analogue. Docket No. 30 at 9-11. The Individual Plaintiffs argue that the remaining seven laws are not appropriate analogues to SB23-169 because they rely on a status, namely, legal minority, that does not apply to 18-to-20 year olds today. *Id.* at 11.

The Governor argues that the regulations he identifies burden the right to self-defense in a similar way to SB23-169 in that they burden persons under a certain age from accessing weapons, mostly by limiting their ability to purchase weapons. Docket No. 28 at 19-21. Additionally, the Governor argues that the regulations were in place for the same reason that SB23-169 was passed, to protect public safety, despite the fact that such laws would burden the right to self-defense. *Id.* at 20-21.

*Bruen* stated that the Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137. While it remains an open question as to how a court should weigh historical understandings of the Second Amendment at the time that the Fourteenth Amendment was adopted, *id.* at 2138, because the Governor fails to point to any evidence during the founding era that a total prohibition on the sale of firearms to minors was consistent with

39

the right to bear arms, the Court gives little weight to evidence from the time of the Fourteenth Amendment's ratification to limit the scope of the right to keep and bear arms. *Cf. McCraw*, 623 F. Supp. 3d at 757 (observing that relying on evidence from the Reconstruction Era alone would "give postenactment history more weight than it can rightly bear" (quoting *Bruen*, 142 S. Ct. at 2136)). The Court finds that the Governor has failed to meet his burden to demonstrate that SB23-169 is consistent with the Nation's historical tradition of firearms regulation. For the purpose of obtaining a preliminary injunction, the Individual Plaintiffs have demonstrated a likelihood of success on the merits.

### C. Irreparable Harm

In order to demonstrate entitlement to a preliminary injunction, the Individual Plaintiffs must show that the "[the movant] will suffer irreparable injury unless the injunction issues." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992)). "[T]he 'showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). The Supreme Court has opined that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). The Tenth Circuit has observed that "[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019). The Tenth Circuit has

40

ruled that violations of individual rights guaranteed under the Constitution constitute irreparable harm. *See Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

The Individual Plaintiffs argue that they face irreparable harm in the absence of an injunction because "a showing of the infringement of a constitutional right requires no further showing of irreparable injury." Docket No. 12 at 16 (citing *Free the Nipple-Fort Collins*, 916 F.3d at 805). The Governor responds that the Individual Plaintiffs have not shown that a constitutional violation is imminent, arguing that, to the extent the Individual Plaintiffs argue an inability to acquire firearms is a violation of their rights, the Individual Plaintiffs' ability to purchase firearms before SB23-169 took effect and their ability to possess and use a firearm under SB 23-169 mitigates the harm to the Individual Plaintiffs. Docket No. 28 at 24. The Individual Plaintiffs reply that they need an injunction when SB23-169 becomes effective. Docket No. 30 at 14.

Here, because SB23-169 likely causes a violation of the Individual Plaintiffs' individual constitutional rights, *see Aposhian*, 958 F.3d at 990 (observing that "our cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government"), resulting in damages that are potentially inadequately remedied by money and "difficult[ to] calculat[e]," *Free the Nipple-Fort Collins*, 916 F.3d at 806, the Court finds the Individual Plaintiffs have shown irreparable injury.

### D. Balancing the Equities and Public Interest

The Individual Plaintiffs must demonstrate "that the balance of equities tips" in their favor and "that the injunction is in the public interest." *RoDa Drilling Co.*, 552 F.3d at

1208.  The Individual Plaintiffs argue that "the State's interest in enforcing an unconstitutional law does not outweigh [the Individual] Plaintiffs' interest in having their constitutional rights protected" and that "it is always in the public interest to prevent the violation of a party's constitutional rights."  Docket No. 12 at 17.  The Governor responds that the State suffers an injury when it cannot enact a law and that, in the case of SB23-169, public safety will be threatened if a pre-enforcement injunction issues.  Docket No. 28 at 24-25 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  On the record before the Court, the Individual Plaintiffs have made a sufficient showing that the balance of equities tips in their favor and that the Individual Plaintiffs' proposed injunction is in the public interest because the Individual Plaintiffs have made a sufficient showing that SB23-169 infringes the Individual Plaintiffs' Second Amendment rights.[19] *See Free the Nipple-Fort Collins*, 916 F.3d at 806-07 ("When a constitutional right hangs in the balance, though, even a temporary loss usually trumps any harm to the defendant. . . .  [I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotations and citations omitted)).

## IV. SECURITY

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

---

[19] Neither party addresses how the balance of the equities should be addressed in a Second Amendment case or what effect the government's interest in public safety has on the cases.  *See* Docket No. 28 at 24-25; Docket No. 30 at 14.  The Court is unaware of any Tenth Circuit precedent describing how cases with these circumstances should be evaluated.

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A trial court has "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotations and citation omitted). It is, however, reversible error to fail to consider whether to require a bond. *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). The parties do not address whether a bond should be required.[20] *See generally* Docket Nos. 12, 28, 30. The Court finds a bond unnecessary as this case seeks to enforce a constitutional right against the government. *See United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (citing *RoDa Drilling Co.*, 552 F.3d at 1215).

## V. CONCLUSION

It is **ORDERED** that the portion of plaintiffs' Motion for Preliminary Injunction [Docket No. 12] brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED**. It is further

**ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23-169. It is further

**ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits. It is further

---

[20] The proposed order in plaintiffs' motion for a temporary restraining order, Docket No. 34-1 at 2, ¶ 6, states "Plaintiffs do not need to post a security bond because enjoining the Defendant from prohibiting Plaintiffs' exercise of their Second Amendment rights does not interfere with the Defendant's rights."

**ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c).  It is further

**ORDERED** that plaintiffs' Motion for Temporary Restraining Order [Docket No. 34] is

**DENIED as moot**.

DATED August 7, 2023.

BY THE COURT:

s/Philip A. Brimmer
Philip A. Brimmer
Chief United States District Judge