23-1251

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| JARED POLIS, in his official capacity as Governor of the State of Colorado, | |
| Defendant - Appellant, | |
| v. | |
| ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA, | |
| Plaintiffs - Appellees. | |

On Appeal from the United States District Court, District of Colorado
The Honorable Phillip A. Brimmer
Chief District Judge

District Court Case No. 23-cv-01077-PAB-NRN

### APPELLANT'S BRIEF

PHILIP J. WEISER
Attorney General
GRANT T. SULLIVAN*
Assistant Solicitor General
MICHAEL T. KOTLARCZYK *
Senior Assistant Attorney General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone:  720-508-6349
E-Mail:  grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record
*Attorneys for Governor Polis*

### ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE.............................................................3

    A. Background and Procedural History ...........................................3

    B. The Parties' Evidence...............................................................4

    C. The District Court's Order.........................................................6

SUMMARY OF THE ARGUMENTS ..................................................9

JURISDICTION.................................................................................13

ARGUMENT ....................................................................................13

I.    Plaintiffs' declarations were insufficient to establish Plaintiffs' standing. .........................................................................................13

II.   The district court abused its discretion when it held Plaintiffs were likely to succeed under *Bruen*. .......................................................15

    A. Plaintiffs failed to demonstrate that the Second Amendment's text covers their proposed conduct. .................................................16

        1. The Second Amendment's plain text was never understood to cover gun purchases by those under 21. ...................................18

            a) Plaintiffs failed to carry their burden at *Bruen*'s first step. .....18

            b) Courts cannot imply rights under the Second Amendment's plain text without considering historical evidence. .................24

        2. The plain text of the Second Amendment does not cover 18-to-20-year-olds. .......................................................................31

            a) 18-to-20-year-olds were not part of the "political community" at the Founding. ......................................................31

            b) The Second Amendment does not displace the States' power to set reasonable minimum age limits for activities that involve a constitutional right. ..................................................34

        3. Age-restrictions on commercial sales are "presumptively lawful," and the district court erred by abandoning *Heller*'s "presumptively lawful" categories of gun regulations. ...........................................37

a)  SB23-169's age-restriction is a "presumptively lawful" gun regulation. ..................................................................38

b)  The district court wrongly evaluated the Supreme Court's "presumptively lawful" category at *Bruen*'s second step.........41

B.  Even if Plaintiffs were likely to succeed on *Bruen*'s first step, this Court should reverse because SB23-169 is relevantly similar to historic regulations on firearms at *Bruen*'s second step. .......................................43

1.  The Governor's evidence demonstrated a "relevantly similar" tradition of firearm regulation from the Founding through the 19th century. ..........................................................................................45

2.  The district court applied the wrong standard at *Bruen*'s second step. ..........................................................................................50

a)  The district court wrongly required identification of a "total prohibition" from the Founding era, *i.e.* a "dead ringer." ........50

b)  The district court wrongly rejected the Governor's Reconstruction-era evidence, despite its consistency with earlier traditions. .................................................................................54

III.  The remaining factors do not support the preliminary injunction. ...........59

CONCLUSION .........................................................................................62

STATEMENT REGARDING ORAL ARGUMENT ...........................................62

District Court's Order Granting Preliminary Injunction .......................... Exhibit A

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State,*
  50 Tenn. 165 (Tenn. 1871) ........................................................... 29, 30

*Atkinson v. Garland,*
  70 F.4th 1018 (7th Cir. 2023) ..............................................................28

*Att'y Gen. of Okla. v. Tyson Foods, Inc.,*
  565 F.3d 769 (10th Cir. 2009) .............................................................16

*Bevis v. City of Naperville, Ill.,*
  85 F.4th 1175 (7th Cir. 2023) ..............................................................17

*Bond v. United States,*
  572 U.S. 844 (2014) ...........................................................................34

*Bonidy v. U.S. Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015) ...................................................... 33, 41

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ................................................ 33, 35, 45, 52, 53

*NYSRPA v. Bruen,*
  597 U.S. 1 (2022) ..................7-11, 15-18, 21-29, 32-34, 38-48, 50-52, 54-58, 60

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011) ...............................................................15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980) ...........................................................................38

*Chiafalo v. Washington,*
  140 S. Ct. 2316 (2020) .......................................................................37

*Coleman v. State,*
  32 Ala. 581 (Ala. 1858) ......................................................................49

*Colo. Outfitters Ass'n v. Hickenlooper,*
  823 F.3d 537 (10th Cir. 2016) .............................................................13

*Def. Distributed v. Bonta,*
  2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...................................25

*Denver Homeless Out Loud v. Denver*,
   32 F.4th 1259 (10th Cir. 2022)..............................................................22

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...7, 8, 10, 11, 18-20, 24-27, 31-33, 37-43, 45, 55, 56, 58, 60

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..............................................................................61

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ..................................................... 29-31, 58

*Ezell v. City of Chicago*,
   846 F.3d 888 (7th Cir. 2017) ................................................................30

*Firearm Pol'y Coal., Inc. v. McCraw*,
   623 F. Supp. 3d 740 (N.D. Tex. 2022)..................................................36

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016)...............................................................61

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
   916 F.3d 792 (10th Cir. 2019)...................................................... 16, 59

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ..............................................................................21

*Hanson v. D.C.*,
   2023 WL 3019777 (D.D.C. Apr. 20, 2023) ..........................................57

*Harmon v. City of Norman, Okla.*,
   981 F.3d 1141 (10th Cir. 2020)..............................................................21

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003)..............................................................59

*Jones v. Jones*,
   72 F.2d 829 (D.C. Cir. 1934)..................................................................34

*Lara v. Evanchick*,
   534 F. Supp. 3d 478 (W.D. Pa. 2021) ...................................................40

*Lassiter v. Northampton Cnty. Bd. of Elections*,
   360 U.S. 45 (1959) ................................................................................35

*Lenahan v. Pittston Coal Mining Co.*,
   218 Pa. 311 (Pa. 1907)...................................................................... 34, 35

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ..................................................................15

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................................15

*Maryland v. King,*
    567 U.S. 1301 (2012) .............................................................................61

*Maynard v. Hill,*
    125 U.S. 190 (1888) ...............................................................................35

*McCulloch v. Maryland,*
    4 Wheat. 316 (1819) ...............................................................................58

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ................................................... 19, 33, 55, 58, 60

*Mitchell v. Atkins,*
    483 F. Supp. 3d 985 (W.D. Wash. 2020) ..............................................40

*Morse v. Frederick,*
    551 U.S. 393 (2007) ...............................................................................33

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior,*
    854 F.3d 1236 (10th Cir. 2017) ..................................................... 15, 60

*Nat'l Ass'n for Gun Rts. v. Lamont,*
    2023 WL 4975979 (D. Conn. Aug. 3, 2023).........................................22

*Newland v. Gentry,*
    57 Ky. 666 (Ky. 1857)...........................................................................48

*Nken v. Holder,*
    556 U.S. 418 (2009) ...............................................................................61

*Nova Health Sys. v. Gandy,*
    416 F.3d 1149 (10th Cir. 2005)..............................................................14

*NRA v. BATFE,*
    700 F.3d 185 (5th Cir. 2012)..................................................................47

*NRA v. Bondi,*
    61 F.4th 1317 (11th Cir. 2023)............................................... 28, 48, 58

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ...............................................................................35

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022) ......................................................22

*Or. Firearms Fed'n v. Kotek*,
2023 WL 4541027 (D. Or. July 17, 2023) ...........................................57

*Peterson v. Martinez*,
707 F.3d 1197 (10th Cir. 2013) ...........................................................28

*Range v. Att'y Gen. U.S. of Am.*,
69 F.4th 96 (3d Cir. 2023) ............................................................ 28, 33

*Reese v. BATFE*,
647 F. Supp. 3d 508 (W.D. La. 2022) ..................................................47

*Renna v. Bonta*,
2023 WL 2846937 (S.D. Cal. Apr. 3, 2023) ........................................29

*Rocky Mountain Gun Owners v. Polis*,
2023 WL 8446495 (D. Colo. Nov. 13, 2023).................................. 29, 60

*Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*,
40 F.4th 1133 (10th Cir. 2022) ...........................................................13

*Saltonstall v. Riley*,
28 Ala. 164 (Ala. 1856) .......................................................................48

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ...........................................................21

*State v. Allen*,
94 Ind. 441 (Ind. 1884).......................................................................49

*State v. Callicutt*,
69 Tenn. 714 (1878) ................................................................ 20, 30, 49

*Stevison v. Enid Health Sys.*,
920 F.2d 710 (10th Cir. 1990).............................................................23

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................14

*Tankesly v. Comm.*,
9 S.W. 702 (Ky. 1888).........................................................................49

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986) ............................................................................35

*Teixeira v. Cnty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) .................................................................. 27, 29-31

*United States v. Hosford,*
   843 F.3d 161 (4th Cir. 2016) ............................................................................40

*United States v. Huitron-Guizar,*
   678 F.3d 1164 (10th Cir. 2012) .................................................................. 28, 32

*United States v. Manzanares,*
   956 F.3d 1220 (10th Cir. 2020) .......................................................................43

*United States v. McCane,*
   573 F.3d 1037 (10th Cir. 2009) .......................................................................41

*United States v. McNulty,*
   2023 WL 4826950 (D. Mass. July 27, 2023) ............................................. 29, 43

*United States v. Minter,*
   635 F. Supp. 3d 352 (M.D. Pa. 2022) ..............................................................43

*United States v. Price,*
   635 F. Supp 455 (S.D. W. Va. 2022) ...............................................................43

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir.) ....................................................................................28

*United States v. Sineneng-Smith,*
   140 S. Ct. 1575 (2020) ....................................................................................23

*Vincent v. Garland,*
   80 F.4th 1197 (10th Cir. 2023) .................................................................. 42, 43

*Warwick v. Cooper,*
   37 Tenn. 659 (1858) .................................................................................. 20, 48

