23-1251

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JARED POLIS, in his official capacity as Governor of the State of Colorado,

Defendant - Appellant,

v.

ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA,

Plaintiffs - Appellees.

On Appeal from the United States District Court, District of Colorado
The Honorable Phillip A. Brimmer
Chief District Judge

District Court Case No. 23-cv-01077-PAB

## DEFENDANT-APPELLANT JARED POLIS'S APPENDIX, VOLUME 1 OF 3

PHILIP J. WEISER
Attorney General
GRANT T. SULLIVAN*
Assistant Solicitor General
MICHAEL T. KOTLARCZYK *
Senior Assistant Attorney General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone:  720-508-6349
E-Mail:  grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record

*Attorneys for Governor Polis*

# TABLE OF CONTENTS

## Volume 1 of 3

District Court Docket Sheet, Case No. 1:23-cv-01077-PAB ....................................3

Document 1, Complaint ........................................................................9

Document 1-1, Exhibit A to Complaint, SB 23-169 ...............................................15

Document 2, WITHDRAWN Complaint ...............................................................20

Document 2-1, WITHDRAWN Exhibit A to Complaint, HB 23-1219 .................27

Document 3, Request Regarding Inadvertent Filing ................................................32

Document 4, Administrative Notice: Duplicate Filing Fee .....................................33

Document 5, Case Assignment to Magistrate Judge Mix........................................34

Document 6, Consent/Non-Consent to Magistrate Judge Form.............................35

Document 7, Order Setting Scheduling/Planning Conference ...............................39

Document 7-1, Instruction for Preparation of Scheduling Order ...........................42

Document 7-2, Scheduling Order Form .................................................................44

Document 8, Minute Order Granting Withdrawal of Inadvertent Filing ...............53

Document 9, First Amended Complaint .................................................................54

Document 10, Summons to be Issued to Jared S. Polis...........................................61

Document 11, Issued Summons to Jared S. Polis...................................................63

Document 12, Motion for Preliminary Injunction .................................................65

Document 12-1, Declaration of Dudley Brown......................................................83

Document 12-2, Declaration of Tate Mosgrove ....................................................85

Document 12-3, Declaration of Adrian Pineda .....................................................87

Document 13, Waiver & Acceptance of Service.....................................................89

Document 14, Minute Order on Assignment to District Judge ..............................90

Document 15, Case reassigned to Judge Kane, drawn to Magistrate Judge Mix....91

Document 16, Minute Order on Motion for Preliminary Injunction Briefing
Schedule and on Setting Hearing.................................................................92

Document 17, Minute Order on Evidentiary Hearing Date....................................93

Document 18, Sullivan Entry of Appearance ........................................................94

Document 19, Kotlarczyk Entry of Appearance.....................................................97

Document 20, Worthington Entry of Appearance .................................................100

Document 21, Unopposed Motion for Tate Mosgrove to Appear Electronically at
July 6 Hearing.........................................................................................103

Document 22, Minute Order Vacating Scheduling Conference............................105

Document 23, Order Granting Unopposed Motion for Tate Mosgrove to Appear
Electronically at July 6 Hearing ..............................................................106

Document 24, Order of Transfer to Chief Judge Brimmer...................................108

Document 25, Minute Order on Motion for Preliminary Injunction Briefing ......109

Document 26, Unopposed Motion to Exceed Page Limits....................................110

Document 27, Order Granting Motion to Exceed Page Limits .............................114

Document 28, The Governor's Response to Plaintiffs' Motion for Preliminary
Injunction .................................................................................................115

Document 28-1, Exhibit 1, Cornell Declaration...................................................141

**Volume 2 of 3**

Document 28-2, Exhibit 2, Spitzer Declaration.....................................................226

Document 28-3, Exhibit 3, Rivas Declaration .......................................................334

Document 28-4, Exhibit 4, Steinberg Declaration.................................................379

Document 28-5, Exhibit 5, Historical Analogues..................................................462

Document 29, Notice of Three Related Cases........................................................471

Document 30, Reply in Support of Motion for Preliminary Injunction ................474

Document 31, Consent/Non-Consent Form...........................................................489

Document 32, Notice of Supplemental Authority ...............................................491

Document 32-1, Eleventh Circuit Case No. 21-12314 Order...............................493

Document 33, The Governor's Response to Notice of Supplemental Authority and
    Notice of Additional Supplemental Authority........................................495

## Volume 3 of 3

Document 33-1, District of Oregon Case No. 2:22-cv-01815-IM Findings of Fact
    and Conclusions of Law ...........................................................................498

Document 34, Motion for Temporary Restraining Order.....................................620

Document 34-1, Proposed Temporary Restraining Order and SB 23-169............623

Document 35, Minute Order on Response to Motion for Temporary Restraining
    Order ........................................................................................................630

Document 36, The Governor's Response to Plaintiffs' Motion for Temporary
    Restraining Order......................................................................................631

Document 37, Order Granting Motion for Preliminary Injunction ......................636

Document 38, Stipulated Extension for Time to Respond ...................................680

Document 39, Order Referring Case to Magistrate Judge Neureiter ...................682

Document 40, Order Setting Scheduling/Planning Conference ...........................684

Document 41, Notice of Appeal ..........................................................................686

Document 42, The Governor's Motion for a Stay of the Preliminary Injunction
    Pending Appeal.........................................................................................688

Document 42-1, Exhibit 1, Declaration of Nicholaus Baumgart .........................700

Document 43, Unopposed Motion to Expedite Briefing on Motion to Stay the
    Preliminary Injunction Order....................................................................703

Document 44, Order Granting Unopposed Motion for Expedited Briefing on
    Motion to Stay the Preliminary Injunction Order.....................................706

Document 45, Letter Transmitting Notice of Appeal ...........................................707

Document 45-1, Docket Sheet ............................................................................709

Document 45-2, Preliminary Record ...............................................................714

Document 46, USCA Case Number ...................................................................760

Document 47, Response in Opposition to Motion For Stay ..............................762

Document 48, Order Denying the Governor's Motion for a Stay of the Preliminary Injunction ...................................................................................770

Document 49, USCA Appeal Fees received .......................................................778

Document 50, Governor's Answer to First Amended Complaint ......................779

Document 51, Letter Certifying the Record is Complete ..................................783

APPEAL,JD1,MJ CIV PP,NDISPO

## U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23-cv-01077-PAB-NRN

Rocky Mountain Gun Owners et al v. Polis          Date Filed: 04/28/2023
Assigned to: Chief Judge Philip A. Brimmer        Jury Demand: None
Referred to: Magistrate Judge N. Reid Neureiter    Nature of Suit: 440 Civil Rights: Other
Case in other court: U.S. Court of Appeals, 10th Circuit, 23-01251    Jurisdiction: Federal Question
Cause: 42:1983 Civil Rights Act

**Plaintiff**

**Rocky Mountain Gun Owners**                represented by    **Barry Kevin Arrington**
                                                               Arrington Law Firm
                                                               4195 Wadsworth Boulevard
                                                               Wheat Ridge, CO 80033
                                                               303-205-7870
                                                               Email: barry@arringtonpc.com
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tate Mosgrove**                            represented by    **Barry Kevin Arrington**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Adrian S Pineda**                          represented by    **Barry Kevin Arrington**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jared S. Polis**                           represented by    **Grant T. Sullivan**
*in his official capacity as Governor of the*                  Colorado Attorney General's Office
*State of Colorado*                                            Ralph L. Carr Colorado Judicial Center
                                                               1300 Broadway
                                                               Denver, CO 80203
                                                               720-508-6349
                                                               Fax: 720-508-6038
                                                               Email: grant.sullivan@coag.gov
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Matthew John Worthington**
                                                               Colorado Attorney General's Office
                                                               Ralph L. Carr Colorado Judicial Center
                                                               1300 Broadway

App 3

Appellate Case: 23-1251     Document: 010110965256     Date Filed: 12/07/2023     Page: 7

Denver, CO 80203
720-508-6124
Email: matt.worthington@coag.gov
*ATTORNEY TO BE NOTICED*

**Michael T. Kotlarczyk**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6187
Fax: 720-508-6041
Email: mike.kotlarczyk@coag.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/28/2023 | 1 | COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC-9072435)Attorney Barry Kevin Arrington added to party Tate Mosgrove(pty:pla), Attorney Barry Kevin Arrington added to party Rocky Mountain Gun Owners(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) (Entered: 04/28/2023) |
| 04/28/2023 | 2 | **WITHDRAWN** COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC-9072445), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) Modified on 5/10/2023 pursuant to Minute Order 8 . (alave, ). (Entered: 04/28/2023) |
| 04/28/2023 | 3 | MOTION to Withdraw Document re 2 Complaint by Plaintiffs Tate Mosgrove, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 04/28/2023) |
| 04/28/2023 | 4 | Administrative Notice: Duplicate filing fee received. Financial notified and a refund is pending. (Text Only Entry) (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 5 | Case assigned to Magistrate Judge Kristen L. Mix. Text Only Entry. (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 6 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (blaws) (Entered: 04/28/2023) |
| 05/08/2023 | 7 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge Kristen L. Mix on 05/08/2023. Proposed Scheduling Order due 8/21/2023. Scheduling/Planning Conference set for 8/28/2023 11:10 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (Attachments: # 1 Continuation of Main Document, # 2 Continuation of Main Document) (alave, ) (Entered: 05/09/2023) |
| 05/09/2023 | 8 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 05/09/2023. IT IS HEREBY **ORDERED** that Motion 3 is **GRANTED**. The Complaint 2 , which Plaintiffs state was inadvertently filed shall be deemed **WITHDRAWN**. The correct Complaint in this case is 1 in the docket.(alave, ) (Entered: 05/10/2023) |
| 05/26/2023 | 9 | AMENDED COMPLAINT against Jared S. Polis Attorney Barry Kevin Arrington added to party Adrian S Pineda(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove, Adrian S Pineda.(Arrington, Barry) (Entered: 05/26/2023) |
| 05/31/2023 | 10 | SUMMONS REQUEST as to Jared S. Polis re 9 Amended Complaint by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: |

App 4

| | | |
|---|---|---|
| | | 05/31/2023) |
| 06/02/2023 | 11 | SUMMONS issued by Clerk. (alave, ) (Entered: 06/02/2023) |
| 06/07/2023 | 12 | MOTION for Preliminary Injunction by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration) (Arrington, Barry) (Entered: 06/07/2023) |
| 06/08/2023 | 13 | WAIVER OF SERVICE Returned Executed by Adrian S Pineda, Rocky Mountain Gun Owners, Tate Mosgrove. Jared S. Polis waiver sent on 6/7/2023, answer due 8/6/2023. (Arrington, Barry) (Entered: 06/08/2023) |
| 06/08/2023 | 14 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on June 8, 2023. This matter is before the Court sua sponte. This case was assigned to a United States Magistrate Judge pursuant to D.C.COLO.LCivR 40.1(c). Although a signed Consent/Non-Consent Form has not yet been filed, Plaintiff has filed a Motion for Preliminary Injunction 12 . See D.C.COLO.LCivR 40.1(c)(2)(a) (discussing assignment of cases in which a motion for injunctive relief has been filed). Accordingly, IT IS HEREBY ORDERED that this case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a). (csarr, ) (Entered: 06/09/2023) |
| 06/09/2023 | 15 | CASE REASSIGNED pursuant to 14 Minute Order. This case is randomly reassigned to Judge John L. Kane and drawn to Magistrate Judge Kristen L. Mix. All future pleadings should be designated as 23-cv-01077-JLK. (Text Only Entry) (csarr, ) (Entered: 06/09/2023) |
| 06/09/2023 | 16 | MINUTE ORDER. Defendant is DIRECTED to file a Response to Plaintiffs' Motion for Preliminary Injunction 12 on or before June 22, 2023. Any Reply is due on or before June 28, 2023. The parties are DIRECTED to call chambers JOINTLY at (303) 844-6118 to set a date and time for the preliminary injunction hearing. The Court has availability on June 29th, July 5th, or July 6th for the hearing. Plaintiffs are DIRECTED to provide notice of this Order to Defendant without delay. Ordered by Judge John L. Kane on 6/9/2023. Text Only Entry (jlksec) (Entered: 06/09/2023) |
| 06/12/2023 | 17 | MINUTE ORDER. An Evidentiary Hearing on Plaintiffs' Motion for Preliminary Injunction 12 is set for July 6, 2023, beginning at 9:30 a.m. The parties are DIRECTED to file their Witness and Exhibit Lists for the hearing on or before June 29, 2023. Counsel and the parties are expected to attend the hearing in person. The parties shall note on their Witness Lists whether it is anticipated any witness will testify via video teleconferencing. Ordered by Judge John L. Kane on 6/12/2023. Text Only Entry (jlksec) (Entered: 06/12/2023) |
| 06/12/2023 | 18 | NOTICE of Entry of Appearance by Grant T. Sullivan on behalf of Jared S. PolisAttorney Grant T. Sullivan added to party Jared S. Polis(pty:dft) (Sullivan, Grant) (Entered: 06/12/2023) |
| 06/12/2023 | 19 | NOTICE of Entry of Appearance by Michael T. Kotlarczyk on behalf of Jared S. PolisAttorney Michael T. Kotlarczyk added to party Jared S. Polis(pty:dft) (Kotlarczyk, Michael) (Entered: 06/12/2023) |
| 06/12/2023 | 20 | NOTICE of Entry of Appearance by Matthew John Worthington on behalf of Jared S. PolisAttorney Matthew John Worthington added to party Jared S. Polis(pty:dft) (Worthington, Matthew) (Entered: 06/12/2023) |
| 06/13/2023 | 21 | MOTION for Leave to *Allow Mosgrove to Appear Electronically at July 6 Hearing* 17 Minute Order,, by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 06/13/2023) |

App 5

| 06/13/2023 | 22 | MINUTE ORDER. In light of the reassignment of this case to Senior District Judge John L. Kane [#15], the Scheduling Conference set for August 28, 2023, at 11:00 a.m. is VACATED. By Magistrate Judge Kristen L. Mix on June 13, 2023. Text Only Entry (klmlc1, ) (Entered: 06/13/2023) |
| --- | --- | --- |
| 06/13/2023 | 23 | ORDER granting 21 Unopposed Motion for Tate Mosgrove to Appear Electronically at July 6 Hearing. Plaintiff Tate Mosgrove is allowed to appear electronically for the Evidentiary Hearing on the Motion for Preliminary Injunction on July 6, 2023, beginning at 9:30 a.m. Plaintiffs' counsel and Mr. Mosgrove are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC. Please contact Ms. Abiakam on or before June 30, 2023. Ordered by Judge John L. Kane on 6/13/2023. Text Only Entry(jlksec) (Entered: 06/13/2023) |
| 06/21/2023 | 24 | Order of Transfer. This case is closely related to Case No. 23-cv-01076-PAB, with one of the same plaintiffs and the same defendant in each case and common questions of fact and/or law. Clerk shall transfer this case to Chief Judge Brimmer. All future pleadings shall be designated as 23-cv-01077-PAB. ORDERED by Judge John L. Kane on 6/21/2023. (angar, ) (Entered: 06/21/2023) |
| 06/22/2023 | 25 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 6/22/2023. Defendant shall respond to plaintiffs' Motion for Preliminary Injunction [Docket No. 12 ] on or before **June 29, 2023**. Plaintiffs may file a reply in support of their motion on or before **July 13, 2023**. Text Only Entry (pabsec, ) (Entered: 06/22/2023) |
| 06/23/2023 | 26 | Unopposed MOTION for Leave to File Excess Pages by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 06/23/2023) |
| 06/26/2023 | 27 | ORDER by Chief Judge Philip A. Brimmer on 6/26/2023 re: 26 defendant's Unopposed Motion to Exceed Page Limits is **GRANTED**. Defendant shall file a response to 12 Motion for Preliminary Injunction **that shall not exceed 25 pages**, and plaintiffs may file a reply in support of their motion **that shall not exceed 15 pages**. Text Only Entry(pabsec, ) (Entered: 06/26/2023) |
| 06/29/2023 | 28 | RESPONSE to 12 MOTION for Preliminary Injunction filed by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1; Cornell Declaration, # 2 Exhibit 2; Spitzer Declaration, # 3 Exhibit 3; Rivas Declaration, # 4 Exhibit 4; Steinberg Declaration, # 5 Exhibit 5; Historical Analogues)(Worthington, Matthew) (Entered: 06/29/2023) |
| 07/10/2023 | 29 | NOTICE of Three Related Cases by Defendant Jared S. Polis (Sullivan, Grant) (Entered: 07/10/2023) |
| 07/12/2023 | 30 | REPLY to Response to 12 MOTION for Preliminary Injunction filed by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 07/12/2023) |
| 07/13/2023 | 31 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners All parties do not consent.. (Arrington, Barry) (Entered: 07/13/2023) |
| 07/15/2023 | 32 | SUPPLEMENT/AMENDMENT to 30 Reply to Response to Motion by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 11th Cir Order Vacating Bondi)(Arrington, Barry) (Entered: 07/15/2023) |
| 07/18/2023 | 33 | RESPONSE to 32 Supplement/Amendment *and Notice of Additional Supplemental Authority* by Defendant Jared S. Polis. (Attachments: # 1 Exhibit A, Oregon Firearms Federation v. Kotek Decision)(Worthington, Matthew) (Entered: 07/18/2023) |

| 08/03/2023 | 34 | MOTION for Temporary Restraining Order by Plaintiffs Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Proposed Order (PDF Only))(Arrington, Barry) (Entered: 08/03/2023) |
|---|---|---|
| 08/03/2023 | 35 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 8/03/2023. Defendant may file a response to 34 Motion for Temporary Restraining Order on or before **Monday, August 7, 2023, at 12:00 p.m.** Text Only Entry (pabsec, ) (Entered: 08/03/2023) |
| 08/07/2023 | 36 | RESPONSE to 34 MOTION for Temporary Restraining Order filed by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/07/2023 | 37 | ORDER by Chief Judge Philip A. Brimmer on 8/7/2023, re: The Portion of 12 Plaintiffs Motion for Preliminary Injunction brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED. ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23-169. **ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits. **ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c). **ORDERED** that 34 Plaintiffs' Motion for Temporary Restraining Order is **DENIED as moot.** (jtorr, ) (Entered: 08/07/2023) |
| 08/07/2023 | 38 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Jared S. Polis. Jared S. Polis answer due 8/28/2023. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/10/2023 | 39 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter for **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 8/10/2023. Text Only Entry (pabsec, ) (Entered: 08/10/2023) |
| 08/11/2023 | 40 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE. A Scheduling Conference is set for 9/25/2023 at 2:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. By Magistrate Judge N. Reid Neureiter on August 11, 2023. (rvill, ) (Entered: 08/11/2023) |
| 08/11/2023 | 41 | NOTICE OF APPEAL as to 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis (Worthington, Matthew) (Entered: 08/11/2023) |
| 08/11/2023 | 42 | MOTION to Stay re 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1, Declaration of Baumgart) (Sullivan, Grant) (Entered: 08/11/2023) |
| 08/11/2023 | 43 | Unopposed MOTION to Expedite *Briefing on Motion to Stay the Preliminary Injunction Order* by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 08/11/2023) |

App 7

| 08/14/2023 | 44 | ORDER by Chief Judge Philip A. Brimmer on 8/14/2023 re: 43 defendant's Unopposed Motion for Expedited Briefing on Motion to Stay the Preliminary Injunction Order is **GRANTED**. Plaintiffs shall file a response to 42 The Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal (Dkt. 37) on or before **Tuesday, August 15, 2023**. Text Only Entry(pabsec, ) (Entered: 08/14/2023) |
|---|---|---|
| 08/14/2023 | 45 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 41 Notice of Appeal filed by Jared S. Polis to the U.S. Court of Appeals. (Retained Counsel, Fee not paid and 1915 motion not filed) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(jtorr, ) (Entered: 08/14/2023) |
| 08/14/2023 | 46 | USCA Case Number 23-1251 for 41 Notice of Appeal filed by Jared S. Polis. (jtorr, ) (Entered: 08/14/2023) |
| 08/15/2023 | 47 | RESPONSE to 42 MOTION to Stay re 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, filed by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 08/15/2023) |
| 08/18/2023 | 48 | ORDER by Chief Judge Philip A. Brimmer on 8/18/2023, re: 42 Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal is **DENIED**. (jtorr, ) (Entered: 08/18/2023) |
| 08/18/2023 | 49 | USCA Appeal Fees received $ 505, receipt number 107937; Full Payment (USCA Case No. 23-1251) (efoga, ) (Entered: 08/18/2023) |
| 08/28/2023 | 50 | *Governor's* ANSWER to 9 Amended Complaint by Jared S. Polis.(Worthington, Matthew) (Entered: 08/28/2023) |
| 08/31/2023 | 51 | LETTER TO USCA and all counsel certifying the record is complete as to 41 Notice of Appeal filed by Jared S. Polis. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 23-1251) Text Only Entry (schap, ) (Entered: 08/31/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/29/2023 11:56:18 | | |
| **PACER Login:** | cvanpelt11 | **Client Code:** | 2023-EXAD-146639 |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-01077-PAB-NRN Starting with document: 1 Ending with document: 51 |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

App 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS, and
TATE MOSGROVE,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

_____

## COMPLAINT
_____

      Plaintiffs Rocky Mountain Gun Owners ("RMGO") and Tate Mosgrove ("Mosgrove") submit the following Complaint.

## I.  INTRODUCTION

      This action is a challenge to the constitutionality of Senate Bill 23-169 enacted by the Colorado General Assembly and signed by Governor Polis on April 27, 2023 ("SB23-169"). SB23-169 will become effective on August 4, 2023. SB-23-169 prohibits persons over the age of 18 but under the age of 21 from purchasing a firearm of any type. As such, it is blatantly unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment. A copy of SB23-169 in its final form is attached as Exhibit A.

1

## II.  PARTIES

1.      Plaintiff RMGO is a nonprofit organization.  RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms.  RMGO has members who reside in Colorado who are between the ages of 18 and 20.  RMGO represents the interests of these members.  Specifically, RMGO represents the interests of those who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms. It is these members' present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in their home. These members are precluded from purchasing a firearm by SB23-169, which bars them from exercising their fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

2.      Plaintiff Mosgrove is a natural person, over the age of 18 but under the age of 21, and a citizen Colorado and the United States. Mosgrove has never been charged with nor convicted of any misdemeanor or felony offense. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. Mosgrove is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

3.      Defendant Jared S. Polis is the Governor of the State of Colorado.  This action is brought against him in his official capacity.

App 10

4. Defendant is or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

## III. JURISDICTION AND VENUE

5. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

6. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

7. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV. GENERAL ALLEGATIONS

8. The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

9. The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra.*

10.     SB23-169 states in relevant part: "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

11.     In *Bruen*, the Court held: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

12.     Plaintiffs desire to purchase firearms for lawful purposes (including defense of their homes). The right to keep arms necessarily implies the right to acquire arms. SB23-169 prohibits or soon will prohibit Plaintiffs from doing so. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen*, and SB23-169 is presumptively unconstitutional.

13.     Since the Second Amendment presumptively protects Plaintiffs' conduct, the State must justify SB23-169 by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden, because there is no such historical tradition of firearms regulation in this Nation.

14.   In *Worth v. Harrington*, 2023 WL 2745673 (D. Minn. Mar. 31, 2023), the court held that there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from carrying firearms in public. *See also Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) (same). *A fortiori* there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from purchasing firearms to possess for the self-defense and other lawful uses, including self-defense in the home.

15.   In summary, the plain text of the Second Amendment covers Plaintiffs' conduct. Therefore, SB23-169 is presumptively unconstitutional. The State is unable to rebut this presumption, because the law is not consistent with Nation's historical tradition of firearm regulation. Therefore, SB23-169 is unconstitutional to the extent it probits law-abiding adults from purchasing firearms for lawful purposes.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

16.   Paragraphs 1-15 are realleged and incorporated by reference.

17.   SB23-169 prohibits residents of the State, including Plaintiffs, from exercising their right to acquire arms protected by the Second Amendment.   There are significant penalties for violations of the law.

18.   These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment.

19.     SB23-169's prohibitions prohibit purchasing arms even for the purpose of self-defense in the home, where Second Amendment protections are at their zenith.

20.     The State cannot satisfy its burden of justifying these restrictions on the Second Amendment right of the People by demonstrating that they are consistent with this Nation's historical tradition of firearm regulation.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray that the Court:

21.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that SB23-169 is unconstitutional on its and face or as applied to the extent it prohibits adults from acquiring firearms for lawful purposes;

22.     Enter preliminary and permanent injunctive relief enjoining Defendant and his officers, agents, and employees from enforcing SB23-169 against adults;

23.     Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

24.     Award actual or nominal damages to the individual Plaintiff (RMGO does not seek damages); and

25.     Grant any such other and further relief as the Court may deem proper.

Respectfully submitted this 28th day of April 2023.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Appellate Case: 23-1251   Document: 010110965256   Date Filed: 12/07/2023   Page: 18

**NOTE: This bill has been prepared for the signatures of the appropriate legislative officers and the Governor. To determine whether the Governor has signed the bill or taken other action on it, please consult the legislative status sheet, the legislative history, or the Session Laws.**

Exhibit A



# An Act

SENATE BILL 23-169

BY SENATOR(S) Mullica and Danielson, Bridges, Coleman, Cutter, Exum, Fields, Gonzales, Hansen, Jaquez Lewis, Kolker, Moreno, Rodriguez, Sullivan, Fenberg;
also REPRESENTATIVE(S) Duran and Hamrick, Kipp, Amabile, Bacon, Bird, Boesenecker, Brown, Daugherty, deGruy Kennedy, Dickson, English, Froelich, Gonzales-Gutierrez, Herod, Jodeh, Joseph, Lindsay, Lindstedt, Mabrey, McCormick, Michaelson Jenet, Parenti, Ricks, Sirota, Snyder, Valdez, Velasco, Weissman, Willford, Woodrow, McCluskie.

CONCERNING INCREASING THE LEGAL AGE TO PURCHASE A FIREARM TO TWENTY-ONE YEARS OF AGE, WITH LIMITED EXCEPTIONS.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, 18-12-101, **add** (1)(b.7) and (1)(c.5) as follows:

**18-12-101. Peace officer affirmative defense - definitions.** (1) As used in this article 12, unless the context otherwise requires:

(b.7) "FIREARM" MEANS ANY WEAPON, INCLUDING A STARTER GUN, THAT CAN, IS DESIGNED TO, OR MAY READILY BE CONVERTED TO EXPEL A

_____
*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

PROJECTILE BY THE ACTION OF AN EXPLOSIVE; THE FRAME OR RECEIVER OF A FIREARM; OR A FIREARM SILENCER. "FIREARM" DOES NOT INCLUDE AN ANTIQUE FIREARM, AS DEFINED IN 18 U.S.C. SEC. 921 (a)(16). IN THE CASE OF A LICENSED COLLECTOR, "FIREARM" MEANS ONLY CURIOS AND RELICS. "FIREARM" INCLUDES A WEAPONS PARTS KIT THAT IS DESIGNED TO OR MAY READILY BE COMPLETED, ASSEMBLED, RESTORED, OR OTHERWISE CONVERTED TO EXPEL A PROJECTILE BY THE ACTION OF AN EXPLOSIVE. "FIREARM" DOES NOT INCLUDE A WEAPON, INCLUDING A WEAPONS PARTS KIT, IN WHICH THE FRAME OR RECEIVER OF THE FIREARM, AS DEFINED IN SUBSECTION (1)(c.5) OF THIS SECTION, OR THE WEAPON, IS DESTROYED.

(c.5) "FRAME OR RECEIVER OF A FIREARM" MEANS A PART OF A FIREARM THAT, WHEN THE COMPLETE FIREARM IS ASSEMBLED, IS VISIBLE FROM THE EXTERIOR AND PROVIDES HOUSING OR A STRUCTURE DESIGNED TO HOLD OR INTEGRATE ONE OR MORE FIRE CONTROL COMPONENTS, EVEN IF PINS OR OTHER ATTACHMENTS ARE REQUIRED TO CONNECT THE FIRE CONTROL COMPONENTS. ANY PART OF A FIREARM IMPRINTED WITH A SERIAL NUMBER IS PRESUMED TO BE A FRAME OR RECEIVER OF A FIREARM, UNLESS THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES MAKES AN OFFICIAL DETERMINATION OTHERWISE OR THERE IS OTHER RELIABLE EVIDENCE TO THE CONTRARY.

