23-1251

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JARED POLIS, in his official capacity as Governor of the State of Colorado,

Defendant - Appellant,

v.

ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA,

Plaintiffs - Appellees.

On Appeal from the United States District Court, District of Colorado
The Honorable Phillip A. Brimmer
Chief District Judge

District Court Case No. 23-cv-01077-PAB

**DEFENDANT-APPELLANT JARED POLIS'S APPENDIX,
VOLUME 3 OF 3**

PHILIP J. WEISER
Attorney General
GRANT T. SULLIVAN*
Assistant Solicitor General
MICHAEL T. KOTLARCZYK *
Senior Assistant Attorney General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone:  720-508-6349
E-Mail:  grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record

*Attorneys for Governor Polis*

# TABLE OF CONTENTS

## Volume 1 of 3

District Court Docket Sheet, Case No. 1:23-cv-01077-PAB ....................................3

Document 1, Complaint ........................................................................9

Document 1-1, Exhibit A to Complaint, SB 23-169 ...............................................15

Document 2, WITHDRAWN Complaint ................................................................20

Document 2-1, WITHDRAWN Exhibit A to Complaint, HB 23-1219 .................27

Document 3, Request Regarding Inadvertent Filing ...............................................32

Document 4, Administrative Notice: Duplicate Filing Fee .....................................33

Document 5, Case Assignment to Magistrate Judge Mix........................................34

Document 6, Consent/Non-Consent to Magistrate Judge Form..............................35

Document 7, Order Setting Scheduling/Planning Conference .................................39

Document 7-1, Instruction for Preparation of Scheduling Order ...........................42

Document 7-2, Scheduling Order Form .................................................................44

Document 8, Minute Order Granting Withdrawal of Inadvertent Filing ...............53

Document 9, First Amended Complaint .................................................................54

Document 10, Summons to be Issued to Jared S. Polis..........................................61

Document 11, Issued Summons to Jared S. Polis...................................................63

Document 12, Motion for Preliminary Injunction .................................................65

Document 12-1, Declaration of Dudley Brown......................................................83

Document 12-2, Declaration of Tate Mosgrove ....................................................85

Document 12-3, Declaration of Adrian Pineda .....................................................87

Document 13, Waiver & Acceptance of Service....................................................89

Document 14, Minute Order on Assignment to District Judge ..............................90

Document 15, Case reassigned to Judge Kane, drawn to Magistrate Judge Mix....91

Document 16, Minute Order on Motion for Preliminary Injunction Briefing
Schedule and on Setting Hearing................................................................92

Document 17, Minute Order on Evidentiary Hearing Date....................................93

Document 18, Sullivan Entry of Appearance ........................................................94

Document 19, Kotlarczyk Entry of Appearance.....................................................97

Document 20, Worthington Entry of Appearance ................................................100

Document 21, Unopposed Motion for Tate Mosgrove to Appear Electronically at
July 6 Hearing.........................................................................................103

Document 22, Minute Order Vacating Scheduling Conference............................105

Document 23, Order Granting Unopposed Motion for Tate Mosgrove to Appear
Electronically at July 6 Hearing .............................................................106

Document 24, Order of Transfer to Chief Judge Brimmer....................................108

Document 25, Minute Order on Motion for Preliminary Injunction Briefing ......109

Document 26, Unopposed Motion to Exceed Page Limits....................................110

Document 27, Order Granting Motion to Exceed Page Limits .............................114

Document 28, The Governor's Response to Plaintiffs' Motion for Preliminary
Injunction .................................................................................................115

Document 28-1, Exhibit 1, Cornell Declaration...................................................141

**Volume 2 of 3**

Document 28-2, Exhibit 2, Spitzer Declaration....................................................226

Document 28-3, Exhibit 3, Rivas Declaration ......................................................334

Document 28-4, Exhibit 4, Steinberg Declaration................................................379

Document 28-5, Exhibit 5, Historical Analogues.................................................462

Document 29, Notice of Three Related Cases.......................................................471

Document 30, Reply in Support of Motion for Preliminary Injunction ...............474

Document 31, Consent/Non-Consent Form...........................................................489

Document 32, Notice of Supplemental Authority .................................................491

Document 32-1, Eleventh Circuit Case No. 21-12314 Order................................493

Document 33, The Governor's Response to Notice of Supplemental Authority and
    Notice of Additional Supplemental Authority.........................................495

### Volume 3 of 3

Document 33-1, District of Oregon Case No. 2:22-cv-01815-IM Findings of Fact
    and Conclusions of Law .........................................................................498

Document 34, Motion for Temporary Restraining Order......................................620

Document 34-1, Proposed Temporary Restraining Order and SB 23-169............623

Document 35, Minute Order on Response to Motion for Temporary Restraining
    Order .......................................................................................................630

Document 36, The Governor's Response to Plaintiffs' Motion for Temporary
    Restraining Order.....................................................................................631

Document 37, Order Granting Motion for Preliminary Injunction .......................636

Document 38, Stipulated Extension for Time to Respond ....................................680

Document 39, Order Referring Case to Magistrate Judge Neureiter ...................682

Document 40, Order Setting Scheduling/Planning Conference ............................684

Document 41, Notice of Appeal ...........................................................................686

Document 42, The Governor's Motion for a Stay of the Preliminary Injunction
    Pending Appeal.......................................................................................688

Document 42-1, Exhibit 1, Declaration of Nicholaus Baumgart .........................700

Document 43, Unopposed Motion to Expedite Briefing on Motion to Stay the
    Preliminary Injunction Order...................................................................703

Document 44, Order Granting Unopposed Motion for Expedited Briefing on
    Motion to Stay the Preliminary Injunction Order....................................706

Document 45, Letter Transmitting Notice of Appeal ...........................................707

Document 45-1, Docket Sheet ...............................................................709

Document 45-2, Preliminary Record ....................................................714

Document 46, USCA Case Number .....................................................760

Document 47, Response in Opposition to Motion For Stay ................................762

Document 48, Order Denying the Governor's Motion for a Stay of the Preliminary
      Injunction ...........................................................................770

Document 49, USCA Appeal Fees received...........................................................778

Document 50, Governor's Answer to First Amended Complaint .........................779

Document 51, Letter Certifying the Record is Complete .....................................783

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, et al.**, | Case No. 2:22-cv-01815-IM (Lead Case) |
| | 3:22-cv-01859-IM (Trailing Case) |
| Plaintiffs, | 3:22-cv-01862-IM (Trailing Case) |
| | 3:22-cv-01869-IM (Trailing Case) |
| v. | |
| **TINA KOTEK, et al.**, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants, | |
| and | |
| **OREGON ALLIANCE FOR GUN SAFETY**, | |
| Intervenor-Defendant. | |
| **MARK FITZ, et al.**, | |
| Plaintiffs, | |
| v. | |



EXHIBIT

A

tabbies

**ELLEN F. ROSENBLUM, et al.**,

     Defendants.

_____

**KATERINA B. EYRE, et al.**,

     Plaintiffs,

  v.

**ELLEN F. ROSENBLUM, et al.**,

     Defendants,

     and

**OREGON ALLIANCE FOR GUN SAFETY,**

        Intervenor-Defendants.

_____

**DANIEL AZZOPARDI, et al.**,

     Plaintiffs,

  v.

**ELLEN F. ROSENBLUM, et al.**,

     Defendants.

_____

Karen Louise Osborne, KOsborne Law, LLC, 9721 NW Livingston Mountain Ct., Camas, WA 98607. Leonard W. Williamson, Van Ness Williamson, 960 Liberty St. SE, Suite 100, Salem, OR 97302. Pete Serrano, Silent Majority Foundation, 5238 Outlet Dr., Pasco, WA 99301. Stephen J. Joncus, Joncus Law, PC, 13203 SE 172nd Ave., Suite 166 #344, Happy Valley, OR 97086. Daniel Nichols, JurisLaw, LLP, Three Centerpointe Dr., Suite 160, Lake Oswego, OR 97035. Attorneys for Plaintiffs Oregon Firearms Federation, Inc., Brad Lohrey, Adam Johnson, Cody Bowen, Harold Richard Haden, Jr., Kevin Starrett, Terry Rowan, Brian Pixley, and Damian Bunting.

Adam Kraut and William Aaron Sack, Second Amendment Foundation, 12500 NE 10th Pl., Bellevue, WA 98005. Derek Angus Lee, Angus Lee Law Firm, PLLC, 9105a NE Hwy 99, Suite 200, Vancouver, WA 98665. William V. Bergstrom, Cooper & Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington, DC 20036. James J. Buchal, Murphy & Buchal, LLP, PO

Box 86620, Portland, OR 97286. Attorneys for Plaintiffs Mark Fitz, Grayguns, Inc., G4 Archery, LLC, Second Amendment Foundation, and Firearms Policy Coalition, Inc.

Paul D. Clement, Trevor W. Ezell, Nicholas Gallagher, Erin E. Murphy, and Matthew Rowen, Clement & Murphy, PLLC, 706 Duke St., Alexandria, VA 22314. Christian Cho, Shawn M. Lindsay, and Daniel Nichols, JurisLaw, LLP, Three Centerpointe Dr., Suite 160, Lake Oswego, OR 97035. Attorneys for Plaintiffs Katerina B. Eyre, Tim Freeman, Mazama Sporting Goods, National Shooting Sports Foundation, Inc., and Oregon State Shooting Association.

Adam Kraut and William Aaron Sack, Second Amendment Foundation, 12500 NE 10th Pl., Bellevue, WA 98005. Derek Angus Lee, Angus Lee Law Firm, PLLC, 9105a NE Hwy 99, Suite 200, Vancouver, WA 98665. William V. Bergstrom, Cooper & Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington, DC 20036. James J. Buchal, Murphy & Buchal, LLP, PO Box 86620, Portland, OR 97286. Attorneys for Plaintiffs Daniel Azzopardi and Sportsman's Warehouse, Inc.

Brian Simmonds Marshall, Oregon Department of Justice, Trial Division, Special Litigation Unit, 100 SW Market St., Portland, OR 97201. Erin N. Dawson, Hannah Hoffman, Anit K. Jindal, Harry B. Wilson, Markowitz Herbold, PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Attorneys for Defendants Tina Kotek, Ellen Rosenblum, and Terri Davie.

Scott Ferron, Zachary J. Pekelis, Jessica A. Skelton, and Kai Smith, Pacifica Law Group, 1191 2nd Ave., Suite 2000, Seattle, WA 98101. Attorneys for Intervenor-Defendant Oregon Alliance for Gun Safety.

3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Table of Contents**

I.    INTRODUCTION ................................................................................. 6

II.    PROCEDURAL BACKGROUND .................................................... 7

III.    SECOND AMENDMENT LEGAL FRAMEWORK ........................................ 10

IV.    FINDINGS OF FACT: BALLOT MEASURE 114'S STATUTORY

        FRAMEWORK ........................................................... 14

    A.    Purchase and Possession of Firearms in Oregon Prior to BM 114 ................. 14

    B.    LCM Restrictions under BM 114 ................................................ 15

    C.    Permit-to-Purchase ........................................................ 17

V.    FINDINGS OF FACT: MODERN LARGE-CAPACITY MAGAZINES ......... 19

    A.    LCMs and Firearm Technology ................................................ 19

    B.    LCMs and the U.S. Civilian Firearms Market ................................. 21

    C.    LCMs and Self-Defense ..................................................... 25

    D.    LCMs and Mass Shootings ................................................... 29

    E.    LCMs and Public Health .................................................... 32

VI.    FINDINGS OF FACT: HISTORY AND TRADITION .................................... 33

    A.    The American Colonies and the Early Republic (1700-1800) ...................... 36

    B.    Early-to-Mid-Nineteenth Century (1800-1850) ............................... 40

    C.    The Civil War and Reconstruction (1850-1880) .............................. 46

    D.    Late Nineteenth and Early Twentieth Century (1880 to 1940) ..................... 51

VII.    CONCLUSIONS OF LAW ................................................................. 55

   A.    Second Amendment ................................................................... 55

   B.    Fifth Amendment ...................................................................... 107

   C.    Fourteenth Amendment ............................................................ 113

VIII.    CONCLUSION ........................................................................... 120

**IMMERGUT, District Judge.**

## I.    INTRODUCTION

Before this Court are two core questions: (1) can the State of Oregon limit the number of bullets to ten, that a law-abiding citizen can fire without reloading; and (2) can the State of Oregon require firearm purchasers to obtain a permit, which imposes various requirements, including a completed background check, safety training, and consideration of mental health status, before purchasing a firearm. After a weeklong bench trial, this Court concludes that the answer to each of these questions is yes. Accordingly, Oregon Ballot Measure 114 is constitutional.

As explained below, Plaintiffs have not shown that the Second Amendment protects large-capacity magazines, defined as magazines capable of firing eleven or more rounds without reloading. And even if the Second Amendment were to protect large-capacity magazines, this Court finds that Defendants and Intervenor-Defendant have established that Oregon's restrictions on the use and possession of large-capacity magazines are consistent with the Nation's history and tradition of firearm regulation. Consequently, Oregon's large-capacity magazine restrictions are constitutional under the Second Amendment. This Court also finds that the text of Oregon's permit-to-purchase framework is consistent with the type of regulations that the United States Supreme Court has deemed constitutional under the Second Amendment. Finally, this Court finds that Oregon's large-capacity magazine restrictions are not an unconstitutional taking of property, are not unconstitutionally retroactive, and are not unconstitutionally vague. Accordingly, this Court enters judgment for Defendants and Intervenor-Defendant on all of Plaintiffs' claims.

## II.    PROCEDURAL BACKGROUND

This consolidated action includes four separate lawsuits, all filed in the wake of the passage of Oregon Ballot Measure 114 ("BM 114"), which amends existing state regulations on the purchase and possession of firearms.[1] Plaintiffs in the consolidated action include advocacy groups, firearms dealers, firearms owners, county sheriffs, and one private security guard.

Plaintiffs bring six constitutional challenges against BM 114: a Second Amendment challenge to BM 114's large-capacity magazine ("LCM") restrictions, a Second Amendment challenge to BM 114's permit-to-purchase regime, a Fifth Amendment takings challenge to BM 114's LCM restrictions, a Fourteenth Amendment due process challenge to BM 114's permit-to-purchase regime, and two Fourteenth Amendment challenges—due process and void for vagueness—to BM 114's LCM restrictions.

On December 6, 2022, this Court denied Plaintiffs' initial motions for a temporary restraining order, which sought to prevent BM 114 from taking effect as scheduled on December 8, 2022. *See generally* ECF 39. In that order, this Court found that Plaintiffs had failed to demonstrate that they would suffer immediate and irreparable harm if BM 114 were allowed to take effect. *Id.* at 3. This Court also held that Plaintiffs had failed to demonstrate a likelihood of success on the merits with respect to their facial challenge to BM 114's permitting regime as well as their constitutional challenges to BM 114's restriction on LCMs. *Id.* Nonetheless, this

---

[1] *Oregon Firearms Fed'n, Inc. v. Kotek*, the lead case in this consolidated action, was the first lawsuit to be filed and challenged all aspects of Ballot Measure 114 ("BM 114")—including Oregon's permit-to-purchase regime and the restrictions on large-capacity magazines ("LCMs"). No. 2:22-cv-01815-IM. *Fitz v. Rosenblum*, the second case filed, challenged only BM 114's LCM restrictions. No. 3:22-cv-01859-IM. *Eyre v. Rosenblum*, the third case filed, challenged all aspects of BM 114, including both Oregon's permit-to-purchase regime and Oregon's restrictions on LCMs. No. 3:22-cv-01862-IM. Finally, *Azzopardi v. Rosenblum*, the fourth and final case filed, challenged only BM 114's permit-to-purchase regime. No. 3:22-cv-01869-IM.

7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Court—at the request of Defendants—entered an order staying implementation of BM 114's permitting provision for thirty days to allow Defendants to prepare for implementation. *Id.* at 4.

Following this Court's denial of Plaintiffs' motions for a temporary restraining order, this Court ordered that the four separate cases be consolidated into the present action. ECF 62. This Court also granted Intervenor-Defendant Oregon Alliance for Gun Safety's motion to intervene in the action under Federal Rule of Civil Procedure 24(b). ECF 59. This Court then set this matter for briefing and a hearing on Plaintiffs' motions for a preliminary injunction. ECF 66.

On February 9, 2023, with the consent of the parties, this Court vacated the scheduled preliminary injunction hearing and set this matter for an expedited trial. ECF 134. The parties conducted discovery between February and May of 2023. ECF 139. On May 12, Plaintiffs moved for summary judgment on all six of their claims, ECF 165, while Defendants moved for summary judgment on Plaintiffs' facial challenge to BM 114's permitting regime and dismissal of Plaintiffs' as-applied challenge to the permitting regime as unripe for adjudication, ECF 163. This Court initially denied both sides' motions, finding that this matter implicates both important and unsettled questions of law, as well as genuine disputes of material fact. ECF 216 at 2–3.

On May 30, 2023, this Court held a Pretrial Conference with the parties, wherein the parties clarified both their legal positions regarding Plaintiffs' challenges to BM 114's permitting provisions and their intentions with respect to evidence regarding these claims at trial. ECF 222. Following that hearing, this Court found it appropriate to clarify the type of evidence it would receive regarding Plaintiffs' facial challenge to BM 114's permitting provisions and to revisit its prior ruling denying Defendants' motion to dismiss. ECF 234. This Court ultimately concluded that Plaintiffs' as-applied challenge to BM 114's permitting regime was not ripe for trial, as the permitting regime has not yet gone into effect, and dismissed that claim without prejudice and

8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

with leave to refile should BM 114 go into effect at some future date. *Id.* at 7. As written, BM

114 was scheduled to go into effect on December 8, 2022, but Defendants are currently

restrained from enforcing BM 114 by state court order. *See* Opinion Letter, December 15, 2022,

*Arnold v. Brown*, No. 22-cv-41008 (granting preliminary injunction of BM 114's LCM

restrictions and temporary restraining order of BM 114's permitting provisions).

This Court held a bench trial on all of Plaintiffs' remaining claims beginning on June 5,

2023. ECF 240. Over the course of the weeklong trial, this Court heard testimony from twenty

witnesses and received more than 100 exhibits into evidence. ECF 248; ECF 251. In addition to

witness testimony and evidence admitted into the record, Plaintiffs have asked this Court to

consider as legislative facts thirteen documents. ECF 223. These documents are authored by

individuals who were not called to testify at trial, making these documents inadmissible hearsay.

ECF 238; *see also* Fed. R. Evid. 802. This Court concludes that these thirteen documents deserve

no weight in this case.[2]

---

[2] Plaintiffs did not identify any nonhearsay purpose or exception to the rule against
hearsay for these documents. Instead, Plaintiffs argue that this Court may consider them as
legislative facts, which are not subject to the Federal Rules of Evidence. ECF 223. Defendants
and Intervenor-Defendant object, arguing that these documents contain adjudicative rather than
legislative facts. ECF 233; ECF 238 at 4. This Court agrees.
    The Ninth Circuit has described the difference between legislative and adjudicative facts
as follows: Adjudicative facts resolve factual disputes pertaining to the elements of the claims at
issue in a particular case. *See Perry v. Brown*, 671 F.3d 1052, 1075 (9th Cir. 2012), *vacated sub
nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013) ("Adjudicative facts are . . . the types of 'facts
that go to a jury in a jury case,' or to the factfinder in a bench trial."). Legislative facts, on the
other hand, are "those which have relevance to legal reasoning and the lawmaking process." Fed.
R. Evid. 201(a) advisory committee's note to 1972 Proposed Rules.
    The legislative fact exhibits offered by Plaintiffs address factual questions that this Court
must answer, including the commonality of LCMs, their use by ordinary citizens, and the
relevancy of certain historical firearms regulations. Thus, the thirteen documents are replete with
adjudicative facts. This Court offered Plaintiffs the opportunity to identify specific legislative
facts and the purpose for which those purported legislative facts were offered. Plaintiffs failed to
do so with any specificity. It is not appropriate for this Court to rummage through voluminous

9 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

III.    SECOND AMENDMENT LEGAL FRAMEWORK

1.    Pre-*Bruen* and the Means-End Test for Second Amendment
      Challenges

The Second Amendment to the United States Constitution reads, in full: "*A well*

*regulated Militia, being necessary to the security of a free State, the right of the people to keep*

*and bear Arms, shall not be infringed.*" U.S. Const. amend. II (emphasis added).

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment

protects an individual right to keep and bear arms unconnected with militia service. 554 U.S.

570, 583, 592 (2008). In arriving at this interpretation, the Supreme Court emphasized "the

inherent right of self-defense" as "central to the Second Amendment right." *Id.* at 628. The

Supreme Court explicitly cautioned, however, that "[l]ike most rights, the right secured by the

Second Amendment is not unlimited" and noted that the Second Amendment does not protect a

right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Id.* at 626. The Supreme Court then struck down a District of Columbia law that

generally prohibited the possession of handguns, as violating the Second Amendment,

---

materials submitted by Plaintiffs to divine which facts, if any, might properly be deemed
legislative facts. It is up to the party offering such legislative facts to provide concrete guidance
as to which facts this Court should consider and for what purpose.

    While legislative facts are often considered by appellate courts deciding Second
Amendment challenges, *see Jones v. Bonta*, 34 F.4th 704, 726 n.24 (9th Cir. 2022), *vacated*, 47
F.4th 1124, this Court is a trial court. It is the function of the trial court to receive evidence and
testimony that has been tested through the adversarial process. This process helps the fact-finder
"ascertain[] [the] truth" and "minimiz[e] the risk of error," by subjecting witnesses to cross-
examination on potential bias and credibility, and by excluding evidence that is irrelevant,
prejudicial, or lacking indicia of reliability. *See Mackey v. Montrym*, 443 U.S. 1, 13 (1979);
*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("Vigorous cross-examination,
presentation of contrary evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but admissible evidence."). The adversarial
process also "crystallizes the pertinent issues and facilitates appellate review . . . ." *Neitzke v.
Williams*, 490 U.S. 319, 330 (1989). Without subjecting Plaintiffs' legislative facts to the
adversarial process, this Court cannot adequately assess issues of credibility or bias.

10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

concluding that it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]." *Id* at 628.

Two years after *Heller*, the Supreme Court once again considered the scope of the Second Amendment right in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *McDonald*, the Supreme Court reiterated that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense." *Id.* at 749–50. The Supreme Court then held that the Second Amendment is "fully applicable to the States" through the Fourteenth Amendment. *Id.* at 750. In so holding, the Supreme Court reversed a Seventh Circuit Court of Appeals decision upholding two citywide bans on the possession of handguns in the home. *Id.* at 791.

Following *Heller* and *McDonald*, circuit courts across the country—including the Ninth Circuit—adopted a two-step means-end analysis for Second Amendment challenges. First, courts considered whether the challenged regulation burdened conduct protected by the Second Amendment. If it did, courts then balanced the state's interests in the regulation against the burden on the constitutional right. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). This inquiry allowed courts to consider not only the text and history of the Second Amendment, but also the state's interest in public safety and the general welfare.[3]

---

[3] Pre-*Bruen*, the Ninth Circuit, sitting en banc, upheld the constitutionality California's LCM restrictions under the means-end test. *Duncan v. Bonta*, 19 F.4th 1087, 1100, 1102–03 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022). In assessing the constitutionality of the ban, the Ninth Circuit first asked whether the challenged law involved conduct protected by the Second Amendment. *Id.* at 1102. The Ninth Circuit assumed, without deciding, that California's law implicated the Second Amendment. *Id.* at 1103. Finding that California's restrictions imposed only a minimal burden on the Second Amendment right, the Ninth Circuit proceeded to analyze the law under intermediate scrutiny. *Id.* at 1108. At this second step, the Ninth Circuit concluded that California's LCM restrictions were a reasonable fit for the compelling state interest of reducing gun violence, and held that the law did not violate the Second Amendment. *Id.* at 1111.

11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## 2. *Bruen* and the History and Tradition Test for Second Amendment Challenges

In June of 2022, the Supreme Court again considered the scope of the Second

Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*. In *Bruen*, the Supreme Court

reiterated that the Second Amendment protects the right to keep and bear arms for "law-abiding

citizens with ordinary self-defense needs." 142 S. Ct. 2111, 2156 (2022). But *Bruen* explicitly

rejected the two-step, means-end analysis for Second Amendment challenges. *Id.* at 2126.

Instead, *Bruen* held that "when the Second Amendment's plain text covers an individual's

conduct," the government must affirmatively "demonstrate that the [challenged] regulation is

consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, *Bruen*

creates a new two-step analysis for assessing the constitutionality of firearms regulations. First, a

plaintiff challenging a firearm regulation must show the plain text of the Second Amendment

covers the conduct regulated by the challenged law. *See id.*[4] To determine whether the conduct at

issue is covered by the plain text of the Second Amendment, a court must determine whether the

weapon in question is a "bearable arm" that is "in common use today for self-defense." *Id.* at

---

[4] While *Bruen* does not specify that the plaintiff bears the burden of showing that the challenged conduct falls within the plain text of the Second Amendment, this Court finds that is the most logical reading of the Supreme Court's opinion. The Supreme Court explicitly states that "when the Second Amendment's plain text covers an individual's conduct . . . the government *must then* justify its regulation . . . ." *Bruen*, 142 S. Ct. at 2129–30 (emphasis added). This Supreme Court language strongly suggests that the burden shifts to the government only after the plaintiffs have shown that the challenged conduct is covered by the plain text of the Second Amendment. *See id.* This also comports with "one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law." *Lemon v. Kurtzman*, 411 U.S. 192, 208 (1973) (citation omitted). In applying this "first principle" to the holding of *Bruen*, this Court finds that the burden is on the plaintiff, in the first instance, to show that the challenged law implicates conduct covered by the plain text of the Second Amendment. If the plaintiff makes such a showing, then the burden shifts to the government to show that the challenged regulation is consistent with the Nation's history and tradition of firearm regulation.

12 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

2132, 2134 (internal quotation marks omitted). If the weapon is in common use today for self-defense, then the Constitution presumptively protects that conduct. *Id.* at 2128, 2134, 2135. Under *Bruen*'s second step, the government must then affirmatively prove that the challenged regulation is consistent with the historical tradition of firearm regulation. *See id.* at 2130.

      *Bruen* also made clear that "the right secured by the Second Amendment is not unlimited," and that governments may still impose certain restrictions on the purchase, possession, and use of firearms. *Id.* at 2128 (citation omitted); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[T]he Second Amendment allows a 'variety' of gun regulations," including "presumptively lawful regulatory measures" such as laws prohibiting the keeping and carrying of "dangerous and unusual weapons.") (citation omitted).

      While *Bruen*'s test for Second Amendment challenges is grounded in history and tradition, *Bruen* also acknowledged that modern regulations may implicate either "unprecedented societal concerns" or "dramatic technological changes" different from those that existed at the Second Amendment's ratification in 1791 or at the Fourteenth Amendment's ratification in 1868. *Id.* at 2132. In those circumstances, *Bruen* directs courts to consider "a more nuanced approach" and determine whether historical regulations are "relevantly similar" to the current challenged regulation based on two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

      In analyzing whether a challenged regulation violates the Second Amendment, *Bruen* directed courts to rely on "various evidentiary principles and default rules to resolve uncertainties." *Id.* at 2130 n.6 (internal quotation marks omitted). This case involved disputed issues of fact involving whether BM 114 prohibits conduct covered by the plain text of the Second Amendment, such as whether LCMs are "in common use today for self-defense" by

"law-abiding citizens with ordinary self-defense needs." *Id.* at 2134, 2156 (internal quotation marks omitted). This case also involved disputed issues regarding the historical record that required this Court to assess witness credibility and bias. Accordingly, this Court held a weeklong bench trial to resolve these issues and now makes the following findings of fact in accordance with Federal Rule of Civil Procedure 52(a).

## IV.    FINDINGS OF FACT: BALLOT MEASURE 114'S STATUTORY FRAMEWORK

BM 114 was approved by a majority of Oregon voters in November of 2022. *Measure 114, November 8, 2022, General Election Abstract of Votes*, OREGON SECRETARY OF STATE, http://perma.cc/7ZCU-5CU3 (last visited July 14, 2023).[5] The express purpose of BM 114, as stated in its preamble, is to enhance public safety and reduce gun violence, particularly mass shootings associated with LCMs. Ex. 1.

Excluding certain exceptions for law enforcement and military use, BM 114 prohibits the sale and restricts the use of LCMs that hold eleven or more rounds of ammunition. *Id.* § 11. BM 114 also requires individuals to obtain a permit before purchasing firearms. *Id.* § 4.

### A.  Purchase and Possession of Firearms in Oregon Prior to BM 114

Prior to BM 114, Oregon imposed no restrictions on the capacity of firearm magazines. And, any individual who wanted to purchase a firearm in Oregon was required to complete a background check at the time of purchase, including a criminal history check, to determine whether the individual was disqualified from purchasing a gun under Oregon law. O.R.S.

---

[5] Oregon has a statutory ballot measure system, which includes initiative, referenda, and legislative referral. Ballot initiatives allow Oregon voters to propose revisions or additions to the Oregon Revised Statutes. To be placed on the ballot, a statutory initiative must garner 1,000 sponsorship signatures followed by signatures totaling six percent of the total votes cast for governor at the last election. *Make or Change State Law*, OREGON SECRETARY OF STATE, http://perma.cc/6F54-BVPQ (last visited July 14, 2023).

14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

166.412(2) (effective Jan. 1, 2019–Dec. 7, 2022). Oregon law disqualifies the following persons

from possessing a firearm: felons, certain criminal defendants, individuals with certain adjudged

mental illnesses, and individuals subject to protective orders for domestic abuse or extreme risk

protection. O.R.S. 166.250(1). If the required background check was not completed within three

days, the gun dealer could nonetheless deliver the firearm to the individual. O.R.S. 166.412(3)(c)

(effective Jan. 1, 2019–Dec. 7, 2023). There was no requirement that individual firearm owners

complete any kind of safety training, except to obtain a concealed handgun license or a hunting

license for youth. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

### B.  LCM Restrictions under BM 114

BM 114 makes it a misdemeanor offense to manufacture, import, possess, use, purchase,

sell, or otherwise transfer any LCM in Oregon after BM 114 goes into effect. Ex. 1 § 11(2), (6).

BM 114 defines LCMs as "a fixed or detachable magazine . . . or similar device . . . that has an

overall capacity of, or that can be readily restored, changed, or converted to accept, more than

[ten] rounds of ammunition and allows a shooter to keep firing without having to pause to reload

. . . ." *Id.* § 11(d).

### 1.  Exceptions to BM 114's LCM Restrictions

BM 114 contains various exceptions to the general prohibition on the manufacture,

purchase, sale, or possession of LCMs. Licensed gun dealers that have LCMs in their inventory

have several options for complying with BM 114's new restrictions within 180 days after BM

114 takes effect. During that time, a licensed gun dealer may transfer or sell LCMs within their

inventory to a non-resident gun dealer or other transferee located out of state. *Id.* § 11(3)(a)(A).

The licensed dealer may also purchase LCMs from any owner for permanent removal from

Oregon. *Id.* § 11(3)(a)(B). And, a licensed dealer may permanently alter any LCM in their

15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

inventory such that it is no longer capable of accepting more than ten rounds of ammunition. *Id.*
§ 11(3)(a)(C).

BM 114 also contains exceptions for certain firearms manufacturers that produced LCMs
before the regulations went into effect. If a firearm manufacturer is properly licensed under
federal, state, and local law and is party to a binding contract pre-dating the effective date of the
measure with an entity outside of the state of Oregon for the manufacture of LCMs, then it may
fulfill that contract so long as all manufacture is completed no later than 180 days after the
effective date of the measure and the manufacturer makes the entity aware of BM 114's future
requirement in writing. *Id.* § 11(3)(b)(A)–(B). BM 114 does not apply, at any time, to a properly
licensed firearms manufacturer that manufactures LCMs exclusively for the United States Armed
Forces or law enforcement, or a licensed gun dealer that sells or otherwise transfers LCMs to the
United States Armed Forces or law enforcement. *Id.* § 11(4)(a)–(b).[6]

Current owners and future inheritors of LCMs can still possess and use LCMs obtained
prior to BM 114's effective date, subject to certain limitations.[7] Current owners and inheritors of
LCMs may only use those firearms at their home (or on property under their control), on the
premises of a gun dealer, at shooting ranges, for recreational activities like hunting, at firearms

---

[6] Any magazine manufactured, sold, or otherwise pursuant to this exception must
"include a permanent stamp or marking indicating that the large-capacity magazine was
manufactured or assembled after the effective date of [BM 114]." Ex. 1 § 11(4)(a)(B).

[7] BM 114 states, in relevant part, that "it shall be an affirmative defense . . . that (a) [t]he
large-capacity magazine was owned by the person before the effective date of this 2022 Act and
maintained in the person's control or possession; or (b) [t]he possession of a large-capacity
magazine was obtained by a person who, on or after the effective date of this section, acquired
possession of the large-capacity magazine by operation of law upon the death of a former owner
who was in legal possession of the large-capacity magazine . . . ." Ex. 1 § 11(5).

16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

competitions or exhibitions, for certain educational purposes, or during transport to or from one

of these permissible locations. *Id.* § 11(5)(c)(A)–(E). BM 114 does not apply at all to any

member of the United States Armed Forces or law enforcement who acquire, possess, or use

LCMs, so long as that acquisition, possession, or use "is related directly to activities within the

scope of that person's official duties." *Id.* § 11(4)(c).[8]

## C. Permit-to-Purchase

Under BM 114, any individual seeking to purchase a firearm in Oregon must first apply

for a permit. *See id.* §§ 6(2)(a), 7(3)(a), 8(2), 9(1)(a)(A). Applicants receive a permit if they: (1)

are not prohibited from purchasing or acquiring a firearm under state or federal law; (2) are not

subject to certain protective orders which prohibit individuals in Oregon from possessing guns;

(3) are not reasonably likely to be a danger to themselves, others, or the community at large;[9] (4)

provide proof that they have completed a firearm safety course;[10] and (5) pay a fee.[11] *Id.* §

---

[8] BM 114's military and law enforcement exception covers "peace officer[s]" as that term is defined in O.R.S. 133.005. Ex. 1 § 11(4)(c). This definition excludes private security guards. *See* O.R.S. 133.005(3).

[9] BM 114 prohibits an individual from obtaining a permit if they "present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." Ex. 1 § 4(1)(b)(C).

[10] Per BM 114, the safety course must include review of applicable state and federal firearm laws, including laws about safe storage and reporting lost or stolen firearms. The course must also cover the dangers associated with the misuse of firearms. Safety courses can be completed in-person or online, though all permit applicants must complete an in-person demonstration that shows that the applicant can lock, load, unload, fire, and store a firearm. Ex. 1 § 4(8)(c)(A)–(D).

[11] BM 114 states that fees for first-time applicants must be "reasonable" and cannot exceed sixty-five dollars. Ex. 1 § 4(3)(b). Fees for permit renewals must likewise be "reasonable" and cannot exceed fifty dollars. *Id.* § 4(7)(c). Fees are intended to "reflect[] the

17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

4(1)(b)(A)–(E). The applicant must submit to fingerprinting and photographing by a permitting agent. *Id.* § 4(1)(e).[12] The applicant must also submit to a criminal background check conducted by the Oregon State Police ("OSP"), including but not limited to a fingerprint identification, through the Federal Bureau of Investigation ("FBI"). *Id.*[13] Within thirty days of receiving an application for a permit, if the applicant meets the criteria, the permit agent "shall issue the permit-to-purchase." *Id.* § 4(3)(a). A permit is valid for five years. *Id.* § 4(7)(a).[14]

　　If the permit application is denied, or if no written response has been received within thirty days of the application, the applicant may file an action in state circuit court to compel the issuance of the permit. *Id.* § 5(1), (5). The state circuit court reviews the application anew and must issue a decision on the matter "within [fifteen] judicial days of filing or as soon as practicable thereafter." *Id.* § 5(8), (10). That decision is appealable, as a matter of right, to the Oregon Court of Appeals. *Id.* § 5(11).

---

actual cost of the process . . . including the cost of obtaining a criminal background check and photographing." *Id.*

[12] BM 114 defines a "permit agent" as either the police chief or county sheriff in the place where the applicant lives, or an individual designated to be a permit agent by the police chief or sheriff. Ex. 1 §§ 3(5), 4(1)(a).

[13] BM 114 requires the permitting agent to request that OSP "conduct a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation." Ex. 1 § 4(1)(e). The law states that the FBI "shall return the fingerprint cards used to conduct the criminal background check and may not keep any record of the fingerprints." *Id.* BM 114 also states that "[u]pon completion of the criminal background check and determination of whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm, [OSP] shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent." *Id.*

[14] Any individual seeking to renew their permit must submit a new application, but they are not required to take another safety course or undergo fingerprinting if the earlier set "has been retained by the permit agent or is otherwise available." Ex. 1 § 4(7)(b)(A)–(B).

BM 114 requires licensed dealers to verify that any potential firearm purchaser has a valid permit and forbids a dealer from transferring the firearm to the purchaser unless the dealer receives a unique approval number from OSP. *Id.* § 6(3)(c).[15] BM 114 likewise requires individuals seeking to transfer firearms to confirm that the individual to whom the firearm is being transferred has a valid permit. *Id.* § 7(3)(a). And BM 114 requires anyone seeking to sell or transfer a firearm at a gun show to confirm that the individual to whom the firearm is being sold or transferred has a valid permit. *Id.* §§ 8(3)(c), 9(1)(a)(A). BM 114 makes it a misdemeanor to sell or transfer firearms to an individual who does not have a permit. *Id.* §§ 6(14), 7(5)(a), 9(5)(a). BM 114 does not criminalize possession of a firearm without a permit. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

## V.   FINDINGS OF FACT: MODERN LARGE-CAPACITY MAGAZINES

### A.  LCMs and Firearm Technology

Under *Bruen*, a court must first consider whether the plain text of the Second Amendment covers the regulated conduct. 142 S. Ct. at 2126. Because the regulated conduct at issue in this case is the ability to keep and bear LCMs, this Court received evidence regarding how magazines, and LCMs specifically, operate. Based on that evidence this Court finds as follows: A magazine is a device that contains and facilitates the feeding of ammunition cartridges into a firearm. Trial Transcript ("Tr.") 6/6/2023 523:5–7. A magazine is a rectangular box generally made of steel, though magazines can also be made from plastic, polymer, or other

_____

[15] Pre-BM 114, under both state and federal law, firearms dealers could transfer a firearm to a purchaser without a completed background check if the background check process took longer than three business days. O.R.S. 166.412(3)(c); 18 U.S.C. § 922(t)(1)(B)(ii). BM 114 ends this practice by requiring a firearms dealer to receive a unique approval number before transferring a firearm to the prospective purchaser.

19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

materials. Tr. 5/30/2023 43:21–44:2; Tr. 6/5/2023 118:14–15. The bottom of the magazine is

called the floor plate. Tr. 5/30/2023 43:24. Inside the magazine is a carrier that sits atop a spring.

Tr. 5/30/2023 43:25–44:1. When the magazine is loaded with bullet cartridges, the spring is

compressed. Tr. 5/30/2023 44:3–4. When an individual fires a modern semi-automatic firearm,

the top portion of a firearm—known as the slide—is driven back by recoil force. Tr. 5/30/2023

44:4–5. An extractor inside of the gun catches the rim of the spent shell casing, pulling it

backwards and striking a stud known as an ejector, which in turn kicks the spent shell casing out

of the firearm's ejection port. Tr. 5/30/2023 44:6–10. With the slide now completely moved to

the rear of the firearm, the spring-loaded magazine pushes the next cartridge towards the top of

the magazine's box. Tr. 5/30/2023 44:11–12. A recoil spring, located parallel to and underneath

the barrel of the firearm, moves the slide forward. Tr. 5/30/2023 44:13–15. As the slide moves

forward, it picks up the cartridge that has been pushed to the top of the magazine box and places

it in the firing chamber. Tr. 5/30/2023 44:15–16. With a new round now chambered, the operator

of the firearm can resume shooting. Tr. 5/30/2023 44:16–17.

Magazines can be either fixed or detachable. Tr. 6/6/2023 523:10–14. A fixed magazine

is permanently attached to the firearm. Tr. 6/6/2023 523:15–19. A detachable magazine is a

magazine that can be easily removed from the firearm when empty and replaced with another

fully loaded detachable magazine. Tr. 6/6/2023 523:10–13. Detachable magazines facilitate more

rapid reloading of a firearm when the previous magazine is empty. Tr. 6/6/2023 523:13–14. It

takes a skilled firearm user approximately three and a half seconds to reload a firearm with a

detachable magazine. Tr. 5/30/2023 78:14–19.

Magazines vary in their capacity, or the number of rounds that the magazine can hold.

Some magazines hold a maximum of ten rounds. Tr. 6/6/2023 523:20–23. Other magazines hold

20 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

as many as 100 rounds. Tr. 6/5/2023 123:3–4. Magazine capacity is not a determining factor in

the operability of a firearm, and most firearms that accept detachable magazines will function the

same regardless of the magazine's capacity. Tr. 6/6/2023 527:4–5. Glock semi-automatic pistols,

Beretta pistols, and most AR-15-style rifles will function with a ten-round magazine as well as

with an LCM. Tr. 6/6/2023 527:10–13. Aside from the number of rounds available without

reloading, the mechanical function of an LCM and a ten-round magazine is the same: both

deliver ammunition into the firearm. Tr. 6/5/2023 127:19–23; 128:11–12. LCMs and ten-round

magazines also offer the same reliability. Tr. 6/6/2023 526:24–527:1. When a detachable

magazine is inserted into a handgun's magazine well, it is difficult to discern the total capacity of

the magazine. *See* Tr. 6/6/2023 529:2–4.

      Some magazines that hold a maximum of ten rounds can be extended to hold more

rounds. Tr. 6/5/2023 79:10–15. To extend a ten-round magazine, a user must first remove the

magazine's baseplate, which can be done with a tool like a punch or a screwdriver, or sometimes

can be done by hand. Tr. 6/5/2023 79:11–13. The user must then add an extended baseplate to

their ten-round magazine. Tr. 6/5/2023 79:12–14. An extender replaces the original baseplate of

the magazine. Tr. 6/6/2023 531:16–18. In some firearms, a magazine that has been extended will

also require the user to replace the original spring with a stronger spring to push the cartridges

out of the magazine and into the chamber of the firearm. Tr. 6/6/2023 531:19–532:6. An

individual must add these parts—an extender, and possibly a stronger spring—before they can

successfully extend the capacity of their magazine. *See* Tr. 6/6/2023 532:7–10.

## B.  LCMs and the U.S. Civilian Firearms Market

      Under *Bruen*, a court must consider whether a regulated firearm or firearm accessory is

"in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks

omitted). Accordingly, this Court received evidence at trial regarding the commonality of LCMs among U.S. civilians. Based on that evidence, this Court now as finds follows: LCMs first achieved commercial success in the U.S. civilian market in the 1980s. Tr. 6/5/2023 131:13–21. In 1954, only two models of firearms available in the civilian marketplace were sold with factory-issued LCMs, which accounted for 0.7 percent of firearms sold. Tr. 6/6/2023 408:18–21; Ex. 565.[16] In 1964, 0.6 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 408:22–25; Ex. 565. In 1974, 1.7 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:1–2; Ex. 565. In 1984, 5.4 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:3–4; Ex. 565. And, in 1994, 7.2 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:4–7; Ex. 565. In 1994, Congress passed the Federal Assault Weapons Ban, which capped the maximum capacity for detachable magazines at ten rounds. Tr. 6/6/2023 525:21–526:7; *see also* Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). The Federal Assault Weapons Ban expired in 2004. Tr. 6/6/2023 405:22–23.

Today, many popular firearms come standard with LCMs. Tr. 6/5/2023 43:23–44:7; 44:14–19. Many firearms also come standard with multiple LCMs. Tr. 6/5/2023 44:17–18; 67:6–

---

[16] During trial, Defendants' expert Dr. Louis Klarevas testified about the number of firearm models sold with factory-issued LCMs in the United States from 1954 to 1994. Tr. 6/6/2023 407:6–409:7. This testimony corresponds to Exhibit 565, which is a chart labeled "Firearm Models Sold with Factory-Issue LCMs in U.S., 1955-1995." *See generally* Ex. 565. According to Dr. Klarevas's testimony, the data compiled in Exhibit 565 relates to firearms sold in the previous year, such that statistics from 1955 are reflective of the number of these firearms sold in 1954, and so on. Tr. 6/6/2023 408:1–4. Accordingly, this Court uses the years in which the firearms were sold, rather than the years listed in the Exhibit.

17. Millions of Americans today own LCMs. ECF 206 at ¶ 49.[17]  Magazines typically cost between twelve to twenty-five dollars for standard models, while more unique models can cost upwards of fifty dollars each. Tr. 6/5/2023 130:11–15. Some LCMs sold to civilians are the same as LCMs used by the military and are marketed to civilians as such. Tr. 6/5/2023 145:1–19.

Plaintiffs presented evidence regarding the total number of LCMs possessed by civilians through a 2018 National Shooting Sports Foundation ("NSSF") Industry Intelligence Report, which contains a chart estimating the number of detachable magazines in circulation in the United States from 1990 to 2018 ("NSSF Magazine Chart").[18] Tr. 6/6/2023 363:17–22. The NSSF Magazine Chart includes data from three sources: the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Annual Firearms Manufacturing and Exportation Report ("AFMER"), the U.S. International Trade Commission ("ITC"), and "industry insights." Tr. 6/6/2023 362:24–25. To create the chart, NSSF uses firearm production data from government sources. Tr. 6/6/2023 366:3–368:4. The NSSF then takes those firearm production numbers and asks firearm manufacturers and distributors how many magazines, and of what capacity, they include with those firearms. Tr. 6/6/2023 367:25–368:4. The NSSF uses those responses to

---

[17] The parties presented this fact as stipulated in their joint Stipulation of Agreed-Upon Facts filed prior to trial. *See generally* ECF 206. Neither party moved for this stipulation to be admitted into evidence at trial. Nonetheless, this Court accepts this fact as true given the parties' stipulation.

[18] Plaintiffs offered the chart as an industry report through the testimony of Salam Fatohi, who serves as the Director of Research at the National Shooting Sports Foundation ("NSSF"). Tr. 6/6/2023 356:4–5. Although this Court received the chart in evidence, *see* Ex. 33 at 7, in assessing the weight and credibility to give Mr. Fatohi's testimony, this Court notes that the NSSF is a plaintiff in this case and has been a plaintiff in several Second Amendment challenges to firearms regulations. The NSSF is a firearm and industry trade association which advocates for the firearm and ammunition industry. NSSF members have a significant financial interest in the outcome of this case.

23 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

extrapolate how many magazines, and of what capacity, are in circulation in the United States. Tr. 6/6/2023 368:5–8.[19]

    According to the NSSF Magazine Chart, between 1990 and 2018, 106.8 million pistol magazines were in circulation with a capacity of ten rounds or fewer. Tr. 6/6/2023 370:16–17. Between 1990 and 2018, 71.2 million pistol magazines were in circulation with a capacity of eleven rounds or more. Tr. 6/6/2023 370:18–19. Between 1990 and 2018, 37.7 million rifle magazines were in circulation with a capacity of ten rounds or fewer. Tr. 6/6/2023 370:20–21. Between 1990 and 2018, 9.4 million rifle magazines were in circulation with a capacity of between eleven and twenty-nine rounds. Tr. 6/6/2023 370:22–24. Between 1990 and 2018, 79.2 million rifle magazines were in circulation with a capacity of thirty or more rounds. Tr. 6/6/2023 370:25. In total, the NSSF Magazine Chart shows that between 1990 and 2018, there were 304.3 million detachable magazines in circulation in the United States. Tr. 6/6/2023 371:1–2. Of those 304.3 million detachable magazines, approximately 160 million had a capacity of eleven rounds or greater. Tr. 6/6/2023 371:10–11.

    After hearing and evaluating the trial evidence, this Court finds that the NSSF Magazine Chart is entitled to little weight. On cross-examination, Salam Fatohi, who serves as the NSSF's Director of Research, admitted that he did not know how many industry representatives were consulted to obtain the "industry insights" data that went into the magazine chart. Tr. 6/6/2023 377:18. Mr. Fatohi admitted that the NSSF report could have extrapolated the number of magazines in circulation from as few as two industry representatives. Tr. 6/6/2023 377:21–22.

---

[19] Mr. Fatohi testified that he was not personally involved in compiling the data included in the 2018 NSSF Industry Intelligence Report's magazine chart, but that he is currently personally involved in updating the chart with data from 2022. Tr. 6/6/2023 365:20–366:7.

24 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. Fatohi also testified that prior versions of Exhibit 33 had been used by the NSSF in litigation challenging firearms regulations. Tr. 6/6/2023 382:11–13.

Nevertheless, based on the parties' pretrial stipulation, this Court finds that millions of Americans today own LCMs. But this Court also finds that the number of LCMs possessed by Americans is influenced to some degree by whether a firearms manufacturer sells a particular model of firearm standard with an LCM, and whether that firearm is sold standard with more than one LCM. Tr. 6/5/2023 44:16–19; 67:6–17.

### C. LCMs and Self-Defense

Under *Bruen*, a court must consider whether a regulated firearm or firearm accessory is "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Accordingly, this Court received evidence at trial regarding the use of LCMs in self-defense. Plaintiffs presented evidence at trial that some individuals purchase LCMs for self-defense. Tr. 6/5/2023 46:4–7. LCMs allow an individual to fire more bullets without reloading than a magazine that holds ten bullets or fewer. Tr. 6/5/2023 128:13–15; 129:2–5. Detachable magazines also allow an individual to reload their firearm more quickly than with a fixed magazine. Tr. 6/6/2023 523:13–14.

According to Plaintiffs' expert Massad Ayoob, most civilians who attend his self-defense classes bring a semi-automatic pistol with a magazine capacity of greater than ten rounds. Tr. 5/30/2023 31:16–18.[20] According to Plaintiffs' fact witness Jessica Harris, who owns an outdoor

--------

[20] This Court cannot give significant weight to the testimony of Plaintiffs' expert Massad Ayoob. This Court acknowledges that Mr. Ayoob has decades of experience as a firearms instructor for law enforcement and served for nineteen years as the chair of the Firearms Deadly Force Training Committee for the American Society of Law Enforcement Trainers. Tr. 5/30/2023 21:9–17. Mr. Ayoob has also written about self-defense and the use of deadly force by private citizens. Tr. 5/30/2023 22:16–23:7. Nevertheless, Mr. Ayoob testified that he has served

25 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

sporting goods store that sells firearms, most of her customers who purchase firearms for self-defense purchase "things with as many rounds as possible." Tr. 6/5/2023 38:9–24; 46:4–7.

Plaintiffs offered only limited anecdotal evidence of LCMs actually being used in self-defense. Mr. Ayoob described an incident in which a law enforcement officer fired thirty-three rounds in pursuit of an armed bank robber. Tr. 5/30/2023 39:24–40:16. On cross-examination, Mr. Ayoob also testified about an incident in which two individuals fired nine and three rounds, respectively, at an armed intruder. Tr. 5/30/2023 56:16–57:14. On re-direct, Mr. Ayoob testified to two other incidents with civilians firing more than ten rounds in self-defense: two brothers who owned a jewelry store and fired between thirty and forty rounds to stop an attempted robbery, and one gun shop owner who used an M16-rifle and a sub-machine gun to stop an attempted robbery. Tr. 5/30/2023 95:15–96:13.

By contrast, Defendants presented substantial and highly credible evidence at trial showing that ordinary civilians in self-defense situations rarely fire more than ten rounds. Defendants offered Lucy Allen as an expert on the statistical use of LCMs in defensive gun use situations ("DGUs"). Ms. Allen received her bachelor's degree from Stanford University, and received a master's degree in economics, a Master of Philosophy in economics, and a Master of Business Administration, all from Yale University. Tr. 6/7/2023 659:17–20. Ms. Allen is the senior managing director at National Economic Research Associates ("NERA"), an economic

---

for decades on the Board of Trustees for the Second Amendment Foundation, which is an advocacy organization for gun rights and a plaintiff in the present action. Tr. 5/30/2023 59:13–23. Mr. Ayoob testified on cross-examination that he has served as president of the Second Amendment Foundation since September of 2020. Tr. 5/30/2023 59:24–60:2. Mr. Ayoob testified that, as president, he has input into litigation decisions and yet has not implemented any sort of screen within the Second Amendment Foundation due to his role as an expert in the present case. Tr. 5/30/2023 60:12–61:6.

26 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

consulting firm that provides quantitative and analytic research for clients in both the public and private sectors. Tr. 6/7/2023 657:3–16. Ms. Allen has worked at NERA for twenty-five years. Tr. 6/7/2023 658:13–14. Prior to her work at NERA, Ms. Allen was an economist for the Council of Economic Advisors under the first President Bush and President Clinton. Tr. 6/7/2023 658:16– 17. Ms. Allen has been conducting statistical analyses related to crime and gun use for twenty-five years and began researching DGUs specifically ten years ago. Tr. 6/7/2023 659:5–15; 660:7–8. On cross-examination, Plaintiffs were unable to develop any persuasive evidence of Ms. Allen's bias. Accordingly, this Court finds Ms. Allen to be a highly qualified and credible witness and gives significant weight to her testimony and statistical conclusions.

Ms. Allen analyzed the number of shots fired in DGUs using two sources: the National Rifle Association's ("NRA") Armed Citizens Database, which Ms. Allen described as "the largest collection of [DGUs]," and a compilation of news articles taken from the aggregator Factiva. Tr. 6/7/2023 660:24–661:4; 660:19–21. Ms. Allen testified that NERA analysts, as well as other economic research firms and academics, commonly use Factiva for their research. Tr. 6/7/2023 672:25–673:6.

The NRA Armed Citizens Database consists of DGUs compiled by the NRA. Tr. 6/7/2023 661:5–8. When it first began, the NRA database consisted of incidents compiled and summarized by the NRA itself. Tr. 6/7/2023 661:11–14. More recently, the NRA database consists of links to news articles about relevant DGUs. Tr. 6/7/2023 661:15–20. Ms. Allen used the NRA database to analyze DGUs over a six-and-a-half-year period, from January 2011 to May 2017. Tr. 6/7/2023 662:19–22. Of those 736 incidents, 134, or about 18 percent, involved no shots fired. Tr. 6/7/2023 663:25–664:2; Ex. 536. For 587 of the incidents, or around 80 percent, one to five shots were fired. Tr. 6/7/2023 664:3–5. For thirteen of the incidents, or a

little less than 2 percent, six to ten shots were fired. Tr. 6/7/2023 664:5–6. More than ten shots

were fired in only two incidents, or 0.3 percent. Tr. 6/7/2023 664:7–8; Ex. 536.[21] Based on data

from the NRA database, an average of 2.2 shots are fired in DGUs. Tr. 6/7/2023 664:9–10; Ex.

536.

      Ms. Allen also testified that she conducted a similar analysis using her own sample of

news stories pulled from a database compiled by the aggregator Factiva. Tr. 6/7/2023 673:7–8.

This analysis looked at a random sample of 200 incidents from the roughly 4,800 news stories

describing DGUs over the same six-and-a-half-year period as the NRA database. Tr. 6/7/2023

673:8–17. Ms. Allen testified that this analysis produced roughly identical results to her analysis

of the NRA database: no shots were fired in 11.3 percent of incidents, one to five shots were

fired in 86 percent of incidents, and six to ten shots were fired in 2.7 percent of incidents, and in

no incidents were more than ten shots fired. Tr. 6/7/2023 674:8–12; Ex. 537. Based on data from

the Factiva database, an average of 2.3 shots are fired in DGUs. Tr. 6/7/2023 674:7; Ex. 537.

      Accordingly, based on the credible evidence presented at trial, this Court finds that many

Americans purchase LCMs with the intent to use them for self-defense. This Court finds,

however, that it is exceedingly rare (far less than 1 percent) for an individual to fire more than

ten shots in self-defense. Therefore, this Court finds that the features unique to LCMs—the

ability to shoot more than ten bullets without reloading—are not "commonly used . . . for self-

defense." *Bruen*, 142 S. Ct. at 2138.

---

[21] Ms. Allen also explained that these two incidents were added to the NRA database
after her initial research was made public through litigation challenging firearm regulations in
New York and Maryland. Tr. 6/7/2023 665:4–11.

28 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### D.  LCMs and Mass Shootings

Under *Bruen*, a court must analyze analogous historical weapons regulations under "a more nuanced approach" if the modern regulation implicates an "unprecedented societal concern." *Id.* at 2132. Accordingly, this Court received evidence at trial regarding LCMs and mass shooting events, which Defendants and Intervenor-Defendant argue represent an unprecedented societal concern. Based on that evidence, this Court finds as follows: In the field of criminology, mass shootings are defined as a shooting involving four or more people shot. Tr. 6/6/2023 398:22–24; 464:21–23. This definition excludes large inner group violence, including things like race riots, labor riots, and battle skirmishes. Tr. 6/6/2023 464:21–465:2. A fatal mass shooting is a mass shooting where at least one of the four victims died. Tr. 6/6/2023 399:3–6. A high-fatality mass shooting is defined as a shooting where at least six or more people died, not including the perpetrator. Tr. 6/6/2023 399:6–8.

Between 1776 and 1949, or for about 70 percent of American history, there was no example of a mass shooting event that resulted in double digit fatalities. Tr. 6/6/2023 403:25–404:3; Ex. 564. The first known mass shooting involving more than ten fatalities, not including the perpetrator, occurred in 1949. Tr. 6/6/2023 404:1–5; *see also* Ex. 564. The annual incidence of high-fatality mass shootings has increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 413:5–9; Ex. 567. The number of fatalities in mass shooting events has also increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 414:12–14; Ex. 568.

Since 1990, 78 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:14–16; Ex. 569. Since 2000, 79 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:16–18; Ex. 569. Since 2010, 86 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:19–22; Ex. 569. Since 2020, 100 percent

29 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:23–416:2; Ex. 569. The average number of shots fired in a mass shooting where an LCM was not used was sixteen. Tr. 6/7/2023 681:17–19. By contrast, the average number of shots fired in a mass shooting where an LCM was used was ninety-nine. Tr. 6/7/2023 681:13–14. More than ten shots were fired in 94 percent of mass shootings where an LCM was used. Tr. 6/7/2023 681:14–16.

Between 1982 and 2022, at least 179 mass shootings have occurred in which more than four people were killed in a public place, excluding the shooter. Tr. 6/7/2023 680:18–21; 681:2–6. Of the seventy-three of those incidents in which it is known that an LCM was used, there was an average of ten fatalities and sixteen injuries. Ex. 538. Of the forty-two incidents in which it is known that an LCM was not used, there was an average of six fatalities and three injuries. Ex. 538.

The deadliest mass shooting event in American history took place in Las Vegas, Nevada in 2017. Ex. 564. Sixty people were killed and more than 410 people were shot. Tr. 6/6/2023 423:1–6; Ex. 564. The perpetrator used 100-round LCMs. Tr. 6/5/2023 138:2–140:4. Using LCMs and semi-automatic rifles—some of which were equipped with a feature known as a bump-stock, which allows a semi-automatic firearm to be fired automatically—the shooter was able to fire 100 rounds in between nine and eleven seconds. Tr. 6/6/2023 423:11–21. The shooter shot for approximately eleven minutes and fired over 1,000 rounds. Tr. 6/6/2023 424:25–425:5.

The second deadliest mass shooting in American history took place in Orlando, Florida in 2016. Ex. 564. Forty-nine people were killed. Ex. 564. The shooter used an LCM. Ex. 564.

The third-deadliest mass shooting in American history took place in Blacksburg, Virginia in 2007. Ex. 564. Using a firearm equipped with an LCM, the shooter fired 174 rounds in

approximately nine to ten minutes. Tr. 6/7/2023 602:24–603:2; Ex. 564. Thirty-two people were killed. Ex. 564.

Magazine capacity is highly related to the lethality of a weapon, because capacity is what determines the number of shots that can be fired within a given time without having to pause to reload. Tr. 6/6/2023 513:5–10. State laws banning LCMs reduce the incidents of mass shootings between 48 to 72 percent and decrease the number of fatalities that occur in these mass shootings by 37 to 75 percent. Tr. 6/6/2023 506:14–19. Defendants presented credible evidence at trial demonstrating that the relationship between restrictions on LCMs and reductions in mass shootings is so pronounced that it is a causal relationship, meaning that the restrictions were at least partly responsible for the reductions. Tr. 6/6/2023 507:20–508:1.

When a shooter has fired all the available rounds in a magazine's chamber, the shooter must pause shooting to either swap out magazines or change firearms. Tr. 6/6/2023 427:19–428:3. Defendants' expert Dr. Louis Klarevas, who studies mass shootings, testified that he was not aware of a mass shooting event in which it took the shooter less than five seconds to swap out magazines. Tr. 6/6/2023 401:15–23; 428:4–6. During a mass shooting event in 2022 in Buffalo, New York, it took the mass shooter approximately eight to nine seconds to swap out magazines. Tr. 6/6/2023 428:10–12; Ex. 564. Pauses in mass shootings allow potential victims to respond by fleeing, hiding, or fighting back. Tr. 6/6/2023 426:15–427:2. During the Newtown, Connecticut mass shooting that occurred at Sandy Hook Elementary school in 2012, nine children were able to flee and two were able to hide when the shooter paused to reload magazines. Tr. 6/6/2023 429:10–15; Ex. 564. During a 2019 shooting at the Poway synagogue in California, the shooter was confronted by congregants and chased out after he had fired all ten

31 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

rounds from his firearm and paused to reload. Tr. 6/6/2023 446:5–20. These pauses occur less

frequently when a mass shooter uses a firearm equipped with an LCM. Tr. 6/6/2023 429:1–4.

Accordingly, this Court finds as follows: Mass shootings are a recent phenomenon in

American history. The annual incidence of mass shootings has increased since 1990. LCMs are

commonly used in high-fatality mass shootings, and their use in these shootings has increased in

recent years. The use of LCMs in mass shooting events increases the lethality of those events.

The features unique to LCMs—the ability to shoot more than ten bullets without reloading—are

useful for mass shooters. Pauses where a shooter must reload magazines or switch firearms

provide an opportunity for potential victims to flee, hide, or fight back.

### E.  LCMs and Public Health

Under *Bruen*, a court must analyze historical weapons regulations under "a more nuanced

approach" if the modern regulation implicates "an unprecedented societal concern" or "dramatic

technological change[]." *Bruen*, 142 S. Ct. at 2132. Accordingly, this Court received evidence at

trial regarding the severity of gunshot wounds from LCM-equipped firearms and the burdens

imposed on hospital capacity by mass shooting events. Based on the credible evidence presented

at trial, this Court finds as follows: Gunshot victims typically die from gunshot wounds in one of

two ways. First, a victim dies if the bullet enters a critical organ such as the brain stem or heart.

Tr. 6/6/2023 486:16–21. If an individual is shot multiple times, there is a greater likelihood they

will suffer a gunshot wound to a critical organ. Tr. 6/6/2023 487:15–18. Second, a victim may

die if they have multiple gunshot wounds that hit less critical structures but cause rapid bleeding.

Tr. 6/6/2023 486:22–25. A victim who is shot multiple times is more likely to suffer rapid

bleeding, though that it is not always a linear relationship. Tr. 6/6/2023 490:20–21. A patient

shot multiple times in non-critical areas might lose less blood than a patient shot fewer times with major blood vessel injuries. Tr. 6/6/2023 490:20–25.

Surge capacity is the capacity of any given hospital to deal with multiple casualty incidents in a short period of time. Tr. 6/6/2023 494:6–12. In Oregon, Oregon Health and Sciences University ("OHSU") is one of two hospitals with a level one trauma center, which is the largest and most well-resourced level of trauma center. Tr. 6/6/2023 483:1–5. OHSU and Legacy Emanuel, another level one trauma center, receive all acutely injured patients from the Portland metropolitan area. Tr. 6/6/2023 483:3–6. If a mass shooting event resulted in more than five or ten critically injured patients being taken to OHSU in a short period of time, OHSU would rapidly run out of available resources to treat patients. Tr. 6/6/2023 495:2–13. The surge capacity of hospitals around the state of Oregon would likely be much smaller. Tr. 6/6/2023 496:2–12. Once a hospital reaches surge capacity, the hospital must decide how to allocate care to patients, which can result in delayed care and the postponement of elective cancer surgeries or other treatments. Tr. 6/6/2023 495:14–21.

## VI.   FINDINGS OF FACT: HISTORY AND TRADITION

Under *Bruen*, courts are tasked with determining whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Accordingly, this Court received evidence about the evolution of firearms and weapons technology. In addition, this Court heard evidence about societal concerns that arose from the proliferation of such weapons and the regulations that were enacted to address those concerns.

Plaintiffs and Defendants both offered expert testimony regarding the existence and prevalence of weapons—including repeating firearms, which are firearms that can be fired more than once without reloading, and large-capacity repeating firearms, which are firearms that can

be fired more than ten times without reloading—throughout American history. Defendants also offered expert testimony regarding the societal context amid which certain historical regulations arose. Plaintiffs offered Ashley Hlebinsky, formerly a curator at the Cody Firearms Museum at the Buffalo Bill Center of the West and current Senior Fellow at the University of Wyoming College of Law's Firearms Research Center. Tr. 6/5/2023 162:3–7; 153:24–154:5; 154:10–21. Ms. Hlebinsky earned a bachelor's degree and a master's degree in American History from the University of Delaware. Tr. 6/5/2023 156:8–10; 160:12–15. Ms. Hlebinsky worked for the Cody Firearms Museum from 2013 to 2020. Tr. 6/5/2023 161:11–13; 165:19. Her published work is largely limited to non-peer-reviewed articles in firearms publications, such as Recoil Magazine and Armax Journal. Ex. 196.

Defendants offered five historical experts: Dr. Brian DeLay, Dr. Kevin Sweeney, Dr. Roger Pauley, Dr. Brennan Rivas, and Dr. Robert Spitzer. Dr. DeLay is a professor of history at the University of California, Berkeley, where he focuses on the international arms trade in the eighteenth and nineteenth centuries. Tr. 6/6/2023 545:17–546:4. Dr. DeLay received his bachelor's degree from the University of Colorado at Boulder, and his master's degree and Ph.D. in American History from Harvard University. Tr. 6/6/2023 545:10–14. Dr. Sweeney is a professor emeritus at Amherst College, where he taught in both the History and American Studies departments from 1989 to 2016. Tr. 6/7/2023 618:1–3. Dr. Sweeney received his bachelor's degree in history from Williams College and his Ph.D. in history from Yale University. Tr. 6/7/2023 617:7–9. Dr. Pauley is a professor of history at the University of Central Arkansas, where he has been teaching since 2001. Tr. 6/8/2023 1004:13–16. Dr. Pauley received his bachelor's degree in history from St. Olaf College, his master's degree in history from Villanova University, and his Ph.D. from the University of Delaware. Tr. 6/8/2023 1005:9–12.

34 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dr. Rivas received her bachelor's degree in history from Oklahoma State University, and her master's degree and Ph.D. in history from Texas Christian University. Tr. 6/7/2023 704:17–20. And Dr. Spitzer, who serves as a professor emeritus at the State University of New York at Cortland, and has taught at Cornell University and the College of Law at William and Mary, received his bachelor's degree in political science from the State University of New York at Fredonia, and his master's degree and Ph.D. in political science from Cornell University. Tr. 6/8/2023 854:25–855:5; 856:9–12. Defendants' historical experts have a combined ninety-three years of experience studying the history of firearms, the history of firearms-related regulations, or the history of firearms policy. Tr. 6/6/2023 548:22–23; Tr. 6/7/2023 619:10–18; 705:8–9; Tr. 6/8/2023 856:13–857:2; 1006:3–8. Additionally, Defendants' experts have all published either peer-reviewed scholarship or books in these fields. Tr. 6/6/2023 500:9–13; Tr. 6/7/2023 619:18; 706:3; Tr. 6/8/2023 857:5; 1005:15–17.

Defendants' experts come from neutral academic backgrounds and possess no economic interest in the sale of LCMs. Ms. Hlebinsky, by contrast, offers a curatorial perspective on the evolution of firearms technology in the United States, including personal experience handling firearms from different eras. Tr. 6/5/2023 168:20–25. But Ms. Hlebinsky lacks background and training as a historian. More troubling to this Court, Ms. Hlebinsky has both professional and personal ties to pro-gun groups and the firearms industry, which this Court finds limit her ability to serve as a neutral expert in this case. Ms. Hlebinsky has received numerous awards from pro-gun advocacy groups, has co-founded a research center that advocates for the firearms industry and denounces gun regulation, and has a strong financial interest in the success of the firearms industry. For example, Ms. Hlebinsky has done speaking engagements and received awards from the Second Amendment Foundation, which is an advocacy organization for gun rights and a

plaintiff in this case. Tr. 6/5/2023 281:25–282:13. She received the Second Amendment

Foundation's "Defender of the Constitution" award in 2022. Tr. 6/5/2023 282:8–10. She has also

received awards from the National Shooting Sports Foundation, Inc., which is also a plaintiff in

this case. Tr. 6/5/2023 281:2–11.

Perhaps most importantly, however, Ms. Hlebinsky is married to Mark Hanish, who also

served as an expert witness in this case. Tr. 6/5/2023 278:14–17. Mr. Hanish has spent decades

working for gun dealers and gun manufacturers and currently serves as the Vice President of

Sales and Marketing for Timney Triggers. Tr. 6/5/2023 278:18–24. Not only does Mr. Hanish

derive his standard income from the firearms industry, but he also owns over one million dollars

in stock in Ammo, Inc. Tr. 6/5/2023 278:25–279:2; 279:13–15. Ms. Hlebinsky testified that Mr.

Hanish's financial interest in the firearms industry is part of the couple's marital assets. Tr.

6/5/2023 279:13–18. This Court finds the testimony of Defendants' neutral historical experts to

be significantly more credible—and entitled to more weight—than that of Ms. Hlebinsky.

### A. The American Colonies and the Early Republic (1700-1800)

#### 1. Firearms and Weapons Technology

Because *Bruen* instructs courts to consider whether a challenged regulation "is consistent

with the Nation's historical tradition of firearm regulation," this Court admitted evidence at trial

about the history of firearms and weapons technology since the Nation's founding in 1776 and

the ratification of the Second Amendment in 1791 through to the mid-twentieth century. *Bruen*,

142 S. Ct. at 2130. Based on the evidence presented, this Court finds that detachable magazines

did not exist at the time of the Founding. *See* Tr. 6/7/2023 597:17–25. In the eighteenth century,

the word "magazine" referred to a storage facility or depot that housed gunpowder and, on

occasion, weapons. Tr. 6/7/2023 768:15–21; Ex. 736. Items that contained ammunition in the

eighteenth century, such as cartridge boxes, were considered "accoutrements," which was used as a semantically distinct term from "arm." Tr. 6/7/2023 767:4–9.

While repeating firearms existed prior to the ratification of the Second Amendment, these firearms were exceedingly rare, particular within the general populace. Tr. 6/6/2023 551:14–150; 552:23–553:16. Defendants' expert Dr. DeLay testified about two specific types of repeating firearms that existed in early Colonial America and at the time of the Founding: the Cookson repeating firearm and the Belton repeating firearm. The Cookson repeating firearm was a firearm designed by English master gunmaker John Cookson that could fire nine shots without reloading. Tr. 6/6/2023 554:3–14. There is evidence of only one nine-shot Cookson repeating firearm, produced in England, that existed in America prior to the Founding. Tr. 6/6/2023 556:9–17. The Belton repeating firearm was a superposed load firearm, which operated like a Roman candle, in which a single charge would ignite each subsequent charge until the firearm had fired all its rounds. Tr. 6/6/2023 557:14–558:9. While there is evidence that the Continental Congress offered to purchase 100 of these firearms for use in the Revolutionary War, there is no evidence that this firearm existed outside of a prototype. Tr. 6/6/2023 559:14–17; 560:3–12.

Repeating firearms were not commonly owned by civilians in the years immediately prior to, or following, the Founding of the United States of America in 1776. Repeating firearms were expensive and laborious to produce, and the technology was beyond the mechanical and technical capacity of most firearms manufacturers at the time. Tr. 6/6/2023 555:9–15; Tr. 6/7/2023 574:6; 577:6–11. Because of their rarity amongst civilians, these repeating firearms were viewed more as curiosities than as weapons for self-defense. Tr. 6/7/2023 576:18–20. And

large-capacity repeating firearms, which could fire more than ten rounds without reloading, likely did not exist in America prior to the Founding in 1776.[22]

Instead, the firearms most commonly possessed by civilians in the eighteenth century fell into four categories: muskets, rifles, pistols, and lighter smoothbore firearms used for hunting. Tr. 6/7/2023 630:24–631:4. An eighteenth-century musket held one round, and reloading it required the user to complete at least eight steps, including opening a paper cartridge with a premeasured amount of gunpowder and single ammunition ball, pouring some of the gunpowder into a priming pan, pouring the rest of the gunpowder into the muzzle of the musket, inserting the ammunition ball covered with the paper from the cartridge into the muzzle, and ramming the powder and ammunition together to form a seal. Tr. 6/7/2023 641:21–643:9. A well-trained militia person in the eighteenth century could fire two to three rounds per minute from a musket. Tr. 6/7/2023 643:10–17. An eighteenth-century rifle user could, at most, fire three rifle shots in two minutes. Tr. 6/7/2023 646:10–16. Reloading a rifle took longer than reloading a musket because there were no paper cartridges for rifles, meaning that a shooter had to use a gunpowder horn to pour the gunpowder into the muzzle. Tr. 6/7/2023 645:5–9. Reloading a rifle also required the shooter to put a grease patch, which was a greased piece of linen, between the gunpowder and the ammunition ball, to provide a seal between the two. Tr. 6/7/2023 645:10–22. An eighteenth-century smoothbore long gun was reloaded like a musket, in that it did not require

---

[22] Ashley Hlebinsky, whom Plaintiffs' offered as an expert on the history of firearms technology, testified that she "believed" that there was a twelve-shot Cookson-style firearm that existed in America prior to the Founding. Tr. 6/5/2023 218:15–219:9. On cross-examination, Ms. Hlebinsky was unable to offer any compelling evidence that suggests this firearm existed in America prior to 1776. *See generally* Tr. 6/5/2023 218:23–219:14. Aside from this firearm, Ms. Hlebinsky testified that she was not aware of any firearm capable of firing more than ten shots without reloading that existed in America prior to 1776. Tr. 6/5/2023 219:10–14.

a grease patch, but smoothbores also did not commonly use paper cartridges, such that reloading a smoothbore long gun took slightly longer than reloading a musket but was not as slow as reloading a rifle. Tr. 6/7/2023 647:2–3. An eighteenth-century pistol was reloaded like a musket, except that the pistol's size allowed the user to load slightly faster, such that it could be fired three to four times per minute. Tr. 6/7/2023 647:11–20.

Given these technological limits on firearms, interpersonal gun violence was not widespread in society prior to the middle of the nineteenth century. Tr. 6/7/2023 587:23–588:4. Between 1776 and 1860, only ten to fifteen percent of homicides between family members involved a firearm. Tr. 6/7/2023 587:7–9. Because most firearms were muzzleloading powder firearms, they were difficult to keep loaded and at the ready for self-defense or spontaneous violence due to the powder's corrosive properties. Tr. 6/7/2023 588:5–10.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: Repeating firearms were not commonly owned by civilians at the time of the Second Amendment's ratification in 1791. Repeating firearms that could fire more than ten rounds without reloading did not exist in America prior to 1791. Interpersonal gun violence was not a general societal concern in 1791.

### 2. Firearms and Weapons Regulations

Because *Bruen* instructs courts to consider how and why historical weapons regulations burdened the right to self-defense, this Court received evidence at trial regarding historical weapons regulations and the justifications underlying those regulations. *Bruen*, 142 S. Ct. at 2133.

Before 1791, firearms could not fire without gunpowder. Tr. 6/5/2023 227:9–22. Gunpowder in the eighteenth century was unstable and could lead to explosions and fires if

stored improperly. Tr. 6/5/2023 166:10–11; Tr. 6/8/2023 880:25–881:2. Because of these risks, gunpowder was subject to regulation throughout colonial America and, after 1776, throughout the early Republic. Tr. 6/8/2023 879:25–880:1. In the eighteenth and early-nineteenth centuries, gunpowder-related explosions posed a particular societal risk because of the lack of uniform safety codes or fire departments, meaning that even small fires could potentially turn catastrophic. Tr. 6/8/2023 880:25–881:8. Pre-1800, nine colonies or states passed laws limiting or regulating the possession, use, or sale of gunpowder. Maryland, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island, and Virginia all enacted laws regulating the storage of gunpowder. Ex. 640. Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island all enacted laws regulating the manufacture, inspection, sale, or ignition of gunpowder. Ex. 640. And Maryland and New York additionally enacted laws regulating the transport of gunpowder. Ex. 640.

Based on the above evidence, this Court makes the following finding: Large quantities of gunpowder posed a threat to public safety at the time of the Second Amendment's ratification in 1791. In the late-eighteenth century, colonies and states responded to this danger by regulating the amount of gunpowder that could be stored in a given area and placed restrictions on the manufacture, inspection, sale, and transport of gunpowder.

**B. Early-to-Mid-Nineteenth Century (1800-1850)**

**1. Firearms and Weapons Technology**

At the beginning of the nineteenth century, repeating firearms were still a rarity in American daily life. Defendants' expert Dr. DeLay testified about the existence of one repeating rifle in America in the period between 1791, when the Second Amendment was adopted, and 1830, when repeating pistols began to emerge onto the U.S. civilian market: the Girandoni

repeating firearm. The Girandoni repeating rifle was an air rifle created by an Italian gun maker

and was regarded, for its time, as the best repeating air gun available. Tr. 6/7/2023 572:16–21.

The Girandoni air rifle relied on a reservoir of compressed air to fire; to prime the reservoir such

that the firearm could fire without reloading, an individual had to complete 1,500 strokes of the

firearm's air pump, which made priming the gun a laborious process. Tr. 6/7/2023 573:16–21.

There is no evidence of the Girandoni air rifle existing in America prior to 1776. Tr. 6/7/2023

572:22–24. There is, however, evidence that a Girandoni air rifle was brought on the Lewis and

Clark expedition from 1803 to 1804. Tr. 6/7/2023 573:3–9.

Following the Founding in 1776 and the ratification of the Second Amendment in 1791,

most repeating firearms that appear in the historical record before the mid-nineteenth century are

all variations of the superposed system used by the Belton firearm. Tr. 6/7/2023 578:4–9. These

firearms enjoyed very limited success in the United States. Tr. 6/7/2023 578:15–16. A few

hundred of these superposed firearms were used by the U.S. Navy during the War of 1812. Tr.

6/7/2023 579:13–17. These superposed firearms did not enjoy any commercial success among

the public. Tr. 6/7/2023 580:10–15.

In the early nineteenth century, pistols remained single-shot, muzzleloading devices. Tr.

6/7/2023 724:7–8. Early nineteenth century pistols came in three traditional sizes: a large pistol

known as a horse pistol, which was designed to be carried for mounted combat, a mid-size pistol

known as a belt pistol, which was designed to be hung from a belt, and a pocket pistol, which

was designed to be concealed in a pocket. Tr. 6/7/2023 724:7–725:4.

In the 1820s, firearms moved from a flintlock ignition system, which relied on an

external charge caused by the friction of flint on steel to spark the firearm's charge, to a

percussion ignition system, which employed an internal combustion caused by pressure and a

41 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

chemical compound to spark the firearm's charge. Tr. 6/5/2023 182:16–183:2; Tr. 6/7/2023 581:9–16; 581:23–582:12. Around this time, firearms also moved from round-ball ammunition to a conically shaped projectile. Tr. 6/5/2023 183:2–4. Following these technological advancements, the first reliable repeating handguns began entering the civilian market in the 1830s. Tr. 6/7/2023 582:19–22. None were large-capacity firearms. Tr. 6/7/2023 586:2–9.

The first type of reliable repeating handgun, known as a pepperbox, was a handgun with multiple barrels that revolved around a single axis. Tr. 6/7/2023 582:23–583:3. A pepperbox could typically hold between three and six rounds, and reloading was a time-consuming process that involved multiple steps. Tr. 6/7/2023 584:23–585:1; Tr. 6/7/2023 584:8–12. The second type of reliable repeating pistol, known as a revolver, was a handgun with rotating chambers. Tr. 6/7/2023 582:25–583:2. The first commercially successful revolver was patented by Samuel Colt, and came to be known as the Colt revolver. Tr. 6/5/2023 183:14–16; Tr. 6/7/2023 583:6–10. A Colt revolver in the 1830s could hold between five and seven rounds, with the most common capacity being six rounds. Tr. 6/7/2023 584:18–21. It took a user five steps to reload a single chamber, meaning that it took a user thirty separate steps to fully reload a popular six-shot revolver. Tr. 6/7/2023 584:7–10. Colt revolvers did not become popular among the civilian population until the mid-to-late 1840s. Tr. 6/7/2023 726:2–10. Large-capacity pepperboxes or revolvers, which could fire more than ten rounds without reloading, were not common in the early or mid-nineteenth century. Tr. 6/7/2023 586:2–9. No large-capacity firearms, including revolvers or rifles capable of firing more than ten rounds without reloading, enjoyed any commercial success before 1860. Tr. 6/7/2023 586:5–9.

Based on the credible evidence presented at trial, this Court finds as follows: the first reliable repeating handguns entered the civilian market in the 1830s, but were not popular with

42 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

civilians until the mid-to-late 1840s. None of these handguns had a capacity of more than ten

rounds. No firearm with a capacity of more than ten rounds enjoyed any commercial success

before 1860.

### 2.   Firearms and Weapons Regulations

The beginning half of the nineteenth century saw a rise in "deadly weapons" regulations,

wherein local and state governments sought to regulate weapons viewed as being particularly

dangerous to public safety. Tr. 6/7/2023 713:16–20; 714:3–7; 721:8–11. Many of these weapons

were considered particularly dangerous because of how easily they could be concealed. Tr.

6/7/2023 721:10–14.

These "deadly weapons" regulations took various forms, largely related to the type of

weapon—or the feature of the deadly weapon—that the government sought to regulate. At the

beginning of the nineteenth century, for instance, the most popular pistols were single-shot,

muzzleloading devices. Tr. 6/7/2023 724:7–8. These pistols gave the user one shot, after which

the pistol would be essentially as useful as a bludgeon. Tr. 6/7/2023 717:6–8. Knives, on the

other hand, could be used as many times as the individual desired and could be exceedingly

deadly. Tr. 6/7/2023 717:9–12. Accordingly, laws regulating knives were often broad, trying to

capture as many kinds of fighting knives as possible, including "daggers," "dirks," "stilettos,"

"Arkansas tooth-picks," and others. Tr. 6/7/2023 717:13–16; *see, e.g.*, Ex. 636 at 2, 5. Often,

these laws took the form of anti-concealed carry statutes, which prohibited the carrying of a

concealed knife in public. Tr. 6/7/2023 714:13–18. An anti-concealed carry statute passed in

1813 in Louisiana, for instance, made it a criminal offense for any person to "be found with any

concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Ex. 636 at

33.

43 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

These laws typically did not ban possession of knives outright, however, because of the relative simplicity and commonality of knives as a household item. Tr. 6/8/2023 868:14–19. Governments in early-to-mid-nineteenth century America lacked the type of policing infrastructure necessary to ban possession of a common and easily made item. Tr. 6/8/2023 868:6–19. Instead, these laws sought to prevent what was viewed as the most dangerous feature of a knife: its ability to be concealed on a person in public places. Tr. 6/7/2023 721:11–14. Often, concealed carry laws that restricted the carrying of knives contained exceptions for ordinary pocketknives. *See, e.g.*, Ex. 636 at 15, 78, 87.

Regulations in the early to mid-nineteenth century also targeted a specific type of knife, known as a Bowie knife. A Bowie knife is a long, large knife, typically six or more inches in length, with a guard on the handle and a double-edge blade near the tip. Tr. 6/7/2023 718:5–11. While it is difficult to gauge in numerical terms the popularity of Bowie knives during the nineteenth century, Bowie knives were frequently reported as being associated with crime in the mid-nineteenth century. Tr. 6/7/2023 719:22–720:4. Defendants' expert Dr. Brennan Rivas testified that, from these reports, she could conclude that there was a significant amount of societal concern associated with the carrying of Bowie knives, and particularly with the concealed carrying of these knives. Tr. 6/7/2023 720:25–721:3.

Governments responded to the carrying of Bowie knives by enacting laws criminalizing their concealed carry. Tr. 6/8/2023 865:19–25. Prior to 1850, four states prohibited the concealed carrying of Bowie knives. Tr. 6/8/2023 866:21–22; Ex. 639. Bowie knives were particularly regulated via concealed carry statutes because the ability to conceal a Bowie knife was thought to render the weapon particularly dangerous. Tr. 6/7/2023 721:10–20.

44 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

The early and mid-nineteenth century also saw a rise in interpersonal violence and murder, particularly in the American South. Tr. 6/8/2023 877:17–21. Much of this violence involved pistols, which at this time were still typically single-shot, muzzleloading devices. Tr. 6/7/2023 724:7–8; Tr. 6/8/2023 877:20–21. Governments responded to this rise in interpersonal violence by enacting anti-concealed carry laws targeting pistols. Tr. 6/8/2023 877:21–23. These concealed carry laws often targeted pocket pistols specifically, which were the smallest size of pistol and were readily concealable. A Memphis city ordinance passed in 1826, for instance, prohibited the carry—open or concealed—of any pocket pistol. Ex. 636 at 77. New Jersey also specifically targeted pocket pistols in its anti-concealed carry law. Ex. 636 at 52. Between 1800 and 1850, eleven states or municipalities enacted regulations prohibiting the concealed carry of pistols. Ex. 634. Some of these laws, such as those passed in Alabama and Arkansas, exempted individuals who were "upon a journey." Ex. 636 at 2, 8.

Some laws went beyond prohibiting the concealed carry of weapons that were considered particularly dangerous. In Florida, for instance, an 1838 law made it unlawful for anyone to sell pocket pistols without first paying a yearly fee. Ex. 636 at 19. The same 1826 Memphis law that outlawed the carrying of pocket pistols also made it a misdemeanor to sell a Bowie knife. Ex. 636 at 76–77. In Alabama, an 1837 law imposed greater criminal penalties for the use of a Bowie knife and taxed the sale or gift of Bowie knives; two years later, Alabama passed another law prohibiting the concealed carry of Bowie knives. Ex. 636 at 1–2.

Based on the credible evidence presented at trial, this Court finds as follows: State and municipal governments in the beginning half of the nineteenth century regulated weapons viewed as being particularly dangerous to public safety. These regulations were tailored to address the particular features of the weapons that made them most dangerous to public safety.

45 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**C. The Civil War and Reconstruction (1850-1880)**

**1. Firearms and Weapons Technology**

In the mid-nineteenth century, metallic cartridges for firearms, which combined primer, propellant, and projectile into a single package that could be loaded in one step, were introduced onto the American market. Tr. 6/7/2023 589:9–15. In the decades before the Civil War began in 1861, another technological advancement paved the way for reliable repeating rifles: breech loading, wherein a firearm user could load their firearm through the breech, or the rear of the barrel, as opposed to the muzzle, or the front of the barrel. Tr. 6/7/2023 609:25–610:7. Between 1811 and 1860, there was a flurry of patent activity around breech loading firearms, with various gun manufacturers attempting to perfect the technology. Tr. 6/7/2023 609:21–22; 610:16–21. Towards the beginning of the Civil War, gun manufacturers began combining breech loading and metallic cartridges with levers that could cycle spent casings and new rounds into firearms. Tr. 6/7/2023 590:1–8.

This combination of metallic cartridges, breech loading, and lever-action technology first appeared in the 1840s and improved through the 1850s. Tr. 6/7/2023 590:9–13. In the 1860s, the Henry and Winchester rifles, which were lever-action firearms, became the first large-capacity repeating firearms to enjoy limited commercial success in the United States. Tr. 6/7/2023 590:14–591:2. Both rifles had a capacity of more than ten rounds. Tr. 6/7/2023 591:14–16. Unlike modern detachable LCMs, both rifles relied on a fixed magazine and lever to cycle spent metallic cartridges out of the chamber and cycle new metallic cartridges into the chamber. Tr. 6/7/2023 590:1–20. An individual using a Winchester or Henry could fire their rounds only as quickly as they could work the lever and trigger. Tr. 6/7/2023 651:1–3. Both models required the user to reload the rounds one by one after the fixed magazine had been emptied. Tr. 6/7/2023

46 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

593:4–8. The Henry rifle, which came onto the market in 1860, required the user to insert rounds

through the tip of the firearm's magazine, which was located near the muzzle of the rifle. Tr.

6/7/2023 591:3–10. The Winchester rifle, which came onto the market in 1866, improved upon

this technology by allowing the user to load cartridges through a side gate on the rifle. Tr.

6/7/2023 591:7–10.

Between 1861 and 1872, there were 74,000 Henry and Winchester rifles produced; of

those, about 65,000 were exported to foreign militaries and 8,500 were purchased by or for

officers in the Union Army during the Civil War, leaving just 500 for the civilian market. Tr.

6/7/2023 594:4–21. According to Dr. DeLay's estimates, large-capacity firearms accounted for

less than 0.002 percent of firearms in the United States at the time of the ratification of the

Fourteenth Amendment in 1868. Tr. 6/7/2023 595:18–22. This Court finds that, while large-

capacity repeating firearms became commercially available in the United States around 1860,

they nevertheless represented an exceedingly small portion of the U.S. civilian gun stock at that

time.

The mid-nineteenth century also saw a proliferation in the production of revolvers. Colt's

patent on the revolver expired in 1857, at which point various other firearms manufacturers

began making their version of a revolver. Tr. 6/7/2023 727:16–24. At the beginning of the Civil

War, these manufacturers obtained government contracts to produce revolvers for the military.

Tr. 6/7/2023 727:23–25. These contracts allowed manufacturers to vastly increase their

production of revolvers. Tr. 6/7/2023 727:24–728:1. When the Civil War ended in 1865, these

manufacturers turned to the civilian market to continue selling revolvers at the level they had

previously been producing for the military. Tr. 6/7/2023 728:1–7. The revolvers had an

ammunition capacity of less than eleven rounds. Tr. 6/7/2023 726:23–724:4. The rise in

47 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

production of these handguns also led to a drop in price. Tr. 6/8/2023 878:11. In the years

immediately following the Civil War, a Colt revolver sold for about thirty-two dollars; by the

end of the nineteenth century, an individual could purchase a working handgun for just two

dollars. Tr. 6/8/2023 878:12–14.

      Accordingly, based on the credible evidence presented at trial, this Court finds as

follows: The first large-capacity repeating rifles entered the U.S. civilian market in the 1860s.

These rifles used fixed magazines, could only be fired as quickly as the user could work the lever

and trigger, and required rounds to be loaded one at a time after the user had fired all the rounds

in the magazine. The Henry and Winchester rifles were not commonly owned by U.S. civilians at

the time of the Fourteenth Amendment's ratification in 1868. The expiration of Colt's patent led

to an increase in the number of revolvers produced by firearms manufacturers. These revolvers

were sold to the military before and during the Civil War. Following the Civil War, gun

manufacturers began selling revolvers to U.S. civilians in larger quantities. The existing

revolvers did not allow an individual to shoot more than ten rounds without reloading.

### 2.  Firearms and Weapons Regulations

      The proliferation of relatively inexpensive revolvers in the U.S. civilian market following

the end of the Civil War led to an increase in interpersonal violence involving firearms. Tr.

6/8/2023 877:24–878:3. The influx of these revolvers, which could fire multiple rounds—

although less than ten—without needing to be reloaded, injected a new and more lethal

technology into the already rising rates of violence and crime throughout the county. Tr.

6/7/2023 729:6–15. In response, states enacted statutes specifically targeted at revolvers, and

primarily targeted the concealed carry of these revolvers, which was considered a particularly

dangerous feature of these weapons. Tr. 6/7/2023 732:5–12.

From the beginning of the Civil War in 1861 through to the end of the nineteenth century, at least nine states and territories passed anti-concealed carry statutes that specifically prohibited the concealed carrying of revolvers. Ex. 636 at 5, 14, 41, 58, 67, 70, 78, 88, 91. Cities in Illinois, Iowa, Kansas, Missouri, Nebraska, and Washington also passed anti-concealed carry statutes specifically prohibiting the concealed carry of revolvers. Ex. 636 at 25, 26, 28, 29, 46, 47, 50, 51, 87, 88. Still other states passed broad anti-carry laws prohibiting the carry of revolvers, concealed or otherwise, with any intent to do harm. A West Virginia law from 1882, for instance, made it a misdemeanor for someone to "carry about his person *any* revolver." Ex. 636 at 89 (emphasis added). A Syracuse, New York law from 1885 also prohibited the carry, concealed or otherwise, of revolvers with "intent to do bodily harm to any person." Ex. 636 at 60. Notably, all laws that mention "revolver" specifically were enacted after 1860, mirroring the surge of revolvers entering the civilian market after the Civil War. *See generally* Ex. 636.

In the years leading up to and after the Civil War, states also continued to regulate the carrying of Bowie knives. Fourteen states banned the concealed carry of Bowie knives between 1850 and 1875. Ex. 639. An additional six states enacted laws that completely prohibited the carry, concealed or otherwise, of these knives. Ex. 639. Between 1875 and 1900, twenty-two states had laws prohibiting the concealed carry of Bowie knives. Ex. 639. As with mid-nineteenth century regulations on Bowie knives, some states also went beyond prohibiting the concealed carry of Bowie knives to prohibit the sale or transfer of these weapons. An 1881 Arkansas law, for instance, made it a misdemeanor to sell, barter, exchange, or furnish a Bowie knife "in any manner" to "any person." Ex. 903 § 3.

In the mid-to-late nineteenth century, a weapon known as a slungshot—which was a handheld weapon with a piece of metal, stone, or some similar type of weighted object attached

to a flexible strap or handle—became widely associated with criminal and gang violence. Tr. 6/8/2023 870:21–871:7. Slingshots were considered particularly dangerous due to their relatively small size, which made them easy to conceal. Tr. 6/8/2023 871:10. The slingshot's flexible handle also magnified its striking power, meaning that the user could inflict more damage than with other kinds of blunt objects. Tr. 6/8/2023 871:10–14. States and local governments responded to the proliferation of the slingshot largely by prohibiting the carry, and particularly the concealed carry, of these weapons. Tr. 6/8/2023 871:5–7. Between 1850 and 1875, sixteen states and municipalities enacted laws regulating the concealed carry of slingshots. Ex. 634; Ex. 636. Between 1875 and 1900, thirty-one states and municipalities enacted laws regulating the carry of slingshots. Ex. 634. States also regulated the carrying of blunt objects and bludgeons more generally, with eight states passing regulations on bludgeons and thirteen states passing regulations on billy clubs, the equivalent of a modern-day baton or night stick, between 1875 and 1900. Ex. 634.

In the late nineteenth century, states also passed laws regulating the use of trap guns, which were conventional firearms rigged with a wire or other device to fire without the firearm operator being physically present. Tr. 6/8/2023 874:18–23; 876:5–11. Trap guns were particularly dangerous because they did not need an operator present to fire, which meant that trap guns could fire at unintended targets or victims. Tr. 6/8/2023 874:25–875:11. While the earliest regulation on trap guns was passed in New Jersey in 1771, by the end of the nineteenth century, eleven states had passed regulations on trap guns. Ex. 633. By 1925, this number would grow to fourteen states. Ex. 633.[23]

---

[23] In addition to these fourteen states, there is evidence of an individual being criminally prosecuted for setting a trap gun in New York and Missouri. *See* Ex. 633.

50 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: In the mid-to-late nineteenth century, the proliferation of revolvers among the U.S. civilian population led to an increase in these weapons being used for interpersonal violence. As they had done in the early nineteenth century, governments responded to this rise in violence by regulating the feature of revolvers thought to contribute most to their dangerousness—their ability to be easily concealed. Governments also responded to a rise in the use of dangerous weapons like Bowie knives, trap guns, and slungshots by enacting regulations that targeted the features that made these weapons particularly dangerous.

### D.  Late Nineteenth and Early Twentieth Century (1880 to 1940)

#### 1.  Firearms and Weapons Technology

Firearms were not designed around detachable magazines until the end of the nineteenth century, and it was rare to see the word "magazine" used in connection with firearms before 1900. Tr. 6/7/2023 597:19–25; 774:6–11. Semi-automatic firearm technology was developed around the end of the nineteenth century and the beginning of the twentieth century, first in Europe and then spreading to the United States. Tr. 6/8/2023 1006:11–13. Most semi-automatic handguns in the early twentieth century had detachable magazines, and most held a capacity of seven to eight rounds. Tr. 6/8/2023 1009:10–14. The most important semi-automatic handgun to enter the U.S. market in the early twentieth century was the Colt 1911, which was developed by an American firearms developer in collaboration with the Colt Firearms Company. Tr. 6/8/2023 1006:21–22; 1007:15–17. The Colt 1911 held seven rounds in the magazine and an additional round in the chamber, for a total capacity of eight rounds. Tr. 6/8/2023 1008:4–6. The Colt 1911 began to circulate in the United States most commonly after World War I, resulting from a post-war surplus of these pistols. Tr. 6/8/2023 1008:12–14.

The first fully-automatic handheld firearm marketed to U.S. civilians was the Thompson sub-machine gun, also known as the "Tommy gun." Tr. 6/8/2023 1010:23–25. The Thompson sub-machine gun was initially developed for use in World War I, which ended in 1918, and entered the U.S. market in the 1920s. Tr. 6/7/2023 601:25–602:3. The Thompson sub-machine gun was marketed to civilians for self-defense, but eventually became associated with criminal activities including police shootings and intergang warfare. Tr. 6/8/2023 883:24–884:4; 1010:10–12.

Also around the 1920s, large-capacity ammunition feeding devices—the type of detachable magazines capable of holding more than ten rounds that are associated with modern-day LCMs—first became commercially available in the United States. Tr. 6/8/2023 885:16–886:1. These devices were initially developed for military use and allowed soldiers to fire without pausing to reload. Tr. 6/8/2023 886:4–19.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: Detachable magazines capable of holding more than ten rounds of ammunition, and automatic firearms were invented for military-use in World War I. Semi-automatic firearms were invented in Europe in the late nineteenth century and spread to the United States in the early twentieth century. The most popular semi-automatic handgun in the early twentieth century held a total of eight rounds. The first fully-automatic handheld firearm marketed to U.S. civilians was the Thompson sub-machine gun, which was marketed for self-defense but became widely associated with violence and criminal activity.

### 2.  Firearms and Weapons Regulations

As revolvers continued to enter the civilian market in the late nineteenth century and early twentieth century, anti-concealed carry laws specifically prohibiting the carrying of

52 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

revolvers continued to spread across the country. Between 1900 and 1930, five more states and territories passed laws prohibiting the concealed carry of revolvers, among other deadly weapons. Ex. 636 at 24, 29, 56, 62, 65. Additionally, California and Massachusetts prohibited the carry, concealed or otherwise, of a revolver with unlawful intent. Ex. 636 at 12, 41.

States also responded to the proliferation of automatic and semi-automatic firearms in the early twentieth century. Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in many instances, prohibiting the possession of a fully-automatic firearm. Tr. 6/8/2023 884:10–12. In 1934, the federal government began regulating machine guns through the National Firearms Act, which required firearms manufacturers and importers to register machine guns before those guns could be imported, made, or transferred. 26 U.S.C. §§ 5841, 5845.[24] At least twenty-three states enacted regulations between 1920 and the early 1930s restricting magazine capacity by restricting possession or use of guns that could fire more than a certain number of rounds without reloading. Tr. 6/8/2023 887:13–16.

At least six states, plus the District of Columbia, enacted restrictions on semi-automatic weapons capable of firing a certain number of rounds without reloading. These restrictions varied in the maximum capacity they allowed. Tr. 6/8/2023 888:24–25. A 1927 Massachusetts law defined a machine gun to include "[a]ny gun of small arm calibre designed for rapid fire and operated by a mechanism" that could shoot more than one round without reloading, and prohibited possession of this type of gun. Ex. 635 at 13. Michigan, in 1927, made it illegal to manufacture, sell, or possess any machine gun or firearm capable of firing more than sixteen

---

[24] In 1986, Congress passed the Firearm Owners' Protection Act, which bans, with certain limited exceptions, the possession and transfer of machine guns made after May 19, 1986. 18 U.S.C. § 922(o). This law is still in effect.

53 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

times without reloading. Ex. 635 at 14. Minnesota passed a law in 1933 that outlawed any firearm capable of automatically reloading after each shot and that had a capacity of more than twelve rounds. Ex. 635 at 14. In 1933, Ohio passed a law limiting possession of semi-automatic firearms that could fire more than eighteen rounds without reloading. Ex. 635 at 20. Rhode Island passed a law in 1927 that banned the sale, purchase, or possession of machine guns, defined to include any weapon that shoots more than twelve shots semi-automatically without reloading. Ex. 635 at 23. In Virginia, a 1934 law made it illegal to possess or use a machine gun for an offensive purpose, and defined machine gun to include a weapon that could fire more than seven bullets semi-automatically from a magazine. Ex. 635 at 30. And the District of Columbia, in 1932, passed a law prohibiting possession of any gun that could fire, automatically or semi-automatically, more than twelve shots without reloading. Ex. 635 at 3. This law was passed by Congress and was modeled heavily after a uniform law created by the Uniform Law Commission. Tr. 6/8/2023 891:21–892:13. In some instances, states that restricted semi-automatic or fully-automatic firearms allowed possession if an individual obtained a permit. Tr. 6/8/2023 917:10–11; 921:4–15.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: As semi-automatic and fully-automatic firearms and ammunition feeding devices became increasingly popular in the early twentieth century, governments responded by passing regulations limiting the possession and use of these firearms. Prohibitions on the possession of automatic firearms were widespread. Prohibitions on the possession of semi-automatic firearms were also common, with six states plus the District of Columbia prohibiting these weapons. These regulations functionally limited magazine capacity, because they prevented individuals from possessing firearms that could fire over a certain number of rounds without reloading.

54 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## VII.    CONCLUSIONS OF LAW

### A.  Second Amendment

#### 1.  BM 114's LCM restrictions do not violate the Second Amendment.

When assessing whether BM 114 violates the Second Amendment under *Bruen*, this Court must first consider whether the plain text of the Second Amendment covers conduct that BM 114 restricts. If the Second Amendment does not cover the restricted conduct, then BM 114 is constitutional. If the Second Amendment does cover the restricted conduct, then the State of Oregon must demonstrate that BM 114 is consistent with the Nation's history and tradition of firearm regulation. As explained below, at both steps, this Court finds that BM 114's LCM restrictions do not violate the Second Amendment.

#### a.  LCMs are not covered by the Second Amendment.

##### i.    LCMs are not "bearable arms."

When assessing whether a regulation of a particular weapon violates the Second Amendment, courts begin by asking whether the weapon constitutes a "bearable arm." *Heller*, 554 U.S. at 582. ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the Founding.") Recently, the Supreme Court clarified that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. This means that a firearm need not have existed in 1791 to be considered a "bearable arm" protected by the Second Amendment.

Courts have held that handguns are "bearable arms" as contemplated by the Second Amendment. *See Heller*, 554 U.S. at 628 (defining handguns as arms). And courts have found that the Second Amendment "protects ancillary rights necessary to the realization of the core

right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th

Cir. 2017). Within the Ninth Circuit, these "ancillary rights" have included accessories like

bullets, without which "the right to bear arms would be meaningless." *Jackson v. City and Cnty.*

*of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015),

*abrogation on other grounds recognized by United States v. Alaniz*, 69 F.4th 1124, 1127–28 (9th

Cir. 2023).

BM 114 restricts LCMs, which are a subset of magazines. *See* Ex. 1 § 11(1)(d) (defining

LCMs); Tr. 6/8/2023 885:6–8. Magazines are an accessory to firearms, rather than a specific

type of firearm. Tr. 6/6/2023 523:5–7. At the time of the Second Amendment's ratification

through to the late nineteenth century, firearm accessories like cartridge boxes—which held

ammunition but, unlike modern magazines, did not feed the ammunition into firearms—were not

considered "arms" but instead were considered "accoutrements." Tr. 6/7/2023 767:4–9; 767:22–

23; 768:5–9.

Nevertheless, just because a magazine is an accessory does not mean that it fails to

qualify as a "bearable arm" as that term is used in Second Amendment jurisprudence. Like

bullets, magazines are often necessary to render certain firearms operable. Tr. 6/6/2023 523:10–

19. The Ninth Circuit has recognized a "corollary, albeit not unfettered, right to possess the

magazines necessary to render . . . firearms operable." *See Fyock v. Sunnyvale*, 779 F.3d 991,

998 (9th Cir. 2015). "Without a magazine, many weapons would be useless, including

'quintessential' self-defense weapons like the handgun." *Duncan v. Becerra*, 970 F.3d 1133,

1146 (9th Cir. 2020) (citation omitted), *rev'd en banc on other grounds, Duncan v. Bonta*, 19

F.4th 1087 (9th Cir. 2021), *vacated on other grounds*, *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).

This case, however, is not simply about the constitutionality of all magazines generally; it is about magazines that allow the user to shoot eleven or more rounds without reloading. Both Plaintiffs' and Defendants' experts testified that LCMs are a subset of magazines. Tr. 6/5/2023 65:14–17; 68:4–9. This Court therefore must decide whether LCMs specifically are necessary to render firearms operable. Based on the evidence presented at trial, this Court finds that while magazines may often be necessary to render a firearm operable, LCMs are not. Plaintiffs' expert Mark Hanish, a firearms marketing executive with approximately twenty years of experience in the industry, testified that a magazine with a capacity of ten rounds "performs the same basic function" as an LCM in that both "deliver[] ammunition to the action." Tr. 6/5/2023 128:11–12. Mr. Hanish also testified that, aside from the number of rounds available to the user, the mechanical function of a firearm is the same whether that firearm is equipped with a magazine with a ten-round capacity or equipped with an LCM. Tr. 6/5/2023 127:19–23. Defendants' expert Jim Yurgealitis likewise testified that "magazine capacity is not a determining factor in operability of a firearm" and that "any firearm that will accept a ten-round magazine will function identically . . . as it would with a larger capacity magazine." Tr. 6/6/2023 527:4–5; 527:14–16.

The evidence received at trial also shows that most firearms that accept detachable LCMs can accept detachable magazines that hold ten or fewer rounds of ammunition. Tr. 6/5/2023 76:5–8. Mr. Yurgealitis, for instance, testified that most major firearms manufacturers have some variation of specific firearm models, such as the AR-15-style rifles, which can accept a detachable magazine with ten rounds or less in capacity. Tr. 6/6/2023 524:9–11. Mr. Yurgealitis also testified that popular firearm models like the Glock semi-automatic pistol, the Beretta pistol,

and most AR-15-style rifles "will function with a ten-round magazine . . . as well as [they] would with a larger capacity magazine." Tr. 6/6/2023 527:10–13.

In sum, the evidence at trial shows that while magazines may be necessary to render firearms operable, LCMs, as a subset of magazines, are never necessary to render firearms operable. A firearm is not useless without an LCM because magazine capacity is not a determining factor in the operability of a firearm. And the right to bear arms does not become "meaningless" because the government chooses to restrict LCMs. Unlike the total handgun ban in *Heller*, for instance, BM 114 does not restrict "an entire class of 'arms,'" but merely a subset of an accessory to firearms. *See Heller*, 554 U.S. at 628. Notably, BM 114 does not restrict the number of ten-round magazines individuals may own or carry at any one time. BM 114 simply requires that the user reload after expelling ten rounds. Nor does it limit the type of firearm that an individual may carry for self-defense. Because most popular gun models accept both LCMs and magazines that hold ten or fewer rounds, individuals are still free to choose any type of firearm that best suits their needs—from semi-automatic handguns to semi-automatic rifles—so long as that firearm cannot fire eleven or more rounds without reloading. Accordingly, this Court finds that LCMs are not "bearable arms" as that term is used in Second Amendment jurisprudence.

### ii.    LCMs are not in common use today for self-defense.

Even if this Court were to find that LCMs are "bearable arms," that would not end this Court's inquiry into whether LCMs are covered by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. In considering the scope of the Second Amendment right, the Supreme Court in *Heller* emphasized that it protects an individual right to keep and bear arms "'in common use' . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. In *Bruen*, the Supreme Court reemphasized *Heller*'s central holding, stating that the Second Amendment

58 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

extends only to bearable arms that are "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). This Court accordingly considers whether Plaintiffs have shown that LCMs are in common use, and whether they are in common use for self-defense.

### (a) Are LCMs "in common use"?

As announced in *Heller* and reiterated in *Bruen*, the Second Amendment extends only to bearable arms that are in "common use." *Id.* Pre-*Bruen*, courts struggled to reach a consensus framework for deciding what renders a firearm "in common use" as stated in *Heller*. *See, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("The record shows that perhaps 9 [percent] of the [N]ation's firearms owners have assault weapons, but what line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say."); *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) ("[T]here is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use."). This lack of a unifying framework often led courts to apply divergent approaches, *compare Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 788 (D. Md. 2014) (considering whether assault weapons comprise a high percentage of the overall civilian gun stock) *with Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (considering only the absolute number of assault weapons and LCMs sold), or more commonly, to sidestep the question altogether, *see, e.g.*, *Duncan*, 19 F.4th at 1103; *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019); *Ass'n. of N.J. Rifle and Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018).

Despite this ambiguity, *Bruen* itself declined to clarify the metric by which courts should determine whether a firearm is "in common use." Instead, the Supreme Court repeated *Heller*'s

59 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

observation that the Second Amendment "protects the possession and use of weapons that are 'in common use at the time'" and found, without identifying any particular evidence, that handguns "are weapons 'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2128, 2134 (citations omitted).

Without clear guidance from binding authority, this Court is forced to determine which metric is most appropriate for evaluating "common use." Is it sufficient, for instance, for a court to consider the absolute number of LCMs sold in the United States? Or should a court consider the percentage of LCMs relative to the overall civilian gun stock in the United States? Should a court consider not only the absolute number of LCMs, but the number of Americans that own those LCMs? And if this ratio suggests that a relatively small percentage of gun owners possess a disproportionate number of LCMs, does that mean that LCMs are not commonly owned?

Plaintiffs argue that, of these potential options, only the absolute number of LCMs possessed by Americans is relevant. To support their argument, Plaintiffs rely on the NSSF Magazine Chart, which they say shows that Americans possessed 160 million detachable LCMs between 1990 and 2018, or roughly 52 percent of all detachable magazines possessed during that period. Ex. 33 at 7. NSSF Director of Research Salam Fatohi testified that this data comes from three sources. Tr. 6/6/2023 359:21–25. First, the NSSF collects data related to the number and type of firearms produced from two government sources: the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Annual Firearms Manufacturing and Exportation Report ("AFMER") and the U.S. International Trade Commission ("ITC"). Tr. 6/6/2023 362:24–25. Then, the NSSF asks industry members—firearms manufacturers, distributors, and retailers—to tell them how many magazines, and of what capacity, they typically ship with a given type of firearm. Tr. 6/6/2023 368:1–8. The NSSF then uses those "industry insights" to extrapolate the

60 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

total number of magazines possessed relative to the number and type of firearms produced. Tr. 6/6/2023 368:10–22.

　　This Court is unable to give this evidence significant weight for two reasons. First, though the chart itself is labeled as "magazines in possession," Mr. Fatohi testified that the chart shows the number of firearms *produced* as opposed to firearms actually purchased and therefore possessed. Tr. 6/6/2023 386:23–387:7. For the chart to reflect magazine possession, in other words, this Court must assume that every firearm produced in the country is subsequently sold to U.S. consumers. Plaintiffs failed to present evidence to support such an assumption. Second, Mr. Fatohi testified that he did not know how many industry members supplied information from which the number of magazines was extrapolated. Tr. 6/6/2023 377:15–20. Indeed, he testified that it was "possible" that this data was extrapolated from information provided by only two industry members or up to 200 industry members. Tr. 6/6/2023 377:21–22. Without knowing how many industry members supplied information, this Court cannot determine whether the numbers in the NSSF chart represent a fair extrapolation of detachable magazine possessed by consumers. If those industry members that supplied the data distribute fewer magazines than is typical within the industry, for instance, the chart could underestimate the number; if, on the other hand, the members distribute more magazines than is typical, the chart could overestimate the number. Without more information, this Court cannot be confident in the NSSF's extrapolation of magazine possession from government data on firearm production.

　　Nevertheless, this Court accepts the parties' stipulation that magazines holding more than ten rounds of ammunition are owned and possessed by millions of Americans. ECF 206 at ¶ 49. In closing argument, Plaintiffs' counsel argued that if a firearm or firearm accessory is owned by at least 200,000 or more individuals, then it merits constitutional protection as "in common use."

61 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Tr. 6/9/2023 1102:15–1103:12. Plaintiffs therefore argue that even if this Court were to find only that magazines that hold more than ten rounds of ammunition are owned and possessed by millions of Americans—a number that is clearly higher than Plaintiffs' 200,000 threshold—it would need to find that those magazines are protected by the Second Amendment. This Court need not decide whether the metrics offered by Plaintiff are sufficient to show common use because there is an additional component to the *Bruen* analysis—that is, the common use must be related to self-defense.

### (b) "Common use" alone is insufficient to establish Second Amendment Protection.

This Court finds that, while magazines that hold more than ten rounds of ammunition are owned and possessed by millions of Americans, this fact alone does not automatically entitle these magazines to Second Amendment protection. This Court rejects Plaintiffs' invitation to equate "commonly owned" with "in common use today for self-defense." Tr. 6/9/2023 1102:23–1103:7; *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Under Plaintiffs' interpretation, if the firearms industry were able to successfully market a firearm or firearm accessory to 200,000 Americans—which is 0.0006 percent of the overall U.S. population—then the firearm or firearm accessory would be constitutionally protected, regardless of that firearm or firearm accessory's features or typical use. *See Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc) (noting that there are "over 330 million people" in the United States). Plaintiffs' argument would make "commonality" the dispositive inquiry, and would erase any consideration of how firearms or firearm accessories are used. This Court finds such an interpretation troubling for several reasons.

First, this Court notes that firearm manufacturers and dealers make decisions that both limit consumer choice and magnify the commonality of LCMs. At trial, Plaintiffs' witness

Jessica Harris testified that at her store, all firearms that do not have a fixed magazine come with a detachable magazine, and that many firearms come from the factory with multiple magazines. Tr. 6/5/2023 41:7–9; 44:16–19. The Glock 19, for instance, is sold with three fifteen round magazines. 6/5/2023 Tr. 67:9–10. The Sig Sauer P320, another popular handgun model, comes from the factory with either two or three detachable magazines that hold anywhere from fifteen to twenty-one rounds. Tr. 6/5/2023 67:12–17. Plaintiffs' witnesses also testified that a number of popular firearm models, such as the AR-style rifle, come standard with LCMs. Tr. 6/5/2023 43:21–25. This evidence illustrates that the commonality of LCMs is at least partially due to choices made by firearms manufacturers and dealers rather than firearm purchasers. The absolute number of LCMs owned, then, is not necessarily reflective of an affirmative choice by consumers. Further, this evidence adds little to the determination of whether LCMs are commonly used for "ordinary self-defense needs." *Bruen*, 142 S. Ct. at 2156.

Additionally, this Court notes the inherent tension in allowing the firearms industry to control the bounds of the Second Amendment because of the firearm industry's economic interest in the increased sale of firearms. At trial, Plaintiffs' expert Mark Hanish testified that magazines usually cost somewhere between twelve and twenty-five dollars. 6/5/2023 Tr. 130:11–13. Using Plaintiffs' estimate of 160 million LCMs as a baseline and considering the lowest estimate for the average cost of a magazine, this Court finds that the sale of LCMs approached two billion dollars between 1990 and 2018. Mr. Hanish, who testified that he would not support any regulation on magazine capacity of any kind (even regulations on 100-round magazines), Tr. 6/5/2023 151:11–12, also testified that his personal economic investments in the firearms industry exceed one million dollars, Tr. 6/5/2023 149:16–18. This Court declines to

adopt an interpretation of the Second Amendment that solely allows those with the greatest economic interest in the sale of LCMs to define the boundaries of a constitutional right.

This Court does not mean to suggest that the realities of the firearms market—including the economic interest of firearms dealers and manufacturers, or marketing decisions made by these entities—should have no bearing on whether a firearm or firearm accessory is in common use for self-defense. This Court simply holds today that the popularity of a firearm or firearm accessory alone cannot be dispositive when considering whether that item is "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Instead, this Court finds that the standard requires consideration of not only the commonality of the firearm or firearm accessory in question, but also the *use* of that firearm or firearm accessory. This Court therefore next considers whether Plaintiffs have shown that LCMs are in common use for the lawful purpose of self-defense. *See Heller*, 554 U.S. at 624.

### (c) The Second Amendment protects an individual's right to possess a firearm for use in self-defense.

In considering the scope of the Second Amendment, the Supreme Court in *Heller* focused largely on the concept of self-defense, noting for instance that at the time of the Second Amendment's adoption, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. Moreover, in assessing whether the District of Columbia's ban on assembled handguns in the home passed constitutional muster, the Supreme Court focused squarely on the issue of self-defense, noting that "the inherent right of self-defense has been central to the Second Amendment right" and that the handgun was "overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628. The District's ban was particularly violative of the Second Amendment, the Supreme Court held, because it prohibited handguns in "the home, where the need for defense of self, family,

64 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

and property is most acute." *Id.* The Supreme Court thus ultimately held that the challenged

regulation "makes it impossible for citizens to use them for the core lawful purpose of self-

defense and is hence unconstitutional." *Id.* at 630.

The Supreme Court cases that follow *Heller* emphasize that self-defense is the central

right protected by the Second Amendment.[25] In *McDonald v. City of Chicago*, for instance, the

Supreme Court reiterated that *Heller* found that "the Second Amendment protects the right to

keep and bear arms *for the purpose of self-defense*." 561 U.S. 742, 749 (2010) (emphasis added).

The Supreme Court also observed that this "core lawful purpose of self-defense" is "deeply

rooted in this Nation's history and tradition." *Id.* at 767–68 (citations omitted). *McDonald* also

stated that the central holding in *Heller* is "that the Second Amendment protects a personal right

to keep and bear arms for lawful purposes, *most notably for self-defense* within the home." *Id.* at

780 (emphasis added).

*Bruen* continues this trend. First, *Bruen* notes that *Heller* and *McDonald* "recognized that

the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to

possess a handgun in the home *for self-defense*." 142 S. Ct. at 2122 (emphasis added); *see also*

*id.* at 2128 (explaining that *Heller* held that "the Second Amendment protected an individual

right to armed self-defense" and "relied on the historical understanding of the Amendment to

---

[25] Indeed, at nearly every turn, some justices have found it important to individually re-emphasize the Second Amendment's central purpose of self-defense. In dissenting from a denial of certiorari, for instance, Justice Thomas wrote that self-defense is "a basic right and the central component of the Second Amendment's guarantee of an individual's right to keep and bear arms." *Jackson v. City and Cnty. of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., dissenting) (internal quotation marks omitted) (citation omitted). And in a concurrence to an opinion that considered the Second Amendment and stun guns, Justice Alito wrote that the individual right to keep and bear arms "vindicates the basic right of individual self-defense." *Caetano v. Massachusetts*, 577 U.S. 411, 413 (2016) (Alito, J., concurring) (internal quotation marks omitted) (citations omitted).

65 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

demark the limits on the exercise of that right"). And when considering the metrics against which courts should evaluate whether modern regulations are consistent with the Nation's tradition of firearm regulation, *Bruen* states that "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133 (citations omitted).

This Court acknowledges that there may be lawful purposes other than self-defense for which an individual can use a firearm. Jessica Harris, a plaintiff and fact witness, testified that customers at her store include hunters and those who use firearms for sport or target shooting. Tr. 6/5/2023 45:25–46:3. Mark Hanish, one of Plaintiffs' expert witnesses, testified that LCMs are particularly useful in the sporting context. Tr. 6/5/2023 105:18. And Sheriff Kevin Lohrey, a plaintiff and fact witness, testified that he sees community members in his rural county use firearms, including firearms with LCMs, to protect their livestock from predators. Tr. 6/5/2023 86:16–17.

While these uses may be lawful, they have never been explicitly recognized as being "the *central component*" of the Second Amendment right; only self-defense enjoys that kind of unique focus within the Supreme Court's caselaw. *Heller*, 554 U.S. at 559. "Hunting and other recreational uses of guns have no explicit or otherwise direct protection in the text of the Constitution or under existing doctrine, nor does the historical evidence support such a conclusion." Joseph Blocher, *Hunting and the Second Amendment*, 91 NOTRE DAME L. REV. 133, 153 (2015). Accordingly, this Court finds that the Second Amendment protects an individual right to commonly used firearms for the central purpose of self-defense.

### (d) An individual's subjective intent, while relevant, is not sufficient to show that a firearm is in common use for self-defense.

The parties stake divergent legal positions on what evidence is relevant to the question of whether an LCM is in common use for self-defense. Plaintiffs' interpretation relies on the

66 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

subjective belief of the LCM owner to determine whether the LCM is used for self-defense—that is, if an individual purchases an LCM and states that they purchased that LCM for self-defense, then the LCM is being used for self-defense. Defendants and Intervenor-Defendant, on the other hand, both argue for an interpretation of "use" that includes some objective metric of an LCM's actual use in self-defense. Under Defendants and Intervenor-Defendant's view, common use for self-defense relies not on the subjective view of the LCM owner, but on whether LCMs objectively facilitate armed self-defense.

This Court assumes that most firearm owners purchase their firearms, and firearm accessories such as LCMs, with the intent to use them for lawful purposes such as self-defense. If the subjective intent of an individual were enough to show that a firearm or firearm accessory is used for a lawful purpose—primarily self-defense—then nearly every firearm or firearm accessory purchased in this country would satisfy that test. The constitutionality of a firearm or firearm accessory, in other words, would depend only on how common a firearm or firearm accessory is—not on how the firearm is used. As discussed above, this Court finds that sheer commonality is not dispositive in determining whether a particular firearm or firearm accessory is protected by the Second Amendment. As such, this Court finds that an individual's subjective intent in purchasing a firearm or firearm accessory for self-defense, while relevant, also cannot be dispositive in assessing whether a firearm or firearm accessory is in common use for self-defense.

### (e) Objective standards are common when assessing the boundaries of constitutional rights.

In *Bruen*, the Supreme Court emphasized that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561

67 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

U.S. at 780). The Supreme Court in *Bruen* suggests that the Second Amendment framework should reflect the frameworks that courts use to analyze the scope of other constitutional rights. Therefore, in determining whether it is appropriate to consider objective evidence of use in assessing whether LCMs are in common use for self-defense, this Court finds it appropriate to consider the extent to which objective standards are used in delineating the boundaries of other constitutional rights.

In the First Amendment context, courts in the Ninth Circuit apply both a subjective and objective standard to judge whether speech can be considered a "true threat" and therefore outside of the bounds of protected speech. *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008). In considering whether speech is a true threat, the objective standard requires a court to consider the speech in "light of [its] entire factual context, including the surrounding events and reaction of the listeners." *Id.* (alteration in original) (citations omitted).

Objective standards are also prevalent in the Fourth Amendment context. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("In the Fourth Amendment context . . . we have almost uniformly rejected invitations to probe subjective intent.") (internal quotation marks omitted) (citations omitted). When reviewing the constitutionality of arrests under the Fourth Amendment, courts assess whether "the circumstances, viewed objectively, justify [the challenged] action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (alteration in original) (citation omitted). In considering whether an individual was subject to an unreasonable search, courts assess both whether the person being searched had an objectively reasonable expectation of privacy as well as the objective effect of the officer's actions. *Bond v. United States*, 529 U.S. 334, 338, 338 n.2 (2000). And in analyzing claims of unreasonable use of force under the Fourth

Amendment, courts look to whether that force "is excessive under objective standards of reasonableness." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citation omitted).

In considering whether the government has violated its duty to provide conditions of reasonable health and safety to people in its custody under the Due Process Clause of Fifth Amendment, courts consider, among other factors, whether the government failed to "take reasonable available measures to abate [a substantial] risk" of serious harm. *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). The government's actions must be "objectively unreasonable," which turns "on the facts and circumstances of each particular case." *Id.* (citation omitted).

In the context of the Sixth Amendment, a criminal defendant claiming a violation of their right to effective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). A pretrial detainee's claim for violation of the right to adequate medical care under the Fourteenth Amendment is judged against an objective deliberate indifference standard, *Gordon*, 888 F.3d at 1124–25, as is a pretrial detainee's failure-to-protect claim under the Fourteenth Amendment, *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

Indeed, even in the Second Amendment context, the Supreme Court has suggested that some objective standard could be relevant in judging whether a constitutional violation has occurred. In *Bruen*, for instance, the Supreme Court held that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens *with ordinary self-defense needs* from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This Court reads the qualifier of "ordinary self-defense needs" to

include some consideration of how and why firearms or firearm accessories are actually used in typical self-defense scenarios.

In sum, it is common in constitutional law for courts to consider objective evidence—such as the factual context of a particular piece of speech, or the societal understanding of an individual's expectation of privacy—in considering whether the violation of a constitutional right has occurred. Because the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees," this Court finds that it may fairly consider objective evidence to determine whether LCMs are commonly used in self-defense. *See Bruen*, 142 S. Ct. at 2156.

### (f) Whether LCMs are in common use for self-defense must be measured by an objective standard.

The question is whether Plaintiffs have shown that the LCMs restricted by BM 114 are in common use for self-defense, based not only on the subjective belief of individuals who possess LCMs, but also on the objective evidence related to LCM use in self-defense. Or, to adopt Plaintiffs' framing of the question in their closing argument, this Court asks whether LCMs, according to any objective evidence, "facilitate armed self-defense." Tr. 6/9/2023 1208:12–13.

Based on the credible evidence presented at trial, this Court concludes that LCMs are not "commonly used . . . for self-defense." *Bruen*, 142 S. Ct. at 2138. Plaintiffs failed to provide compelling evidence at trial that the ability to fire eleven or more shots without reloading facilitates armed self-defense for "law-abiding citizens with ordinary self-defense needs." *Id.* at 2156. Instead, the evidence produced at trial establishes that LCMs are not, by any objective metric, commonly used for self-defense.

The evidence at trial establishes that it is extremely rare for an individual to fire more than ten rounds in self-defense. Lucy Allen, an expert for Defendants, testified that she analyzed

70 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

DGUs taken from the NRA Armed Citizens Database over a six-and-a-half-year period, from January 2011 to May 2017. Tr. 6/7/2023 662:19–25. Of the 736 incidents Ms. Allen analyzed, the individual fired more than ten shots in just two—or about 0.3 percent of incidents. Tr. 6/7/2023 663:24–664:8. In approximately 80 percent of incidents, the individual fired one to five shots. Tr. 6/7/2023 664:3–5. Based on Ms. Allen's analysis, the average number of rounds fired in self-defense is 2.2. Tr. 6/7/2023 664:10; Ex. 536. And, because many firearms come standard with LCMs today, the low number of rounds fired cannot be attributed to a lack of ammunition. Rather, the evidence shows that law-abiding citizens with ordinary self-defense needs simply do not commonly fire more than ten rounds when acting in self-defense.

This objective evidence greatly undermines the testimony of Plaintiffs' self-defense expert Massad Ayoob, who testified that LCMs are useful in self-defense situations because "[LCMs] allow[] [individuals] to continue the fight." Tr. 5/30/2023 32:18–20. The gist of Mr. Ayoob's testimony was that LCMs facilitate armed self-defense by allowing individuals to fire more rounds without having to reload in the face of an attack. Tr. 5/30/2023 32:24–33:9. But the objective evidence shows that having more rounds does not facilitate self-defense because those rounds are rarely, if ever, used.

Indeed, Plaintiffs' own evidence at trial illustrates how rare it is for "law-abiding citizens with ordinary self-defense needs" to fire more than ten rounds in self-defense. *See Bruen*, 142 S. Ct. at 2156. Mr. Ayoob, for instance, testified about an incident involving a police officer who engaged in a car chase with a heavily-armed bank robber in which the officer fired thirty-three rounds. Tr. 5/30/2023 39:19–40:18. Mr. Ayoob described this incident as "a classic example of why so many police departments and private citizens have gone to the higher capacity guns." Tr. 5/30/2023 40:19–21. But this incident involved a police officer engaged in the active pursuit of

71 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

an armed suspect, which is hardly a scenario that implicates "ordinary self-defense needs." *See Bruen*, 142 S. Ct. at 2156. Mr. Ayoob admitted as much on cross-examination, stating that "the law enforcement officer has different duties" than a civilian. Tr. 5/30/2023 74:12–13. As noted previously, BM 114 does not restrict LCMs for police officers or military use.

Plaintiffs' fact witness Adam Johnson, a gun store owner and a plaintiff in this action, testified that he was involved in a defensive gun use incident while working for a "plainclothes loss prevention company" at a convenience store. Tr. 6/5/2023 70:2–14. Mr. Johnson testified that an individual attempted to rob the convenience store while brandishing a firearm. Tr. 6/5/2023 70: 8–11. Mr. Johnson testified that he drew his firearm and fired what he believed to be thirteen rounds at the assailant. Tr. 6/5/2023 70:13–17. This Court gives Mr. Johnson's testimony little weight, given his economic interest in the outcome of this case. However, even if this Court did consider Mr. Johnson's testimony to be entirely credible, this Court nonetheless finds that an armed private security guard engaging in a DGU with an armed robber does not exemplify "ordinary self-defense needs." *See Bruen*, 142 S. Ct. at 2156.

Plaintiffs argue, and this Court agrees, that an individual need not fire a gun to use it for self-defense.[26] This Court finds that in brandishing a firearm to intimidate an attacker, for

––––––––––––––––––––

[26] This Court finds a short passage from Justice Scalia's dissent from *Smith v. United States*, which considered whether the exchange of a gun for cocaine constitutes "use" of a firearm "during and in relation to . . . [a] drug trafficking crime" under federal law, instructive in considering the meaning of "using" a firearm or firearm accessory:

> To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i.e.*, as a weapon.

*Smith v. United States*, 508 U.S. 223, 242 (1993) (Scalia, J., dissenting).

72 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

instance, the individual uses the firearm for self-defense. But this Court again emphasizes that this case is about LCMs, not about firearms generally. Plaintiffs presented no evidence at trial that brandishing a firearm with an LCM, as opposed to brandishing a firearm with a magazine holding ten or fewer rounds, facilitates armed self-defense. Fact witness and plaintiff Jessica Harris testified about an incident in which she brandished a handgun, equipped with an LCM, to deter a potential attacker. Tr. 6/5/2023 47:15–19. Notably absent from Ms. Harris's testimony is any evidence that the LCM itself had any impact on the would-be-assailant's decision to flee. Tr. 6/5/2023 47:20–21.

Instead, this Court finds that, based on the credible evidence presented at trial, brandishing an LCM does not facilitate self-defense. Defendants' expert Jim Yurgealitis testified that he could not tell the magazine capacity of a Glock 19, a popular handgun model, when the magazine is inserted into the firearm. *See* Tr. 6/6/2023 529:2–4 ("It certainly appears to be a Glock 19. Although, the magazine capacity itself is hard to determine because . . . it's actually inserted in the magazine well."). This Court finds that if Mr. Yurgealitis, a former ATF agent who was specially trained in the field of firearm identification and has personally viewed over 5,000 firearms throughout his career, Tr. 6/6/2023 522:3–6, cannot determine the capacity of a popular handgun model's magazine when it is inserted into the firearm, then the size of a firearm's magazine—as opposed to the firearm itself—has little deterrent effect in the average civilian self-defense context.

The Second Amendment protects the right of law-abiding citizens with ordinary self-defense needs to keep and bear arms commonly used for lawful purposes, centrally self-defense. *See Bruen*, 142 S. Ct. at 2156. For an item to be used in self-defense, it must somehow be employed to that end. *Voisine v. U.S.*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently

73 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

define the noun 'use' to mean the 'act of employing' something."). Plaintiffs have not shown that LCMs are commonly employed for self-defense. Defendants have produced credible evidence showing that they are not. This Court accordingly finds that the Second Amendment does not protect LCMs.

### iii.    LCMs have features that are "dangerous and unusual."

As the Supreme Court reiterated in *Bruen*, just as weapons that are commonly used for self-defense are presumptively covered by the Second Amendment, weapons that are "dangerous and unusual" fall outside of the Second Amendment's protections. *Bruen*, 142 S. Ct. at 2128 ("[In *Heller*], we found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'") (citing *Heller*, 554 U.S. at 627). "To determine [whether a firearm is dangerous and unusual], we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock*, 779 F.3d at 997 (citation omitted).

As noted above, this Court finds that while LCMs may be possessed by millions of Americans today, they are not commonly used for self-defense. Further, this Court finds based on the evidence in the record that LCMs have uniquely dangerous propensities. This Court finds, based on the testimony of Plaintiffs' expert Mark Hanish, that the LCMs sold to civilians are often the same LCMs used in the military context. Tr. 6/5/2023 135:16–22. Mr. Hanish testified that Surefire, a firearms manufacturer for which he served as Vice President of Marketing and Sales, sells to both the Department of Defense and the U.S. domestic civilian market through the same website. Tr. 6/5/2023 145:1–5. On that website, Surefire markets its LCMs—which it sells with capacities of sixty and 100 rounds—as delivering "twice the violence of action and half the required reloads[,] providing a crucial edge in any firefight." Tr. 6/5/2023 136:10–17; 145:10–

74 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

12; *see also* Ex. 816. Mr. Hanish testified that he thought this was a reasonable way to market

LCMs to civilians. Tr. 6/5/2023 146:4–6. This testimony suggests that LCMs, even in civilian

hands, are closely related to weapons used in warfare.

This Court also finds, based on the testimony of Defendants' experts Michael Siegel and

Louis Klarevas, that LCMs enhance the lethality of shooting events. Tr. 6/6/2023 422:21–

424:13. Dr. Siegel, whose area of scholarly focus includes firearm violence prevention policy,

specifically testified that the capacity of a firearm is highly related to the lethality of the weapon

because the capacity is what determines the number of shots that can be fired within a given time

without having to pause to reload. Tr. 6/6/2023 500:5–8; 513:5–10. And Mr. Yurgealitis testified

that detachable magazines "facilitate[] more rapid reloading of a firearm when the previous

magazine is empty." Tr. 6/6/2023 523:13–14.

Again, this Court finds it necessary to compare this testimony to the objective evidence

regarding the "ordinary self-defense needs" of "law-abiding citizens." *Bruen*, 142 S. Ct. at 2156.

While the average number of shots fired in self-defense is around 2.2, in a mass shooting

involving an LCM, the average number of shots fired is ninety-nine. Tr. 6/7/2023 681:10–12.

And while more than ten shots are fired in just 0.3 percent of DGUs, more than ten shots are

fired in 94 percent of mass shootings where an LCM is used. Tr. 6/7/2023 681:14–16. Thus,

while it is uncommon for an individual to fire more than ten shots in self-defense, it *is* common

for mass shooters to fire more than ten shots, especially when the mass shooter is using an LCM.

In sum, this Court finds that Plaintiffs have not met their burden to show that LCMs are

protected by the Second Amendment. The evidence in the record illustrates that LCMs are not

necessary for firearms to function and are not commonly used for self-defense. Because this

Court finds that the Second Amendment's plain text does not cover LCMs, BM 114's restrictions on LCMs are constitutional.

      **b.  BM 114's LCM restrictions are consistent with the Nation's history and tradition of firearm regulation.**

Even if Plaintiffs could show that LCMs are protected by the Second Amendment, this Court finds that Defendants and Intervenor-Defendant have met their burden of showing that BM 114's restrictions on LCMs are consistent with the Nation's history and tradition of firearm regulation.[27]

In some instances, the historical inquiry set forth in *Bruen* will be straightforward. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the

---

[27] Plaintiffs argue that if this Court were to find that LCMs are in common use for self-defense, it does not need to inquire into whether the challenged regulations are "consistent with this Nation's historical tradition of firearm regulation" because, under Plaintiffs' formulation of *Bruen*, historical tradition protects arms that are "in common use today," as opposed to those "highly unusual in society at large." *Bruen*, 142 S. Ct. at 2143 (internal quotation marks omitted). This Court disagrees with Plaintiffs' interpretation. This Court notes that *Bruen* did find that "[a]part from a few late-[nineteenth]-century outlier jurisdictions, American governments . . . have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. But this Court does not read this statement to automatically render any regulation that covers a firearm or firearm accessory that is commonly used for self-defense unconstitutional. First, as the Supreme Court made clear, "when the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively* protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added). This suggests that even when a firearm is commonly used for self-defense, and is therefore covered by the plain text of the Second Amendment, the government may still rebut the presumption that the firearm is protected. Second, the Supreme Court in *Bruen* did not apply the more nuanced analogical approach required for technology or societal concerns that did not exist at the Founding, because the *Bruen* Court found that the challenged regulation sought to address a societal concern that had existed since the eighteenth century. *Id.* at 2131–32. As discussed more fully below, this Court finds that a nuanced approach must apply to the present case. Accordingly, *Bruen*'s historical conclusions stem from a more "straightforward" analysis not applicable here. *See id.*

76 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

[eighteenth] century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Or "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* The challenged regulation in *Heller,* for instance, sought to address technology (handguns) and a societal problem (interpersonal firearm violence) that the Supreme Court found existed at the time of the Second Amendment's ratification in 1791 and, later, the adoption of the Fourteenth Amendment in 1868. *See id.* at 2131.

But *Bruen* also acknowledged that not all inquiries will be so straightforward. The Second Amendment, as this Court has noted, protects not only the types of arms that were in existence in 1791 but also "modern instruments that facilitate armed self-defense." *Id.* at 2132 (citation omitted). But if an instrument of self-defense did not exist—or was exceedingly rare—in 1791, we would not expect to find any regulations limiting or restricting the possession or use of this rare or non-existent instrument.[28] The Supreme Court thus clarified its rule in *Bruen* to account for technology or societal ills that the Founders could not have envisioned by explaining that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

───────────────

[28] It would be a mistake to treat this absence of evidence as evidence of BM 114's unconstitutionality. In *Hanson v. District of Columbia*, which considered the constitutionality of the District of Columbia's restrictions on LCMs, the court explained that while the first patent for a personal jetpack was taken out in 1919, jetpacks remain unregulated today. *Hanson v. District of Columbia*, --- F. Supp. 3d ----, 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023). Nonetheless, it would be absurd for a future court, in reviewing the regulatory landscape around personal jetpacks in 2023, to view the lack of widespread regulation as illustrating "an ideological disposition against regulating jetpacks." *Id.* Rather, it shows that personal jetpacks remain an "expensive and experimental curiosity," too rare to attract the kind of societal (and political) attention necessary to lead to widespread regulation in 2023. *Id.*

77 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

In these cases, *Bruen* instructs courts to "reason[] by analogy," which "requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (citation omitted). In making that determination, *Bruen* focuses on two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. And, in assessing whether a modern-day regulation is relevantly similar to a historical analogue, *Bruen* notes that the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*  "[E]ven if a modern-day regulation is not a dead ringer for historical precursors," in other words, "it still may be analogous enough to pass constitutional muster." *Id.*

> i.  **LCMs implicate both "unprecedented societal concerns" and "dramatic technological changes."**

Under *Bruen*, a "more nuanced" analogical approach is necessary if a case implicates either "unprecedented societal concerns" or "dramatic technological changes." *Id.* at 2132. As this Court explains below, Defendants and Intervenor-Defendant have shown that this case implicates both.

> **(a) Mass shootings using LCMs are an "unprecedented societal concern."**

First, this Court finds that based on the evidence presented at trial, Defendants and Intervenor-Defendant have shown that mass shootings using LCMs are an unprecedented societal concern rather than a general societal problem that has persisted since the eighteenth century.

First, the evidence at trial shows that the shooting of multiple victims by a single assailant using a firearm is a recent phenomenon in American history. The first example in American history of a mass shooting involving more than ten fatalities, not including the perpetrator,

78 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

occurred in 1949.[29] Tr. 6/6/2023 464:6–10; *see also* Ex. 564. The annual incidence of high-fatality mass shootings—which are defined as a mass-shootings where six or more individuals died, not including the perpetrator—has increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 413:5–17. Defendants' expert Dr. Klarevas concluded that the trend line is "indicative of a growing problem" related to high-fatality mass shootings. Tr. 6/6/2023 413:18; *see also* Ex. 567. Dr. Klarevas also testified that in addition to observing a rise in the occurrence of mass shooting events, he has also observed a rise in the fatalities or victims killed in recent years from mass shooting events. Tr. 6/6/2023 414:7–17; *see also* Ex. 568. Plaintiffs produced no evidence at trial to rebut Dr. Klarevas's testimony.

Defendants also produced evidence showing that, in recent years, it has become more common for LCMs to be used in mass-shooting events. Tr. 6/6/2023 415:14–416:2. Since 1990, 78 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. But that percentage goes up as one approaches present-day. Since 2000, for instance, 79 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. Since 2010, 86 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. And since 2020, every single high-fatality mass shooting in which six or more individuals were killed involved an LCM. Ex. 569. Again, Plaintiffs produced no evidence at trial to rebut this evidence.

Finally, Intervenor-Defendant produced evidence showing that mass shootings have created new societal concerns related to the capacity of health care systems. Mass shooting

---

[29] As noted above, Dr. Klarevas's testimony relies on a definition of "mass shooting" that excludes large inner group violence. This Court accepts Dr. Klarevas's definition of mass shooting as the kind of definition that those in his field would typically use, while acknowledging that covers a specific type of event: a mass shooting against civilians using a firearm, and therefore necessarily excludes some instances of mass violence in American history.

events impact a hospital's surge capacity, which is the ability of a given hospital to deal with multiple casualties in a short period of time. Tr. 6/6/2023 494:8–17. If a mass shooting event results in more than five or ten critically injured patients in a short period of time, OHSU— which is one of Oregon's largest, most well-resourced trauma hospitals—would rapidly run out of available resources to treat patients. Tr. 6/6/2023 493:15–20; 495:2–13. The surge capacity of hospitals around the state of Oregon is likely much smaller than that of OHSU, meaning that a mass shooting that resulted in four casualties could overwhelm these hospitals. Tr. 6/6/2023 496:6–12. Once a hospital reaches surge capacity, a hospital must decide how to allocate care to patients, which can result in delays and postponements of certain treatments. Tr. 6/6/2023 495:15–21. Plaintiffs produced no evidence at trial to rebut this evidence, or to suggest that these administrative concerns have existed since the eighteenth century.

In sum, this Court finds that Defendants and Intervenor-Defendant produced sufficient evidence at trial to show that mass shootings related to LCMs are an unprecedented societal concern. Incidents of mass shootings were rare even a half a century ago and have increased rapidly in very recent years. In the last decade, most mass shootings in which more than five individuals were killed involved LCMs. And the rise in these mass casualty events is placing an unprecedented pressure on society's medical institutions, which must now be prepared to handle mass casualty events at the expense of other patients. Though gun violence certainly has long plagued the United States, Defendants and Intervenor-Defendant have shown that these incidents of singular and concentrated violence against civilians are unprecedented.

80 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**(b) LCMs represent a "dramatic technological change."**

Additionally, this Court finds that Defendants and Intervenor-Defendant have shown that LCMs represent a "dramatic technological change" from the technology available at the Founding.

The evidence presented at trial overwhelmingly shows that large-capacity repeating firearms—defined as firearms capable of firing more than ten rounds without requiring the shooter to reload—were extremely rare at the adoption of the Second Amendment. Defendants' expert Dr. Brian DeLay described repeating firearms from the Founding Era as "vanishingly rare" and "perhaps nonexistent." Tr. 6/6/2023 552:25–553:1. Examples of repeating firearms from this era included a single nine-shot firearm brought to the Colonies from England, as well as a prototype for a repeating firearm that operated like a Roman candle. Tr. 6/6/2023 556:12–15; 557:18–19; 559:14–560:12. And while there is evidence that a Girardoni air rifle was brought on the Lewis and Clark expedition in the early 1800s, repeating air rifles were broadly viewed as uncommon and unusual curiosities rather than common weapons of self-defense. Tr. 6/7/2023 573:3–9; 576:18–20. According to Dr. Delay's testimony, there is no evidence that ordinary Americans would have had any familiarity with large-capacity repeating firearms at the time of the Second Amendment's ratification in 1791. Tr. 6/7/2023 577:6–16.

At the time of the ratification of the Fourteenth Amendment in 1868, large-capacity magazines or repeating firearms capable of firing more than ten rounds without reloading were likewise uncommon. Dr. DeLay testified that between 1776 and 1868, repeating firearms did become easier to manufacture and more reliable to use. Tr. 6/7/2023 582:19–22; 590:14–20. The first type of repeating firearm to gain some limited commercial success, according to Dr. DeLay, was the Colt revolver, which entered the civilian market in the 1830s and could hold between

five to and seven rounds. Tr. 6/7/2023 582:19–22; 583:9–10; 584:20–21. Dr. DeLay testified that

loading those rounds was a time-consuming process that required an individual to complete five

separate steps to reload a single chamber. Tr. 6/7/2023 583:14–584:7.

       As for large-capacity firearms at the time the Fourteenth Amendment was ratified in

1868, Dr. DeLay testified that there were two models capable of firing more than ten rounds

without reloading: the Winchester rifle and the Henry rifle. Tr. 6/7/2023 591:16. Both models

required the shooter to reload the rounds one by one once the rifle's fixed magazine had been

emptied, unlike modern detachable magazines which allow the user to simply insert an already-

fully-loaded magazine into their firearm. Tr. 6/7/2023 593:4–8. Neither firearm was semi-

automatic, unlike many firearms that come standard with LCMs today. Tr. 6/7/2023 593:9–10.

And both rifles enjoyed only minimal success on the domestic civilian market. According to Dr.

DeLay's testimony, 74,000 of these rifles were produced between 1861 and 1872; of those, about

65,000 were exported to foreign militaries and 8,500 were purchased by or for officers in the

Union Army during the Civil War, leaving just 500 for the civilian market. Tr. 6/7/2023 594:8–

21.  According to Dr. DeLay's estimates, large-capacity firearms accounted for less than 0.002

percent of firearms in the United States at the time of the Fourteenth Amendment. Tr. 6/7/2023

595:18–22.

       Indeed, the evidence at trial shows that the commonality of LCMs within the American

civilian market today is itself a relatively recent phenomenon. In 1954, there were only two

models of firearms that were sold with factory-issued large-capacity magazines, which accounted

for 0.7 percent of firearms sold. Tr. 6/6/2023 408:18–21. LCMs did not come factory-issued with

more than five percent of firearm models until 1984. Tr. 6/6/2023 409:3. This is around the time

that Plaintiffs' experts testified that LCMs first became popular within the civilian firearm

market. Tr. 5/30/2023 84:23–85:5; 6/5/2023 131:13–21.

      This Court concludes that modern-day LCMs represent a dramatic technological change

from the Founding and Reconstruction-era firearms based on at least two key metrics: the time

and effort involved in reloading and the time involved in shooting the firearm's rounds.

Plaintiffs' expert Massad Ayoob testified that he can reload a handgun with a detachable LCM in

three-and-a-half seconds. Tr. 5/30/2023 78:14–16. And Defendants' expert Jim Yurgealitis

testified that detachable magazines "facilitate[] more rapid reloading of a firearm when the

previous magazine is empty." Tr. 6/6/2023 523:13–14. By comparison, reloading a muzzle-

loading weapon—the typical style of weapon popular at the time of the Second Amendment's

adoption in 1791—required an individual to complete at least eight steps, including priming the

firearm, pouring in gunpowder, inserting the musket ball, and ramming the gunpowder and

musket ball with a ramrod. Tr. 6/7/2023 641:22–643:9. Repeating firearms at the time of the

ratification of the Fourteenth Amendment were more streamlined, but still less so than modern-

day LCMs. As discussed above, even the most reliable multi-shot firearms of the nineteenth

century—the Colt revolver, the Henry rifle, and the Winchester rifle—had to be reloaded round

by round, meaning that a repeating firearm could only be reloaded as quickly as the shooter

could insert the individual rounds. Tr. 6/7/2023 583:14–584:7; 593:4–8; 601:15–18.

      Modern LCMs also allow an individual to fire more rapidly than the firearms of the

Founding or Reconstruction eras. Dr. DeLay testified that the shooter in the Virginia Tech

massacre fired 174 rounds in around nine to ten minutes using an LCM, which means that the

shooter could discharge between seventeen and nineteen rounds in a single minute. Tr. 6/7/2023

603:1–2; Ex. 556. Dr. DeLay testified that this rate of shooting would have been impossible

83 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

between 1860 and the turn of the twentieth century using a Winchester or Henry rifle. Tr. 6/7/2023 603:3–8; 603:15–16. Dr. DeLay also testified that this rate of shooting would have been impossible using a six-shot Colt revolver from the 1830s. Tr. 6/7/2023 603:9–12. Nor would this rate of firing have been possible with the most popular weapons at the Founding: according to Defendants' expert Dr. Kevin Sweeney, the most highly-trained soldiers could reload and fire a muzzleloading musket three times per minute. Tr. 6/7/2023 643:10–19. An eighteenth-century rifle could be reloaded and fired once every ninety seconds. Tr. 6/7/2023 650:14–16. And while eighteenth-century pistols could be reloaded and fired slightly faster, they could still only fire three to four times per minute—far slower than a modern-day LCM. Tr. 6/7/2023 647:11–20.

The evidence presented at trial thus establishes that LCMs—and large-capacity repeating firearms in general—were exceedingly rare among the U.S. civilian population through the ratification of the Fourteenth Amendment. Moreover, a modern LCM allows an individual to fire at least four times more rapidly than the most well-trained soldier of the Founding era. These LCMs represent a dramatic technological change from the types of weapons available at the Founding and Reconstruction. This Courts' analysis of BM 114's restrictions on LCMs must therefore use the more nuanced approach called for in *Bruen*.

> ii. **Modern and historical regulations impose a comparable burden on the right of armed self-defense, and that burden is comparably justified.**

Under *Bruen*'s nuanced approach, a court must compare the challenged modern regulation to historical analogues presented by the government. *Bruen*, 142 S. Ct. at 2132. In determining whether these analogues are "relevantly similar," a court must consider whether the modern regulation imposes comparable burdens on the right to self-defense and decide whether the burden imposed is comparably justified. *Id.* at 2133. In other words, a court must consider *how* the regulation restricts the right to self-defense and *why* the restrictions were implemented.

84 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

At trial, Defendants presented credible evidence about several types of historical analogues that impose comparable burdens on the right to self-defense as BM 114's restrictions on LCMs, and which are comparably justified. These include regulations on the use of trap guns, the storage of gun powder, the possession and carrying of blunt objects like clubs, the possession and carrying of certain fighting knives, the concealed carrying of pistols, the concealed carrying of revolvers, and the use and possession of fully-automatic and semi-automatic firearms. This Court considers each in turn.

### (a) Trap Guns

As described above, a trap gun is a conventional firearm that is rigged, with a string, wire, or similar mechanism, to discharge without the firearm operator being physically present. Tr. 6/8/2023 874:18–20. Trap guns were used by individuals to protect property, protect livestock, and deter thieves. Tr. 6/8/2023 874:21–23. Defendants' expert Dr. Robert Spitzer testified that certain features of trap guns made them particularly dangerous, including the "haphazard manner" in which individuals would fashion them, as well as the fact that the guns could fire without any individual being present. Tr. 6/8/2023 874:25–875:9.

At least sixteen states criminalized the setting of trap guns in the nineteenth and twentieth centuries. Ex. 633. Fourteen states enacted specific anti-trap gun laws. Ex. 633; Tr. 6/8/2023 876:5–7. There is also evidence of individuals being criminally prosecuted for setting a trap gun in two states. Ex. 633; Tr. 6/8/2023 876:7–9. The primary method of regulating the trap gun was to prohibit the use or setting of a trap gun. Tr. 6/8/2023 876:23–877:1.

This Court finds that these laws prohibiting the use or setting of a trap gun placed a minimal burden on the right to armed self-defense. The laws only prohibited individuals from using or setting their firearms in a particularly dangerous way; it did not limit individuals from

possessing or using the underlying firearms themselves. Similarly, BM 114 imposes a minimal burden on the right to armed self-defense. This Court reiterates the objective evidence discussed above: it is exceedingly rare for an individual with ordinary self-defense needs to fire more than ten rounds in self-defense. According to objective evidence, an individual discharges more than ten rounds in just 0.3 percent of self-defense incidents. That means that in 99.7 percent of all self-defense incidents, BM 114's restrictions on LCMs would place no burden on the right to self-defense.

Moreover, under BM 114, an individual may possess and use any model or type of firearm of their choosing, so long as that firearm is not capable of firing more than ten rounds without reloading. Firearms that use LCMs allow a shooter to fire more shots without having to pause, which increases the potential lethality of the weapon. Tr. 6/6/2023 513:5–10. An LCM, in other words, takes a firearm and makes it more lethal. A trap gun, too, takes a firearm and makes it more lethal by allowing the firearm to discharge without the presence of a shooter. Thus, just as trap gun laws sought to regulate a particularly dangerous feature of a firearm, so too do BM 114's restrictions on LCMs seek to regulate a particularly dangerous feature of a firearm.

### (b) Gunpowder Storage

Defendants also presented evidence regarding restrictions on the storage of gunpowder in early American history. Before 1900, nine states regulated the possession, use, or sale of gunpowder. Ex. 640.  Dr. Spitzer testified that these regulations were passed to protect public safety, because of the risk of explosion and fire associated with the storage of gunpowder. Tr. 6/8/2023 880:25–881:8.

This Court finds that these gunpowder regulations acted as a kind of limit on the amount of firepower that an individual could amass in a single place. The gunpowder laws did not

severely restrict the right to armed self-defense because an individual could still purchase gunpowder but could not store that gunpowder in amounts that would place the public at risk by leading to a catastrophic explosive event.

Similarly, BM 114 restricts the ability of an individual to amass a level of firepower deemed to be a threat to public safety. While described as an LCM restriction, this Court has explained that BM 114 is more accurately described as a limit on the amount of ammunition that an individual is permitted to fire without reloading. Like the gunpowder laws, BM 114 does not prohibit an individual from purchasing ammunition or amassing firepower; it merely limits the amount of firepower that an individual can amass and use without reloading. Indeed, BM 114 does not restrict the number of ten-round magazines that an individual may carry or possess. It simply requires reloading after ten rounds are spent. This Court therefore finds that these gunpowder regulations placed a relevantly similar burden on the right to armed self-defense as BM 114.

This Court also finds that the justifications underpinning these gunpowder laws are relevantly similar to the justifications underpinning BM 114. As discussed above, mass civilian casualty events involving firearms were extremely uncommon—indeed, according to the evidence at trial, unheard of—in the nineteenth century. But gunpowder-related fires did create the fear of mass civilian casualty events. Tr. 6/8/2023 880:25–881:8. Accordingly, governments restricted the amount of gunpowder that could be stored in an individual's home and regulated where large amounts of gunpowder could be stored, to protect the public from the dangers associated with gunpowder explosions and fires. BM 114 likewise restricts the amount of ammunition that an individual can fire at any given time without reloading to protect the public from mass civilian casualty events.

87 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (c) Blunt Objects

Defendants also produced credible evidence regarding the regulation of blunt weapons in the eighteenth and nineteenth centuries. These blunt weapons included things like bludgeons, billy clubs, and slungshots Tr. 6/8/2023 869:12–870:3.

Restrictions on bludgeons typically involved laws criminalizing the carrying of such objects. Tr. 6/8/2023 869:18–21. By the beginning of the twentieth century, thirteen states regulated billy clubs. Tr. 6/8/2023 870:6–9; Ex. 634. By the beginning of the twentieth century, eight states regulated bludgeons. Between 1850 and 1875, sixteen states regulated slungshots. Ex. 634. By 1900, that number had grown to thirty-one. Ex. 634. According to Dr. Spitzer, the purpose of these laws restricting the carry of blunt objects was to improve public safety, with the goal being to sever the link between the carrying of these objects and their use in crime. Tr. 6/8/2023 873:19–23.

Plaintiffs argued at trial that these laws are not sufficiently analogous because the laws restricting blunt objects restricted only the concealed carry of these objects, rather than the possession of these objects. BM 114, by contrast, restricts both the purchase and the carrying of LCMs. This Court acknowledges this distinction, but does not find that it changes this Court's analysis of the comparative burdens on the right to armed self-defense. As Dr. Spitzer testified, the social and political realities of the eighteenth and nineteenth century likely made an outright ban on the possession of blunt objects impossible. Tr. 6/8/2023 874:9–16. Given the ease with which an individual could fashion a blunt object, it made little sense for fledgling state and municipal governments to attempt to ban their outright possession. *Id.* The same cannot be said about modern LCMs, which cannot be fashioned by an individual and must be purchased. This Court also notes that our modern regulatory system is more sophisticated than that of our

eighteenth and nineteenth century predecessors. This Court therefore finds the absence of laws banning the possession of blunt objects outright to be of little value when considering whether the laws restricting blunt objects are relevantly similar to BM 114's restrictions on LCMs.

Instead, this Court focuses on whether the laws restricting the concealed carry of blunt objects placed a comparable burden on the right to armed self-defense as BM 114's LCM restrictions. Here, this Court finds that the burdens are relevantly similar. Laws regulating blunt objects typically sought to restrict the concealed carrying of these objects, which was viewed as a feature of these weapons that made them particularly dangerous and suited to criminal use. The laws therefore did not prohibit the carrying of all blunt objects, but only those that were small enough or able to be concealed. This left open some means of self-defense using blunt objects, whether the individual chose to openly carry the object or chose a larger object that could not be concealed. BM 114 likewise does not prohibit the carrying, or possession, of all firearms. Instead, BM 114 seeks to regulate the feature of firearms that makes them particularly dangerous and suited to criminal use: the ability to fire more than ten shots quickly without reloading. BM 114 leaves open ample channels for self-defense, including all rifles and handguns, so long as those firearms cannot fire more than ten rounds without reloading.

This Court likewise finds that laws restricting the concealed carry of blunt objects, and particularly laws criminalizing the concealed carry of the slungshot, are comparably justified to BM 114. As discussed above, laws prohibiting the concealed carry—or the carrying altogether—of slungshots sought to protect public safety by preventing the use of a particularly dangerous weapon and, particularly, the feature that rendered that weapon so dangerous. Similarly, BM 114 seeks to protect public safety by restricting a feature of firearms that renders them particularly dangerous.

89 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## (d) Bowie Knives

Defendants also produced credible evidence regarding the regulation of knives and, in particular, Bowie knives, during the nineteenth century. While Defendants' expert Dr. Brennan Rivas testified that it is difficult to gauge in numerical terms the popularity of Bowie knives during the nineteenth century, Bowie knives were frequently reported on in the media as being associated with crime. Tr. 6/7/2023 719:22–720:4. Dr. Rivas testified that, from these reports, she could conclude that there was a significant amount of societal concern associated with the carrying of Bowie knives, and particularly with the concealed carrying of these knives. Tr. 6/7/2023 720:25–721:2. Dr. Rivas testified that Bowie knife regulations were most often regulated via concealed carry statutes because the ability to conceal a Bowie knife was thought to render the weapon particularly dangerous. Tr. 6/7/2023 721:10–20.

Defendants' expert Dr. Spitzer also testified that governments responded to the concern around Bowie knives by enacting laws criminalizing their concealed carry. Tr. 6/8/2023 865:19–25. At least twenty-nine states or municipalities prohibited the concealed carrying of Bowie knives. Ex. 636; Ex. 639. And fifteen states or municipalities prohibited the carrying of Bowie knives altogether, concealed or open. *Id.*; Tr. 6/8/2023 866:21–25. Dr. Spitzer also testified that some states prohibited the general public from acquiring a Bowie knife, referring specifically to an 1881 Arkansas law that made it a crime to sell, barter, exchange, or provide a Bowie knife. Tr. 6/8/2023 932:17–933:5.

Plaintiffs again argue that these laws are not analogous to BM 114 because states typically did not ban possession of Bowie knives, while BM 114 does restrict possession of LCMs. Again, Defendants' expert Dr. Spitzer testified that in the nineteenth century, laws banning possession of Bowie knives altogether would not have been feasible, because the United

90 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

States was still a relatively new system of government with a "primitive" system of policing. Tr. 6/8/2023 868:6–13. According to Dr. Spitzer's testimony, "governments generally did not have the mechanisms, the ability, the capability to simply ban a knife outright, especially in light of the fact that a knife is a very simple thing technologically." Tr. 6/8/2023 868:14–17. This Court agrees that it must consider the political realities of an era when evaluating whether a law is sufficiently analogous to a modern-day regulation, and finds Dr. Spitzer's testimony persuasive.

Accordingly, this Court focuses on whether the laws restricting Bowie knives placed a comparable burden on the right to armed self-defense as BM 114's LCM restrictions. This Court again finds that the prohibition on the carry of a Bowie knife likely placed a greater burden on the right to armed self-defense than BM 114's restrictions on LCMs. Defendants' expert Dr. Rivas testified that, for much of the nineteenth century, single-shot pistols were as useful to individual self-defense as clubs. Tr. 6/7/2023 717:8. Knives, on the other hand, were "exceedingly deadly," and could be used by individuals as many times as they were so inclined. Tr. 6/7/2023 717:9–13. A Bowie knife, then, was likely a useful device for self-defense in the nineteenth century, particularly compared to other available options. By contrast, LCMs are not commonly used for self-defense, and restrictions on the use of LCMs do not prevent individuals from obtaining firearms, like handguns, that *are* commonly used in self-defense, so long as those handguns cannot fire more than ten rounds without reloading.

The justifications underpinning these regulations are also relevantly similar. Both Bowie knife regulations and BM 114 seek to protect public safety. And the mechanisms of both laws are likewise relevantly similar because both target the feature of the weapon thought to be the most dangerous: concealment for Bowie knives, and the ability to shoot more than ten rounds without reloading for LCMs.

91 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**(e) Pistols**

Defendants produced credible evidence regarding the regulation of pistols in the early-to-mid nineteenth century. In fact, according to Dr. Spitzer's testimony, by the early twentieth century, there was some form of anti-concealed carry law passed in every state or territory, or cities within those states or territories, except for New Hampshire. Ex. 634; Tr. 6/8/2023 877:6–10. Some of these laws specifically targeted the carrying or sale of pocket pistols, which were viewed as particularly dangerous due to their size and ease of concealment. Tr. 6/7/2023 725:1–4; 732:6–10.

These anti-concealed carry laws targeting pistols were passed in response to both technological advances and an increase in commonality of pistols within the civilian population. Dr. Rivas testified that around 1850, firearms technology had advanced such that any individual who wanted to purchase a pistol—and who had the money to do so—could. Tr. 6/7/2023 726:19–22. And Dr. Spitzer testified that there was an increase in interpersonal violence and murders throughout the country in the pre-Civil War nineteenth century involving pistols. Tr. 6/8/2023 877:15–23.

These anti-concealed carry laws targeting pistols imposed a similar, if not greater, burden on the right to armed self-defense than BM 114's LCM restrictions. On their face, these laws appear to restrict the concealed carry of an entire class of arms: pistols. But by prohibiting the concealed carry of pistols, these laws restricted only those pistols that were small enough to be readily concealed; these laws still allowed individuals to carry small pistols openly, or carry the larger horse or belt pistols. The laws thus did not completely prevent an individual from carrying pistols for their self-defense. Indeed, laws that made exceptions to the carrying of pistols for those on journeys seem to recognize that pistols were useful in certain self-defense situations.

92 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

*See, e.g.*, Ex. 636 at 2, 8, 24. Similarly, BM 114 does not restrict the carry—open or otherwise—or possession of any broad category of arms. Rather, BM 114's LCM restrictions restrict only a subset of magazines that are particularly dangerous to public safety, in the same way that the concealed carry laws targeted a subset of firearms thought to be particularly useful in the commission of crimes.

These anti-concealed carry laws are likewise comparably justified to BM 114. These laws were passed in response to a rise in the commission of violent crime using pistols, and sought to restrict a feature of a firearm that made it particularly dangerous to public safety: the pistol's size, which made it easily concealable and useful in the commission of crime. Tr. 6/7/2023 725:1–4; 732:6–10. Similarly, BM 114 was passed in response a rise in mass shootings involving LCM-equipped firearms and seeks to restrict a feature of a firearm that makes it particularly dangerous to public safety: the firearm's magazine capacity, which makes it able to shoot more than ten bullets in a short period of time, well above the number of bullets commonly used for self-defense.

### (f) Revolvers

Defendants also produced credible evidence regarding the regulation of revolvers as a specific subset of firearms in the mid-to-late nineteenth century, following the relative commercial success of the Colt revolver and the increase in production of revolvers following the Civil War. At least thirteen states passed regulations on the concealed carry of pistols between 1861 and 1930. Ex. 636.

This Court finds that these nineteenth century laws prohibiting or limiting concealed carry of revolvers burdened the right to armed self-defense to a much greater degree than BM 114's restrictions on LCMs. These laws restricted the carry of all revolvers regardless of

93 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

capacity, and most popular revolvers in the mid-to-late nineteenth century held between five to seven rounds. BM 114, by contrast, imposes a minimal burden on the right to armed self-defense, because BM 114's restrictions on LCMs do not prevent individuals from possessing or using any model or type of firearm of their choice, so long as that firearm is not capable of firing more than ten rounds without reloading. Again, this Court reiterates that, based on the evidence produced at trial, LCMs are not commonly used in self-defense, such that restricting their possession would have no impact on 99.7 percent of ordinary self-defense situations.

This Court notes that regulations on the carrying of revolvers increased as these revolvers became more common in the civilian market. While the Colt revolver was first created in the 1830s, they did not become popular among the civilian population until the mid-to-late 1840s, and became very popular in the civilian market in the years following 1860. Tr. 6/7/2023 583:4–10; 726:2–10; 728:1–7. Regulations that specifically limited the carrying of revolvers likewise began appearing after 1860. Ex. 363. This is analogous to modern regulations on LCMs. Plaintiffs' expert Mark Hanish testified that modern LCMs became popular on the civilian market in the 1980s. Tr. 6/5/2023 131:15–21. LCMs were subsequently prohibited under federal law beginning in 1994. Tr. 6/6/2023 525:22–526:7.

Plaintiffs argued at trial that these laws are not sufficiently analogous because the laws restricted only the concealed carrying of revolvers, while BM 114's restrictions on LCMs restrict both the purchase and the carrying of LCMs. This Court acknowledges this distinction, but does not find that it changes this Court's analysis of the comparative burdens on the right to armed self-defense. As discussed above, this Court finds that the objective evidence shows that LCMs are not commonly used in self-defense because the unique features of an LCM—the ability to shoot more than ten rounds without reloading—are rarely, if ever, "commonly used . . . for self-

94 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

defense." *Bruen*, 142 S. Ct. at 2138. By contrast, revolvers or other types of handguns are commonly used in self-defense situations, both in firing and in brandishing. An outright prohibition on the concealed carrying of an item that is commonly used in self-defense is more burdensome than restrictions on the purchase and carrying of an item that is almost never used in self-defense situations.

This Court likewise finds that the anti-concealed carry laws of the nineteenth century are comparably justified to BM 114. The anti-concealed carry laws of the nineteenth century sought to restrict the use of a weapon that posed a threat to public safety by virtue of its increased popularity in the civilian market. Tr. 6/7/2023 729:6–15. These concealed carry laws were also aimed at limiting what was viewed as a particularly dangerous feature of these firearms: their design as being readily concealable, which was viewed as rendering them more deadly. Tr. 6/7/2023 721:10–20; 731:19–21. Similarly, BM 114 seeks to restrict the use of a firearm accessory that poses a threat to public safety by virtue of its particularly dangerous features.

### (g) Semi and Fully-Automatic Firearms

Finally, Defendants' presented evidence related to twentieth century laws regulating semi- and fully-automatic firearms. Before discussing whether these regulations are analogous to BM 114, it is necessary to consider *Bruen*'s discussion of the relevant time period to which courts should look when considering whether a regulation is consistent with the Nation's history and tradition.

*Bruen* cautioned courts that, when considering historical evidence, "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Most useful to understanding whether a modern regulation is consistent with history and tradition, the Supreme Court noted, is evidence that does not "long predate[]" either the adoption of the Second Amendment in 1791 or the Fourteenth

95 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Amendment in 1868. *Id.* Accordingly, and as discussed above, the vast majority of the historical analogues on which Defendants rely come from either the eighteenth or nineteenth centuries. Historical evidence that post-dates the adoption of the Fourteenth Amendment, according to the Supreme Court, can be used to confirm earlier historical traditions, but cannot be used as evidence to contradict or override those traditions. *Id.* at 2137 (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (Kavanaugh, J., dissenting) ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.")). Accordingly, historical evidence from the twentieth century is useful only to the extent that it confirms the historical traditions from the eighteenth and nineteenth centuries on which Defendants chiefly rely.

Fully-automatic and semi-automatic firearms, as well as large-capacity ammunition feeding devices, entered the U.S. civilian market following World War I. Tr. 6/8/2023 883:1–5; 885:16–886:1; 884:23–885:5. These changes in firearm technology allowed individuals to fire a greater number of rounds than ever before without needing to reload. Tr. 6/8/2023 887:8–12.

According to Dr. Spitzer, governments quickly responded to the proliferation of these new technologies among civilians. Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in some instances, prohibiting the possession of fully-automatic firearms. Tr. 6/8/2023 884:10–13. Dr. Spitzer testified that at least twenty-three states enacted regulations in the 1920s that effectively restricted magazine capacity by prohibiting individuals from possessing firearms that could fire over a certain number of rounds. Tr. 6/8/2023 887:13–16. And while many of these statutes only applied to automatic firearms, at least six states and the District of Columbia passed restrictions on firearms that could fire more than a certain number of rounds semi-automatically without reloading. Ex. 635 at 3, 13, 14, 20, 23, 30. Some states, like

96 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ohio, allowed possession only if any individual obtained a permit. Tr. 6/8/2023 919:7–13; Ex. 635 at 20. Other states, by contrast, did not allow possession of these firearms under any circumstances, and limited the capacity of possessable firearms well-below the restrictions of BM 114. Ex. 635 at 13, 30.

Dr. Spitzer testified that he was not aware of any law from the early twentieth century that specifically addressed LCMs. However, LCMs were effectively restricted by laws regulating firearms capable of firing over a certain number of rounds, such as laws restricting the possession of semi-automatic firearms that could fire more than twelve rounds. Tr. 6/8/2023 926:4–8. Some states specifically prohibited semi-automatic firearms where the magazines had been expanded to accept extra capacity, illustrating a regulatory focus on limiting the number of rounds that an individual could fire without reloading. Ex. 365 at 14. Thus, restrictions on semi- and fully-automatic firearms were closely associated with restrictions on ammunition magazines or their equivalents.[30]

This Court finds that these twentieth century restrictions on semi- and fully-automatic firearms overall imposed a comparable burden on the right to self-defense as BM 114's restrictions on LCMs. As Dr. Spitzer testified, semi- and fully-automatic firearms were first created for warfare and were of limited value to civilian self-defense, though Tommy guns were marketed to civilians for that purpose. A restriction on their possession or use therefore imposed a relatively minimal burden on the right to self-defense. The twentieth century restrictions on

---

[30] While Defendants did not rely on this evidence at trial, this Court also notes that magazine capacity was capped at ten rounds for detachable magazines throughout the entire country from 1994 to 2004. Tr. 6/6/2023 405:22–23; 525:21–526:7; *see also* Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). This further confirms a tradition of regulating firearms based on magazine capacity.

97 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

semi- and fully-automatic firearms also did not prohibit an individual from purchasing multiple firearms, or multiple magazines, to increase their firepower. This Court notes that while some regulations on semi- and fully-automatic firearms allowed possession if an individual obtained a permit, other regulations allowed for no such exceptions, and limited capacity to near or below that of BM 114's ten-round restriction. *See, e.g.*, Ex. 635 at 2, 13, 14, 23. Accordingly, this Court finds that some of these regulations burdened the right to self-defense less than BM 114, while some burdened the right to self-defense more; in general, however, these regulations imposed a minimal burden on the right to self-defense.

Similarly, as discussed above, BM 114's restrictions on LCMs impose a minimal burden on the right to self-defense. Unlike many of the twentieth century restrictions on semi- and fully-automatic firearms, BM 114 only limits capacity, and does not limit the type of firearm an individual can purchase. Under BM 114, an individual can purchase a semi-automatic handgun, so long as that handgun is not capable of firing more than ten rounds without reloading. And similar to the twentieth century restrictions, under BM 114, an individual is allowed to purchase as many firearms and as many magazines as they desire—so long as no single magazine is capable of firing more than ten rounds without reloading.

This Court also finds that the twentieth century restrictions on semi- and fully-automatic firearms and BM 114 are comparably justified. Both seek to protect public safety by limiting a particularly dangerous feature of a weapon: in both cases, the ability to fire a large number of bullets without pausing to reload. Restrictions on semi- and fully-automatic firearms in the twentieth century were passed in response to the use of these firearms in the commission of violent crimes. Similarly, BM 114 was passed in response to the use of LCMs in violent mass shootings. As noted above, while these restrictions cannot independently form the basis of a

98 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

historical tradition of firearm regulation, they confirm the historical traditions from the eighteenth and nineteenth centuries discussed earlier, which is the tradition of regulating new firearms and weapons technology to restrict the features that rendered these weapons particularly dangerous.

In sum, this Court finds that Defendants have presented sufficient evidence to show that BM 114's restrictions on LCMs are consistent with the Nation's history and tradition of firearm regulation. Throughout this Nation's history, new technologies have led to the creation of particularly dangerous weapons. As those weapons became more common, they became tied with violence and criminality. In response, governments passed laws that sought to address the features of those weapons that made them particularly dangerous to public safety. BM 114's restrictions on LCMs are no different, and are thus constitutional under *Bruen*'s history and tradition test.

### 2. BM 114's permitting provisions do not violate the Second Amendment.

*Bruen* considered the constitutionality of New York's public carry licensing regime that required an applicant to demonstrate a special need for self-defense before the state would issue a license. *Bruen*, 142 S. Ct. at 2122. In striking down New York's law as violative of the Second Amendment, the Supreme Court noted that respondents—the New York state government—had failed to "identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. But the Supreme Court also noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" *Id.* at 2138 n.9 (alteration in original) (citation omitted). Accordingly, BM 114's permitting provisions are constitutional under *Bruen* if they constitute a *shall-issue* licensing regime.

99 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### a. BM 114's permitting provisions constitute a "shall-issue" licensing regime.

As described above, BM 114's permit-to-purchase regime requires applicants to satisfy several criteria before obtaining a permit: applicants must undergo a background check, fingerprinting, and a mental health check, complete a training course in firearms, and pay a fee. Ex. 1 § 4(1)(b)(A)–(E). If an applicant meets the criteria for a permit, the permit agent "shall issue" the permit. *Id.* § 4(3)(a). BM 114's mental health provision states that an applicant is not qualified to obtain a permit, however, if they "present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." *Id.* § 4(1)(b)(C).

Plaintiffs argue that BM 114 is not a shall-issue regime because the mental health provision makes the permitting agent's decision to approve or deny the application discretionary.[31] Defendants counter that BM 114's permitting regime, including the mental health provision, tracks with the types of permitting regimes explicitly approved of in *Bruen*.

In describing the types of constitutionally-permissible "shall-issue" licensing regimes, the Supreme Court explained that such regimes "often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9

---

[31] In pretrial briefing, Plaintiffs also argued that Defendants would be unable to implement the other portions of BM 114's permitting regime —including the firearms courses— without significant delays. This Court found that any claims regarding BM 114's constitutionality that hinged on future implementation of the permitting regime were unripe for adjudication and dismissed those claims without prejudice. *See* ECF 234.

100 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

(citation omitted). The Court explained that "the vast majority of states—43 by [its] count—are 'shall issue' jurisdictions." *Id*. at 2123. The Court then collected these forty-three "shall-issue" regimes in *Bruen*'s first footnote. *Id.* at 2123 n.1. One of these constitutional "shall-issue" regimes was Oregon's concealed handgun license ("CHL") regime. *Id.* (citing O.R.S. 166.291). The Court then explained in *Bruen*'s ninth footnote that these permitting regimes are "shall-issue" regimes because they "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials . . . rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Id.* at 2138 n.9 (internal citations omitted).

Defendants argue that *Bruen* approved of Oregon's CHL regime as a shall-issue regime and that BM 114 contains a mental health provision that mirrors Oregon's CHL regime. *Compare* Ex. 1 § 4(1)(b)(C) (stating that an individual is qualified to obtain a permit-to-purchase if they "[do] not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence") *with* O.R.S. 166.293(2) (stating that a sheriff may deny an individual a CHL if the sheriff "has reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence."). Defendants thus argue that the Supreme Court has implicitly approved the mental health provision found in BM 114 as constitutional.

Plaintiffs counter that *Bruen* only explicitly approves of the language of one section of Oregon's CHL permitting regime—O.R.S. 166.291—and the mental health provision comes

from a subsequent section of Oregon's CHL permitting regime: O.R.S. 166.293. Plaintiffs therefore argue that the Supreme Court would not approve of BM 114's mental health provision, which mirrors the language found in O.R.S. 166.293—not O.R.S. 166.291. Although Plaintiffs are correct that *Bruen* cites only to the first section of Oregon's CHL permitting regime, O.R.S. 166.291, their argument that the *Bruen* Court only approved that section is not well-taken. Oregon's CHL permitting regime includes a number of sections, including the mental health provision found in O.R.S. 166.293. To obtain a CHL permit under O.R.S. 166.291, the mental health provision in O.R.S. 166.293 must be satisfied. The language of BM 114's mental health provision mirrors the language in O.R.S. 166.293. One simply cannot legitimately read O.R.S. 166.291 as divorced from the sections that follow and supply further conditions for obtaining a CHL.

Moreover, review of the shall-issue statutes cited in *Bruen*'s first footnote shows that the Supreme Court only included citations to a single section of each of the forty-three cited shall-issue regimes, typically the first substantive section to deal with permitting requirements. There is no example of a citation that goes beyond a single section, which, again, is usually the regime's general permitting section. It is implausible that the Supreme Court intended to convey approval of only a single section of these forty-three permitting regimes. Rather, this Court finds that the most reasonable interpretation is that the *Bruen* Court's citations are used to refer to the entirety of each state's referenced firearms permitting regime. This interpretation is supported by the language of *Bruen* itself, in which the Supreme Court specifically refers to the statutes in the first footnote as coming from "'shall-issue' *jurisdictions*." *Bruen*, 142 S. Ct. at 2123 (emphasis added). Like Oregon's CHL permitting statutes, several of the statutes cited with approval in *Bruen* involve subsequent statutory sections that continue or clarify the state's permitting

102 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

framework. *See, e.g.*, Alaska Stat. § 18.65.705 (2020) (outlining qualifications to obtain a concealed handgun permit); Ark. Code Ann. § 5–73–310 (2019) (describing the application form for a concealed handgun permit); Colo. Rev. Stat. § 18–12–207 (2021) (describing the judicial review process for denial of a concealed handgun permit). This Court concludes that the statutes cited in *Bruen*'s first footnote are meant to convey approval of these shall-issue permitting regimes as a whole, rather than specific statutory sections.

Further, even if the Supreme Court did intend for these citations to signal approval of only those specifically-cited sections, several of the statutory sections cited in *Bruen*'s first footnote include nearly identical language to BM 114's mental-health provision. For example, in Missouri, "[a] concealed carry permit . . . shall be issued . . . if the applicant . . . [h]as not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have *a reasonable belief* that the applicant presents a danger to himself or others." Mo. Rev. Stat. § 571.101 (2016) (emphasis added). In Montana, a sheriff "*may deny an applicant a permit to carry a concealed weapon if the sheriff *has reasonable cause to believe* that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon." Mont. Code Ann. § 45-8-321 (2021) (emphasis added).[32] In North Dakota, the bureau of criminal investigation, which grants concealed carry permits, "*may deny approval for a license if the bureau *has reasonable cause to believe* that the applicant . . . has been or is a danger to self or others as demonstrated by evidence, including past pattern of behavior

_____

[32] Montana amended its concealed carry statute in 2023, but did not amend this language. *See* Mt. Legis. 474 (2023).

103 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

involving unlawful violence or threats of unlawful violence; past participation in incidents involving unlawful violence or threats of unlawful violence; or conviction of a weapons offense." N. D. Cent. Code Ann. § 62.1–04–03 (Supp. 2021) (emphasis added).[33] And in Wyoming, the state shall deny a permit "upon *reasonable grounds* for denial" which include "facts known to the sheriff which establish *reasonable grounds to believe* that the applicant has been or is *reasonably likely* to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section." Wyo. Stat. Ann. § 6–8–104 (2021) (emphasis added). This Court finds that the language in BM 114's mental health provision mirrors the language of these statutes, and that the specific approval of these statues in *Bruen* demonstrates that BM 114's mental health provision is constitutional.

Plaintiffs next argue that Oregon courts have interpreted O.R.S. 166.293(2) as giving the permitting agents discretion to deny a CHL, which, in turn, means that BM 114's substantially similar mental health provision makes BM 114's permitting decision discretionary. It is true that both state and federal courts have interpreted O.R.S. 166.293(2) as giving permitting agents discretion to deny an applicant a CHL based on an applicant's mental health, even when other statutory criteria have been satisfied. *See*, *e.g.*, *Helgeson v. Tillamook Cnty.*, No. 3:13–cv–01222–PK, 2014 WL 1946614, at *3 (D. Or. May 14, 2014); *Held v. Hanlin*, 239 Or. App. 486, 489 (2010). First, this Court notes that these decisions, while persuasive, do not bind this Court to a similar finding. Second, this Court is not aware of any state or federal decision that

---

[33] North Dakota amended its concealed carry statute in 2023, but did not amend this language. *See* N.D. Legis. H.B. 1339 (2023).

104 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

considered the CHL permitting regime in the context of the Second Amendment. Third, this Court finds that any limited discretion conferred by BM 114's mental health provision—which does mirror O.R.S. 166.293(2)—does not automatically convert BM 114 from a shall-issue regime to a constitutionally suspect regime.

Indeed, the *Bruen* Court acknowledged that some limited amount of discretion does not render a firearm permitting regime unconstitutional. In its first footnote, the Supreme Court stated, with approval, that "[t]hree States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like 'shall issue' jurisdictions." *Bruen*, 142 S. Ct. at 2123 n.1 (citation omitted). Connecticut's permitting regime gives officials "discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,'" which, in turn, "precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'" *Id.* (quoting Conn. Gen. Stat. § 29–28(b); *Dwyer v. Farrell*, 193 Conn. 7, 12 (1984)). This Court finds that the "suitable person" standard conveys *more* discretion than BM 114's mental-health provision. Likewise, in interpreting Rhode Island's permitting regime, the Supreme Court of Rhode Island has held that "while issuance of a license . . . is mandatory if an applicant has satisfied the statutory criteria, whether an applicant has satisfied such criteria 'involves an exercise of discretion' on the part of local officials." *Gadomski v. Tavares*, 113 A.3d 387, 390 (R.I. 2015) (citation omitted). Notwithstanding this discretion, the Supreme Court of Rhode Island found that the licensing regime did not "commit [the permitting regime] to the unfettered discretion of an executive agency," in large part because the regime includes "certain procedural steps . . . to allow a meaningful review" of any licensing decisions. *Id.* (citation omitted).

Like Rhode Island, BM 114 includes judicial review—available as a matter of right to any individual whose permit application is denied, and reviewed de novo, or without deference to the permitting agent's findings—which significantly limits the discretion of individual permitting agents. *See* Ex. 1 § 5.

Finally, Plaintiffs argue that even if BM 114 aligns perfectly with the type of shall-issue licensing regimes described in *Bruen*, any discussion of these regimes is dicta and therefore irrelevant to this Court's analysis. Plaintiffs are correct that the constitutionality of shall-issue regimes was not before the Supreme Court in *Bruen*, and so the Supreme Court's statements regarding shall-issue permitting regimes were not necessary to the disposition of the case. But within the Ninth Circuit, well-reasoned dicta is binding. *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013). The Ninth Circuit has defined well-reasoned dicta as discussion in an opinion that, while not necessary to the ultimate disposition of the case, is both "reasoned and deliberate." *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019). Well-reasoned dicta does not include comments "made casually and without analysis," "uttered in passing without due consideration of the alternatives," or "[done as] a prelude to another legal issue that commands the [court's] full attention." *Id.* (alteration in original) (citation omitted).

This Court concludes that *Bruen*'s discussion of shall-issue permitting regimes is well-reasoned dicta. The discussion was made neither in passing nor without analysis. Instead, the Supreme Court's discussion of shall-issue regimes appears both in the body of the opinion itself, *see Bruen*, 142 S. Ct. at 2123–24, and in multiple footnotes, *see id.* at 2123 n.1; *id.* at 2124 n.2; *id.* at 2138 n.9. In those discussions, the Supreme Court considered the statutory language of all forty-three shall-issue jurisdictions, *see id.* at 2123 n.1, and compared that statutory language to five proper-cause jurisdictions, *see id.* at 2124 n.2. The Supreme Court also grounded its

discussion of the presumptive constitutionality of shall-issue regimes in case law. *See id.* at 2138 n.9. Justice Kavanaugh, joined by Chief Justice Roberts, also separately reiterated the presumptive constitutionality of shall-issue regimes in his concurrence. *See id.* at 2162 (Kavanaugh, J., concurring). Though a concurrence is obviously not the same as a majority opinion, this Court nonetheless finds Justice Kavanaugh's independent discussion of the constitutionality of shall-issue regimes highly persuasive, particularly when considered in conjunction with the majority's own well-reasoned discussion about state firearms permitting regimes. And while it is true that the discussion of shall-issue regimes occurs before the larger discussion of the constitutionality of New York's proper-cause regime, this Court does not find that the discussion is a mere "prelude" to another legal issue. *Bruen* fundamentally alters the test against which Second Amendment challenges are judged. Accordingly, this Court finds that *Bruen*'s discussion of the presumptive constitutionality of certain widespread permitting regimes provides important context and analysis for the decision as a whole.

Accordingly, this Court holds that BM 114's permitting provisions do not, on their face, violate the Second Amendment. BM 114's permitting provisions contain the kind of narrow, objective criteria endorsed as constitutional in *Bruen*. BM 114's mental health provision is substantially similar to language contained in other shall-issue jurisdictions. And BM 114 contains sufficient procedural safeguards, like de novo judicial review, to prevent permitting agents from exercising unbridled discretion when conducting BM 114's mental health check.

**B. Fifth Amendment**

**1. BM 114's LCM restrictions are not an unconstitutional taking.**

The Fifth Amendment provides, in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. There are two kinds of government action which fall within the ambit of the Fifth Amendment: physical takings and

107 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

regulatory takings. Exercises of police power are not compensable under the Takings Clause. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . .").

As noted above, with respect to licensed gun dealers, BM 114 makes it a misdemeanor to manufacture, import, possess, use, purchase, sell, or otherwise transfer any LCM in Oregon. Ex. 1 § 11(2). However, BM 114 contains various exceptions to this general prohibition. Licensed gun dealers that have LCMs in their inventory have several options within the 180 days after BM 114 takes effect. During that time, a licensed gun dealer may transfer or sell LCMs within their inventory to a non-resident gun dealer or other transferee located out of state. *Id.* § 11(3)(a)(A). The licensed dealer may also purchase LCMs from any owner for permanent removal from Oregon. *Id.* § 11(3)(a)(B). And a licensed dealer may permanently alter any LCM in their inventory such that it is no longer capable of accepting more than ten rounds of ammunition. *Id.* § 11(3)(a)(C).

Similarly, as noted above, current owners and future inheritors of LCMs can possess and use LCMs obtained prior to BM 114's effective date. *Id.* § 11(5). However, they may only use LCMs at their home (or on property under their control), on the premises of a gun dealer, at shooting ranges, for recreational activities like hunting, at firearms competitions or exhibitions, for certain educational purposes, or during transport to or from one of these permissible locations. *Id.* § 11(5)(c)(A)–(E).

Plaintiffs argue that absent BM 114, LCMs would be sellable and in demand, but, because of BM 114, LCMs are effectively worthless. With respect to licensed gun dealers,

108 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs argue that forcing businesses to sell their property, move it out of state, or permanently alter it places an unconstitutional condition on constitutionally protected conduct, which thereby effects a taking. With respect to individuals, Plaintiffs contend that making individuals prove that they obtained property before BM 114 took effect and limiting the ability to use that property destroys such a large portion of the property right that it constitutes a regulatory taking. According to Plaintiffs, BM 114, at a minimum, places an unconstitutional condition on constitutionally protected conduct, constituting a taking.

Defendants respond that BM 114 is neither a physical nor a regulatory taking because BM 114 is an exercise of police power, which is not compensable under the Takings Clause. Furthermore, Defendants argue that a permanent injunction is not a proper remedy for a takings claim, which can be remedied with damages. Finally, with respect to Plaintiffs' regulatory takings claim, Defendants argue that Plaintiffs cannot show a sufficient diminution in the value of their property to establish that the regulation has interfered with distinct investment backed expectations.

This Court agrees with Defendants that BM 114 effects neither a physical nor a regulatory taking. The Takings Clause only applies to property that has been taken for public use. U.S. Const. amend. V. Property seized pursuant to the police power is not taken for public use and is not compensable under the Fifth Amendment. *Lucas*, 505 U.S. at 1027 (1992); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 417 (1922); *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008). The Supreme Court has long held that states may regulate the use of certain property, without compensation, to protect public health and safety without violating the Fifth Amendment. *See e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887)

109 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

(holding that a state law prohibiting the manufacture and sale of intoxicating liquors except for limited purposes did not constitute a compensable taking).

At trial, Defendants demonstrated that BM 114's regulation of LCMs serves Oregon's public health and safety interests. Defendants presented credible and undisputed evidence that state laws banning LCMs reduce the incidents of mass shootings between 48 to 72 percent and decrease the number of fatalities that occur in these mass shootings by 37 to 75 percent. Tr. 6/6/2023 506:14–19. According to Defendants' expert Dr. Michael Siegel, the relationship between these restrictions and reductions in mass shootings is so pronounced that it is a causal relationship, meaning that the restrictions led, at least in part, to the reductions. Tr. 6/6/2023 508:11–509:21.

Indeed, in *Duncan v. Bonta*, the Ninth Circuit sitting en banc rejected a takings claim challenging an even stricter ban on LCMs in California. *Duncan*, 19 F.4th at 1111–12. Unlike BM 114, the California ban did not contain a "grandfather clause" allowing current owners or future inheritors of large-capacity magazines to keep those magazines. *See* Cal. Penal Code § 32310. The Ninth Circuit explained that "[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." *Duncan*, 19 F.4th at 1112. The Ninth Circuit noted that, "[t]o the contrary, the Supreme Court has made clear that 'the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers.'" *Id.* (quoting *Lucas*, 505 U.S. at 1027).

Plaintiffs concede that, had the *Duncan* en banc decision not been vacated post-*Bruen*, "their Takings challenge would be foreclosed by Ninth Circuit precedent." ECF 165 at 50.

However, Plaintiffs argue that this Court should not consider the *Duncan* decision because it "*was* vacated—and it was vacated in its entirety." ECF 165 at 50. Although the Supreme Court certainly vacated the *Duncan* decision following its decision in *Bruen*, the Court vacated and remanded the case "for further consideration *in light of* [*Bruen*]." *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (emphasis added); *see also Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022). As the *Bruen* Court did not consider a Fifth Amendment challenge, *Duncan*'s takings analysis cannot be reconsidered "in light of" *Bruen*. While an opinion that has been vacated is no longer binding circuit precedent, *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998), since nothing in *Bruen* affected the Ninth Circuit's takings analysis, this Court finds that *Duncan* is still persuasive authority with respect to Plaintiffs' takings claim. *See In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (a decision vacated on other grounds is still persuasive authority); *see also Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (a decision vacated as moot is still persuasive authority); *Roe*, 134 F.3d at 1404 (a decision vacated as unripe is still persuasive authority). This Court agrees with the Ninth Circuit's reasoning in *Duncan* and concludes that LCMs regulated or seized as a result of BM 114 are not compensable under the Fifth Amendment because, in enacting BM 114's restrictions on LCMs, Oregon was acting pursuant to its police power.

Furthermore, even if Plaintiffs had viable takings claims, injunctive relief is not generally a proper remedy for a takings claim, which can be remedied with damages. "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can

be brought against the sovereign subsequent to the taking.") (citation omitted). "Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Knick*, 139 S. Ct at 2176; *see* 28 U.S.C. §§ 1346(a), 1491 (providing a federal cause of action for takings claims in the Court of Federal Claims); O.R.S. 35.015 *et seq.* (prescribing the procedure for eminent domain cases in Oregon). In short, as long as there is an adequate remedy at law, a plaintiff is not ordinarily entitled to injunctive relief. *Knick*, 139 S. Ct. at 2176. Plaintiffs do not seek compensatory damages for their Fifth Amendment challenge—they seek only declaratory and injunctive relief, and nominal damages. *See* ECF 158 at 52; ECF 67 at 42. This Court finds that there is an adequate remedy at law for Plaintiffs' takings claim and there is, therefore, no basis for this Court to enjoin BM 114 as a remedy for a takings claim.

Finally, to succeed on a regulatory takings claim, Plaintiffs must show both "the economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment backed interests." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012). Plaintiffs have failed to do so. Plaintiffs produced no evidence at trial, beyond speculative statements by fact witnesses about potential losses, to support a finding that BM 114's LCM restrictions would have a substantial adverse economic impact on Plaintiffs. At trial, Plaintiffs' witness Jessica Harris testified that she did not know how much of a potential loss her store might suffer if she had to comply with BM 114 by selling or otherwise moving her LCMs out of state. Tr. 6/5/2023 56:10–16. Ms. Harris testified that she "would speculate" that the price would be less than the cost of the LCMs, but admitted that she had done no research to confirm that suspicion. Tr. 6/5/2023 56:25–57:5. Ms. Harris also testified that while customers currently primarily purchase LCMs, it is entirely possible that those customers will simply

112 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

switch to purchasing ten-round magazines. Tr. 6/5/2023 54:17–20. Plaintiff Adam Johnson likewise testified that his assumption that BM 114 would cause his business economic loss was based on "speculation" rather than accounting data. Tr. 6/5/2023 76:16–22. These speculative assertions about loss are insufficient to prove that BM 114 would have a negative economic impact on Plaintiffs.

Plaintiffs' Fifth Amendment physical and regulatory takings challenges thus fail for three reasons. First, BM 114 is an exercise of police power, and Defendants have presented evidence at trial showing that BM 114 is related to public health and safety. Second, even if Plaintiffs' claims were viable, the relief they seek is not appropriate for this Court to grant. Third, Plaintiffs have failed to provide any non-speculative evidence regarding the potential negative economic impact of BM 114 to support their regulatory takings claim. Therefore, this Court concludes that Plaintiffs have failed to prove that BM 114's LCM restrictions are a taking in violation of the Fifth Amendment.

## C. Fourteenth Amendment

### 1. BM 114's permitting regime does not violate due process.

In addition to challenging BM 114's permitting provisions as violating the Second Amendment, Plaintiffs argue that BM 114's permitting provisions violate the Due Process clause of the Fourteenth Amendment. The Fourteenth Amendment provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

Plaintiffs did not, either in briefing or at trial, provide this Court with a standard by which their Due Process challenge to BM 114's permitting provisions should be assessed. In their motion for summary judgment, for instance, Plaintiffs do not use the phrase "due process" even once in their argument challenging BM 114's permitting provisions under the Fourteenth

Amendment. *See* ECF 165 at 12–18. Plaintiffs also cite to no case that has considered a firearm

permitting regime under the Due Process Clause of the Fourteenth Amendment.

This Court acknowledges that courts typically follow the principle of party presentation,

where courts "rely on the parties to frame the issues for decision and assign to courts the role of

neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243

(2008). Plaintiffs have failed to frame their Due Process claim for this Court. Nonetheless, this

Court finds that to succeed on their Due Process claim, Plaintiffs must show both a deprivation

of a constitutionally protected liberty or property interest, and a denial of adequate procedural

protections. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir.

1998).

Plaintiffs do not appear to argue that they have a protected property interest in firearms;

they argue that BM 114's permitting regime deprives them of a constitutionally protected liberty

interest, or the right to keep and bear arms. As discussed above, this Court does not find that BM

114's permitting provisions violate the Second Amendment on their face.[34] Because Plaintiffs

---

[34] The thrust of Plaintiffs' argument with respect to their Due Process claim hinges on
implementation of BM 114. Plaintiffs essentially argue that when BM 114 is implemented, it will
operate in such a way that individuals will be unable to receive a permit, due to lack of funding,
bureaucratic disorganization, and the refusal of the FBI to process background checks. *See* ECF
165 at 18–28. As this Court has previously held, *see* ECF 234 at 5–6, this evidence goes to
Plaintiffs' unripe as-applied challenge, not their facial challenge. Speculation about how BM 114
might be implemented in the future—including whether the FBI's refusal to process background
checks will in practice prohibit a permitting agent from issuing a permit—is irrelevant to a facial
challenge, which looks only at the language of the statute. *Calvary Chapel Bible Fellowship v.
Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020) ("[W]hen reviewing a facial challenge,
[courts] are limited to reviewing the text of the ordinance itself, not what others have said the
statute means. How the statute has been interpreted and applied by local officials is the province
of an as-applied challenge . . . .") At trial, Plaintiffs argued that the FBI cannot run background
checks under BM 114 as a matter of law. But the law to which Plaintiffs aver—Public Law 92-
544—requires the FBI to consider certain discretionary factors, like whether a law is in violation
of public policy, before deciding whether the agency can run background checks. *See* Pub. L. 92-

114 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

have not shown that BM 114's permitting regime violates their Second Amendment rights, Plaintiffs have not shown that the permitting regime deprives them of a protected liberty interest. Plaintiffs' Due Process claim therefore fails because Plaintiffs have failed to make out the threshold element of their claim.

### 2. BM 114's LCM restrictions do not violate due process.

#### a. BM 114's LCM restrictions are not retroactive.

Plaintiffs argue that BM 114's prohibitions on magazines with a capacity of more than ten rounds apply retroactively. Plaintiffs suggest that the law is retroactive because it "appl[ies] a criminal prohibition to federally licensed individuals and enterprises who lawfully possessed the now-banned magazines for decades before the statute took effect." ECF 165 at 52.

Defendants respond that BM 114 is not retroactive because it "does not punish past purchases, possession, or any acts that occurred before its effective date" and "[l]ike other health and safety measures, it operates prospectively." ECF 185 at 13; *see also* ECF 167 at 40–41.

This Court agrees with Defendants that BM 114's restrictions on LCMs are not retroactive. The Supreme Court has explained that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269 (1994) (citation omitted). Nor does it operate retrospectively because it "upsets expectations based in prior law." *Id.* Rather, "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70.

---

544 (Oct. 25, 1972). It is not clear from the face of that law that BM 114 runs afoul of these provisions, and any stipulated fact to the contrary is outside of the scope of a facial challenge.

BM 114's LCM restrictions do not operate retroactively because they do not attach new legal consequences to any conduct completed before BM 114's enactment. BM 114 does not criminalize purchases, possession, or use of LCMs that occurred prior to the measure's enactment. Indeed, BM 114 expressly allows current owners and inheritors to keep and continue to use LCMs purchased prior to the measure's enactment. BM 114 does not render Plaintiffs' already-possessed LCMs illegal. BM 114 allows Plaintiffs to retain possession of these LCMs on their property, and allows Plaintiffs to use these LCMs in limited situations. Ex. 1 § 11(5)(c)(C)–(D).

### i. Even assuming BM 114's LCM restrictions are retroactive, Defendants provide adequate justification for these restrictions.

Even if this Court were to find that BM 114 operates retroactively, Plaintiffs due process rights are not infringed if Defendants can justify its retroactive application. A retroactive law does not violate due process where "the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means." *Pension Ben. Guar Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

Defendants' public safety interest in regulating LCMs is a legitimate legislative purpose. As discussed above, Defendants set forth evidence showing that LCMs are frequently used in the commission of mass shootings and that the use of LCMs in mass shootings increases the lethality of these events. Tr. 6/6/2023 415:23–416:2; 422:21–424:13. The LCM restrictions are also a rational means of furthering this interest in public safety. Defendants produced evidence at trial showing both that LCMs are connected to increased lethality in mass shooting events, and that state-level restrictions on LCMs reduce the occurrence of these events and their overall lethality. Tr. 6/6/2023 422:21–424:13; 506:2–5. Indeed, Plaintiffs concede that a state's interest in public safety is generally considered a compelling interest. ECF 161 at 24. Accordingly, this Court

116 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

finds that BM 114's LCM restrictions do not violate the Due Process Clause of the Fourteenth Amendment.

### b. BM 114's LCM restrictions are not void for vagueness.

Plaintiffs argue that BM 114's LCM restrictions are unconstitutionally vague because they include any fixed or detachable magazine, or similar device, "that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition." Ex. 1 § (11)(1)(d). Plaintiffs argue that this language is unconstitutionally vague because it does not give fair notice about what types of magazines are restricted.

A law is void-for-vagueness if it does not give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a violation of the statute may result in a criminal penalty and when the statute does not include a scienter requirement, a court must scrutinize a potentially vague law with heightened scrutiny. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

BM 114 makes it a misdemeanor to manufacture, import, possess, use, purchase, sell, or otherwise transfer LCMs. Ex. 1 § 11(6). BM 114 does not include a scienter requirement. Accordingly, this Court pays particular attention to whether BM 114's restrictions on LCMs give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Plaintiffs argue that BM 114 is unconstitutionally vague because it prohibits magazines that "can be readily restored, changed, or converted to accept" more than ten rounds. Ex. 1 § 11(1)(d). Defendants argue that BM 114 is not vague because it gives the person of ordinary intelligence notice that "magazines that can be quickly altered to accept more than ten rounds" are prohibited. ECF 167 at 39.

117 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs counter that if BM 114 means what Defendants say it means, then BM 114 restricts essentially all magazines because any magazine that can hold ten rounds or fewer can be "quickly altered" to accept more than ten rounds. To support this position, Plaintiffs elicited testimony from their fact witness Adam Johnson, a plaintiff in this action who owns a gun store. Mr. Johnson testified that, based on his experience as a gunsmith, "almost all supposed ten-round magazines . . . are easily readily modifiable with either factory or aftermarket parts that would make them not compliant with [BM] 114." Tr. 6/5/2023 74:2–5. Mr. Johnson testified that "even the ten-round magazines . . . most of them do not even require tools, or if they do require, a very simple hand tool, like a punch or a screwdriver, to remove the baseplate from the magazine and then add an extended baseplate, which would increase the capacity of that magazine." Tr. 6/5/2023 79:10–15. Mr. Johnson further testified that some magazines "don't require any tools at all" to modify, and that an individual "can just use [their] fingers." Tr. 6/5/2023 80:18–19.

Mr. Johnson's testimony is unpersuasive for several reasons. First, this Court notes that Defendants' expert Jim Yurgealitis testified that a ten-round capacity magazine cannot be extended without an individual taking affirmative steps of purchasing additional equipment (at least a baseplate extender, but also sometimes a stronger spring), removing the existing baseplate of the magazine, and adding the extender. Tr. 6/6/2023 531:15–25; 532:7–10. Contrary to Plaintiffs argument, this Court does not find that a standard ten-capacity magazine is "readily convertible" to an LCM if such conversion requires an individual to complete at least three affirmative, additional steps to extend the magazine. Indeed, a ten-round capacity magazine is not readily convertible until the individual removes the baseplate of the magazine—without removing the baseplate, the magazine cannot be extended. Accordingly, any ten-round magazine with an intact baseplate would not violate BM 114.

118 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs produced no evidence suggesting that an individual would remove a baseplate of a ten-round magazine for any other purpose than extending the magazine's capacity. This Court acknowledges that the evidence at trial shows that an individual could take steps to alter a ten-round capacity magazine such that it might run afoul of BM 114's restrictions. But a statute is not void for vagueness merely because an individual could take affirmative steps to come close to breaking the law.[35] *See Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.") (citations omitted).

Second, this Court notes that the "readily convertible" language with which Plaintiffs take issue appeared, in almost identical form, in the Federal Assault Weapons Ban, which was in effect from 1994 to 2004. The federal ban defined LCMs as "a magazine, belt, drum, feed strip, or similar device . . . that has a capacity of, or that can be readily restored or converted to accept, more than [ten] rounds of ammunition." Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). Plaintiffs have not found, and this Court is not aware, of any court that found this provision of the federal ban to be void for vagueness. Nor have Plaintiffs shown that there was widespread confusion for a decade across the country about the meaning of this law. To the contrary, Plaintiffs' expert Mark Hanish testified that he sold magazines with a capacity of ten rounds during the federal ban. Tr. 6/5/2023 131:22–132:12. Mr. Hanish testified that during the

---

[35] Whether a ten-round magazine with the baseplate removed would violate BM 114 is not for this Court to decide. This Court need not parse every potential hypothetical scenario to find what is generally prohibited under BM 114. BM 114's prohibition on magazines that hold more than ten rounds of ammunition would be clear to the ordinary person. Cases in which BM 114 might be enforced in a manner inconsistent with this general meaning are best saved for as-applied challenges.

119 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

federal ban, there were no regulatory barriers to the sale of magazines, other than obtaining a Federal Firearms License. Tr. 6/5/2023 133:3–5.[36]

In sum, this Court finds that BM 114 gives "the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and is not unconstitutionally vague. *Grayned*, 408 U.S. at 108.

## VIII.    CONCLUSION

The Supreme Court has held that Second Amendment protects an individual right to self-defense inside and outside of the home. LCMs are not commonly used for self-defense, and are therefore not protected by the Second Amendment. Even if LCMs are protected by the Second Amendment, BM 114's restrictions are consistent with this Nation's history and tradition of regulating uniquely dangerous features of weapons and firearms to protect public safety. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Second Amendment challenge to BM 114's LCM restrictions.

The Second Amendment also allows governments to ensure that only law-abiding, responsible citizens keep and bear arms. BM 114's permit-to-purchase regime, on its face, sets forth objective criteria for the issuance of permits, and does not allow unfettered discretion by permitting agents in assessing an applicant's mental health status to ensure that only law-abiding and responsible citizens can purchase firearms in the state of Oregon. This Court accordingly

---

[36] Plaintiff Adam Johnson testified that "[w]ithin a day or two after the passage of [BM] 114 . . . almost all [firearms] distributors" stopped shipping to his store because of confusion around what magazines were permitted. Tr. 6/5/2023 73:15–19. This is inconsistent with Mr. Johnson's testimony that following BM 114's passage, his store continued to purchase LCMs "in bulk" and was "overnighting cases" of 30-round magazines to meet customer demand. Tr. 6/5/2023 73:4–11.

120 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Second Amendment challenge to BM 114's permit-to-purchase regime.

The Fifth Amendment protects an individual from having their property taken by the government for public use without just compensation. But the Fifth Amendment does not prevent the government from exercising its police power to protect the public welfare. BM 114's LCM restrictions are a valid exercise of police power. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fifth Amendment challenge to BM 114's LCM restrictions.

The Due Process Clause of the Fourteenth Amendment prevents the government from depriving a person of liberty without due process of law. Plaintiffs have failed to show that BM 114's permitting provisions deprive them of liberty, because BM 114's permitting provisions do not violate their Second Amendment rights. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's permitting provisions.

The Due Process Clause of the Fourteenth Amendment also prevents the government from passing retroactive laws, unless the government can point to a legitimate legislative purpose furthered by rational means. BM 114 does not impose retroactive penalties on the possession of LCMs, and is therefore not retroactive. Moreover, Defendants' interest in public safety provides a legitimate legislative purpose furthered by rational means. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's LCM restrictions.

Finally, the Due Process Clause of the Fourteenth Amendment prevents governments from passing laws that are so vague that they fail to give a person of ordinary intelligence fair

121 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

notice of what is prohibited. BM 114's LCM restrictions give a person of ordinary intelligence fair notice of what is prohibited. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's LCM restrictions.

This Court enters judgment in favor of Defendants and Intervenor-Defendant on all claims.

**IT IS SO ORDERED.**

DATED this 14th day of July, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

122 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-PAB**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

   Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

   Defendant.

_____

## MOTION FOR TEMPORARY RESTRAINING ORDER
_____

   Plaintiffs submit the following Motion for Temporary Restraining Order.

### INTRODUCTION

   This action is a challenge to the constitutionality of Senate Bill 23-169 enacted by the Colorado General Assembly and signed by Governor Polis on April 27, 2023 ("SB23-169"). SB-23-169 prohibits law-abiding adults over the age of 18 but under the age of 21 from purchasing a firearm of any type. As such, it is unconstitutional under the Second Amendment.

   SB23-169 will become effective on August 8, 2023. On June 7, 2023, Plaintiffs filed their motion for preliminary injunction (ECF 12). That motion is now fully briefed. As set forth in the motion, Plaintiffs reserved the option of applying for a temporary restraining order shortly prior to the effective date of SB23-169 if there had been no ruling on the motion. *See* ECF 12, p. 2. The Act will become effective in five days. Hence, Plaintiffs hereby move the Court to enter a temporary restraining order for the reasons set forth below.

1

## ARGUMENT

### I.    Certification

The undersigned certifies that he conferred with counsel for Defendant regarding this motion. Defendant opposes this motion.

### II.    Standard for Temporary Restraining Order

A party seeking a TRO must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). A showing of probable irreparable harm is the single most important prerequisite for the issuance of a TRO; therefore, the moving party must first demonstrate that such injury is likely before the other requirements will be considered. *A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5*, 2020 WL 2197920, at *2 (D. Colo. 2020), *quoting, First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017). The loss of constitutional freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir.2003) (citation omitted). The third and fourth factors identified in *Roda Drilling*, *supra*, also weigh in favor of Plaintiffs. When a law is likely unconstitutional, the government's interest in enforcing the law does not outweigh that of individuals in securing the protection of their constitutional rights. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1132.

2

**III.     Plaintiffs Are Entitled to a Temporary Restraining Order**

The requirements for obtaining a temporary restraining order "are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). Accordingly, Plaintiffs incorporate their arguments in support of their motion for a preliminary injunction. See ECF 12, ECF 30, and ECF 32.

WHEREFORE, Plaintiffs respectfully move the Court to issue a temporary restraining order preventing the constitutional law from going into effect on August 8, 2023. Plaintiffs have attached a form of TRO.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
Voice:  (303) 205-7870; Fax:  (303) 463-0410
Email:  barry@arringtonpc.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-PAB**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## TEMPORARY RESTRAINING ORDER

---

1.      The Court GRANTS the motion for a temporary restraining order filed by Plaintiffs against Defendant.

2.      The Court **ENTERS** this Temporary Restraining Order on August ___, 2023 at _____ __.M.  Fed. R. Civ. P. 65(b)(2).

3.      For purposes of this Order the term "Act" shall mean Senate Bill 23-169, a copy of which is attached hereto.

4.      The Court **ENJOINS** the Defendant from enforcing; attempting to enforce; threatening to enforce; or otherwise requiring compliance with the provisions of the Act.

5.      Unless the Court enters this Temporary Restraining Order, the Plaintiffs and/or their members will suffer irreparable harm.  Plaintiffs reasonably fear prosecution, including fines, arrest, and jail, if they purchase a firearm.

6.      Plaintiffs do not need to post a security bond because enjoining the Defendant from prohibiting Plaintiffs' exercise of their Second Amendment rights does not interfere with the Defendant's rights.  Fed. R. Civ.P. 65(c).

August __, 2023 at _____ __.M..

BY THE COURT


_____

Judge, United States District Court

SENATE BILL 23-169

BY SENATOR(S) Mullica and Danielson, Bridges, Coleman, Cutter, Exum, Fields, Gonzales, Hansen, Jaquez Lewis, Kolker, Moreno, Rodriguez, Sullivan, Fenberg;
also REPRESENTATIVE(S) Duran and Hamrick, Kipp, Amabile, Bacon, Bird, Boesenecker, Brown, Daugherty, deGruy Kennedy, Dickson, English, Froelich, Gonzales-Gutierrez, Herod, Jodeh, Joseph, Lindsay, Lindstedt, Mabrey, McCormick, Michaelson Jenet, Parenti, Ricks, Sirota, Snyder, Valdez, Velasco, Weissman, Willford, Woodrow, McCluskie.

CONCERNING INCREASING THE LEGAL AGE TO PURCHASE A FIREARM TO TWENTY-ONE YEARS OF AGE, WITH LIMITED EXCEPTIONS.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, 18-12-101, **add** (1)(b.7) and (1)(c.5) as follows:

**18-12-101. Peace officer affirmative defense - definitions.** (1) As used in this article 12, unless the context otherwise requires:

(b.7) "FIREARM" MEANS ANY WEAPON, INCLUDING A STARTER GUN, THAT CAN, IS DESIGNED TO, OR MAY READILY BE CONVERTED TO EXPEL A

_____
*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

App 625

PROJECTILE BY THE ACTION OF AN EXPLOSIVE; THE FRAME OR RECEIVER OF A FIREARM; OR A FIREARM SILENCER. "FIREARM" DOES NOT INCLUDE AN ANTIQUE FIREARM, AS DEFINED IN 18 U.S.C. SEC. 921 (a)(16). IN THE CASE OF A LICENSED COLLECTOR, "FIREARM" MEANS ONLY CURIOS AND RELICS. "FIREARM" INCLUDES A WEAPONS PARTS KIT THAT IS DESIGNED TO OR MAY READILY BE COMPLETED, ASSEMBLED, RESTORED, OR OTHERWISE CONVERTED TO EXPEL A PROJECTILE BY THE ACTION OF AN EXPLOSIVE. "FIREARM" DOES NOT INCLUDE A WEAPON, INCLUDING A WEAPONS PARTS KIT, IN WHICH THE FRAME OR RECEIVER OF THE FIREARM, AS DEFINED IN SUBSECTION (1)(c.5) OF THIS SECTION, OR THE WEAPON, IS DESTROYED.

(c.5) "FRAME OR RECEIVER OF A FIREARM" MEANS A PART OF A FIREARM THAT, WHEN THE COMPLETE FIREARM IS ASSEMBLED, IS VISIBLE FROM THE EXTERIOR AND PROVIDES HOUSING OR A STRUCTURE DESIGNED TO HOLD OR INTEGRATE ONE OR MORE FIRE CONTROL COMPONENTS, EVEN IF PINS OR OTHER ATTACHMENTS ARE REQUIRED TO CONNECT THE FIRE CONTROL COMPONENTS. ANY PART OF A FIREARM IMPRINTED WITH A SERIAL NUMBER IS PRESUMED TO BE A FRAME OR RECEIVER OF A FIREARM, UNLESS THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES MAKES AN OFFICIAL DETERMINATION OTHERWISE OR THERE IS OTHER RELIABLE EVIDENCE TO THE CONTRARY.

**SECTION 2.** In Colorado Revised Statutes, 18-12-112, **add** (2)(e), (2)(f), and (2)(g) as follows:

**18-12-112.   Private firearms transfers - sale and purchase - background check required - penalty - definitions.** (2) (e)  A PERSON WHO IS NOT A LICENSED GUN DEALER SHALL NOT MAKE OR FACILITATE THE SALE OF A FIREARM TO A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE.

(f)  IT IS UNLAWFUL FOR A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE TO PURCHASE A FIREARM.

(g)  SUBSECTIONS (2)(e) AND (2)(f) OF THIS SECTION DO NOT APPLY IF:

(I)  THE PERSON IS AN ACTIVE MEMBER OF THE UNITED STATES ARMED FORCES WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE UNITED STATES ARMED FORCES; OR

PAGE 2-SENATE BILL 23-169

(II) THE PERSON IS A PEACE OFFICER, AS DESCRIBED IN SECTION 16-2.5-101, WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE EMPLOYING AGENCY, AS SET FORTH IN SECTION 16-2.5-101 AND SECTION 16-2.5-135; OR

(III) THE PERSON IS CERTIFIED BY THE P.O.S.T. BOARD PURSUANT TO SECTION 16-2.5-102.

**SECTION 3.** In Colorado Revised Statutes, 18-12-112.5, **amend** (1) as follows:

**18-12-112.5.   Firearms transfers by licensed dealers - sale and purchase - background check required - penalty - definitions.** (1) (a) It is unlawful for a licensed gun dealer to transfer a firearm to a transferee until the dealer has obtained approval for the firearms transfer from the bureau after the bureau has completed any background check required by state or federal law.

(a.3) A PERSON WHO IS A LICENSED GUN DEALER SHALL NOT MAKE OR FACILITATE THE SALE OF A FIREARM TO A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE.

(a.5) IT IS UNLAWFUL FOR A PERSON WHO IS LESS THAN TWENTY-ONE YEARS OF AGE TO PURCHASE A FIREARM. THIS SUBSECTION (1)(a.5) AND SUBSECTION (1)(a.3) OF THIS SECTION DO NOT APPLY IF:

(I) THE PERSON IS AN ACTIVE MEMBER OF THE UNITED STATES ARMED FORCES WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE UNITED STATES ARMED FORCES; OR

(II) THE PERSON IS A PEACE OFFICER, AS DESCRIBED IN SECTION 16-2.5-101, WHILE ON DUTY AND SERVING IN CONFORMANCE WITH THE POLICIES OF THE EMPLOYING AGENCY, AS SET FORTH IN SECTION 16-2.5-101 AND SECTION 16-2.5-135; OR

(III) AN INDIVIDUAL CERTIFIED BY THE P.O.S.T. BOARD PURSUANT TO SECTION 16-2.5-102.

(b) Transferring OR SELLING a firearm in violation of this subsection (1) is a class 1 misdemeanor.

PAGE 3-SENATE BILL 23-169

(c)  PURCHASING A FIREARM IN VIOLATION OF THIS SUBSECTION (1) IS A CLASS 2 MISDEMEANOR.

**SECTION 4.  Act subject to petition - effective date.** This act takes effect at 12:01 a.m. on the day following the expiration of the ninety-day period after final adjournment of the general assembly; except that, if a referendum petition is filed pursuant to section 1 (3) of article V of the state constitution against this act or an item, section, or part of this act within such period, then the act, item, section, or part will not take effect

PAGE 4-SENATE BILL 23-169

App 628

unless approved by the people at the general election to be held in November 2024 and, in such case, will take effect on the date of the official declaration of the vote thereon by the governor.

_____
Steve Fenberg
PRESIDENT OF
THE SENATE

_____
Julie McCluskie
SPEAKER OF THE HOUSE
OF REPRESENTATIVES

_____
Cindi L. Markwell
SECRETARY OF
THE SENATE

_____
Robin Jones
CHIEF CLERK OF THE HOUSE
OF REPRESENTATIVES

APPROVED  Friday, April 28th 2023 at 9:30 AM
             (Date and Time)

_____
Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO

PAGE 5-SENATE BILL 23-169

App 629

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-PAB Rocky Mountain Gun Owners et al v. Polis |
| **Date:** | Thursday, August 3, 2023 1:02:07 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court - District of Colorado

### District of Colorado

### Notice of Electronic Filing

The following transaction was entered on 8/3/2023 at 1:01 PM MDT and filed on 8/3/2023
**Case Name:**          Rocky Mountain Gun Owners et al v. Polis
**Case Number:**      1:23-cv-01077-PAB
**Filer:**
**Document Number:** 35(No document attached)

**Docket Text:**
**MINUTE ORDER by Chief Judge Philip A. Brimmer on 8/03/2023. Defendant may file a response to [34] Motion for Temporary Restraining Order on or before Monday, August 7, 2023, at 12:00 p.m. Text Only Entry (pabsec, )**

**1:23-cv-01077-PAB Notice has been electronically mailed to:**

Barry Kevin Arrington     barry@arringtonpc.com

Grant T. Sullivan     grant.sullivan@coag.gov, carmen.vanpelt@coag.gov

Michael T. Kotlarczyk     mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov

Matthew John Worthington     matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB Notice has been mailed by the filer to:**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
     Plaintiffs,
v.
JARED POLIS, in his official capacity as Governor of Colorado,
     Defendant.

---

### THE GOVERNOR'S RESPONSE TO
### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

---

The Governor submits this Opposition to Plaintiffs' Motion for Temporary Restraining Order [Dkt. 34], and states the following:

**Not the Proper Procedure.**  Plaintiffs seek a Temporary Restraining Order after the parties have already fully briefed Plaintiffs' Motion for Preliminary Injunction (Dkt. 12; Dkt. 28; Dkt. 30).  The primary differences between a TRO and a preliminary injunction "are that a TRO may issue without notice to the opposing party and that TROs are limited in duration."  *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd*., 350 F. Supp. 3d 1129, 1138 (D. N.M. 2018).  However, where, as here, "the opposing party has notice, the procedure and standards for issuance of a temporary restraining order mirror those for a preliminary injunction."  *Emmis Commc'ns Corp. v. Media Strategies, Inc*., No. CIV. A. 00-WY-2507-CB, 2001 WL 111229, at *2 (D. Colo. Jan. 23, 2001).

Plaintiffs' TRO Motion is effectively a second preliminary injunction motion incorporating Plaintiffs' first.  Instead of considering Plaintiffs' new motion, the Court should deny Plaintiffs' first preliminary injunction motion for the reasons stated in the Governor's Response (Dkt. 28).  Plaintiffs have not shown a "clear and unequivocal" right to preliminary

relief because "[g]ranting such drastic relief is the exception, rather than the rule." *Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020) (internal citations omitted).

**<u>No Irreparable Harm.</u>**  Plaintiffs' TRO Motion highlights their lack of any irreparable injury that would justify the extraordinary remedy of a preliminary injunction, let alone a temporary restraining order.  The individual Plaintiffs have not declared they currently lack firearms for self-defense.  They had the clear opportunity to acquire firearms prior to the law's effective date. [1]  SB 23-169 does not prohibit the possession of firearms by 18-to-20-year-olds, only the purchase.  Plaintiffs have not demonstrated any irreparable harm to a right of self-defense.  The individual Plaintiffs declared on June 2, 2023, that they "had a present intention and desire to lawfully purchase a firearm." Dkt. 12-2, ¶ 2; Dkt. 12-3 ¶ 2.  SB 23-169 did not prevent them from doing so.  They could still do so on the date they filed their TRO Motion.  Plaintiffs have provided no updated declarations suggesting that they were unable to acquire the firearm they desired in the last two months.  Plaintiffs have also not declared that they are unable to acquire a firearm between their TRO Motion and SB 23-169's effective date.

As a result, Plaintiffs' alleged irreparable harm is manufactured.  By voluntarily refraining from purchasing firearms that they profess a present desire to purchase, Plaintiffs' alleged injuries are self-inflicted and not fairly traceable to SB 23-169.  It is well-settled that a

---

[1] The current record is unclear on SB 23-169's effective date.  Plaintiffs' Amended Complaint identified August 4, 2023, as the effective date (Dkt. 9, ¶ 1).  The Governor's Response to Plaintiffs' Preliminary Injunction Motion and Plaintiffs' Motion for TRO identified August 8, 2023, as the effective date (Dkt. 28 at 1; Dkt. 34 at 3).  The Colorado General Assembly states that SB 23-169's effective date is today, August 7, 2023.  *See* https://tinyurl.com/34r82p9y.  Upon further investigation, the Governor agrees that today is the effective date, as it is the day following the 90-day expiration of the General Assembly's May 8, 2023 adjournment.  *See* Dkt. 1-1, SB 23-169, § 4.

"manufactured" injury is insufficient to confer Article III standing.  *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").  So, too, should such self-inflicted injuries be insufficient to support their alleged threat of irreparable harm for purposes of seeking a TRO.  The Court should not grant the extraordinary remedy Plaintiffs seek—enjoining a statewide public safety law based on a preliminary record—when the Plaintiffs had a clear opportunity to avoid the alleged harm, but voluntarily chose not to.  Rather, Plaintiffs' TRO and preliminary injunction motion should be denied, and this case should proceed to discovery so that Plaintiffs' claims are decided on a full and complete record.

**Plaintiffs Are Not Substantially Likely to Succeed on the Merits**.  Plaintiffs cannot show they are substantially likely to succeed on the merits, for the same reasons stated in the Governor's Response to Plaintiffs' preliminary injunction motion and its attached expert declarations.  *See* Dkt. 28; Dkt. 28-1; Dkt. 28-2; Dkt. 28-3; Dkt. 28-4; Dkt. 33.

Plaintiffs must first show that the Second Amendment's "plain text" covers their conduct. *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2117 (2022).  Yet, Plaintiffs have presented no textual-historical record demonstrating the Second Amendment's text was understood by the "ordinary citizens in the founding generation" to create a right for 18-to-20-year-olds to purchase firearms. *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008).  "The job of judges is not to resolve historical questions in the abstract … [but] based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6.  The Court should not grant Plaintiffs' TRO Motion before they have even presented a historical record on the issue.

On *Bruen*'s second step, the Governor has identified "well-established and representative historical *analogue*[s]" for SB 23-169. *Bruen*, 142 S. Ct. at 2133. Eighteen States and the District of Columbia enacted similar age restrictions on sales of firearms to those under 21 in the 19th century. Dkt. 28 at 17; Dkt. 28-5. These laws were consistent with earlier traditions under English common law, at founding era public colleges, and pre-Civil War restrictions. Dkt. 28 at 14–15; 17. By the 20th century, nearly every State had adopted some age-related firearm regulation. *Id.* at 17. SB 23-169 is also consistent with Colorado law that has, since 1861 to present day, used 21 as the default age of majority. *Id.* at 11. At this preliminary stage, the Governor's identification of this extensive historical record in support of SB 23-169 is enough; Plaintiffs are not substantially likely to succeed on their claim. *Bruen* is not a "straightjacket," 142 S. Ct. at 2133, and "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" by the States, *id.* at 2162 (Kavanaugh, J. concurring) (quoting *Heller*, 554 U.S. at 636.).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a TRO should be denied.

Dated: August 7, 2023

PHILIP J. WEISER
Attorney General

*s/ Matthew J. Worthington*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Defendant Governor Jared Polis*
*Counsel of Record

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*


*s/ Carmen Van Pelt*
Carmen Van Pelt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**ORDER**

---

This matter comes before the Court on the Motion for Preliminary Injunction [Docket No. 12] of plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove, and Adrian S. Pineda. Defendant Jared S. Polis, in his capacity as the Governor of the State of Colorado (the "Governor"), filed a response opposing plaintiffs' motion. Docket No. 28. Plaintiffs filed a reply. Docket No. 30.

**I. BACKGROUND**

    <u>A. Findings of Fact</u>

Plaintiffs challenge the constitutionality of Senate Bill 23-169 ("SB23-169"), which was passed by the Colorado General Assembly and which amends Sections 18-12-112 and 18-12-112.5 of the Colorado Revised Statutes, a provision in the Colorado Criminal Code regulating private firearm transfers. Docket No. 9 at 1, ¶ 1; Colo. Rev. Stat. § 18-12-112. The Governor signed the bill on April 27, 2023. Docket No. 9 at 1, ¶ 1. SB23-

169 becomes effective[1] "at 12:01 a.m. on the day following the expiration of the ninety-day period after final adjournment of the general assembly."  SB23-169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023).  Colorado's General Assembly adjourned on May 8, 2023.[2]

Section 18-12-112, as amended by SB23-169, provides:

> (2)(e) A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (f) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm.

Colo. Rev. Stat. § 18-12-112.  "A person who violates a provision of [Section 18-12-112] commits a class 2 misdemeanor."  *Id.* at § 18-12-112(9)(a).  Relevant provisions of Section 18-12-112.5 as amended provide:

> (a.3) A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (a.5) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm
>
> . . . .
>
> (b) Transferring or selling a firearm in violation of this subsection (1) is a class 1 misdemeanor.
>
> (c) Purchasing a firearm in violation of this subsection (1) is a class 2 misdemeanor.

---

[1] The parties are not consistent as to when they claim SB23-169 goes into effect, indicating August 4, August 7, and August 8, 2023.  *See* Docket No. 9 at 1, ¶ 1; Docket No. 12 at 1; Docket No. 28 at 1; Docket No. 30 at 14; Docket No. 36 at 2 n.1.

[2] The Court takes judicial notice of the date that the Colorado General Assembly adjourned.  S. J., 74th Gen. Assemb., 1st Reg. Sess. at 1489 (Colo. 2023), https://leg. colorado.gov/sites/default/files/2023_senate_cumulative_journal.pdf.

*Id*. at § 18-12-112.5.  Sections 18-12-112 and 18-12-112.5 make exceptions for sales to persons under twenty-one years old if the purchaser is an active-duty member of the United States Armed Forces, a peace officer who is "on duty," or a person "certified by the P.O.S.T. Board."[3]  *Id*. at §§ 18-12-112, 18-12-112.5.  As noted by the Governor, 18-to-20 year olds may still possess and use firearms.  Docket No. 28 at 3.  And they may acquire, inherit, or receive as gifts firearms from family members.  *Id*.

RMGO is a nonprofit organization that "seeks to defend the right of all law-abiding individuals to keep and bear arms."  Docket No. 12-1 at 1, ¶ 3.  RMGO has members between 18 and 20 years old who desire and intend to purchase firearms for lawful purposes, including self-defense in their homes.  *Id*. at 1-2, ¶¶ 3-4.

Mr. Mosgrove is a citizen of Colorado and is older than 18, but younger than 21. Docket No. 12-2 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."  *Id*.

Mr. Pineda is a citizen of Colorado and is older than 18, but younger than 21.  Docket No. 12-3 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm

---

[3] "The following peace officers shall meet all the standards imposed by law on a peace officer and shall be certified by the peace officers standards and training board, referred to in this article as the 'P.O.S.T. board': A chief of police; a police officer; a sheriff; an undersheriff; a deputy sheriff; a Colorado state patrol officer; a town marshal; a deputy town marshal; a reserve police officer; a reserve deputy sheriff; a reserve deputy town marshal; a police officer or reserve police officer employed by a state institution of higher education; a Colorado wildlife officer; a Colorado parks and recreation officer; a Colorado police administrator or police officer employed by the Colorado mental health institute at Pueblo; an attorney general criminal investigator; a community parole officer; a public transit officer; a municipal court marshal; and the department of corrections inspector general."  Colo. Rev. Stat. § 16-2.5-102.

for lawful purposes, including self-defense in [his] home." *Id.*

## B. Procedural History

Plaintiffs filed this action on April 28, 2023.  Docket No. 1.  Plaintiffs amended their complaint on May 26, 2023.  Docket No. 9.  The amended complaint adds Mr. Pineda as a plaintiff and brings one claim on behalf of all plaintiffs alleging that the restrictions in SB23-169 "infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment." *Id.* at 6, ¶ 20. Plaintiffs seek a declaratory judgment, injunctive relief, and damages for the individual plaintiffs.  *Id.* at 6-7, ¶¶ 23-26.  On June 7, 2023, plaintiffs filed a motion for preliminary injunction requesting that the Court preliminarily enjoin the enforcement of SB23-169 arguing that the bill is unconstitutional under the Second Amendment.[4]  Docket No. 12 at 1, 17.  On August 3, 2023, plaintiffs filed a motion for a temporary restraining order seeking the same relief.  Docket No. 34.

## II. LEGAL STANDARD

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs

---

[4] The parties did not request a hearing.  *But see* Docket No. 12 at 1-2 ("Plaintiffs submit this motion hoping that it will be briefed and argued prior to the effective date of the law.").  The decision whether to hold a hearing on a preliminary injunction is within the discretion of the Court.  *Buentello v. Boebert*, 545 F. Supp. 3d 912, 914 n.1 (D. Colo. 2021) (citing *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014) (unpublished), and *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision)).  As the material facts are not in dispute, other than the historical section for which declarations have been attached, the Court exercises its discretion not to hold a hearing on plaintiffs' motions.

from irreparable injury that will surely result without [its] issuance" and "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258, 1267 (10th Cir. 2005); *see also Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1197 (D. Colo. 2009) ("injunctive relief can only be obtained for current or prospective injury and cannot be conditioned on a past injury that has already been remedied").  "[C]ourts generally will refuse to grant injunctive relief unless plaintiff demonstrates that there is no adequate legal remedy."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (3d ed. 2023).

To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

## III. ANALYSIS

### A. Standing

"[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction." *Russell v. Fin. Cap. Equities*, 158 F. App'x 953, 955 (10th Cir. 2005) (unpublished) (quoting *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996)).  Moreover, if a court believes there is a standing issue, it "is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir.

2005) (citation omitted); *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537,

543 (10th Cir. 2016) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94

(1998)) ("a federal court can't 'assume' a plaintiff has demonstrated Article III standing

in order to proceed to the merits of the underlying claim, regardless of the claim's

significance").  Each plaintiff must have standing to seek each form of relief in each

claim.  *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).  Therefore, the

Court will begin by examining each plaintiffs' standing to seek injunctive relief.

### 1.  Pre-Enforcement Challenge

Plaintiffs seek to enjoin enforcement of SB23-169 as unconstitutional.  Docket No. 12

at 17.  Because SB23-169 had not taken effect at the time of filing, plaintiffs are bringing

a pre-enforcement challenge.  The Governor argues that plaintiffs' declarations "simply

repeat a legal conclusion that they 'desire to purchase a firearm . . . and [they are] or

soon will be precluded from purchasing a firearm by SB23-169.'  This is not enough to

preliminarily enjoin the law or even establish standing."  Docket No. 28 at 8 (citations

omitted).  Plaintiffs do not respond directly to the Governor's standing argument.  *See*

Docket No. 30 at 14.  Instead, plaintiffs state:

> The State argues that because the law is not effective until August 8,
> 2023, the Plaintiffs are not at this moment entitled to a preliminary
> injunction.  Plaintiffs do not disagree, as they explained in their motion [].
> Plaintiffs filed their motion prior to the effective date of the statute so that
> the issues would be fully briefed prior to that date so that the Court would
> be able to proceed in a more deliberate fashion rather than all at once on
> August 8.  Obviously, Plaintiffs will require an injunction to vindicate their
> constitutional rights when the statute does become effective.  The point of
> the State's argument is thus unclear.

*Id.* (citation omitted).  The Court understands plaintiffs' argument to be that, although

plaintiffs filed their preliminary injunction motion well in advance of the statute's effective

date, plaintiffs are not seeking to enjoin the statute before that date, but rather plaintiffs challenge the statute as of the date it goes into effect. *See id.* at 13-14.

The Supreme Court has stated that, "standing is to be determined as of the commencement of the suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992); *see also Nova Health Sys.*, 416 F.3d at 1154-55. "Where, as here, the original complaint has been super[s]eded by an amended complaint, we examine 'the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing.' Nevertheless, 'standing is determined at the time the action is brought . . . and we generally look to when the complaint was first filed, not to subsequent events' to determine if a plaintiff has standing." *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253-54 (10th Cir. 2007)). The Court will evaluate the allegations in the amended complaint to determine plaintiffs' standing to seek injunctive relief as of April 28, 2023, the time of filing.

### 2. Legal Standard for Standing

To establish Article III standing, a plaintiff must allege "that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)). In order to show the first element of standing, a plaintiff must show he has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61 (internal

quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Injury in fact is a constitutional requirement.").  An injury is particularized if it affects the plaintiff in "a personal and individual way."  *Spokeo*, 578 U.S. at 339 (citation omitted).  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist;" it must be "real," not "abstract."  *Id*. at 340.  Furthermore, "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury.'"  *Warth v. Seldin,* 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 (1973)).

   "[T]he proof required to establish standing increases as the suit proceeds.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, while on summary judgment, the plaintiff must set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true."  *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (internal citations and quotations omitted).  At the preliminary injunction stage, plaintiffs must make a "'clear showing' that they have standing."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring) (quoting *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

   Where, as here, a plaintiff seeks prospective relief such as an injunction, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

"The threatened injury must be certainly impending and not merely speculative." *Id.* (quotations and citation omitted).

In some narrow circumstances, a plaintiff may seek prospective relief for a law he fears may be enforced against him in the future. *See, e.g.*, *Bronson*, 500 F.3d at 1108-09. A pre-enforcement challenge can be brought against an existing law under which plaintiff has previously been prosecuted, against an existing law under which plaintiff has not been prosecuted, or in some rare cases before an enacted law is enforced. *See, e.g.*, *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947-48 (10th Cir. 2001) (evaluating a pre-enforcement challenge to a statute before it took effect); *Winsness v. Yocom*, 433 F.3d 727, 733 (10th Cir. 2006) (evaluating a pre-enforcement challenge to a statute that plaintiff had not been cited or prosecuted under); *Virginia v. American Booksellers Ass'n, Inc.*,[5] 484 U.S. 383, 387-88, 392 (1988) (evaluating a pre-enforcement challenge to a statute that had been enacted but before the statute was made effective). Consistent with the usual standing requirements described above,

---

[5] In *American Booksellers*, 484 U.S. at 387-88, the Court examined a First Amendment claim where plaintiffs alleged harm was chilled speech. A "chilled speech" claim differs from a "pre-enforcement challenge," but both can be used in a First Amendment context to establish an injury-in-fact that is sufficient to obtain prospective relief. *See Rio Grande Found.*, 57 F.4th at 1160 (observing a "lessening of prudential limitations on standing" for "chilled speech or pre-enforcement challenges" (citations omitted)). A chilled speech claim also requires showing a credible threat of enforcement. *Id.* The Court, however, finds no Tenth Circuit precedent applying the "chilled speech" test outside of a First Amendment context. The Court's order should not be interpreted as extending the "chilled speech" test to a Second Amendment claim; instead, the Court relies on "chilled speech" cases for their value in demonstrating a credible threat of prosecution for a pre-enforcement challenge.

courts have held that, for a threat of enforcement to be sufficient for Article III injury, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

### 3. RMGO Standing

An organization has standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Organizations may assert standing in their own right when, for instance, a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, such as when the organization faces a drain on its resources or when the defendant's actions "have perceptibly impaired" the organization's ability to carry out its mission. *Id.* at 379. An association also has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

RMGO does not provide grounds for its own standing. Plaintiffs state that RMGO "seeks to defend the right of all law-abiding individuals to keep and bear arms" and that it specifically "represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms."

Docket No. 12-1 at 1, ¶ 3.  Plaintiffs provide no evidence or argument that SB23-169 has made it difficult for RMGO to fulfill any of its essential goals or that SB23-169 has caused a drain on RMGO's resources.  Accordingly, RMGO fails to show standing in its own right to seek an injunction.

RMGO may also establish standing on behalf of its members.  RMGO, however, fails to show the first requirement for establishing standing in this way, namely, that its members would have standing to sue in their own right.  In *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), the Court observed that organizational plaintiffs must "identify members who have suffered the requisite harm."  This is accomplished when, through allegations or competent evidence, a plaintiff "name[s] the individuals who were harmed" or shows "*all* the members of the organization are affected by the challenged activity."  *Id.* at 498-99 (citations omitted).  Plaintiffs do not identify any individual members of RMGO, much less any individual member who is affected by SB23-169. *See* Docket No. 12-1.  RMGO claims it "has members who reside in Colorado who are between the ages of 18 and 20" who intend and "desire to lawfully purchase a firearm for lawful purposes including, self-defense in their home," *id.* at 1, ¶¶ 3-4, but does not claim that this is true regarding every member of RMGO or even regarding every Colorado member of RMGO.  *See id.*  Although RMGO could presumably identify individual members it references, a "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Nova Health Sys.*, 416 F.3d at 1154 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990)). Plaintiffs have not met their burden, *see Colo. Outfitters Ass'n*, 823 F.3d at 543, to show that RMGO has standing in its own right or that it has standing based on its members'

standing.  The Court may go no further, *id.* at 543-44, and will deny plaintiffs' motion to the extent it is brought on behalf of RMGO.

### 4. Individual Plaintiffs

Mr. Mosgrove and Mr. Pineda (the "Individual Plaintiffs") seek prospective relief and, therefore, to meet the injury-in-fact requirement of Article III standing, they must show a continuing or imminent injury.  *Tandy*, 380 F.3d at 1283.  Because the Individual Plaintiffs seek to enjoin a law pre-enforcement, the Individual Plaintiffs can establish an injury sufficient to establish standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder."  *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward*, 321 F.3d at 1267).

### a.  Injury in Fact

First, Mr. Pineda and Mr. Mosgrove must show an intention to engage in a course of conduct arguably affected with a constitutional interest.  Their declarations indicate that both intend to purchase a firearm for the purpose of self-defense in their homes.[6] Docket No. 12-2 at 1, ¶ 2; Docket No. 12-3 at 1, ¶ 2.  The Supreme Court has ruled that

---

[6] In *Colo. Outfitters Ass'n*, 823 F.3d at 551, the Tenth Circuit found that plaintiffs in a Second Amendment case lacked standing based on not having "concrete plans to engage in conduct" that violates the challenged statute.  Here, the Individual Plaintiffs state they intend to purchase firearms, but do not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, or that they have taken any steps to prepare to purchase firearms.  *See* Docket No. 12-2; Docket No. 12-3.  At this phase of the proceedings, the Individual Plaintiffs have done enough to make a "clear showing," *Hobby Lobby Stores, Inc.*, 723 F.3d at 1185, that they intend to purchase firearms, but the Court does not pass on the Individual Plaintiffs' showing for purposes of other stages of the case.

"the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).  The Governor argues that the Second Amendment does not extend to the right to purchase a firearm as opposed to the right to "keep" and "bear" firearms.[7]  Docket No. 28 at 7.  Based on Mr. Mosgrove's and Mr. Pineda's representations that the purchase is at least partly for self-defense, the Court finds the Individual Plaintiffs' proposed course of conduct is "arguably affected with a constitutional interest," *Babbitt*, 442 U.S. at 298, under the Second Amendment.

Next, the Individual Plaintiffs must show that their conduct is proscribed by statute. *Id.*  Mr. Mosgrove and Mr. Pineda do not state whether they seek to purchase a firearm through a licensed gun dealer or through a private sale, *see* Docket No. 12-2 at 1; Docket No. 12-3 at 1, but SB23-169 criminalizes both for 18-to-20 year olds.  *See* Colo. Rev. Stat. §§ 18-12-112, 18-12-112.5.  Purchasing a firearm from either a licensed gun dealer or a private party would constitute a class two misdemeanor under SB23-169

---

[7] The Governor raises his argument about the right to purchase firearms in the merits portion of his brief.  The test for determining whether a plaintiff has suffered an injury arguably affected by a constitutional interest for Article III standing purposes is different from the test for the likelihood of success on the merits prong of a preliminary injunction. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 (8th Cir. 2021) ("The standard reaffirmed in *Susan B. Anthony List* does no work for Plaintiffs beyond the standing context.  Although related, our analysis of whether Plaintiffs have standing on their First Amendment claim at this stage in the litigation is separate from our analysis of whether the claim is likely to prevail on the merits.").  The Court nevertheless addresses the Governor's argument to the extent it can be construed to challenge the Individual Plaintiffs' standing.

because both the Individual Plaintiffs were under the age of 21 at the time of filing.[8] Therefore, the Court finds that the Individual Plaintiffs have demonstrated their proposed course of conduct is proscribed by statute.

Finally, the Individual Plaintiffs must establish a credible threat of prosecution.  The Tenth Circuit has recognized "at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement."  *Peck*, 43 F.4th at 1132 (quotations and citation omitted).  "[A] plaintiff need not risk actual prosecution before challenging an allegedly unconstitutional criminal statute."  *Bronson*, 500 F.3d at 1107.  The most credible threats of prosecution exist in "pre-enforcement claims brought after the entity responsible for enforcing the challenged statute actually threatens a particular plaintiff with arrest or even prosecution."  *Id.* at 1108.  "These claims can be juxtaposed with" those cases where "affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute prevents a 'threat' of prosecution from maturing into a 'credible' one, even when the plaintiff previously has been arrested under the statute."  *Id.*

---

[8] Mr. Mosgrove and Mr. Pineda state they were under 21 as of June 2, 2023, Docket No. 12-2 at 2; Docket No. 12-3 at 2.  The Court has no indication that the Individual Plaintiffs have turned 21 since June 2, 2023, but, moving forward, this question will be relevant to determining whether any requests for continuing injunctive relief are moot. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 326 (4th Cir. 2021).

Here, the statute is new, there is no evidence of an assurance that the statute will not be enforced, and there is no indication that the statute is moribund based on a change in controlling law. *Cf. Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) ("Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing." (citing *Babbit*, 442 U.S. at 301-02)). For the purpose of a preliminary injunction, the Individual Plaintiffs have made a clear showing of a credible threat of prosecution.[9] Accordingly, the Individual Plaintiffs have shown an injury-in-fact sufficient to establish Article III standing.

### b. Causation and Redressability

To establish the second and third elements of Article III standing, the Individual Plaintiffs must show "there is a causal connection between the injury and the conduct complained of; and [] it is likely that the injury will be redressed by a favorable decision." *Ward*, 321 F.3d at 1266 (citation omitted). Neither party addresses causation or

---

[9] Some courts require individualized threats of enforcement for cases asserting rights other than those guaranteed by the First Amendment. *See, e.g.*, *Angelo v. District of Columbia*, --- F. Supp. 3d ----, 2022 WL 17974434, at *4 (D.D.C. Dec. 28, 2022) ("binding D.C. Circuit case law demands more [evidence of a credible threat] than does [*Babbit*] — at least where the plaintiff presents a non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings. In those contexts, plaintiffs must establish that the threat of prosecution is not only credible, but also imminent. In other words, plaintiffs bringing a preenforcement challenge must demonstrate that their prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution." (internal citations, alterations, and quotations omitted)). Neither party addresses the relevant standard in this circuit. Finding no evidence this is the standard in the Tenth Circuit, the Court will decline to apply this requirement.

redressability.  *See generally* Docket No. 12; Docket No. 28.  The Court finds the Individual Plaintiffs have established both.

Relevant to establishing causation, the Individual Plaintiffs allege the Governor "will enforce the unconstitutional provisions of the law against Plaintiffs."  Docket No. 12 at 3, ¶ 4.  The Governor argues that, for purposes of Eleventh Amendment immunity as described in *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013), "he does not 'have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty,'" but states that he waives his Eleventh Amendment immunity. Docket No. 28 at 3 n.2.  The Court notes that, in determining causation in an analysis of whether a party has standing, "there is a common thread between Article III standing analysis and *Ex parte Young*[, 209 U.S. 123 (1908)] analysis."  *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013).  The Governor's comment on his lack of a particular duty to enforce SB23-169 could be interpreted as an attack on the causation element of the Individual Plaintiffs' standing because the two inquiries are related.  The Court, however, finds that the Governor "possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute" because "[t]he Colorado Constitution states that the 'supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.'"  *Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013) (quoting Colo. Const. Art. IV, § 2), *aff'd in part sub nom. Colo. Outfitters Ass'n*, 823 F.3d at 554-55.  Enjoining the enforcement of SB23-169 would redress the Individual Plaintiffs' injuries by removing the alleged violation of their Second Amendment rights.  *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 978

(10th Cir. 2020).

**B. Likelihood of Success on the Merits**

In order for the Court to grant a plaintiff's motion for a preliminary injunction, the

plaintiff must demonstrate "a likelihood of success on the merits." *RoDa Drilling Co.*,

552 F.3d at 1208.

> The purpose of a preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be held.  Given this
> limited purpose, and given the haste that is often necessary if those
> positions are to be preserved, a preliminary injunction is customarily
> granted on the basis of procedures that are less formal and evidence that
> is less complete than in a trial on the merits.  A party thus is not required
> to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Progress Development

Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).  The Individual Plaintiffs raise a facial

challenge to the validity of SB23-169.[10]  As stated above, the amended complaint brings

one claim on behalf of all plaintiffs alleging that the restrictions in SB23-169 "infringe on

---

[10] The Individual Plaintiffs do not explicitly state that they bring a facial challenge as
opposed to an as-applied challenge in their motion for preliminary injunction.  *See*
Docket No. 12.  The Individual Plaintiffs indicate they are challenging the statute in both
ways in their amended complaint.  *See* Docket No. 9 at 6, ¶ 23 ("SB23-169 is
unconstitutional on its face or as applied").  It is unclear what the Individual Plaintiffs' as-
applied challenge is and, for purposes of this motion, the Court presumes the Individual
Plaintiffs' challenge is facial because SB23-169 has not been enforced against any of
the Individual Plaintiffs.  *See Colo. Outfitters Ass'n*, 24 F. Supp. 3d 1050, 1058 n.8 (D.
Colo. 2014) ("Challenges to the constitutionality of statutes can take two forms.  There
can be a challenge as to how the law has actually been applied to a plaintiff (an 'as-
applied' challenge) or, there can be a challenge based solely on its language and
anticipated applications (a 'facial' challenge).  Here, because the statutes have not been
enforced against any Plaintiff, only facial challenges have been asserted."), *vacated and
rev'd on other grounds, Colo. Outfitters Ass'n*, 823 F.3d at 554-55.

the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment."  Docket No. 9 at 6, ¶ 20.

### 1. Legal Framework for Second Amendment Claims

On June 23, 2022, the Supreme Court announced its decision in *Bruen*, 142 S. Ct. 2111.  The Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Id.* at 2122.  In evaluating a Second Amendment claim, the Court declined to adopt the two-step approach the courts of appeal had developed, in which, "at the second step, courts often analyze how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."  *Id.* at 2122, 2126 (quotations and citations omitted).  *Bruen* held that the "two step test" has one step too many and that means-end scrutiny of laws that infringe upon Second Amendment rights is not supported by the Court's opinions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Bruen*, 142 S. Ct. at 2117-18.

*Bruen* states that the appropriate test for applying the Second Amendment is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  In order to determine whether the plain text of the Second Amendment covers a plaintiff's conduct, a court must determine whether plaintiff is "part of 'the people' whom the Second Amendment protects" and if the firearms at issue are "weapons 'in common

use' today for self-defense."[11]  *Id.* at 2134 (quoting *Heller*, 554 U.S. at 580, 627).  Next, a court determines whether the plaintiff's "proposed course of conduct" is protected by the plain text of the Second Amendment.  *Id.*  After determining that a plaintiff's conduct is covered, the burden shifts to the government to demonstrate that the challenged regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id.* at 2135.

To perform the inquiry into the Nation's historic tradition, *Bruen* states the text of the Second Amendment must control over later history that contradicts the text.  *Id.* at 2137. *Bruen* also states that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Id.* at 2138.  *Bruen* did not resolve this debate because it was not necessary for purposes of examining the challenged statute, observing only that it "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id.* at 2137-38.

Since the Supreme Court's ruling in *Bruen*, few courts have addressed the evidentiary burdens necessary to preliminarily enjoin a law on Second Amendment

---

[11] The Governor observes that federal law already prohibits licensed gun dealers from selling shotguns and rifles to anyone under 18 years old and selling all other firearms to anyone under 21 years old.  Docket No. 28 at 3 (citing 18 U.S.C. § 922(b)(1)).  The effect of SB23-169 would be to limit 18-to-20 year olds' ability to purchase shotguns and rifles from licensed gun dealers and to prohibit 18-to-20 year olds from purchasing any firearm in private sales.

grounds.  On the likelihood of success on the merits prong, the Governor argues that, because *Bruen* is silent on who carries the burden of establishing that the proposed conduct falls within the plain text of the statute, the Individual Plaintiffs should bear the burden.  Docket No. 28 at 6 n.3.  Courts that have considered this issue have ruled that, in order for plaintiffs to carry their burden on the likelihood of success on the merits prong, plaintiffs must show their conduct is covered by the Second Amendment and that plaintiffs' burden remains unchanged for the remaining three prongs of the preliminary injunction requirements.  *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, --- F. Supp. 3d. ----, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022), *appeal dismissed*, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Baird v. Bonta*, --- F. Supp. 3d. ----, 2022 WL 17542432, at *5–6 (E.D. Cal. Dec. 8, 2022).  The Court agrees with the analysis in *Oregon Firearms* and *Baird* and will analyze the Individual Plaintiffs' motion by allocating burdens in the same way.

### 2. *Scope*

First, the Individual Plaintiffs must establish that their proposed conduct falls within the scope of the Second Amendment.  *Bruen*, 142 S. Ct. at 2129-30.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  The Individual Plaintiffs state that their proposed course of conduct is to "purchase firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.

### a. Right of the People

In determining whether their proposed conduct is within the scope of the Second

Amendment, a threshold question is whether the Individual Plaintiffs are part of "the

people" the Second Amendment protects. *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3rd

Cir. 2023) (en banc).  Neither *Heller* nor *Bruen* defines the scope of the phrase "the

people" because it was undisputed that the plaintiffs in each case were a part of "the

people." *Id.*  The Second Amendment "codifies a 'right of the people.'" *Heller*, 554 U.S.

at 579.  *Heller* states that in every other instance where the unamended Constitution

and Bill of Rights references a right of "the people" that the right is exercised individually

and belongs to "all members of the political community, not an unspecified subset." *Id.*

at 579-81 (citing U.S. Const. Amends. I, IV).  Thus, *Heller* began "with a strong

presumption that the Second Amendment right is exercised individually and belongs to

all Americans." *Id.* at 581.  *Bruen* states that it is undisputed that "ordinary, law-abiding,

adult citizens—are part of 'the people' whom the Second Amendment protects." *See*

142 S. Ct. at 2134.

The Governor argues that "the people" does not include 18-to-20 year olds based on

a "textual-historical" inquiry of how the term "the people" was used in 1787.  Docket No.

28 at 10-11.  First, the Governor argues that 18-to-20 year olds were considered minors

without full legal protections when the Second Amendment was adopted (which the

Court will refer to as the "founding era") and that 18-to-20 year olds were only

recognized as part of the political community in the late 20th century. *Id.* at 11.

Second, the Governor argues that the age of majority at the time the Second

Amendment was adopted by Colorado was 21 and nothing prevents Colorado from

using its long-held age of majority at 21 to regulate firearm purchases. *Id.*  Finally, the

Governor argues that declining to engage in a textual-historical inquiry into the meaning

of the words "the people" defies *Heller's* holding; therefore, this Court should not rely on cases that do not perform such inquiry.  *Id.* at 12.

The Individual Plaintiffs argue that, under *Heller*, "the people" applies to all Americans, that comparison to other provisions of the Constitution reveals that the Second Amendment does not include an age limit, and that, because 18-to-20 year olds were required to serve in militias at the time of the Bill of Rights' adoption, it would be inconceivable to conclude they had anything but full rights regarding firearms.  Docket No. 30 at 6-8.

Recently, in *Range*, 69 F.4th 96, the Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in 18 U.S.C. § 922(g)(1). *Range* ruled that "the people" included felons.  *Id.* at 103.  The court provided four reasons why it believed felons were included in "the people": (1) references to law-abiding responsible citizens in *Heller*, *McDonald*, and *Bruen* were dicta because criminal history was not at issue in those cases, (2) other provisions of the Constitution that reference "the people" include felons and there is no reason to read the Second Amendment differently, (3) acknowledging permissible restrictions on the right to keep and bear arms for a group of people does not mean they are not a part of "the people," and (4) the phrase "law-abiding" is too broad to be understood as a part of the Second Amendment because it "devolves authority to legislators to decide whom to exclude from 'the people.'"  *Id.* at 101-03.

In *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. Aug. 25, 2022), the court ruled that 18-to-20 year olds are part of "the people" under the Second Amendment.  The court observed that the Second Amendment does not

include an age restriction, unlike other parts of the Constitution that list an explicit age restriction such as the requirement in Section 2 of Article I that members of the House of Representatives be at least 25 years old, the requirement in Section 3 of Article I that senators be at least 30 years old, and the requirement in Section 1 of Article II that the president be at least 35 years old.  *Id.*  As in *Heller*, the court compared definitions of "the people" in other constitutional amendments, which have been held to include 18-to-20 year olds, to bolster its conclusion that "the people" in the Second Amendment includes 18-to-20 year olds.  *Id.* at 748-49.  Specifically, the court observed that the First and Fourth Amendments extend their protections to 18-to-20 year olds.  *Id.*  The court also looked at individual rights guaranteed by the Constitution that are not specifically a "right of the people," observing that the Fifth and Fourteenth Amendments include 18-to-20 year olds and that, in the context of the Eighth Amendment, "the Supreme Court has said that where 'a line must be drawn,' '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood.'"  *Id.* at 749 (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)).  Finally, the court reasoned that, because *Heller* interpreted the prefatory clause of the Second Amendment to announce that the purpose of the Amendment is to "prevent elimination of the militia" and because 18-to-20 year olds could be required to join a militia, "[i]t would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn."  *Id.* at 749-50 (quoting *Heller*, 554 U.S. at 599).

In *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012), the Tenth Circuit considered whether the Second Amendment extends to non-citizens.  The court

cautioned against reading "an unwritten holding into *Heller*" by interpreting *Heller's* reference to "citizens" as conclusive as to whom "the people" refers because the issue was not before the Court in *Heller* and because "the question seems large and complicated." *Id.* at 1169. The court declined to pass on the question without the benefit of a full record and adversarial argument. *Id.*

The Governor states minors under 21 did not have "full legal rights" and that 18-to-20 year olds "did not enjoy significant legal rights at the founding." Docket No. 28 at 11-12. The Governor argues that "[o]nly in the late 20th century did our Nation recognize 18-to-20-year-olds' role in the political community with First Amendment protection and the right to vote under the Twenty-Sixth Amendment."[12] *Id.* at 11. The Governor cites a declaration prepared by historian Saul Cornell[13] (the "Cornell report") to support the claim that 18-to-20 year olds were not recognized as being part of the "political community" until the late 20th century. *See id.* (citing Docket No. 28-1 at 23-24). The Cornell report states that, because 18-to-20 year olds were considered minors, it is

---

[12] The Governor cites Justice Thomas' concurrence in *Morse v. Frederick*, 551 U.S. 393, 410 (2007). Docket No. 28 at 11. In *Morse*, Justice Thomas opined that in his view "the history of public education suggests that the First Amendment, as originally understood, does not protect student speech in public schools." 551 U.S. at 410-11. Justice Thomas' concurrence does not argue that children or students outside of schools were not part of "the people" referenced in the First Amendment and instead describes speech in public schools as exempted from First Amendment restrictions. *See id.* Justice Thomas' concurrence supports historical readings that limit the rights of minors, but does not support excluding minors from the Constitution's provision of individual rights granted to "the people."

[13] Dr. Saul Cornell is "the Paul and Diane Guenther Chair in American History at Fordham University in New York City." Docket No. 28-1 at 2.

anachronistic to assume that, at the time of the founding, they had a legal right to keep and bear arms.  Docket No. 28-1 at 14.

The Court is persuaded by the reasoning in *Range* and *McCraw* that an interpretation of "the people" in the Second Amendment should begin with the assumption that every American is included.  In reaching this conclusion, the Court is careful not to read *Heller* or *Bruen* as limiting to whom "the people" refers.  Moreover, the Court finds that the Governor has not shown a "historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, of 18-to-20 year olds during the founding era, as opposed to him citing evidence supporting an argument that states could have regulated 18-to-20 year olds because they lacked rights as minors.  Thus, the Court finds that the Individual Plaintiffs have shown a likelihood of success on the merits on the question of whether the Second Amendment applies to 18-to-20 year olds.

### b. Proposed Conduct

Next, the Individual Plaintiffs must show that the plain text of the Second Amendment covers their conduct.  *Bruen* ruled that the Second Amendment covers "carrying handguns publicly for self-defense," and *Heller* and *McDonald* ruled that the Second Amendment covers "possess[ing] a handgun in the home for self-defense."  *Bruen*, 142 S. Ct. at 2122.  The Governor argues the Individual Plaintiffs' course of conduct is not protected by the Second Amendment because there is no Second Amendment right to purchase firearms.  Docket No. 28 at 7-8.  The Individual Plaintiffs, on the other hand, argue that the right to keep and bear arms impliedly includes a right to acquire arms. Docket No. 30 at 1.

The Court must first decide what the Individual Plaintiffs intend to do to exercise their

alleged Second Amendment rights.  The Individual Plaintiffs categorize their proposed course of conduct as "purchas[ing] firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.  Mr. Mosgrove has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[14]  Docket No. 12-2 at 1, ¶ 2.  Mr. Pineda has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[15]  Docket No. 12-3 at 1, ¶ 2.  Thus, based on the declarations, the Court finds that the Individual Plaintiffs have a stated intention to purchase firearms, in an otherwise lawful manner, not having any felony or misdemeanor convictions, for lawful reasons including self-defense in their homes.

The second question is whether the Second Amendment's right to "keep" and "bear" arms extends to the Individual Plaintiffs' intended conduct.  The Individual Plaintiffs claim the right to keep firearms necessarily implies the right to acquire arms.  Docket No. 12 at 5.  The Individual Plaintiffs claim that it is settled law that Constitutional rights protect closely related acts necessary to their exercise and that purchasing firearms is necessary for keeping and bearing arms.  Docket No. 30 at 1.  Additionally, the Individual Plaintiffs argue that a total prohibition on a right is not necessary to show a

---

[14] Mr. Mosgrove does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-2 at 1, ¶ 2.

[15] Mr. Pineda does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-3 at 1, ¶ 2.

right is infringed. *Id.* at 2. The Governor argues that the Individual Plaintiffs have made an insufficient showing that the right to keep arms includes a right to buy firearms. Docket No. 28 at 7-8. Additionally, the Governor argues the Individual Plaintiffs have not shown that their right to self-defense is burdened because SB23-169 has not gone into effect and therefore the Individual Plaintiffs still have the ability to purchase firearms.[16] *Id.* at 8.

Several courts have ruled that the right to keep arms necessarily includes a right to acquire arms. *See, e.g., Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (quotations and citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."); *United States v. McNulty*, --- F. Supp. 3d. ----, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase, sell, or otherwise transfer firearms in order to keep oneself properly armed."); *Renna v. Bonta*, 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023) ("the right to keep arms, necessarily involves the right to purchase them."), *appeal filed*, No. 23-55367 (9th Cir.

---

[16] This argument is more appropriately considered in evaluating whether the Individual Plaintiffs have shown that they face irreparable harm absent a preliminary injunction, and the Court will address the Governor's argument in its discussion of the irreparable harm prong.

Apr. 20, 2023).

The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct. *See Teixeira*, 873 F.3d at 677; *Ezell*, 651 F.3d at 704. For purposes of a preliminary injunction, the Individual Plaintiffs have sufficiently demonstrated a likelihood of success in showing their proposed conduct is covered by the plain text of the Second Amendment.

### 3. *Historical Tradition*

The Court has found that the Individual Plaintiffs' proposed course of conduct, purchasing firearms for self-defense in the home, is covered by the plain text of the Second Amendment. Under *Bruen*, the government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. Thus, for purposes of this case, the Governor has the burden of establishing that SB23-169 is "consistent with the Nation's historical tradition of firearm regulation" such that the Individual Plaintiffs' conduct "falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg*, 366 U.S. at 50 n.10).

### a. Presumptively Lawful Regulations

First, the Governor argues that SB23-169 falls within one of the categories of firearm regulations that the Supreme Court has found to be presumptively lawful, namely, "conditions and qualifications on the commercial sale of arms." Docket No. 28 at 8-10. The Governor relies on *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124-25 (10th Cir. 2015) (citation and quotations omitted), where the court opined that the presumptively

lawful categories of regulations identified by *Heller* cannot be ignored since the Tenth

Circuit is "bound by Supreme Court dicta almost as firmly as by the Courts' outright

holdings, particularly when the dicta is recent and not enfeebled by later statements."

As a result, the Governor argues that *Bonidy* "demonstrates that courts cannot

disregard *Heller's* carve outs." Docket No. 28 at 10. The Individual Plaintiffs respond

that, in light of *Bruen*, it is inappropriate to presume a regulation is lawful as that would

improperly shift the burden to the Individual Plaintiffs to point out why a law is

unconstitutional. Docket No. 30 at 3.

    In *Heller*, the Court states:

> Although we do not undertake an exhaustive historical analysis today of
> the full scope of the Second Amendment, nothing in our opinion should be
> taken to cast doubt on longstanding prohibitions on the possession of
> firearms by felons and the mentally ill, or laws forbidding the carrying of
> firearms in sensitive places such as schools and government buildings, or
> laws imposing conditions and qualifications on the commercial sale of
> arms.
>
> We identify these presumptively lawful regulatory measures only as
> examples; our list does not purport to be exhaustive.

554 U.S. at 626-27 & n.26. In *Bruen*, Justice Kavanaugh filed a concurring opinion,

joined by the Chief Justice, that repeated *Heller's* description of presumptively lawful

regulations and noted that Justice Alito's concurring opinion in *McDonald* used the

same description. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

    The Court rejects the Governor's argument that SB23-169 is presumptively lawful for

two reasons. First, the Court disagrees with the Governor's reading of *Heller* as

exempting certain types of regulations at the first step of the *Bruen* test. *Bruen* does not

suggest that a different test applies to certain categories of laws or regulations. *Id*. at

2132-33. Rather, *Bruen* is clear that the government must justify the constitutionality of

any law regulating conduct covered by the plain text of the Second Amendment. Justice Kavanaugh's concurrence also does not state that regulations falling into the "presumptively lawful" categories should be subject to a different test.  *See id.* at 2162. Additionally, the Court disagrees with the Governor's reading of *Bonidy* to the extent it suggests a different test for "presumptively lawful" regulations.  Acknowledging *Bonidy's* admonition not to ignore the language of *Heller* as dicta, the Court reads *Heller* to provide examples of laws or regulations that lawfully limit or qualify rights under the Second Amendment in a way that aligns with the Nation's historical tradition of firearm regulation.

Second, the Governor fails to show that SB23-169 falls into the category of commercial regulations described by *Heller*.  Regulations of the commercial sale of arms have been described as "condition[s] or qualification[s]" that "affect[] only those who regularly sell firearms."  *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016).  SB23-169 does not base its prohibitions on 18-to-20 year olds because 18-to-20 year olds, as a group, regularly sell firearms.  Rather, SB23-169 categorically bans an entire group of law-abiding citizens from purchasing firearms based on age. Additionally, the Court is not persuaded that the pre-*Bruen* cases the Governor cites, *see* Docket No. 28 at 9, suggest a different outcome for age-based firearm restrictions[17]

---

[17]  In *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489-91 (W.D. Pa. 2021), the court decided age-based restrictions are longstanding and presumptively lawful without evaluating whether the Nation's historic tradition of firearm regulations had similar analogues specific to the challenged regulations.  In *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992-93 (W.D. Wash. 2020), *vacated*, 2022 WL 17420766 (9th Cir. Dec. 2, 2022), the court concluded that the regulation on gun purchases by 18-to-20 year olds fell outside the ambit of the Second Amendment in part because of the presumed

because these cases presume the lawfulness of the category of restriction and, as a result, do not follow the test for Second Amendment cases discussed in *Bruen*.

### b. Tradition of Age Based Regulations

*Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but provided "two metrics" to determine whether a regulation is within the Nation's historical tradition, namely, "how and why" the regulations burden a law-abiding citizen's right to armed self-defense. *Bruen*, 142 S. Ct. at 2132-33. *Bruen* acknowledged that:

> Analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

The Governor argues that SB23-169 is consistent with the Nation's past history of firearm regulation because: (1) "[t]his Nation has a longstanding history of placing age-restrictions on firearm purchases," and (2) "[m]id-to late-19th Century history 'is relevant'

lawfulness of age-based regulations. In *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. at 2127 n.4, the court upheld age-based firearm restrictions because, "[a]t a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety."

to understanding the Second Amendment's scope."  Docket No. 28 at 13-23.  The Governor claims that the Nation has a longstanding history of placing age restrictions on firearm purchases and, in support, cites English common law, founding era restrictions, evidence of the conception of founding era militias, pre-Civil War restrictions, and post-Civil War restrictions on gun possession and ownership.  Docket No. 28 at 13-18.  The Court addresses each time period in turn.

### i. Founding Era Laws

The Governor cites English common law to support the proposition that 18-to-20 year olds were not considered full adults and lacked legal contract authority, only having the capacity to be bound by contract for essentials like food, clothing, and lodging.  *Id.* at 14.  The Governor states that the American colonies followed the English common law in imposing legal limitations based on age.  *Id.*  As a result, the Governor argues that, because 18-to-20 year olds did not have full contractual rights at the founding, they did not have unfettered commercial rights which would extend to purchasing firearms.  *Id.*

In *Bruen*, the Court states:

> As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights.  The common law, of course, developed over time.  *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 533 n.28 (1983); *see also Rogers v. Tennessee*, 532 U.S. 451, 461 (2001).  And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution.

*Bruen*, 142 S. Ct. 2136.  The Court further observed, "in interpreting our own Constitution, it is better not to go too far back into antiquity for the best securities of our liberties, unless evidence shows that medieval law survived to become our Founders'

law." *Id.* (internal citations, quotations, and alterations omitted).

The Cornell report opines that:

> Under English common law, individuals under the legal age of majority,
> 21, were entirely subsumed under the authority of their parents (usually
> their fathers) or guardians . . . . There was no recourse to legal redress for
> such minors against their parents or guardians (provided the punishment
> was deemed necessary and not excessively cruel).

Docket No. 28-1 at 21 (citing John E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L.Q. 449 (2008); Elizabeth Pleck, *Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present* (1987)). The Cornell report further opines that in the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and in protecting the interests of minors, demonstrating that, previously, minors had more state supervision over their commercial activity than any other legal entity in the founding era. *Id.* at 23 (citing Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2012)).

In support of the claim that parents' control over minors, consistent with English common law, continued into the founding era, the Cornell report provides evidence that, in the founding era, regulations on minors' ability to enter into contracts were commonplace because minors fell under their parents' authority. *Id.* at 22-23. The Cornell report and the Governor, however, do not identify any evidence that contractual restrictions on minors under the English common law or from the founding era were directed specifically at the acquisition of firearms by minors or whether the purchase of a firearm by 18-to-20 year olds, or anyone else, typically involved a contract, which limits the weight of this evidence in determining whether such evidence forms a

pertinent historical analogue to restrictions on 18-to-20 year olds' right to keep and bear arms. *See McCraw*, 623 F. Supp. 3d. at 755 (observing that "the age of majority — even at the [f]ounding — lacks meaning without reference to a particular right . . . . Instead, the relevant age of majority depends on capacity or activity." (citation omitted)).

The Governor states that gun safety regulations at the time the Second Amendment was adopted disarmed specific groups of people for safety reasons. Docket No. 28 at 14. For instance, founding era laws provided for "disarmament of those refusing to swear an oath of allegiance to the Nation or those who participated in Shays' Rebellion." *Id.* (citing *Nat'l Rifle Ass'n of America, Inc.*, 700 F.3d at 200). Additionally, the Governor identifies rules at certain colleges that prohibited 18-to-20 year old students from possessing or discharging firearms on campus, noting that "college campuses were one of the few places in founding era society where 18-to-20 year olds lived outside of direct parental authority." *Id.* at 15 (citing Docket No. 28-2 at 15-16, Declaration of Robert Spitzer[18]).

Colonial laws that disarmed persons who presented a risk of danger to the state or to the country are not analogous to a categorical ban on a segment of society that has not professed hostility to the state or to the nation. *Cf. Range*, 69 F.4th at 104-105 (ruling "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of

---

[18] Dr. Robert Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland with expertise on "the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues." Docket No. 28-2 at 2-3.

a similar group today.  And any such analogy would be 'far too broad.'" (quoting *Bruen*, 142 S. Ct. at 2134)).  Additionally, college codes of conduct that banned possession of firearms on campuses are not analogous to SB23-169.  The Spitzer Declaration does not indicate that college rules prohibited students from using or possessing firearms because of their age.  *See* Docket No. 28-2 at 15-18.  Such rules could just as easily have been based on their status as students living together in dormitories and are more comparable to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Bruen*, 142 S. Ct. at 2118, than a prohibition on purchasing firearms applicable to a category of people.  *See Fraser v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F. Supp. 3d ----, 2023 WL 3355339, at *20 (E.D. Va. May 10, 2023) (observing that "universities' regulations limiting the ability of students to carry firearms on campus are not 'analogous' to the wholesale prohibition on 18-to-20-year-olds from purchasing firearms manifest in the statutes and regulations here at issue").  Thus, the Court finds that the Governor has not identified founding era gun laws that are analogous to SB23-169.

### ii. Founding Era Militia Laws

The Governor argues that militia service during the founding era does not demonstrate a right by 18-to-20 year olds to purchase firearms and "instead demonstrate[s] the extensive control that States had over 18-to-20-year-olds in early America."  Docket No. 28 at 16.  The Governor points out that minors participating in militias acted under the supervision of adults, that parents often supplied firearms for their minor children's participation in militias, and that militia members possessed firearms in "coordinated and rigorous military service, distinct from everyday civilian life."

*Id.* The Cornell report opines that:

> Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.

Docket No. 28-1 at 28. The Cornell report highlights 18-to-20 year olds' participation in militias as a duty under supervision by patriarchal authority frameworks that regarded minors as existing under the authority of their fathers. *Id.* at 26-27. The report notes that minors were regarded as being similar to "madmen" and "idiots." *Id.* at 27 (quoting John Fauchereaud Grimké, *The South Carolina Justice of the Peace*, 117 (1788)).

The Court agrees with the Governor that service by 18-to-20 year olds in militias does not prove that such persons had an unfettered right to possess firearms outside of militias. *See* Docket No. 28 at 16; *see also Fraser*, 2023 WL 3355339, at *15 ("The Court is also cognizant of the Eleventh Circuit's admonition not to confuse the legal *obligation* to perform militia service with the *right* to bear arms."). The Governor's argument, however, does not carry his burden to show an analogous restriction on the sale of firearms to 18-to-20 year olds.

### iii. Post Second Amendment Ratification Regulations

The Governor argues that the Court cannot ignore 19th century history and focus only on founding era history because *Bruen* did not determine whether courts should look for historical analogues in founding era history or history at the time the Fourteenth Amendment was ratified. Docket No. 28 at 21-23. The Governor observes that *Bruen* declined to address "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in

1868 when defining its scope (as well as the scope of the right against the Federal Government)" because it ruled that public understanding of the right to keep and bear arms did not differ between 1791 and 1868 in any relevant way. *See* 142 S. Ct. at 2138.

*Bruen* observed that courts "must []guard against giving postenactment history more weight than it can rightly bear," that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," and that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2136-37 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *Heller*, 554 U.S. at 614).

The Governor identifies several restrictions on the use of firearms by minors after the ratification of the Bill of Rights. Docket No. 28 at 17-18. The Governor identifies the following pre-Civil War firearm laws involving minors: (1) a law from New York City in 1803 that held parents liable for the unlawful discharge of firearms by minors, *id.* at 17 (citing Docket No. 28-2 at 8-9); (2) laws from cities in Delaware in 1812, South Carolina in 1817, and Connecticut in 1835 that similarly imposed liability on parents for unlawful discharge of firearms by minors, *id.* (citing Docket No. 28-2 at 9); (3) laws passed in Kentucky in 1853, 1859, and 1860 that penalized selling gunpowder to those under fifteen without parental consent and selling certain weapons including pistols to minors and to any "slave, or free negro," *id.*; Docket No. 28-2 at 8-9; Docket No. 28 at 17; (4) a law from Alabama in 1856 that fined "anyone who sold, gave or lent a pistol or fighting

knife to a minor," Docket No. 28 at 17; Docket No. 28-2 at 10 (citing 856 Ala. Acts 17,

To Amend the Criminal Law, §1); and (5) a law from Tennessee in 1858 "prohibiting

selling, giving, or lending to a minor a pistol, fighting knife or 'like dangerous weapon.'"

Docket No. 28 at 17 (quoting Docket No. 28-2 at 9-10).

The description of the first two examples of firearm laws the Governor identifies

reveals that certain cities prohibited discharging firearms within city limits and shifted

liability to parents when minors discharged firearms.  *See* Docket No. 28-2 at 8-9.

These laws are not properly characterized as "restrictions on the use of firearms by

minors."  Docket No. 28 at 17.  These statutes regulate the discharge of firearms by the

general population and shift liability to parents for minors' tortious use of firearms.

The last three examples of laws that the Governor identifies can be properly

construed as prohibitions on minors' possession or purchase of firearms.  The Court

largely agrees with *Fraser's* analysis on these laws:

> Thus, by the eve of the Civil War, only three states had passed any form
> of restrictions on the ability of minors to purchase firearms and each of
> these was passed 65 years or more after the ratification of the Second
> Amendment.  This legislation therefore tells us nothing about the
> Founders' understanding of the Second Amendment.

*Fraser*, 2023 WL 3355339, at *21 (citations omitted).  Without any confirmation in the

form of founding era regulations, the Court does not consider three pre-Civil War

regulations as strong evidence of the "public understanding of the right to keep and bear

arms" at the time the Second Amendment was ratified.  *Bruen*, 142 S. Ct. at 2138.

Finally, the Governor identifies post-Civil War regulations that some states adopted

by the early 20th century.  Docket No. 28 at 17-18.  The Governor represents that, by

1900, 18 states and the District of Columbia adopted laws regulating firearm sales to

those under the age of 21 and that shortly thereafter 45 states had laws restricting the

sale of firearms to minors.  *Id.* at 17.  The Individual Plaintiffs argue that, of the 17 post-

Civil War laws the Governor identifies, *see* Docket No. 28-5 at 2-9, one did not prohibit

the purchase of firearms, one is from a state that "operated under a fundamental

misunderstanding of the right to bear arms," one was from a Western state that should

be disregarded as overly restrictive under *Bruen*, and that seven other laws were

adopted by States with no Second Amendment analogue.  Docket No. 30 at 9-11.  The

Individual Plaintiffs argue that the remaining seven laws are not appropriate analogues

to SB23-169 because they rely on a status, namely, legal minority, that does not apply

to 18-to-20 year olds today.  *Id.* at 11.

    The Governor argues that the regulations he identifies burden the right to self-

defense in a similar way to SB23-169 in that they burden persons under a certain age

from accessing weapons, mostly by limiting their ability to purchase weapons.  Docket

No. 28 at 19-21.  Additionally, the Governor argues that the regulations were in place for

the same reason that SB23-169 was passed, to protect public safety, despite the fact

that such laws would burden the right to self-defense.  *Id.* at 20-21.

    *Bruen* stated that the Court has "made clear that individual rights enumerated in the

Bill of Rights and made applicable against the States through the Fourteenth

Amendment have the same scope as against the Federal Government."  142 S. Ct. at

2137.  While it remains an open question as to how a court should weigh historical

understandings of the Second Amendment at the time that the Fourteenth Amendment

was adopted, *id.* at 2138, because the Governor fails to point to any evidence during the

founding era that a total prohibition on the sale of firearms to minors was consistent with

the right to bear arms, the Court gives little weight to evidence from the time of the Fourteenth Amendment's ratification to limit the scope of the right to keep and bear arms. *Cf. McCraw*, 623 F. Supp. 3d at 757 (observing that relying on evidence from the Reconstruction Era alone would "give postenactment history more weight than it can rightly bear" (quoting *Bruen*, 142 S. Ct. at 2136)). The Court finds that the Governor has failed to meet his burden to demonstrate that SB23-169 is consistent with the Nation's historical tradition of firearms regulation. For the purpose of obtaining a preliminary injunction, the Individual Plaintiffs have demonstrated a likelihood of success on the merits.

### C. Irreparable Harm

In order to demonstrate entitlement to a preliminary injunction, the Individual Plaintiffs must show that the "[the movant] will suffer irreparable injury unless the injunction issues." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992)). "[T]he 'showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). The Supreme Court has opined that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). The Tenth Circuit has observed that "[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019). The Tenth Circuit has

ruled that violations of individual rights guaranteed under the Constitution constitute irreparable harm. *See Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

The Individual Plaintiffs argue that they face irreparable harm in the absence of an injunction because "a showing of the infringement of a constitutional right requires no further showing of irreparable injury." Docket No. 12 at 16 (citing *Free the Nipple-Fort Collins*, 916 F.3d at 805). The Governor responds that the Individual Plaintiffs have not shown that a constitutional violation is imminent, arguing that, to the extent the Individual Plaintiffs argue an inability to acquire firearms is a violation of their rights, the Individual Plaintiffs' ability to purchase firearms before SB23-169 took effect and their ability to possess and use a firearm under SB 23-169 mitigates the harm to the Individual Plaintiffs. Docket No. 28 at 24. The Individual Plaintiffs reply that they need an injunction when SB23-169 becomes effective. Docket No. 30 at 14.

Here, because SB23-169 likely causes a violation of the Individual Plaintiffs' individual constitutional rights, *see Aposhian*, 958 F.3d at 990 (observing that "our cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government"), resulting in damages that are potentially inadequately remedied by money and "difficult[ to] calculat[e]," *Free the Nipple-Fort Collins*, 916 F.3d at 806, the Court finds the Individual Plaintiffs have shown irreparable injury.

### D. Balancing the Equities and Public Interest

The Individual Plaintiffs must demonstrate "that the balance of equities tips" in their favor and "that the injunction is in the public interest." *RoDa Drilling Co.*, 552 F.3d at

1208.  The Individual Plaintiffs argue that "the State's interest in enforcing an unconstitutional law does not outweigh [the Individual] Plaintiffs' interest in having their constitutional rights protected" and that "it is always in the public interest to prevent the violation of a party's constitutional rights."  Docket No. 12 at 17.  The Governor responds that the State suffers an injury when it cannot enact a law and that, in the case of SB23-169, public safety will be threatened if a pre-enforcement injunction issues.  Docket No. 28 at 24-25 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  On the record before the Court, the Individual Plaintiffs have made a sufficient showing that the balance of equities tips in their favor and that the Individual Plaintiffs' proposed injunction is in the public interest because the Individual Plaintiffs have made a sufficient showing that SB23-169 infringes the Individual Plaintiffs' Second Amendment rights.[19] *See Free the Nipple-Fort Collins*, 916 F.3d at 806-07 ("When a constitutional right hangs in the balance, though, even a temporary loss usually trumps any harm to the defendant. . . .  [I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotations and citations omitted)).

## IV. SECURITY

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

---

[19] Neither party addresses how the balance of the equities should be addressed in a Second Amendment case or what effect the government's interest in public safety has on the cases.  *See* Docket No. 28 at 24-25; Docket No. 30 at 14.  The Court is unaware of any Tenth Circuit precedent describing how cases with these circumstances should be evaluated.

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A trial court has "wide discretion under Rule 65(c) in determining whether to require security."  *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotations and citation omitted).  It is, however, reversible error to fail to consider whether to require a bond.  *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).  The parties do not address whether a bond should be required.[20]  *See generally* Docket Nos. 12, 28, 30.  The Court finds a bond unnecessary as this case seeks to enforce a constitutional right against the government.  *See United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (citing *RoDa Drilling Co.*, 552 F.3d at 1215).

## V. CONCLUSION

It is **ORDERED** that the portion of plaintiffs' Motion for Preliminary Injunction [Docket No. 12] brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED**.  It is further

**ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23-169.  It is further

**ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits.  It is further

---

[20]  The proposed order in plaintiffs' motion for a temporary restraining order, Docket No. 34-1 at 2, ¶ 6, states "Plaintiffs do not need to post a security bond because enjoining the Defendant from prohibiting Plaintiffs' exercise of their Second Amendment rights does not interfere with the Defendant's rights."

**ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c).  It is further

**ORDERED** that plaintiffs' Motion for Temporary Restraining Order [Docket No. 34] is

**DENIED as moot**.

DATED August 7, 2023.

BY THE COURT:

s/Philip A. Brimmer
Philip A. Brimmer
Chief United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

### STIPULATED EXTENSION FOR TIME TO RESPOND

---

Under District of Colorado Local Civil Rule 6.1(a), the Plaintiffs Rocky Mountain Gun Owners, Tate Mosgrove, Adrian S. Pineda, and Defendant Jared S. Polis stipulate to an extension of Defendant's deadline to respond to the First Amended Complaint (Doc. 9).

1.    Plaintiffs sent Defendant a request to waive service of the summons and complaint on June 8, 2023. Defendant executed the waiver the same day. Accordingly, Defendant's response to the complaint is due today, August 7, 2023. *See* Fed. R. Civ. P. 4(d)(3).

2.    Under the Local Civil Rules, the parties may agree to one extension of not more than 21 days to respond to a pleading or amended pleading. D.C.Colo.LCivR. 6.1.

3.    The parties have not previously stipulated to an extension of time in this matter.

4.    Accordingly, under Local Civil Rule 6.1, the parties stipulate to a 21-day extension of time for the Defendant to respond to the Complaint, to and including August 28, 2023.

Dated: August 7, 2023

*/s/ Barry K. Arrington*
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

PHILIP J. WEISER
Attorney General

*/s/ Matthew J. Worthington*
*Grant Sullivan*,
Assistant Solicitor General
*Michael T. Kotlarczyk*,
Senior Assistant Attorney General
*Matthew J. Worthington*,
Assistant Attorney General
1300 Broadway
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov

*Attorneys for Defendant Jared Polis, in his
official capacity as Governor of the State of
Colorado*
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2023, I served a true and complete copy of the foregoing **STIPULATED EXTENSION FOR TIME TO RESPOND,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

App 681

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-PAB-NRN Rocky Mountain Gun Owners et al v. Polis Order Referring Case to Magistrate Judge |
| **Date:** | Thursday, August 10, 2023 4:32:14 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court - District of Colorado

#### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 8/10/2023 at 4:31 PM MDT and filed on 8/10/2023
**Case Name:**       Rocky Mountain Gun Owners et al v. Polis
**Case Number:**    1:23-cv-01077-PAB-NRN
**Filer:**
**Document Number:** 39(No document attached)

**Docket Text:**
**ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter for non-dispositive matters. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 8/10/2023. Text Only Entry (pabsec, )**

**1:23-cv-01077-PAB-NRN Notice has been electronically mailed to:**

Barry Kevin Arrington      barry@arringtonpc.com

Grant T. Sullivan    grant.sullivan@coag.gov, carmen.vanpelt@coag.gov

Michael T. Kotlarczyk    mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov

Matthew John Worthington    matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB-NRN Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

Defendant.

**ORDER SETTING SCHEDULING/PLANNING CONFERENCE**

Entered by U.S. Magistrate Judge N. Reid Neureiter

The above-captioned case has been referred to Magistrate Judge N. Reid Neureiter pursuant to the Order Referring Case, entered by Chief Judge Philip A. Brimmer on August 10, 2023 (Dkt. #39).

**IT IS HEREBY ORDERED** that a Scheduling/Planning Conference pursuant to Fed. R. Civ. P. 16(b) shall be held on:

> September 25, 2023 at 2:00 p.m.
> in Courtroom C-203,
> Second Floor,
> Byron G. Rogers U.S. Courthouse,
> 1929 Stout Street,
> Denver, Colorado 80294

**The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time.**

If this date is not convenient for any counsel/pro se party, he/she should confer with opposing counsel/pro se party and file a motion to reschedule the conference to a more convenient date. Absent exceptional circumstances, no request for rescheduling any appearance in this court will be entertained unless a motion is filed no less than FIVE (5) business days in advance of the date of appearance.

App 684

**IT IS FURTHER ORDERED** that counsel/pro se parties in this case shall hold a pre-scheduling conference meeting and prepare a proposed Scheduling Order in accordance with Fed. R. Civ. P. 26(f) and D.C.COLO.LCivR 16.1 and 26.1(a) on or before 21 days prior to scheduling conference. Pursuant to Fed. R. Civ. P. 26(d) no discovery shall be sought until after the pre-scheduling conference meeting. No later than five (5) business days prior to the Scheduling/Planning Conference, counsel/pro se parties shall file their proposed Scheduling Order **(in PDF)** in compliance with the ECF Filing Procedures, and email a copy of the proposed Scheduling Order (**as a Microsoft Word document**) to Neureiter_Chambers@cod.uscourts.gov. In addition, on or before fourteen (14) days after the pre-scheduling conference meeting, the parties shall comply with the mandatory disclosure requirements of Fed. R. Civ. P. 26(a)(1).

Counsel/pro se parties shall prepare the proposed Scheduling Order as provided in D.C.COLO.LCivR 16.1 in accordance with the form and instructions which may be found through the links in D.C.COLO.LCivR 16.2 and 26.1(a). Parties who are unrepresented and do not have access to the internet may visit the Clerk's Office in Alfred A. Arraj U.S. Courthouse, 901 19th Street, Room A-105, Denver, Colorado. (The Clerk's Office telephone number is (303) 844-3433.) Scheduling Orders prepared by parties not represented by counsel, or without access to ECF, shall be submitted on paper.

All out-of-state counsel shall comply with D.C.COLO.LAttyR 3(a) prior to the Scheduling/Planning Conference.

It is the responsibility of counsel to notice the court of their entry of appearance, notice of withdrawal, or notice of change of counsel's address, e-mail address, or telephone number by complying with the ECF Procedures and filing the appropriate motion or document with the court.

Please remember that **everyone** seeking entry into the Byron G. Rogers United States Courthouse will be required to show valid photo identification and be subject to security procedures. See D.C.COLO.LCivR 83.2. Failure to comply with the identification requirement and security procedures will result in denial of entry into the Byron G. Rogers United States Courthouse.

DONE AND SIGNED THIS 11th DAY OF AUGUST, 2023.

BY THE COURT:

s/N. Reid Neureiter
N REID NEUREITER
United States Magistrate Judge

App 685

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
       Plaintiffs,
v.
JARED POLIS, in his official capacity as Governor of Colorado,
       Defendant.

---

### NOTICE OF APPEAL

---

        Defendant Jared Polis, the Governor of the State of Colorado, hereby gives notice of his

appeal to the United States Court of Appeals for the Tenth Circuit from the District Court's

August 7, 2023 order, which enjoined the Governor "and his officers, agents, servants

employees, and all persons in concert or participation with them . . . from enforcing SB23-169."

*See* Dkt. 37; *see also* 28 U.S.C. § 1292(a)(1) (courts of appeal have jurisdiction over district

court orders ranting an injunction).

        Dated: August 11, 2023

                                    PHILIP J. WEISER
                                    Attorney General

                                    *s/ Matthew J. Worthington*
                                    *Grant T. Sullivan*, Assistant Solicitor General*
                                    *Michael T. Kotlarczyk,* Senior Assistant Attorney General*
                                    *Matthew J. Worthington*, Assistant Attorney General*
                                    1300 Broadway, 6th Floor
                                    Denver, CO 80203
                                    Telephone: (720) 508-6000
                                    Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
                                    matt.worthington@coag.gov
                                    *Attorneys for Defendant Governor Jared Polis*
                                    *Counsel of Record

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 11, 2023, I served a true and complete copy of the foregoing **NOTICE OF APPEAL** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

<u>*s/ Carmen Van Pelt*</u>
Carmen Van Pelt

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
     Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of Colorado,
     Defendant.

---

**THE GOVERNOR'S MOTION FOR A STAY OF THE PRELIMINARY INJUNCTION
PENDING APPEAL [DKT. 37]**

---

The Governor respectfully moves for a stay of the Court's preliminary injunction [Dkt. 37] pending appeal. Upon conferral, Plaintiffs' counsel stated they oppose this motion.

**PROCEDURAL BACKGROUND**

Colorado's Senate Bill 23-169 raises the minimum age to purchase a firearm in this state from 18 to 21. The new law regulates only the purchase of firearms. Persons 18-to-20-years-old may still lawfully possess firearms under the new law. Plaintiffs challenged the new law as a violation of the Second Amendment and sought a preliminary injunction two months before the law's August 7, 2023, effective date. Dkt. 12. This Court granted the individual Plaintiffs' request on August 7 and preliminarily enjoined enforcement of SB23-169 pending disposition of this case on the merits. Dkt. 37.

Because SB23-169 is a critical component of Colorado's broader effort to combat gun violence, teen suicide, and mass shootings, and because the Court's analysis granting the injunction presents a large number of novel, unresolved issues, the Governor is seeking immediate appellate review of the preliminary injunction order. *See* 28 U.S.C. § 1292(a)(1). The

Governor respectfully requests that the preliminary injunction order be stayed pending that appellate review.

## ARGUMENT

"While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). When seeking a stay of an injunction pending appeal, the movant must ordinarily first seek the stay in the district court. Fed. R. App. P. 8(a)(1).

A motion for a stay of an injunction pending appeal is subject to the same standards as a motion for a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015). The Court considers (1) whether the movant has made a strong showing that they are likely to prevail on the merits of their appeal; (2) whether the movant will be irreparably injured if the stay is not granted; (3) whether granting the stay will substantially harm the opposing parties; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Bradford v. U.S. Dep't of Labor*, No. 21-cv-03283-PAB-STV, 2022 WL 266805, at *1 (D. Colo. Jan. 28, 2022).

Here, each factor militates in favor of granting a stay pending appeal.

I.       **The Governor is likely to prevail on the merits of his appeal.**

        A.       **The record does not establish that Plaintiffs have standing to obtain an injunction.**

The Governor's response to the preliminary injunction motion described how the individual Plaintiffs' allegations were insufficient to establish standing or the Court's subject matter jurisdiction. Dkt. 28 at 8. In a similar Second Amendment case, the Tenth Circuit held that certain plaintiffs lacked standing because they did not have "concrete plans to engage in

conduct" that violated the challenged statute. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). The Court noted here that the individual Plaintiffs "do not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, or that they have taken any steps to prepare to purchase firearms." Dkt. 37 at 12 n.6. The Court also stated it was not aware of the individual Plaintiffs' current age or whether SB23-169 would apply to the individual Plaintiffs' conduct after the law became effective. *Id.* at 14 n.8. The Court also "exercise[ed] its discretion not to hold a hearing on plaintiffs' motions" without resolving these jurisdictional prerequisites. *Id.* at 4 n.4. Under these circumstances, the Court erred when it held that the individual Plaintiffs' declarations alone established "concrete plans" to violate SB23-169. Dkt. 37 at 12 n.6; *Colo. Outfitters Ass'n*, 823 F.3d at 551. A court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) (citation omitted).

**B.    The Governor is likely to prevail under the *Bruen* standard.**

The Supreme Court in *Bruen* announced a new test for evaluating gun laws under the Second Amendment. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). First, the court must determine if the Second Amendment's plain text covers the individual's conduct. *Id.* at 2126. If so, under *Bruen*'s second step, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Id.*

The Governor's response to Plaintiffs' preliminary injunction motion satisfied this standard, noting Plaintiffs had not carried their burden on the first step while also identifying several historical analogues at the second step that show this Nation has a long tradition of placing restrictions on 18-to-20-year-olds' ability to purchase firearms. Dkt. 28 at 13-23. The

Governor's evidence included over 320 pages of sworn declarations and exhibits from leading experts. Dkt. 28-1 to 28-5. Plaintiffs rebutted none, choosing to submit no expert declarations whatsoever. The Governor's evidence revealed, for example, that persons under 21 in the 18th century were subject to their parents' authority and thus did not have full contracting rights to purchase firearms (Dkt. 28 at 14; Dkt. 28-1 at 12-13, 20-22); that early American colleges and universities prohibited their students from possessing firearms on campus (Dkt. 28 at 15; Dkt. 28-2 at 14-16); that parents continued to be responsible for their minor children when they served in the militia and were even responsible for supplying the minor's firearm (Dkt. 28 at 15-16; Dkt. 28-1 at 25-27, 34-41); and that states and cities in the Founding and Reconstruction periods adopted restrictions on minors' ability to purchase and use firearms (Dkt. 28 at 17-18; Dkt. 28-2 at 7-9; Dkt. 28-5).

The Court rejected the Governor's evidence. But in doing, the Court misapplied *Bruen* in at least four critical ways. *First*, at *Bruen*'s first step, the Court failed to evaluate the "plain text" of the Second Amendment as "known to ordinary citizens in the founding generation." *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008). The Court did not require Plaintiffs to first demonstrate that the "public understanding of the right when the Bill of Rights was adopted in 1791" included a right for 18-to-20-year-olds to purchase firearms. *Bruen*, 142 S. Ct. at 2137. Indeed, the Court did not require the Plaintiffs to present any evidence at all. Instead, the Court erred by placing the burden of *Bruen*'s first step on the Governor. At step one, the Court held that the Governor had not presented evidence of a historical tradition, only evidence that "states could have regulated 18-to-20 year olds [at the founding] because they lacked rights as minors." Dkt. 37 at 25. By doing so, the Court makes *Bruen* an impossible test. The Governor must point

to a historical restriction on a right before the Plaintiffs have even demonstrated such a right historically existed. But the absence of Founding era regulations cannot indicate a lack of a historical tradition if the Founding generation never understood the Second Amendment to cover the conduct in the first place.

*Second*, at *Bruen*'s second step, the Court held the Governor to an impermissibly high standard that requires a *de facto* historical "dead ringer," not a "historical analogue." *Bruen*, 142 S. Ct. at 2133. On early college bans of firearms, for example, the Court reasoned that colleges did not prohibit students from possessing firearms "because of their age." Dkt. 37 at 35. But the Governor's evidence showed that early colleges acted as a parental substitute over their students, most of whom were 18 to 22 years old. Dkt. 28-1 at 27 ("[M]inors attending college traded strict parental authority for an equally restrictive rule of in *loco parentis*."); Dkt. 28-2 at 14 (same). Requiring a parental substitute would not have been necessary without the common understanding that college students, because of their age, were not yet full-fledged adults and did not enjoy the fully panoply of constitutional rights. While perhaps not a "dead ringer," early college bans on firearms satisfies *Bruen*'s more flexible "historical analogue" rubric.

So, too, with the other Founding and Reconstruction-era restrictions identified by the Governor. The Court was unpersuaded by the Governor's analogues because he "fail[ed] to point to any evidence during the founding era that a total prohibition on the sale of firearms to minors was consistent with the right to bear arms[.]" Dkt. 37 at 39-40. But demanding such a prohibition would amount to a "historical twin" not required by *Bruen*. 142 S. Ct. at 2133. Under *Bruen*, identifying "historical analogues" is sufficient. *Id.*

*Third*, the Court's order granting the preliminary injunction effectively nullifies *Heller*'s category of "presumptively lawful" regulations. *Heller*, 554 U.S. at 627 n.26; *accord Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) & 2162 (Kavanaugh, J., concurring) (recognizing that *Bruen* does not disturb this provision of *Heller*). *Heller* stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and governments buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27. *Heller* described these presumptively lawful regulations as "exceptions" to the Second Amendment, *id.* at 635, and part of what "the Constitution leaves [to the States as] … tools for combating" modern gun violence, *id.* at 636. The Governor argued that SB23-169 falls into this presumptively lawful category as a condition on the commercial sale of a firearm. Contrary to the Court's holding, Dkt. 37 at 30, the law regulates firearm sellers, not just buyers, preventing them from selling to anyone under 21. *See* Dkt. 1-1, SB23-169, § 2 (enacting § 18-12-112(2)(e)); *id.*, § 3 (enacting § 18-12-112.5(1)(a.3)). The Court disagreed, stating that even regulations falling into *Heller*'s presumptively lawful category are subject to *Bruen*'s two-part test, including the second step where the government carries the burden. Dkt. 37 at 28-31.

This flips *Heller*'s presumption on its head. Instead of presuming that the regulation is constitutional, the government must now bear the burden of showing a historical analogue for all manner of laws that gave the *Heller* Court no pause. Flipping the *Heller* presumption will effectively mean the end of the presumptively lawful category, since few to no historical analogues exist prior to the 20th century for many of the laws that *Heller* held are presumptively

valid. *See Bruen*, 142 S. Ct. at 2133 (noting "relatively few" "sensitive places" in the historical record but continuing to recognize the "lawfulness of such prohibitions").

Other courts have correctly rejected this call to invalidate *Heller*'s presumptively lawful category after *Bruen*. *See, e.g.*, *United States v. Minter*, 635 F. Supp. 3d 352, 361 (M.D. Penn. 2022) ("Where *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons, may no longer be lawful, this Court is bound by the Supreme Court's decision in *Heller*."); *United States v. Price*, 635 F. Supp. 3d 455, 466 (S.D. W. Va. 2022) ("[T]he Supreme Court left generally undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons through its decision in *Bruen* by reaffirming and adhering to its reasoning in *Heller* and *McDonald*."). These courts rightly hold that *Bruen*'s two-step test need not be applied to presumptively lawful regulations that the Supreme Court has "already signaled" are constitutional. *Minter*, 635 F. Supp. 3d at 358; *accord Price*, 635 F. Supp. 3d at 466.

And *fourth*, the Court gave too little weight to the historical analogues identified by the Governor from the time of the Fourteenth Amendment's ratification. Dkt. 37 at 39-40. As the Governor argued, the Supreme Court does not demand that courts ignore 19th century history. *Heller* looked to how the text was interpreted "from immediately after its ratification through the end of the 19th century." 554 U.S. at 605. And while *Bruen* declined to definitively decide the issue, it nonetheless looked to the historical record from the "18th- and 19th-century" when continuing to uphold *Heller*'s "sensitive places" category. 142 S. Ct. at 2133. Thus, 19th century history should not be discounted in the historical analysis required by *Bruen*.

At bottom, the new two-part test required by *Bruen* has reopened an array of questions that lower courts are grappling with. How close of a fit must the historical analogue be? What historical period should be considered? These questions will require time—and a record—to resolve. But for now, the Governor has made a strong showing under existing Supreme Court guidance that SB23-169 is constitutional. He is therefore substantially likely to succeed on the merits of his appeal, justifying a stay of the preliminary injunction pending appeal.

**II.    Colorado will be irreparably injured if a stay of the preliminary injunction is not granted pending appeal.**

A stay of the preliminary injunction pending appeal is also necessary because Colorado is suffering, and will continue to suffer, irreparable injury each day that SB23-169 remains preliminarily enjoined. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

In just the last five days, some 54 Coloradans aged 18-to-20-years old have attempted to purchase firearms. *See* Ex. 1, Baumgart Decl. Many would not have been eligible if SB23-169 were in effect. More will occur each day that the law remains enjoined. These attempted purchases are especially troubling because firearms are now the leading cause of death for 18-to-20-year-olds in Colorado and the United States. Dkt. 28 at 1 & n.1. With the new school year about to commence, Colorado needs fewer guns in the hands of minors, not more.

**III.    Granting a stay of the preliminary injunction will not substantially harm Plaintiffs.**

Conversely, granting a stay of the preliminary injunction will not substantially harm Plaintiffs here. To show irreparable harm, Plaintiffs were required to show that their rights were threatened or actually impaired "*at the time relief was sought*." *Elrod v. Burns*, 427 U.S. 347,

373 (1976) (emphasis added). As the Governor argued, the individual Plaintiffs had ample opportunity to acquire firearms in the two months between their preliminary injunction motion and the law's August 7, 2023, effective date. Dkt. 36 at 2-3. If they failed to do so, it was Plaintiffs' own voluntary choice and thus a self-inflicted injury. Such injuries will not support relief from a federal court. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

In granting the preliminary injunction, this Court found that Plaintiffs had made the requisite showing because the violation of a constitutional right alone constitutes irreparable harm. Dkt. 37 at 41. But even if true, the Court must "nonetheless engage in [the] traditional equitable inquiry as to the presence of irreparable harm in such a context[.]" *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). Here, the individual Plaintiffs easily could have avoided their claimed harm, if any, by purchasing their desired firearms before SB23-169's effective date. Moreover, other than the bare assertion that the individual Plaintiffs intend to buy firearms for self-defense, the record is devoid of any evidence suggesting that they have concrete plans to engage in conduct that violates Colorado law. *See* Dkt. 37 at 12 n.6 (explaining that Plaintiffs failed to indicate "that they will purchase firearms after the law goes into effect, that they have previously purchase firearms, or that they have taken any steps to prepare to purchase firearms."). Even under a traditional equitable balancing analysis that is generous to Plaintiffs, this falls well short of constituting irreparable harm.

**IV.     The public interest strongly favors staying the preliminary injunction pending appeal.**

Absent a stay of the preliminary injunction pending appeal, Colorado will be foreclosed from enforcing a law enacted by its elected representatives that seeks to combat gun violence, teen suicide, and mass shootings. These tragedies are well-known to Colorado. *See Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 317 (Colo. 2020) ("Colorado has been the setting of two of the nation's most notorious mass shootings: Columbine High School in 1999 and the Aurora movie theater in 2012 … Collectively, the shooters killed over two dozen people and wounded scores more."). In fact, the Court's injunction takes effect the same month that schoolchildren across Colorado will be returning to the classroom to begin the new school year. The Court's injunction allows some of those schoolchildren to purchase guns, contrary to the will of the people of Colorado.

By enacting SB23-169, Colorado's General Assembly determined it would serve the public interest and promote public safety if the minimum age to purchase firearms was raised to 21. *See Fish*, 840 F.3d at 755 ("our democratically elected representatives are in a better position than this Court to determine the public interest."). Risk taking peaks in the late teens and early 20s because the human brain is still developing. Dkt. 28-4 at 16. Widely available firearm purchases by this group can threaten public safety. Coloradans will undoubtedly be harmed unless the law can be enforced while judicial review proceeds in the Tenth Circuit. The public interest thus strongly favors a stay.

## CONCLUSION

For the reasons stated above, the Court should enter a stay of its preliminary injunction pending appeal.

Dated: August 11, 2023

PHILIP J. WEISER
Attorney General

*s/ Grant T. Sullivan*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael T. Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Defendant Governor Jared Polis*
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S MOTION FOR A STAY OF THE PRELIMINARY INJUNCTION PENDING APPEAL** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*


*s/ Carmen Van Pelt*
Carmen Van Pelt

Appellate Case: 23-1251    Document: 010110965258    Date Filed: 12/07/2023    Page: 208

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS, et al.,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

### DECLARATION OF NICHOLAUS BAUMGART

      I, Nicholaus Baumgart, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

      1.      I am employed by the Colorado Bureau of Investigation ("CBI") as a Instacheck Unit Program Manager since March 1,2022. As part of my duties, I am familiar with CBI's process of collecting and maintaining certain demographic statistics regarding firearms purchases in Colorado, including data on purchases by age of the buyer.

      2.      Attached hereto is a true a correct copy of a data set regarding firearm purchases in Colorado by 18-to-20-year-olds from August 5,2023 to August 10,2023.

**EXHIBIT**

**1**

tabbies®

Appellate Case: 23-1251   Document: 010110965258   Date Filed: 12/07/2023   Page: 209

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __10th_ day of _____August_____, 2023.

Nicholaus Baumgart

| August 5 - 11 | |
|---|---|
| No Record - Approve | 21 |
| Docs Received - Approve | 24 |
| Docs Recieved - Deny | 1 |
| No Response 3 Day - Approve | 8 |
| Agency Refused - Approve | |
| | |
| **Total Ran** | 54 |
| | |
| | |
| Overall Total Processed Since 10/14/2022 | 6112 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, et al.
     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,
     Defendant.

---

**UNOPPOSED MOTION TO EXPEDITE BRIEFING ON MOTION TO STAY THE
PRELIMINARY INJUNCTION ORDER**

---

     Jared Polis, in his official capacity as Governor of the State of Colorado, moves to expedite briefing on the motion to stay the preliminary injunction order, filed contemporaneously herewith.

     1.      Upon conferral, Plaintiffs' counsel stated they do not oppose this motion.

     2.      On August 7, 2023, this Court preliminarily enjoined Colorado's SB23-169, which raises the minimum age to purchase a firearm from 18 to 21. This new law is a critical component of Colorado's broader effort to combat gun violence, teen suicide, and mass shootings. As a result, the Governor is immediately appealing the preliminary injunction order and has filed a motion to stay the preliminary injunction order pending appeal. The Governor must first seek the stay in the district court before requesting relief in the appellate court. Fed. R. App. P. 8(a)(1).

     3.      The Court's preliminary injunction allows high school- and college-aged students to purchase firearms that they otherwise would be ineligible to buy. With the school year about to commence, the Governor seeks to obtain an answer on his request for stay—from this Court,

the Tenth Circuit, or both—before students return to the classroom. As such, the Governor has

acted expeditiously by filing his appeal and seeking a stay of the preliminary injunction order

within just four days of the Court's order.

4.    To keep the process moving, the Governor proposes that Plaintiffs' response to

the motion to stay the preliminary injunction be filed within four days of today (rather than the

default 21 days), and that no reply be allowed absent leave of the Court. This expedited schedule

will allow the Court to promptly address the requested stay and, if necessary, allow the Governor

to seek further expedited relief in the Tenth Circuit. *Cf. McClendon v. City of Albuquerque*, 79

F.3d 1014, 1020 (10th Cir. 1996) (explaining an emergency stay of an injunction pending appeal

must be sought "at the earliest practicable time"). Plaintiffs do not oppose this requested relief.

5.    Accordingly, the Governor respectfully requests that this Court enter an order

requiring that Plaintiffs file their response to the motion to stay the preliminary injunction order

no later than four days from today, and that no reply be allowed absent leave of the Court.

Dated: August 11, 2023

PHILIP J. WEISER
Attorney General

*s/ Grant T. Sullivan*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael T. Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Defendant Governor Jared Polis*
*Counsel of Record

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on August 11, 2023, I served a true and complete copy of the foregoing **UNOPPOSED MOTION TO EXPEDITE BRIEFING ON MOTION TO STAY THE PRELIMINARY INJUNCTION ORDER,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-PAB-NRN Rocky Mountain Gun Owners et al v. Polis Order on Motion to Expedite |
| **Date:** | Monday, August 14, 2023 9:26:03 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court - District of Colorado**

**District of Colorado**

**Notice of Electronic Filing**

The following transaction was entered on 8/14/2023 at 9:25 AM MDT and filed on 8/14/2023
**Case Name:**       Rocky Mountain Gun Owners et al v. Polis
**Case Number:**     1:23-cv-01077-PAB-NRN
**Filer:**
**Document Number:** 44(No document attached)

**Docket Text:**
**ORDER by Chief Judge Philip A. Brimmer on 8/14/2023 re: [43] defendant's Unopposed Motion for Expedited Briefing on Motion to Stay the Preliminary Injunction Order is GRANTED. Plaintiffs shall file a response to [42] The Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal (Dkt. 37) on or before Tuesday, August 15, 2023. Text Only Entry(pabsec, )**

**1:23-cv-01077-PAB-NRN Notice has been electronically mailed to:**

Barry Kevin Arrington     barry@arringtonpc.com

Grant T. Sullivan     grant.sullivan@coag.gov, carmen.vanpelt@coag.gov

Michael T. Kotlarczyk     mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov

Matthew John Worthington     matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB-NRN Notice has been mailed by the filer to:**

App 706

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 8/14/2023

☐Pro Se    ☒Retained    ☐CJA    ☐FPD    USA or other
☐Federal Agency
(Appeal Fee Exempt)

Case No: <u>23-cv-01077-PAB-NRN</u>           ☐Amended Notice of Appeal
☐Other pending appeals
Date Filed: <u>08/11/2023</u>                    ☐Transferred Successive
§2254 or §2255
Appellant: <u>Jared S. Polis</u>               ☐Supplemental Record

Pro Se Appellant:
☐IFP forms mailed/given    ☐Motion IFP pending    ☐Appeal fee paid
☐IFP denied              ☐Appeal fee not paid

Retained Counsel:
☐Appeal fee paid    ☒Appeal fee not paid    ☐Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals.  Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, <u>www.ca10.uscourts.gov</u>.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by:   s/ J. Torres
Deputy Clerk

Rev. 8/17/2017

cc:      Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 8/17/2017

APPEAL,JD1,MJ CIV PP,NDISPO

## U.S. District Court – District of Colorado
### District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:23–cv–01077–PAB–NRN
### *Internal Use Only*

| | |
|---|---|
| Rocky Mountain Gun Owners et al v. Polis | Date Filed: 04/28/2023 |
| Assigned to: Chief Judge Philip A. Brimmer | Jury Demand: None |
| Referred to: Magistrate Judge N. Reid Neureiter | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

| **Rocky Mountain Gun Owners** | represented by | **Barry Kevin Arrington** |
|---|---|---|
| | | Arrington Law Firm |
| | | 4195 Wadsworth Boulevard |
| | | Wheat Ridge, CO 80033 |
| | | 303–205–7870 |
| | | Email: barry@arringtonpc.com |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| **Tate Mosgrove** | represented by | **Barry Kevin Arrington** |
|---|---|---|
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| **Adrian S Pineda** | represented by | **Barry Kevin Arrington** |
|---|---|---|
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| **Jared S. Polis** | represented by | **Grant T. Sullivan** |
|---|---|---|
| *in his official capacity as Governor of the State of Colorado* | | Colorado Attorney General's Office |
| | | Ralph L. Carr Colorado Judicial Center |
| | | 1300 Broadway |
| | | Denver, CO 80203 |
| | | 720–508–6349 |
| | | Fax: 720–508–6038 |
| | | Email: grant.sullivan@coag.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Matthew John Worthington** |
| | | Colorado Attorney General's Office |
| | | Ralph L. Carr Colorado Judicial Center |
| | | 1300 Broadway |
| | | Denver, CO 80203 |
| | | 720–508–6124 |
| | | Email: matt.worthington@coag.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Michael T. Kotlarczyk** |
| | | Colorado Attorney General's Office |
| | | Ralph L. Carr Colorado Judicial Center |
| | | 1300 Broadway |
| | | Denver, CO 80203 |
| | | 720–508–6187 |
| | | Fax: 720–508–6041 |
| | | Email: mike.kotlarczyk@coag.gov |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 08/14/2023 | 44 | ORDER by Chief Judge Philip A. Brimmer on 8/14/2023 re: 43 defendant's Unopposed Motion for Expedited Briefing on Motion to Stay the Preliminary Injunction Order is **GRANTED**. Plaintiffs shall file a response to 42 The Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal (Dkt. 37) on or before **Tuesday, August 15, 2023**. Text Only Entry(pabsec, ) (Entered: 08/14/2023) |
| 08/11/2023 | 43 | Unopposed MOTION to Expedite *Briefing on Motion to Stay the Preliminary Injunction Order* by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 08/11/2023) |
| 08/11/2023 | 42 | MOTION to Stay re 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1, Declaration of Baumgart)(Sullivan, Grant) (Entered: 08/11/2023) |
| 08/11/2023 | 41 | NOTICE OF APPEAL as to 37 Order on Motion for Preliminary Injunction,,,, Order on Motion for TRO,,, by Defendant Jared S. Polis (Worthington, Matthew) (Entered: 08/11/2023) |
| 08/11/2023 | 40 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE. A Scheduling Conference is set for 9/25/2023 at 2:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. By Magistrate Judge N. Reid Neureiter on August 11, 2023. (rvill, ) (Entered: 08/11/2023) |
| 08/10/2023 | 39 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter for **non–dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 8/10/2023. Text Only Entry (pabsec, ) (Entered: 08/10/2023) |
| 08/07/2023 | 38 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Jared S. Polis. Jared S. Polis answer due 8/28/2023. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/07/2023 | 37 | ORDER by Chief Judge Philip A. Brimmer on 8/7/2023, re: The Portion of 12 Plaintiffs Motion for Preliminary Injunction brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED. ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23–169. **ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits. **ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c). **ORDERED** that 34 Plaintiffs' Motion for Temporary Restraining Order is **DENIED as moot**. (jtorr, ) (Entered: 08/07/2023) |
| 08/07/2023 | 36 | RESPONSE to 34 MOTION for Temporary Restraining Order filed by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 08/07/2023) |
| 08/03/2023 | 35 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 8/03/2023. Defendant may file a response to 34 Motion for Temporary Restraining Order on or before **Monday, August 7, 2023, at 12:00 p.m.** Text Only Entry (pabsec, ) (Entered: 08/03/2023) |
| 08/03/2023 | 34 | MOTION for Temporary Restraining Order by Plaintiffs Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Proposed Order (PDF Only))(Arrington, |

| | | |
|---|---|---|
| | | Barry) (Entered: 08/03/2023) |
| 07/18/2023 | 33 | RESPONSE to 32 Supplement/Amendment *and Notice of Additional Supplemental Authority* by Defendant Jared S. Polis. (Attachments: # 1 Exhibit A, Oregon Firearms Federation v. Kotek Decision)(Worthington, Matthew) (Entered: 07/18/2023) |
| 07/15/2023 | 32 | SUPPLEMENT/AMENDMENT to 30 Reply to Response to Motion by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 11th Cir Order Vacating Bondi)(Arrington, Barry) (Entered: 07/15/2023) |
| 07/13/2023 | 31 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners All parties do not consent.. (Arrington, Barry) (Entered: 07/13/2023) |
| 07/12/2023 | 30 | REPLY to Response to 12 MOTION for Preliminary Injunction filed by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 07/12/2023) |
| 07/10/2023 | 29 | NOTICE *of Three Related Cases* by Defendant Jared S. Polis (Sullivan, Grant) (Entered: 07/10/2023) |
| 06/29/2023 | 28 | RESPONSE to 12 MOTION for Preliminary Injunction filed by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1; Cornell Declaration, # 2 Exhibit 2; Spitzer Declaration, # 3 Exhibit 3; Rivas Declaration, # 4 Exhibit 4; Steinberg Declaration, # 5 Exhibit 5; Historical Analogues)(Worthington, Matthew) (Entered: 06/29/2023) |
| 06/26/2023 | 27 | ORDER by Chief Judge Philip A. Brimmer on 6/26/2023 re: 26 defendant's Unopposed Motion to Exceed Page Limits is **GRANTED**. Defendant shall file a response to 12 Motion for Preliminary Injunction **that shall not exceed 25 pages**, and plaintiffs may file a reply in support of their motion **that shall not exceed 15 pages**. Text Only Entry(pabsec, ) (Entered: 06/26/2023) |
| 06/23/2023 | 26 | Unopposed MOTION for Leave to File Excess Pages by Defendant Jared S. Polis. (Worthington, Matthew) (Entered: 06/23/2023) |
| 06/22/2023 | 25 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 6/22/2023. Defendant shall respond to plaintiffs' Motion for Preliminary Injunction [Docket No. 12 ] on or before **June 29, 2023**. Plaintiffs may file a reply in support of their motion on or before **July 13, 2023**. Text Only Entry (pabsec, ) (Entered: 06/22/2023) |
| 06/21/2023 | 24 | Order of Transfer. This case is closely related to Case No. 23–cv–01076–PAB, with one of the same plaintiffs and the same defendant in each case and common questions of fact and/or law. Clerk shall transfer this case to Chief Judge Brimmer. All future pleadings shall be designated as 23–cv–01077–PAB. ORDERED by Judge John L. Kane on 6/21/2023. (angar, ) (Entered: 06/21/2023) |
| 06/13/2023 | 23 | ORDER granting 21 Unopposed Motion for Tate Mosgrove to Appear Electronically at July 6 Hearing. Plaintiff Tate Mosgrove is allowed to appear electronically for the Evidentiary Hearing on the Motion for Preliminary Injunction on July 6, 2023, beginning at 9:30 a.m. Plaintiffs' counsel and Mr. Mosgrove are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC. Please contact Ms. Abiakam on or before June 30, 2023. Ordered by Judge John L. Kane on 6/13/2023. Text Only Entry(jlksec) (Entered: 06/13/2023) |
| 06/13/2023 | 22 | MINUTE ORDER. In light of the reassignment of this case to Senior District Judge John L. Kane [#15], the Scheduling Conference set for August 28, 2023, at 11:00 a.m. is VACATED. By Magistrate Judge Kristen L. Mix on June 13, 2023. Text Only Entry (klmlc1, ) (Entered: 06/13/2023) |
| 06/13/2023 | 21 | MOTION for Leave to *Allow Mosgrove to Appear Electronically at July 6 Hearing* 17 Minute Order,, by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 06/13/2023) |
| 06/12/2023 | 20 | NOTICE of Entry of Appearance by Matthew John Worthington on behalf of Jared S. PolisAttorney Matthew John Worthington added to party Jared S. Polis(pty:dft) (Worthington, Matthew) (Entered: 06/12/2023) |

| 06/12/2023 | 19 | NOTICE of Entry of Appearance by Michael T. Kotlarczyk on behalf of Jared S. PolisAttorney Michael T. Kotlarczyk added to party Jared S. Polis(pty:dft) (Kotlarczyk, Michael) (Entered: 06/12/2023) |
| 06/12/2023 | 18 | NOTICE of Entry of Appearance by Grant T. Sullivan on behalf of Jared S. PolisAttorney Grant T. Sullivan added to party Jared S. Polis(pty:dft) (Sullivan, Grant) (Entered: 06/12/2023) |
| 06/12/2023 | 17 | MINUTE ORDER. An Evidentiary Hearing on Plaintiffs' Motion for Preliminary Injunction 12 is set for July 6, 2023, beginning at 9:30 a.m. The parties are DIRECTED to file their Witness and Exhibit Lists for the hearing on or before June 29, 2023. Counsel and the parties are expected to attend the hearing in person. The parties shall note on their Witness Lists whether it is anticipated any witness will testify via video teleconferencing. Ordered by Judge John L. Kane on 6/12/2023. Text Only Entry (jlksec) (Entered: 06/12/2023) |
| 06/09/2023 | 16 | MINUTE ORDER. Defendant is DIRECTED to file a Response to Plaintiffs' Motion for Preliminary Injunction 12 on or before June 22, 2023. Any Reply is due on or before June 28, 2023. The parties are DIRECTED to call chambers JOINTLY at (303) 844–6118 to set a date and time for the preliminary injunction hearing. The Court has availability on June 29th, July 5th, or July 6th for the hearing. Plaintiffs are DIRECTED to provide notice of this Order to Defendant without delay. Ordered by Judge John L. Kane on 6/9/2023. Text Only Entry (jlksec) (Entered: 06/09/2023) |
| 06/09/2023 | 15 | CASE REASSIGNED pursuant to 14 Minute Order. This case is randomly reassigned to Judge John L. Kane and drawn to Magistrate Judge Kristen L. Mix. All future pleadings should be designated as 23–cv–01077–JLK. (Text Only Entry) (csarr, ) (Entered: 06/09/2023) |
| 06/08/2023 | 14 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on June 8, 2023. This matter is before the Court sua sponte. This case was assigned to a United States Magistrate Judge pursuant to D.C.COLO.LCivR 40.1(c). Although a signed Consent/Non–Consent Form has not yet been filed, Plaintiff has filed a Motion for Preliminary Injunction 12 . See D.C.COLO.LCivR 40.1(c)(2)(a) (discussing assignment of cases in which a motion for injunctive relief has been filed). Accordingly, IT IS HEREBY ORDERED that this case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a). (csarr, ) (Entered: 06/09/2023) |
| 06/08/2023 | 13 | WAIVER OF SERVICE Returned Executed by Adrian S Pineda, Rocky Mountain Gun Owners, Tate Mosgrove. Jared S. Polis waiver sent on 6/7/2023, answer due 8/6/2023. (Arrington, Barry) (Entered: 06/08/2023) |
| 06/07/2023 | 12 | MOTION for Preliminary Injunction by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration)(Arrington, Barry) (Entered: 06/07/2023) |
| 06/02/2023 | 11 | SUMMONS issued by Clerk. (alave, ) (Entered: 06/02/2023) |
| 05/31/2023 | 10 | SUMMONS REQUEST as to Jared S. Polis re 9 Amended Complaint by Plaintiffs Tate Mosgrove, Adrian S Pineda, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 05/31/2023) |
| 05/26/2023 | 9 | AMENDED COMPLAINT against Jared S. Polis Attorney Barry Kevin Arrington added to party Adrian S Pineda(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove, Adrian S Pineda.(Arrington, Barry) (Entered: 05/26/2023) |
| 05/09/2023 | 8 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 05/09/2023. IT IS HEREBY **ORDERED** that Motion 3 is **GRANTED**. The Complaint 2 , which Plaintiffs state was inadvertently filed shall be deemed **WITHDRAWN**. The correct Complaint in this case is 1 in the docket.(alave, ) (Entered: 05/10/2023) |
| 05/08/2023 | 7 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge Kristen L. Mix on 05/08/2023. Proposed Scheduling Order due 8/21/2023. Scheduling/Planning Conference set for 8/28/2023 11:10 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (Attachments: # 1 Continuation of Main Document, # 2 Continuation of Main Document) (alave, ) (Entered: 05/09/2023) |

| 04/28/2023 | 6 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 5 | Case assigned to Magistrate Judge Kristen L. Mix. Text Only Entry. (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 4 | Administrative Notice: Duplicate filing fee received. Financial notified and a refund is pending. (Text Only Entry) (blaws) (Entered: 04/28/2023) |
| 04/28/2023 | 3 | MOTION to Withdraw Document re 2 Complaint by Plaintiffs Tate Mosgrove, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 04/28/2023) |
| 04/28/2023 | 2 | **WITHDRAWN** COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC−9072445), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) Modified on 5/10/2023 pursuant to Minute Order 8 . (alave, ). (Entered: 04/28/2023) |
| 04/28/2023 | 1 | COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC−9072435)Attorney Barry Kevin Arrington added to party Tate Mosgrove(pty:pla), Attorney Barry Kevin Arrington added to party Rocky Mountain Gun Owners(pty:pla), filed by Rocky Mountain Gun Owners, Tate Mosgrove. (Attachments: # 1 Exhibit)(Arrington, Barry) (Entered: 04/28/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
     Plaintiffs,
v.
JARED POLIS, in his official capacity as Governor of Colorado,
     Defendant.

---

### NOTICE OF APPEAL

---

Defendant Jared Polis, the Governor of the State of Colorado, hereby gives notice of his

appeal to the United States Court of Appeals for the Tenth Circuit from the District Court's

August 7, 2023 order, which enjoined the Governor "and his officers, agents, servants

employees, and all persons in concert or participation with them . . . from enforcing SB23-169."

*See* Dkt. 37; *see also* 28 U.S.C. § 1292(a)(1) (courts of appeal have jurisdiction over district

court orders ranting an injunction).

     Dated: August 11, 2023

                              PHILIP J. WEISER
                              Attorney General

                              *s/ Matthew J. Worthington*
                              *Grant T. Sullivan*, Assistant Solicitor General*
                              *Michael T. Kotlarczyk,* Senior Assistant Attorney General*
                              *Matthew J. Worthington*, Assistant Attorney General*
                              1300 Broadway, 6th Floor
                              Denver, CO 80203
                              Telephone: (720) 508-6000
                              Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
                              matt.worthington@coag.gov
                              *Attorneys for Defendant Governor Jared Polis*
                              *Counsel of Record

App 714

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I served a true and complete copy of the foregoing **NOTICE OF APPEAL** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

_s/ Carmen Van Pelt_
Carmen Van Pelt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**ORDER**

---

This matter comes before the Court on the Motion for Preliminary Injunction [Docket No. 12] of plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove, and Adrian S. Pineda. Defendant Jared S. Polis, in his capacity as the Governor of the State of Colorado (the "Governor"), filed a response opposing plaintiffs' motion. Docket No. 28. Plaintiffs filed a reply. Docket No. 30.

**I. BACKGROUND**

    <u>**A. Findings of Fact**</u>

Plaintiffs challenge the constitutionality of Senate Bill 23-169 ("SB23-169"), which was passed by the Colorado General Assembly and which amends Sections 18-12-112 and 18-12-112.5 of the Colorado Revised Statutes, a provision in the Colorado Criminal Code regulating private firearm transfers. Docket No. 9 at 1, ¶ 1; Colo. Rev. Stat. § 18-12-112. The Governor signed the bill on April 27, 2023. Docket No. 9 at 1, ¶ 1. SB23-

Case No. 1:23-cv-01077-PAB-NRN   Document 45-2   filed 08/07/23   USDC Colorado   pg 2 of 4
Case No. 1:23-cv-01077-PAB-NRN   Document 37   filed 06/27/23   USDC Colorado   pg 2 of 4
46

Appellate Case: 23-1251     Document: 010110965258     Date Filed: 12/07/2023     Page: 225

169 becomes effective[1] "at 12:01 a.m. on the day following the expiration of the ninety-day period after final adjournment of the general assembly."  SB23-169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023).  Colorado's General Assembly adjourned on May 8, 2023.[2]

Section 18-12-112, as amended by SB23-169, provides:

> (2)(e) A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (f) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm.

Colo. Rev. Stat. § 18-12-112.  "A person who violates a provision of [Section 18-12-112] commits a class 2 misdemeanor."  *Id.* at § 18-12-112(9)(a).  Relevant provisions of Section 18-12-112.5 as amended provide:

> (a.3) A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.
>
> (a.5) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm
>
> . . . .
>
> (b) Transferring or selling a firearm in violation of this subsection (1) is a class 1 misdemeanor.
>
> (c) Purchasing a firearm in violation of this subsection (1) is a class 2 misdemeanor.

---

[1] The parties are not consistent as to when they claim SB23-169 goes into effect, indicating August 4, August 7, and August 8, 2023.  *See* Docket No. 9 at 1, ¶ 1; Docket No. 12 at 1; Docket No. 28 at 1; Docket No. 30 at 14; Docket No. 36 at 2 n.1.

[2] The Court takes judicial notice of the date that the Colorado General Assembly adjourned.  S. J., 74th Gen. Assemb., 1st Reg. Sess. at 1489 (Colo. 2023), https://leg.colorado.gov/sites/default/files/2023_senate_cumulative_journal.pdf.

*Id*. at § 18-12-112.5.  Sections 18-12-112 and 18-12-112.5 make exceptions for sales to persons under twenty-one years old if the purchaser is an active-duty member of the United States Armed Forces, a peace officer who is "on duty," or a person "certified by the P.O.S.T. Board."[3]  *Id*. at §§ 18-12-112, 18-12-112.5.  As noted by the Governor, 18-to-20 year olds may still possess and use firearms.  Docket No. 28 at 3.  And they may acquire, inherit, or receive as gifts firearms from family members.  *Id.*

RMGO is a nonprofit organization that "seeks to defend the right of all law-abiding individuals to keep and bear arms."  Docket No. 12-1 at 1, ¶ 3.  RMGO has members between 18 and 20 years old who desire and intend to purchase firearms for lawful purposes, including self-defense in their homes.  *Id*. at 1-2, ¶¶ 3-4.

Mr. Mosgrove is a citizen of Colorado and is older than 18, but younger than 21.  Docket No. 12-2 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."  *Id.*

Mr. Pineda is a citizen of Colorado and is older than 18, but younger than 21.  Docket No. 12-3 at 1, ¶ 2.  It is his "present intention and desire to lawfully purchase a firearm

---

[3] "The following peace officers shall meet all the standards imposed by law on a peace officer and shall be certified by the peace officers standards and training board, referred to in this article as the 'P.O.S.T. board': A chief of police; a police officer; a sheriff; an undersheriff; a deputy sheriff; a Colorado state patrol officer; a town marshal; a deputy town marshal; a reserve police officer; a reserve deputy sheriff; a reserve deputy town marshal; a police officer or reserve police officer employed by a state institution of higher education; a Colorado wildlife officer; a Colorado parks and recreation officer; a Colorado police administrator or police officer employed by the Colorado mental health institute at Pueblo; an attorney general criminal investigator; a community parole officer; a public transit officer; a municipal court marshal; and the department of corrections inspector general."  Colo. Rev. Stat. § 16-2.5-102.

for lawful purposes, including self-defense in [his] home." *Id.*

### B. Procedural History

Plaintiffs filed this action on April 28, 2023.  Docket No. 1.  Plaintiffs amended their

complaint on May 26, 2023.  Docket No. 9.  The amended complaint adds Mr. Pineda

as a plaintiff and brings one claim on behalf of all plaintiffs alleging that the restrictions

in SB23-169 "infringe on the right of the people of the State, including Plaintiffs, to keep

and bear arms as guaranteed by the Second Amendment and made applicable to

Colorado and its political subdivisions by the Fourteenth Amendment." *Id.* at 6, ¶ 20.

Plaintiffs seek a declaratory judgment, injunctive relief, and damages for the individual

plaintiffs. *Id.* at 6-7, ¶¶ 23-26.  On June 7, 2023, plaintiffs filed a motion for preliminary

injunction requesting that the Court preliminarily enjoin the enforcement of SB23-169

arguing that the bill is unconstitutional under the Second Amendment.[4]  Docket No. 12

at 1, 17.  On August 3, 2023, plaintiffs filed a motion for a temporary restraining order

seeking the same relief.  Docket No. 34.

## II. LEGAL STANDARD

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs

---

[4] The parties did not request a hearing.  *But see* Docket No. 12 at 1-2 ("Plaintiffs
submit this motion hoping that it will be briefed and argued prior to the effective date of
the law.").  The decision whether to hold a hearing on a preliminary injunction is within
the discretion of the Court.  *Buentello v. Boebert*, 545 F. Supp. 3d 912, 914 n.1 (D.
Colo. 2021) (citing *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014)
(unpublished), and *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL
339465, at *3 (10th Cir. 1998) (unpublished table decision)).  As the material facts are
not in dispute, other than the historical section for which declarations have been
attached, the Court exercises its discretion not to hold a hearing on plaintiffs' motions.

from irreparable injury that will surely result without [its] issuance" and "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258, 1267 (10th Cir. 2005); *see also Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1197 (D. Colo. 2009) ("injunctive relief can only be obtained for current or prospective injury and cannot be conditioned on a past injury that has already been remedied"). "[C]ourts generally will refuse to grant injunctive relief unless plaintiff demonstrates that there is no adequate legal remedy." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (3d ed. 2023).

To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

## III. ANALYSIS

### A. Standing

"[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction." *Russell v. Fin. Cap. Equities*, 158 F. App'x 953, 955 (10th Cir. 2005) (unpublished) (quoting *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996)). Moreover, if a court believes there is a standing issue, it "is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir.

2005) (citation omitted); *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)) ("a federal court can't 'assume' a plaintiff has demonstrated Article III standing in order to proceed to the merits of the underlying claim, regardless of the claim's significance").  Each plaintiff must have standing to seek each form of relief in each claim.  *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).  Therefore, the Court will begin by examining each plaintiffs' standing to seek injunctive relief.

### 1. Pre-Enforcement Challenge

Plaintiffs seek to enjoin enforcement of SB23-169 as unconstitutional.  Docket No. 12 at 17.  Because SB23-169 had not taken effect at the time of filing, plaintiffs are bringing a pre-enforcement challenge.  The Governor argues that plaintiffs' declarations "simply repeat a legal conclusion that they 'desire to purchase a firearm . . . and [they are] or soon will be precluded from purchasing a firearm by SB23-169.'  This is not enough to preliminarily enjoin the law or even establish standing."  Docket No. 28 at 8 (citations omitted).  Plaintiffs do not respond directly to the Governor's standing argument.  *See* Docket No. 30 at 14.  Instead, plaintiffs state:

> The State argues that because the law is not effective until August 8, 2023, the Plaintiffs are not at this moment entitled to a preliminary injunction.  Plaintiffs do not disagree, as they explained in their motion [].  Plaintiffs filed their motion prior to the effective date of the statute so that the issues would be fully briefed prior to that date so that the Court would be able to proceed in a more deliberate fashion rather than all at once on August 8.  Obviously, Plaintiffs will require an injunction to vindicate their constitutional rights when the statute does become effective.  The point of the State's argument is thus unclear.

*Id.* (citation omitted).  The Court understands plaintiffs' argument to be that, although plaintiffs filed their preliminary injunction motion well in advance of the statute's effective

date, plaintiffs are not seeking to enjoin the statute before that date, but rather plaintiffs challenge the statute as of the date it goes into effect.  *See id.* at 13-14.

The Supreme Court has stated that, "standing is to be determined as of the commencement of the suit."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992); *see also Nova Health Sys.*, 416 F.3d at 1154-55.  "Where, as here, the original complaint has been super[s]eded by an amended complaint, we examine 'the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing.'  Nevertheless, 'standing is determined at the time the action is brought . . . and we generally look to when the complaint was first filed, not to subsequent events' to determine if a plaintiff has standing."  *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253-54 (10th Cir. 2007)).  The Court will evaluate the allegations in the amended complaint to determine plaintiffs' standing to seek injunctive relief as of April 28, 2023, the time of filing.

### 2. Legal Standard for Standing

To establish Article III standing, a plaintiff must allege "that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision."  *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).  In order to show the first element of standing, a plaintiff must show he has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560-61 (internal

quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Injury in fact is a constitutional requirement.").  An injury is particularized if it affects the plaintiff in "a personal and individual way."  *Spokeo*, 578 U.S. at 339 (citation omitted).  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist;" it must be "real," not "abstract."  *Id*. at 340.  Furthermore, "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury.'"  *Warth v. Seldin,* 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 (1973)).

   "[T]he proof required to establish standing increases as the suit proceeds.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, while on summary judgment, the plaintiff must set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true."  *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (internal citations and quotations omitted).  At the preliminary injunction stage, plaintiffs must make a "'clear showing' that they have standing."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring) (quoting *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

   Where, as here, a plaintiff seeks prospective relief such as an injunction, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

"The threatened injury must be certainly impending and not merely speculative." *Id.* (quotations and citation omitted).

    In some narrow circumstances, a plaintiff may seek prospective relief for a law he fears may be enforced against him in the future. *See, e.g.*, *Bronson*, 500 F.3d at 1108-09. A pre-enforcement challenge can be brought against an existing law under which plaintiff has previously been prosecuted, against an existing law under which plaintiff has not been prosecuted, or in some rare cases before an enacted law is enforced. *See, e.g.*, *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947-48 (10th Cir. 2001) (evaluating a pre-enforcement challenge to a statute before it took effect); *Winsness v. Yocom*, 433 F.3d 727, 733 (10th Cir. 2006) (evaluating a pre-enforcement challenge to a statute that plaintiff had not been cited or prosecuted under); *Virginia v. American Booksellers Ass'n, Inc.*,[5] 484 U.S. 383, 387-88, 392 (1988) (evaluating a pre-enforcement challenge to a statute that had been enacted but before the statute was made effective). Consistent with the usual standing requirements described above,

---

    [5] In *American Booksellers*, 484 U.S. at 387-88, the Court examined a First Amendment claim where plaintiffs alleged harm was chilled speech. A "chilled speech" claim differs from a "pre-enforcement challenge," but both can be used in a First Amendment context to establish an injury-in-fact that is sufficient to obtain prospective relief. *See Rio Grande Found.*, 57 F.4th at 1160 (observing a "lessening of prudential limitations on standing" for "chilled speech or pre-enforcement challenges" (citations omitted)). A chilled speech claim also requires showing a credible threat of enforcement. *Id.* The Court, however, finds no Tenth Circuit precedent applying the "chilled speech" test outside of a First Amendment context. The Court's order should not be interpreted as extending the "chilled speech" test to a Second Amendment claim; instead, the Court relies on "chilled speech" cases for their value in demonstrating a credible threat of prosecution for a pre-enforcement challenge.

courts have held that, for a threat of enforcement to be sufficient for Article III injury, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

### 3. RMGO Standing

An organization has standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  Organizations may assert standing in their own right when, for instance, a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, such as when the organization faces a drain on its resources or when the defendant's actions "have perceptibly impaired" the organization's ability to carry out its mission.  *Id.* at 379. An association also has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

RMGO does not provide grounds for its own standing.  Plaintiffs state that RMGO "seeks to defend the right of all law-abiding individuals to keep and bear arms" and that it specifically "represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms."

Docket No. 12-1 at 1, ¶ 3.  Plaintiffs provide no evidence or argument that SB23-169 has made it difficult for RMGO to fulfill any of its essential goals or that SB23-169 has caused a drain on RMGO's resources.  Accordingly, RMGO fails to show standing in its own right to seek an injunction.

RMGO may also establish standing on behalf of its members.  RMGO, however, fails to show the first requirement for establishing standing in this way, namely, that its members would have standing to sue in their own right.  In *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), the Court observed that organizational plaintiffs must "identify members who have suffered the requisite harm."  This is accomplished when, through allegations or competent evidence, a plaintiff "name[s] the individuals who were harmed" or shows "*all* the members of the organization are affected by the challenged activity."  *Id.* at 498-99 (citations omitted).  Plaintiffs do not identify any individual members of RMGO, much less any individual member who is affected by SB23-169.  *See* Docket No. 12-1.  RMGO claims it "has members who reside in Colorado who are between the ages of 18 and 20" who intend and "desire to lawfully purchase a firearm for lawful purposes including, self-defense in their home," *id.* at 1, ¶¶ 3-4, but does not claim that this is true regarding every member of RMGO or even regarding every Colorado member of RMGO.  *See id.*  Although RMGO could presumably identify individual members it references, a "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Nova Health Sys.*, 416 F.3d at 1154 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990)).  Plaintiffs have not met their burden, *see Colo. Outfitters Ass'n*, 823 F.3d at 543, to show that RMGO has standing in its own right or that it has standing based on its members'

standing.  The Court may go no further, *id.* at 543-44, and will deny plaintiffs' motion to the extent it is brought on behalf of RMGO.

### 4. Individual Plaintiffs

Mr. Mosgrove and Mr. Pineda (the "Individual Plaintiffs") seek prospective relief and, therefore, to meet the injury-in-fact requirement of Article III standing, they must show a continuing or imminent injury.  *Tandy*, 380 F.3d at 1283.  Because the Individual Plaintiffs seek to enjoin a law pre-enforcement, the Individual Plaintiffs can establish an injury sufficient to establish standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder."  *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward*, 321 F.3d at 1267).

### a. Injury in Fact

First, Mr. Pineda and Mr. Mosgrove must show an intention to engage in a course of conduct arguably affected with a constitutional interest.  Their declarations indicate that both intend to purchase a firearm for the purpose of self-defense in their homes.[6] Docket No. 12-2 at 1, ¶ 2; Docket No. 12-3 at 1, ¶ 2.  The Supreme Court has ruled that

---

[6] In *Colo. Outfitters Ass'n*, 823 F.3d at 551, the Tenth Circuit found that plaintiffs in a Second Amendment case lacked standing based on not having "concrete plans to engage in conduct" that violates the challenged statute.  Here, the Individual Plaintiffs state they intend to purchase firearms, but do not state that they will purchase firearms after the law goes into effect, that they have previously purchased firearms, or that they have taken any steps to prepare to purchase firearms.  *See* Docket No. 12-2; Docket No. 12-3.  At this phase of the proceedings, the Individual Plaintiffs have done enough to make a "clear showing," *Hobby Lobby Stores, Inc.*, 723 F.3d at 1185, that they intend to purchase firearms, but the Court does not pass on the Individual Plaintiffs' showing for purposes of other stages of the case.

"the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). The Governor argues that the Second Amendment does not extend to the right to purchase a firearm as opposed to the right to "keep" and "bear" firearms.[7] Docket No. 28 at 7. Based on Mr. Mosgrove's and Mr. Pineda's representations that the purchase is at least partly for self-defense, the Court finds the Individual Plaintiffs' proposed course of conduct is "arguably affected with a constitutional interest," *Babbitt*, 442 U.S. at 298, under the Second Amendment.

Next, the Individual Plaintiffs must show that their conduct is proscribed by statute. *Id.* Mr. Mosgrove and Mr. Pineda do not state whether they seek to purchase a firearm through a licensed gun dealer or through a private sale, *see* Docket No. 12-2 at 1; Docket No. 12-3 at 1, but SB23-169 criminalizes both for 18-to-20 year olds. *See* Colo. Rev. Stat. §§ 18-12-112, 18-12-112.5. Purchasing a firearm from either a licensed gun dealer or a private party would constitute a class two misdemeanor under SB23-169

---

[7] The Governor raises his argument about the right to purchase firearms in the merits portion of his brief. The test for determining whether a plaintiff has suffered an injury arguably affected by a constitutional interest for Article III standing purposes is different from the test for the likelihood of success on the merits prong of a preliminary injunction. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 (8th Cir. 2021) ("The standard reaffirmed in *Susan B. Anthony List* does no work for Plaintiffs beyond the standing context. Although related, our analysis of whether Plaintiffs have standing on their First Amendment claim at this stage in the litigation is separate from our analysis of whether the claim is likely to prevail on the merits."). The Court nevertheless addresses the Governor's argument to the extent it can be construed to challenge the Individual Plaintiffs' standing.

because both the Individual Plaintiffs were under the age of 21 at the time of filing.[8] Therefore, the Court finds that the Individual Plaintiffs have demonstrated their proposed course of conduct is proscribed by statute.

Finally, the Individual Plaintiffs must establish a credible threat of prosecution.  The Tenth Circuit has recognized "at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement."  *Peck*, 43 F.4th at 1132 (quotations and citation omitted).  "[A] plaintiff need not risk actual prosecution before challenging an allegedly unconstitutional criminal statute."  *Bronson*, 500 F.3d at 1107.  The most credible threats of prosecution exist in "pre-enforcement claims brought after the entity responsible for enforcing the challenged statute actually threatens a particular plaintiff with arrest or even prosecution."  *Id.* at 1108.  "These claims can be juxtaposed with" those cases where "affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute prevents a 'threat' of prosecution from maturing into a 'credible' one, even when the plaintiff previously has been arrested under the statute."  *Id.*

---

[8] Mr. Mosgrove and Mr. Pineda state they were under 21 as of June 2, 2023, Docket No. 12-2 at 2; Docket No. 12-3 at 2.  The Court has no indication that the Individual Plaintiffs have turned 21 since June 2, 2023, but, moving forward, this question will be relevant to determining whether any requests for continuing injunctive relief are moot. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 326 (4th Cir. 2021).

App 729

Here, the statute is new, there is no evidence of an assurance that the statute will not be enforced, and there is no indication that the statute is moribund based on a change in controlling law.  *Cf. Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) ("Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing." (citing *Babbit*, 442 U.S. at 301-02)).  For the purpose of a preliminary injunction, the Individual Plaintiffs have made a clear showing of a credible threat of prosecution.[9]  Accordingly, the Individual Plaintiffs have shown an injury-in-fact sufficient to establish Article III standing.

### b.  Causation and Redressability

To establish the second and third elements of Article III standing, the Individual Plaintiffs must show "there is a causal connection between the injury and the conduct complained of; and [] it is likely that the injury will be redressed by a favorable decision." *Ward*, 321 F.3d at 1266 (citation omitted).  Neither party addresses causation or

---

[9] Some courts require individualized threats of enforcement for cases asserting rights other than those guaranteed by the First Amendment.  *See, e.g.*, *Angelo v. District of Columbia*, --- F. Supp. 3d ----, 2022 WL 17974434, at *4 (D.D.C. Dec. 28, 2022) ("binding D.C. Circuit case law demands more [evidence of a credible threat] than does [*Babbit*] — at least where the plaintiff presents a non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings.  In those contexts, plaintiffs must establish that the threat of prosecution is not only credible, but also imminent.  In other words, plaintiffs bringing a preenforcement challenge must demonstrate that their prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution." (internal citations, alterations, and quotations omitted)).  Neither party addresses the relevant standard in this circuit.  Finding no evidence this is the standard in the Tenth Circuit, the Court will decline to apply this requirement.

redressability. *See generally* Docket No. 12; Docket No. 28. The Court finds the Individual Plaintiffs have established both.

Relevant to establishing causation, the Individual Plaintiffs allege the Governor "will enforce the unconstitutional provisions of the law against Plaintiffs." Docket No. 12 at 3, ¶ 4. The Governor argues that, for purposes of Eleventh Amendment immunity as described in *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013), "he does not 'have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty,'" but states that he waives his Eleventh Amendment immunity. Docket No. 28 at 3 n.2. The Court notes that, in determining causation in an analysis of whether a party has standing, "there is a common thread between Article III standing analysis and *Ex parte Young*[, 209 U.S. 123 (1908)] analysis." *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013). The Governor's comment on his lack of a particular duty to enforce SB23-169 could be interpreted as an attack on the causation element of the Individual Plaintiffs' standing because the two inquiries are related. The Court, however, finds that the Governor "possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute" because "[t]he Colorado Constitution states that the 'supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.'" *Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013) (quoting Colo. Const. Art. IV, § 2), *aff'd in part sub nom. Colo. Outfitters Ass'n*, 823 F.3d at 554-55. Enjoining the enforcement of SB23-169 would redress the Individual Plaintiffs' injuries by removing the alleged violation of their Second Amendment rights. *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 978

(10th Cir. 2020).

## B. Likelihood of Success on the Merits

In order for the Court to grant a plaintiff's motion for a preliminary injunction, the

plaintiff must demonstrate "a likelihood of success on the merits." *RoDa Drilling Co.*,

552 F.3d at 1208.

> The purpose of a preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be held.  Given this
> limited purpose, and given the haste that is often necessary if those
> positions are to be preserved, a preliminary injunction is customarily
> granted on the basis of procedures that are less formal and evidence that
> is less complete than in a trial on the merits.  A party thus is not required
> to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Progress Development

Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).  The Individual Plaintiffs raise a facial

challenge to the validity of SB23-169.[10]  As stated above, the amended complaint brings

one claim on behalf of all plaintiffs alleging that the restrictions in SB23-169 "infringe on

---

[10] The Individual Plaintiffs do not explicitly state that they bring a facial challenge as
opposed to an as-applied challenge in their motion for preliminary injunction.  *See*
Docket No. 12.  The Individual Plaintiffs indicate they are challenging the statute in both
ways in their amended complaint.  *See* Docket No. 9 at 6, ¶ 23 ("SB23-169 is
unconstitutional on its face or as applied").  It is unclear what the Individual Plaintiffs' as-
applied challenge is and, for purposes of this motion, the Court presumes the Individual
Plaintiffs' challenge is facial because SB23-169 has not been enforced against any of
the Individual Plaintiffs.  *See Colo. Outfitters Ass'n*, 24 F. Supp. 3d 1050, 1058 n.8 (D.
Colo. 2014) ("Challenges to the constitutionality of statutes can take two forms.  There
can be a challenge as to how the law has actually been applied to a plaintiff (an 'as-
applied' challenge) or, there can be a challenge based solely on its language and
anticipated applications (a 'facial' challenge).  Here, because the statutes have not been
enforced against any Plaintiff, only facial challenges have been asserted."), *vacated and
rev'd on other grounds, Colo. Outfitters Ass'n*, 823 F.3d at 554-55.

the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment."  Docket No. 9 at 6, ¶ 20.

### 1. Legal Framework for Second Amendment Claims

On June 23, 2022, the Supreme Court announced its decision in *Bruen*, 142 S. Ct. 2111.  The Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Id.* at 2122.  In evaluating a Second Amendment claim, the Court declined to adopt the two-step approach the courts of appeal had developed, in which, "at the second step, courts often analyze how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."  *Id.* at 2122, 2126 (quotations and citations omitted).  *Bruen* held that the "two step test" has one step too many and that means-end scrutiny of laws that infringe upon Second Amendment rights is not supported by the Court's opinions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Bruen*, 142 S. Ct. at 2117-18.

*Bruen* states that the appropriate test for applying the Second Amendment is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  In order to determine whether the plain text of the Second Amendment covers a plaintiff's conduct, a court must determine whether plaintiff is "part of 'the people' whom the Second Amendment protects" and if the firearms at issue are "weapons 'in common

use' today for self-defense."[11] *Id.* at 2134 (quoting *Heller*, 554 U.S. at 580, 627).  Next, a court determines whether the plaintiff's "proposed course of conduct" is protected by the plain text of the Second Amendment.  *Id.*  After determining that a plaintiff's conduct is covered, the burden shifts to the government to demonstrate that the challenged regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id.* at 2135.

To perform the inquiry into the Nation's historic tradition, *Bruen* states the text of the Second Amendment must control over later history that contradicts the text.  *Id.* at 2137.  *Bruen* also states that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Id.* at 2138.  *Bruen* did not resolve this debate because it was not necessary for purposes of examining the challenged statute, observing only that it "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id.* at 2137-38.

Since the Supreme Court's ruling in *Bruen*, few courts have addressed the evidentiary burdens necessary to preliminarily enjoin a law on Second Amendment

---

[11] The Governor observes that federal law already prohibits licensed gun dealers from selling shotguns and rifles to anyone under 18 years old and selling all other firearms to anyone under 21 years old.  Docket No. 28 at 3 (citing 18 U.S.C. § 922(b)(1)).  The effect of SB23-169 would be to limit 18-to-20 year olds' ability to purchase shotguns and rifles from licensed gun dealers and to prohibit 18-to-20 year olds from purchasing any firearm in private sales.

grounds.  On the likelihood of success on the merits prong, the Governor argues that, because *Bruen* is silent on who carries the burden of establishing that the proposed conduct falls within the plain text of the statute, the Individual Plaintiffs should bear the burden.  Docket No. 28 at 6 n.3.  Courts that have considered this issue have ruled that, in order for plaintiffs to carry their burden on the likelihood of success on the merits prong, plaintiffs must show their conduct is covered by the Second Amendment and that plaintiffs' burden remains unchanged for the remaining three prongs of the preliminary injunction requirements.  *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, --- F. Supp. 3d. ----, 2022 WL 17454829, at \*12 (D. Or. Dec. 6, 2022), *appeal dismissed*, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Baird v. Bonta*, --- F. Supp. 3d. ----, 2022 WL 17542432, at \*5–6 (E.D. Cal. Dec. 8, 2022).  The Court agrees with the analysis in *Oregon Firearms* and *Baird* and will analyze the Individual Plaintiffs' motion by allocating burdens in the same way.

### 2.  Scope

First, the Individual Plaintiffs must establish that their proposed conduct falls within the scope of the Second Amendment.  *Bruen*, 142 S. Ct. at 2129-30.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  The Individual Plaintiffs state that their proposed course of conduct is to "purchase firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.

### a.  Right of the People

In determining whether their proposed conduct is within the scope of the Second

Amendment, a threshold question is whether the Individual Plaintiffs are part of "the people" the Second Amendment protects. *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3rd Cir. 2023) (en banc). Neither *Heller* nor *Bruen* defines the scope of the phrase "the people" because it was undisputed that the plaintiffs in each case were a part of "the people." *Id.* The Second Amendment "codifies a 'right of the people.'" *Heller*, 554 U.S. at 579. *Heller* states that in every other instance where the unamended Constitution and Bill of Rights references a right of "the people" that the right is exercised individually and belongs to "all members of the political community, not an unspecified subset." *Id.* at 579-81 (citing U.S. Const. Amends. I, IV). Thus, *Heller* began "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. *Bruen* states that it is undisputed that "ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *See* 142 S. Ct. at 2134.

The Governor argues that "the people" does not include 18-to-20 year olds based on a "textual-historical" inquiry of how the term "the people" was used in 1787. Docket No. 28 at 10-11. First, the Governor argues that 18-to-20 year olds were considered minors without full legal protections when the Second Amendment was adopted (which the Court will refer to as the "founding era") and that 18-to-20 year olds were only recognized as part of the political community in the late 20th century. *Id.* at 11. Second, the Governor argues that the age of majority at the time the Second Amendment was adopted by Colorado was 21 and nothing prevents Colorado from using its long-held age of majority at 21 to regulate firearm purchases. *Id.* Finally, the Governor argues that declining to engage in a textual-historical inquiry into the meaning

of the words "the people" defies *Heller's* holding; therefore, this Court should not rely on cases that do not perform such inquiry.  *Id.* at 12.

The Individual Plaintiffs argue that, under *Heller*, "the people" applies to all Americans, that comparison to other provisions of the Constitution reveals that the Second Amendment does not include an age limit, and that, because 18-to-20 year olds were required to serve in militias at the time of the Bill of Rights' adoption, it would be inconceivable to conclude they had anything but full rights regarding firearms.  Docket No. 30 at 6-8.

Recently, in *Range*, 69 F.4th 96, the Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in 18 U.S.C. § 922(g)(1). *Range* ruled that "the people" included felons.  *Id.* at 103.  The court provided four reasons why it believed felons were included in "the people": (1) references to law-abiding responsible citizens in *Heller*, *McDonald*, and *Bruen* were dicta because criminal history was not at issue in those cases, (2) other provisions of the Constitution that reference "the people" include felons and there is no reason to read the Second Amendment differently, (3) acknowledging permissible restrictions on the right to keep and bear arms for a group of people does not mean they are not a part of "the people," and (4) the phrase "law-abiding" is too broad to be understood as a part of the Second Amendment because it "devolves authority to legislators to decide whom to exclude from 'the people.'"  *Id.* at 101-03.

In *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. Aug. 25, 2022), the court ruled that 18-to-20 year olds are part of "the people" under the Second Amendment.  The court observed that the Second Amendment does not

include an age restriction, unlike other parts of the Constitution that list an explicit age restriction such as the requirement in Section 2 of Article I that members of the House of Representatives be at least 25 years old, the requirement in Section 3 of Article I that senators be at least 30 years old, and the requirement in Section 1 of Article II that the president be at least 35 years old. *Id.* As in *Heller*, the court compared definitions of "the people" in other constitutional amendments, which have been held to include 18-to-20 year olds, to bolster its conclusion that "the people" in the Second Amendment includes 18-to-20 year olds. *Id.* at 748-49. Specifically, the court observed that the First and Fourth Amendments extend their protections to 18-to-20 year olds. *Id.* The court also looked at individual rights guaranteed by the Constitution that are not specifically a "right of the people," observing that the Fifth and Fourteenth Amendments include 18-to-20 year olds and that, in the context of the Eighth Amendment, "the Supreme Court has said that where 'a line must be drawn,' '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood.'" *Id.* at 749 (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)). Finally, the court reasoned that, because *Heller* interpreted the prefatory clause of the Second Amendment to announce that the purpose of the Amendment is to "prevent elimination of the militia" and because 18-to-20 year olds could be required to join a militia, "[i]t would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn." *Id.* at 749-50 (quoting *Heller*, 554 U.S. at 599).

In *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012), the Tenth Circuit considered whether the Second Amendment extends to non-citizens. The court

cautioned against reading "an unwritten holding into *Heller*" by interpreting *Heller's* reference to "citizens" as conclusive as to whom "the people" refers because the issue was not before the Court in *Heller* and because "the question seems large and complicated." *Id.* at 1169. The court declined to pass on the question without the benefit of a full record and adversarial argument. *Id.*

The Governor states minors under 21 did not have "full legal rights" and that 18-to-20 year olds "did not enjoy significant legal rights at the founding." Docket No. 28 at 11-12. The Governor argues that "[o]nly in the late 20th century did our Nation recognize 18-to-20-year-olds' role in the political community with First Amendment protection and the right to vote under the Twenty-Sixth Amendment."[12] *Id.* at 11. The Governor cites a declaration prepared by historian Saul Cornell[13] (the "Cornell report") to support the claim that 18-to-20 year olds were not recognized as being part of the "political community" until the late 20th century. *See id.* (citing Docket No. 28-1 at 23-24). The Cornell report states that, because 18-to-20 year olds were considered minors, it is

---

[12] The Governor cites Justice Thomas' concurrence in *Morse v. Frederick*, 551 U.S. 393, 410 (2007). Docket No. 28 at 11. In *Morse*, Justice Thomas opined that in his view "the history of public education suggests that the First Amendment, as originally understood, does not protect student speech in public schools." 551 U.S. at 410-11. Justice Thomas' concurrence does not argue that children or students outside of schools were not part of "the people" referenced in the First Amendment and instead describes speech in public schools as exempted from First Amendment restrictions. *See id.* Justice Thomas' concurrence supports historical readings that limit the rights of minors, but does not support excluding minors from the Constitution's provision of individual rights granted to "the people."

[13] Dr. Saul Cornell is "the Paul and Diane Guenther Chair in American History at Fordham University in New York City." Docket No. 28-1 at 2.

anachronistic to assume that, at the time of the founding, they had a legal right to keep and bear arms.  Docket No. 28-1 at 14.

The Court is persuaded by the reasoning in *Range* and *McCraw* that an interpretation of "the people" in the Second Amendment should begin with the assumption that every American is included.  In reaching this conclusion, the Court is careful not to read *Heller* or *Bruen* as limiting to whom "the people" refers.  Moreover, the Court finds that the Governor has not shown a "historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, of 18-to-20 year olds during the founding era, as opposed to him citing evidence supporting an argument that states could have regulated 18-to-20 year olds because they lacked rights as minors.  Thus, the Court finds that the Individual Plaintiffs have shown a likelihood of success on the merits on the question of whether the Second Amendment applies to 18-to-20 year olds.

### b. Proposed Conduct

Next, the Individual Plaintiffs must show that the plain text of the Second Amendment covers their conduct.  *Bruen* ruled that the Second Amendment covers "carrying handguns publicly for self-defense," and *Heller* and *McDonald* ruled that the Second Amendment covers "possess[ing] a handgun in the home for self-defense."  *Bruen*, 142 S. Ct. at 2122.  The Governor argues the Individual Plaintiffs' course of conduct is not protected by the Second Amendment because there is no Second Amendment right to purchase firearms.  Docket No. 28 at 7-8.  The Individual Plaintiffs, on the other hand, argue that the right to keep and bear arms impliedly includes a right to acquire arms. Docket No. 30 at 1.

The Court must first decide what the Individual Plaintiffs intend to do to exercise their

alleged Second Amendment rights.  The Individual Plaintiffs categorize their proposed course of conduct as "purchas[ing] firearms for lawful purposes (including defense of their homes)."  Docket No. 12 at 5.  Mr. Mosgrove has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[14]  Docket No. 12-2 at 1, ¶ 2.  Mr. Pineda has "never been charged with nor [sic] convicted of any misdemeanor or felony offense" and he intends to "lawfully purchase a firearm for lawful purposes, including self-defense in [his] home."[15]  Docket No. 12-3 at 1, ¶ 2.  Thus, based on the declarations, the Court finds that the Individual Plaintiffs have a stated intention to purchase firearms, in an otherwise lawful manner, not having any felony or misdemeanor convictions, for lawful reasons including self-defense in their homes.

The second question is whether the Second Amendment's right to "keep" and "bear" arms extends to the Individual Plaintiffs' intended conduct.  The Individual Plaintiffs claim the right to keep firearms necessarily implies the right to acquire arms.  Docket No. 12 at 5.  The Individual Plaintiffs claim that it is settled law that Constitutional rights protect closely related acts necessary to their exercise and that purchasing firearms is necessary for keeping and bearing arms.  Docket No. 30 at 1.  Additionally, the Individual Plaintiffs argue that a total prohibition on a right is not necessary to show a

---

[14] Mr. Mosgrove does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-2 at 1, ¶ 2.

[15] Mr. Pineda does not state what firearms he intends to purchase, when he intends to purchase them, or whether he wants to purchase firearms from a licensed commercial dealer or from a private seller.  *See* Docket No. 12-3 at 1, ¶ 2.

right is infringed.  *Id.* at 2.  The Governor argues that the Individual Plaintiffs have made an insufficient showing that the right to keep arms includes a right to buy firearms. Docket No. 28 at 7-8.  Additionally, the Governor argues the Individual Plaintiffs have not shown that their right to self-defense is burdened because SB23-169 has not gone into effect and therefore the Individual Plaintiffs still have the ability to purchase firearms.[16]  *Id.* at 8.

Several courts have ruled that the right to keep arms necessarily includes a right to acquire arms.  *See, e.g., Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (quotations and citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."); *United States v. McNulty*, --- F. Supp. 3d. ----, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase, sell, or otherwise transfer firearms in order to keep oneself properly armed."); *Renna v. Bonta*, 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023) ("the right to keep arms, necessarily involves the right to purchase them."), *appeal filed*, No. 23-55367 (9th Cir.

---

[16] This argument is more appropriately considered in evaluating whether the Individual Plaintiffs have shown that they face irreparable harm absent a preliminary injunction, and the Court will address the Governor's argument in its discussion of the irreparable harm prong.

Apr. 20, 2023).

The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct. *See Teixeira*, 873 F.3d at 677; *Ezell*, 651 F.3d at 704. For purposes of a preliminary injunction, the Individual Plaintiffs have sufficiently demonstrated a likelihood of success in showing their proposed conduct is covered by the plain text of the Second Amendment.

### 3. Historical Tradition

The Court has found that the Individual Plaintiffs' proposed course of conduct, purchasing firearms for self-defense in the home, is covered by the plain text of the Second Amendment. Under *Bruen*, the government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. Thus, for purposes of this case, the Governor has the burden of establishing that SB23-169 is "consistent with the Nation's historical tradition of firearm regulation" such that the Individual Plaintiffs' conduct "falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg*, 366 U.S. at 50 n.10).

#### a. Presumptively Lawful Regulations

First, the Governor argues that SB23-169 falls within one of the categories of firearm regulations that the Supreme Court has found to be presumptively lawful, namely, "conditions and qualifications on the commercial sale of arms." Docket No. 28 at 8-10. The Governor relies on *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124-25 (10th Cir. 2015) (citation and quotations omitted), where the court opined that the presumptively

lawful categories of regulations identified by *Heller* cannot be ignored since the Tenth

Circuit is "bound by Supreme Court dicta almost as firmly as by the Courts' outright

holdings, particularly when the dicta is recent and not enfeebled by later statements."

As a result, the Governor argues that *Bonidy* "demonstrates that courts cannot

disregard *Heller's* carve outs."  Docket No. 28 at 10.  The Individual Plaintiffs respond

that, in light of *Bruen*, it is inappropriate to presume a regulation is lawful as that would

improperly shift the burden to the Individual Plaintiffs to point out why a law is

unconstitutional.  Docket No. 30 at 3.

In *Heller*, the Court states:

> Although we do not undertake an exhaustive historical analysis today of
> the full scope of the Second Amendment, nothing in our opinion should be
> taken to cast doubt on longstanding prohibitions on the possession of
> firearms by felons and the mentally ill, or laws forbidding the carrying of
> firearms in sensitive places such as schools and government buildings, or
> laws imposing conditions and qualifications on the commercial sale of
> arms.

> We identify these presumptively lawful regulatory measures only as
> examples; our list does not purport to be exhaustive.

554 U.S. at 626-27 & n.26.  In *Bruen*, Justice Kavanaugh filed a concurring opinion,

joined by the Chief Justice, that repeated *Heller's* description of presumptively lawful

regulations and noted that Justice Alito's concurring opinion in *McDonald* used the

same description.  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

The Court rejects the Governor's argument that SB23-169 is presumptively lawful for

two reasons.  First, the Court disagrees with the Governor's reading of *Heller* as

exempting certain types of regulations at the first step of the *Bruen* test.  *Bruen* does not

suggest that a different test applies to certain categories of laws or regulations.  *Id*. at

2132-33.  Rather, *Bruen* is clear that the government must justify the constitutionality of

any law regulating conduct covered by the plain text of the Second Amendment. Justice Kavanaugh's concurrence also does not state that regulations falling into the "presumptively lawful" categories should be subject to a different test. *See id.* at 2162. Additionally, the Court disagrees with the Governor's reading of *Bonidy* to the extent it suggests a different test for "presumptively lawful" regulations. Acknowledging *Bonidy's* admonition not to ignore the language of *Heller* as dicta, the Court reads *Heller* to provide examples of laws or regulations that lawfully limit or qualify rights under the Second Amendment in a way that aligns with the Nation's historical tradition of firearm regulation.

Second, the Governor fails to show that SB23-169 falls into the category of commercial regulations described by *Heller*. Regulations of the commercial sale of arms have been described as "condition[s] or qualification[s]" that "affect[] only those who regularly sell firearms." *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016). SB23-169 does not base its prohibitions on 18-to-20 year olds because 18-to-20 year olds, as a group, regularly sell firearms. Rather, SB23-169 categorically bans an entire group of law-abiding citizens from purchasing firearms based on age. Additionally, the Court is not persuaded that the pre-*Bruen* cases the Governor cites, *see* Docket No. 28 at 9, suggest a different outcome for age-based firearm restrictions[17]

---

[17] In *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489-91 (W.D. Pa. 2021), the court decided age-based restrictions are longstanding and presumptively lawful without evaluating whether the Nation's historic tradition of firearm regulations had similar analogues specific to the challenged regulations. In *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992-93 (W.D. Wash. 2020), *vacated*, 2022 WL 17420766 (9th Cir. Dec. 2, 2022), the court concluded that the regulation on gun purchases by 18-to-20 year olds fell outside the ambit of the Second Amendment in part because of the presumed

because these cases presume the lawfulness of the category of restriction and, as a result, do not follow the test for Second Amendment cases discussed in *Bruen*.

### b. Tradition of Age Based Regulations

*Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but provided "two metrics" to determine whether a regulation is within the Nation's historical tradition, namely, "how and why" the regulations burden a law-abiding citizen's right to armed self-defense. *Bruen*, 142 S. Ct. at 2132-33.  *Bruen* acknowledged that:

> Analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.  On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted."  *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021).  On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

The Governor argues that SB23-169 is consistent with the Nation's past history of firearm regulation because: (1) "[t]his Nation has a longstanding history of placing age-restrictions on firearm purchases," and (2) "[m]id-to late-19th Century history 'is relevant'

lawfulness of age-based regulations.  In *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. at 2127 n.4, the court upheld age-based firearm restrictions because, "[a]t a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety."

to understanding the Second Amendment's scope."  Docket No. 28 at 13-23.  The

Governor claims that the Nation has a longstanding history of placing age restrictions on

firearm purchases and, in support, cites English common law, founding era restrictions,

evidence of the conception of founding era militias, pre-Civil War restrictions, and post-

Civil War restrictions on gun possession and ownership.  Docket No. 28 at 13-18.  The

Court addresses each time period in turn.

### i. Founding Era Laws

The Governor cites English common law to support the proposition that 18-to-20 year

olds were not considered full adults and lacked legal contract authority, only having the

capacity to be bound by contract for essentials like food, clothing, and lodging.  *Id.* at

14.  The Governor states that the American colonies followed the English common law

in imposing legal limitations based on age.  *Id.*  As a result, the Governor argues that,

because 18-to-20 year olds did not have full contractual rights at the founding, they did

not have unfettered commercial rights which would extend to purchasing firearms.  *Id.*

In *Bruen*, the Court states:

> As with historical evidence generally, courts must be careful when
> assessing evidence concerning English common-law rights.  The common
> law, of course, developed over time.  *Associated Gen. Contractors of Cal.,
> Inc. v. Carpenters*, 459 U.S. 519, 533 n.28 (1983); *see also Rogers v.
> Tennessee*, 532 U.S. 451, 461 (2001).  And English common-law
> practices and understandings at any given time in history cannot be
> indiscriminately attributed to the Framers of our own Constitution.

*Bruen*, 142 S. Ct. 2136.  The Court further observed, "in interpreting our own

Constitution, it is better not to go too far back into antiquity for the best securities of our

liberties, unless evidence shows that medieval law survived to become our Founders'

law." *Id.* (internal citations, quotations, and alterations omitted).

The Cornell report opines that:

> Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians . . . . There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).

Docket No. 28-1 at 21 (citing John E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L.Q. 449 (2008); Elizabeth Pleck, *Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present* (1987)). The Cornell report further opines that in the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and in protecting the interests of minors, demonstrating that, previously, minors had more state supervision over their commercial activity than any other legal entity in the founding era. *Id.* at 23 (citing Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2012)).

In support of the claim that parents' control over minors, consistent with English common law, continued into the founding era, the Cornell report provides evidence that, in the founding era, regulations on minors' ability to enter into contracts were commonplace because minors fell under their parents' authority. *Id.* at 22-23. The Cornell report and the Governor, however, do not identify any evidence that contractual restrictions on minors under the English common law or from the founding era were directed specifically at the acquisition of firearms by minors or whether the purchase of a firearm by 18-to-20 year olds, or anyone else, typically involved a contract, which limits the weight of this evidence in determining whether such evidence forms a

pertinent historical analogue to restrictions on 18-to-20 year olds' right to keep and bear arms. *See McCraw*, 623 F. Supp. 3d. at 755 (observing that "the age of majority — even at the [f]ounding — lacks meaning without reference to a particular right . . . . Instead, the relevant age of majority depends on capacity or activity." (citation omitted)).

The Governor states that gun safety regulations at the time the Second Amendment was adopted disarmed specific groups of people for safety reasons. Docket No. 28 at 14. For instance, founding era laws provided for "disarmament of those refusing to swear an oath of allegiance to the Nation or those who participated in Shays' Rebellion." *Id.* (citing *Nat'l Rifle Ass'n of America, Inc.*, 700 F.3d at 200). Additionally, the Governor identifies rules at certain colleges that prohibited 18-to-20 year old students from possessing or discharging firearms on campus, noting that "college campuses were one of the few places in founding era society where 18-to-20 year olds lived outside of direct parental authority." *Id.* at 15 (citing Docket No. 28-2 at 15-16, Declaration of Robert Spitzer[18]).

Colonial laws that disarmed persons who presented a risk of danger to the state or to the country are not analogous to a categorical ban on a segment of society that has not professed hostility to the state or to the nation. *Cf. Range*, 69 F.4th at 104-105 (ruling "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of

---

[18] Dr. Robert Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland with expertise on "the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues." Docket No. 28-2 at 2-3.

a similar group today.  And any such analogy would be 'far too broad.'" (quoting *Bruen*, 142 S. Ct. at 2134)).  Additionally, college codes of conduct that banned possession of firearms on campuses are not analogous to SB23-169.  The Spitzer Declaration does not indicate that college rules prohibited students from using or possessing firearms because of their age.  *See* Docket No. 28-2 at 15-18.  Such rules could just as easily have been based on their status as students living together in dormitories and are more comparable to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Bruen*, 142 S. Ct. at 2118, than a prohibition on purchasing firearms applicable to a category of people.  *See Fraser v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F. Supp. 3d ----, 2023 WL 3355339, at *20 (E.D. Va. May 10, 2023) (observing that "universities' regulations limiting the ability of students to carry firearms on campus are not 'analogous' to the wholesale prohibition on 18-to-20-year-olds from purchasing firearms manifest in the statutes and regulations here at issue").  Thus, the Court finds that the Governor has not identified founding era gun laws that are analogous to SB23-169.

### ii. Founding Era Militia Laws

The Governor argues that militia service during the founding era does not demonstrate a right by 18-to-20 year olds to purchase firearms and "instead demonstrate[s] the extensive control that States had over 18-to-20-year-olds in early America."  Docket No. 28 at 16.  The Governor points out that minors participating in militias acted under the supervision of adults, that parents often supplied firearms for their minor children's participation in militias, and that militia members possessed firearms in "coordinated and rigorous military service, distinct from everyday civilian life."

*Id.* The Cornell report opines that:

> Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.

Docket No. 28-1 at 28. The Cornell report highlights 18-to-20 year olds' participation in militias as a duty under supervision by patriarchal authority frameworks that regarded minors as existing under the authority of their fathers. *Id.* at 26-27. The report notes that minors were regarded as being similar to "madmen" and "idiots." *Id.* at 27 (quoting John Fauchereaud Grimké, *The South Carolina Justice of the Peace*, 117 (1788)).

The Court agrees with the Governor that service by 18-to-20 year olds in militias does not prove that such persons had an unfettered right to possess firearms outside of militias. *See* Docket No. 28 at 16; *see also Fraser*, 2023 WL 3355339, at *15 ("The Court is also cognizant of the Eleventh Circuit's admonition not to confuse the legal *obligation* to perform militia service with the *right* to bear arms."). The Governor's argument, however, does not carry his burden to show an analogous restriction on the sale of firearms to 18-to-20 year olds.

### iii. Post Second Amendment Ratification Regulations

The Governor argues that the Court cannot ignore 19th century history and focus only on founding era history because *Bruen* did not determine whether courts should look for historical analogues in founding era history or history at the time the Fourteenth Amendment was ratified. Docket No. 28 at 21-23. The Governor observes that *Bruen* declined to address "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in

1868 when defining its scope (as well as the scope of the right against the Federal Government)" because it ruled that public understanding of the right to keep and bear arms did not differ between 1791 and 1868 in any relevant way.  *See* 142 S. Ct. at 2138.

*Bruen* observed that courts "must []guard against giving postenactment history more weight than it can rightly bear," that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," and that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"  *Id.* at 2136-37 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *Heller*, 554 U.S. at 614).

The Governor identifies several restrictions on the use of firearms by minors after the ratification of the Bill of Rights.  Docket No. 28 at 17-18.  The Governor identifies the following pre-Civil War firearm laws involving minors: (1) a law from New York City in 1803 that held parents liable for the unlawful discharge of firearms by minors, *id.* at 17 (citing Docket No. 28-2 at 8-9); (2) laws from cities in Delaware in 1812, South Carolina in 1817, and Connecticut in 1835 that similarly imposed liability on parents for unlawful discharge of firearms by minors, *id.* (citing Docket No. 28-2 at 9); (3) laws passed in Kentucky in 1853, 1859, and 1860 that penalized selling gunpowder to those under fifteen without parental consent and selling certain weapons including pistols to minors and to any "slave, or free negro," *id.*; Docket No. 28-2 at 8-9; Docket No. 28 at 17; (4) a law from Alabama in 1856 that fined "anyone who sold, gave or lent a pistol or fighting

knife to a minor," Docket No. 28 at 17; Docket No. 28-2 at 10 (citing 856 Ala. Acts 17, To Amend the Criminal Law, §1); and (5) a law from Tennessee in 1858 "prohibiting selling, giving, or lending to a minor a pistol, fighting knife or 'like dangerous weapon.'" Docket No. 28 at 17 (quoting Docket No. 28-2 at 9-10).

The description of the first two examples of firearm laws the Governor identifies reveals that certain cities prohibited discharging firearms within city limits and shifted liability to parents when minors discharged firearms.  *See* Docket No. 28-2 at 8-9. These laws are not properly characterized as "restrictions on the use of firearms by minors."  Docket No. 28 at 17.  These statutes regulate the discharge of firearms by the general population and shift liability to parents for minors' tortious use of firearms.

The last three examples of laws that the Governor identifies can be properly construed as prohibitions on minors' possession or purchase of firearms.  The Court largely agrees with *Fraser's* analysis on these laws:

> Thus, by the eve of the Civil War, only three states had passed any form of restrictions on the ability of minors to purchase firearms and each of these was passed 65 years or more after the ratification of the Second Amendment.  This legislation therefore tells us nothing about the Founders' understanding of the Second Amendment.

*Fraser*, 2023 WL 3355339, at *21 (citations omitted).  Without any confirmation in the form of founding era regulations, the Court does not consider three pre-Civil War regulations as strong evidence of the "public understanding of the right to keep and bear arms" at the time the Second Amendment was ratified.  *Bruen*, 142 S. Ct. at 2138.

Finally, the Governor identifies post-Civil War regulations that some states adopted by the early 20th century.  Docket No. 28 at 17-18.  The Governor represents that, by 1900, 18 states and the District of Columbia adopted laws regulating firearm sales to

those under the age of 21 and that shortly thereafter 45 states had laws restricting the sale of firearms to minors. *Id.* at 17. The Individual Plaintiffs argue that, of the 17 post-Civil War laws the Governor identifies, *see* Docket No. 28-5 at 2-9, one did not prohibit the purchase of firearms, one is from a state that "operated under a fundamental misunderstanding of the right to bear arms," one was from a Western state that should be disregarded as overly restrictive under *Bruen*, and that seven other laws were adopted by States with no Second Amendment analogue. Docket No. 30 at 9-11. The Individual Plaintiffs argue that the remaining seven laws are not appropriate analogues to SB23-169 because they rely on a status, namely, legal minority, that does not apply to 18-to-20 year olds today. *Id.* at 11.

The Governor argues that the regulations he identifies burden the right to self-defense in a similar way to SB23-169 in that they burden persons under a certain age from accessing weapons, mostly by limiting their ability to purchase weapons. Docket No. 28 at 19-21. Additionally, the Governor argues that the regulations were in place for the same reason that SB23-169 was passed, to protect public safety, despite the fact that such laws would burden the right to self-defense. *Id.* at 20-21.

*Bruen* stated that the Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137. While it remains an open question as to how a court should weigh historical understandings of the Second Amendment at the time that the Fourteenth Amendment was adopted, *id.* at 2138, because the Governor fails to point to any evidence during the founding era that a total prohibition on the sale of firearms to minors was consistent with

the right to bear arms, the Court gives little weight to evidence from the time of the Fourteenth Amendment's ratification to limit the scope of the right to keep and bear arms.  *Cf. McCraw*, 623 F. Supp. 3d at 757 (observing that relying on evidence from the Reconstruction Era alone would "give postenactment history more weight than it can rightly bear" (quoting *Bruen*, 142 S. Ct. at 2136)).  The Court finds that the Governor has failed to meet his burden to demonstrate that SB23-169 is consistent with the Nation's historical tradition of firearms regulation.  For the purpose of obtaining a preliminary injunction, the Individual Plaintiffs have demonstrated a likelihood of success on the merits.

**C. Irreparable Harm**

In order to demonstrate entitlement to a preliminary injunction, the Individual Plaintiffs must show that the "[the movant] will suffer irreparable injury unless the injunction issues."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992)).  "[T]he 'showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'"  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).  The Supreme Court has opined that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  The Tenth Circuit has observed that "[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019).  The Tenth Circuit has

ruled that violations of individual rights guaranteed under the Constitution constitute irreparable harm. *See Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

The Individual Plaintiffs argue that they face irreparable harm in the absence of an injunction because "a showing of the infringement of a constitutional right requires no further showing of irreparable injury." Docket No. 12 at 16 (citing *Free the Nipple-Fort Collins*, 916 F.3d at 805). The Governor responds that the Individual Plaintiffs have not shown that a constitutional violation is imminent, arguing that, to the extent the Individual Plaintiffs argue an inability to acquire firearms is a violation of their rights, the Individual Plaintiffs' ability to purchase firearms before SB23-169 took effect and their ability to possess and use a firearm under SB 23-169 mitigates the harm to the Individual Plaintiffs. Docket No. 28 at 24. The Individual Plaintiffs reply that they need an injunction when SB23-169 becomes effective. Docket No. 30 at 14.

Here, because SB23-169 likely causes a violation of the Individual Plaintiffs' individual constitutional rights, *see Aposhian*, 958 F.3d at 990 (observing that "our cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government"), resulting in damages that are potentially inadequately remedied by money and "difficult[ to] calculat[e]," *Free the Nipple-Fort Collins*, 916 F.3d at 806, the Court finds the Individual Plaintiffs have shown irreparable injury.

### D. Balancing the Equities and Public Interest

The Individual Plaintiffs must demonstrate "that the balance of equities tips" in their favor and "that the injunction is in the public interest." *RoDa Drilling Co.*, 552 F.3d at

1208.  The Individual Plaintiffs argue that "the State's interest in enforcing an unconstitutional law does not outweigh [the Individual] Plaintiffs' interest in having their constitutional rights protected" and that "it is always in the public interest to prevent the violation of a party's constitutional rights."  Docket No. 12 at 17.  The Governor responds that the State suffers an injury when it cannot enact a law and that, in the case of SB23-169, public safety will be threatened if a pre-enforcement injunction issues.  Docket No. 28 at 24-25 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  On the record before the Court, the Individual Plaintiffs have made a sufficient showing that the balance of equities tips in their favor and that the Individual Plaintiffs' proposed injunction is in the public interest because the Individual Plaintiffs have made a sufficient showing that SB23-169 infringes the Individual Plaintiffs' Second Amendment rights.[19] *See Free the Nipple-Fort Collins*, 916 F.3d at 806-07 ("When a constitutional right hangs in the balance, though, even a temporary loss usually trumps any harm to the defendant. . . .  [I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotations and citations omitted)).

## IV. SECURITY

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

---

[19] Neither party addresses how the balance of the equities should be addressed in a Second Amendment case or what effect the government's interest in public safety has on the cases.  *See* Docket No. 28 at 24-25; Docket No. 30 at 14.  The Court is unaware of any Tenth Circuit precedent describing how cases with these circumstances should be evaluated.

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A trial court has "wide discretion under Rule 65(c) in determining whether to require security."  *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotations and citation omitted).  It is, however, reversible error to fail to consider whether to require a bond.  *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).  The parties do not address whether a bond should be required.[20]  *See generally* Docket Nos. 12, 28, 30.  The Court finds a bond unnecessary as this case seeks to enforce a constitutional right against the government.  *See United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (citing *RoDa Drilling Co.*, 552 F.3d at 1215).

## V. CONCLUSION

It is **ORDERED** that the portion of plaintiffs' Motion for Preliminary Injunction [Docket No. 12] brought on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda is **GRANTED**.  It is further

**ORDERED** that the defendant and his officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction are enjoined, effective immediately, from enforcing SB23-169.  It is further

**ORDERED** that this preliminary injunction shall remain in effect pending disposition of the case on the merits.  It is further

---

[20]  The proposed order in plaintiffs' motion for a temporary restraining order, Docket No. 34-1 at 2, ¶ 6, states "Plaintiffs do not need to post a security bond because enjoining the Defendant from prohibiting Plaintiffs' exercise of their Second Amendment rights does not interfere with the Defendant's rights."

**ORDERED** that no bond shall be required under Fed. R. Civ. P. 65(c).  It is further

**ORDERED** that plaintiffs' Motion for Temporary Restraining Order [Docket No. 34] is

**DENIED as moot**.

DATED August 7, 2023.

BY THE COURT:

s/Philip A. Brimmer
Philip A. Brimmer
Chief United States District Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                                   Jane K. Castro
Clerk of Court                                                                       Chief Deputy Clerk

August 14, 2023

Michael Kotlarczyk
Grant Sullivan
Matthew John Worthington
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway
Denver, CO 80203

**RE:**     **23-1251, Rocky Mountain Gun Owners, et al v. Polis**
        Dist/Ag docket: 1:23-CV-01077-PAB-NRN

Dear Counsel:

Your appeal has been docketed, and the appeal number is above.

**Within 14 days** from the date of this letter, Appellant's counsel must electronically file:

- **An entry of appearance and certificate of interested parties** per 10th Cir. R. 46.1(A) and (D).
- **A docketing statement** per 10th Cir. R. 3.4.
- **A transcript order form or notice that no transcript is necessary** per 10th Cir. R. 10.2. This form must be filed in **both** the district court and this court.
- **Also within 14 days**, Appellant must **pay the $505.00 filing and docketing fees** ($5.00 filing fee and $500.00 docket fee) in the district court. Fed. R. App. P. 3(e) and 10th Cir. R. 3.3(B).

**In addition, all counselled entities** that are required to file a Federal Rule of Appellate Procedure 26.1 disclosure statement must do so **within 14 days of the date of this letter**. All parties must refer to Federal Rule of Appellate Procedure 26.1 and Tenth Circuit Rule 26.1 for applicable disclosure requirements. All parties required to file a disclosure statement must do so even if there is nothing to disclose. Rule 26.1 disclosure statements must be promptly updated as necessary to keep them current.

**Also within 14 days**, Appellee's counsel must electronically file an entry of appearance and certificate of interested parties. **Attorneys that do not enter an appearance within the specified time frame will be removed from the service list.**

The Federal Rules of Appellate Procedure, the Tenth Circuit Rules, and forms for the aforementioned filings are on the court's website. The Clerk's Office has also created a set of quick reference guides and checklists that highlight procedural requirements for appeals filed in this court.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court


cc:      Barry K. Arrington


CMW/jjh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-PAB**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## RESPONSE IN OPPOSITION TO MOTION FOR STAY

---

Plaintiffs submit the following response in opposition to Defendant's motion to stay the preliminary injunction entered by the Court (ECF 42).

## I.    Standard of Review

Defendant notes that this Court's holding in *Bradford v. U.S. Dep't of Lab.*, 2022 WL 266805 (D. Colo. Jan. 28, 2022), sets forth the applicable standard governing his motion. That case is particularly relevant because there the Court noted the movants did not provide new argument in their motion but simply emphasized their prior contentions that had already been rejected by the Court. The Court held that this "emphasis does not make them any more likely to succeed in their argument now than when the Court considered their preliminary injunction motion." *Id.* at *4. Similarly in this case, Defendant has not advanced any new

arguments but merely expressed his disagreement with the Court's rulings on his prior arguments. Thus, Defendant has not provided any reason to stay the preliminary injunction.

## II.    Plaintiffs Have Standing

Defendant argues that Plaintiffs lack standing because SB 23-169 was not yet effective when they filed this action. The Tenth Circuit's holding in *Am. C.L. Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), is surely dispositive of this argument. In *Johnson*, the defendants argued the plaintiffs lacked standing because their suit was brought before the effective date of the challenged statute. In response, the court cited *Virginia v. American Booksellers Assoc.*, 484 U.S. 383 (1988), where the Supreme Court held that plaintiffs had standing to bring a constitutional challenge to a statute "even though 'plaintiffs' challenge was ... made before the statute became effective.'" *Id.*, 194 F.3d at 1154, *quoting American Booksellers Assoc.*, 484 U.S. at 392. The court also quoted this passage from *Johnson*:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.

*Id.*, 194 F.3d at 1154 *quoting* 484 U.S. at 393. In this case, the Governor has not suggested the law will not be enforced against Plaintiffs. Just the opposite is true. Defendant insists that the whole reason a stay is necessary is because it is, in his view, vital to enforce the statute against Plaintiffs and those similarly situated. Thus, as the court observed in *Johnson*, Plaintiffs have standing because an injury is "certainly impending" if the statute takes effect. *Id.*, 194 F.3d at 1154, *quoting*

*Cyberspace, Communications, Inc. v. Engler*, 55 F.Supp.2d 737, 745–46 (E.D.Mich.1999).

In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021), the Court held that a "person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *See also Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 536 (1925) (suit prior to effective date of statute was not premature because the injury to the plaintiffs was imminent, not a mere possibility in the remote future); and *Calvey v. Obama*, 792 F. Supp. 2d 1262, 1269 (W.D. Okla. 2011) (impending future injury confers standing). For these reasons, courts have routinely held that standing exists even though the effective date of the alleged harm is in the future. *See Fla. ex rel. McCollum v. U.S. Dep't of Health & Hum. Servs.*, 716 F. Supp. 2d 1120, 1145 (N.D. Fla. 2010) (collecting cases). Defendant's other standing arguments merely express his disagreement with the Court's order and do not establish a strong likelihood of success on appeal.

## III.   Defendant Failed to Show a Strong Likelihood of Success on the Merits on Appeal

Defendant makes four arguments regarding the merits. First, Defendant argues the Court erred when it did not hold that Plaintiffs have the obligation of showing that the plain text of the Second Amendment covers 18-20-year-olds. Mot. 4-5. Even a cursory reading of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), however, undermines this argument. The specific issue under the "plain text" step in *Bruen* was whether the right to "bear" arms includes the right to

bear arms in public. *Id.*, 142 S. Ct. at 2134-35. The Court had "little difficulty concluding that it does" because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. Thus, Defendant's assertion that *Bruen* requires a historical inquiry at the plain text step is belied by *Bruen* itself. The plain text inquiry is based on just that, the plain text. Nothing in the text of the Second Amendment draws a "below 21" – "21 and above" distinction with respect to the right to keep and bear arms. Therefore, the Court was certainly correct when it held Plaintiffs have met their burden under the "plain text" analysis.

Second, Defendant disagrees with the Court's analysis of its historical evidence. Mot. 5. But Defendant's disagreement does not establish a strong likelihood of success on the merits, especially when other courts that have considered the matter have come to the same conclusion as this Court – i.e., laws like SB23-169 have no founding era analogue. *See Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 3355339 (E.D. Va. May 10, 2023); *Worth v. Harrington*, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) and *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022).

Third, Defendant disagrees with the Court's holding that SB23-169 is not a "presumptively constitutional" commercial regulation. Mot. 6-7. The Court was surely correct, however, when it held there are no exceptions to *Bruen's* two-step analysis. Moreover, as this Court noted, Defendant's argument fails because a law that categorically bans a class of people from *purchasing* a firearm is not a

commercial regulation of *sellers* to begin with. Order 30. Defendant has no answer to the Court's conclusion.

Fourth, Defendant argues the Court gave too little weight to historical analogues from the late 19th century. Mot. 7. But Defendant provides no argument that the Court's careful analysis of this evidence was inconsistent with *Bruen's* admonition that that courts "must []guard against giving postenactment history more weight than it can rightly bear," that "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text," and that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2136-37 (*quoting Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *Heller*, 554 U.S. at 614).

## IV.   The Court Need Not Consider the Remaining Three Factors

Defendant failed to show a strong likelihood that he will succeed on the merits of his appeal. Therefore, "the Court need not consider the other factors for a stay ..." *Bradford v. U.S. Dep't of Lab.*, 2022 WL 266805, at *4 (D. Colo. Jan. 28, 2022), *citing In re Way to Grow, Inc.*, 2019 WL 669795, at *3 (D. Colo. Jan. 18, 2019) (declining to consider remaining factors where movants failed to show strong likelihood of success); *Aposhian v. Barr*, 2019 WL 8195243, at *2 (D. Utah Mar. 20, 2019) (same);

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); and *Nken v. Holder*, 556 U.S. 418, 434 (2009). Accordingly, the Court could end its analysis here.

## V.    Plaintiffs Have Suffered Irreparable Harm

If the Court does analyze the remaining factors, Plaintiffs note that Defendant does not dispute that but for the Court's injunction, the individual Plaintiffs would be categorically prohibited from exercising their Second Amendment right to purchase firearms for lawful purposes. Nevertheless, he argues Plaintiffs have suffered no injury at all, much less an irreparable injury, because they could have exercised their constitutional rights before the State prohibited them from doing so. Mot. 8-9. Defendant cites no authority for the proposition that a party suffers no harm when a law deprives him of his constitutional rights because he could have exercised those rights before the law went into effect. Again, the Court considered and rejected this argument (Order 41), and Defendant's disagreement with the Court's ruling does not meet his burden for obtaining a stay.

## VI.   The Balance of Harms and Public Interest Factors Do Not Support a Stay

Finally, Defendant argues that the balance of harms and public interest factors[1] require this Court to stay its injunction. Mot. 8-10. Defendant bases this argument almost exclusively on his assertion that public safety might be increased if SB23-169 were allowed to go into effect. *Id*. This is not the law. "While the public has an interest in enforcing laws that promote safety or welfare, the public has no

---

[1] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means. A state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

## VII.   Conclusion

In summary, Defendant disagrees with the Court's Order and has reiterated his arguments stating the reasons why the preliminary injunction should have been denied. But, as in *Bradford*, *supra*, Defendant has provided no new arguments, and his motion does not make him any more likely to succeed than the arguments the Court considered with respect to his opposition to the preliminary injunction motion. Accordingly, his motion for a stay should be denied.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

## CERTIFICATE OF SERVICE

     I hereby certify that on August 15, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**ORDER**

---

This matter comes before the Court on defendant's Motion for a Stay of the Preliminary Injunction Pending Appeal [Docket No. 42]. Plaintiffs responded. Docket No. 47.

**I. BACKGROUND**

Plaintiffs filed this action on April 28, 2023. Docket No. 1. The amended complaint brings one claim on behalf of all plaintiffs alleging that the restrictions in Senate Bill 23-169 ("SB23-169") "infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to Colorado and its political subdivisions by the Fourteenth Amendment." Docket No. 9 at 6, ¶ 20. Plaintiffs seek a declaratory judgment and injunctive relief and seek monetary damages on behalf of plaintiffs Tate Mosgrove and Adrian S. Pineda (the "Individual Plaintiffs"). *Id.* at 6-7, ¶¶ 23-26.

On June 7, 2023, plaintiffs filed a motion for preliminary injunction requesting that the Court preliminarily enjoin the enforcement of SB23-169 arguing that the law is unconstitutional under the Second Amendment.  Docket No. 12.  On August 3, 2023, plaintiffs filed a motion for a temporary restraining order seeking the same relief. Docket No. 34.

On August 7, 2023, the Court granted plaintiffs' motion for preliminary injunction, enjoining defendant Jared S. Polis, in his capacity as the Governor of the State of Colorado (the "Governor"), and his officers, agents, servants, employees, and all persons in concert or participation with them from enforcing SB23-169.  Docket No. 37 at 43.  Additional background facts and procedural history can be found in that order, *see id.* at 1-4, and will not be repeated here except as necessary to resolve the Governor's motion.

On August 11, 2023, the Governor filed a notice of appeal from the Court's order on plaintiffs' motion for preliminary injunction.  Docket No. 41.  Through Docket No. 42, the Governor seeks to stay the Court's preliminary injunction pending his appeal to the Tenth Circuit.  Docket No. 42 at 1.

## II. LEGAL STANDARD

"While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  Fed. R. Civ. P. 62(d); *see also* Fed. R. App. P. 8(a).  In evaluating a motion for an injunction pending appeal, the Court considers (1) whether the movants have made a strong showing that they are likely to

prevail on the merits of their appeal; (2) whether the movants will be irreparably injured if the injunction is not granted; (3) whether granting the injunction will substantially harm the opposing parties; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Bradford v. U.S. Dep't of Labor*, No. 21-cv-03283-PAB-STV, 2022 WL 266805, at *1-2 (D. Colo. Jan. 28, 2022) (observing that the standard for a motion for a stay pending appeal does not warrant a modified or relaxed standard as compared to a motion for a preliminary injunction). The Tenth Circuit's rules provide the same four-factor showing. *See* 10th Cir. R. 8.1(B)-(E). The Supreme Court has explained that "[t]here is substantial overlap between [the factors for a stay or injunction pending appeal] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citation omitted).

## III. ANALYSIS

On the first factor, a strong showing of success on the merits, the Governor makes two arguments: (1) the Individual Plaintiffs lack standing to obtain a preliminary injunction and (2) the Governor is likely to prevail under the standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Docket No. 42 at 2-8.

First, the Governor argues that his response to plaintiffs' motion for preliminary injunction "described how the individual Plaintiffs' allegations were insufficient to

establish standing or the Court's subject matter jurisdiction." *Id.* at 2.  The Governor argues that the Individual Plaintiffs lack concrete plans to engage in conduct that violates SB23-169 and that the Court erred by failing to hold a hearing on plaintiffs' motion and relying on plaintiffs' declarations to determine the Individual Plaintiffs had standing to seek a preliminary injunction.  *Id.* at 2-3.  The Governor argues that, "[i]n a similar Second Amendment case, the Tenth Circuit held that certain plaintiffs lacked standing because they did not have 'concrete plans to engage in conduct' that violated the challenged statute."  *Id.* (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016)).

     In its August 7, 2023 order, the Court distinguished *Colo. Outfitters Ass'n*, observing that, "[a]t this phase of the proceedings, the Individual Plaintiffs have done enough to make a clear showing[] that they intend to purchase firearms, but the Court does not pass on the Individual Plaintiffs' showing for purposes of other stages of the case." Docket No. 37 at 12 n.6 (internal quotations and citation omitted).  *Colo. Outfitters Ass'n* evaluated a Second Amendment claim after a nine-day bench trial.  823 F.3d at 542. The Governor does not address the Court's observation that the proof required to establish standing increases as a case proceeds, Docket No. 37 at 8, or explain why the proof required at the conclusion of a bench trial is appropriately compared to the proof required for a preliminary injunction based on a pre-enforcement challenge under the Second Amendment.  *See* Docket No. 42 at 2-3.  Moreover, the Governor does not show it was error to rely on the Individual Plaintiffs' declarations to establish that they had plans to engage in conduct that violated SB23-169 for the purposes of a preliminary

injunction.

The Governor argues that the Court should have held a hearing to resolve whether plaintiffs had satisfied the jurisdictional prerequisites because "[t]he Court also stated it was not aware of the individual Plaintiffs' current age." *Id.* at 3. The Court declined to hold a hearing because the parties did not request a hearing and because the material facts were not in dispute. Docket No. 37 at 4 n.4. Moreover, the Court did not lack evidence of the Individual Plaintiffs' ages. In their declarations, the Individual Plaintiffs each stated they are "over the age of 18 but under the age of 21." Docket No. 12-2 at 1, ¶ 2; Docket No. 12-3 at 1, ¶ 2. The Court noted that, going forward, the Individual Plaintiffs' ages would be relevant to determine whether the Individual Plaintiffs' request for relief was moot. Docket No. 37 at 14 n.8. The Governor does not argue that the Individual Plaintiffs have turned 21 rendering their claim moot and does not raise a factual dispute relating to the Individual Plaintiffs' ages.

Next, the Governor argues that he is likely to succeed on the merits of his appeal under the *Bruen* standard because: (1) the Court failed to evaluate the plain text of the Second Amendment; (2) the Court held the Governor to an impermissibly high standard; (3) the Court nullified the presumptively lawful categories of regulations recognized by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008); and (4) the Court did not give sufficient weight to historical analogues from the time of the Fourteenth Amendment's ratification. Docket No. 42 at 3-8.

The Court finds that the Governor has failed to show a strong likelihood of success on the merits. Although the Governor correctly observes that "the new two-part test required by *Bruen* has reopened an array of questions that lower courts are grappling

with," *id*. at 8, all four of the arguments raised in the Governor's motion for a stay were directly addressed and rejected in this Court's preliminary injunction order and the Governor provides no compelling reason or new authority to alter the Court's prior rulings.

Initially, the Governor argues that "[t]he Court did not require Plaintiffs to first demonstrate that the 'public understanding of the right when the Bill of Rights was adopted in 1791' included a right for 18-to-20-year-olds to purchase firearms" and erroneously placed the burden on the Governor for the first step of the analysis under *Bruen*. *Id*. at 4 (quoting *Bruen*, 142 S. Ct. at 2137). The Court explicitly ruled that plaintiffs carried the burden of demonstrating the Individual Plaintiffs' conduct is covered by the plain text of the Second Amendment. Docket No. 37 at 19-20. The Court observed that the evidence the Governor supplied was not specific to Second Amendment rights and so it did not rebut plaintiffs' showing 18-to-20 year olds are covered by the Second Amendment. *Id*. at 25. The Governor did not have the burden for the first step of the Court's *Bruen* analysis. The Court simply ruled the Governor failed to rebut plaintiffs' showing.

Next, the Governor argues that the Court required him to supply a historic limitation on 18-to-20 year olds' ability to possess and acquire firearms that was exactly the same as SB23-169 in the second step of its *Bruen* analysis, creating an impermissibly high standard. Docket No. 42 at 5. The Governor argues that rules regarding college students' possession of guns on campus are sufficiently similar to SB23-169 to constitute a historical analogue under *Bruen*. *Id*. The Court, however, did not rule that the Governor's analogues failed because they were not exactly the same as SB23-169;

instead, the Court ruled they were not sufficiently analogous under the *Bruen* test. Docket No. 37 at 35.  The Court noted that college rules were like modern regulations of possession of firearms in sensitive places and that a prohibition on purchasing a firearm is not the same as a prohibition on discharging or possessing a firearm.  The Court looked to "why" and "how" SB23-169 burdens Second Amendment rights, *see id.* at 31, and ruled that the Governor had not shown any relevant prohibitions on acquiring firearms that would burden Second Amendment rights in the way SB23-169 does.  *Id.* at 34-35.

Third, the Governor argues that the Court nullifies the presumptively lawful categories of firearm regulations stated in *Heller*.  Docket No. 42 at 6.  In its August 7, 2023 order, the Court disagreed with the Governor's interpretation of *Heller* based on *Bruen*. Docket No. 37 at 29-30.  Even assuming the Court was wrong in its interpretation of *Heller* and *Bruen*, the Court found that the Governor did not show that SB23-169 fits into one of the presumptively lawful categories that *Heller* lists.  *Id.* at 30.  *Heller* referred to regulations of the commercial sale of arms, but the Governor failed to show that SB23-169 was merely a commercial regulation that affects firearm sellers as opposed to a prohibition on acquiring firearms by certain people.  *Id.*  Accordingly, the Governor fails to show it was error to decline to uphold the constitutionality of SB23-169 as presumptively lawful under *Heller*.

Finally, the Governor argues the Court did not give enough weight to analogues from the time of the Fourteenth Amendment's ratification.  Docket No. 42 at 7.  The Court did not "discount" the history the Governor mentions.  Even considering the language in *Bruen* that history at the time of the Fourteenth Amendment could be relevant, the Court

ruled that, without any evidence of historic analogues from the time the Second Amendment was ratified, later history cannot overcome the text of the Second Amendment by providing an inconsistent definition.  Docket No. 37 at 39-40.  The Governor has failed to show any error in the Court's ruling that plaintiffs showed a likelihood of success on the merits or any evidence that the Governor will succeed on the merits of his appeal.

Because the Governor has failed to show a strong likelihood that he will succeed on the merits of his appeal, the Court need not consider the other factors for a stay or injunction pending appeal.  *See, e.g., In re Way to Grow, Inc.*, No. 18-cv-03245-WJM, 2019 WL 669795, at *3 (D. Colo. 2019) (declining to consider remaining factors where movants failed to show strong likelihood of success); *Aposhian v. Barr*, 2019 WL 8195243, at *2 (D. Utah 2019) (same).  The Court therefore declines to stay the preliminary injunction.  *See Hilton*, 481 U.S. at 776; *Nken*, 556 U.S. at 434.

## IV. CONCLUSION

It is,

**ORDERED** that The Governor's Motion for a Stay of the Preliminary Injunction Pending Appeal [Docket No. 42] is **DENIED**.

DATED August 18, 2023.

BY THE COURT:

Philip A. Brimmer
Chief United States District Judge

App 777



# U.S. District Court

## District of Colorado

Receipt Date: Aug 18, 2023 10:16AM

Samatha Sconzo

| Rcpt. No: 107937 | | Trans. Date: Aug 18, 2023 10:16AM | | | Cashier ID: #NO |
|---|---|---|---|---|---|
| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
| 203 | Notice of Appeal/Docketing Fee | | 1 | 505.00 | 505.00 |

| CD | Tender | Amt |
|---|---|---|
| CC | Credit Card | $505.00 |
| | Total Due Prior to Payment: | $505.00 |
| | Total Tendered: | $505.00 |
| | Total Cash Received: | $0.00 |
| | Cash Change Amount: | $0.00 |

**Comments**: Appeal Filing Fee for 23-cv-1077-PAB-NRN

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**GOVERNOR'S ANSWER TO FIRST AMENDED COMPLAINT [DOC. 9]**

---

      Defendant Jared S. Polis, in his official capacity as Governor of the State of Colorado, answers the allegations in the Complaint as follows:

**INTRODUCTION**

    1.     Admit the first sentence of paragraph 1. Deny that SB23-169 was signed by the Governor on April 27, 2023, or will become effective on August 4, 2023, and affirmatively state that the act was signed on April 28, 2023, and has an August 7, 2023 effective date. Deny the third sentence and affirmatively state that the act speaks for itself. Deny the fourth sentence.

**PARTIES**

    2.     The Governor is without sufficient knowledge to admit or deny the allegations in paragraph 2 and so denies them.

    3.     The Governor is without sufficient knowledge to admit or deny the allegations in paragraph 3 and so denies them.

4.      The Governor is without sufficient knowledge to admit or deny the allegations in paragraph 4 and so denies them.

5.      Admit.

6.      Deny that the Governor has direct authority to enforce SB23-169. Affirmatively state that the Governor has waived his Eleventh Amendment immunity, for this case only and only for prospective equitable relief, to allow this matter to proceed against him.

## JURISDICTION AND VENUE

7.      Admit that, if Plaintiffs have standing and the case is ripe (neither of which Governor concedes at this stage), the cited provisions of law confer subject matter jurisdiction on the Court.

8.      Admit that the cited provisions of law authorize Plaintiffs to request declaratory relief and attorney fees. Deny that Plaintiffs are entitled to such relief.

9.      Admit.

## GENERAL ALLEGATIONS

10.      Admit that paragraph 10 quotes part of the Second Amendment.

11.      Admit that *McDonald v. City of Chicago* makes the Second Amendment applicable to the states through the Fourteenth Amendment.

12.      Admit that paragraph 12 accurately quotes part of SB23-169.

13.      Admit that paragraph 13 accurately quotes from *New York State Rifle & Pistol Association, Inc. v. Bruen*.

14.      The Governor is without sufficient knowledge to admit or deny the allegations in the first or third sentences of paragraph 14 and so denies them. The fourth sentence accurately

quotes from *New York State Rifle & Pistol Association, Inc. v. Bruen*. Deny the remaining allegations in paragraph 14.

15.     Deny.

16.     The Governor admits that the first and third sentences of paragraph 16 accurately describe the decision in *Fraser v. BATFE*. Deny the remaining allegations in paragraph 16.

17.     Deny.

### FIRST CLAIM FOR RELIEF

18.     The Governor incorporates his prior responses.

19.     Deny.

20.     Deny.

21.     Deny.

22.     Deny.

### GENERAL DENIAL

The Governor denies any allegations not specifically admitted above. The Governor denies that Plaintiffs are entitled to any of the relief requested.

### AFFIRMATIVE DEFENSES

(1) Plaintiffs lack standing.

(2) This case is not ripe for determination.

(3) The Complaint fails to state a claim for which relief can be granted.

(4) Plaintiffs cannot satisfy the factors for a preliminary or permanent injunction.

(5) The Governor enjoys sovereign immunity against Plaintiffs' claims, except that he has waived his sovereign immunity, only in this case, only in his official capacity, and only for prospective equitable relief.

(6) The Governor reserves the right to raise additional affirmative defenses.

Dated: August 28, 2023

PHILIP J. WEISER
Attorney General

*/s/ Matthew J. Worthington*
_____
*Grant Sullivan*, Assistant Solicitor General
*Michael T. Kotlarczyk*, Senior Assistant Attorney General
*Matthew J. Worthington*, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6152
Email: grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov; matt.worthington@coag.gov

*Attorney for Defendant Jared Polis, in his official capacity as Governor of the State of Colorado*
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, I served a true and complete copy of the foregoing **GOVERNOR'S ANSWER TO FIRST AMENDED COMPLAINT [DOC. 9],** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*

| | |
|---|---|
| **From:** | COD_ENotice@cod.uscourts.gov |
| **To:** | COD_ENotice@cod.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-01077-PAB-NRN Rocky Mountain Gun Owners et al v. Polis Letter re Record Complete |
| **Date:** | Thursday, August 31, 2023 9:22:13 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court - District of Colorado

### District of Colorado

### Notice of Electronic Filing

The following transaction was entered on 8/31/2023 at 9:21 AM MDT and filed on 8/31/2023

| | |
|---|---|
| **Case Name:** | Rocky Mountain Gun Owners et al v. Polis |
| **Case Number:** | 1:23-cv-01077-PAB-NRN |
| **Filer:** | |
| **Document Number:** | 51(No document attached) |

**Docket Text:**
**LETTER TO USCA and all counsel certifying the record is complete as to [41] Notice of Appeal filed by Jared S. Polis. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 23-1251) Text Only Entry (schap, )**

**1:23-cv-01077-PAB-NRN Notice has been electronically mailed to:**

Barry Kevin Arrington     barry@arringtonpc.com

Grant T. Sullivan     grant.sullivan@coag.gov, carmen.vanpelt@coag.gov

Michael T. Kotlarczyk     mike.kotlarczyk@coag.gov, carmen.vanpelt@coag.gov

Matthew John Worthington     matt.worthington@coag.gov, jennifer.davis-weiser@coag.gov

**1:23-cv-01077-PAB-NRN Notice has been mailed by the filer to:**