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................15

**Statutes**

18 U.S.C. § 922 .....................................................................................................3

28 U.S.C. § 1292 .................................................................................................13

28 U.S.C. § 1331 .................................................................................................13

1856 Ala. Acts 17........................................................................................... 47, 48

1859 Ky. Acts 245 ........................................................................... 47, 48

1875 Ind. Acts 59 ................................................................................48

1897 Tex. Gen. Laws 221 ...................................................................56

Colo. Rev. Stat. § 2-4-401 ...............................................................3, 36

Colo. Rev. Stat. § 13-22-101 ..............................................................36

Colo. Rev. Stat. § 18-12-112 ............................................................3, 38

Mo. Rev. Stat. § 1247 (1883)..............................................................49

S.B. 169, 74th Gen. Assemb., 1st Reg. Sess (Colo. 2023).... 1, 3, 4, 6, 8, 10, 12, 14, 17, 20, 37, 38, 40, 43, 47, 49-51, 54, 60-62

Tenn. Code § 4864 ........................................................................ 47, 48

## Constitution

U.S. Const. amend. I ................................................................. 33, 38, 45

U.S. Const. amend. II....... 1, 3-5, 7-11, 13, 16-34, 36, 37, 41, 45, 47, 49, 53, 55, 56, 58-60

U.S. Const. amend. XIV ................................................35, 54-56, 58, 59

U.S. Const. amend. XV........................................................................35

U.S. Const. amend. XIX ......................................................................35

U.S. Const. amend. XXIV ...................................................................35

U.S. Const. amend. XXVI ............................................................. 35-37

## Other Authorities

42 Am. Jur. 2d Infants § 6 (Oct. 2023 Update) ....................................34

James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836)....32

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) .... 20, 30

## Related Appeals

*Rocky Mountain Gun Owners, et al v. Polis*, 23-1380 (10th Cir.)

## STATEMENT OF ISSUES

1.      Whether the district court erred by finding Plaintiffs have standing when they did not state concrete plans to purchase guns after Colorado's Senate Bill 23-169 ("SB23-169") went into effect.

2.      Whether the district court erred by finding the Second Amendment's plain text covers Plaintiffs' desire to buy guns before they turn 21, when Plaintiffs failed to provide any evidence on the text's meaning, Plaintiffs failed to rebut the Governor's historical evidence, and the district court implied a right under the Second Amendment contrary to the text's historic meaning.

3.      Whether the district court erred by finding SB23-169's minimum age restriction is not "presumptively lawful," and requiring the government to justify the constitutionality of all "presumptively lawful" gun regulations by showing they are consistent with our Nation's historical tradition of gun regulation.

4.      Whether the district court erred by finding SB23-169's minimum age restriction is not consistent with our Nation's historical tradition of gun regulation because Colorado did not identify a "total prohibition" from the Founding era and laws similar to SB23-169 enacted by nineteen states in the 19th century were too late to be considered.

1

5.    Whether the district court erred by finding Plaintiffs satisfied the remaining preliminary injunction factors.

## STATEMENT OF THE CASE

### A.     Background and Procedural History

On April 28, 2023, Governor Polis signed SB23-169 into law, which sets 21 as the minimum age for the sale of guns in Colorado.  App. Vol. 1 at 15.  Federal law has long prohibited licensed gun dealers from selling guns to anyone under 21, except shotguns or rifles can be sold to those over 18.  18 U.S.C. § 922(b)(1). Colorado's SB23-169 sets the minimum age for the sale of all guns at 21, consistent with Colorado's long-held view that 21 is the default age of majority. Colo. Rev. Stat. § 2-4-401(6).  SB23-169 prohibits gun dealers and private sellers from selling guns to those under 21 but does not prohibit anyone from *possessing* or *using* guns.  And an 18-year-old may still acquire guns, such as receiving it as a gift from a family member.  Colo. Rev. Stat. § 18-12-112(6).  SB23-169 also exempts certain individuals, such as active military and on-duty police officers.

SB23-169's effective date was August 7, 2023.  App. Vol. 1 at 18.  On April 28, 2023, Plaintiffs, two 18-to-20-year-old Coloradans and a gun advocacy group, filed this lawsuit asserting one claim that SB23-169 violates the Second Amendment.  *Id.* at 9.  On June 7, 2023, Plaintiffs moved for a preliminary injunction.  *Id.* at 65.

### B.     The Parties' Evidence

Plaintiffs presented no expert testimony or historical evidence to support their motion for a preliminary injunction.  Plaintiffs asserted, without proffering any evidence, that "[t]he right to keep arms necessarily implies the right to acquire arms."  App. Vol. 1 at 69.  The rest of Plaintiffs' motion argued that the government could not demonstrate SB23-169 was consistent with our Nation's history of gun regulation based on historic militia obligations.  *Id.* at 69–73.  The Individual Plaintiffs' only evidence supporting their standing and their motion's merits were identical one-paragraph declarations stating they are "over the age of 18 but under the age of 21" and "[i]t is my present intention and desire to lawfully purchase a firearm for lawful purposes[.]"  *Id*. at 85–88.

The Governor, by contrast, submitted over 320 pages of sworn declarations and supporting exhibits from four leading experts:

➢ Dr. Saul Cornell, the Chair in American History at Fordham University:
    Dr. Cornell explained that the Second Amendment was not understood at
    the Founding to apply to 18-to-20-year-olds, who were minors without
    full legal rights.  *Id.* at 153, 160–164.  Minors' service in early militias
    was also under parents' supervision.  *Id.* at 178–182.  States conscripting
    minors into the militia was consistent with the government's intense

regulation of minors, not an indicator that minors held a broad Second Amendment right to purchase guns. *Id.*

➢ <u>Dr. Robert Spitzer, Professor of Political Science Emeritus at the State University of New York at Cortland</u>: Dr. Spitzer explained that restrictions on 18-to-20-year-olds' ability to use and possess firearms were ubiquitous in our Nation's history. App. Vol. 2 at 244. These included, for example, over 100 Founding- and Reconstruction-era restrictions by 46 States and cities. *Id.* at 232–238; *see also id.* at 283–286 (chart of historical state laws). The Nation's early universities and colleges, including public institutions, also enacted bans on students possessing firearms, starting as early as 1655 and continuing through Reconstruction. *Id.* at 240–243.

➢ <u>Dr. Brennan Rivas, Ph.D. in history from Texas Christian University</u>: Dr. Rivas explained that the rise in state statutes in the 19th century prohibiting gun sales to those under 21 were due to dramatic societal changes, unprecedented violence, and evolution in gun technology, manufacturing, and distribution not present during the Founding era. *Id.* at 346, 348–63, 368–72.

➢ Dr. Laurence Steinberg, Professor of Psychology and Neuroscience at Temple University: Dr. Steinberg explained that risk-taking peaks in the late teens and early 20s because the human brain is still developing before the age of 21. *Id.* at 384–85, 395–97. SB23-169 is likely to reduce the number of gun-related homicides, suicides, and accidental deaths in Colorado and is consistent with scientific consensus on adolescent development. *Id.* at 399.

### C. The District Court's Order

On August 7, 2023, the district court preliminarily enjoined enforcement of SB23-169. Ex. A, District Court's Order Granting Preliminary Injunction ("Order"). The district court did not hold a hearing to take testimony or hear argument on Plaintiffs' motion.

On standing, the district court found that the two Individual Plaintiffs "do not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, [] that they have taken any steps to prepare to purchase firearms," or that they would still be under 21 when the law went into effect. Order at 12 n.6, 14 n.8. Despite these deficiencies, the district court found Plaintiffs' allegations sufficient for standing "[a]t this phase of the proceedings" but "[did] not pass" on Plaintiffs' standing "for purposes of other stages of the

case." Order at 12 n.6. The district court also held that the organizational Plaintiff Rocky Mountain Gun Owners ("RMGO") lacked standing, which Plaintiffs have not appealed. Order at 10–12.

On the merits, the district court held that Plaintiffs were likely to succeed on their challenge under the framework announced in *NYSRPA v. Bruen*, 597 U.S. 1 (2022).

At *Bruen*'s first step, the district court held that the Second Amendment's plain text "includes the right to acquire firearms" without citing any supporting evidence in the record. The district court held that the Governor's evidence showed only "that states could have regulated 18-to-20 year olds" during the Founding era consistent with the Second Amendment. Order at 25. The district court found, however, "that the Governor has not shown a historical tradition of firearm regulation of 18-to-20 year olds during the founding era." *Id.* (internal quotation and citation omitted).

With respect to the "presumptively lawful" categories of gun regulations announced in *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008), the district court stated it would evaluate them at *Bruen*'s second step. Order at 29. The district court held that, under *Bruen*, the government "must justify the constitutionality of any law regulating conduct covered by" the Second

Amendment, even those laws that *Heller* said are "presumptively lawful." *Id.* at 29–30. Turning to SB23-169, the district court said the law was not "presumptively lawful" as a commercial regulation because it did not "affect only those who regularly sell firearms." *Id.* at 30. (quotation omitted).

As to *Bruen*'s second step, the district court held that the Governor did not demonstrate that SB23-169 is consistent with our Nation's historical traditions of firearm regulations. *Id.* at 40. The district court rejected Plaintiffs' argument that Founding era militia laws showed those under 21 enjoyed a right to possess guns outside militia duty. *Id.* at 36. However, the Governor's historical analogues, the district court said, were insufficiently analogous because the Governor did not point to a "total prohibition" on the sale of guns to minors "during the founding era." *Id.* at 39. The district court also gave no consideration to the Governor's post-Founding-era historical analogues. *Id.* at 40.

## SUMMARY OF THE ARGUMENTS

This Court should reverse the district court's preliminary injunction because the Second Amendment does not prohibit Colorado from adopting a minimum age to purchase guns.  Guns are now the leading cause of death among 18-to-20-year-olds in Colorado.  The Constitution does not leave the people of Colorado helpless to address this loss of life.  To the contrary, the Second Amendment has never been understood to prohibit States from adopting a minimum age for gun sales, and our Nation's history is full of examples where States set that minimum age at 21.

*First*, the Plaintiffs failed to demonstrate they have standing.  Plaintiffs' bare allegations in their declarations were devoid of any specific facts to show a concrete and actual injury.  This alone requires reversing the district court's preliminary injunction.