**SECTION 2.**  In Colorado Revised Statutes, 18-12-112, **add** (2)(e), (2)(f), and (2)(g) as follows:

**18-12-112.  Private firearms transfers - sale and purchase - background check required - penalty - definitions.** (2) (e)  A PERSON WHO IS NOT A LICENSED GUN DEALER SHALL NOT MAKE OR FACILITATE THE SALE OF A FIREARM TO A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE.

(f)  IT IS UNLAWFUL FOR A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE TO PURCHASE A FIREARM.

(g)  SUBSECTIONS (2)(e) AND (2)(f) OF THIS SECTION DO NOT APPLY IF:

(I)  THE PERSON IS AN ACTIVE MEMBER OF THE UNITED STATES ARMED FORCES WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE UNITED STATES ARMED FORCES; OR

PAGE 2-SENATE BILL 23-169

(II)   THE PERSON IS A PEACE OFFICER, AS DESCRIBED IN SECTION 16-2.5-101, WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE EMPLOYING AGENCY, AS SET FORTH IN SECTION 16-2.5-101 AND SECTION 16-2.5-135; OR

(III)   THE PERSON IS CERTIFIED BY THE P.O.S.T. BOARD PURSUANT TO SECTION 16-2.5-102.

**SECTION 3.**   In Colorado Revised Statutes, 18-12-112.5, **amend** (1) as follows:

**18-12-112.5.   Firearms transfers by licensed dealers - sale and purchase - background check required - penalty - definitions.** (1) (a) It is unlawful for a licensed gun dealer to transfer a firearm to a transferee until the dealer has obtained approval for the firearms transfer from the bureau after the bureau has completed any background check required by state or federal law.

(a.3)   A PERSON WHO IS A LICENSED GUN DEALER SHALL NOT MAKE OR FACILITATE THE SALE OF A FIREARM TO A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE.

(a.5)   IT IS UNLAWFUL FOR A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE TO PURCHASE A FIREARM. THIS SUBSECTION (1)(a.5) AND SUBSECTION (1)(a.3) OF THIS SECTION DO NOT APPLY IF:

(I)   THE PERSON IS AN ACTIVE MEMBER OF THE UNITED STATES ARMED FORCES WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE UNITED STATES ARMED FORCES; OR

(II)   THE PERSON IS A PEACE OFFICER, AS DESCRIBED IN SECTION 16-2.5-101, WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE EMPLOYING AGENCY, AS SET FORTH IN SECTION 16-2.5-101 AND SECTION 16-2.5-135; OR

(III)   AN INDIVIDUAL CERTIFIED BY THE P.O.S.T. BOARD PURSUANT TO SECTION 16-2.5-102.

(b)   Transferring OR SELLING a firearm in violation of this subsection (1) is a class 1 misdemeanor.

PAGE 3-SENATE BILL 23-169

(c)  PURCHASING A FIREARM IN VIOLATION OF THIS SUBSECTION (1) IS A CLASS 2 MISDEMEANOR.

**SECTION 4.  Act subject to petition - effective date.** This act takes effect at 12:01 a.m. on the day following the expiration of the ninety-day period after final adjournment of the general assembly; except that, if a referendum petition is filed pursuant to section 1 (3) of article V of the state constitution against this act or an item, section, or part of this act within such period, then the act, item, section, or part will not take effect

PAGE 4-SENATE BILL 23-169

unless approved by the people at the general election to be held in November 2024 and, in such case, will take effect on the date of the official declaration of the vote thereon by the governor.

_____   _____
Steve Fenberg                                    Julie McCluskie
PRESIDENT OF                        SPEAKER OF THE HOUSE
THE SENATE                                OF REPRESENTATIVES

_____   _____
Cindi L. Markwell                              Robin Jones
SECRETARY OF                  CHIEF CLERK OF THE HOUSE
THE SENATE                                OF REPRESENTATIVES

APPROVED_____
(Date and Time)

_____
Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO

PAGE 5-SENATE BILL 23-169

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1076**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## COMPLAINT

---

Plaintiffs Rocky Mountain Gun Owners ("RMGO") and Alicia Garcia ("Garcia") submit the following Complaint.

### I.  INTRODUCTION

This action is a challenge to the constitutionality of House Bill 23-1219 enacted by the Colorado General Assembly and signed by Governor Polis on April 28, 2023 ("HB23-1219"). HB23-1219 will become effective on August 4, 2023. HB23-12119 makes it unlawful for any person who sells a firearm to deliver the firearm to the purchaser until a minimum of three days after the seller has initiated a background check, even if a clean background check comes back immediately. As such, it is blatantly unconstitutional under the Second Amendment to the United States

Constitution as made applicable to the states by the Fourteenth Amendment. A copy of HB23-1219 in its final form is attached as Exhibit A.

## II. PARTIES

1.      Plaintiff RMGO is a nonprofit organization. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. RMGO has members who reside in Colorado who desire to exercise their Second Amendment right to purchase a firearm without having their right burdened by arbitrary, unnecessary, burdensome and useless delays.  RMGO represents the interests of these members.  Specifically, RMGO represents the interests of those who are affected by HB23-1219's unconstitutional burden on the Second Amendment rights of law-abiding citizen who purchase firearms. It is these members' present intention and desire to lawfully purchase firearms for lawful purposes, including self-defense in their home, and they desire to do so without arbitrary, unnecessary, burdensome and useless delays. These members are precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by HB23-1219.

2.      Plaintiff Garica is an adult law-abiding citizen of Colorado and the United States. She is affected by HB23-1219's unconstitutional burden on the Second Amended rights of law-abiding citizens who purchase firearms. She has a present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in her home, and she desires to do so without arbitrary, unnecessary, burdensome and useless delays. She is precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by HB23-1219.

2

3.     Defendant Jared S. Polis is the Governor of the State of Colorado.  This action is brought against him in his official capacity.

4.     Defendant is or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

## III.  JURISDICTION AND VENUE

5.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

6.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

7.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.  GENERAL ALLEGATIONS

8.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

9.    The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment.  *McDonald, supra.*

10.    HB23-1219 states in relevant part:

> It is unlawful for any person who sells a firearm, including a licensed gun dealer as defined in section 18-12-506 (6), to deliver the firearm to the purchaser until the later in time occurs: (i) three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or (ii) the seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

11.    In *Bruen*, the Court held: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

12.    Plaintiffs desire to purchase firearms for lawful purposes (including defense of their homes). HB23-1219 prohibits or soon will prohibit Plaintiffs from doing so without being subjected to an arbitrary, unnecessary, burdensome and useless delay. The right to keep arms necessarily implies the right to acquire arms. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen*, and HB23-1219 is presumptively unconstitutional.

13.     Since the Second Amendment presumptively protects Plaintiffs' conduct, the State must justify HB23-1219 by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden because there is no such historical tradition of firearms regulation in this Nation. See Complete Colorado, *Kopel: Colorado bill forcing delay of firearms acquisition on shaky constitutional ground*, available at:

https://pagetwo.completecolorado.com/2023/03/01/kopel-colorado-bill-forcing-delay-of-firearms-acquisition-on-shaky-constitutional-ground/ (March 1, 2023). This article sets forth the written testimony of Law Professor David B. Kopel (whose work was cited favorably in *Bruen*) on HB23-1219, which was submitted to the Colorado House of Representatives State, Civic, Military & Veterans Affairs Committee. Professor Kopel's exhaustive historical research led him to conclude that there is no historical tradition supporting firearm purchase waiting periods.

14.     In summary, the plain text of the Second Amendment covers Plaintiffs' conduct. Therefore, HB23-1219 is presumptively unconstitutional. The State is unable to rebut this presumption because the law is not consistent with Nation's historical tradition of firearm regulation. Therefore, HB23-1219 is unconstitutional.

### V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

15.     Paragraphs 1-14 are realleged and incorporated by reference.

16. HB23-1219 burdens the right of residents of the State, including Plaintiffs, in exercising their right to acquire arms protected by the Second Amendment. There are significant penalties for violations of the law.

17. These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment.

18. HB23-1219's prohibitions arbitrarily delay the right of law-abiding citizens to purchase arms even if they immediately pass all required background checks and even if they desire to purchase an arm for the purpose of self-defense in the home, where Second Amendment protections are at their zenith.

19. The State cannot meet its burden of justifying these restrictions on the Second Amendment right of the People by demonstrating that they are consistent with this Nation's historical tradition of firearm regulation.

## VI. PRAYER FOR RELIEF

Plaintiffs pray that the Court:

20. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that HB23-1219 is unconstitutional on its and face or as applied;

21. Enter preliminary and permanent injunctive relief enjoining Defendant and his officers, agents, and employees from enforcing HB23-1219;

22. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

23.     Award actual or nominal damages to the individual Plaintiff (RMGO does not

seek damages); and

24.     Grant any such other and further relief as the Court may deem proper.

Respectfully submitted this 28th day of April 2023.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
Email:  barry@arringtonpc.com

Appellate Case: 23-1251   Document: 010110965256   Date Filed: 12/07/2023   Page: 30

**NOTE:  This bill has been prepared for the signatures of the appropriate legislative officers and the Governor.  To determine whether the Governor has signed the bill or taken other action on it, please consult the legislative status sheet, the legislative history, or the Session Laws.**

Exhibit A



HOUSE BILL 23-1219

BY REPRESENTATIVE(S) Froelich and Amabile, Bacon, Boesenecker, Brown, deGruy Kennedy, Dickson, Epps, Garcia, Gonzales-Gutierrez, Hamrick, Herod, Jodeh, Joseph, Kipp, Lindsay, Lindstedt, Mabrey, McCormick, Michaelson Jenet, Ortiz, Parenti, Ricks, Sirota, Story, Willford, Woodrow, Bird, Daugherty, English, Mauro, Snyder, Titone, Valdez, Velasco, Weissman, McCluskie, Duran;
also SENATOR(S) Sullivan and Hansen, Cutter, Fields, Gonzales, Jaquez Lewis, Kolker, Mullica, Bridges, Buckner, Coleman, Danielson, Exum, Ginal, Marchman, Moreno, Winter F., Zenzinger, Fenberg.

CONCERNING ESTABLISHING A MINIMUM THREE-DAY WAITING PERIOD PRIOR TO THE DELIVERY OF A PURCHASED FIREARM.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.  Legislative declaration.** (1)  The general assembly finds and declares that:

(a)  In 2020, according to the Centers for Disease Control and Prevention, firearm-related injury was among the five leading causes of death for people ages 1 to 44 in the United States;

_____

*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

App 27

(b)   From 2014 to 2019, the number of firearm-related deaths in Colorado was greater than the number of deaths due to motor vehicle crashes, opioid overdoses, HIV, and colon cancer. Among firearm-related deaths, more than 75 percent were caused by intentional self-harm or suicide and more than 20 percent were as a result of assaults or homicides.

(c)   In 2021, Colorado had its highest number of homicides by discharge of a firearm since 2000. There were 274 homicides by firearm in Colorado in 2021, and the age group with the highest rate of firearm homicide victims was people ages 15 to 24, with 74 deaths.

(d)   In 2020, Colorado had the seventh highest suicide rate in the United States; in 2021, there were 740 suicides by firearm in Colorado, which was more than half of all suicides in the state;

(e)   Nationwide, from 2000 to 2018, rural suicide rates were higher than urban suicide rates, and although suicide rates increased in both rural and urban areas during that period, since 2007, rural suicide rates increased at a greater rate than in urban areas;

(f)   One study estimates that mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm; the study also suggests that delaying the purchase of firearms by a few days reduces firearm homicides by approximately 17 percent; and

(g)   The Colorado bureau of investigation employs and trains personnel to process background checks, in accordance with section 24-33.5-424 (7)(b)(IV)(C), Colorado Revised Statutes.

(2)   Therefore, the general assembly declares that:

(a)   Delaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides; and

(b)   The establishment of a waiting period is a matter of mixed state and local concern because the state has an interest in preventing suicides and homicides, and local governments are equipped to determine the length of waiting periods best suited for their jurisdictions.

PAGE 2-HOUSE BILL 23-1219

App 28

**SECTION 2.**  In Colorado Revised Statutes, **add** 18-12-115 as follows:

**18-12-115. Waiting period for firearms sales - background check required - penalty - exceptions.** (1) (a)  IT IS UNLAWFUL FOR ANY PERSON WHO SELLS A FIREARM, INCLUDING A LICENSED GUN DEALER AS DEFINED IN SECTION 18-12-506 (6), TO DELIVER THE FIREARM TO THE PURCHASER UNTIL THE LATER IN TIME OCCURS:

(I)  THREE DAYS AFTER A LICENSED GUN DEALER HAS INITIATED A BACKGROUND CHECK OF THE PURCHASER THAT IS REQUIRED PURSUANT TO STATE OR FEDERAL LAW; OR

(II)  THE SELLER HAS OBTAINED APPROVAL FOR THE FIREARM TRANSFER FROM THE BUREAU AFTER IT HAS COMPLETED ANY BACKGROUND CHECK REQUIRED BY STATE OR FEDERAL LAW.

(b)  A PERSON WHO VIOLATES THIS SUBSECTION (1) COMMITS A CIVIL INFRACTION AND, UPON CONVICTION THEREOF, SHALL BE PUNISHED BY A FINE OF FIVE HUNDRED DOLLARS; EXCEPT THAT FOR A SECOND OR SUBSEQUENT OFFENSE, THE FINE SHALL BE NOT LESS THAN FIVE HUNDRED DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS.

(2)  THIS SECTION DOES NOT APPLY TO:

(a)  THE SALE OF AN ANTIQUE FIREARM, AS DEFINED IN 18 U.S.C. SEC. 921 (a)(16), AS AMENDED, OR A CURIO OR RELIC, AS DEFINED IN 27 CFR 478.11, AS AMENDED;

(b)  THE SALE OF A FIREARM BY A PERSON SERVING IN THE ARMED FORCES OF THE UNITED STATES WHO WILL BE DEPLOYED OUTSIDE OF THE UNITED STATES WITHIN THE NEXT THIRTY DAYS TO ANY FAMILY MEMBER, INCLUDING:

(I)  REGARDLESS OF AGE, A BIOLOGICAL, ADOPTED, OR FOSTER CHILD; A STEPCHILD OR LEGAL WARD; A CHILD OF A DOMESTIC PARTNER; A CHILD TO WHOM THE SELLER STANDS IN LOCO PARENTIS; OR A PERSON TO WHOM THE SELLER STOOD IN LOCO PARENTIS WHEN THE PERSON WAS A MINOR;

(II)  A BIOLOGICAL, ADOPTIVE, OR FOSTER PARENT; A STEPPARENT OR

PAGE 3-HOUSE BILL 23-1219

LEGAL GUARDIAN OF THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER; OR A PERSON WHO STOOD IN LOCO PARENTIS WHEN THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER WAS A MINOR CHILD;

(III)  A PERSON TO WHOM THE SELLER IS LEGALLY MARRIED UNDER THE LAWS OF ANY STATE OR A DOMESTIC PARTNER OF A SELLER;

(IV)  A GRANDPARENT, GRANDCHILD, OR SIBLING, WHETHER A BIOLOGICAL, FOSTER, ADOPTIVE OR STEP RELATIONSHIP, OF THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER; OR

(V)  AS SHOWN BY THE SELLER, ANY OTHER INDIVIDUAL WITH WHOM THE SELLER HAS A SIGNIFICANT PERSONAL BOND THAT IS OR IS LIKE A FAMILY RELATIONSHIP, REGARDLESS OF BIOLOGICAL OR LEGAL RELATIONSHIP; OR

(c)  A FIREARM TRANSFER FOR WHICH A BACKGROUND CHECK IS NOT REQUIRED PURSUANT TO STATE OR FEDERAL LAW.

(3)  PURSUANT TO THE AUTHORITY GRANTED IN SECTION 29-11.7-103, A LOCAL GOVERNMENT MAY ENACT AN ORDINANCE, REGULATION, OR OTHER LAW CONCERNING A WAITING PERIOD.

**SECTION 3.   Act subject to petition - effective date - applicability.** (1)  This act takes effect October 1, 2023; except that, if a referendum petition is filed pursuant to section 1 (3) of article V of the state constitution against this act or an item, section, or part of this act within the ninety-day period after final adjournment of the general assembly, then the act, item, section, or part will not take effect unless approved by the people at the general election to be held in November 2024 and, in such case, will take effect on the date of the official declaration of the vote thereon by the

PAGE 4-HOUSE BILL 23-1219

governor.

     (2)  This act applies to offenses committed on or after the applicable effective date of this act.

<br>

_____          _____
Julie McCluskie                                                          Steve Fenberg
SPEAKER OF THE HOUSE                                PRESIDENT OF
OF REPRESENTATIVES                                      THE SENATE

<br>

_____          _____
Robin Jones                                                       Cindi L. Markwell
CHIEF CLERK OF THE HOUSE                      SECRETARY OF
OF REPRESENTATIVES                                      THE SENATE

<br>

     APPROVED_____
                (Date and Time)

<br>

     _____
     Jared S. Polis
     GOVERNOR OF THE STATE OF COLORADO

<br>

PAGE 5-HOUSE BILL 23-1219

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS, and
TATE MOSGROVE,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

_____

### REQUEST REGARDING INADVERTENT FILING
_____

     The undersigned inadvertently file the complaint for Case No. 23-cv-1076 in this matter. See Docket Number 2.  It is respectfully requested that this document be stricken from this case docket.

Respectfully submitted this 28th day of April 2023.


*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

| 04/28/2023 | 4 | Administrative Notice: Duplicate filing fee received. Financial notified and a refund is pending. (Text Only Entry) (blaws) (Entered: 04/28/2023) |
|---|---|---|

| 04/28/2023 | 5 | Case assigned to Magistrate Judge Kristen L. Mix. Text Only Entry. (blaws) (Entered: 04/28/2023) |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____ -cv- _____- _____

_____,

      Plaintiff(s),

v.

_____,

      Defendant(s).

---

**CONSENT/NON-CONSENT TO THE EXERCISE OF JURISDICTION BY A UNITED
STATES MAGISTRATE JUDGE IN DIRECT ASSIGNMENT CASES**
_____

      Under 28 U.S.C. § 636(c) and D.C.COLO.LCivR 40.1(c) – Assignment of
Cases/Direct Assignment to Magistrate Judges, you are notified that this civil action has
been randomly assigned to a full time United States magistrate judge of this district to
conduct all proceedings in this civil action, including trial, and to order the entry of a final
judgment. Exercise of this jurisdiction by a magistrate judge, however, is permitted only if
all parties voluntarily consent to the reference under 28 U.S.C. § 636(c). An appeal from a
judgment entered by a magistrate judge shall be taken directly to the appropriate United
States Court of Appeals in the same manner as an appeal from any other judgment of a
district court.

      Consent to magistrate judge jurisdiction is voluntary, and no adverse consequence
shall result if consent is declined. If any party withholds consent, the identity of the parties
consenting or withholding consent will not be communicated to any magistrate judge or to
the district judge to whom the case has been assigned. Pursuant to D.C.COLO.LCivR
72.2, no district judge or magistrate judge, court official, or court employee may attempt to
influence the granting or withholding of consent to the reference of any civil matter to a
magistrate judge under this rule.

      You are directed to confer with all parties in this action and execute and file with the
Court the attached Election Concerning Consent/Non-Consent to United States
Magistrate Judge Jurisdiction, indicating either the unanimous consent of the parties or
that at least one party has declined to consent, at the earlier of (1) no later than seven
days before the scheduling conference, if any; or (2) 45 days after the filing of the first
response, other than an answer, to the operative complaint. All parties must either
consent to the exercise of magistrate judge jurisdiction, or any party may decline to

consent. In either event, **filing of the Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction is mandatory**, indicating either the unanimous consent of the parties or that at least one party has declined to consent.

If all parties consent to magistrate judge jurisdiction, the magistrate judge shall notify the Chief Judge or his/her designee, who shall determine whether to enter an order of reference under 28 U.S.C. § 636(c). If an order of reference is entered, the magistrate judge shall conduct all proceedings and order the entry of judgment. The Chief Judge, or his/her designee, may sua sponte for good cause or on motion of a party for extraordinary circumstances vacate the order of reference.

Any party added to the civil action after reference to a magistrate judge shall be notified by the clerk of the obligation to complete and file the mandatory Consent/Non-Consent Form. If any added party does not consent to magistrate judge jurisdiction within 21 days from the date of the notice, the civil action shall be assigned to a district judge under D.C.COLO.LCivR 40.1(a), and the magistrate judge shall continue on the case as if consent had been declined initially.

If consent to magistrate judge jurisdiction is declined by any party, no order of reference is entered or the order of reference is vacated, the civil action shall be assigned to a district judge under D.C.COLO.LCivR 40.1(a), and the magistrate judge shall continue on the case as if consent had been declined initially.

A case assigned directly to a magistrate judge in which there is consent may be assigned randomly to another magistrate judge to conduct an early neutral evaluation or other alternative dispute resolution proceeding under D.C.COLO.LCivR 16.6.

If after direct assignment, a magistrate judge recuses and the action is assigned to another magistrate judge, each party shall complete an Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction no later than (a) 21 days after assignment to the successor magistrate judge; or (b) the deadlines imposed in the third paragraph of this form, whichever is later.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____ -cv- _____- _____

_____,

      Plaintiff(s),

v.

_____,

      Defendant(s).

---

**ELECTION CONCERNING CONSENT/NON-CONSENT TO
UNITED STATES MAGISTRATE JUDGE JURISDICTION**

Under 28 U.S.C. § 636(c) and

(1)     D.C.COLO.LCivR 40.1(c) (Assignment of Cases/Direct Assignment to Magistrate Judges);

or

(2)     Fed. R. Civ. P. 73 and D.C.COLO.LCivR 72.2 (Consent Jurisdiction of a Magistrate Judge);

or

(3)     D.C.COLO.LAPR 72.2 (Consent Jurisdiction of a Magistrate Judge).

**CHECK ONE**

_____ all parties in this civil action CONSENT to have a United States magistrate judge conduct all proceedings in this civil action, including trial, and to order the entry of a final judgment;

**OR**

_____ at least one party in this civil action DOES NOT CONSENT to have a United States magistrate judge conduct all proceedings in this civil action, including trial, and to order the entry of a final judgment.

App 37

Signatures                        Party Represented                        Date

_____    _____    _____

Print name_____

_____    _____    _____

Print name_____

_____    _____    _____

**NOTE:**      You are directed to confer with all parties in this action and execute and file with the Court this Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction, indicating either the unanimous consent of the parties or that at least one party has declined to consent, at the earlier of (1) no later than seven days before the scheduling conference, if any; or (2) 45 days after the filing of the first response, other than an answer, to the operative complaint. All parties must either consent to the exercise of magistrate judge jurisdiction, or any party may decline to consent. In either event, **filing of the Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction is mandatory**, indicating either the unanimous consent of the parties or that at least one party has declined to consent.

App 38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-KLM

ROCKY MOUNTAIN GUN OWNERS, and
TATE MOSGROVE,

      Plaintiffs,

v.

JARED S. POLIS, in his Official Capacity as Governor of the State of Colorado,

      Defendant.

---

**ORDER SETTING
SCHEDULING/PLANNING CONFERENCE**
(as *amended* effective November 22, 2019)

---

      The above captioned case has been assigned to Magistrate Judge Kristen L. Mix pursuant to D.C.COLO.LCivR 40.1(c).  [5]; *see also* [#6] (explaining D.C.COLO.LCivR 40.1). The parties are reminded that "[a]ll parties must either consent to the exercise of magistrate judge jurisdiction, or any party may decline to consent.  In either event, **filing of the Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction is mandatory**, indicating either the unanimous consent of the parties or that at least one party has declined to consent."  [#6 at 1-2 (emphasis in original).

### A.  Date of Scheduling Conference

      IT IS HEREBY **ORDERED** that a Scheduling/Planning Conference pursuant to Fed. R. Civ. P. 16(b) shall be held on **August 28, 2023**, commencing at **11:10 a.m.** in Courtroom A-401, Fourth Floor, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.

### B.  How to Request Different Date for Scheduling Conference

      If this date is not convenient for any counsel or *pro se* party, he or she shall file a motion to reschedule the conference to a more convenient date, and shall list dates in the motion which are available for all counsel and pro se parties. Absent exceptional circumstances, no request for rescheduling any appearance in this court will be considered unless a motion is made **five (5) business days** in advance of the date of appearance.

### C.  How to Request Appearance By Telephone at Scheduling Conference

      If you wish to appear at the Scheduling Conference by telephone, you must file a motion seeking permission to appear by telephone and setting forth good cause for a telephonic

--             1

appearance.  No motion for any telephonic appearance will be granted unless it is filed at least **five (5) business days** in advance of the date of appearance.

### D.  Plaintiff's Duty to Notify Parties of Scheduling Conference

The plaintiff shall notify all parties who have not entered an appearance as of the date of this Order of the date and time of the Scheduling/Planning Conference set forth above.

### E. Parties' Obligations Before Scheduling Conference

1. Scheduling Order

IT IS **ORDERED** that counsel and *pro se* parties in this case are to hold a pre-scheduling conference meeting pursuant to Fed. R. Civ. P. 26(f)(1) at least twenty-one (21) days before the proposed scheduling order is due to be tendered and prepare a proposed Scheduling Order in accordance with Fed. R. Civ. P. 26(f), as amended.  The instructions for completing the Scheduling Order may be found on the Court's website (www.cod.uscourts.gov) with the scheduling order forms.  **Please be aware there are multiple forms of Scheduling Order available on the Court's website under the "Forms" link: one form for ERISA cases, one form for patent cases, and one form for all other non-administrative review cases.  PLEASE USE THE CURRENT and CORRECT FORM FOR YOUR CASE.**

Pursuant to Fed. R. Civ. P. 26(d), as amended, no discovery is to be exchanged until after the Rule 26(f) conference meeting.  The parties **shall** include the following language in Section 8, Paragraph (d) of their proposed Scheduling Order in *non-administrative review* cases:

> "Other Planning or Discovery Orders:  No opposed discovery motions are to be filed with the Court until the parties comply with D.C.COLO.LCivR. 7.1(a).  If the parties are unable to reach agreement on a discovery issue after conferring, they shall arrange a telephone hearing with Magistrate Judge Mix regarding the issue. Both of these steps must be completed before any contested discovery motions are filed with the Court."

No later than **seven (7) calendar days** prior to the Scheduling/Planning Conference, counsel and *pro se* parties shall submit their proposed Scheduling Order http://www.cod.uscourts.gov in compliance with the Court's Electronic Case Filing Procedures which are also available on the Court's website.  An additional copy of the proposed scheduling order is to be provided to my chambers at Mix_Chambers@cod.uscourts.gov by **e-mail attachment** with the subject line containing the case number and stating "Proposed Scheduling Order."mailto:Coan_Chambers@cod.uscourts.gov

Parties who are pro se or do not have access to the internet may obtain the scheduling order form and instructions from the Clerk's Office, Room  A105, in the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado, 80294.  Scheduling Orders prepared by parties not represented by counsel, or without access to electronic case filing, are to be submitted to the Clerk of the Court on paper.

    2. <u>Mandatory Disclosures</u>

IT IS **FURTHER ORDERED** that on or before 14 days after the Rule 26(f) pre-scheduling conference meeting, the parties shall comply with the mandatory disclosure requirements of Fed. R. Civ. P. 26(a)(1), as amended.

### F. Miscellaneous

All counsel shall comply with D.C.COLO.LAttyR 1 through 14 before the Scheduling/Planning Conference. **Counsel are warned that the use of "appearance counsel" providing limited representation solely for a Scheduling Conference is not permitted** in light of the fact that the Court liberally permits appearances of counsel by telephone. To the extent any attorney provides limited representation to a client, the requirements of D.C.COLO.LAttyR 5 must be followed.

It is the responsibility of all counsel and pro se parties to notify the Court of his or her entry of appearance, withdrawal of appearance, substitution of counsel, or change of address, e-mail address, or telephone number by complying with the Court's Electronic Case Filing Procedures or paper-filing the appropriate document with the Court.