*Second*, Plaintiffs are not likely to succeed on their claim.  Pursuant to *Bruen*, the Court considers whether the plain text of the Second Amendment covers Plaintiffs' conduct, and if so, whether Colorado's law is historically analogous to our Nation's history and traditions of gun regulation.

On *Bruen*'s first step, the Governor's substantial evidence shows that the Second Amendment never covered gun purchases before the age of 21 and those under the age of 21 were not part of the "political community" that the Second

9

Amendment protected.  Colorado's law is also presumptively lawful under Supreme Court precedent because it is a condition and qualification on the sale of guns.  The Court can thus reverse the injunction at *Bruen*'s first step.

But if the Court proceeds to *Bruen*'s second step, the Governor demonstrated our Nation's unbroken historical tradition restricting guns from those under 21.  At the Founding, the common law viewed those under 21 as "infants" without Second Amendment rights.  During the Reconstruction era, nearly half the States enacted laws similar to SB23-169, restricting gun sales to those under 21.

While *Bruen* announced a new test for lower courts to apply to Second Amendment claims, the district court made multiple errors in applying *Bruen* that warrant reversal.  Specifically, the district court:

- Held Plaintiffs demonstrated that the Second Amendment's text covered their conduct without Plaintiffs presenting any evidence or authority;

- Failed to consider the only historical evidence in the record on the meaning of the Second Amendment's text, including sources the Supreme Court has previously relied on in its textual analysis;

- Implied a right under the Second Amendment, contrary to *Bruen*, *Heller*, and the historical evidence in the record;

10

- Held Plaintiffs were part of "the people" covered by the Second Amendment, despite the undisputed historical evidence to the contrary;

- Held the absence of an express age limit in the Second Amendment prohibits Colorado from adopting one, contrary to how courts interpret other constitutional rights;

- Held Colorado's minimum age limit on gun sales was not a condition and qualification on commercial sales of guns;

- Held *Heller*'s "presumptively lawful" categories are no longer presumptively lawful, contrary to binding Supreme Court and Tenth Circuit precedent;

- Required Colorado to demonstrate a "total prohibition" (i.e. a "dead ringer") from the Founding era to establish a historical tradition instead of a "historical analogue;"

- Ignored all historical evidence and historical analogies after the Founding era, despite *Bruen* and *Heller* finding such evidence a "critical tool."

*Third*, Plaintiffs are unable to satisfy the remaining preliminary injunction factors. Their bare-bones declarations did not establish an irreparable injury.

11

Moreover, the evidence showed that the public interest favors denying the injunction because SB23-169 will save lives in Colorado by reducing gun-related homicides, accidents, and suicides.

## JURISDICTION

This Court has jurisdiction to review the district court's preliminary injunction under 28 U.S.C. § 1292(a)(1). Plaintiffs alleged the district court had jurisdiction under 28 U.S.C. § 1331.

## ARGUMENT

### I. Plaintiffs' declarations were insufficient to establish Plaintiffs' standing.

Plaintiffs did not meet their burden to establish standing. This issue was raised and ruled on below. Order at 5–16. This Court "review[s] a district court's rulings on Article III standing de novo." *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1151 (10th Cir. 2022) (quotations omitted).

To establish the required injury-in-fact, a plaintiff must show an injury that is "concrete, particularized, and actual or imminent." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016). In *Colorado Outfitters*, a similar Second Amendment case, this Court held that certain plaintiffs lacked standing because they had no "concrete plans to engage in conduct" that violated Colorado's ban on large capacity magazines. *Id.* at 551. Plaintiffs' allegations that they would purchase a large capacity magazine "some day" were insufficient to establish an imminent injury. *Id.*

The same rationale should have applied here.  The Individual Plaintiffs' bare allegation of an intent to purchase guns at some unspecified time in the future falls short of establishing a concrete plan to engage in allegedly protected conduct.  A court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) (citation omitted).

Instead of holding Plaintiffs to their burden under *Colorado Outfitters*, the district court erroneously lowered it.  The court recognized that Plaintiffs did "not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, or that they have taken any steps to prepare to purchase firearms," Order at 12 n.6.  Plaintiffs also did not state whether they already owned guns for self-defense, what guns they intended to purchase, or whether they would be under 21 when the law became effective.  *Id.* at 14 n.8.[1]  Nevertheless, the court held that "*[a]t this phase of the proceedings*, the Individual Plaintiffs have done enough" to establish standing, even though the district court

---

[1] RMGO also failed to identify any members who would be affected by SB23-169 or any direct injury.  Order at 10–12.  The district court correctly held that RMGO lacked standing.  *Id.* (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

did "not pass on the Individual Plaintiffs' showing for purposes of other stages of the case." *Id.* at 12 (emphasis added).

The district court incorrectly applied a lower burden to establish standing at the preliminary injunction stage. But "[w]hen a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). This is consistent with the "general rule that a preliminary injunction should not issue on the basis of affidavits alone." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) (internal quotation omitted). At the preliminary injunction stage, a court is not testing the sufficiency of the allegations but whether the plaintiff's proffered evidence establishes a "'clear showing' of [their] injury in fact." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

Plaintiffs' conclusory statements were insufficient to establish their standing and the Court should reverse.

## II. The district court abused its discretion when it held Plaintiffs were likely to succeed under *Bruen*.

This Court should reverse the preliminary injunction because the district court erred at every step of its *Bruen* analysis. Under the two-step test announced

in *Bruen*, a court must first determine if the Second Amendment's plain text covers plaintiffs' proposed conduct. 597 U.S. at 17. If the conduct is covered, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. When a state law addresses "unprecedented societal concerns" not present at the Nation's Founding, the "lack of a distinctly similar historical regulation" is not dispositive. *Id*. at 26–27. Instead, a court must "reason[] by analogy" and the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 28–30.

This Court reviews the grant of preliminary injunction for abuse of discretion, "examin[ing] the court's factual findings for clear error and its legal conclusions de novo." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 796-97 (10th Cir. 2019). A district court abuses its discretion if it "commits an error of law or makes clearly erroneous factual findings." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009).

### A.     Plaintiffs failed to demonstrate that the Second Amendment's text covers their proposed conduct.

This Court should reverse at *Bruen*'s first step because Plaintiffs failed to establish that the Second Amendment's text covers their intent to buy guns before they turn 21. The parties did not dispute, and the district court correctly held, that

16

Plaintiffs have the burden at *Bruen*'s first step to demonstrate that the Second Amendment's text covers their proposed conduct. Order at 20; *see also Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1179 (7th Cir. 2023) ("In order to show a likelihood of success on the merits … [plaintiffs] have the burden of showing" the text covers their conduct). However, the district court erred by finding Plaintiffs were substantially likely to succeed at this step.

The district court committed at least three errors at *Bruen's* first step, each of which independently requires reversal. *First*, the Governor's evidence established that the Second Amendment was never understood to cover purchases by those under 21. In the absence of any historical evidence proffered by Plaintiffs on the public understanding of the Second Amendment's text, the district court erred by concluding that "the Second Amendment includes the [implied] right to acquire firearms." Order at 28. *Second*, Plaintiffs presented no evidence that they were part of "the people" under the Second Amendment. Instead, the absence of an express age limit in the Second Amendment leaves to the States the power to set a reasonable minimum age for gun purchases. *Third*, SB23-169 is a presumptively lawful regulation under the Supreme Court's precedent, and the district court erred by giving it no presumptive weight. These issues were raised and ruled on below. Order at 20–31.

17

### 1. The Second Amendment's plain text was never understood to cover gun purchases by those under 21.

The Supreme Court has not held that the Second Amendment's text covers gun purchases by those under 21. Both *Heller* and *Bruen* did "not undertake an exhaustive historical analysis … of the full scope of the Second Amendment." *Bruen*, 597 U.S. at 31; *Heller*, 554 U.S. at 626. Justice Alito wrote separately that *Bruen* "decides nothing about … the requirements that must be met to buy a gun" and did not change federal law prohibiting "the sale of a handgun to anyone under the age of 21." 597 U.S. at 72–73 (Alito, J., concurring).

Despite Plaintiffs arguing for a new right to purchase guns before the age of 21, the district court incorrectly relieved Plaintiffs of their burden to demonstrate that the Second Amendment's text was publicly understood to cover that conduct. The district court also ignored the historical evidence before it and wrongly implied what conduct is included under the Second Amendment.

#### a) Plaintiffs failed to carry their burden at *Bruen*'s first step.

Plaintiffs must first demonstrate that the Second Amendment's plain text covers the Individual Plaintiffs' desire to purchase guns before they turn 21. *See Bruen*, 597 U.S. at 17. *Heller* instructs how a court performs that textual analysis. A court must give the Second Amendment's text its "[n]ormal meaning … [as]

known to ordinary citizens in the founding generation." *Heller,* 554 U.S. at 576–77. A court also looks to how the text was interpreted after its ratification. *Heller* described "a court's interpretative task" as "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text[.]" *Id*. at 605; *see also McDonald v. Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring) ("When interpreting constitutional text, the goal is to discern the most likely *public understanding* of a particular provision at the time it was adopted.") (emphasis added).

The Governor presented substantial evidence below that the words "to keep and bear arms"—both at the Founding and in the 19th century—were not publicly understood to guarantee a right by those under 21 to purchase guns. The Governor's expert, Historian Saul Cornell, explained that those under 21 in Founding-era America were considered "minors" or "infants" in the eyes of the law. App. Vol. 1 at 153, 160–64. Until the late 20th century, the American consensus was that the age of majority was 21. *Id.* at 164–65. There is simply no historical evidence suggesting those under 21 had a constitutional right to acquire guns at America's Founding. *Id*. at 168. In fact, they would not even have had the ability to assert a legal claim in a court under the Second Amendment. *Id.* at 161. Instead, until they reached the age of 21, their legal affairs were managed by their

parents or guardians. *Id*. Many of America's early state militia laws also made the parent or guardian responsible for purchasing any gun used for militia participation. *Id*. at 178–79.