The Parties are further advised that they shall not assume that the Court will grant the relief requested in any motion. Failure to appear at a court-ordered conference or to comply with a court-ordered deadline which has not been vacated by court order may result in the imposition of sanctions under Fed. R. Civ. P. 16(f).

Anyone seeking entry to the Alfred A. Arraj United States Courthouse will be required to show valid photo identification. *See* D.C.COLO.LCivR 83.2(b). Failure to comply with this requirement will result in denial of entry to the courthouse.

DATED: May 8, 2023 at Denver, Colorado.

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge

--           3

# INSTRUCTIONS FOR PREPARATION

# OF SCHEDULING ORDER

When the court has set a scheduling conference pursuant to Fed. R. Civ. P. 16 and D.C.COLO.LCivR 16.1 and 16.2 , a scheduling order shall be prepared in accordance with these instructions.  The rule 26(f) meeting shall be held at least 21 days before the proposed scheduling order is due to be tendered.  The disclosures required by Fed. R. Civ. P. 26(a)(1) shall be exchanged at or within 14 days after the rule 26(f) meeting.  Do not file any disclosure statements with the court.

Seven days before the scheduling conference (see Fed. R. Civ. P. 6 for all computations of time), counsel are to tender a proposed scheduling order which shall include the signatures of counsel and *pro se* parties and shall provide for approval by the court as specified on the attached form.  Counsel and pro se parties should try, in good faith, to agree upon matters covered in the scheduling order.  Any area of disagreement should be set forth with a brief statement concerning the basis for the disagreement.  The parties should expect that the court will make modifications in the proposed scheduling order and will want to discuss all issues affecting management of  the case.

Local civil rules D.C.COLO.LCivR 40.1(c) and 72.2 authorize full-time magistrate judges to exercise jurisdiction of  civil matters upon the consent of the parties.  If all parties have consented to the  exercise of jurisdiction by a magistrate judge pursuant to D.C.COLO.LCivR 40.1(c ) or 72.2, the  "Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction" form is to be filed promptly with the Clerk of the Court and the  consent indicated in section 6 of the proposed scheduling order.  Note that  D.C.COLO.LCivR 40.1(c)(7) and 72.2(d) provide, in part:  "Unless otherwise ordered by the assigned district judge, written consent to proceed before a magistrate judge must be filed no later than (1) seven days before the scheduling conference, if any; or (2) 45 days after the filing of the first response, other than an answer, to the operative complaint, whichever is earlier" Refer to D.C.COLO.LCivR 40.1(c)(7) or 72.2(f)  if all parties have not been served or in the event additional parties are added after the  scheduling conference.

Listed on the following pages is the format for the proposed  scheduling order. The bracketed and italicized information on the form explains what  the court expects.

i

Also available on the court's website 'Forms' page (link available HERE) is the proposed scheduling order form in an ERISA action, the proposed scheduling order form in a patent case, and the proposed joint case management plan for petitions for review of agency action in environmental cases.  The bracketed and italicized information on the form explains what the court expects.

**Scheduling orders shall be double-spaced in accordance with D.C.COLO.LCivR 10.1(e), even though the instructions in the following format for the proposed scheduling order are single-spaced.**

**PARTIES AND COUNSEL ARE DIRECTED TO THE COURT'S WEBSITE, http://www.cod.uscourts.gov/Home.aspx FOR ITS LOCAL RULES AND THE GENERAL PROCEDURES OF EACH JUDICIAL OFFICER.**

(Rev. 03/2020)

ii

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.


Plaintiff(s),

v.


Defendant(s).

---

**SCHEDULING ORDER**

---

**1.  DATE OF
CONFERENCE
AND APPEARANCES OF COUNSEL AND PRO SE
PARTIES**

*[Provide the date of the conference and the names, addresses, and telephone numbers of counsel for each party and each pro se party. Identify by name the party represented by each counsel.]*


**2.  STATEMENT OF
JURISDICTION**

*[Provide a concise statement of the basis for subject matter jurisdiction with appropriate statutory citations.  If jurisdiction is denied, give the specific reason for the denial.]*

1

### 3.  STATEMENT OF CLAIMS AND
### DEFENSES

a.  Plaintiffs:

b.  Defendants:

c.  Other Parties:

*[Provide concise statements of all claims or defenses. Each party, in light of formal or informal discovery undertaken thus far, should take special care to eliminate frivolous claims or defenses. Fed. R. Civ. P. 11 and 16(c)(2)(A).  Do not summarize the pleadings. Statements such as defendant denies the material allegations of the complaint" are not acceptable.]*

### 4.  UNDISPUTED
### FACTS

The following facts are undisputed:

*[When the parties have the Rule 26(f) meeting, they should make a good-faith attempt to determine which facts are not in dispute.]*

### 5.  COMPUTATION OF
### DAMAGES

*[Include a computation of all categories of damages sought and the basis and theory for calculating damages. See Fed. R. Civ. P. 26(a)(1)(A)(iii). This should include the claims of all parties. It should also include a description of the economic damages, non-economic damages, and physical impairment claimed, if any.]*

### 6.  REPORT OF PRECONFERENCE DISCOVERY
### AND MEETING UNDER FED. R. CIV. P. 26(f)

     a.  Date of Rule 26(f) meeting.

     b.  Names of each participant and party he/she represented.

     c.  Statement as to when Rule 26(a)(1) disclosures were made or will be made.

*[If a party's disclosures were not made within the time provided in Fed. R. Civ. P. 26(a)(1)(C) or by the date set by court order, the parties must provide an explanation showing good cause for the omission.]*

     d.  Proposed changes, if any, in timing or requirement of disclosures under Fed. R. Civ. P. 26(a)(1).

     e.  Statement concerning any agreements to conduct informal discovery:

*[State what processes the parties have agreed upon to conduct informal discovery, such as joint interviews with potential witnesses or joint meetings with clients to discuss settlement, or exchanging documents outside of formal discovery. If there is agreement to conduct joint interviews with potential witnesses, list the names of such witnesses and a date and time for the interview which has been agreed to by the witness, all counsel, and all pro se parties.]*

     f.  Statement concerning any other agreements or procedures to reduce discovery and other litigation costs, including the use of a unified exhibit numbering system.

*[Counsel and pro se parties are strongly encouraged to cooperate in order to reduce the costs of litigation and expedite the just disposition of the case. Discovery and other litigation costs may be reduced, for example, through telephone depositions, joint repositories for documents, use of discovery in other cases, and extensive use of expert affidavits to support judicial notice. Counsel and pro se parties also will be expected to use a unified exhibit numbering system if required by the practice standards of the judicial officer presiding over the trial of this case. Non-prisoner pro se parties are reminded that e-filing is available as one means to reduce expenses – see the Electronic Case Filing page of the Court's website.]*

g.     Statement as to whether the parties anticipate that their claims or defenses will involve extensive electronically stored information, or that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.

*[In such cases, the parties must indicate what steps they have taken or will take to (I) preserve electronically stored information; (ii) facilitate discovery of electronically stored information; (iii) limit the associated discovery costs and delay; (iv) avoid discovery disputes relating to electronic discovery; and (v) address claims of privilege or of protection as trial-preparation materials after production of computer-generated records. Counsel should refer to the court's Electronic Discovery Guidelines and Checklist, available on the court's website HERE, and should describe any proposals or agreements regarding electronic discovery made at the Rule 26(f) conference and be prepared to discuss issues involving electronic discovery, as appropriate, at the Scheduling Conference.]*

*[When the parties have their Rule 26(f) meeting, they must discuss any issues relating to the disclosure and discovery of electronically stored information, including the form of production, and also discuss issues relating to the preservation of electronically stored information, communications, and other data. At the Rule 26(f) meeting, the parties should make a good faith effort to agree on a mutually acceptable format for production of electronic or computer-based information. In advance of the Rule 26(f) meeting, counsel carefully investigate their client's information management systems so that they are knowledgeable as to its operation, including how information is stored and how it can be retrieved.]*

h.     Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.

*[The parties are required by Fed. R. Civ. P. 26(f)(2) to have discussed the possibilities for a prompt settlement or resolution of the case by alternate dispute resolution.  They must also report the result of any such meeting, and any similar future meeting, to the magistrate judge within 14 days of the meeting.]*

## 7.
## CONSENT

*[Pursuant to D.C.COLO.LCivR 40.1(c) and 72.2, all full-time magistrate judges in the District of Colorado are specially designated under 28 U.S.C. § 636(c)(1) to conduct any or all proceedings in any jury or nonjury civil matter and to order the entry of judgment.  Parties consenting to the exercise of jurisdiction by a magistrate judge must*

*complete and file the court- approved Consent to the Exercise of Jurisdiction by a United States Magistrate Judge form.]*

*[Indicate below the parties' consent choice. Upon consent of the parties and an order of reference from the district judge, the magistrate judge assigned the case under 28 U.S.C.§ 636(a) and (b) will conduct all proceedings related to the case.]*

All parties   □   [have]   □   [have not] consented to the exercise of jurisdiction of a magistrate judge.

## 8.  DISCOVERY LIMITATIONS

*[In the majority of cases, the parties should anticipate that the court will adopt the presumptive limitations on depositions established in Fed. R. Civ. P. 30(a)(2)(A)(i) and 33(a)(1). The parties are expected to engage in pretrial discovery in a responsible manner consistent with the spirit and purposes of Fed. R. Civ. P. 1 and 26 through 37.  The parties are expected to propose discovery limits that are proportional to the needs of the case, the amount in controversy, the importance of the issues at stake in the action, and all other scope of discovery considerations. See Fed. R. Civ. P. 26(b)(1). The court must limit discovery otherwise permitted by the Federal Rules of Civil Procedure if it determines that "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1). " See Fed. R. Civ. P. 26(b)(2)(C).]*

   a.   Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules.

*[If a party proposes to exceed the numerical limits set forth in Fed. R. Civ. P. 30(a)(2)(A)(I), at the scheduling conference they should be prepared to support that request by reference to the factors identified in Fed. R. Civ. P. 26(b)(2)(C)]*

   b.   Limitations which any party proposes on the length of depositions.

   c.   Limitations which any party proposes on the number of requests for production and/or requests for admission.*[If the parties propose more than twenty-five (25) requests for production and/or requests for admission, at the scheduling conference they should be prepared to support that proposal by reference to the factors identified in Fed. R. Civ. P. 26(b)(2)(C).]*

5

d.      Deadline for service of Interrogatories, Requests for Production of Documents and/or Admissions:

*[The parties are expected to serve interrogatories, requests for production and/or requests for admission on opposing counsel or a pro se party on a schedule that allows timely responses on or before the discovery cut-off date.]*

e.      Other Planning or Discovery Orders

*[Set forth any other proposed orders concerning scheduling or discovery. For example, the parties may wish to establish specific deadlines for submitting protective orders or for filing motions to compel.]*

## 9.  CASE PLAN AND SCHEDULE

a.      Deadline for Joinder of Parties and Amendment of Pleadings:

*[Set time period within which to join other parties and to amend all pleadings.  This deadline refers to timing only and does not eliminate the necessity to file an appropriate motion and to otherwise comply with Fed. R. Civ. P. 15. Unless otherwise ordered in a particular case, for good cause, this deadline should be no later than 45 days after the date of the scheduling conference, so as to minimize the possibility that late amendments and joinder of parties will precipitate requests for extensions of discovery cutoff, final pretrial conference, and dispositive motion dates. Counsel and pro se parties should plan discovery so that discovery designed to identify additional parties or claims is completed before these deadlines.]*

b.      Discovery Cut-off:

c.      Dispositive Motion Deadline:

*[Set time periods in which discovery is to be completed and dispositive motions are to be filed.]*

d.      Expert Witness Disclosure

1.      The parties shall identify anticipated fields of expert testimony, if any.

6

App 49

2.      Limitations which the parties propose on the use or number of expert witnesses.

3.      The parties shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before _____, 20_____. *[This includes disclosure of information applicable to "Witnesses Who Must Provide a Written Report" under Rule 26(a)(2)(B) and information applicable to "Witnesses Who Do Not Provide a Written Report" under Rule 26(a)(2)(C).]*

4.      The parties shall designate all rebuttal experts and provide opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before _____, 20_____. [This includes disclosure of information applicable to "Witnesses Who Must Provide a Written Report" under Rule 26(a)(2)(B) and information applicable to "Witnesses Who Do Not Provide a Written Report" under Rule 26(a)(2)(C).]

*[Notwithstanding the provisions of Fed. R. Civ. P. 26(a)(2)(B), no exception to the requirements of the Rule will be allowed by stipulation unless the stipulation is in writing and approved by the court. In addition to the requirements set forth in Rule 26(a)(2)(B)(I)-(vi), the expert's written report also must identify the principles and methods on which the expert relied in support of his/her opinions and describe how the expert applied those principles and methods reliably to the facts of the case relevant to the opinions set forth in the written report.]*

e.      Identification of Persons to Be Deposed:

*[List the names of persons to be deposed and provide a good faith estimate of the time needed for each deposition. All depositions must be completed on or before the discovery cut- off date and the parties must comply with the notice and scheduling requirements set for in D.C.COLO.LCivR 30.1.]*

## 10.  DATES FOR FURTHER CONFERENCES

*[The magistrate judge will complete this section at the scheduling conference if he or she has not already set deadlines by an order filed before the conference.]*

a.  Status conferences will be held in this case at the following dates and times:

_____.

b.  A final pretrial conference will be held in this case on _____ at o'clock _____ m. A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

## 11.  OTHER SCHEDULING MATTERS

a.  Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement.

b.  Anticipated length of trial and whether trial is to the court or jury.

c.  Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S. Courthouse/Federal Building, , La Plata County Courthouse 1060 E. 2nd Avenue, Suite 150, Durango, Colorado 81301.

   *[Determination of any such request will be made by the magistrate judge based on the individual needs of the case and the availability of space and security resources.]*

## 12.  NOTICE TO COUNSEL AND PRO SE PARTIES

*[The following paragraphs shall be included in the scheduling order:]*

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1(c) by serving the motion contemporaneously upon the moving attorney's client.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a).

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13.  AMENDMENTS TO SCHEDULING ORDER

*[Include a statement that the scheduling order may be altered or amended only upon a showing of good cause.]*

DATED at Denver, Colorado, this _____ day of _____, 20___.

BY THE COURT:

_____

United States Magistrate Judge

APPROVED:

| | |
|---|---|
| _____ | _____ |
| (Name) | (Name) |
| (Address) | (Address) |
| (Telephone Number) | (Telephone Number) |
| Attorney for Plaintiff (or Plaintiff, Pro Se) | Attorney for Defendant (or Defendant, Pro Se) |

*[Please affix counsels' and any pro se party's signatures before submission of the final scheduling order to the court.]*

9

App 52

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-KLM

ROCKY MOUNTAIN GUN OWNERS, and
TATE MOSGROVE,

     Plaintiffs,

v.

JARED S. POLIS, in his Official Capacity as Governor of the State of Colorado,

     Defendant.
_____

**MINUTE ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on the Request Regarding Inadvertent Filing [#3] (the "Motion"), which the Court interprets as a motion to withdraw a filing.

     IT IS HEREBY **ORDERED** that Motion [#3] is **GRANTED**.   The Complaint [#2], which Plaintiffs state was inadvertently filed shall be deemed **WITHDRAWN**.   The correct Complaint in this case is [#1] in the docket.

     Dated: May 9, 2023

--

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## FIRST AMENDED COMPLAINT

---

     Pursuant to Fed. R. Civ. P. 15(a)(1), Plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove ("Mosgrove"), and Adrian S. Pineda ("Pineda") submit the following First Amended Complaint.

## I. INTRODUCTION

1.    This action is a challenge to the constitutionality of Senate Bill 23-169 enacted by the Colorado General Assembly and signed by Governor Polis on April 27, 2023 ("SB23-169"). SB23-169 will become effective on August 4, 2023. SB-23-169 prohibits persons over the age of 18 but under the age of 21 from purchasing a firearm of any type. As such, it is blatantly unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment.

## II. PARTIES

2.      Plaintiff RMGO is a nonprofit organization.  RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms.  RMGO has members who reside in Colorado who are between the ages of 18 and 20.  RMGO represents the interests of these members.  Specifically, RMGO represents the interests of those who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms. It is these members' present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in their home. These members are precluded from purchasing a firearm by SB23-169, which bars them from exercising their fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

3.      Plaintiff Mosgrove is a natural person, over the age of 18 but under the age of 21, and a citizen Colorado and the United States. Mosgrove has never been charged with nor convicted of any misdemeanor or felony offense. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. Mosgrove is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

4.      Plaintiff Pineda is a natural person, over the age of 18 but under the age of 21, and a citizen Colorado and the United States. Pineda has never been charged with nor convicted of any misdemeanor or felony offense. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in

his home. Pineda is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

5.      Defendant Jared S. Polis is the Governor of the State of Colorado.  This action is brought against him in his official capacity.

6.      Defendant is or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

## III.  JURISDICTION AND VENUE

7.      The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

9.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.  GENERAL ALLEGATIONS

10.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

11.     The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment.  *McDonald, supra.*

12.     SB23-169 states in relevant part: "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

13.     In *Bruen*, the Court held: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

14.     Plaintiffs desire to purchase firearms for lawful purposes (including defense of their homes). The right to keep arms necessarily implies the right to acquire arms. SB23-169 prohibits or soon will prohibit Plaintiffs from doing so. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added).

4

Plaintiffs have met their burden under *Bruen*, and SB23-169 is presumptively unconstitutional.

15.     Since the Second Amendment presumptively protects Plaintiffs' conduct, the State must justify SB23-169 by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden, because there is no such historical tradition of firearms regulation in this Nation.

16.     The plaintiffs in *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 3355339 (E.D. Va. May 10, 2023), challenged the federal law that makes it illegal for an 18-20-year-old person to acquire a firearms from a federally licensed firearms dealer. The federal law challenged in *Fraser* is, for practical purposes, identical to SB23-169. The court held that the federal statute violated the plaintiffs' Second Amendment rights. *See also Worth v. Harrington*, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) (there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from carrying firearms in public); and *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) (same). As the *Fraser* court held, there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from purchasing firearms to possess for the self-defense and other lawful uses, including self-defense in the home.

17.     In summary, the plain text of the Second Amendment covers Plaintiffs' conduct. Therefore, SB23-169 is presumptively unconstitutional. The State is unable to rebut this presumption, because the law is not consistent with Nation's historical

tradition of firearm regulation. Therefore, SB23-169 is unconstitutional to the extent it probits law-abiding adults from purchasing firearms for lawful purposes.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

18.     Paragraphs 1-17 are realleged and incorporated by reference.

19.     SB23-169 prohibits residents of the State, including Plaintiffs, from exercising their right to acquire arms protected by the Second Amendment.   There are significant penalties for violations of the law.

20.     These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment.

21.     SB23-169's prohibitions prohibit purchasing arms even for the purpose of self-defense in the home, where Second Amendment protections are at their zenith.

22.     The State cannot satisfy its burden of justifying these restrictions on the Second Amendment right of the People by demonstrating that they are consistent with this Nation's historical tradition of firearm regulation.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray that the Court:

23.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that SB23-169 is unconstitutional on its and face or as applied to the extent it prohibits adults from acquiring firearms for lawful purposes;

24.     Enter preliminary and permanent injunctive relief enjoining Defendant and his officers, agents, and employees from enforcing SB23-169 against adults;

25.     Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

26.     Award actual or nominal damages to the individual Plaintiff (RMGO does not seek damages); and

27.     Grant any such other and further relief as the Court may deem proper.

Respectfully submitted this 26th day of May 2023.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| _____<br>*Plaintiff(s)*<br>v.<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)     Civil Action No.<br>)<br>)<br>)<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                *Signature of Clerk or Deputy Clerk*

App 61

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
DISTRICT OF COLORADO

| | |
|---|---|
| ROCKY MOUTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA ⟩<br>⟩<br>⟩<br>⟩<br>⟩ | |
| *Plaintiff(s)* | |
| v. ⟩ | Civil Action No.  23-cv-1077 |
| JARED S. POLIS, in his official capacity as Governor of the State of Colorado ⟩<br>⟩<br>⟩<br>⟩<br>⟩ | |
| *Defendant(s)* | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Jared S. Polis, in his official capacity
c/o Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



*CLERK OF COURT*

Date:  06/02/2023

s/ A. Hinojosa-Lavalle

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  23-cv-1077

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify)*:



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-KLM**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

---

## MOTION FOR PRELIMINARY INJUNCTION

---

     Plaintiffs submit the following Motion for Preliminary Injunction.

## I. INTRODUCTION

     This action is a challenge to the constitutionality of Senate Bill 23-169 enacted by the Colorado General Assembly and signed by Governor Polis on April 27, 2023 ("SB23-169"). SB-23-169 prohibits law-abiding adults over the age of 18 but under the age of 21 from purchasing a firearm of any type. As such, it is unconstitutional under the Second Amendment.

## II. NOTE REGARDING TIMING OF MOTION

     SB23-169 will become effective on August 4, 2023. Plaintiffs have not sought immediate relief through a temporary restraining order because the law is not currently effective. Plaintiffs submit this motion hoping that it will be briefed and

argued prior to the effective date of the law. However, they reserve the right to apply to the Court for a TRO if the matter remains pending in late July.

### III. FACTS

1.      Plaintiff RMGO is a nonprofit organization. Declaration of Dudley Brown, ¶ 3. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. *Id*. RMGO has members who reside in Colorado who are between the ages of 18 and 20. *Id*. RMGO represents the interests of these members.  *Id*. Specifically, RMGO represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms. *Id*. It is these members' present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in their home. *Id*., ¶ 4. These members are precluded from purchasing a firearm by SB23-169, which bars them from exercising their fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

2.      Plaintiff Mosgrove is a natural person, over the age of 18 but under the age of 21, and a citizen of Colorado and the United States. Declaration of Tate Mosgrove, ¶ 2. Mosgrove has never been charged with nor convicted of any misdemeanor or felony offense. *Id*. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id*. Mosgrove is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

3.      Plaintiff Pineda is a natural person, over the age of 18 but under the age of 21, and a citizen of Colorado and the United States. Declaration of Adrian Pineda, ¶ 2. Pineda has never been charged with nor convicted of any misdemeanor or felony offense. *Id*. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id*. Pineda is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

4.      Defendant Jared S. Polis is the Governor of the State of Colorado.  This action is brought against him in his official capacity.  Defendant is enforcing or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

5.      SB23-169 states in relevant part: "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

### IV. STANDARD FOR OBTAINING RELIEF

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

In a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014). This is because: (a) the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury; (b) when a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interests in having his constitutional rights protected; and (c) it is always in the public interest to prevent violation of a person's constitutional rights. *Id*. Indeed, in constitutional cases whether to grant the injunction often turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam).

## V. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.   The Plain Text of the Second Amendment Covers Plaintiffs' Conduct

The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*. In *Bruen*, the Court held: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the

Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

Plaintiffs desire to purchase firearms for lawful purposes (including defense of their homes). The right to keep arms necessarily implies the right to acquire arms. SB23-169 prohibits or soon will prohibit Plaintiffs from doing so. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen*, and SB23-169 is presumptively unconstitutional. The State may attempt to rebut the presumption of unconstitutionality by demonstrating that SB23-169 is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden, because there is no such historical tradition of firearms regulation in this Nation.

1.    **The Government Cannot Demonstrate That its Regulation is Consistent with the Nation's History and Tradition of Firearms Regulation**

There were no state laws governing the possession or purchase of firearms by minors prior to 1791 and only two states adopted them between the Constitution's ratification and 1867. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History in The United States And Second Amendment Rights*, 80 LAW & CONTEMP. PROB. 55, 58–59 (2017). Historical

5

materials "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *NRA v. BATFE*, 714 F.3d 334, 339-40 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). At the time of our nation's Declaration of Independence and the Revolutionary War, armed militias in the colonies were comprised of boys as young as sixteen, with thousands entering service while even younger. *See id*. George Washington's Continental Army consisted of thousands of young men under twenty-one and they regularly used firearms. *See id*. Young males were commonly required to possess firearms as part of their militia service. *Id*., James Madison, the "father of the Constitution" was only twenty-five on July 4, 1776, and ultimately served in George Washington's Continental Army along with others who were even younger. His contemporaries included an eighteen-year-old James Monroe and Charles Pinckney, along with a twenty-year-old Henry Lee III, John Trumbull, Aaron Burr, and John Marshall. Additionally, the French officer Marquis de Lafayette was only eighteen in 1776; yet he gained the rank of Major General in the Continental Army while leading battles including the Siege of Yorktown. Eighteen-year-olds regularly used, possessed, and traded pistols, ammunition, and other firearms at this time and these firearms continue to serve as the "most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *See Heller*, 554 U.S. at 628.

Following the ratification of the Bill of Rights on December 15, 1791, eighteen-year-olds were required by the 1792 Militia Act to be available for service and militia members were required to furnish their own weapons. Eighteen-year-olds must have

been allowed to "keep" firearms for personal use. *NRA*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc). Because they were within the "core" rights-holders at the founding, their rights cannot be infringed today. *Id*.

The laws prior to and immediately surrounding passage of the Second Amendment illuminate contemporary understanding. Sixteen was almost exclusively the minimum age for colonial militias for 150 years before the Constitution. *Id*. at 340. For example, in 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut to bear arms. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 3 (2004). Other colonies had similar laws, *id*. at 8, with Delaware's minimum age of seventeen as the exception. *Id*. At the time of the Second Amendment's passage and shortly thereafter, the minimum age for militia service in every state[1] became eighteen. Nearly every

---

[1] Alphabetically by state, these are the available minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792: **Connecticut**: 18 / Acts and Laws, 308 (1792); **Delaware**: 18/ Ch. XXXVI, An Act for Establishing the Militia In This State, 1134 (1793); **Georgia**: 18/ An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as contained in Digest of the Laws of Georgia, 460 (1792); **Maryland**: 18 / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793); **Massachusetts**: 18 / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793); **New Hampshire**: 18 / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792); **New Jersey**: 18 / Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792); **New York**: 18 / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793); **North Carolina**: 18 / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)); **Pennsylvania**: 18/ Ch. MDCXCVI, An Act for

7

state adopted the Militia Act of 1792 by reference and began using its age structure. *Id*. Historical data confirms that those eighteen and above had the right to keep and bear arms and this right was not coextensive with militia service, but it was intimately related. *Id*. Gun ownership was necessary for militia service, but militia service was not necessary for gun ownership. *Id*. Not only had the colonies employed sixteen-year-olds in the militia for more than a century prior to the Second Amendment's ratification, other gun laws in place at the time serve as indicia of the Founders' mindset. *Id*. While the age of majority was twenty-one during the Founding era, minors were nevertheless in the militia and were expected, if not required, to own and provide their own weapons.

Referring to permissible historic limitations on gun ownership, *Heller* never mentioned a minimum age for exercise of the right. On the contrary, to explain the "militia clause," the Court positively quoted the first federal Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). The Court explained that the right of able-bodied citizens to keep and bear arms for self-defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might

---

Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793); **South Carolina**: 18/ An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782-91)); **Virginia**: 18/ Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

do by taking away the citizens' arms. *Id.* at 599. Those subject to militia duty are therefore a subset of citizens entitled to be armed and the right was considered to be essential. To think the Founders would have permitted a federal limitation on the purchase of new, commonly used firearms by the same body that constituted the militia is fundamentally at odds with the Second Amendment. Not only does the conduct proscribed by SB23-169 fall squarely within the scope of what our Founders meant to protect, but a reading of early-American documents show that the Founders would have rejected such bans altogether. *See, e.g.*, Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican*, at 21, 22, 24 (Univ. of Alabama Press 1975) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them." (emphasis added)); *see also* Tench Coxe, "*A Pennsylvanian, No. 3*," Pennsylvania Gazette, Feb. 20, 1788 ("[T]he powers of the sword are in the hands of the yeomanry of America from 16 to 60 . . . . Their swords . . . are the birthright of an American.").

Finally, if the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so. *See, e.g.*, U.S. Const. Art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for holding office in Senate), Art. II, § 1 (minimum age of thirty-five for holding office as President). Further, if the People want to apply an age threshold, they know how to do so. *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year- olds with universal suffrage). The maxim *expressio unius est exclusio alterius* is applicable. *See,*

9

App 73

*e.g.*, *United States Term Limits v. Thornton*, 515 U.S. 779, 868 (1995) (Thomas, J., dissenting). "When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution." *Id*.