This fact is also confirmed by the Governor's post-enactment evidence. *See Heller*, 554 U.S. at 605 (finding post-enactment evidence "a critical tool of constitutional interpretation … to determine *the public understanding* of a legal text[.]"). For example, in the 19th century, the Tennessee Supreme Court rejected that the Second Amendment covered gun purchases by those under 21. App. Vol. 1 at 121 (citing *State v. Callicutt*, 69 Tenn. 714 (1878)). Upholding a state law similar to SB23-169, the Tennessee court held that the "right to 'keep and bear arms,'" did not "necessarily impl[y] the right to buy or otherwise acquire" a gun by a minor. *Id*. at 716.[2] Thomas Cooley—who *Heller* relied on as the "most famous" 19th century legal scholar, 554 U.S. at 616—also concluded that "the State may prohibit the sale of arms to minors" under a State's police powers. App. Vol. 1 at 132 (citing Thomas M. Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883)).

---

[2] Tennessee's age of majority was 21 at the time. *See, e.g., Warwick v. Cooper*, 37 Tenn. 659, 660 (1858) (describing "an infant under the age of twenty-one").

Despite having the burden at *Bruen*'s first step, Plaintiffs offered *no* evidence that the words "to keep and bear Arms" guaranteed a right by those under 21 to purchase guns. Plaintiffs did not rebut the Governor's expert evidence or present a textual argument. Instead, Plaintiffs' entire argument on the issue consisted of one sentence—that "[t]he right to keep arms necessarily implies the right to acquire arms"—without citation to any evidence or authority. *Id.* at 69. Nonetheless, the district court held that Plaintiffs "have sufficiently demonstrated a likelihood of success in showing their proposed conduct is covered by the plain text of the Second Amendment." Order at 28. The district court erred in three ways.

*First*, the district court improperly relieved Plaintiffs of their burden at *Bruen*'s first step. A preliminary injunction is an "extraordinary remedy" granted only where the movant shows a "clear and unequivocal" right to relief. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Plaintiffs must at least "make a prima facie case showing a reasonable probability that they will ultimately be entitled to the relief sought." *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1146 (10th Cir. 2020) (internal quotation omitted); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (the "burdens at the preliminary injunction stage track [who has] the burdens at trial").

21

The bar cannot be so low that Plaintiffs can show a likelihood of success at *Bruen's* first step—and preliminary enjoin democratically-enacted state laws—without pointing to any evidence or authority that the Second Amendment was publicly understood to cover their conduct. Other courts have properly denied preliminary injunction motions when a plaintiff fails to submit supporting historical evidence at *Bruen*'s first step. *See Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118 (JBA), 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) (unpublished) (denying preliminary injunction because "[n]othing in *Bruen* … grants [plaintiffs] an automatic presumption that their conduct is constitutionally protected which Defendants are then required to affirmatively rebut. Plaintiffs must bear the burden of producing evidence" at *Bruen*'s first step); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387–88 (D.R.I. 2022) (denying preliminary injunction because "only the State has supported its argument with historical analysis" on "the textual meaning of the Second Amendment").

*Second*, the district court abused its discretion by failing to consider the relative evidence presented by the parties. *See Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1279 (10th Cir. 2022) (reversing where district court "failed to consider record evidence" and preliminary injunction order "lacked a rational basis in the evidence"). *Bruen* did not create new evidentiary standards for

Second Amendment cases. Instead, the Supreme Court instructed courts to continue to "follow the principle of party presentation." 597 U.S. at 25 n.6 (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)). Lower courts were instructed "not to resolve historical questions in the abstract" but "to decide a case based on the historical record compiled by the parties." *Id.* Here, the only evidence in the record on the meaning of the Second Amendment's text was the Governor's evidence. The Governor's evidence showed the Second Amendment was never publicly understood to cover gun sales to those under 21. Plaintiffs presented no rebuttal or affirmative evidence on the issue. The district court erred when it reached a decision that was contrary to the only evidence in the record.

*Third*, the district court erred by shifting the burden at *Bruen*'s first step to the Governor. *See Stevison v. Enid Health Sys.*, 920 F.2d 710, 714 (10th Cir. 1990) (reversing where district court improperly shifted burden of proof). The district court held the Governor's Founding-era evidence was only "evidence supporting an argument that states ***could have*** regulated 18-to-20 year olds [during the Founding era] because they lacked rights as minors." Order at 25 (emphasis added). Yet, that is exactly the evidence *Bruen* requires. At the first step, a court should look to what States "could have" done in the Founding era consistent with

23

the Second Amendment.  The goal is "to determine the *public understanding* of a legal text," *Heller*, 554 U.S. at 605, as the text's meaning is "fixed according to the understandings of those who ratified it."  *Bruen*, 597 U.S. at 28.  If States "could have" regulated gun sales to 18-to-20-year-olds at the Founding consistent with the Second Amendment, then the district court's analysis should have ended there.

Instead, the district court held that the Governor's evidence was insufficient because "the Governor has not shown a 'historical tradition of firearm regulation' of 18-to-20 year olds during the founding era[.]"  Order at 25 (quoting *Bruen*, 597 U.S. at 24).  But that is the standard for *Bruen*'s second step.  597 U.S. at 24.  The district court improperly required the Governor to satisfy *Bruen*'s second step before Plaintiffs even satisfied *Bruen*'s first step.  This makes *Bruen* an impossible test.  How does the government identify a historic restriction on a right when there is no evidence that the alleged right ever existed?  The district court erred by shifting the burden to the Governor to point to a historical regulation before Plaintiffs demonstrated the Second Amendment covered their conduct.

> **b)**    **Courts cannot imply rights under the Second Amendment's plain text without considering historical evidence.**

Rather than considering the party's evidence on the Second Amendment's public understanding and meaning, the district court accepted Plaintiffs'

24

conclusory implied-rights argument.  The district court held that the Second Amendment's text "includes" a right to purchase guns, relying on pre-*Bruen* cases. Order at 28.  The district court erred both by implying rights under the Second Amendment contrary to the historical evidence and relying on pre-*Bruen* cases that do not support that the Second Amendment covers Plaintiffs' conduct.

*First*, the district court's implied-rights analysis is directly counter to *Bruen* and *Heller*.  These cases do not support that a court may imply rights guaranteed by the Second Amendment.  The creation of implied rights under the Second Amendment "is quite-clearly not a 'plain text' analysis, required under *Bruen*." *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (unpublished).  The district court erred by determining what rights must be "included" under the Second Amendment in the 21st century without relying on any historical evidence about the public understanding of the text.

Compare the district court's analysis here to *Heller*'s textual analysis. *Heller* did not determine what rights were "included" or "implied" in the abstract. *Heller*'s "textual analysis" on the Second Amendment's scope included review of 18th and 19th century dictionaries; 18th and 19th century state constitutional provisions and statutes; Continental Congress records; 19th century state court

decisions; 18th and 19th century legal commentaries; the Federalist Papers and

other Founders' writings; the 1788 ratification debates; 17th and 18th century

English statues and complications; 18th century newspapers; and 18th century

debates in the British Parliament.  554 U.S. at 580–600.  Only after reviewing this

bevy of historical sources did *Heller* conclude that the Second Amendment's text

covered a right to carry guns for confrontation unconnected with militia service.

*Id.*  The district court conducted no such textual-historical analysis here, and could

not do so because Plaintiffs presented no evidence on the meaning of the Second

Amendment's text.

     *Bruen* did not eliminate the need to interpret the Second Amendment's text

through historical evidence.  While the text must apply to new circumstances not

anticipated at the Founding, *Bruen* repeatedly stated that the Second Amendment's

meaning is "historically fixed," "fixed according to its historical understanding,"

and "fixed according to the understandings of those who ratified it."  *Bruen*, 597

U.S. at 28.  *Bruen* spoke favorably of the first step of the two-part test that courts

of appeals had previously used to evaluate Second Amendment challenges after

*Heller*, which required lower courts to "ascertain the original scope of the right

based on its historical meaning."  *Id.* at 18.  *Bruen* abrogated only the second step,

replacing means-ends scrutiny with the requirement that, when conduct falls within

26

the text's historical understanding, the government "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

*Bruen* specifically rejected "any judge-empowering interest balancing inquiry" that could imply what rights exist under the Second Amendment. *Id.* at 22 (quotation to *Heller* omitted).  The district court here cited a pre-*Bruen* Ninth Circuit case that stated in dicta that the Second Amendment "wouldn't mean much without the ability to acquire arms."  Order at 27 (citing *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)).  But the Second Amendment is not "subject to future judges' assessments of its usefulness."  *Heller*, 554 U.S. at 634.  Rather, "it is the very *product* of an interest balancing by the people."  *Id*.  Courts do not "decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.*  The Second Amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]."  *Id.*  Thus, a court's analysis at step one must be "rooted in the Second Amendment's text, as informed by history."  *Bruen*, 597 U.S. at 19.  The district court erred by not considering the Governor's historical evidence, and Plaintiffs' utter lack of historical support, at *Bruen*'s first step.

Before *Bruen*, this Court stated it must follow a "textual-historical" approach, and draw "upon the understanding of the age of 1787 in determining [the Second Amendment's textual] scope." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *see also Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (looking to historical evidence on "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment guarantee[.]") (internal quotation omitted).

Post-*Bruen,* at least four other courts of appeals have looked to history when analyzing the Second Amendment's text at *Bruen*'s first step, although reaching different results on its meaning. *See Range v. Att'y Gen. U.S. of Am.*, 69 F.4th 96, 102 (3d Cir. 2023) (looking to English common law to determine if non-violent felons are part of "the people"); *NRA v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023), *reh'g en banc granted, vacated*, 72 F.4th 1346 (11th Cir. 2023) (stating *Bruen*'s first step requires "consider[ing] the plain text of the Amendment, as informed by the historical tradition"); *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (determining based on "record before us" that individuals subject to domestic violence restraining order "did not fall into any such group" who the Founders historically disarmed); *Atkinson v. Garland*, 70 F.4th 1018, 1022–23, 1025 (7th Cir. 2023) (remanding for historical

28

facts and analysis to determine if "the plain text of the Second Amendment does not cover felons"). This Court should follow the same approach and evaluate the Second Amendment's text at *Bruen*'s first step, "as informed by history." *Bruen*, 597 U.S. at 19.