The State might argue that it can discriminate against 18-20 year-olds because the common law age of majority was twenty-one at the time of the Founding. But this would presuppose that the legal threshold of adulthood is the determinative factor for whether the Second Amendment applies, and as discussed above, it is not. Even assuming arguendo that this is true, however, the determination of who is an adult must rely on the generally recognized age of majority as established in a state at the time of the Court's inquiry. No one disputes that states are entitled to reduce the age of majority to 18, and all but three have. The age of majority in Colorado is 18. C.R.S. § 13-22-101. *See Jones v. Dressel*, 623 P.2d 370, 373 (Colo. 1981). Eighteen-year-old males have been required to register for Selective Service for over a century and eighteen-year-olds are treated as adults for criminal trials, jury service, and their emancipation from parental oversight. At eighteen, one can enter a binding contract, execute a will, work without restriction, vote, and be held responsible for his own taxes.

Since Bruen, courts have not hesitated to protect the right of young adults. In *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 3355339 (E.D. Va. May 10, 2023), the court struck down the federal law that makes it illegal for an 18-20-year-old person to acquire a firearms from a federally licensed firearms dealer.

10

App 74

The federal law challenged in *Fraser* is, for practical purposes, identical to SB23-169, and the court held that the federal statute violated the plaintiffs' Second Amendment rights. In particular, the Court held with respect to *Bruen's* "plain text" step: "given its ordinary, commonsense, and logical meaning the right to 'keep arms' (the right to 'have') of necessity includes the right, inter alia, to purchase arms. That then puts an end to the textual inquiry with the conclusion that the conduct at issue is protected by the plain text of the Second Amendment." *Id.*, at *7.

Turning to *Bruen's* "history and tradition" step, after an exhaustive survey of the relevant history, the court concluded:

> Under the analytical framework established in *Bruen*, the Government simply has not met its burden to support the finding that restrictions on the purchasing of firearms by 18-to-20-year-olds is part of our Nation's history and tradition. Founding-era militia laws provide circumstantial evidence that 18-to-20-year-olds could purchase, own, and use arms. These militia laws and the cases interpreting them further support the finding that 18 was the age of majority for acquiring and possessing firearms in the Founding period. There is no direct evidence of age-based firearms restrictions. *The Government, the party which bears the burden, fails to point to any Founding-era laws to support the challenged law and implementing regulations.*

*Id.* at *22 (emphasis added).

In summary, the plaintiffs met their burden under the "plain text" prong and the government failed to meet its burden under the history and tradition prong. Therefore, the court granted summary judgment to the plaintiffs and declared the statute unconstitutional. *Id.* at *23. *See also Worth v. Harrington*, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) (there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from carrying firearms in public); and *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) (same).

### B.   *Bondi* Was Wrongly Decided

In *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), the court reached a different conclusion with respect to a Florida statute similar to SB23-169. In that case, the court held that the state's age restriction is consistent with the Nation's history and tradition of firearms regulation. *Id.* at 1325. The court was able to reach this conclusion, however, only because it considered certain mid- to late-19th-century laws as relevant analogues. *Id. See Fraser*, at *21, n. 44. But the court erred when it considered these later laws. *See Fraser* at *22 (pointing to laws from more than a half-century after ratification does not discharge the burden that *Bruen* imposes on the government).

*Fraser's* rejection of these later laws is consistent with *Bruen*, where the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id.*, 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). *Bruen* noted an "ongoing scholarly

debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ...” *Id.*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had “generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.” *Id.*, 142 S.Ct. at 2137 (citations omitted).

Thus, evidence from the second half of the 19th century is not relevant to an inquiry into the original public meaning of the Second Amendment, which was enacted six decades earlier. *Bruen,* 142 S. Ct. at 2153–54 (“As we suggested in *Heller,* [] late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.”). The Court expressed this concept even more forcefully in *Espinoza v. Montana Dep’t of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), where it held that laws enacted in the second half of the 1800s – even if enacted by the overwhelming majority of states – are not relevant to the “history and tradition” inquiry regarding the scope of a provision of the Bill of Rights. In that case, the plaintiff challenged a Montana regulation that excluded religiously affiliated private schools from a state scholarship program for students attending private schools. The Court held that the law was unconstitutional because there was no founding era tradition supporting Montana’s decision to disqualify religious schools from government aid. *Id.*, 140 S. Ct. at 2258. Far from prohibiting such aid, founding era laws actively encouraged it. *Id.* Significantly, Montana pointed

13

out that in the latter half of the 1800s the overwhelming majority of states (30) had enacted no-aid laws. *Id.*, 140 S. Ct. at 2259. The Court rejected Montana's argument, holding that "[s]uch a development, of course, cannot by itself establish an early American tradition. … [S]uch evidence may reinforce an early practice but cannot create one. … The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id.*

*Espinoza's* holding is unsurprising, because the Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–68 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

A second problem with *Bondi's* approach is that it leads to results that directly conflict with *Bruen's* admonition "that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* 142 S. Ct. at 2137. *See also McDonald*, 561 U.S. at 765 (incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment); and *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) ("incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when

14

App 78

asserted against the federal government"). As *Frasier* noted, there is absolutely no support for the age restriction in the founding era. *Id.* at *22. *Bondi* reached a different conclusion only by relying on laws enacted around 1868 when the 14th Amendment was ratified. *Id.,* 61 F.4th at 1325. *Bondi's* approach conflicts with *Bruen* because under the 11th Circuit's approach the text of the Second Amendment can mean one thing when applied to federal laws (as in *Fraser*) and the opposite thing when applied to state laws (as in *Bondi*). Surely, therefore, the Second Amendment right applicable to Florida as explicated in *Bondi* does not "have the same scope as against the Federal Government," and thus conflicts with *Bruen.* The founding era, not the 19th century, is key for understanding the scope of the Bill of Rights. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at [bit.ly/3Xwtgze](bit.ly/3Xwtgze) (last visited June 1, 2023), in which the author engages in an exhaustive analysis of the numerous Supreme Court cases regarding this issue.

C.    **Summary**

Plaintiffs have easily met their "plain text" burden. The State cannot meet its "history and tradition" burden because there are no founding-era analogues to its restriction on the right to keep and bear arms. *Bondi's* holding is incorrect, because its reliance on 19th-century laws as analogues conflicts with *Bruen* and *Espinoza* and numerous other Supreme Court cases holding that the founding-era is the appropriate time frame for the historical inquiry, and it also conflicts with *Bruen,*

*McDonald, Ramos* and other cases rejecting any result that would lead to a different meaning of the text when applied to the states as opposed to the federal government. Accordingly, Plaintiffs are likely to prevail on the merits.

## II.    The Other Preliminary Injunction Factors Favor Plaintiffs

In constitutional cases whether to grant the injunction often turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Since, as demonstrated above, Plaintiffs are likely to prevail on the merits, the Court could end its inquiry here.

Even if the Court were to consider the other three factors, however, the result would be the same, because all of the factors favor Plaintiffs. It is well-settled that a showing of the infringement of a constitutional right requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the court held that this principle applies in cases involving the infringement of Second Amendment rights. *Id.*, at 699 ("Infringements of [Second Amendment] right cannot be compensated by damages."). *See also Koons v. Platkin*, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023) (many decisions find that deprivation of Second Amendment rights is not easily remediable by monetary damages); *Spencer v. Nigrelli*, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (citing *Ezell*, infringement of Second Amendment rights cannot be compensated with damages);

*Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022); and *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

As for the balance of harms and public interest prongs, the State's interest in enforcing an unconstitutional law does not outweigh Plaintiffs' interest in having their constitutional rights protected. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Moreover, it is always in the public interest to prevent the violation of a party's constitutional rights. *Id.* (internal citation and quotation marks omitted).

Finally, this is not a case in which Plaintiffs must overcome a heightened standard to obtain a preliminary injunction. "Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo – that is, the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (internal citation and quotation marks omitted). The law has not gone into effect. Therefore, the current status quo is that Plaintiffs may exercise their Second Amendment rights. It is the State that seeks to disrupt the status quo, not Plaintiffs.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court to enter an order preliminary enjoining enforcement of SB23-169.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033

17

Voice: (303) 205-7870
Email: barry@arringtonpc.com

CERTIFICATE OF NOTICE TO THE OFFICE OF THE ATTORNEY GENERAL

The summons and complaint in this matter were served on the Attorney General on June 5, 2023. Undersigned counsel has been in contact with Assistant Solicitor General Grant Sullivan, who has indicated that he will be attorney handling this matter. On June 7, 2023, the undersigned email a copy of this motion to Mr. Sullivan at:

Grant.Sullivan@coag.gov

*/s/ Barry K. Arrington*
_____

Barry K. Arrington

Page: 86

Date Filed: 12/07/2023

Document: 010110965256

Appellate Case: 23-1251

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF DUDLEY BROWN

---

1.      My name is Dudley Brown.  I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.      I am President of Plaintiff Rocky Mountain Gun Owners ("RMGO").

3.      RMGO is a nonprofit organization. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. RMGO has members who reside in Colorado who are between the ages of 18 and 20. RMGO represents the interests of these members. Specifically, RMGO represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms.

4.      It is these members' present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in their home. These members are precluded from

1

App 83

purchasing a firearm by SB23-169, which bars them from exercising their fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

I, Dudley Brown, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct.

Dudley Brown

Date:  June 2, 2023

2

App 84

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

---

## DECLARATION OF TATE MOSGROVE

---

1.     My name is Tate Mosgrove.  I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.     I am over the age of 18 but under the age of 21 and a citizen of Colorado and the United States. I have never been charged with nor convicted of any misdemeanor or felony offense. It is my present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in my home. I am or soon will be precluded from purchasing a firearm by SB23-169, which bars me from exercising this fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

I, Tate Mosgrove, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct.

1

*Tate Mosgrove*
_____
Tate Mosgrove

Date:  June 2, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF ADRIAN PINEDA

---

1.      My name is Adrian Pineda.  I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.      I am over the age of 18 but under the age of 21 and a citizen of Colorado and the United States. I have never been charged with nor convicted of any misdemeanor or felony offense. It is my present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in my home. I am or soon will be precluded from purchasing a firearm by SB23-169, which bars me from exercising this fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

I, Adrian Pineda, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct.

Adrian Pineda

Date:  June 2, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-KLM**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

### WAVIER AND ACCEPTANCE OF SERVICE

---

     The undersigned hereby states that he is Defendant's attorney and he has received the Complaint and a Summons in this matter.  Pursuant to Fed.R.Civ.P. 4(d), the undersigned accepts service on behalf of Defendant and waives personal service.

     This waiver of service is not to be construed as an admission of the truth of any allegation in the pleadings, and Defendant reserves all rights and defenses of any kind.


*/s/ Grant T. Sullivan*
Signature

Printed Name:  Grant T. Sullivan

Date:  6/8/23

App 89

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-KLM

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

   Plaintiffs,

v.

JARED S. POLIS, in his Official Capacity as Governor of the State of Colorado,

   Defendant.

_____

**MINUTE ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

   This matter is before the Court sua sponte.   This case was assigned to a United States Magistrate Judge pursuant to D.C.COLO.LCivR 40.1(c).   Although a signed Consent/Non-Consent Form has not yet been filed, Plaintiff has filed a Motion for Preliminary Injunction [#12].   *See* D.C.COLO.LCivR 40.1(c)(2)(a) (discussing assignment of cases in which a motion for injunctive relief has been filed).   Accordingly,

   IT IS HEREBY **ORDERED** that this case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a).

   Dated: June 8, 2023

--

1

| 06/09/2023 | 15 | CASE REASSIGNED pursuant to 14 Minute Order. This case is randomly reassigned to Judge John L. Kane and drawn to Magistrate Judge Kristen L. Mix. All future pleadings should be designated as 23-cv-01077-JLK. (Text Only Entry) (csarr, ) (Entered: 06/09/2023) |

App 91

| 06/09/2023 | 16 | MINUTE ORDER. Defendant is DIRECTED to file a Response to Plaintiffs' Motion for Preliminary Injunction 12 on or before June 22, 2023. Any Reply is due on or before June 28, 2023. The parties are DIRECTED to call chambers JOINTLY at (303) 844-6118 to set a date and time for the preliminary injunction hearing. The Court has availability on June 29th, July 5th, or July 6th for the hearing. Plaintiffs are DIRECTED to provide notice of this Order to Defendant without delay. Ordered by Judge John L. Kane on 6/9/2023. Text Only Entry (jlksec) (Entered: 06/09/2023) |

| 06/12/2023 | 17 | MINUTE ORDER. An Evidentiary Hearing on Plaintiffs' Motion for Preliminary Injunction 12 is set for July 6, 2023, beginning at 9:30 a.m. The parties are DIRECTED to file their Witness and Exhibit Lists for the hearing on or before June 29, 2023. Counsel and the parties are expected to attend the hearing in person. The parties shall note on their Witness Lists whether it is anticipated any witness will testify via video teleconferencing. Ordered by Judge John L. Kane on 6/12/2023. Text Only Entry (jlksec) (Entered: 06/12/2023) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01077-JLK

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

### ENTRY OF APPEARANCE

---

     Grant T. Sullivan hereby enters his appearance on behalf of the Defendant, Jared S. Polis, in his official capacity as Governor of the State of Colorado, in the above captioned matter. Mr. Sullivan is a member in good standing of the bar of this Court. All parties shall copy all pleadings, motion, and briefs filed with the Court to the undersigned Grant T. Sullivan, Assistant Solicitor General.

Respectfully submitted this 12th day of June, 2023,

PHILIP J. WEISER
Attorney General

*/s/ Grant T. Sullivan*

GRANT T. SULLIVAN, No.40151*
Assistant Solicitor General
Public Officials Unit | State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720.508.6349
grant.sullivan@coag.gov

*Attorney for Defendant Jared Polis, in his official
capacity as Governor of the State of Colorado*
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2023, I served a true and complete copy of the foregoing **ENTRY OF APPEARANCE,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01077-JLK

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

## ENTRY OF APPEARANCE

---

     Michael T. Kotlarczyk hereby enters his appearance on behalf of the Defendant, Jared S. Polis, in his official capacity as Governor of the State of Colorado, in the above captioned matter. Mr. Kotlarczyk is a member in good standing of the bar of this Court. All parties shall copy all pleadings, motion, and briefs filed with the Court to the undersigned Michael T. Kotlarczyk, Senior Assistant Attorney General.

Respectfully submitted this 12th day of June, 2023,

PHILIP J. WEISER
Attorney General

*/s/ Michael T. Kotlarczyk*

MICHAEL T. KOTLARCZYK, No.43250*
Senior Assistant Attorney General
Public Officials Unit | State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720.508.6187
[mike.kotlarczyk@coag.gov](mailto:mike.kotlarczyk@coag.gov)

*Attorney for Defendant Jared Polis, in his official*
*  capacity as Governor of the State of Colorado*
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2023, I served a true and complete copy of the foregoing **ENTRY OF APPEARANCE,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01077-JLK

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**ENTRY OF APPEARANCE**

---

Matthew J. Worthington hereby enters his appearance on behalf of the Defendant, Jared S. Polis, in his official capacity as Governor of the State of Colorado, in the above captioned matter. Mr. Worthington is a member in good standing of the bar of this Court. All parties shall copy all pleadings, motion, and briefs filed with the Court to the undersigned Matthew J. Worthington, Assistant Attorney General.

Respectfully submitted this 12th day of June, 2023,

PHILIP J. WEISER
Attorney General

*/s/ Matthew J. Worthington*

MATTHEW J. WORTHINGTON, No.47987*
Assistant Attorney General
Higher Education Unit | State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720.508.6124
matt.worthington@coag.gov

*Attorney for Defendant Jared Polis, in his official
    capacity as Governor of the State of Colorado*
*Counsel of Record

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 12, 2023, I served a true and complete copy of the foregoing **ENTRY OF APPEARANCE,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

App 102

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-JLK**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

---

### UNOPPOSED MOTION FOR TATE MOSGROVE TO
### APPEAR ELECTRONICALLY AT JULY 6 HEARING

---

     Plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove ("Mosgrove"), and Adrian S. Pineda ("Pineda") move the Court for leave to allow Mosgrove to appear electronically at the July 6, 2023, hearing.

     **CERTIFICATION**: Undersigned counsel has consulted with counsel for Defendant regarding this motion. Defendant does not oppose this motion.

     1.    Plaintiffs filed their motion for preliminary injunction on June 7, 2023 (ECF # 12).

     2.    The Court set a hearing on Plaintiffs' motion for preliminary injunction for July 6, 2023 (ECF # 17).

3.     Plaintiff Mosgrove will be in Japan from July 1 to August 14 on a previously scheduled trip. Mosgrove is, therefore, unavailable to appear in person at the July 6 hearing.

4.     Accordingly, Plaintiffs move the Court to allow Mosgrove to testify at the hearing, if necessary, electronically.

5.     No party will be prejudiced by the requested relief and the interests of justice will be served thereby. Defendant does not oppose the requested relief.

WHEREFORE, Plaintiffs respectfully request leave to allow Mosgrove to appear electronically at the July 6 hearing.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

| From: | COD_ENotice@cod.uscourts.gov |
| To: | COD_ENotice@cod.uscourts.gov |
| Subject: | Activity in Case 1:23-cv-01077-JLK Rocky Mountain Gun Owners et al v. Polis |
| Date: | Tuesday, June 13, 2023 8:40:46 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court - District of Colorado

### District of Colorado

### Notice of Electronic Filing

The following transaction was entered on 6/13/2023 at 8:40 AM MDT and filed on 6/13/2023
**Case Name:**          Rocky Mountain Gun Owners et al v. Polis
**Case Number:**      1:23-cv-01077-JLK
**Filer:**
**Document Number:** 22(No document attached)

**Docket Text:**
**MINUTE ORDER. In light of the reassignment of this case to Senior District Judge John L. Kane [#15], the Scheduling Conference set for August 28, 2023, at 11:00 a.m. is VACATED. By Magistrate Judge Kristen L. Mix on June 13, 2023. Text Only Entry (klmlc1, )**


**1:23-cv-01077-JLK Notice has been electronically mailed to:**

Barry Kevin Arrington      barry@arringtonpc.com

Grant T. Sullivan      grant.sullivan@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Michael T. Kotlarczyk      mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Matthew John Worthington      matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-JLK Notice has been mailed by the filer to:**

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-JLK Rocky Mountain Gun Owners et al v. Polis Order on Motion for Leave |
| **Date:** | Tuesday, June 13, 2023 10:24:59 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court - District of Colorado

### District of Colorado

### Notice of Electronic Filing

The following transaction was entered on 6/13/2023 at 10:24 AM MDT and filed on 6/13/2023

**Case Name:**       Rocky Mountain Gun Owners et al v. Polis

**Case Number:**     1:23-cv-01077-JLK

**Filer:**

**Document Number:** 23(No document attached)

**Docket Text:**
**ORDER granting [21] Unopposed Motion for Tate Mosgrove to Appear Electronically at July 6 Hearing. Plaintiff Tate Mosgrove is allowed to appear electronically for the Evidentiary Hearing on the Motion for Preliminary Injunction on July 6, 2023, beginning at 9:30 a.m. Plaintiffs' counsel and Mr. Mosgrove are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC. Please contact Ms. Abiakam on or before June 30, 2023. Ordered by Judge John L. Kane on 6/13/2023. Text Only Entry(jlksec)**

**1:23-cv-01077-JLK Notice has been electronically mailed to:**

Barry Kevin Arrington     barry@arringtonpc.com

Grant T. Sullivan     grant.sullivan@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Michael T. Kotlarczyk     mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Matthew John Worthington     matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-JLK Notice has been mailed by the filer to:**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-JLK

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE,
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

### ORDER OF TRANSFER

---

      THIS MATTER comes before the Court upon review of the file. This case is closely related to Case No. 23-cv-01076-PAB, with one of the same plaintiffs and the same defendant in each case and common questions of fact and/or law.  Accordingly, in keeping with the Court's customary practice, this case is being transferred to the judge having the oldest filing number assigned to the cases drawn.  That judge is Chief Judge Brimmer.  Pursuant to D.C.COLO. LCivR 40.1(a), with approval and consent of Chief Judge Brimmer, it is

      ORDERED that the Clerk shall transfer this case to Chief Judge Brimmer.  All future pleadings shall be designated as 23-cv-01077-PAB.

      The pending hearing and deadlines ordered by Judge Kane are vacated.

      DATED this 21st day of June, 2023.

            BY THE COURT:

            *John L. Kane*

            JOHN L. KANE
            SENIOR U.S. DISTRICT JUDGE

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-PAB Rocky Mountain Gun Owners et al v. Polis |
| **Date:** | Thursday, June 22, 2023 7:50:39 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court - District of Colorado**

**District of Colorado**

### Notice of Electronic Filing

The following transaction was entered on 6/22/2023 at 7:50 AM MDT and filed on 6/22/2023
**Case Name:**          Rocky Mountain Gun Owners et al v. Polis
**Case Number:**       1:23-cv-01077-PAB
**Filer:**
**Document Number:** 25(No document attached)

**Docket Text:**
**MINUTE ORDER by Chief Judge Philip A. Brimmer on 6/22/2023. Defendant shall respond to plaintiffs' Motion for Preliminary Injunction [Docket No. [12]] on or before June 29, 2023. Plaintiffs may file a reply in support of their motion on or before July 13, 2023. Text Only Entry (pabsec, )**

**1:23-cv-01077-PAB Notice has been electronically mailed to:**

Barry Kevin Arrington     barry@arringtonpc.com

Grant T. Sullivan     grant.sullivan@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Michael T. Kotlarczyk     mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov, xan.serocki@coag.gov

Matthew John Worthington     matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB Notice has been mailed by the filer to:**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## UNOPPOSED MOTION TO EXCEED PAGE LIMITS

---

Defendant, Jared S. Polis, in his official capacity, respectfully requests an order permitting him to file a Response to Plaintiffs' Motion for a Preliminary Inunction not to exceed 25 pages.  As good cause, Defendant states:

1.      On June 7, 2023, Plaintiffs filed a Motion for Preliminary Injunction, Dkt. 12.  On June 9, 2023, this case was assigned to Judge John L. Kane, who ordered the Defendant to file a Response to the Preliminary Injunction by June 22, 2023.  Dkts. 15; 16.

2.      This action raises complex issues of great public interest that arises under the Supreme Court's recent decision in *NYSRPA v. Bruen*, 142 S. Ct. 2111 (2022).  *Bruen* adopted a two-step test, with the second step requiring the government to justify a regulation challenged under the Second Amendment by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  To adequately address this new legal standard and

set forth the relevant factual history of firearm regulation throughout this Nation's past 250

years, Defendant requires an additional ten pages.

     3.     Defendant further states that Plaintiffs' Motion for Preliminary Injunction was 17

pages, despite Plaintiffs not having the burden of the historical analysis required under *Bruen*'s

second step.  Dkt. 12.  Thus, the default 15-page limit for the Response to the Preliminary

Injunction is not adequate for the Defendant to both respond to the specific legal arguments

Plaintiffs raised in their Motion and to set forth the Nation's history of firearm regulation that

justifies Colorado's new law.

     4.     Defendant further states that Defendant's counsel previously prepared and nearly

filed a Response brief on June 22, 2023, that was consistent with Judge Kane's Practice

Standards not requiring specific page limits for briefs, before this case was transferred to Chief

Judge Brimmer on June 21, 2023.  Dkt. 24.  Chief Judge Brimmer has now ordered the

Defendant to file the Response brief on or before June 29, 2023.  Dkt. 25.

     5.     Under D.C.COLO.LCivR. 7.1, counsel for Defendant conferred with counsel for

Plaintiffs by email concerning the relief in this motion.  Plaintiffs do not oppose the requested

relief with an agreement that Plaintiffs may file a 15-page Reply brief.

     Therefore, Defendant respectfully requests an order permitting him to file a Response to

Plaintiffs' Motion for a Preliminary Injunction not to exceed 25 pages and for Plaintiffs to file a

Reply not to exceed 15 pages.

Dated: June 23, 2023

PHILIP J. WEISER
Attorney General

*/s/ Matthew J. Worthington*_____
*GRANT T. SULLIVAN\**
    Assistant Solicitor General
*MICHAEL KOTLARCZYK\**
    Senior Assistant Attorney General
*MATTHEW J. WORTHINGTON\**
    Assistant Attorney General
Colorado Attorney General's Office
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov

*Attorneys for Defendant Governor Jared Polis*

*Counsel of Record

App 112

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on June 23, 2023, I served a true and complete copy of the foregoing **UNOPPOSED MOTION TO EXCEED PAGE LIMITS,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

| From: | COD_ENotice@cod.uscourts.gov |
|---|---|
| To: | COD_ENotice@cod.uscourts.gov |
| Subject: | Activity in Case 1:23-cv-01077-PAB Rocky Mountain Gun Owners et al v. Polis Order on Motion for Leave to File Excess Pages |
| Date: | Monday, June 26, 2023 9:19:19 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court - District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 6/26/2023 at 9:18 AM MDT and filed on 6/26/2023

**Case Name:**     Rocky Mountain Gun Owners et al v. Polis
**Case Number:**   1:23-cv-01077-PAB
**Filer:**
**Document Number:** 27(No document attached)

**Docket Text:**
**ORDER by Chief Judge Philip A. Brimmer on 6/26/2023 re: [26] defendant's Unopposed Motion to Exceed Page Limits is GRANTED. Defendant shall file a response to [12] Motion for Preliminary Injunction that shall not exceed 25 pages, and plaintiffs may file a reply in support of their motion that shall not exceed 15 pages. Text Only Entry(pabsec, )**


**1:23-cv-01077-PAB Notice has been electronically mailed to:**

Barry Kevin Arrington    barry@arringtonpc.com

Grant T. Sullivan    grant.sullivan@coag.gov, carmen.vanpelt@coag.gov

Michael T. Kotlarczyk    mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov

Matthew John Worthington    matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB Notice has been mailed by the filer to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
     Plaintiffs,
v.
JARED POLIS, in his official capacity as Governor of Colorado,
     Defendant.

---

**THE GOVERNOR'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

Firearms are now the leading cause of death for 18-to-20-year-olds in Colorado and America, whether by accident, suicide, or homicide.[1] In response to this unprecedented crisis, Colorado's General Assembly made the commonsense decision to raise the minimum age to purchase firearms from 18 to 21.

Senate Bill 23-169 ("SB23-169") prohibits licensed gun dealers in Colorado from selling firearms to those under 21 and will become effective on August 8, 2023. It does not prohibit the *possession* or *use* of firearms in self-defense by an 18-to-20-year-old, only the commercial sale to such an individual. Thus, SB23-169 targets the *unchecked* commercial firearm purchases by 18-to-20-year-olds that have become so deadly in modern times, including when an 18-year-old purchased three of the four guns used to murder twelve students and one teacher at Columbine High School on April 20, 1999.

Plaintiffs, two 18-to-20-year-old Coloradans and a gun advocacy group, seek to preliminarily enjoin SB23-169 even before it becomes effective on August 8. Their motion

---

[1] CDC, WONDER, Underlying Cause of Death, Injury Mechanism & All Other Leading Causes, 2020-21, Ages 18–20, http://wonder.cdc.gov/ucd-icd10-expanded.html

asserts that it is "impossible" for Colorado to justify this new law under the Second Amendment. Dkt. 12 at 5. But Plaintiffs come well short of showing that a preliminary injunction should issue here. The U.S. Constitution does not leave Colorado helpless to address the recent unprecedented rise in youth gun deaths. Rather, the U.S. Supreme Court has repeatedly assured that the Constitution leaves States with various tools to address such threats to the public health, safety, and welfare. Among these presumptively lawful tools are State statutes that place conditions and qualifications on the commercial sale of firearms.

And age-restrictions on firearms purchasers like the one imposed by SB23-169 are nothing new. Our Nation has a well-established historical tradition of limiting sales of firearms to 18-to-20-year-olds, further demonstrating that age-related qualifications have never been understood to violate the Constitution. By the end of the 19th century, 18 States and the District of Columbia had enacted laws restricting the sale of firearms to those under 21. Just earlier this year, the Eleventh Circuit upheld a similar Florida law based on this well-established tradition. Plaintiffs' Motion fails to wrestle with these facts.