*Second*, the pre-*Bruen* cases the district court cited—*Teixeira* and *Ezell v. City of Chicago*—offer no support for an implied-rights approach to the Second Amendment. Order at 28.[3] At the outset, neither case evaluated whether the Second Amendment covers the acquisition of a gun by those under 21. These cases also do not support that the Second Amendment covers a right to purchase guns more generally. *Rocky Mountain Gun Owners, et al. v. Polis,* --- F. Supp. --- 2023 WL 8446495, at *9 (D. Colo. Nov. 13, 2023) (unpublished) (rejecting that these same cases support "that the purchase of a firearm is covered by the Second Amendment" as they "predate *Bruen*, rely on cases predating *Bruen*, and/or conduct no analysis of the text.") ("*RMGO II*"). *Teixeira* only addressed the issue

---

[3] The district court also cited two district court opinions for support: *United States v. McNulty*, --- F. Supp. 3d. --- 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) and *Renna v. Bonta*, --- F. Supp. 3d. --- 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023). However, *McNulty* only cited the *Teixeira* and *Andrews* cases before stating it "does not make a ruling as to whether the Second Amendment covers the sale of firearms." 2023 WL 4826950, at 4. Likewise, *Renna* is unhelpful because it merely cited *Teixeira* while noting that the government in the case did not dispute that the Second Amendment involved a right to purchase guns. 2023 WL 2846937, at *7.

in passing, upholding dismissal of the plaintiff's complaint because "no historical authority suggests that the Second Amendment protects an individual's right to sell a firearm[.]"  873 F.3d at 686–87.  *Ezell* involved a ban on firing ranges, not gun sales.  *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

Both cases also looked to historical sources on the meaning of the Second Amendment.  *Ezell* relied on "post-Civil War legal commentaries" including Thomas Cooley's *Treatise* to analyze the scope of the Second Amendment's text.  *Id.*  The Seventh Circuit later explained that "whether minors have a general right … to purchase or possess firearms" was a separate issue, and 19th century laws prohibiting gun sales to minors "might properly inform [that] question" instead.  *Ezell v. City of Chicago*, 846 F.3d 888, 896 (7th Cir. 2017) ("*Ezell II*").  *Teixeira* quoted *Andrews v. State*, 50 Tenn. 165 (Tenn. 1871), a late-19th century decision from the Tennessee Supreme Court.  873 F.3d at 678.  *Ezell* and *Teixeira* did not suggest that a court may decide what is "included" under the Second Amendment without reviewing the historical evidence presented by the parties.

These same historical sources cited in *Teixeira* and *Ezell* show that the Second Amendment does not apply to gun sales to those under 21.  The Governor relied on Thomas Cooley's *Treatise* and the 1878 *Callicutt* case, a decision issued by the same Tennessee Supreme Court only seven years after *Andrews*.  Both

sources demonstrate that the Second Amendment was never understood to cover gun sales to those under 21. *See, supra*, II.A.1.a. The district court erred when it merely cited *Teixeira* and *Ezell*, without conducting its own textual analysis as informed by history. Had the district court considered these historical sources cited in *Ezell* and *Teixeira* and by the Governor below, it would have concluded that the Second Amendment did not cover gun sales to those under 21.

      **2.**     **The plain text of the Second Amendment does not cover 18-to-20-year-olds.**

Even if Plaintiffs had shown that the Second Amendment guarantees a right to purchase guns, Plaintiffs failed to carry their burden showing that the Individual Plaintiffs were part of "the people" covered by the Second Amendment. Moreover, the absence of any express age limit in the Second Amendment demonstrates that the Constitution does not prohibit States from setting a reasonable minimum age for the purchase of a gun.

      **a)**     **18-to-20-year-olds were not part of the "political community" at the Founding.**

The Governor again presented historical evidence that 18-to-20-year-olds were not part of "the people" under the Second Amendment. Plaintiffs again presented no evidence. *Heller* stated that "the people" "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at

580.  Finding that Justices on both sides of *Heller* "drew upon the understanding of the age of 1787 in determining the right's scope," this Court has previously stated it "must follow that approach" when interpreting "the people." *Huitron-Guizar*, 678 F.3d at 1169 (declining to decide whether Second Amendment applies to non-citizens when "this textual-historical inquiry is unaddressed in the parties' briefs … [and] the record.").

There is no dispute that 18-to-20-year-olds were not part of the "political community" when the Second Amendment was ratified.  The Governor's expert, Professor Cornell, explained that during the Founding era those under 21 lived under the supervision of their parents or guardians.  App. Vol. 1 at 160–64.  Early American legal experts wrote that this was necessary based on "the inability of infants to take care of themselves … until the infant has attained the age of twenty-one years."  *Id.* at 163 (quoting James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836)).  Early American lawmakers also rejected giving the right to vote to those under 21.  *Id.*

The district court erred when it failed to consider whether 18-to-20-year-olds were part of the "political community" as informed by history.  *See Huitron-Guizar*, 678 F.3d at 1168.  Instead, the district court held it would not "read *Heller* or *Bruen* as limiting to whom 'the people' refers."  Order at 25.  The district court

agreed with the Third Circuit's decision in *Range* that *Heller*'s and *Bruen*'s

"references to law-abiding responsible citizens … were dicta."  Order at 22 (citing

*Range*, 69 F.4th at 101).  Even if true, the district court was "bound by Supreme

Court dicta almost as firmly as by the Courts' outright holdings."  *Bonidy v. U.S.*

*Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (considering "dicta" from

*Heller*).

Justice Thomas, the author of *Bruen*, also has looked to "the founding

generation's understanding of parent-child relations" when describing the scope of

the First Amendment.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 832 (2011)

(Thomas, J., dissenting); *see also Morse v. Frederick*, 551 U.S. 393, 410-11 (2007)

(Thomas, J., concurring) ("the First Amendment, as originally understood, does not

protect student speech in public schools").  In *Brown*, Justice Thomas discussed at

length the Founding-era view that those under 21 had "utter incapacity" under law.

564 U.S. at 826-27.  Justice Thomas commented that, given views on parent-child

relations at the Founding, "the Framers could not possibly have understood"

minors to have "unqualified" First Amendment speech rights.  *Id.* at 835.  The

same is true for the Second Amendment.  *See McDonald,* 561 U.S. at 780 (Second

Amendment is not "a second-class right, subject to an entirely different body of

rules than the other Bill of Rights guarantees").

This Court should not interpret certain words of the Second Amendment ("the people") through a modern lens while interpreting other words ("keep and bear Arms") only based on Founding-era history.  Instead, the Court should interpret all words of the Amendment "as informed by history."  *Bruen*, 597 U.S. at 19.  Here, the district court erred because the public understanding of the Second Amendment did not include those under 21 as part of the "political community."

> **b)** **The Second Amendment does not displace the States' power to set reasonable minimum age limits for activities that involve a constitutional right.**

State legislatures hold expansive power to set different minimum ages for different activities.  42 Am. Jur. 2d Infants § 6 (Oct. 2023 Update) ("statutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature"); *see also Jones v. Jones*, 72 F.2d 829, 830 (D.C. Cir. 1934) (observing that at common law infants attained the age of majority at 21, but noting the "Legislature may regulate the age of majority for infants in all cases, or for specified purposes only").  This power is rooted in the Tenth Amendment and the States' police power to enact legislation "for the public good."  *Bond v. United States*, 572 U.S. 844, 854 (2014); *see, e.g.*, *Lenahan v. Pittston Coal Mining Co.*, 218 Pa. 311, 313 (Pa. 1907) ("the Legislature, under

its police power, could fix an age limit below which boys should not be employed").

This principle applies equally to fundamental rights enshrined in the federal Constitution, including the right to keep and bear arms. Take, for example, the right to vote. It is protected by multiple constitutional provisions and has been recognized as a fundamental right. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *e.g.*, U.S. Const. amend. XIV, XV, XIX, XXIV. But before the Twenty-Sixth Amendment was ratified in 1971, nothing in the Constitution prevented States from setting the minimum voting age at 21 or some other age. *See Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959) (listing age as an "obvious example[ ]" of a factor a State "may take into consideration in determining the qualifications of voters.").

Or take the fundamental right to marry. The right is protected by the federal Constitution. *See Obergefell v. Hodges*, 576 U.S. 644, 645 (2015). But that does not mean that States are powerless to set the minimum age to marry. To the contrary, "[e]very State in the Union still establishes a minimum age for marriage without parental or judicial consent." *Brown*, 564 U.S. at 836 (Thomas, J., dissenting); *Maynard v. Hill,* 125 U.S. 190, 205 (1888) (State legislatures may prescribe "the age at which parties may contract to marry").

35

The Second Amendment was adopted against this same background.  States hold broad authority to set minimum ages for different activities, including activities that touch upon the exercise of a constitutional right.  In Colorado, a "person who has not attained the age of twenty-one years" is a "minor."  Colo. Rev. Stat. § 2-4-401(6).  By statute in the late-20th century, Colorado has used 18 as the minimum age for "specific purposes," including to contract or to sue and be sued.  Colo. Rev. Stat. § 13-22-101(1).  But the Second Amendment does not prohibit Colorado from using its age of majority as the minimum age for gun purchases.

The district court disregarded this constitutional background, holding instead that the Second Amendment's absence of an express age restriction prohibits Colorado from setting one.  Order at 22-23, 25 (finding persuasive the reasoning in *Firearm Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022)).  This view would lead to absurd results.  A nine-year-old could claim the right to vote.  Or a six-year-old could assert the right to carry a gun.  And while Congress and the States can amend the Constitution to set a minimum age for a particular activity for the entire Nation—as they have in the Twenty-Sixth Amendment for voting—no constitutional amendment has altered this original understanding for the Second Amendment right.  And when the Constitution is

36

"silent about the exercise of a particular power[,] . . . the power is either delegated to the state government or retained by the people." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2334 (2020) (Thomas, J., concurring) (quotations omitted). Here, unlike the Twenty-Sixth Amendment, the Second Amendment sets no minimum age for purchasing a firearm. Accordingly, the Colorado General Assembly acted well within its authority when it filled this gap and set a minimum age of 21 to purchase a gun.