The Court should also reject Plaintiffs' Motion for more fundamental reasons. Plaintiffs have presented no textual-historical analysis supporting their view that the Second Amendment was publicly understood to create a right for 18-to-20-year-olds to commercially purchase firearms. Moreover, in their rush to the courthouse, Plaintiffs have not demonstrated any actual or imminent irreparable harm justifying preliminary relief. SB23-169 is not currently effective and therefore nothing prohibits Plaintiffs from following through on their alleged "present intention and desire to lawfully purchase a firearm." Dkt. 9 at 2–3. Nor would SB23-169 remove Plaintiffs' possession of guns they lawfully purchase before August 8, 2023. In the absence of an

injunction, Plaintiffs may still currently acquire the firearms they desire, and may lawfully possess them after SB23-169 takes effect. The Motion should be denied.[2]

## BACKGROUND

On April 28, 2023, Governor Polis signed SB23-169 into law. *See* Dkt. 1-1, S.B. 169, 74th Gen. Assemb., 1st Sess. (Colo. 2023). Federal law already prohibits licensed gun dealers from selling a shotgun or rifle to anyone under 18-years-old, and the sale of all other firearms to anyone under 21. 18 U.S.C. § 922(b)(1). Colorado's SB23-169 would raise this age from 18 to 21 for all firearms, by regulating sales by licensed gun dealers in the State. *See* Dkt. 1-1 at § 3 (C.R.S. § 18-12-112.5(1)(a.5)). It also will regulate private gun sales by prohibiting firearm purchases by minors until they turn 21. *See id.* at § 2 (C.R.S. §§ 18-12-112(2)(e) and (2)(f)).

But SB23-169 neither prohibits anyone's *possession* or *use* of firearms, nor prevents 18-to-20-year-olds from acquiring firearms outside of commercial or private sales. *See* C.R.S. § 18-12-112(6). For example, 18-to-20-year-olds may still possess and use firearms they acquire, borrow, inherit, or receive as gifts from a family member. *Id.* SB23-169 also exempts from the age-restriction anyone who is on duty as an active member of the Armed Forces, on duty as a peace officer, or a P.O.S.T. Board certified individual. *Id. See* Dkt. 1–1 at §§ 2 and 3.

---

[2] The Governor, sued here in his official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending SB23-169 from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

## LEGAL STANDARD

**I.    Legal standard for preliminary injunctions.**

A preliminary injunction is an "extraordinary remedy" granted only where a plaintiff establishes (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019). The last two factors merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The burden of proof is on Plaintiffs to demonstrate that each factor tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). Plaintiffs' requested injunction is also disfavored because it seeks "substantially all the relief [Plaintiffs] could feasibly attain after a full trial on the merits." *Sgaggio v. Weiser*, No. 22-cv-01791-PAB, 2022 WL 3700723, at *2 (D. Colo. Aug. 26, 2022) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir 2005)). Thus, Plaintiffs "must make a strong showing with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

**II.    Legal standard for Second Amendment claims.**

States are "bound to respect the [Second Amendment] right to keep and bear arms because of the Fourteenth Amendment." *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2137 (2022). When a State law is alleged to violate this right, the court applies a two-part test. *First*, the court must determine if the "Second Amendment's plain text covers" the individual's conduct. *Id.* at 2129–30. The "right secured by the Second Amendment is not unlimited" and individual self-defense

is "the central component." *District of Columbia v. Heller*, 554 U.S. 570, 599, 626 (2008).

*Second*, if the conduct is covered by the Second Amendment's plain text, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. When a State law exists to address "unprecedented societal concerns" not present at the Nation's founding, the "lack of a distinctly similar historical regulation" is not dispositive. *Id.* at 2131-32. Instead, a court must "reason[] by analogy" whether "how and why" a modern law burdens armed self-defense is consistent with "how and why" historical firearm regulations burdened this right. *Id.* at 2132–33. This test is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133.

## ARGUMENT

For three reasons, Plaintiffs have not satisfied the requirements for obtaining the extraordinary remedy of a preliminary injunction. *First*, Plaintiffs cannot show they are substantially likely to succeed on the merits. At *Bruen*'s first step, Plaintiffs have not shown that the Second Amendment's text covers their conduct. Plaintiffs' claims also fail at *Bruen*'s second step, because the Governor can demonstrate that SB23-169 is consistent with this Nation's historical tradition of firearm regulation. *Second*, Plaintiffs cannot show they will suffer an irreparable injury absent a preliminary injunction. SB23-169 is not yet effective and Plaintiffs are free to lawfully purchase the firearms they want today. Plaintiffs do not presently need an injunction to get the relief they seek. *Third*, Plaintiffs cannot show the equities or public interest weigh in their favor. A preliminary injunction would prevent Colorado from adopting a commonsense measure to reduce youth gun deaths in the State, and Plaintiffs have not demonstrated any clear constitutional injury.

I.    **Plaintiffs have not shown they are substantially likely to succeed on the merits of their claim.**

    A.    **Plaintiffs' proposed conduct is not covered by the Second Amendment's plain text.**

Plaintiffs cannot show they will succeed on *Bruen*'s first step[3], which requires them to demonstrate that the Second Amendment's "plain text covers [their] conduct" and that they "are part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2126, 2134. However, Plaintiffs' claims fail for three reasons. *First*, they have not shown through a textual-historical inquiry that the Second Amendment prohibits States from regulating commercial sales to 18-to-20-year-olds. *Second*, SB23-169 regulates commercial firearms sales, which is a category of regulation that the Supreme Court has repeatedly assured is "presumptively lawful," *Heller*, 554 U.S. at 627 n.26. *Third*, Plaintiffs have not shown that 18-to-20-year-olds were part of "the people" the Second Amendment protected, without referencing late-20th century understandings that came two-hundred years after the amendment was adopted.

    1.    **Plaintiffs fail to show that the Second Amendment covers their conduct.**

The Supreme Court has never held that the Second Amendment reaches the commercial or private sale of firearms at issue here. The Supreme Court has repeatedly emphasized the "narrowness" of its Second Amendment decisions. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015). *Heller* found the amendment's text covered possession of handguns in the home for self-defense, and only after an extensive review of 17th, 18th, and 19th century sources

---

[3] In contrast to *Bruen*'s second step, which explicitly lodges the burden with the government, the Court did not discuss the allocation of the burden for the threshold inquiry. 142 S. Ct. at 2126. Accordingly, the "default rule" prevails—Plaintiffs "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

of how the words "keep" and "bear" were popularly understood. 554 U.S. at 581–86. "Keep" referred to "possessing arms." *Id.* at 583. "Bear" meant to "carry" arms for confrontation. *Id.* at 584. *Bruen* concluded from the same historical understandings that the text also covers carrying firearms for self-defense outside the home. 142 S. Ct. at 2134.

Plaintiffs' Motion devotes only one sentence of argument to *Bruen*'s first step, stating that "[t]he right to keep arms necessarily implies the right to acquire arms." Dkt. 12 at 5. This falls far short of showing that the Second Amendment's text covers commercial sales to 18-to-20-year-olds. Indeed, in the only known legal challenge to early State laws prohibiting firearm sales to 18-to-20-year-olds, the Tennessee Supreme Court rejected this very argument verbatim, stating the Second Amendment right to "keep arms" *did not* "necessarily impl[y] the right to buy or otherwise acquire" a pistol by a minor or imply the "right in others to give, sell, or loan" the pistol to the minor. *Tennessee v. Callicutt*, 69 Tenn. 714, 716 (Tenn. 1878).

To the extent Plaintiffs are attempting to establish a new "right to purchase" firearms by 18-to-20-year-olds under the Second Amendment, they fail to engage in the required textual-historical inquiry. *Heller*, 554 U.S. at 581–619. Plaintiffs have not shown how that proposed right is rooted in the "normal and ordinary" meaning of the text as judged by "ordinary citizens in the founding generation." 554 U.S. at 576–77 (internal quotation omitted). They also have not shown how their proposed right is consistent with post-ratification interpretations. *Id*. at 606–19. Plaintiffs have not established, for example, that the Second Amendment was historically understood to reach commercial or private sales to 18-to-20-year-olds—*Callicutt* suggests the opposite. The Court's job is not to "resolve historical questions in the abstract" but "to resolve *legal* questions presented in particular cases" and "based on the historical record compiled by the

parties." *Bruen*, 142 S. Ct. at 2130 n.6. At the first step, Plaintiffs provide no historical record at all on whether they fall within the right's scope as delineated at the Nation's founding.

Nor have Plaintiffs demonstrated how SB23-169 would limit their right to self-defense, "the *central component*" of the Second Amendment. *Bruen*, 142 S. Ct. at 2133. To the extent Plaintiffs claim that SB23-169 burdens the rights announced in *Heller* or *Bruen*, their threadbare declarations provide none of the facts needed. All three declarations simply repeat a legal conclusion that they "desire to purchase a firearm … and [they are] or soon will be precluded from purchasing a firearm by SB23-169." Dkts. 12-1; 12-2; 12-3. This is not enough to preliminarily enjoin the law or even establish standing. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) (remanding Second Amendment challenge where plaintiffs' speculations they "some day" may violate the law failed to establish injury-in-fact). For example, Plaintiffs have not stated whether they already possess firearms for self-defense, what guns they wish to purchase and from whom, whether federal law also prohibits their desired purchases, if they can purchase a firearm prior to SB23-169's effective date, or whether they can obtain a firearm for self-defense outside of a commercial or private sale—such as through an intrafamilial transfer. In the absence of any well-pled, nonconclusory facts, Plaintiffs fail to show that SB23-169 will burden their right to self-defense. *See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222,1227 n.1 (10th Cir. 2010) (A court "need not accept [the complaints'] unsupported conclusory allegations" as true).

**2. SB23-169 is part of a State's "presumptively lawful" tools to combat youth gun deaths.**

Plaintiffs' Motion also fails because, by restricting firearms sales, SB23-169 falls within the "longstanding" and "presumptively lawful" category of regulations that are not covered by

the Second Amendment. *Heller*, 554 U.S. 627 n.26. *Heller* made clear that "[t]he Constitution leaves [the States] a variety of tools for combating" the modern problems of gun violence. *Id*. at 636. Among the tools *Heller* expressly mentioned were state laws that place "conditions and qualifications on the commercial sale of arms." *Id*. at 626–27. One tool is a State's authority to set the appropriate age an individual is qualified to purchase firearms. SB23-169 does just that. The bill limits commercial and private purchases to combat modern problems of youth accidental death, suicide, and homicide that these unchecked sales create. *See also Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1074 (D. Colo. 2014) (the "same power to regulate [commercial sales] should extend to non-commercial transactions, lest the loophole swallow the regulatory purpose.") (vacated and remanded on other grounds). SB23-169 does not prevent interfamilial transfers of firearms. The law is also not a "total[] ban" on possession. *Heller*, 554 U.S. at 628. This carve-out is also broadly consistent with the "commonsense distinction" for other constitutional rights where the Court creates different rules when States regulate commercial conduct already "traditionally subject to government regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (first amendment speech) (quotations omitted).

Pre-*Bruen*, some courts looked to *Heller*'s "conditions and qualifications" carve-out when deciding that the Second Amendment does not reach commercial age-based restrictions, *see, e.g.*, *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489 (W.D. Pa. 2021); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 994 (W.D. Wash. 2020) (vacated and remanded); *NRA v. BATFE*, 700 F.3d 185, 206 (5th Cir. 2012) (abrogated on other grounds), while some courts did not, *see Hirschfeld v. BAFTE*, 5 F.4th 407, 416 (4th Cir. 2021) (vacated as moot).

App 123

However, the Tenth Circuit has stated it is "bound" to apply the *Heller* carve-outs when deciding Second Amendment's scope. *Bonidy*, 790 F.3d at 1125. The repeated use of the same language in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) demonstrates that courts cannot disregard *Heller*'s carve-outs. *Bonidy*, 790 F.3d at 1125. *Bruen* did not change this directive. *See Bruen*, 142 S. Ct. at 2133 (discussing "longstanding" restrictions in "sensitive places"). Instead, three of the five justices who joined the *Bruen* decision—a plurality of the majority—issued separate concurrences reemphasizing the importance of these "presumptively lawful" categories. *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring). Justice Alito went as far to state that *Bruen* "decides nothing about … the requirements that must be met to buy a gun." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Plaintiffs ignore this issue entirely. The Court should not ignore the Supreme Court's repeated assurance in *Heller*, *McDonald*, and *Bruen,* or the Tenth Circuit's gloss in *Bonidy*. States have at their disposal various tools that fall outside the scope of the Second Amendment's plain text, including setting the minimum age to buy a gun.

### 3. Plaintiffs do not demonstrate that 18-to-20-year-olds were part of "the people" under the Second Amendment.

Plaintiffs also do not establish that the individual Plaintiffs fall within "the people" whom the Second Amendment protects. *See Bruen*, 142 S. Ct. at 2134. *Heller* did not clearly answer who falls within "the people" under the Second Amendment and "the question seems large and complicated." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168–69 (10th Cir. 2010). In *Huitron-Guizar*, the Tenth Circuit abstained from resolving the question, among other reasons, because a court "must" answer what the words "the people" meant by looking at the

"understanding of the age of 1787" through a "textual-historical inquiry," and the parties had not compiled a full record on that issue. *Id.* at 1169.

In this case, the record is clear that 18-to-20-year-olds were minors without full legal rights when the Second Amendment was adopted. *See* Ex. 1, Cornell Decl. at 19–23. They were considered "infants" subject to intense State regulation. *Id*. Only in the late 20th century did our Nation recognize 18-to-20-year-olds' role in the political community with First Amendment protection and the right to vote under the Twenty-Sixth Amendment. *Id* at 23–24; *Morse v. Frederick*, 551 U.S. 393, 410–11 (2007) (Thomas, J., concurring) (History "suggests that the First Amendment, as originally understood, does not protect student speech in public schools.").

Plaintiffs concede that the age of majority was 21 during the founding era. Dkt. 12 at 10. However, Plaintiffs argue, without support, that the Court must look to "the generally recognized age of majority as established in a state at the time of the Court's inquiry" rather than a textual-historical inquiry. *Id.* At the outset, Plaintiffs are wrong about Colorado law, *id.* at 10, which sets the default age of majority at 21. *See* C.R.S. § 2-4-401(6) ("'Minor' means any person who has not attained the age of twenty-one years."). Prior to this statute, Colorado used the common law age of 21 from its earliest days. *See* 1861 Colo. Terr. Sess. Laws p.35 (adopting Common Law of England). While Colorado statutes have lowered certain age-related privileges to 18, nothing prevents Colorado from using its long-held age of majority at 21 for firearm purchases.

Plaintiffs cannot have it both ways. They assert the Court must look only to the founding era when interpreting the scope of some Second Amendment words, "keep" and "bear." Dkt. 12 at 12–15. But they also insist the Court look at late-20th century interpretations to understand what is meant by "the people"—nearly 200 years after the Second Amendment was adopted—

App 125

and, as explained below, nearly 100 years after States enacted laws restricting firearm sales to 18-to-20-year-olds. The Court should instead use the "textual-historical inquiry" in both instances. *Huitron-Guizar*, 678 F.3d at 1169.

Plaintiffs rely extensively on *Fraser v. BATFE*, a recent district court case invalidating a federal age restriction. However, the *Fraser* court made the exact historical errors the Supreme Court has warned against. *See Fraser v. BATFE*, --- F. Supp. 3d ---, 2023 WL 3355339, at *11 (E.D. Va. 2023). In *Fraser*, the court declined to interpret "the people" through a textual-historical inquiry because it purportedly "would remove Second Amendment protections for vast swaths of the American population." *Id.* But this is not a result of *Heller*'s textual-historical inquiry but the *Fraser* court's decision to exclude from consideration the history after the founding era. *Id.* at 19–20. Had *Fraser* looked to the Second Amendment's understanding after the Fourteenth Amendment, as *Heller* did, it easily could have concluded that "the Second Amendment gave freed blacks the right to keep and bear arms." *Heller*, 554 U.S. at 614–26. *Fraser* reached its result through a "logical inconsistency" that did not apply the precedent of *Heller* or *Bruen*. 2023 WL 3355339, at *12 n.15. *Fraser* demonstrates an unsound method of historical inquiry that occurs when a court artificially limits what history is considered. It therefore should be rejected by this Court as a roadmap for a textual-historical analysis.

In sum, there is no dispute that 18-to-20-year-olds did not enjoy significant legal rights at the founding. To the extent Plaintiffs assert that the scope of the Second Amendment must be interpreted only on "founding-era analogues," Dkt. 12 at 15, then the individual Plaintiffs clearly fall outside of "the people" the Second Amendment protects. And, if the Court looks to

understandings of rights for 18-to-20-year-olds in the late-20th century, the Court must also look at what came first—our Nation's extensive history of age-related firearm regulations, *infra* I.B.1.

**B. SB23-169 is consistent with this Nation's past history of firearm regulation.**

If Plaintiffs' claim survives *Bruen*'s first step, the Governor will demonstrate that SB23-169 "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The Governor does not need to point to a "dead ringer" of a law that existed at the founding. *Id*. at 2133. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Instead, the Governor's burden is to demonstrate SB23-169 has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. The Court considers whether modern and historical regulations are "relevantly similar," including across at least two metrics: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added).

**1. This Nation has a longstanding history of placing age-restrictions on firearm purchases.**

A review of this Nation's historical regulations shows that firearm age-restrictions have always been understood as consistent with the Second Amendment. The one federal court of appeals to consider the question post-*Bruen* has already held that "the states have never been without power to regulate 18-to-20-year-olds' access to firearms." *NRA v. Bondi*, 61 F.4th 1317, 1332 (11th Cir. 2023); *see also Reese v. BAFTE,* No. 6:20-CV-01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022) (holding that "discussion of the historical record in [*NRA v. BAFTE,* 700 F.3d 185 (5th Cir. 2012)] satisfies the *Bruen* test").

i. <u>English common law</u>

As *Heller* did, the Court should start its historical analysis with English common law. 554 U.S. at 592. In 18th century England, 18-to-20-year-olds were not considered full adults but "minors" and "infants." Ex. 1 at 12–13; 20. Colonial America continued to recognize that 18-to-20-year-olds lacked full legal rights and were subject to their parent's authority. *Id.* at 21. One founding era jurist wrote that "[p]ersons within the age of twenty-one, are, in the language of the law denominated infants" and could be bound by contract only for "necessaries" like food, clothing, and lodging. *Id.* at 21–22. Early American courts protected minors contracting independently from their parents by voiding contracts that went against the minor's interest. *Id.* Thus, founding era States regulated a minor's commercial relations for their own protection. It is hard to see how 18-to-20-year-olds could be understood to have an unfettered right to purchase firearms at the founding when they did not have full contractual rights. History from the time the Second Amendment was adopted supports that they did not have this right. Ex. 1 at 12; 64.

ii. <u>Founding era restrictions and early public colleges</u>

"[G]un safety regulation was commonplace in the colonies" including various safety laws regulating gun storage and "who in the community had guns." *NRA*, 700 F.3d at 200. "American legislators had determined that permitting [certain] persons to keep and bear arms posed a potential danger." *Id.* As a result, "revolutionary and founding-era gun regulations" are noteworthy for "target[ing] particular groups for safety reasons." *Id.* Early examples include the disarmament of those refusing to swear an oath of allegiance to the Nation or those who participated in Shays' Rebellion. *Id.*

Colleges in the founding era likewise restricted 18-to-20-year-olds' ability to use and possess firearms. Ex. 2, Spitzer Decl. at 14. This is noteworthy because early college campuses were one of the few places in founding era society where 18-to-20-year-olds lived outside of direct parental authority. *Id.* Before the American Revolutionary War, Harvard College and Yale College, both private institutions, adopted policies that prohibited their students from possessing guns on campus. *Id.* at 15. Public colleges created after the founding quickly adopted similar provisions, including at the University systems of North Carolina (1799, 1838), Georgia (1810), Virginia (1824), College of William and Mary (Virginia, 1830), the College of New Jersey (1871), the University of Mississippi (1878), and the University of Kentucky (1890-1891). *Id.* Some of these restrictions, like at the University of Georgia, appear to have also prohibited possession off campus. *Id.* Appx. C (prohibiting "any gun [or] pistol … in College or elsewhere"). Thomas Jefferson and James Madison were part of the Board of Visitors at the University of Virginia that adopted the policy that "[n]o Student shall, within the precincts of the University … keep or use weapons or arms of any kind, or gunpowder." *Id.* Early public college prohibitions show that our Nation already had a tradition of restricting firearms to 18-to-20-year-olds shortly after the Second Amendment's adoption, especially when unsupervised by a parent.

iii.  <u>Founding era militias</u>

Plaintiffs place great emphasis on militia service during the founding era. *See* Dkt. 12 at 5-8. But the government's burden at *Bruen*'s second step is not to show 18-to-20-year-olds *never* had access to firearms in this Nation's history. Instead, the government must point to "a well-established and representative historical analogue" where the State imposed "a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Past militia service also does not demonstrate that the Second Amendment prohibited State regulation of firearm *purchase*s by minors for personal use. Plaintiffs conflate the legal *obligations* the States placed on minors with an understanding of their constitutional *rights* against government regulation. *See Bondi*, 61 F.4th at 1331–32 ("the historical record shows that merely being part of the militia did not entitle 18-to-10-year-olds to enjoy the same political and civil rights as adults."); Ex. 1 at 37–41. This distinction was also understood by the courts of the day. *United States v. Bainbridge*, 24 F. Cas. 946, 950 (C.C. D. Mass. 1816) (Story, J.) (U.S. Constitution grants "power to enlist minors in naval service" in derogation of common law parental rights). Militia obligations instead demonstrate the extensive control that States had over 18-to-20-year-olds in early America. Ex. 1 at 34–37. States imposed fines and punishments on those who failed to muster. *Id.* The also specified the type of firearms required for militia service and made the weapons subject to inspection. *Id.* The State's broad police power to compel military service cannot be understood to create a restriction on a State's police power today.

Minors participating in militias also did so under the supervision of parents and other adults. Ex. 1 at 25-27. Militia law often required the minor's parent to supply the firearm, including in Delaware, (1785); New Hampshire (1792); Massachusetts (1793); Vermont (1797); and North Carolina (1806). Ex. 1 at 37, Table 1. Militia members were subject to disciplinary order and possessed firearms in the coordinated and rigorous military service, distinct from everyday civilian life. *Id.* at 36. Early militia service does not support that minors had rights to purchase firearms. They show States conscripted minors for State purposes.

iv.  Pre-Civil War restrictions

Cities and States also adopted restrictions on the use of firearms by minors shortly after the founding. In 1803, the City of New York prohibited the fire or discharge of any gun or pistol and made parents responsible for any unlawful discharge by a minor. Ex. 2 at 7-8. Similar restrictions were adopted by cities in Delaware (1812), South Carolina (1817), Connecticut (1835), and Kentucky (1853, 1859, 1860). *Id.* at 8. The three Kentucky laws prohibited sales of pistols and gunpowder to a minor. *Id.* at 8–9.

In 1856, Alabama prohibited "anyone who shall sell or give or lend" a pistol to a minor statewide. *Id.* at 9. Two years later, in 1858, Tennessee enacted a similar law prohibiting selling, giving, or lending to a minor a pistol, fighting knife or "like dangerous weapon." *Id.* In both States, the age of majority was 21. *Bondi*, 61 F.4 at 1326.

v.  Post-Civil War restrictions

Numerous States adopted restrictions like Alabama and Tennessee after the Civil War. Ex. 2 at 9. From 1855 to 1900, 18 States and the District of Columbia adopted laws regulating firearm sales to those under 21-years-old. Ex. 5 ("State Historical Analogues for Restrictions on 18-to-20-year-old Firearm Sales"). By the early-20th century, some 45 States had enacted nearly 100 State laws restricting the sale of firearms to minors. Ex. 2 at 9–10.

These State laws varied, but generally prohibited gun transfers (through commercial sales or otherwise) to minors, especially pistols along with other dangerous weapons. *Id.* at 10. For example, Missouri's law made it unlawful to, without the parent's consent, "directly or indirectly sell or deliver, loan or barter to any minor" weapons, defined as "any kind of fire arms, bowie knife, dagger, slung-shot, or other deadly weapon." *Id.* Appx. A at 17–18. The specific age limit

varied with each State law, although 21 was the most widely used age of majority. Ex. 2 at 10. And consistent with earlier understandings, many of these statutes accounted for parental supervision. For example, Texas made it unlawful for anyone to "knowingly sell, give or barter … to any minor, any pistol" or other types of weapons "without the written consent of the parent or guardian." *Id.* Appx. A at 30.

The public's understanding on age-restrictions was also reflected in the contemporaneous legal commentary of the time. *See Bruen*, 142 S. Ct. at 2128 (discussing use of post-ratification history). Thomas Cooley—a 19th century scholar whose "massively popular 1868 Treatise on Constitutional Limitations" was cited favorably in *Heller*, 554 U.S. at 616–17—wrote in the same work that "the State may prohibit the sale of arms to minors" under the State's police power. Thomas M. Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883).

There is only one known contemporary challenge to this wave of age-restriction laws in the mid- and late- 19th century, a fact which itself "suggests that the public understanding at the time of the ratification considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330. The previously mentioned *Callicutt* case in Tennessee rejected a Second Amendment challenge brought by a defendant charged with selling a pistol to a minor. 69 Tenn. 714. The minor was likely 18-to-20-years-old, as the court suggested the minor was "subject to military duty." *Id.* at 716. The court rejected that the right to keep arms "implies the right to buy or otherwise acquire" a pistol by a minor. *Id.* The court "regard[ed] the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.* at 716–17.

vi. <u>Colorado's SB23-169</u>

With this survey of our Nation's tradition of age-related restrictions, the Court should

hold that SB23-169 is "relevantly similar." *Bruen*, 142 S. Ct. at 2132. It has close "representative

analogues," *id.* at 2133, in the laws restricting sales of firearms to 18-to-20-year-olds adopted by

18 States and D.C. prior to 1900. Ex. 5. By the early 20th-century, 46 States had placed some age

restriction on firearms. Ex. 2 at 9–10. These laws were "well-established," not "localized

restrictions" or "outliers." *Bruen*, 142 S. Ct. at 2133; 2153–54.

These laws also did not contradict earlier public understandings. *See id.* at 2154. They

were consistent with and merely codified early safety restrictions at public colleges and an

English common law tradition regulating 18-to-20-year-olds' conduct. These 19th century laws

also emerged due to dramatic societal changes, unprecedented violence, and evolution in firearm

technology, manufacturing, and distribution. *See* Ex. 3, Rivas Decl. at 4; Ex. 1 at 43–54; Ex. 2 at

12–14. States adopted laws to protect minors from these deadlier and more accessible weapons.

Ex. 3 at 15–28. Our understanding of the Second Amendment did not change, rather 19th century

States had a greater need to use their longstanding power to set a minimum age for firearm sales.

The "how and why" of these historical laws closely mirror the "how and why" of SB23-

169. *Bruen*, 142 S. Ct. at 2133. With respect to the "how," SB23-169 does not burden the right of

armed self-defense any more than these historical regulations. Like 19th century regulations,

SB23-169 primarily acts on gun dealers by making it unlawful to sell firearms to those under 21.

Some historical regulations were more burdensome than SB23-169, prohibiting any transfer of

the weapon to a minor. That these historical regulations often restricted the transfer (not just sale)

of handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—further

underscores the burden that was historically accepted on an 18-to-20-year-olds' firearm access. Other past State laws permitted the transfer of firearms with the parent's consent, much like SB23-169's exception for the acquisition of a firearm through an intrafamilial transfer. And while historical regulations varied in their age limit, 21 was the most common age used as the qualification to purchase firearms. These laws are a close "historical *twin*" for SB23-169, more than "analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133; *see Bondi*, 61 F.4[th] at 1131 (upholding Florida law based on same analogues); Ex. 5. They show it was well understood in our Nation's history that governments could use their police power to restrict sales of firearms to 18-to-20-year-olds.