### 3. Age-restrictions on commercial sales are "presumptively lawful," and the district court erred by abandoning *Heller*'s "presumptively lawful" categories of gun regulations.

Colorado's SB23-169 is also constitutional because it regulates the conditions and qualifications on the commercial sale of arms. *Heller* made clear that "the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, and the "Constitution leaves the [States] a variety of tools for combating" gun violence. *Id.* at 636. The Supreme Court described a non-exhaustive list of "presumptively lawful" gun regulations such as "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–627 n.26.

Colorado's law does not prohibit gun possession or the use of guns in self-defense. Instead, the law primarily prohibits those who sell guns from selling to 18-to-20-year-olds consistent with States' longstanding power to regulate sales

37

transactions.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*
447 U.S. 557, 562 (1980) (recognizing different standards apply to commercial
speech under the First Amendment because it is "traditionally subject to
government regulation").

The district court erred by holding SB23-169's age restriction on guns did
not qualify as a condition and qualification on commercial sales, and by not
applying Supreme Court and Tenth Circuit precedent on "presumptively lawful"
gun relations, effectively eliminating the category altogether.

> ### a)    SB23-169's age-restriction is a "presumptively lawful" gun regulation.

SB23-169 is a "presumptively lawful" condition and qualification on the
commercial sales of arms.  SB23-169 regulates only gun sales.  The law primarily
operates by prohibiting those who sell guns—both licensed and private sellers—
from *selling* to those under the age of 21.  App. Vol. 1 at 16–17, §§ 2(2)(e),
3(a)(3).  It also prohibits those under 21 from *purchasing* a firearm.  *Id.* at §
2(2)(f).  But SB23-169 does not prohibit anyone from *possessing* a gun, nor does it
prohibit certain non-purchase gun transfers.  *See* Colo. Rev. Stat. § 18-12-112(6).

*Bruen* did not call into question narrow, objective, and definite regulatory
standards that ensure gun purchasers "are, in fact, 'law-abiding, responsible
citizens.'"  597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 570).  Instead, *Bruen*

stated nothing in its "analysis should be interpreted to suggest the unconstitutionality of the 43 States 'shall-issue' licensing regimes" that do not require licensing officials to exercise judgment on the applicant's need for armed self-defense. *Id.* That included restricting permits to those applicants who "undergo a background check or pass a firearms safety course" to show they are law-abiding, responsible citizens. *Id.* Paralleling *Heller*'s presumptively lawful language, *Bruen* indicated these regulations are constitutional absent some evidence that they were being put towards "abusive ends." *Id.*

A commercial restriction on gun sales is a presumptively lawful means of limiting gun purchases to "ordinary, law-abiding *adult* citizens." *Id.* at 15 (emphasis added). Colorado's lawmakers determined that 21 should be the minimum age to purchase guns to ensure guns are sold only to responsible *adults*. There can be no more definite and objective regulatory standard than using a minimum age limit to determine an individual's responsibility with a gun. That decision, in addition to being well within a State's discretion, *see supra* at II.A.2.b, is well-supported by modern science. The Governor presented unrebutted testimony from Dr. Lawrence Steinberg, who explained that adolescent brain development makes individuals aged 18-to-20 more prone to risk-taking and more

prone to gun-violence and suicide than among people who are 21 and older.  App. Vol. 2 at 387–97.

The district court erred by limiting the commercial sales category to regulations that "affect[] only those who regularly sell firearms" citing a pre-*Bruen* case.  Order at 30 (quoting *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)).  But as *Bruen* itself indicated, nondiscretionary regulations aimed at ensuring guns are held by "law abiding, responsible citizens" are likely constitutional.  597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 570).  The question is not whether the regulation impacts *only* those who regularly sell guns, but whether a State has abused its traditional police power to regulate commercial conduct.  Colorado has not abused its powers by adopting a reasonable minimum age limit to ensure gun purchases only by responsible adult citizens.

Other courts have also that held reasonable age-restrictions like SB23-169 are longstanding and presumptively lawful.  *See Lara v. Evanchick*, 534 F. Supp. 3d 478, 489-91 (W.D. Pa. 2021); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992-93 (W.D. Wash. 2020), *vacated*, 2022 WL 17420766 (9th Cir. 2022).  The district court rejected these cases because they applied the presumption "without evaluating whether the Nation's historic tradition of firearm regulations had similar analogues specific to the challenged regulations."  Order at 30 n.17.  But as

40

explained directly below, *infra* at II.A.3.b, it was the district court that erred by applying *Bruen*'s second step to "presumptively lawful" gun regulations.

> **b)    The district court wrongly evaluated the Supreme Court's "presumptively lawful" category at *Bruen*'s second step.**

This Court has held that it is "bound" to apply *Heller*'s "presumptively lawful" language, which was "an important emphasis upon the narrowness of the holding" in *Heller*.  *Bonidy*, 790 F.3d at 1124–25; *see also United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (Tymkovich, J. concurring) (agreeing that *Heller*'s "presumptively lawful" categories are binding on the Tenth Circuit).

The district court erred by effectively eliminating the "presumptively lawful" category of gun regulations altogether.  The district court held that *Heller* does not "exempt[] certain types of regulations at the first step of the *Bruen* test." Order at 29.  Instead, the district court held "the government must justify the constitutionality of any law regulating conduct covered by the plain text of the Second Amendment[]" at *Bruen*'s second step, including those deemed "presumptively lawful."  Order at 29-30.  But this turns the presumption announced in *Heller* on its head.  At *Bruen*'s second step, the "Constitution presumptively protects" plaintiff's conduct.  597 U.S. at 17.  But under the district

41

court's approach, entire categories of laws the Supreme Court held were "presumptively lawful" would now be presumptively unconstitutional if they survive to *Bruen*'s second step. The government would bear the burden of identifying historical analogues for laws that gave the Supreme Court no pause and that six justices in *Bruen* recognized remained valid—such as restrictions on felony possession or possession at schools. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 80–81 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 129–30 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.).

This Court has resolved the issue. After the district court issued its Order, this Court confirmed that *Bruen* does not undermine *Heller*'s "presumptively lawful" categories. *See Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023). In *Vincent*, this Court upheld a felony gun possession law without requiring the government to justify the constitutionality of the law at *Bruen*'s second step. *See id.* at 1202. Instead, this Court held *Heller* already "had appeared to recognize the constitutionality of longstanding prohibitions" like those "on possession of firearms by convicted felons." *Id.* at 1201. *Bruen* did not "indisputably and pellucidly abrogate" the Tenth Circuit's prior precedent upholding the validity of the felon-in-possession ban. Nor did *Bruen* undermine these "presumptively lawful" categories. Instead, *Bruen* contains "signs of support for these

42

prohibitions." *Id.* (noting that six justices in *Bruen* affirmed the "presumptively lawful" category). Other courts have also correctly rejected the call to invalidate *Heller*'s presumptively lawful category after *Bruen*. *See, e.g.*, *United States v. Minter*, 635 F. Supp. 3d 352, 361 (M.D. Pa. 2022) (upholding prohibition of possession of guns by felons); *United States v. Price*, 635 F. Supp 455, 466 (S.D. W. Va. 2022) (same); *see also McNulty*, 2023 WL 4826950, at *5 ("no significant case, precedential or persuasive, has cast doubt on the constitutionality of imposing conditions and qualifications on the commercial sale of arms").

This Court is bound by the *Vincent* panel's determination that the "presumptively lawful" category continues to apply after *Bruen*. *See, e.g.*, *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020) ("We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court") (quotations omitted). Because SB23-169 is a presumptively lawful commercial regulation, the district court erred by proceeding to *Bruen*'s second step and enjoining it.

**B.    Even if Plaintiffs were likely to succeed on *Bruen*'s first step, this Court should reverse because SB23-169 is relevantly similar to historic regulations on firearms at *Bruen*'s second step.**

Although the district court's analysis should have ended at *Bruen*'s first step, the district court also erred by holding that the Governor failed to "demonstrate

43

that SB23-169 is consistent with the Nation's historical tradition of firearm regulation." Order at 40. These issues were raised and ruled on below. *Id.* at 31–40.

*First*, the Governor presented robust and unrebutted evidence that SB23-169 is consistent with Founding-era and Reconstruction-era restrictions. Our Nation's history of prohibiting gun sales to those under 21 is one of the most extensive traditions of gun regulations—with nearly half of the States existing prior to the 20th century enacting such restrictions.

*Second*, the district court only reached its conclusion by misapplying *Bruen*. The district court concluded that the Governor failed to identify "during the founding era" "a total prohibition on the sale of firearms to minors." Order at 39. But *Bruen* does not require a "dead ringer" in the historical record. 597 U.S. at 30. Instead, when faced with "unprecedented societal concerns or dramatic technological changes" the Supreme Court instructed lower courts to "reason[] by analogy" whether the modern regulation is "relevantly similar" to the "historical analogues" identified by the government. *Id.* at 28–30. The district court also erred by excluding any non-Founding-era historical evidence from its analysis. The district court required the Governor to first point to a "total prohibition" from the Founding era *before* the district court would even consider pre-Civil War or

Reconstruction era evidence.  Order at 39–40.  *Heller* and *Bruen* do not require this

and otherwise found post-enactment evidence "critical" on the Second

Amendment's meaning when it was not inconsistent with earlier evidence.  *Bruen*,

597 U.S. at 34–36 (quoting *Heller*, 554 U.S. at 605).

### 1. The Governor's evidence demonstrated a "relevantly similar" tradition of firearm regulation from the Founding through the 19th century.