With respect to the "why," SB23-169 was adopted for the same reasons as these historical analogues—public safety. As these historical regulations show, our Nation understood that the ends of public safety "justified" age-related sales restrictions, *id.*, even if these laws placed some burden on a right to self-defense. *See* Ex. 3 at 24–28.

SB23-169 is also consistent with early founding era understandings that limited guns among people who posed a public danger to society. *See NRA*, 700 F.3d at 200. Our understanding of human brain development has changed over the last two decades. Ex. 4, Steinberg Decl. at 7–8. Modern neuroscience now accepts that the brain is still maturing until at least age 21. *Id*. 18-to-20-year-olds are more like younger teens neurobiologically than adults. *Id.* They engage in riskier and impulsive behavior. *Id.* When mixed with firearms, this behavior leads to tragic outcomes. Suicidal ideation and attempted suicide are higher during this period of life, and firearms are used in more than half of all suicide attempts. *Id.* at 16-17. Data also indicates that violent crime peaks during this time of life and 18-to-20-year-olds are more likely

to use weapons to commit crimes than older adults. *Id.* at 17. Colorado can adopt a new minimum age for firearm purchases based on a modern understanding of adolescent brain development. Doing so does not upset the Second Amendment and is consistent with other longstanding safety measures. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J. dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns" for the public good.).

Plaintiffs also claim that the Second Amendment's lack of an express age limitation prohibits the States from adopting one. Dkt. 12 at 9–10. This argument misstates how our federal system works and the dissenting opinion it cites. Under the Tenth Amendment, "the States can exercise all powers that the Constitution does not withhold from them." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 848 (1995) (Thomas J., dissenting). Thus, we are told not "to read constitutional provisions to preclude state power by negative implication." *Id.* at 870. Instead, in the absence of any express age restriction, the Constitution leaves to the States the power to set the appropriate minimum age for firearm purchases. SB23-169 does just that by relying on modern understandings of 18-to-20-year-old brain development. *See* Ex. 4 at 18–20.

In short, Plaintiffs are not *substantially* likely to succeed on the merits. Even if Plaintiffs could show their conduct is covered by the Second Amendment's text, SB23-169 does not violate it. SB23-169 is consistent with our Nation's historical tradition of firearm regulation.

### 2. Mid- to late-19th Century history "is relevant" to understanding the Second Amendment's scope.

The Court should also reject Plaintiffs' request to limit what history and traditions may be considered in defining the Second Amendment's scope. Likely because mid- to late-19th century

firearm regulations are so analogous to SB23-169, Plaintiffs argue courts should treat this history as "not relevant." Dkt. 12 at 12–15. Plaintiffs are wrong for three reasons.

*First*, *Heller* and *Bruen* do not command a court to ignore 19th century history. *Heller* looked to how the text was "interpreted from immediately after its ratification through the end of the 19th century." 554 U.S. at 605. To "determine *the public understanding*," *Heller* found post-ratification history "a critical tool of constitutional interpretation." *Id. Heller* cited late 19th century legal sources for support, including the same legal jurist who wrote that States may regulate sales to minors. *See Id.* at 616–17; *supra* at 18. *Bruen* ultimately declined to decide the issue. *Bruen* chose not to adopt a rule concerning whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified." 142 S. Ct. at 2138. *Bruen* found that unnecessary because it determined the "public understanding of … public carry" was the same in 1791 and 1868. *Id.* What *Bruen* cautioned against is using "late-19-century evidence … when it *contradicts* earlier evidence." *Id.* at 2154 (citing *Heller*, 554 U.S. at 614) (emphasis added).[4]

*Second*, and with that in mind, Plaintiffs have not demonstrated that age-based restrictions adopted in the late 19th century *contradict* an early understanding. *Fraser* erred for the same reason by failing to consider whether late-19th century laws were consistent with evidence from the founding era. 2023 WL 3355339, at *21. The history should therefore be reviewed and considered. As described above, these 19th century laws were *consistent* with what

---

[4] *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), cited by Plaintiffs, merely makes this same point. The Court disregarded 19th century laws prohibiting state support for religious schools when those laws were inconsistent with founding-era laws that provided such support. 140 S. Ct. at 2258. The holding in *Espinoza* simply does not support Plaintiffs' sweeping position that all 19th century evidence "is not relevant." *See* Dkt. 12 at 13.

came before, including the understanding in English common law on the status of 18-to-20-year-olds and early 19th century restrictions at the Nation's first colleges. *Bondi* also held the public understanding was always consistent. 61 F.4th at 1332 ("the states have never been without power to regulate 18-to-20-year-olds' access to firearms."). Thus, as in *Bruen*, the Court does not need to resolve whether the public understandings from the founding or the Fourteenth Amendment control. The Second Amendment's scope and the States' power were the same in 1791 as they were in 1868 or 2023. *See Reese*, 2022 WL 17859138, at * 10 (firearm age-restrictions are consistent because "the Founders likely would not have been of the opinion that [18-to-20-year-olds] enjoy the full scope of rights encompassed in the Second Amendment.").

*Third*, Plaintiffs' position is hard to square with actual history. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 142 S. Ct. at 2136, and States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," *id.* at 2137. In 1791, the land now known as Colorado was not part of the United States. Colorado gained its sovereignty as a State eight years *after* the Fourteenth Amendment was adopted, and after several other States had already passed laws restricting firearm sales to minors. The popular understanding of the Second Amendment from this time period is certainly relevant to understanding the scope of the right.

## II.    Plaintiffs have not shown that they will suffer an irreparable injury.

Plaintiffs' Motion for a pre-enforcement injunction also fails because they have not shown any irreparable injury. Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *N.M. Dep't of Game & Fish v. U.S.*, 854 F.3d 1236, 1249 (10th Cir. 2017) (quotation omitted). "To constitute irreparable harm, an injury must be certain,

great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Moreover, Plaintiffs must show that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. (quotations omitted).

Plaintiffs assert that the "showing of the infringement of a constitutional right" necessarily satisfies Plaintiffs' burden "of showing irreparable injury." Dkt. 12 at 16. However, Plaintiffs must first make it "clear [] that [constitutional] interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiffs have not shown SB23-169 currently impairs their right to keep and bear arms. SB23-169 does not become effective until August 8, 2023. The individual Plaintiffs both declared on June 2, 2023, that they had "a present intention and desire to lawfully purchase a firearm." Dkt. 12-2, ¶ 2; Dkt. 12-3, ¶ 2. SB23-169 is not currently preventing Plaintiffs from following through on that intention. In the absence of injunctive relief, Plaintiffs still have over a month to purchase a firearm. Nor would an injunction in this case change federal law, which prohibits the commercial sale of handguns to those under 21. *See* 18 U.S.C. § 922(b)(1). Once effective, SB23-169 does nothing to prevent Plaintiffs' *possession* or *use* of firearms they may purchase before the law's effective date. Plaintiffs therefore face no actual, great, or imminent injury from SB23-169 that would justify a clear and present need for preliminary relief.

## III.   The balance of the equities and public interest weigh heavily in Colorado's favor and against Plaintiffs.

Plaintiffs have not shown that the balance of equites and public interest weigh in their favor. Plaintiffs' requested pre-enforcement relief would enjoin Colorado from enforcing a law enacted by its elected representatives and aimed at addressing an unprecedent rise in gun

violence, teen suicide, and mass shootings. *See generally Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). By enacting SB23-169, Colorado's General Assembly determined it would serve the public interest and promote public safety if the minimum age to purchase firearms was raised to 21. Risk taking peaks in the late teens and early 20s because the human brain is still developing before 21. Ex. 4 at 17. Unchecked firearm purchases by this group can threaten public safety. Coloradans will be harmed by an injunction that delays enforcement of SB23-169 while this litigation is pending.

On the other side, Plaintiffs have not shown their interests should outweigh Colorado's public interest. Plaintiffs are not substantially likely to succeed on their claim and have not demonstrated that their interests are covered by the Second Amendment's plain text. Moreover, Plaintiffs have a clear method of mitigating any alleged injury during the pendency of this litigation by purchasing the firearms they intend to acquire before August 8, 2023.

## CONCLUSION

The Court should deny Plaintiff's Motion for Preliminary Injunction.

Dated: June 29, 2023

PHILIP J. WEISER
Attorney General

*s/ Matthew J. Worthington*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Defendant Governor Jared Polis*
*Counsel of Record

App 139

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 29, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

*s/ Carmen Van Pelt*
Carmen Van Pelt

# Exhibit 1 - Cornell Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

## DECLARATION OF SAUL CORNELL

---

     I, Saul Cornell, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

### BACKGROUND AND QUALIFICATIONS

     I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City. I have a master's degree in History and a Ph.D. in History, both from the University of Pennsylvania. In addition to teaching constitutional history at Fordham College, I teach seminars in constitutional law at Fordham Law School. I have been a Senior Visiting Research Scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. Prior to my time at Fordham University, I was a Professor of History at The Ohio State University, the Thomas Jefferson Chair at the University of Leiden in the Netherlands, and an Assistant Professor in the Departments of History at The Ohio State University and the College of William and Mary. A copy of my complete curriculum vitae (CV) is attached.

My scholarship on the Second Amendment and the history of firearms regulation has been widely cited by state and federal courts.[1] I have published two dozen articles on this topic that have appeared in leading law reviews and top peer-reviewed legal history journals.[2] I authored the chapter on the right to bear arms in the *Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]

I have given numerous invited lectures, presented papers at faculty workshops, and participated in conferences on the Second Amendment and the history of firearms regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

I have also provided expert witness testimony in both state and federal courts in firearms-related matters, including *Rocky Mountain Gun Owners v. Hickenlooper*, No. 2013-CV-33879 (Colo. Dist. Ct. 2017), *Chambers v. City of Boulder*, No. 2018-CV-30581 (Colo. Dist. Ct. 2021), *Zeleny v. Newsom*, No. 17-CV-07357-RS (TSH) (N.D. Cal. 2020); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019); *Baird v. Bonta*,

---

[1] *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 791 n.11, 796 n.16, 797-98 (9th Cir. 2021) (en banc); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1327 (S.D. Cal. 2020). For a complete list of court citations, see my attached CV.

[2] Particularly relevant publications include Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). A full list of relevant publications is also included in my CV.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022); *Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022). A list of my publications and other cases in which I have testified as an expert witness is also included in the attached CV.

I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports, $1,000 per hour for depositions and court appearances, and a flat per-day fee of $500 for travel. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## SUMMARY OF CONCLUSIONS

Counsel for the Defendant has asked me to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of and access to firearms of those below the age of 21, including those old enough to participate in the militias. In the body of my report below, I provide evidence and reasoning for the following opinions:

In their pleadings and preliminary injunction briefing, Plaintiffs assert an uncontroversial fact about the history of the militia in the eighteenth century and much of the nineteenth century: governments compelled some minors to serve in the militia and participate in related community-based forms of law enforcement. But the fact that government forced individuals to

participate in the militia does not demonstrate the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, this fact shows that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense. Imposing a legal obligation on individuals does not establish that a right existed; it demonstrates that the opposite was the case. Failure to comply with this legal obligation resulted in punishment. Militia laws gave governments broad power over minors, but they did not confer an individual rights claim that minors might make against government regulation. In the Anglo-American constitutional tradition, rights and duties are correlates, not synonyms. [4]

During the Revolutionary and Founding eras (1776–1799), minors or "infants" (those below the age of twenty-one, which was the age of legal majority at the time) were not independent legal actors claiming the full panoply of rights, including the right to keep and bear arms. This was so even though militia laws obligated some minors to join the militia and perform related activities, including participating in peacekeeping as mandated by the common law and statutes of the era. Revolutionary-era and later Founding-era militia statutes requiring militia service and the bearing of arms by those under the age of 21 created legal obligations or duties that governments enforced by fines and possible imprisonment, but they did not articulate any individual rights for infants under the age of 21 to purchase, receive transfer, or bear arms outside of these situations.

The decision to impose duties upon members of a particular age group, those 18-20, to serve in the militia was a policy choice made by states and the federal government; it did not assert a fixed constitutional principle.  This fact is clear from the plain text of the Second

---

[4] Ori Herstein, "Legal Rights", The Stanford Encyclopedia of Philosophy (Spring 2023 Edition), Edward N. Zalta & Uri Nodelman (eds.), URL = <https://plato.stanford.edu/archives/spr2023/entries/legal-rights/>.

Amendment which originally defined the militia as "composed of the body of the people." As the debates of the First Congress make clear, Congress chose to do this so that it would retain plenary authority to decide the composition of the militia and alter it to meet the demands of the nation's defense requirements.[5] There was no constitutional requirement that any subset of the population serve in the militia. And these requirements were adjusted over time to the changing needs of the individual states and the federal government.

Firearms regulation is a core component of state police power which is central to the scheme of ordered liberty in American law.[6] Moreover, the scope of state police power is greatest when protecting the health and safety of minors. Given these facts, it is not surprising that there is a long history of state regulations targeting minors and guns. The case law *Heller* probed from antebellum America analyzed the permissible scope of firearms regulation in terms of the police power. The history of arms regulation therefore requires an understanding of the police power and its role in firearms regulation over the long arc of American history.

In her concurrence in *Bruen*, Justice Barrett discussed the lively academic debate among originalists, including Second Amendment originalists, regarding the relative weighting of historical evidence from 1791 and 1868, in ascertaining the scope of permissible regulation. Posing the issue in these terms presents a false choice. In *Heller*, Justice Scalia's majority opinion noted that "constitutional rights are enshrined with the scope they were thought to have

---

[5] Saul Cornell, A Well Regulated Militia: The Founding Fathers and the Origins of Gun Control in America (2008).

[6] On Founding era conceptions of liberty, JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." See *Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

when the people adopted them."[7] The same holds true for the police power, which is not simply inalienable, but was understood in the Founding era to be a right of the people to regulate their own internal police. Thus, Scalia's observation holds true for both the right to bear arms and the right to regulate them consistent with the legitimate scope of the police power. The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[8] The phrase "internal police" had already become common, particularly in state laws establishing towns and defining the scope of their legislative authority.[9] By the early nineteenth century the term was a fixture in American law.[10] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[11] The Founding era's police right and the Marshall Court's doctrine of the police power would become fixtures in American law.

---

[7] *District of Columbia. v. Heller*, 554 U.S. 570, 684 (2008).

[8] PA. CONST. OF 1776, Ch. I, art iii.

[9] For other examples of similar constitutional language, *see* N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV. For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[10] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[11] 10 ENCYCLOPÆDIA AMERICANA 214 new edition (Francis Lieber ed.).

The legal concept of "police"—the power of the people, acting through government, to enact and enforce laws to protect public health, safety and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[12] By the era of the American Revolution, the concept had become foundational in Anglo-American law.[13] References to the regulation of internal police were included in many of the early state constitutions drafted after the American Revolution.[14]

By the eve of the Civil War, a strong consensus in American law had emerged on the broad scope of the police power.[15]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote that the police power:

> is not susceptible of an exact limitation but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[16]

Rather than view it as a fixed body of power, most judges in the pre-Civil War period viewed it as a reservoir from which the people could draw authority to enact laws necessary to

---

[12] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

[13] Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007).

[14] See, e.g., MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

[15] *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*, 46 U.S. 504 (1847) (License Cases); *Commonwealth v. Alger*, 61 Mass. 53 (1851); *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[16] *Thurlow v. Com. of Mass.*, 46 U.S. 504, 592 (1847).

promote the public health, welfare, and morality of society.[17] The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states and local municipalities.[18]

Given the centrality of police power jurisprudence to early American law it was only natural that early state cases adjudicating gun regulation used this framework to resolve the constitutionality of laws.[19] *State v. Reid*, a case prominently featured in *Heller*, offers a clear statement of the centrality of the police power analysis to judicial decisions regarding arms regulation.[20] The *Reid* Court observed that the state's concealed carry prohibition was not only a legitimate exercise of police power authority, it was at the very core of this power: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[21] Understanding historical state regulation of minors and firearms therefore necessitates a close examination of the history of the police power.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states, local municipalities and the federal government on federal land and buildings.[22] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only

---

[17] *Id.*

[18] Harry N. Scheiber, *State Police Power*, in 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy et al. eds., 1986).

[19] *See Heller*, 554 U.S. at 629.

[20] *State v. Reid*, 1 Ala. 612 (1840).

[21] *Id.*, at 616.

[22] Harry N. Scheiber, *State Police Power*, in 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy et al. eds., 1986).

possible because Federalists offered their Anti-Federalist opponents strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[23]

The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities.  The slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[24]

The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[25]  Nor was Marshall unique in highlighting the centrality of this idea to American law. [26] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety.[27]

---

[23]  Saul Cornell,  THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[24]  Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864,  https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[25] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[26]  In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340)  464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[27]ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man:*

Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[28]

The period after the Civil War, including the period after the adoption of the Fourteenth Amendment (1868), did nothing to diminish the centrality of police power analysis to judicial resolution of questions about the scope of regulation. As had been true in pre-Civil War America, the states' interests in preserving the peace and in protecting minors gave them broad authority to regulate arms. The level of state regulation intensified to respond to new and unprecedented problems created by firearms in an increasingly urban and modern society that lacked the community-based forms of peacekeeping and law enforcement typical of pre-industrial and pre-modern societies. The increasingly complicated nature of American law led to

---

*The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

[28] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

App 151

new models of regulation, including more laws governing minors and their access to weapons. States and localities made expanded use of the authority they had held since the Founding to regulate firearms. States and localities adopted new administrative mechanisms, including permitting and licensing schemes, to address the continuing problems posed by firearms. Regulation and rights continued to be seen as inextricably linked with one another.

The trajectory of gun regulation continued into the next century. The most significant change in government regulation in the twentieth century was the expansion of federal regulation of inter-state commerce during the New Deal. This power enabled the federal government to enact a range of laws about the sale and transfer of firearms and further limited the ability of minors to access guns.

Across the broad arc of American history, from the from the Founding era and through the modern day, governments have regulated firearms. The scope of permissible regulation for those under the age of 21 are longstanding and firmly rooted in the American historical and legal tradition. The law has never considered minors fully independent legal actors who possessed the same rights as adults. Given this irrefutable fact, state limits on the ability of minors to acquire and use firearms is indisputably consistent with the original public understanding of the Second Amendment right and its various state analogs.

Counsel for Defendant provided me with the operative complaint in this matter, the briefs the parties filed in support of and in opposition to Plaintiffs' motion for preliminary injunction. Otherwise, my report is based on my independent research. In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions. The materials cited are a subset of the relevant materials I have consulted to understand the contours of American constitutional history.

## OPINIONS

### I.   INTRODUCTION

American law, particularly the law governing the family, derived from English common law. A central principle inherited from this common law tradition was the legal distinction between adults and "infants"; there was no legal category of "young adult" under English common law or the American law of domestic relations. Those between the ages of eighteen and twenty (and indeed all under the age of 21) were considered "minors" or "infants" from the time of the nation's founding up through the latter half of the twentieth century.[29] The proper historical framing of the issue before the Court thus should be: "Did the Second Amendment recognize a right of infants, meaning those under 21, to keep and bear arms?" The answer to that question is simple: no.

This report explains the interpretive methodology and sources necessary to understand the history of the right to keep and bear arms in the United States and American firearms regulation, and focuses additional attention on the way state, federal, and even local law regulated minors and arms. The scope of materials examined is extensive, in both chronological and substantive scope; it includes a wide variety of legal texts, from statutes, regulations, and case law to popular legal guidebooks and commentary from legal scholars.

The ability to regulate firearms and gun powder is central to the conception of ordered liberty that defined American law from its earliest days. Based on a careful review of the materials consulted in this report, I conclude that infants could not assert an independent right to purchase or own a gun outside of the context of participation in a militia in the founding era, or, indeed, for most of American history. The historical record demonstrates that infants were

---

[29] Note these two terms, "infant" and "minor," are used interchangeably throughout this report. On the role of common law in shaping American law's treatment of those below the age of majority, see T. E. James, *The Age of Majority*, 4 AM. J. LEGAL Hist. 22 (1960); Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55 (2016).

typically only entrusted with firearms when under the supervision of a parent or a guardian, or when serving in militias or other community-based peace keeping activities such as the hue and cry.

After reviewing the arguments Plaintiffs have made thus far in the case, I conclude that there is no evidence to support the claim that infants under the age of 21 had a constitutional right to keep and bear arms in the Founding era. The fact that early American militia laws imposed duties upon able-bodied males under 21—the legal age of majority at the time—to serve in militias does not demonstrate the existence of a robust or unfettered right to purchase, receive transfer of, keep, or bear arms. Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors entirely within their parents, guardians, or masters.  Thus, when properly contextualized, the available historical evidence supports just the opposite conclusion from that posed by Plaintiffs:  At the time of the Founding, and in the periods that followed, minors had no constitutional right to purchase, receive transfer of, keep, or bear arms. Many states chose as a matter of policy to require infants to participate in the militia and other law enforcement activities, but this did not instantiate a constitutional right.

Nonetheless, given the centrality of militia laws to Plaintiffs' erroneous argument about the historical Second Amendment rights of minors, this report explores the nature of such laws in considerable detail. It also offers several important but neglected contexts for understanding the history in which the militia laws were passed and implemented. Early American militia statutes reflected the importance of the militia in early America and the persistent problem states and the federal government faced in properly arming the militia. Minors did not arm themselves; they depended on parents and guardians to outfit them with the necessary arms, and in some instances depended on the state to provide arms. These arms were provided so that minors required to serve in the militia would be able to meet their legal obligations as defined by early American

militia statutes.  Given the legal limits on minors, the economic realities of early America, and the problems of arming the militia the Plaintiff's claim are entirely without merit and rest on a set of discredited myths about early American history.[30]

The report then surveys the considerable authority states and localities have historically exercised under their police power to regulate the ability of minors to acquire or use dangerous weapons. The exercise of that power was not static, but proved extremely flexible, allowing states and localities to craft new laws to address the shifting threats to public safety posed by the proliferation of weapons and other changes in society, including the increasing availability of deadly weapons to minors occasioned by the rise of the market economy and other changes in society such as urbanization. Finally, the report takes note of the development of modern federal firearms regulation. Firearms law's complexity has increased as society has become more complex, and modern government and the administrative state have grown to deal with these changes. This process began at the end of the nineteenth century and the pace of this transformation quickened in the twentieth century. The use of permit schemes, fees, and taxes were among the new legal tools used after the Civil War to achieve the goals of regulating arms to further the goals of ordered liberty.[31]

## II.   MATERIALS REVIEWED AND METHODOLOGIES USED

My evaluation of these legal historical materials draws on the most recent scholarship on the Second Amendment and the right to bear arms, as well as the existing case law. I employ the

---

[30] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006); Pamela Haag, GUNNING OF AMERICA : BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE. (2016).

[31]  There is a rich literature on the growth of the modern administrative state and regulation, Morton Keller, REGULATING A NEW SOCIETY PUBLIC POLICY AND SOCIAL CHANGE IN AMERICA, 1900–1933 (1996) at 160-162; Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301 (2015). Firearms regulation mirrored other forms of regulation and took advantage of these new methods and institution.

accepted historical and legal methodologies for interpreting legal sources from the Founding era and later periods of American history, including the era of the Fourteenth Amendment's adoption and implementation. This report analyzes the public meaning of the Second Amendment, the Fourteenth Amendment, the various state constitutional provisions on the right to keep and bear arms, state statutes, local ordinances, court decisions, and popular and learned legal commentaries.[32] The goal of surveying such a wide range of sources is to ascertain the various public understandings of how these different legal and constitutional texts were interpreted when the Bill of Rights was ratified, when individual laws and ordinances were enacted, and when the Fourteenth Amendment was adopted and interpreted by courts.[33]

Historical inquiries by courts must be supplemented by careful examination of the relevant scholarship and evidence if they are to avoid the dangers of "law office history."[34] Courts must proceed carefully when tackling complex historical questions, particularly those that span across more than five hundred years.[35] Avoiding the trap of "law office history" requires a sophisticated approach to the historical record and the relevant legal sources.[36]

Modern legal history—the methodology I use in this report—approaches the past with a more holistic model of meaning, recognizing that legal meanings, including those relevant to

---

[32] For a discussion of the minimum standard for undergraduate history majors, see MARY LYNN RAMPOLLA, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed., 2015); MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, see THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). On the methods of originalism, see Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

[33] J.H. HEXTER, REAPPRAISALS IN HISTORY 194–45 (1961).

[34] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965).

[35] *Bruen*, 142 S. Ct. at 2130 n.6.

[36] HEXTER, REAPPRAISALS IN HISTORY 194–45.

understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, must be rigorously contextualized.[37] This approach requires analyzing more than traditional legal texts to understand the social, cultural, and intellectual contexts that shaped the law. Any effort to understand the Second Amendment and the history of gun regulation must canvass a variety of historical topics, including such diverse and distinctive sub-fields as legal history, social history, cultural history, economic history, and military history. The eminent English legal historian Frederic Maitland was one of the first modern scholars to recognize that true historical inquiry, particularly the history of the law, requires unraveling multiple webs of meaning. As Maitland sagely noted: "such is the unity of all history that anyone who endeavours to tell a piece of it must feel that his first sentence tears a seamless web."[38]

In *District of Columbia v. Heller*, and more recently in *Bruen,* the Supreme Court directed courts and litigants to look to history  when evaluating the scope of permissible regulation under the Second Amendment.[39] At the time *Heller* was decided, there was relatively little scholarship on the history of gun regulation, but in the decade since the decision was published, a burgeoning body of scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American legal tradition.[40] My report draws on this important body of

---

[37] The best illustration of this method is the three volume *Cambridge History of Law in America*. *See* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[38] Frederic William Maitland, *A Prologue to a History of English Law*, 14 L. QUARTERLY REV. 13 (1898).  For a more recent exploration of Maitland's idea of the web of meaning, see Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[39] *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[40] Cornell & DeDino, *supra* note 2; Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017). For an effort to synthesize

new scholarship and the breadth of digital sources now available to scholars in order to understand and contextualize the rights implicated—and not implicated—in this case.

*Heller* did not undertake the arduous and laborious task of doing the historical research necessary to understand the full scope of the legal tradition of arms regulation.  Rather, it left this project to lower courts and future scholars. Justice Scalia's characterization of the limits of *Heller's* foray into history in the majority opinion is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[41]

*Heller* also made clear that the right to keep and bear arms was not absolute:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the nineteenth-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.[42]

*Heller* identified an illustrative set of examples of "presumptively lawful regulations."[43] This list was not exhaustive, but only a sketch of the many ways guns and gunpowder have been regulated by government, a legacy that is deeply anchored in text, history, and tradition.[44] Thus,

---

the new scholarship on regulation and apply it using *Heller's* framework, see Joseph Blocher & Darrell A. H. Miller, The Positive Second Amendment: Rights, Regulation, and the Future of Heller (2018).

[41]*Heller*, 554 U.S. at 626–27.

[42] *Id.* at 626.

[43] *Id.* at 627 n.26.

[44] *Id.* at 626.

*Heller* directed courts to look at the Founding era, antebellum America, and Reconstruction when examining the scope of the right.[45]

In *McDonald v. City of Chicago*, this analysis was refined in Justice Alito's majority opinion. In addition to discussions of the Founding period, he included references to the modern Supreme Court's substantive due process jurisprudence and its focus on the central role of historical tradition in understanding the scope of cherished rights in the American legal tradition:

> In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan* [v. *Louisiana,* 391 U. S. 145,149 (1968)], or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg,* 521 U.S. 702, 721 (1997).[46]

In *Bruen*, Justice Kavanaugh reiterated *Heller*'s centrality to the future of Second Amendment jurisprudence.[47] The dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[48]

---

[45] On the notion of constitutional modalities, and the relevance of the categories of history, text, and tradition, see P. BOBBITT, CONSTITUTIONAL INTERPRETATION (1991). Of course, other scholars may have different terminology for these modes of analysis, but these jurisprudential categories largely overlap these six forms. *E.g.,* Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189 (1987); Robert Post, *Theories of Constitutional Interpretation*, in LAW AND THE ORDER OF CULTURE 13–41 (R. Post ed., 1991).

[46] *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010).