The Governor presented unrebutted evidence that age-restrictions on gun

sales were consistent with our Nation's historical traditions.  As discussed *supra*

II.A.1.a and II.A.2.a, the Governor's expert showed that those under 21 were not

adults under the common law at America's Founding.  Their legal affairs were

managed by their parents or guardians.  *Id.*  Minors were viewed as "lack[ing]

reason and decisionmaking ability" and "the law imposed age limits on all manner

of activities that required judgment and reason."  *Brown*, 564 U.S. at 826, 834

(Thomas, J. dissenting).  Based on this history, Justice Thomas concluded in

*Brown* that laws limiting a minor's speech "by requiring parental consent to speak

to a minor … [were] within the original meaning of the First Amendment."  *Id.* at

835.  The same historical analysis should apply to the Second Amendment.

Furthermore, Professor Cornell explained that early States regulated the

commercial conduct of those under 21.  Early American courts regularly voided

contracts entered by those under 21 when the court determined the transaction was not in the minor's interest.  App. Vol. 1 at 162–63.  States protected those under 21 who entered contracts independently from their parents and upheld contracts only for "necessaries" like food and shelter.  *Id.*  This made minors "subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic."  *Id.* at 163.  If 18-to-20-year-olds did not have full contractual rights under early American common law, then it is hard to imagine they had an unfettered right to contract for the purchase of guns.

Next, the Governor presented unrebutted testimony from Historian Robert Spitzer that early American colleges enacted policies prohibiting students from possessing guns.  App. Vol. 2 at 240–43, 287–92.  Among early public colleges, Professor Spitzer identified such restrictions at the University of North Carolina (1799, 1838), Georgia (1810), Virginia (1824), College of Wiliam and Mary (1830), the College of New Jersey/Rutgers College/Drew University (1871), the University of Mississippi (1878, 1892), and the University of Kentucky.  *Id.* at 242–43.  Professor Spitzer also explained that has not yet found a college policy from this era permitting gun possession on college campuses.  *Id.* at 243.

Founding-era laws also often regulated who could possess guns for safety reasons.  At least one court of appeals held pre-*Bruen* that these colonial

restrictions were part of the "considerable evidence" that laws prohibiting gun sales to those under 21 were "consistent with a longstanding, historical tradition[.]" *NRA v. BATFE*, 700 F.3d 185, 203 (5th Cir. 2012); *see also Reese v. BATFE*, 647 F. Supp. 3d 508, 524 (W.D. La. 2022) (dismissing Second Amendment challenge by 18-to-20-year-olds because *BATFE*'s discussion of colonial era-regulations "satisfies the *Bruen* test" for a historical analogue).

At the start of the 19th century, States began to codify these common law restrictions in statute. In the early 19th century, laws in New York, Delaware, South Carolina, and Connecticut made parents liable for minors unlawfully firing guns. App. Vol. 2 at 233–34. And by the early 1900s, some 46 States had enacted over 100 state laws that restricted access to guns and other dangerous weapons by young people. *Id.* at 232–33, 246–286.

By the end of the 19th century, eighteen States and the District of Columbia had enacted laws remarkably similar to SB23-169, restricting those under 21 from using or purchasing guns. [4] *Id.* at 234–37, 462–70. Before the Civil War, Alabama, Tennessee, and Kentucky passed laws prohibiting the sale of pistols and other dangerous weapons to minors. 1856 Ala. Acts 17; Tenn. Code § 4864; 1859

---

[4] A nineteenth state, Kentucky, enacted laws prohibiting the sale of pistols to minors in two major cities. App. Vol. 2 at 235 n.21.

Ky. Acts 245.  In all three, the age of majority was 21.  *See Saltonstall v. Riley*, 28

Ala. 164, 172 (Ala. 1856); *Warwick*, 37 Tenn. at 660–61; *Newland v. Gentry*, 57

Ky. 666, 671 (Ky. 1857).  Over the next forty years, sixteen more States (Indiana,

Georgia, Mississippi, Delaware, Illinois, Nevada, Maryland, West Virginia,

Wisconsin, Kansas, Missouri, Iowa, Louisiana, Wyoming Territory, North

Carolina, Texas) and the District of Columbia enacted nearly identical laws.  App.

Vol. 2 at 234–37, 462–70.  For example, in 1875 Indiana law made it "unlawful for

any person to sell … to any other person, under the age of twenty-one years, any

pistol" or other dangerous weapons.  1875 Ind. Acts 59.  Many of these States

restricted gun sales to "minors."  App. Vol. 2 at 234–37, 462–70.  The law of each

jurisdiction stated that minors were those under 21.  *See Bondi*, 61 F.4th at 1333;

App. Vol. 2 at 462–70.

These 19th century laws were "well-established," not "localized restrictions"

or "outliers."  *Bruen*, 597 U.S. at 30, 65, 67.  They were enacted over a forty-year

period.  App. Vol. 2 at 462–70.  These twenty jurisdictions represent nearly half of

the States at the time.  The States adopting these laws were also geographically

diverse, with States from the East (e.g., Delaware, Maryland), the South (e.g.,

Alabama, Georgia), the Midwest (e.g., Illinois, Wisconsin), and the then-West

(e.g., Texas, Wyoming Territory).

While each law varied, these 19th century laws generally operated like SB23-169 by regulating what gun dealers could sell to those under 21. *Id.* at 236. Several went further than SB23-169 by making it unlawful to even give those under 21 a gun. *See, e.g.*, Mo. Rev. Stat. § 1247 (1883) (making it unlawful to "directly or indirectly sell or deliver, loan, or barter to any minor any" any dangerous weapon including "any kind of fire arms, bowie knife, dirk, dagger, [or] slung-shot.").

The Governor also pointed to the lack of legal challenges to these laws at the time. As discussed above, *supra* II.A.1.a, legal commentators like Thomas Cooley agreed that "the State may prohibit the sale of arms to minors' pursuant to the State's police power." In *Callicutt*, the Tennessee Supreme Court rejected the only known Second Amendment challenge to these 19th century laws. *Callicutt*, 69 Tenn. at 716. In other cases, courts reviewed convictions under these age-restriction laws without even addressing the Second Amendment. *See Coleman v. State*, 32 Ala. 581, 582–83 (Ala. 1858); *State v. Allen*, 94 Ind. 441 (Ind. 1884); *Tankesly v. Comm*., 9 S.W. 702, 703 (Ky. 1888). These defendants did not bother to assert the Second Amendment as a defense to their charges under these 19th century laws, underscoring the public's understanding that age-restrictions were constitutional.

49

In sum, the Governor presented evidence of an unbroken historical tradition—from common law attitudes to widespread state statutes—regulating access to guns by those under 21. If this Court reaches *Bruen*'s second step, the Governor has carried his burden of demonstrating relevantly similar historical analogues for SB23-169.

### 2. The district court applied the wrong standard at *Bruen*'s second step.

The district court's conclusion that the Governor failed to carry his burden at *Bruen*'s second step was the result of two legal errors. *First*, the district court wrongly required the Governor identify a "dead ringer" from the Founding-era rather than a "historical analogue." *Bruen*, 597 U.S. at 30. *Second*, the district court completely discounted Reconstruction-era evidence despite the fact that such evidence is relied on by the Supreme Court when, as here, the evidence is consistent with prior historical evidence.

### a) The district court wrongly required identification of a "total prohibition" from the Founding era, *i.e.* a "dead ringer."

At *Bruen*'s second step, the government's burden is to "identify a well-established and representative historical *analogue*[.]" *Id*. *Bruen* made clear that the government need not identify a "historical twin" or a "dead ringer" in the historical record to pass constitutional muster. *Id*. Lower courts were not

instructed to simply flyspeck whether the modern regulation existed in the same form in 1791. Due to "unprecedented societal concerns or dramatic technological changes" "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. The Supreme Court instructed lower courts to "reason[] by analogy" whether the modern regulation is "relevantly similar" to the historical analogues identified by the government. *Id.* at 29. A court conducts this analysis across at least two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*

The district court applied the wrong standard to the Governor's evidence. The district court stated the Governor "fail[ed] to point to any evidence during the founding era that a ***total prohibition*** on the sale of firearms to minors was consistent with the right to bear arms[.]" Order at 39–40 (emphasis added). But by requiring the Governor to show a "total prohibition" "during the founding era" for SB23-169, the district court improperly required evidence of a "dead ringer."

The Governor presented uncontested evidence that the modern challenges of youth gun violence were not prevalent at the Founding. Gun violence was not a pressing issue at the Founding. App. Vol. 1 at 184. Founding-era America was a rural society where minors lived mostly at home. App. Vol. 2 at 238–39.

51

However, by the late 1800s, the United States had become an urban-industrialized society necessitating the creation of various laws protecting minors. *Id.* The Governor's expert, Historian Brennan Rivas, explained that dramatic technological advancements in gun production in the 19th century and increased levels of violence led to new gun regulations, like age-based sales restrictions. *Id.* at 348–72. These laws were a response to America's first gun crisis in the late 19th century, and the sudden easy commercial availability of more dangerous guns. *Id.* at 373–74. Thus, it is not surprising that statutes directed specifically at restricting sales of guns to minors did not emerge until this period.

However, throughout its analysis, the district court required a "dead ringer" instead of a "historical analogue." For example, as to Founding-era common law, the district court found this evidence was not "directed specifically at the acquisition of firearms" or that the evidence did not show gun purchases "typically involved a contract[.]" Order at 33. While possibly not a dead ringer, Founding era attitudes were nonetheless relevantly similar. "The history clearly shows a founding generation that believed parents to have complete authority over their minor children." *Brown*, 564 U.S. at 834 (Thomas, J. dissenting). Importantly, the "how and the why" was the same. *Bruen*, 142 S. Ct. at 2133. American common law imposed age limits and regulated 18-to-20-year-olds' commercial conduct to

52

protect minors and because those under 21 were viewed as lacking responsible decision making ability. *Brown* at 826–27.