[47] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26; *Bruen* (Kavanaugh, concurring)

[48] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the*

Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[49] The Court underscored that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

### A. THE LEGAL STATUS OF INFANTS UNDER THE COMMON LAW: THE FOUNDING ERA AND BEYOND

The first step in evaluating the status of Second Amendment rights for those aged 18–20 and other minors in the Founding era is to consider the common law treatment of the legal capacities and rights of persons under the age of legal majority at that time. Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[50] This legal fact did not change until the latter half of the twentieth century.[51] In fact, across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in

---

*Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[49] *Id.*

[50] ZEPHANIAH SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).

[51] Hamilton, *supra* note 29 at 57-8.

which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians.  The power of fathers or guardian under this system of patriarchy exceeded the power of the monarch over his subjects. For example, for minors there was no right of petition or other rights enjoyed by English subjects and later by American citizens.[52] Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment. There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).[53]

In many respects, the situation of minors under 21 resembled that of married women under coverture. Under the doctrine of coverture, a married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[54] Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[55]

---

[52] Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142 (1986).

[53] John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449 (2008); ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (1987).

[54] J.H.BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed. 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate,* 26 YALE JOURNAL OF LAW AND FEMINISM 165,167 (2014).

[55] 1 William Blackstone, COMMENTARIES *442.

Indeed, an influential eighteenth-century English treatise on the law of domestic relations noted that the comparison between a femme covert and minors was frequently made by writers on the law: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[56] Given the irrefutable fact that minors were legally "disabled" in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is erroneous.

The American Revolution set in motion a process of change that republicanized the rights of minors by giving society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.[57] This change did not endow minors with full legal rights under the law, but it did diminish the near absolute power that fathers (or parents more generally) and guardians had over minors living under their authority. The term "young adult" is profoundly anachronistic; there was no legal category of "young adult" in the Founding era. Nor did such a category emerge in the next century following the adoption of the Second Amendment. In fact, the idea of a "young adult" is a very recent development in American society and law.[58]

The subject of minors' legal status was explored at considerable length by Zephaniah Swift, an esteemed Connecticut jurist in the Founding era, and author of one of the first legal treatises published after the adoption of the Constitution. Swift captured the central legal fact governing persons below the age of majority at the time of the Founding: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—

---

[56] Anon., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

[57] Jeffrey Shulman, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014).

[58] On the emergence of the category of young adult in contemporary legal theory, see Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016).

minors." Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[59] During the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts. This new supervisory role narrowed the range of contractual freedom of minors acting without consent. Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[60]

The influential early nineteenth century legal author and jurist James Kent discussed the legal status of minors in 1836 in his influential *Commentaries on American* law: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[61] When some radical Jacksonian Democrats suggested that the age of majority for voting ought to be lowered for those who had served in the militia, leading Federalists in the New York state constitutional convention mocked them. Federalist Elisha Williams, a delegate from Columbia County, wondered if his democratic opponents wished to enfranchise "brave infants" by giving them the right to vote.[62] Extending full rights to minors was literally treated as a joke by Federalists sitting in the constitutional convention.

John Bouvier, author of the first American law dictionary, shared the views of Swift and Kent, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps

[59] SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT, 213.

[60] HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

[61] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

[62] CORINNE T. FIELD, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.

universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[63] Bouvier's statement captures the widespread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full panoply of rights under American law.[64]

### B.    Constitutional Rights Claims in a Patriarchal Society

The most elemental task of the historian is to recognize anachronisms and avoid them in any analysis. Contemporary law, including attitudes towards the rights of minors are a product of the Warren Court's rights revolution, including the landmark decision of *Tinker v. Des Moines*.[65] But, the claim that minors enjoy broad rights claims, an indisputable fact about modern law, was not true in the Founding era.  Justice Thomas originalist critique of *Tinker* correctly notes that minors enjoyed few rights in the Founding era.[66]

One of the most illuminating discussions of this issue occurred in an obscure  case adjudicated by Justice Joseph Story while he rode circuit.  Story was among the most influential early American jurist of the Marshall Court era and his conception of the status of minors offers a useful guide to modern jurists seeking to understand the original meaning of the Second Amendment, an inquiry that necessitates recovering the way the text would have been read by

---

[63] JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[64] Field, *supra* note 62.

[65] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503 (1969); Saul Cornell, "Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record, 40 Yale L. & Pol'y Rev. inter Alia 1, 22 (2021). On Tinker's significance in modern constitutional law, see  *Constitutional Law Symposium: The Constitution Inside the Schoolhouse Gate--Students' Rights Thirty Years After Tinker v. Des Moines School District*, 48 DRAKE L. REV. 433 (2000).

[66] *Morse v. Frederick*, 551 U.S. 393, 418-19 (2007) (Thomas, J., dissenting).

judges in the early republic. [67] Story opined that the rights of parents and minors were entirely

within the purview of "mere municipal rules of the state, and may be enlarged, restrained, and

limited as the wisdom or policy of the times may dictate." Moreover, he expressly noted that

when it came to the rights of minors the state's power to define the age of majority was plenary:

> Can there be a doubt, that the state legislature can, by a new statute, declare a minor
> to be of full age, and capable of acting for himself at fourteen, instead of twenty-one
> years of age? Can it not emancipate the child altogether from the control of its
> parents? It has already, in the case of paupers, taken the custody from the parents,
> and enabled the overseers of the poor to bind out the children as apprentices, or
> servants, during their minority, without consulting the wishes of the parents.

While many modern Americans might recoil at the harshness of the Story's judgment and

its disparagement of the rights of minors, his views reflected common assumptions at the

time that this case was decided. Patriarchalism, not radical egalitarianism was the legal

norm during the Founding era.

### C.    Patriarchy and Rights: The Original Understanding

It is impossible to understand the legal conception of "infant" at the time of the

enactment of the Second Amendment without recognizing the patriarchal nature of English

common law and its early American variants.[68] Johns Hopkins historian Toby Ditz summarizes

the centrality of the legal concept of patriarchy to family law and governance in the Founding

era:

> Historians have begun to use the concept "household patriarchy" to describe
> community organization in eighteenth century America. Household patriarchy
> refers to both internal and external aspects of domestic organization. It describes

---

67 *U S v. Bainbridge*, 1 Mason 71 (1816); R. KENT NEWMYER, SUPREME COURT
JUSTICE JOSEPH STORY: STATESMAN OF THE OLD REPUBLIC  (1985).

68 The absorption of the common law in America and the development of different variants of
common law in the colonies and states has generated a rich scholarly literature, for a useful
overview, see Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in
Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

authority relations in which heads, and not others within households, have the formal right to make final decisions about internal matters. Patriarchal household heads speak for their dependents in dealings with the larger world. The civic status of household dependents is an indirect or secondary one; the community reaches them primarily through the actions and voices of the heads.[69]

Individuals below the age of legal majority served in the militia, and participated in community-based efforts to keep the peace, but these public safety duties were undertaken in a supervised setting under the authority of  parents, guardians, or other adults authorized under the color of law.[70] Further, the circumstances under which an infant could participate in community forms of keeping the peace were defined by the patriarchal structure of local communities and the peacekeeping mechanism instantiated by law. As Princeton historian Laura Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept was based in a long-standing, highly gendered construction of government authority, which subordinated everyone to a sovereign body, just as all individual dependents were subordinated to specific male heads of household. [71]

It is also important to understand the social history of the Founding era, particularly the way economic and social realities shaped family formation in this period. Male minors under 21 living under the authority of their fathers faced significant hurdles in establishing their own independent households. The laws governing settlement and residency for Massachusetts are revealing in this regard: they imposed an age requirement of 21, as well as a variety of different

---

[69] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820*, 47 WILLIAM & MARY Q. 235, 236 (1990).

[70] The Statute of Winchester, adopted in 1284 in the Reign of Edward I, required male members of the community between 15 and 40 to join the "hue" and "cry" and participate in community law enforcement, see 1 STATUTES OF THE REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue" and "cry" were the only means to deal with most forms of ordinary crime. See LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[71] Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-Revolutionary United States*, 1 UC IRVINE L. REV. 565, 570 (2011).

wealth requirements, to establish residency in the commonwealth.[72] Moreover, acquiring the necessary economic resources to establish independence was increasingly difficult during the era of the American Revolution.  Indeed, most adult men in Concord, the town virtually synonymous with the Minuteman ideal of a well regulated militia, were forced by economic necessity to postpone establishing their own households until their mid-twenties, a decision necessitated by the difficulty of acquiring enough land to establish an independent farmstead. Although these persons were no longer minors in the eyes of the law after turning 21, they still remained under the patriarchal authority of their fathers as a practical matter in most respects until they could leave home because of the economic realities they faced.[73]

Community-based law enforcement also existed in a patriarchal framework. The involvement of minors in such activities was, as Professor Edwards notes, embedded in the patriarchal structure of local communities.[74] A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, captured the dominant view of the era when it described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[75] The author of this popular legal guide, John Fauchereaud

[72] Persons residing outside of a properly governed household, i.e., a home headed by a white male patriarch, could be banished from early New England towns, a process known as "warning out," see  Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-Century Massachusetts*, 62 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: LAW IN COLONIA MASSACHUSETTS 1630–1800 152, 190 (1984).

[73] Robert A. Gross, THE MINUTEMEN AND THEIR WORLD *(*1976); Mary Babson Fuhrer, *The Revolutionary Worlds of Lexington and Concord Compared* 85 THE NEW ENGLAND QUARTERLY 78 (2012).

[74] Edwards, *The Peace supra* note 71.

[75] JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Grimké was one of the state's most eminent lawyers and became one of its most influential jurists.  For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

Grimké, was among the state's most distinguished and influential jurists. The fact that he included infants old enough to participate in the militia and local law enforcement in the same category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire arms at the time of the Founding. Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.[76]

One final body of evidence raises further doubts about the claim that Founding era Americans believed that young men below the age of majority could be trusted with firearms without proper supervision, or that they had unfettered rights to keep, bear, and acquire them: the stringent rules prohibiting firearms ownership and use enacted by colleges in the Revolutionary era.  College was one of the very few circumstances where minors lived outside of their parents' or a guardians' direct authority.  As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of in *loco parentis*.[77]

Harvard's campus rules adopted in the era of the American Revolution prohibited guns on campus:

> XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls,

[76] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[77] Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform,* 44 VAND. L. REV.1135 (1991).

Yard or near the College, he shall be fined not exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence. [78]

Although Harvard was a private entity, its role in early Massachusetts society straddled the public and private spheres.[79] Other colleges in the Founding era adopted similar restrictions as Harvard. Yale College prohibited students from possessing any guns or gun powder.[80] The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus. The rule was emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[81] A similar law governed students at the University of North Carolina, another public university founded in the same period. The university prohibition was total: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a

[78] 31 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: COLLECTIONS 338, 358 (1935).

[79] Thus, the Massachusetts Constitution of 1780 instructed the citizenry "to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge. MASS. CONST. ch. V, § 1. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, 1780-1807) at 580. Harvard students and faculty were exempted from militia obligations but during the American Revolution Harvard College did create a militia company, *see* Conrad E. Wright, *Creating a Fellowship of Educated Men: Forming Gentleman at Pre-Revolutionary Harvard*, *in* YARDS AND GATES: GENDER IN HARVARD AND RADCLIFFE HISTORY 17–38 (Laurel Ulrich ed., 2004).

[80] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 p.26 (1800).

[81] *The Minutes of the Senate Academicus* 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976), https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf.

sword, dirk, sword-cane." [82]   College regulations from this era further demonstrate the fact that norms governing American society in the era of the Second Amendment's ratification opposed the view that unsupervised minors were to be trusted with free access to firearms.

The figure of Thomas Jefferson looms large in modern discussions about the meaning of the Second Amendment. [83]   Although Jefferson was among the Founding generation's most ardent defenders of an expansive vision of the right to keep and bear arms, even he took a dim view of allowing guns at the University of Virginia, the institution he helped found.  The rules at Mr. Jefferson's university were exceedingly strict on this point:

> No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school. [84]

The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them:  fathers, guardians, constables, justices of the peace, or militia officers.

### D.   PROTECTING ORDERED LIBERTY IN AMERICA: EARLY AMERICAN MILITIA LAWS IN HISTORICAL CONTEXT

[82] ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

[83] David Thomas Konig, *Thomas Jefferson's Armed Citizenry and the Republican Militia*, 1 ALB. GOV'T L. REV. 250 (2008).

[84] UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/. Jefferson and his good friend James Madison, the primary architect of the Second Amendment, attended the meeting in which this policy was adopted.

Militia acts designated a specific subset of the white male population to serve in the militia.   By including some older infants in the militia ranks, the statutes creating and regulating these militias and the concomitant duties they imposed on citizens implemented policy goals aimed at arming and expanding the ranks of able-bodied militiamen, but they did not embody or establish a constitutional *right* that might be claimed by minors outside of this very narrow context defined by the relevant statutes. Nor did these statutes alter the legal age of majority; they simply implemented a policy goal of the states and later the federal government.

Although many states chose to include minors for policy reasons, the composition of the militia was always dictated by strategic imperatives.  If a state felt it was necessary to exclude minors because of the economic burden it placed on families or because younger Americans were viewed as less effective soldiers, there was nothing to prevent a legislature from implementing such changes. Thus, New Jersey changed the legal definition of the militia in 1821: "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace."[85] Kansas excluded minors by framing its constitutional provision on the militia as follows: "The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[86] In applying a text, history, and tradition approach it is vital to distinguish between constitutional requirements and policy preferences. The Second Amendment imposes constitutional requirements but it is entirely agnostic regarding policy preferences.

---

[85] An Act to exempt minors from Militia Duty in time of peace, in Josiah Harrison, Ed., *A Compilation Of The Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820* 266 (1833). By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of satire and ridicule, see David, Tatham, *David Claypoole Johnston's Militia Muster*, 19 *AMERICAN ART JOURNAL* 4 (1987).

[86] Kan. Const. of 1859, art. 8, § 1.

App 171

Understanding original meaning requires distinguishing between the sometimes over heated political rhetoric found in newspapers and the more sober legal realities stated in laws and judicial opinions.[87]  The ideal of a broadly inclusive vision of the militia, at least as far as white males were concerned, was venerated in public orations, pamphlets, and newspaper essays, but a close look at the statutes enacted by various states and the federal government in the decades after the adoption of the Second Amendment reveals a different legal reality.[88] Instead of mandating a universal and broadly inclusive militia in the text of the Constitution, the Framers wisely chose to give Congress plenary power to define the composition of the militia. There was no textual mandate in the Constitution that compelled future generations to include minors if such a policy was deemed to be undesirable. If a particular future Congress believed that the labor of  minors were needed elsewhere or governments concluded that minors were not well suited to the military tasks required for national defense, there was no legal ground for minors to claim a right to participate in the militia or acquire the weapons needed for militia service.

The drafting history of the Second Amendment makes the distinction between constitutional law and policy clear. An early draft of the text of the amendment defined the militia as composed of the "body of the people," but this universalistic language was struck out to allow future legislatures greater flexibility in creating an effective militia.[89] Thus, as a matter

---

[87] Saul Cornell, *Reading the Constitution, 1787-91: History, Originalism, and Constitutional Meaning*, 37 Law & Hist. Rev. 821 (2019).

[88] *See* Bernard Bailyn, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (1967); J. G. A. Pocock, THE MACHIAVELLIAN MOMENT: FLORENTINE POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION (1975); Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 69 (2008); Lawrence Delbert Cress, CITIZENS IN ARMS: THE ARMY AND MILITIA IN AMERICAN SOCIETY TO THE WAR OF 1812 (1982); Noah Shusterman, IN ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

[89] Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV. 103, 108, 120-125 (2000) (notes the significance of this tension between American political

of constitutional law the composition of the militia was left to Congress to determine as it saw fit. Plaintiff's argument does not read the text of the Second Amendment, it effectively rewrites the text, reinserting language that was deliberately excised from the text.

Rhetorical praise for the militia did not mean that the members of the First Congress that drafted the Second Amendment were universally supportive of this ideal. Nor is it surprising that those most familiar with American military matters in the era of the Second Amendment, including virtually all the Federalist Founders, believed that America's heavy dependence on the militia had been a strategic mistake in the American Revolution, one that had severely hampered the struggle for independence.[90] George Washington's private correspondences contain withering comments about the inadequacy of the militia, and the necessity of creating an effective professional army. He wrote home to a cousin the following observations: "I assured [Congress] that the longer they delayed raising a standing army, the more difficult and chargeable would they find it to get one, and that, at the same time that the militia would answer no valuable purpose." The performance of the militia led Washington to lament that "the conduct of the militia, whose behavior and want of discipline has done great injury to the other troops, who never had officers, except in a few instances, worth the bread they eat."[91] When Congress finally debated the structure of the militia in the First Congress, there were deep divisions over the organization and structure of the militia. Many—particularly those who had served with Washington in the Continental Army—recognized that the militia, including the revolutionary-era militia, was never, as some pamphleteers and newspaper essayists proclaimed, an effective

rhetoric and constitutional law in the Founding era). On the distinction between legal meaning and ordinary public meaning in originalist theory, see William Baude & Stephen E. Sachs, *Grounding Originalism*, 113 NW.U.L.REV. 1455 (2019).

[90] On the importance of distinguishing between Federalist and Anti-Federalist views of the militia, see Cornell, A WELL REGULATED MILITIA, *supra* note 5, at 41-70.

[91] *From George Washington to Lund Washington, 30 September 1776*, NAT'L ARCHIVES, https://founders.archives.gov/documents/Washington/03-06-02-0341.

fighting force that included the whole body of the people in arms. Those most familiar with the militia's performance during the Revolution, Federalists, the group primarily responsible for drafting the first ten amendments, thus feared placing the future security of the nation in the hands of a universal militia. Many in the First Congress, including the many Federalists serving, shared Washington's concerns and doubted the wisdom of continuing to conceive of the militia in the expansive terms that Whig republican theory demanded—a body of independent yeoman drawn from the ranks of all able-bodied white men of the nation. Despite a close vote on the issue in Congress, the first federal militia act rejected calls to create an elite select militia, and instead carried forward the model of earlier colonial laws and defined membership in the militia broadly, but did little to guarantee that such a militia would be properly armed.[92] The debates over the future of the militia in Congress reveal a tension between the ideals espoused in popular rhetoric and the reasoned consideration of America's military leaders.

The notion that the composition of the militia, including the participation of minors, was hard wired into our constitutional order at the Founding thus is simply mistaken both as a historical matter and a matter of Founding era constitutional law. The composition of the militia was always shaped by political and military imperatives, not determined by fixed constitutional rules. To insist otherwise as plaintiffs do is contradicted by the both intention of the framers of the amendment and the clear meaning of the constitutional text of the Second Amendment. The size of the militia, its composition, and the rules for its training have never been constitutionally fixed, but have varied across American history, changing to respond to the needs of national defense.[93]

---

[92] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[93] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation. These laws imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[94] American citizens did not decide which weapons to bring to muster. Failure to acquire the officially proscribed type of weaponry could result in fines. [95] As far as the militia was concerned, all guns were not created equal in the eyes of the law. Government policy was designed to force Americans, in some cases minors under 21, to acquire the type of weapons the government deemed essential for a well regulated militia.[96]

To accomplish its policy objectives governments laid the structure and rules governing the militia in abundant detail. Militia laws were often among the longest statutes written by early American legislative bodies.[97] These laws not only prescribed the types of armaments needed to participate in the militia; they also described the range of penalties for those who did not acquire or maintain the weapons in good working order.[98] Tennessee's enforcement mechanism involved the institution of the court martial:

---

[94] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

[95] For a sampling of Founding-era militia statutes, see Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county).

[96] Sweeney, *supra* note 92.

[97] An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27-42 (1776).

[98] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2-3.

> The commissioned and staff officers of the infantry are hereby required to meet at the place holding their battalion musters at eleven o'clock on the day preceding said muster armed with a rifle, musket, or shot gun and dressed in the uniform prescribed by law, for the purpose of being trained at regimental drills and the commanding or senior officer, present shall call, or cause the roll to be called, and make a return of all delinquents to the next regimental or battalion court martial.

> § 3. The regimental courts martial shall have power to fine delinquents, field or staff officers, and it shall be the duty of the commanding or senior officer present at any regimental or battalion or drill muster to make a return of all such delinquents.

Militia weapons, including the privately owned weapons used by many to meet this legal obligation, enjoyed a special constitutional status under American law, and were exempted from a variety of civil processes. The misuse of these weapons carried stiff penalties. Connecticut's militia act levied a host of fines on those who reported to muster without arms or with arms not in good working order.

> That the Fines and Penalties incurred for Non-appearance and deficiencies of Arms, Ammunition and Accoutrements shall in future be as follows. Each non-commissioned Officer, Drummer, Fifer or Trumpeter who shall neglect to appear at the Time and Place appointed for regimental or battalion exercise or review being legally warned thereto shall forfeit and pay a fine of three dollars for each days neglect and for each days neglect to appear at the time and place appointed for company Exercise or Inspection, being legally warned thereto, shall forfeit and pay a Fine of One Dollar and Fifty Cents, and each Private belonging to any Company of Militia, shall for Non-appearance on days of Regimental or Battalion Exercise or Review, being thereto legally warned, forfeit and pay a Fine of Two Dollars for each Day's neglect and for Non-appearance at Time and Place for company Exercise or Inspection he shall forfeit and pay a Fine of One Dollar for each Day's neglect; and for deficiencies of Arms, Ammunition and Accoutrements required by Law, each non-commissioned Officer and Private shall forfeit and pay for each Day of Review or Exercise the he shall be deficient, the following Fines, viz. For a Gun or pair of Pistols, each Seventy-five cents; for Sword, Bayonet or Cartridge Box, each Fifty Cents; and for each of the other Articles required by law, Twenty-five Cents.[99]

---

[99] 1799 Conn Acts 511, An Act For The Militia, § 4.

These laws did not erect a barrier against government intrusion into the most private sphere of American life—the home—in fact, militia statutes achieved the opposite goal: they gave government sweeping powers over Americans and their guns. Weapons were subject to government inspection. Indeed, although militia weapons were often  privately owned, they were among the most heavily regulated forms of private property in early American law.[100]

Militia statutes also prescribed penalties and punishments for failing to report to muster properly armed and for misuse of weapons once an individual appeared at muster.[101] A 1794 Rhode Island statute adopted a few years after the Second Amendment was framed is illustrative of the punishments that could be meted out:

> That every non-commissioned officer or private who shall neglect to appear at the regimental Rendezvous, shall forfeit the sum of Six Shillings and for every day he shall neglect to appear at the company parade, he shall forfeit Four Shillings and Sixpence. And if he shall not be armed and equipped according to other said Act of congress, when so appearing, without sufficient excuse, he shall, for appearing without a gun, forfeit one shilling and sixpence; without bayonet and belt six pence; without a Bayonet and Belt, Sixpence; without a Cartouch-Box and Cartridges.[102]

Once they had mustered, members of the militia were subject to military discipline and punishment.[103] Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as whipping.[104] During this era, the goal of achieving good military

---

[100] Cornell & DeDino, *supra* note 2, at 508-10.

[101] Act effective May 5th, 1794, 1794 R.I. Pub. Laws 14, 21, (organizing the militia of the state); Act of Dec. 28, 1792, 1795 N.H. Laws 525 (adding to a prior act regulating the state militia); Act of 1799, § 4, 1799 Conn. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

[102] Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21.

[103] *Houston v. Moore*, 18 U.S. 1 (1820).

[104] Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (Prohibiting whipping a common form of punishment used by the military in the eighteenth century).

discipline justified a range of discipline and punishment for failure to comply with mandatory *duties* that is hard to reconcile with the idea that these laws offer evidence of a *right* that might be asserted against government, as I discuss next.

### E.   DUTIES, NOT RIGHTS: UNDERSTANDING THE LEGAL SIGNIFICANCE OF AND NEED FOR EARLY AMERICAN MILITIA LAWS

Importantly, interpreting early American militia laws requires reading these statutes as Founding era Americans would have understood them. These laws imposed a legal *obligation* on Americans; they did not create or assert a *right* against government regulation. Indeed, these laws were a highly intrusive form of government regulation.[105] Militia statutes gave government broad authority to compel individuals to engage in specified actions or face punishment, as just discussed.[106] Thus, when these laws are understood within their historical context, they demonstrate that those serving in the militia, including minors, did not have a freestanding and robust right to acquire, keep, and bear whatever arms they desired for whatever purpose. Rather, these laws compelled individuals to purchase or bring to muster the specific type of weapons the government wished them to use and punished individuals severely for any infractions of the laws regulating the militia.

And, as listed in Table 1, the responsibility for acquiring weapons fell on those who were legally responsible for minors, not the minors themselves.[107]  Parents and guardians were singled out as the persons responsible for acquiring militia weapons for their minor children or charges under the age of 21. For example, New Hampshire's 1792 militia law was explicit that parents

---

[105] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. See, e.g., Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984); Leif Wenar, *Rights*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

[106] Cornell & DeDino, *supra* note 2, at 508-10.

[107] *See* Table 1 (identifying five such Founding era laws).

and guardian had a legal obligation and suffered the penalties for failing to acquire the necessary weapons for militia participation: "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements."[108] And even when such obligations were not expressly included by statute, the common law definition of infants meant that minors were impaired from making binding legal contracts in many instances. Any legal proceeding that would attempt to prosecute minors for such a failure would have to proceed against the legally responsible adult in charge of the minor's household. Finally, in the cash poor economy of the period, at a time when government faced a consistent problem arming the militia with military quality weapons, many minors had to fall back on government supplied weapons to meet their obligations.[109]

Thus, the claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms makes neither legal nor historical sense. This claim rests almost entirely on an ahistorical and anachronistic misreading of the original meaning of these documents.[110]

Pennsylvania's 1793 revision of the state's militia statute further reveals how much power the state had over militia members and the process by which they acquired weapons. In 1793, shortly after Congress adopted the first ten Amendments during the First Congress,

---

[108] An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792); see also, An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176.

[109] SWIFT, *supra* note 59, at 213, 217; Sweeney, *supra* note 92.

[110] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

Pennsylvania enacted the following act modifying the nature of its militia law by exempting minors from having to purchase weapons:

> I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia. . . .

> II. And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years. And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states. [111]

This Pennsylvania statute illustrates that there was no fixed constitutional requirement that minors participate in the militia, nor was it a constitutional requirement that they acquire weapons.  Both of these legal obligations were dictated by the policy choice that individual states and the federal government made in response to the need to promote public defense, as discussed above.[112] Many states exempted students from militia service, and individual states were free to exempt any other sub-category of minors, or all minors if they wished, if such a policy furthered the goal of strengthening the militia or any other relevant state goal.[113] A state could choose to

---

[111] Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania).

[112] Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 (only requiring those between the ages of twenty-one and forty-five to be enrolled in the militia); Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 (same).

[113] Delaware adopted a similar provision to Pennsylvania in 1806, exempting minors enrolled in the militia from acquiring weapons, Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816). In 1829

exempt minors from the requirement to purchase weapons if such a policy was expedient, or exclude them from the militia entirely. There was no legal or constitutional requirement that militia include any minors if excluding them served the constitutional needs of maintaining a well regulated militia.

Further, imposing mandatory service upon minors under 21 in the militias was a matter of necessity given the structure of the early American family and the labor market. Militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted. The labor of sons was vital to the survival and prosperity of family farms and apprentices were essential to artisan modes of production. Given the strong economic pressures on small farm owners and artisans in a pre-industrial society, market forces could easily have led families to oppose allowing sons to join the militia voluntarily.[114] Thus, at the time of the Second Amendment's enactment these legal and social facts meant that it was necessary for the states to enact laws requiring able-bodied minors under 21 to participate. Without such laws, it is likely that few minors would have been enrolled in the militia because of the opposition of those who needed their labor, i.e., parents, guardians, and masters. The individual states and federal government had the power to, and did, coerce individuals to participate in the militia, even if such participation posed an economic hardship to individuals, their families, or legal guardians. And the states flexed that power by threatening punishment: Delaware's 1776 militia law, for example, expressly recognized this problem and included a provision that levied a fine on any "Masters, Guardians, and Parents" who "restrained" militia eligible minors from enrolling.[115]

New Jersey exempted all militia-eligible minors from participation during peace time, Act of Nov. 6, 1829, 1829 N.J. Laws 3.

[114] Gross, *supra* note 73.

[115] Delaware, An Act establishing a Militia in this State. Law and Statutes, 4 (1776).