Likewise, the district court dismissed the fact that early American public colleges prohibited this age group from possessing guns on campus. Order at 35. The district court stated that early college bans "could just easily have been based on their status as students living together in dormitories." Order at 35. But this was directly counter to the historians' unrebutted expert declarations, who explained that early colleges acted in place of a parent precisely because a college student's age meant they were not yet adults. App. Vol. 1 at 168–70 ("[M]inors attending college traded strict parental authority for an equally restrictive rule of in *loco parentis*."); Appl Vol. 2 at 240 (same). College was one of the few areas where those under 21 lived outside their parent's authority, making government restrictions during the Founding era necessary. *Id*. Early public college restrictions thus demonstrate a Founding-era tradition that gun restrictions on this age group did not contravene the public's understanding of the Second Amendment.

      **b)**      **The district court wrongly rejected the Governor's Reconstruction-era evidence, despite its consistency with earlier traditions.**

While the Governor needs only to identify a "historical analogue," the 19th century laws identified from twenty American jurisdictions were effectively "dead ringer[s]" or "historical twin[s]" for SB23-169. *Bruen*, 597 U.S. at 30. The district court erred legally by excluding this evidence from its analysis entirely.

While recognizing it was an "open question as to how a court should weigh historical understandings … at the time the Fourteenth Amendment was adopted" the district court ultimately refused to consider any Reconstruction-era evidence "*because* the Governor fails to point to any evidence during the founding era that a total prohibition on the sale of firearms to minors was consistent with the right to bear arms[.]" Order at 39–40 (emphasis added). In other words, the district court required the Governor to first point to a "total prohibition" from the Founding era *before* the district court would even consider Reconstruction-era evidence. *Id*. The district court's analysis would effectively reduce *Bruen*'s second step to a question of whether there is an exact match for the modern regulation from the Founding era.

This Court should reject the district court's refusal to consider 19th century evidence. *First*, the Supreme Court has never instructed lower courts to ignore

19th century history. *Heller*, *McDonald*, and *Bruen* all looked to 19th century history as part of its Second Amendment analysis. *Heller* looked to how the text was "interpreted from immediately after its ratification through the end of the 19th century," 554 U.S. at 605, and described post-ratification history as "a critical tool of constitutional interpretation." *Id.* *Heller* spent nearly fifteen pages analyzing the scope of the Second Amendment based on 19th century evidence. *Id.* at 605-14. Likewise, *McDonald* looked extensively to 19th century evidence when considering whether the Second Amendment right was fundamental. 561 U.S. at 770–78 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental.").

While recognizing the "ongoing scholarly debate" on the question, *Bruen* ultimately declined to decide whether courts should "primarily" look to Reconstruction-era or Founding-era history when evaluating Second Amendment challenges to state laws. 597 U.S. at 37–38. Nonetheless, *Bruen* itself looked to late 19th century history on the scope of public carry, criticizing the parties for "ignor[ing] the outpouring of the discussion of the [right to keep and bear arms] … after the Civil War." *Id.* at 60 (citation to *Heller* omitted). Far from rejecting Reconstruction-era history, *Bruen* explained "the public discourse surrounding

55

Reconstruction is useful in demonstrating" the scope of public carry under the Second and Fourteenth Amendment. *Id.* at 60. This Court should follow the same approach as the Supreme Court and look to 19th century history when evaluating challenges under the Second Amendment.

*Second*, what *Bruen* truly cautioned against when using post-enactment history was using "late-19th-century evidence … when it *contradicts* earlier evidence." *Id.* at 66 (emphasis added). For example, *Bruen* found an 1871 statute from a single state unpersuasive on the scope of public carry under the Second Amendment. *Id.* at 64–66. *Bruen* rejected the relevance of the law, not because it was too late in time, but because the single law "contradicts the overwhelming weight of other evidence" from history closer in time to the Founding. *Id.* at 66 (quoting *Heller*, 554 U.S. at 632).

Here, the Reconstruction-era age-restriction statutes identified by the Governor were broadly consistent with Founding era views on people under the age of 21. For example, many of the Reconstruction-era statutes prohibiting gun sales to minors made exceptions for purchases made under parental consent or supervision. *See, e.g.*, 1897 Tex. Gen. Laws 221-22, App. Vol. 2 at 236. It is hardly surprising that this tradition was codified in a wave of state statutes in the

1800s, when parent-minor relationships were traditionally governed by common law during the Founding-era.

*Bruen* did not suggest that 19th century history is unhelpful when it is *consistent* with earlier evidence or our best historical evidence on the Founding era's view on the right's scope. But the district court adopted that approach here. There is a substantial difference between what *Bruen* said—rejecting later evidence when it contradicts the overwhelming weight of earlier historical evidence—and the district court's refusal to consider historical evidence when it purportedly is not supported by "confirmation in the form of founding era regulations." Order at 38. As other courts have held, "[i]t would be a mistake to treat this absence of evidence as evidence of [a modern regulation's] unconstitutionality," *Or. Firearms Fed'n v. Kotek*, --- F. Supp. 3d ---, 2023 WL 4541027, at *36 n.28 (D. Or. July 17, 2023) (unpublished), because it "make[s] no sense to divine constitutional significance from non-existent legislation concerning non-existent problems" at the Founding. *Hanson v. D.C.,* --- F. Supp. 3d ---, 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023) (unpublished).

Because the Governor's Reconstruction-era evidence was not contradicted by earlier Founding-era history, the district court erred by excluding it. Even if Reconstruction-era evidence does "not provide as much insight into its original

meaning as earlier sources," *Heller* 554 U.S. at 614, it should not be disregarded entirely. The Reconstruction-era generation was closer in time to the Founding and likely had a better understanding of Second Amendment's original meaning. Our Nation's history did not end in 1791. How subsequent generations "adapted [the Constitution] to the various crises of human affairs" not anticipated at the Founding provides insight on its meaning. *Bruen*, 597 U.S. at 28 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819)). The alternative is replacing history with our 21st century understandings of the right's scope. *Bruen* directly rejected that approach, finding that "reliance on history to inform the meaning of constitutional text … is, in our view, more legitimate[.]" 597 U.S. at 25.

*Third*, Reconstruction-era history should be considered when a plaintiff challenges State laws under the Second Amendment. States like Colorado are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37; *see also Bondi*, 61 F.4th at 1323 ("the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment[.]"); *Ezell*, 651 F.3d at 702 ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the states depends on how the right was

58

understood when the Fourteenth Amendment was ratified."). Therefore, how the Second Amendment was publicly understood when the Fourteenth Amendment was ratified in 1868 is the most appropriate inquiry. The district court's exclusion of Reconstruction-era history in a challenge to Colorado law is particularly ahistorical. Colorado joined the Union eight years *after* the Fourteenth Amendment was adopted, and during a time when States across the country were adopting laws restricting sales of guns to minors.

## III.     The remaining factors do not support the preliminary injunction.

The preliminary injunction should also be reversed because Plaintiffs failed to demonstrate that they will experience any irreparable harm or that that the alleged injury outweighs the public interest. *See Free the Nipple-Fort Collins*, 916 F.3d at 797. This issue was raised and ruled on below. Order at 40–41.

*First*, Plaintiffs failed to demonstrate they would suffer any non-theoretical injury absent the injunction. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Moreover, Plaintiffs must show that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quotations omitted).

Plaintiffs' boilerplate declarations were insufficient to establish imminent and non-theoretical irreparable harm. *See N.M. Dep't of Game & Fish*, 854 F.3d at 1253 (declaration insufficient to show irreparable harm because "general rule that a preliminary injunction should not issue on the basis of affidavits alone."). Plaintiffs' declarations failed to disclose whether Plaintiffs already owned guns they could use in self-defense or whether they could acquire guns through family members consistent with the law. SB23-169 does nothing to prevent possession of guns Plaintiffs already owned.

The district court erred by finding that the allegation of a Second Amendment injury alone was sufficient to demonstrate irreparable harm. Order at 41. However, as explained above, the Plaintiffs failed to establish the Second Amendment covers purchasing guns before the age of 21. Instead, "individual self-defense is 'the *central component*' of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *McDonald* and *Heller*). Plaintiffs' declarations were devoid of any non-conclusory facts supporting that SB23-169 threatened their ability to use guns in self-defense. *See RMGO II*, 2023 WL 8446495 at *20 (finding no irreparable harm where plaintiffs possessed "numerous other firearms" did not testify they "would be unable to defend themselves" and "alleged no harm associated with the right of self-defense."). Moreover, Plaintiffs needed to show

60

that their rights were threatened or actually impaired "at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs' declarations were signed two months before SB23-169 went into effect. Plaintiffs had ample opportunity to purchase guns prior to SB23-169's effective date. Even if a constitutional right was involved, the district court was obligated to "nonetheless engage in [the] traditional equitable inquiry as to the presence of irreparable harm in such a context." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). Here, the Plaintiffs did not need a preliminary injunction to avoid the claimed harm, but could have purchased guns on the day they signed their declarations.

*Second*, the public interest strongly favors Colorado's enforcement of SB23-169. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). SB23-169 was enacted as guns became the leading cause of death in Colorado among this age group. App. Vol. 1 at 115 n.1. The Governor's expert Dr. Steinberg explained that Colorado's law would "likely reduce the number of firearm homicides, nonhomicide violent crimes, suicides, and accidental firearms injuries in Colorado." App. Vol. at 2 at 399. Plaintiffs simply cannot show their

61

desire to purchase guns before the age of 21 outweighs Colorado's concrete public interest in protecting people's lives.

## CONCLUSION

This Court should reverse the district court entry of a preliminary injunction against SB23-169.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves a constitutional challenge to a state statute.

Dated: December 7, 2023

PHILIP J. WEISER
Attorney General

*s/   Matthew J. Worthington*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael T. Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6349
Email: grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Governor Jared Polis*
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2023, I served a true and complete copy of the foregoing **Appellant's Brief** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

*s/ Carmen Van Pelt*
Carmen Van Pelt

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) (excluding the items listed under Fed R. App. P. 32(f)) because

      this brief contains 12,920 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

      this brief has been prepared in a proportionally spaced typeface (fourteen-point Times New Roman) using Microsoft Word.

Date: December 7, 2023.

                  *s/ Matthew J. Worthington*
                  MATTHEW J. WORTHINGTON
                  Assistant Attorney General