Rather than provide historical proof that infants under 21 had expansive rights and strong legal claims against government interference with any firearms rights, then, the various militia laws and common law requirements mandating that individuals assist in keeping the peace evidence only the considerable power early American governments had to compel individuals, including minors under the age of 21, into service where the militia was concerned.

### F. THE ECONOMICS OF EARLY AMERICAN FIREARMS:  THE PROBLEM OF ARMING THE MILITIA

Militia statutes in the Revolutionary era and early Republic grappled with another problem that America faced for much of its early history as a nation: how to arm Americans with the military-quality weapons essential for a well regulated militia. Americans were far better armed than any people in the English-speaking world in the eighteenth century and early nineteenth century, but early American governments faced a persistent problem: the arms citizens preferred were not the heavy military-quality muskets needed for militia service. Instead, most Americans owned or wanted light hunting muskets or fowling pieces—firearms that were not the standard weapons of the eighteenth-century militia and the one required by the various state militia statutes. Guns in early America were essential tools in an agrarian society and American consumer preferences reflected this basic fact.[116]

Ground warfare in the Founding era involved close combat; a soldier had to be able to attach a bayonet to a musket and his weapon had to be sturdy enough to function as a bludgeon if needed.[117] The light muskets and fowling pieces that Americans found most useful on their

---

[116] Sweeney, *Firearms Ownership and Militias*, *supra* note 92.

[117] Jeremy Black, A MILITARY REVOLUTION? MILITARY CHANGE AND EUROPEAN SOCIETY, 1550-1800 (1991); Wayne E. Lee, *Early American Ways of War: A New Reconnaissance, 1600-181*5 44 THE HISTORICAL JOURNAL 269 (2001); Stephen Conway, *The British Army, "Military Europe," and the American War of Independence 67* THE WILLIAM AND MARY QUARTERLY 69 (2010).

farms were therefore of limited value to the militia.[118] Thus, arming the militia remained a

persistent problem for states and the federal government in the era of the Second Amendment's

adoption.[119] In fact, fully half of Americans lived in a household in which a military-grade

musket was not available for those required to participate in the militia. And despite persistent

efforts by both the states and the federal government to enact laws forcing households to

purchase muskets and other military-quality weapons, Americans continued to prefer weapons

better suited to the realities of living in an agrarian society, guns which were more useful for

putting food on the table.[120]

   The economic burden of the militia on American families was another fact that shaped

government policy. This concern was voiced forcefully during the debate over the first militia

Act in Congress. Thomas Fitzsimmons, a Federalist representative from Pennsylvania, expressed

his concern that militia service was an onerous tax on Americans, and that it would prove to be

an undue burden for most families.[121] During this debate, Congress seriously considered

abandoning the idea of a broadly inclusive militia in favor of a smaller, more select, better

trained, and better equipped force, but ultimately this proposal failed. Instead, Congress settled

on a compromise:  the first federal militia act carried forward a broadly inclusive idea of a

militia, but did not take the necessary action to properly arm and equip the militia.[122]

---

[118] *Id.*

[119] Kevin M. Sweeney, and Saul Cornell, *All Guns Are Not Created Equal,* THE CHRONICLE
OF HIGHER EDUCATION, February 1, 2013.

[120] *Id.*

[121] 1 ANNALS OF CONG. 3 (1790–91).

[122] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the
Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

### G.   THE POLICE POWER AND REGULATION OF MINORS' ACCESS TO ARMS, 1776-1900

Police power regulations also impacted minors' relationship to arms and gun powder. As was true for other applications of the police power, the enactment of specific laws aimed at minors depended on the practical and public perceptions of the need for government regulation in a particular area.

Gun violence was not a pressing issue of public concern at the time that the Second Amendment was enacted. Firearms in the eighteenth century were not ideally suited for individual self-defense outside the home against unexpected threats or for committing crimes. Flintlocks and muzzle loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity. Given these facts there was little need for modern style gun control laws because gun violence was not a serious problem. Government arms policy at the time of the Second Amendment was driven by the opposite problem: too few military guns in the hands of members of the militia.  One consequence of these facts about firearms role in early American society directly impact government policy: laws were  not designed to restrict access to weapons but encourage citizens to acquire a specific type of weapon needed for militia service. Public policy, both at the state and federal level, aimed to encourage the ownership of military quality weapons needed for militia service and regulation was designed to further this objective.[123]

Modern-style arms control measures targeting weapons better suited for crime and inter-personal violence, and not especially useful for militia service, did not emerge in American law until technological changes and economic efficiencies made more accurate and more easily concealable weapons widely available in the nineteenth century. The market revolution of the

---

[123] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).

Jacksonian period (1828-1854) transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time. The impact of this interconnected set of changes in production, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common.[124] At the time of the Second Amendment, 90% of the guns owned by Americans were long guns.[125] Cheap handguns become widely available for the first time in American history in the early decades of the nineteenth century. In response to the perception that these guns posed a particular danger, states began passing laws to deal with the negative consequences of these weapons, including new limits on public carry.[126]

By the time of the Civil War, many states had enacted a variety of laws to deal with the problem of gun violence, including the special dangers firearms posed by guns and minors. In 1856, for example, Alabama adopted a provision focusing on the specific problem posed by the sale of pistols and other concealable weapons to minors, which imposed a substantial financial penalty:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[127]

Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more

---

[124] *Id.*

[125] Sweeney, *Firearms Ownership and Militias supra* note 92.

[126] Cornell, *supra* note 2. For a good example, see Of Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[127] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

than one thousand dollars."[128] Kentucky also enacted a similar law, but carved out an exception when a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[129]

The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color is itself instructive. As historian Randolph Roth's work demonstrates, the Slave South was the most violent region of the nation in the period before the Civil War. Although some laws enacted in this period and in this region were driven by racial animus, other laws, including laws targeting minors were not. Laws prohibiting concealed carry were one type of racially neutral modern style gun control regulation. Southern states also took the lead in enacting gun-control-type measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[130]

Cities and towns also used their police power authority to regulate arms. In 1803, New York city singled out guardians for punishment for firearms infractions committed by minors under their charge.[131] In 1817, Columbia, South Carolina enacted a law that allowed for the

---

[128] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

[129] *1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.*

[130] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F.121 (2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On southern homicide rates, see Randolph Roth, AMERICAN HOMICIDE 180-249 (2009).

[131] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

seizure of weapons used by minors within the city limits.[132] And in 1857, the city of Louisville, Kentucky passed an ordinance stating that "[n]o person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[133]

Additional changes in firearms technology and society also impacted the regulation of guns and minors.[134] There was a  growing perception in post-Civil War America of the threat guns posed to minors and society.  In response to this perception the scope of firearms regulation of minors increased in the post-Civil War era.  Although the scope of regulation increased, this change was not a radical departure from earlier American law. Post-Civil War America carried forward the antebellum tradition of robust regulation of firearms, including regulating minors and firearms.

Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted western states, expressly asserted that the right to keep and bear arms did not preclude robust legislative power to regulate, making explicit a point that the pre-Civil War case law had firmly established. It is worth comparing Utah's formulation, among the most robust of

---

[132] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

[133] No. 68. An Ordinance as to Retailing Gun Powder, in Oliver H. Strattan, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY 175 (1857).]

[134] Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017)

the new post-Civil War provisions, with Pennsylvania's 1776 arms-bearing provision, the first one adopted after American Independence.

- Pennsylvania 1776: "That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power." [135]

- Utah 1895: "The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law."[136]

The language employed by Utah, and other states focused on the right of regulation and was consistent with the well-established view of the scope of the police power. The new language formulation of the right to keep and bear arms included in these constitutions underscored the breadth of the state's police power authority in arms regulation. Further, at the Utah constitutional convention, there was a vigorous debate over a proposal to change the age at which individuals could be compelled to participate in the militia from 18 to 21. Although there was some disagreement over the wisdom of changing the policy, there was little disagreement that if such a policy was desirable, the state had ample authority to make the change. The contours of this debate make clear that the there was no constitutional necessity compelling states to either require or prohibit minors from participating in the militia. The decision remained one that was dictated by military necessity, not constitutional imperative.[137]

The broad latitude to regulate arms was acknowledged by the major constitutional commentators of the period as well. John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to

---

[135] PA. DECLARATION OF RIGHTS, 1776 cl. XIII

[136] UTAH CONST. of 1895 art. I, § 6

[137] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake City ... (1898) at 815-819.

government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[138]

The Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[139] Among the most pressing concerns of Republicans in the era of the Fourteenth Amendment's adoption (1868) was the problem of protecting the lives and rights of African Americans in the South, including the right of such people to keep and bear arms.[140] Support for this goal did not mean that Republicans opposed strong gun regulations.[141] Quite the opposite was the case across the South. In fact, rather than mark a retreat from robust gun regulation, Reconstruction marked an intensification of efforts to regulate firearms—a development spurred in part by the rise of para-military groups such as the Ku Klux Klan and their violence against free persons and Republicans.[142]

The robust regulation of firearms during Reconstruction, aimed to limit minors' access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept. Exercises of the police power

[138] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3 d., (1899) at 4.

[139] For a more detailed discussion, see Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[140] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 *HARVARD L. REV. FORUM* 238 (2014).

[141] RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003).

[142] Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South,* 17 STAN. L. & POL'Y REV. 615 (2006). One of the most horrifying examples was the Colfax massacre. See Leeanna Keith, THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR, AND THE DEATH OF RECONSTRUCTION (2008).

in this regard were seen as consistent with the scope of the Second Amendment's reach as it had been understood at the Founding. The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the states' ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[143] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[144]

The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[145] Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained 21 during this period).[146] The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[147] Some of these laws targeted children younger than 16, but others singled out anyone below the age of 21. For example, Indiana's state

---

[143] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[144] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

[145] Cornell and Florence, *supra* note 143.

[146] On the growing perception of the threat guns posed to minors in the post-Civil War era, see Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017).

[147] Misdemeanors. Section 53., *in* L. W. MOULTRIE, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition

to Minors":

> Be it enacted by the General Assembly of the State of Indiana, That it shall be
> unlawful for any person to under the age of twenty-one years, any pistol, dirk, or
> bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or
> carried, concealed upon or about the person, or to sell, barter, or give to any
> person, under the age of twenty-one years, any cartridges manufactured and
> designed for use in a pistol. § 2. Be it further enacted, that any person who shall
> violate any of the provisions of the foregoing section shall be deemed guilty of a
> misdemeanor, and upon conviction thereof, shall be fined in any sum not less than
> five dollars, nor more than fifty dollars.[148]

Wisconsin adopted a statute that prohibited minors from going armed or acquiring pistols

and revolvers:

> SECTION 1: It shall be unlawful for any minor, within this state, to go armed
> with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or
> other public police officers, to take from any minor, any pistol or revolver, found
> in his possession.

> SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any
> other person, to sell, loan, or give any pistol or revolver to any minor in this
> state.[149]

Henry Campbell Black, the author of *Black's Law Dictionary* and a leading post-Civil

War legal authority, described the police power as "inalienable" and echoed the view of a long

line of jurists who noted that the scope of the power was not easily defined, and that

determination of its limits was best left to courts on a case-by-case basis.[150] Christopher G.

Tiedeman, a conservative critic of the police power, nonetheless acknowledged the scope of its

legitimate purview: "police power of the State extends to the protection of the lives, limbs,

---

[148] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.

[149] 1883 Wis. Sess. Laws 290.

[150] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

health, comfort and quiet of all persons, and the protection of all property within the State."[151] Other Reconstruction-era commentators on the scope of the police power were more explicit about the reach of the police power over firearms.

Indeed, Lewis Hochheimer, one of the leading authorities on the rights of infants in this period, noted that the regulation firearms was an area of the law in which the police power was at its greatest reach regarding minors. Infants were not entirely beyond the protection of the Bill of Rights, but he was quick to point out that the need to protect those below the age of majority meant some regulations that were impermissible if applied to adults were perfectly legal when regulating infants.[152] Total prohibitions on the sale of dangerous weapons were one such an example. In this instance, the broad power to protect the welfare of minors gave government extraordinary latitude in regulating their conduct.[153] In fact, Hochheimer noted that the scope of state regulatory authority was at its zenith when regulating arms and minors.

This principle is evident in an 1883 Missouri statute that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes." In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor.

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any

---

[151] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

[152] Lewis HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3ed., (1899) at 4.

[153] *Id.*

such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.[154]

A Kansas statute prohibited selling, trading, giving, or loaning pistols or revolvers to minors:

Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[155]

The language of a Louisiana law was even more comprehensive: "That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years."[156]

A Nevada law focused on the danger posed by minors carrying guns in public:

Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred

---

[154] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[155] 1883 Kan. Sess. Laws 159, § 1.

[156] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[157]

In his review of the history of gun regulation, political scientist Robert Spitzer concluded that laws limiting the ability of minors to obtain and use arms without appropriate supervision were among the most common firearms regulations in the post-Civil War period. After surveying hundreds of laws in the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s."[158] In fact, he concluded that restrictions on minors' access and use of arms were more common than limits on felons.[159]

In addition to the vigorous state level regulation described above, many states and localities also enacted robust laws addressing the potential problem firearms posed to public safety by implementing tax or permit schemes that took advantage of the expansion of the size of state and local governments during the post-Civil War era. States and localities used these new administrative tools to address a variety of different problems created by firearms. An Evanston, Illinois law handled the danger posed by permissive public carry with a permit law:

> It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of

---

[157] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. 1077 (David E. Baily and John D. Hammond, 1885).

[158] Spitzer, *supra* note 40 at 60.

[159] *Id.,* at 60.

two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.[160]

The new tools of the administrative state, including permit schemes and taxes, were employed to help states and localities implement the regulations they believed necessary to advance the goals of promoting public health and safety.[161]

## H.  THE MODERN ERA OF GUN REGULATION, 1900-1930

At the dawn of the twentieth century, Congress took up the task of militia reform. The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia. In place of the traditional civic republican model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National Guard system was created. The new militia would be professionalized and—most importantly—controlled more tightly by the federal government.[162]

The militia was divided into the organized militia, the National Guard, and a more amorphous, unorganized Militia. In an influential article published in the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer in the Office of the Judge Advocate General, reviewed the legal changes that facilitated this transformation. One key development was the change in the policy preferences of the individual states about minors and the militia.

---

[160] Concealed Weapons, §531131-132, George W. Hess, REVISED ORDINANCES OF THE CITY OF EVANSTON: ALSO SPECIAL LAWS AND ORDINANCES OF GENERAL INTEREST (1893).

[161] On the transformation of American law and the rise of the modern regulatory state, see Herbert Hovenkamp, *Appraising the Progressive State*, 102 IOWA L. REV. 1063, 1068-75 (2017), William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081-83 (1994), and Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301, 304-05 (2015).

[162] For a discussion of how the modern national guard replaced the ideals at the core of the Founding era militia, see Richard R. Uviller R & William Merkel, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND AMENDMENT FELL SILENT (2002).

The most significant trend was the increasingly popularity of laws that required parental permission for minors to participate in the militia. Among the states enacting such laws were Connecticut, Idaho, Louisiana, Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South Dakota, Texas, Oregon, West Virginia. The decisions of these states to follow this path only underscores a fact that the previous history had made clear: there was no set age requirement for the militia hardwired into the American constitutional system. States were perfectly at liberty to raise, lower, or prohibit the participation of minors as they deemed necessary. Defining who would participate in the militia remained a practical policy choice, not a constitutional imperative.[163]

The pace and scope of gun regulation outside of militia regulation also quickened in the twentieth century. New laws were introduced to address novel problems created by advances in firearms technologies, rising levels of gun crime and perceptions of gun violence, including increased threats to minors.[164] Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.[165]

Prohibitions on machine guns and some semi-automatic weapons illustrated the far-reaching scope of such laws.[166] Repeating rifles emerged in the late nineteenth century, but fully automatic and semi-automatic weapons did not achieve sufficient market penetration to pose a serious problem until the early decades of the next century. As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the antebellum era, the

---

[163] S. T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J. 471, 476 (1917).

[164] On changes in technology and perceptions of crime and gun regulation, see Spitzer, *supra* note 40 at 60. On the perception of growing threats to minors, see Carlson and Cobb, *supra* note 134.

[165] ERNST FREUND, THE POLICE POWER 246–47 (1904).

[166] Spitzer, *supra* note 40 at 60.

concern over more powerful "gangster weapons" did not emerge the moment such laws entered the marketplace.  As had been true during earlier periods of American history there was some time lag between technological change, market saturation, and government intervention to stem the unintended negative consequences of these changes.  Thus, the passage of new regulations did not occur in tandem with changes in firearms, but often trailed technological developments. Legislation was only necessary once new weapons became popular enough to cause a problem that required government action. This pattern repeated itself in the case of rapid-fire weapons, including semi-automatic and fully automatic guns. As these weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms.[167]

Nothing better illustrates this dynamic than the popular concerns about "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a machine gun that was popularly associated with the Saint Valentine's Day Massacre and criminals such as Machine Gun Kelly.[168] Political scientist Robert Spitzer's overview of the history of firearms regulation underscores this point:

> So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

Such laws targeting fully automatic and semi-automatic rapid-fire weapons were a classic example of the flexibility of the police power. Michigan's law is illustrative of these laws:

> It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without

---

[167] Spitzer, *supra* note 16 at 60.

[168] On the history of gun regulation up to and including the act, see ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA (2001).

reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [169]

Silencers posed another problem that prompted new regulations. Minnesota's law banning silencers was typical of these statutes:

§ 1. Use of silencers prohibited. No person shall within the state of Minnesota sell or offer or expose for sale, or have in possession for use upon or in connection with any rifle, shot-gun, revolver, or other firearm or have in possession for purposes of sale any silencer for a shotgun, revolver, rifle or other fire-arm. [170]

Other states, including New York and Connecticut, passed permit laws.[171]

Unsurprisingly, the proliferation of new weapons impacted the calculus of public policy decisions about the scope of regulation or arms necessary for minors. By the early 1930s, the number of laws limiting minors' ability to acquire and use weapons increased by 50 percent, as compared to the late nineteenth century.[172]

Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[173] An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons prohibiting the sale, barter or gift to persons:

---

[169] *Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751.*

[170] Minn. Laws 55, An Act to Prevent the Sale, Offering or Exposing for Sale or Having in Possession for the Use or for Purpose of Sale within this State, of Silencer for Shot-gun, Revolver, Rifle or Other Firearm, Defining a Silencer and Providing Penalties for Violation, Ch. 64, §§ 1-4 (1913).

[171] N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. Ch. 195, § 2 (1911); Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, Ch. 252, § 3 (1923).

[172] Spitzer, *supra* note 40 at 60.

[173] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[174]

In his classic treatise *The Police Power* (1904), the distinguished legal scholar, Ernst Freund noted that the scope of the police power in relation to minors was extensive, and he singled out limits on access to firearms as an illustration of this power.[175] And in *Glenn v. State* (1911), the Georgia Court of Appeals observed that "the police power of the states makes a special charge of minors."[176]

In fact, the police power's scope was at its greatest when the health and safety of minors was at issue, a fact evident in this 1917 Oregon law:

Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.[177]

Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns. For example, the City of Chicago forbade issuing firearms permits to all minors:

It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the

---

[174] Weapon— Furnishing to Minor, § 450, 1905 Ind. Acts 688 (1905).

[175] FREUND, *supra* note 10 at 187, 247.

[176] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

[177] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms.

general superintendent of police to grant such permit upon the payment of a fee of one dollar.[178]

The City of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors. The law equated minors with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy access to guns.

> If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.[179]

Harkening back to traditional parental authority, some jurisdictions allowed an exception for guns used while under the supervision of a parent. For example, a 1903 South Dakota law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents

---

[178] Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6.

[179] Joplin Code of 1917, Art. 67, § 1201, Brandishing, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible.

or guardians."[180] But these exceptions only underscored the fact that minors were not viewed as completely responsible citizens, or fully independent legal actors who could claim Second Amendment rights on their own.

## I.   FIREARMS REGULATION: A PERVASIVE FEATURE IN AMERICAN LAW (1934-2021)

The very first issue of the Duke law journal, *Law and Contemporary Problems* (published in 1934), focused on federal involvement in the prevention of crime and included a comprehensive review of firearms regulation in America.  It explained that the most common forms of regulation were restrictions on public carry, restrictions on the purchase of arms (including purchase by minors, who still included those aged 18–20 at that time), and prohibitions on dangerous or unusual weapons. [181] The essay also noted that the use of license or permit requirements for purchase of a firearm expanded in the post-Civil War era and became a standard feature of gun regulation in the twentieth century.[182] Indeed, by 1938, a comprehensive review of firearms regulation concluded that the vast majority of states had either banned the public carry of concealed weapons or adopted a restrictive permitting scheme.[183]  Localities, especially large urban areas, in the final decades of the nineteenth century and the early decades of the next century increased the level of regulation of arms, including limits on minors. Another wide-ranging legal survey of firearms regulation published in 1950 found little had changed in the ensuing decades between the publication of the two comprehensive reviews discussed above and post-World War Two-era gun regulations.[184]

---

[180] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

[181] John Brabner-Smith*, Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400 (1934).

[182] *Id.*

[183] Sam B. Warner, *Uniform Pistol Act,* 29 AM. INST. CRIM. L. & CRIMINOLOGY 529 (1938).

[184] F.J.K., *Restrictions on the Right to Bear Arms: State and Federal Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

One of the most significant developments in gun regulation in the twentieth century was the growth of federal firearms regulation, beginning with the New Deal. As with the state measures addressed above, the threat posed by organized crime and the proliferation of dangerous "gangster weapons," most notably the machine gun, increased public enthusiasm for additional gun control measures. Repeated popular demands for some type of federal involvement finally bore fruit in 1934, when Congress enacted the first comprehensive federal firearms law. In contrast to traditional state police power-driven legislation, federal regulation of firearms after the New Deal necessarily focused on interstate commerce. The National Firearms Act of 1934 regulated firearms dealers and imposed a series of taxes on classes of weapons, including machine guns. The Act sought to limit access to this class of weapons, which was closely identified with criminal behavior.[185]

Later in the twentieth century, popular concern over crime and civil unrest led to the passage of the federal Gun Control Act of 1968.[186] In addition to revising the federal licensing scheme for the manufacture, importation, and sale of firearms, the act prohibited a variety of persons from purchasing handguns, including minors, who continued to be defined as those below the age of 21. In addition, federal licensees were prohibited from selling firearms to out-of-state residents, minors, felons, persons under indictment for felonies, fugitives, and certain other categories of persons.[187]

The Firearm Owners' Protection Act of 1986 loosened some restrictions on ammunition and prohibited the creation of a federal firearms registry, but it added additional categories of persons who were barred from possessing firearms, including illegal aliens, dishonorably

---

[185] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of June 30, 1938, 15 U.S.C. §§ 901–09.

[186] William J. Vizzard, *The Gun Control Act of 1968*, 18 St. Louis Univ. Pub. L. Rev. 79 (1999).

[187] 18 U.S.C. § 922(b)(1) and § 922(c).

discharged members of the armed forces, and U.S. citizens who renounce their citizenship.[188] The Brady Handgun Violence Protection Act of 1993 (Brady Act) created a background check system for the purchase of firearms from federally licensed dealers.[189] Notably, neither the 1986 nor the 1993 federal legislative amendments lowered the age for the sale of handguns to those under 21, even after the Twenty-Sixth Amendment was adopted and ratified in 1971, setting the voting age at 18.

The next major turning point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings.[190] California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[191] Currently, eight states have passed similar laws.[192]

Current efforts to improve the effectiveness of firearms regulation include additional regulation focused on limiting the access to firearms by those under the age of 21, on top of those regulations already imposed by the 1968 federal Gun Control Act.[193] A recent survey of age restrictions on the acquisition of guns by minors reported the following conclusions:

> As of January 1, 2020, 17 states and the District of Columbia have minimum age requirements that exceed the federal minimum for the purchase of a handgun from unlicensed persons, and eight states and the District of Columbia have minimum age requirements that exceed the federal minimum for handgun

[188] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (1986).

[189] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103-159, 110 Stat. 3009 (1993).

[190] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

[191] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[192] Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020).

[193] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

possession. Several states also have minimums that are higher than the federal law for long gun purchase and possession.[194] (Footnotes omitted).

Restrictions on minors' ability to acquire and use firearms are longstanding. *Heller*'s non-exhaustive recitation of examples of presumptively lawful and longstanding regulations expressly referenced laws prohibiting felons and the mentally ill from acquiring firearms. The bulk of these laws as well as those expressly limiting minors' access to firearms date from the early twentieth century.[195]

The scope of the police power regarding firearms and gunpowder has been among the most expansive in any area of the law. In the case of minors, the legitimate reach of the police power is at its peak. For more than a century, state and federal judges have recognized that minors are among the categories of persons whose access to guns must be carefully regulated. More recently, the United States Court of Appeals for the Fifth Circuit observed that "[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms."[196] The United States Court of Appeals for the Eleventh Circuit held that "the states have never been without power to regulate 18-to-20-year-olds' access to firearms."[197] Federal courts have concluded that laws restricting minors' access to firearms are deeply rooted in American history and tradition.[198]

---

[194] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

[195] Thomas M. Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 29 (1st ed. 1868), concluded that laws preventing felons from acquiring firearms were justified on grounds too obvious to elaborate.

[196] *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012); *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

[197] *Nat'l Rifle Ass'n of Am. v. Bondi*, 61 F.4th 1317, 1332 (11th Cir. 2023).

[198] *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012).

## CONCLUSIONS

A review of the historical record, in context, reveals that "infants"—individuals below the legal age of majority, which has been 21 for most of American history—have never had an unfettered constitutional right to keep, bear, and acquire arms. This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history. For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties supervised by militia officers.

Those under the age of 21 never enjoyed an autonomous individual right to purchase, acquire, own, or use firearms for most of American legal history. In fact, for most of American history, the law did not consider such minors as fully autonomous legal individuals in any meaningful sense. The legal status of infants under American law in the Founding era was an inheritance from English common law. This bedrock principle of Anglo-American law was unaltered by the American Revolution, the adoption of the Constitution, or the addition of amendments, including the Second Amendment and the Fourteenth Amendment. Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority. In fact, the concept of "young adult" is a recent development in American culture and has no grounding in earlier Anglo-American law—and thus it has no bearing on assessing the scope of the Second Amendment right as it was originally understood at the time of its ratification and in the ensuing years.

The central fact asserted by Plaintiffs in this case is uncontroversial: in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related community-based forms of law enforcement. But the existence

of such duties does not provide any concomitant evidence of the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, it demonstrates that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.

 Failure to meet this legal obligation could result in a variety of punishments. In several states, the law expressly punished parents or guardians if they failed to acquire the necessary arms required by law to participate in the militia. In those states in which such a provision was not included in law, the common law would have governed, and legal proceedings against minors would have targeted parents or guardians. Plaintiff's argument not only confuses rights with obligations, but it conflates specific public policy choices made by states and the federal government about the composition of the militia with fixed constitutional principles about the role of the military in the American constitutional scheme of government and the scope of individual rights. State and local governments were free to expand or contract the age restrictions on participation in the militia in response to the needs of public defense and safety. When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal. If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

 The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers. The scope of state police power is greatest when protecting the health and safety of minors. Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns. Most states have had laws regulating arms, including regulations of minors, for more than a century. Many of these laws date to the era of the Fourteenth Amendment and regulate the conduct of those under 21. Public

perception that minors were especially at risk to harm from firearms intensified in the post-Civil War era.  Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions. In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of June, 2023.

*Saul Cornell*

_____

Saul Cornell

**Table 1**
**Founding Era Laws Requiring**
**Parents to Supply Militia Arms for Minors in their Household**

| State | Year | Source | Statutory Text |
|---|---|---|---|
| New Hampshire | 1776 | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . . |
| Delaware | 1785 | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | [E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . . |
| Massachusetts | 1793 | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | [A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . . |
| Vermont | 1797 | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . |
| North Carolina | 1806 | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346–47 (1883). | And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipment's above mentioned . . . |

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

## Book Publications

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  University of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55* University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae* 84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

### **Book Reviews:**

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### **Journal Manuscript Referee:**

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review
- Stanford Law Review
- Yale Law Journal

### **Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### **Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post,* January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller,*" *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

App 219

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

---

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### **Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) .

United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

### State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017) [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

### **Law Review Symposia Organized**

App 224

**Second Amendment:**

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

## New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).