No. 23-1251

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

JARED POLIS, in his official capacity as Governor of the State of Colorado,

*Defendant-Appellant*,

v.

ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA,

*Plaintiffs-Appellees*,

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO; CASE NO. 23-CV-01077-PAB-NRN
THE HONORABLE PHILLIP A. BRIMMER, CHIEF JUDGE, PRESIDING

---

## BRIEF OF PLAINTIFFS-APPELLEES

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Plaintiffs-Appellees*

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ i

TABLE OF AUTHORITIES....................................................... iv

RELATED APPEALS.................................................................. v

GLOSSARY ................................................................................ vi

STATEMENT OF THE ISSUE.................................................. 1

STATEMENT OF THE CASE .................................................. 1

SUMMARY OF ARGUMENT ................................................... 3

ARGUMENT ............................................................................. 6

I.     Plaintiffs Have Standing................................................ 6

    A.     The Elements of Standing...................................... 6

    B.     Plaintiffs Have Demonstrated Standing ................ 8

    C.     *Teter*'s Post-Bruen Standing Analysis is Appropriate in This Case ............................................................. 12

    D.     Summary: Plaintiffs Have Standing ...................... 13

II.     Preliminary Injunction Standard ................................... 14

III.     *Bruen's* Plain Text, History and Tradition Standard...... 16

IV.     SB23-169 is not Categorically Exempt from Constitutional Scrutiny ......................................................................... 17

    A.     SB23-169 is Not Exempt from the *Bruen* Test....... 17

    B.     The State's Argument Proves Too Much ................ 18

    C.     SB23-169 is Not Primarily a Regulation of Commercial Sales ..................................................................... 19

D.     SB23-169 is not Similar to a "Shall Issue" Licensing Law .......................................................................     20

E.     The Cases Cited by the State are not Applicable ...     22

V.     The Plain Text of the Second Amendment Covers Plaintiffs' Proposed Conduct ................................................     23

A.     The State's Effort to Shift its History and Tradition Burden onto Plaintiffs Fails ...................................     23

B.     Plaintiffs are Part of "the People" ...........................     28

C.     The Plain Text of the Second Amendment Protects the Right to Acquire Arms ............................................     33

D.     Summary: Plaintiffs Have Met Their Burden Under Bruen's "Plain Text" Step .......................................     37

VI.     SB23-169 is Not Consistent with the Nation's History and Tradition of Firearm Regulation ....................................     38

A.     The Relevant Timeframe for the *Bruen* Analysis was in 1791 When the Second Amendment was Ratified .     38

B.     The State Cannot Demonstrate That its Regulation is Consistent with the Nation's History and Tradition of Firearms Regulation ............................................     42

C.     Cooley and *Callicutt* Do Not Support the State .....     55

D.     The Same Societal Issues Surrounding 18-to-20 Year-Olds Today were Understood by the Founders ......     56

E.     The District Court Applied the Correct Standard..     58

F.     The State's Late Nineteenth Century Evidence Contradicts Founding-Era Evidence ......................     59

G.    Summary: The State Has Failed to Meet its Burden
      Under Step Two of the Bruen Analysis .................. 60

VII.   The State's Means-End Analysis is Precluded by *Bruen*    61

VIII.  The State May Not Strip Disfavored Demographic Groups of
       their Constitutional Rights ............................................. 61

IX.    The State's Tenth Amendment Argument Fails ............. 62

X.     The Balance of Harms and Public Interest Factors Support
       Entry of Injunctive Relief.................................................. 63

CONCLUSION .......................................................................... 65

STATEMENT REGARDING ORAL ARGUMENT .................. 66

Privacy Redaction Certification ................................................ 66

Paper Copy Certification............................................................. 66

Virus Scan Certification............................................................. 66

CERTIFICATE OF SERVICE.................................................... 67

WORD COUNT AND TYPEFACE ........................................... 68

## TABLE OF AUTHORITIES

**CASE**                                                                PAGE(S)

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023)..................................................    64

*Bronson v. Swensen,*
   500 F.3d 1099 (10th Cir. 2007) .........................................    10

*Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023) ......................... 11, 30, 34

*Brown v. Entertainment Merchants Association,*
   564 U.S. 786 (2011) ...................................................    48

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ...................................................    8

*Carbajal v. Warner,*
   561 F. App'x 759 (10th Cir. 2014) ...........................................    15

*Colo. Outfitters Ass'n v. Hickenlooper,*
   823 F.3d 537 (10th Cir. 2016) .................................................    7

*D.C. v. Heller,*
   554 U.S. 570 (2008) ...................    6, 17, 26, 28, 29, 32, 33, 38, 56, 58

*Dred Scott v. Sandford,*
   19 How. 393, 15 L.Ed. 691 (1857) ...........................................    25

*Espinoza v. Montana Dep't of Revenue,*
   140 S. Ct. 2246 (2020) ................................................    41

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ...................................................    5, 34

*Firearms Policy Coalition, Inc. v. McCraw,*
   623 F. Supp. 3d 740 (N.D. Tex. 2022) ....................................    32

*First W. Cap. Mgmt. Co. v. Malamed,*
   874 F.3d 1136 (10th Cir. 2017) ...............................................    2, 14

*Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    2023 WL 3355339 (E.D. Va. May 10, 2023)............................ 11

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
    916 F.3d 792 (10th Cir. 2019) ................................................ 15

*Hayes v. SkyWest Airlines, Inc.*,
    12 F.4th 1186 (10th Cir. 2021)................................................ 2

*Hirschfeld v. BATFE*,
    5 F.4th 407 (4th Cir. 2021)...................................................... 20

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .............................................. 8

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
    961 F.Supp. 2d 928 (N.D. Ill. 2014) ...................................... 35

*In Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ................................................ 64

*In re Dewey*,
    11 Pick. 265 (Mass. 1831) ...................................................... 45

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) .................................................. 12

*Jackson v. Fair*,
    846 F.2d 811 (1st Cir.1988)..................................................... 15

*Jones v. Bonta*,
    34 F.4th 704 (9th Cir) ............................................................. 47

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) .................................................. 29

*Lane v. Rocah*,
    2024 WL 54237 (S.D.N.Y. Jan. 4, 2024) .............................. 10, 12

*Lara v. Comm'r Pennsylvania State Police*,
    2024 WL 189453 (3d Cir. Jan. 18, 2024) ....................... 23, 39, 42

*Lara v. Evanchick*,
    534 F. Supp. 3d 478 (W.D. Pa. 2021) ...................................... 23

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010) ................................................. 8

*Luis v. United States*,
    578 U.S. 5 (2016) ................................................................. 34

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................. 7

*Malloy v. Hogan*,
    378 U.S. 1 (1964) ................................................................. 40

*Maryland Shall Issue, Inc. v. Moore*,
    86 F.4th 1038 (4th Cir. 2023)............................................... 35

*McDonald v. Chicago*,
    561 U.S. 742 (2010) ....................................................... 30, 40

*Miller v. Bonta*,
    2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ......................... 35

*Mitchell v. Atkins*,
    483 F. Supp. 3d 985 (W.D. Wash. 2020) ............................... 23

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
    *& Explosives*,
    700 F.3d 185 (5th Cir. 2012) ................................................ 11

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023)............................................. 38

*Nat'l Rifle Ass'n, Inc. v. BATFE, ("NRA II")*,
    714 F.3d 334 (5th Cir. 2013) ................................................ 32

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ....................................................... 31, 48

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)....................... 3, 6, 9, 16, 17, 20, 27, 29, 37, 38

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................. 14, 63

*Nunn v. Georgia*,
   1 Ga. 243 (1846) ....................................................................... 31

*Peck v. McCann*,
   43 F.4th 1116 (10th Cir. 2022)................................................... 9

*Phelps v. Hamilton*,
   122 F.3d 1309 (10th Cir. 1997) ................................................. 6

*Ramos v. Louisiana*,
   140 S.Ct. 1390 ......................................................................... 40

*Range v. Att'y Gen. United States of Am.*,
   69 F.4th 96 (3d Cir. 2023) ........................................................ 29

*Renna v. Bonta*,
   2023 WL 2846937 (S.D. Cal. Apr. 3, 2023)............................. 35

*Rhode v. Bonta*,
   2024 WL 374901 (S.D. Cal. Jan. 30, 2024) .............................. 37

*Rio Grande Found. v. Oliver*,
   57 F.4th 1147 (10th Cir. 2023).................................................. 7

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 8446495 (D. Colo. Nov. 13, 2023) ........................... 36

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) ................................................ 14

*Springer v. Grisham*,
   2023 WL 8436312 (D.N.M. Dec. 5, 2023)................................ 15

*State v. Callicutt*,
   69 Tenn. 714 (1878).................................................................. 55

*State v. Callicutt, relies on Aymette v. Tennessee*,
   21 Tenn. (2 Hum.) 154, (1840) ................................................. 55

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .................................................................. 12

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) ............................................ 8

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ..................................... 4, 5, 18, 34, 36

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023) ..................................... 3, 12, 13

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019) .............................................................. 40

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) .......................................................... 31, 48

*United States v. Alston,*
    2023 WL 4758734 (E.D.N.C., Jul 28., 2023) ......................... 36

*United States v. Blakeney,*
    44 Va. (3 Gratt.) 405 (1847) .................................................. 46

*United States v. Hosford,*
    843 F.3d 161 (4th Cir. 2016) ................................................. 20

*United States v. McCane,*
    573 F.3d 1037 (10th Cir. 2009) ............................................. 22

*United States v. McNulty,*
    2023 WL 4826950 (D. Mass. July 27, 2023) ......................... 35

*United States v. Quiroz,*
    629 F.Supp.3d 511 (W.D. Tex. 2022) .................................... 36

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir) ........................................................... 22

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) ............................................................... 14

*Utah Licensed Beverage Ass'n v. Leavitt,*
    256 F.3d 1061 (10th Cir. 2001) ................................................    64

*Vincent v. Garland,*
    80 F.4th 1197 (10th Cir. 2023) ................................................    16, 22

*Vitagliano v. Cnty. of Westchester,*
    71 F.4th 130 (2d Cir. 2023) ................................................    10

*Ward v. Utah,*
    321 F.3d 1263 (10th Cir. 2003) ................................................    6

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................    8

*Worth v. Harrington,*
    2023 WL 2745673 (D. Minn. Mar. 31, 2023) ........................    31, 50, 52

**Statutes**

C.R.S. § 18-12-112 ................................................    1

C.R.S. § 18-12-112.5 ................................................    1

C.R.S. § 18-12-112(1) ................................................    21

C.R.S. § 18-12-112(2)(e) ................................................    19

U.S. Const. amend. XIV ................................................    25

U.S. Const. art. I................................................    30

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................    6

Fed. R. App. P. 32(a)(5) ................................................    68

Fed. R. App. P.32(a)(6) ................................................    68

Fed. R. App. P. 32(a)(7) ................................................    68

Fed. R. App. P. 32(f) ................................................    68

**Other Authorities**

Robert J. Spitzer, *The Second Generation of Second Amendment
    Law & Policy: Gun Law History in The United States and Second
    Amendment Rights*, 80 Law & Contemp. Prob. 55 (2017) .....       42

"Infants" and Arms Bearing in the Era of the Second Amendment:
    Making Sense of the Historical Record, 40 Yale L. & Pol'y Rev.
    Inter Alia 1 (2021)..................................................................       25

SB23-169..              xii, 1, 3-6, 8-11, 13, 16, 17, 19-21, 37, 54, 58, 60-67

The Lingering Legacy of In Loco Parentis: An Historical Survey and
    Proposal for Reform, 44 Vand. L. Rev. 1135 .........................       51

The Second Amendment Rights of Young Adults, 43 S. Ill. U. L.J.
    495 (2019) ................................................................................       46, 60

## RELATED APPEALS

Plaintiffs are not aware of any related appeal. The State lists *Rocky Mountain Gun Owners v. Polis*, 23-1380, as a related appeal, but that appeal involves a challenge to a different statute.

## GLOSSARY

"Mosgrove" means Plaintiff-Appellee Tate Mosgrove.

"Order" means the district court's August 7, 2023, Order Granting Preliminary Injunction attached as Exhibit A to Appellant's Brief.

"Pineda" means Plaintiff-Appellee Adrian S. Pineda.

"Plaintiffs" means collectively Mosgrove and Pineda.

"State.Br." means Appellant's Brief.

"SB23-169" means S.B. 169, 74th General Assembly, 1st Reg. Sess. (Colo. 2023).

"Stay Motion" means Governor Polis's August 21, 2023, Emergency Motion to Stay the District Court's Preliminary Injunction Pending Appeal filed in this appeal.

## STATEMENT OF THE ISSUE

At bottom there is only one issue in this case. Is the Second Amendment unique among the Bill of Rights in excluding a category of law-abiding adult Americans from its protections?

## STATEMENT OF THE CASE

Plaintiffs challenge the constitutionality of SB23-169, which amends Colorado Criminal Code provisions regulating firearm transfers, namely C.R.S. §§ 18-12-112 and 18-12-112.5. Section 18-12-112, as amended by SB23-169, states:

> (2)(e) A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.

> (f) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm.

"A person who violates a provision of [Section 18-12-112] commits a class 2 misdemeanor." *Id.* at § 18-12-112(9)(a).

Section 18-12-112.5 as amended states:

> (a.3) A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age.

> (a.5) It is unlawful for a person who is less than twenty-one years of age to purchase a firearm . . .

1

(b) Transferring or selling a firearm in violation of this subsection (1) is a class 1 misdemeanor.

(c) Purchasing a firearm in violation of this subsection (1) is a class 2 misdemeanor.

The district court found that Mosgrove and Pineda are citizens of Colorado who are older than 18 but younger than 21. Order, 3-4. The court also found that each Plaintiff has a present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id*. Finally, the district court found that Plaintiffs are law-abiding citizens who have never been charged with any crime. Order, 26.

This Court reviews the district court's factual findings for clear error. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140–41 (10th Cir. 2017). A factual finding is clearly erroneous only if it "wholly lacks support in the record or if, after reviewing the evidence, [the Court is] definitively and firmly convinced that the district court made a mistake." *Hayes v. SkyWest Airlines, Inc*., 12 F.4th 1186, 1194 (10th Cir. 2021). Far from erroneous, the district court's factual findings are fully supported by the record (App. Vol. 1 at 85, 87), and the State submitted no evidence that conflicted with its findings.

In summary, the facts of this case are quite simple. Plaintiffs are law-abiding American adults. Their proposed conduct is to purchase a firearm for lawful purposes, including self-defense in their homes. SB23-169 makes it illegal for Plaintiffs to engage in that proposed conduct.

## SUMMARY OF ARGUMENT

The State objects to Plaintiffs' standing on the limited ground that they have not demonstrated they have a "concrete" plan to violate SB23-169. The State's standing objection fails because Plaintiffs have demonstrated all of the elements of standing, and as the Ninth Circuit recently held in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), to establish standing, Plaintiffs need not provide precise details about concrete plans to acquiring arms in violation of the statute.

With respect to the merits, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022), the Court held that the test in Second Amendment cases requires answering two questions: (1) Does the Second Amendment's plain text cover Plaintiffs' conduct? (2) If the answer is yes, has the State justified the ban by

showing that it is consistent with the nation's historical tradition of firearm regulation?

The State's first argument is that the *Bruen* test does not apply to SB23-169, because it is a mere regulation of the commercial sale of firearms. But nothing in either *Heller* or *Bruen* suggested that commercial sales regulations are categorically exempt from constitutional analysis. Indeed, the State's argument proves too much. As the court observed in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017), "if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" altogether. *Id.* 873 F.3d at 688 (internal citation and quotation marks omitted).

Turning to *Bruen's* "plain text" step, *Heller* noted that the term "the people" as used in the Constitution "refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, Second Amendment rights "belong[] to all Americans." *Id.* Plaintiffs are therefore undoubtedly among "the people" protected

by the text. Moreover, as numerous courts have held, Plaintiffs' proposed conduct (acquiring firearms for self-defense) is covered by the text of the Second Amendment. *See, e.g.*, *Teixeira*, 873 F.3d at 677; *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Thus, Plaintiffs have met their burden under *Bruen* step one.

By contrast, the State has failed to meet its burden under *Bruen* step two of demonstrating that SB23-169 is consistent with the Nation's history and tradition of firearms regulation. The State has not been able to show a single Founding-era law that even regulated – much less prohibited – 18-to-20-year-olds' acquisition of firearms. Indeed, the State has no hope of ever analogizing its prohibition to such a regulation, because the militia laws enacted by Congress and all the states in the Founding era affirmatively *required* men over 18 to acquire firearms for militia service. The State's effort to introduce mid-to-late 19th-century evidence to contradict this history fails. Such laws "which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second

5

Amendment' and [are therefore not] 'instructive.'" *Bruen*, 597 U.S. at 67 (quoting *Heller*, 554 U.S. at 614).

Finally, the district court correctly held that the remaining preliminary injunction factors favor entry of injunctive relief. Therefore, the Court should affirm the district court's order preliminarily enjoining SB23-169.

## ARGUMENT

### I.    Plaintiffs Have Standing

#### A.    The Elements of Standing

The State did not challenge Plaintiffs' standing through a Fed. R. Civ. P. 12(b)(1) motion. Rather, the district court raised and addressed standing *sua sponte* (Order, 5-6) and correctly held that Plaintiffs have standing to challenge SB23-169.

To establish Article III standing, a plaintiff must allege "that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (*quoting Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).

The State relies heavily on *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016), in its standing argument. State Br. 13-14. But the State's argument ignores the fact that this case is at the preliminary injunction stage while the standing determination in *Colorado Outfitters* came at the end of a nine-day trial.[1] The State incorrectly argues that the district court should have held Plaintiffs to the same standard at the preliminary injunction stage. State Br. 14.

This is wrong because Plaintiffs' burden to demonstrate standing varies "at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In other words, the "proof required to establish standing increases as the suit proceeds." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (internal citations and quotations omitted). Thus, the State is incorrect when it suggests that Plaintiffs' burden at the preliminary injunction stage is the same as the *Colorado Outfitters* plaintiffs' burden at trial. The district court correctly held that at the preliminary injunction stage, plaintiffs need only make a clear

---

[1] *Colo. Outfitters Ass'n.*, 823 F.3d at 542.

showing that they have standing. Order, 8 (*quoting Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring) (*quoting Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (*quoting Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

## B.    Plaintiffs Have Demonstrated Standing

The State does not raise any issue under the second and third elements of standing (causation and redressability). Its argument is based solely on its assertion that Plaintiffs lack standing because they articulated no "concrete plan" to purchase arms in violation of SB23-169. State Br. 13-14. Plaintiffs will limit their response to this issue.

To meet the injury-in-fact requirement of Article III standing for their claim for injunctive relief, Plaintiffs must show a continuing or imminent injury. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). In the context of a request to enjoin a law prior to enforcement, Plaintiffs can establish an injury sufficient to establish standing by showing "an intention to engage

in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (*quoting Ward*, 321 F.3d at 1267).

In their declarations, both Mosgrove and Pineda state that they are over 18 and under 21 years of age and intend to purchase a firearm for lawful purposes including self-defense in their home. App. Vol. 1 at 85, 87. The State does not assert that this course of conduct is not arguably affected with a constitutional interest. It clearly is. *Bruen*, 597 U.S. at 8 (right to bear firearms for self-defense protected by the Second Amendment). Nor does the State dispute that SB23-169 would make Mosgrove and Pineda criminals if they engaged in their intended course of action. Finally, there is a credible threat of prosecution if Mosgrove and Peneda follow through on their desire to purchase firearms. Earlier in this appeal, the State argued that enforcing the statute against Plaintiffs and those similarly situated is *vital* because, in its view, "[w]idely available firearm purchases by [18 to 20 year-olds] threatens lives." Stay Motion, 21. And, therefore, "Coloradans will undoubtedly be

harmed unless SB23-169 can be enforced while appellate review proceeds." *Id.* Thus, the State has all but assured the Court that but for the injunction it would make enforcement of SB23-169 against Plaintiffs and those similarly situated a top priority.[2]

The State appears to concede that purchasing a firearms is a course of conduct arguably affected with a constitutional interest, that such conduct by Plaintiffs is proscribed by SB23-169, and a credible threat of prosecution exists. At least nothing in its brief suggests otherwise. Rather, the State's sole argument is that Mosgrove and Pineda have not been injured because they do not have a "concrete plan" to purchase firearms in violation of the statute. State Br. 14. But "a plaintiff need not risk actual prosecution before challenging an allegedly unconstitutional criminal statute." *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007). The district court was correct when it held that for the purpose of a preliminary injunction, Plaintiffs have made a clear

---

[2] Moreover, courts presume the government intends to enforce a criminal statute, in the absence of a disavowal by the government or another reason to conclude that no such intent exists. *Lane v. Rocah*, 2024 WL 54237, at *9 (S.D.N.Y. Jan. 4, 2024) (quoting *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023)).

showing that that there is a credible threat that they will be prosecuted should they engage in their constitutionally protected conduct. Order, 15. Unlike the "some day" allegations at issue in *Colorado Outfitters*, Plaintiffs have alleged that it is their "*present intention* and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [their] home" but that they are precluded from doing so by SB23-169. App. Vol. 1 at 85, 87 (emphasis added). In a case on all fours with this one, *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 3355339 (E.D. Va. May 10, 2023), the plaintiffs sought an injunction against the federal statute that prohibited 18-to-20-year-old adults from purchasing handguns. The court held that the plaintiffs' assertion that they desired to purchase the firearms and would do so but for the statute was sufficient to establish injury in fact. *Id*. at *3. *See also Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 8361745, at *6 (N.D.W. Va. Dec. 1, 2023) (18-to-20-year-old had standing); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191–92 (5th Cir. 2012) (*abrogated on other grounds by Bruen*)

11

(same); and *Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 2022 WL 17859138, at *3 (W.D. La. Dec. 21, 2022) (same).

Other courts have held standing exists with respect to similar arms bans. In *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the court held in an arms ban case that evidence practically identical to the evidence submitted by Plaintiffs here was sufficient to establish an injury in fact at the preliminary injunction stage. *Id.* at 967. *See also Lane v. Rocah*, 2024 WL 54237, at *11 (S.D.N.Y. Jan. 4, 2024) (upholding pre-enforcement standing to challenge arms ban).

## C. *Teter's* Post-*Bruen* Standing Analysis is Appropriate in This Case.

In *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), the Ninth Circuit upheld the plaintiffs' standing in a similar Second Amendment case. There, plaintiffs challenged Hawaii's ban on "butterfly knives." Like the State in this case, Hawaii argued the plaintiffs' plans to violate the law were insufficiently concrete. *Id.* But the court held that Hawaii's argument was foreclosed by *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), where the

Court held that it is not necessary for a plaintiff to expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. *Id*. Thus, under *Driehaus*, it is not necessary for a plaintiff to submit precise details about how he plans to engage in the proscribed conduct. *Teter*, 76 F.4th 938 at 945. Rather, it is sufficient to identify the specific conduct they affirmatively intend to engage in if the criminal prohibition is invalidated. *Id*. Finally, the court held that the plaintiffs' declaration stating their present desire to purchase the banned knives was sufficiently concrete and not a "some day intention." *Id*. In summary, *Teter* upheld standing based on evidence practically identical to the evidence submitted by Mosgrove and Pineda in this case and rejected a "concreteness" argument practically identical to the one advanced by the State.

### D.    Summary:  Plaintiffs Have Standing

In summary, Plaintiffs have demonstrated standing to challenge SB23-169's deprivation of their Second Amendment rights.

## II.    Preliminary Injunction Standard

To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). When the government is the party opposing the injunction, the third and fourth elements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Court reviews the district court's factual findings for clear error and its conclusions of law de novo. *First W. Cap. Mgmt. Co.*, 874 F.3d at 1140–41. "[G]iven the haste that is often necessary . . . a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

The goal of a preliminary injunction is to preserve the status quo pending trial. *RoDa Drilling*, 552 F.3d at 1208. The "status quo" is the last uncontested status between the parties before the

14

dispute arose. In the context of a newly enacted law, the last peaceable uncontested status was the status existing before the government enacted the challenged law. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 n.3 (10th Cir. 2019). In *Springer v. Grisham*, 2023 WL 8436312 (D.N.M. Dec. 5, 2023), the court cited this principle in the context of a Second Amendment challenge. *Id.* at *3 (citing *Free the Nipple-Fort Collins*). Thus, plaintiffs are not under any "heightened standard" for showing their entitlement to injunctive relief.[3]

## III.  *Bruen's* Plain Text, History and Tradition Standard

In *Bruen*, the Supreme Court created a test requiring consideration of two questions:

1. Does the Second Amendment's plain text cover an individual's conduct?

---

[3] The State implies that it was improper for the district court not to hold a hearing. State Br. 6. But a reviewing court will overturn the district court's determination of whether to hold a hearing only if there is a clear abuse of discretion. *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014) (*citing*, inter alia, *Jackson v. Fair*, 846 F.2d 811, 819 (1st Cir.1988)). The district court did not abuse its discretion. The State did not request a hearing; nor did it identify any genuinely disputed issues of fact to be addressed at a hearing.

2. If the answer is yes, has the government justified the ban by showing that it is consistent with the nation's historical tradition of firearm regulation?

*Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023) (*citing Bruen*, 597 U.S. at 24).

The Second Amendment protects the right to keep and bear arms in the same manner as the First Amendment protects the right to speak, associate, or worship. *Bruen*, 597 U.S. at 24 (putting Second Amendment rights on equal footing with First Amendment rights by way of example*)*. Thus, the right to keep and bear arms is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees. *Id.* at 70. Yet the State burdens Plaintiffs' Second Amendment rights by severely restricting the rights of an entire class of law-abiding citizens to acquire firearms for self-defense. This cannot stand.

## IV.  SB23-169 is not Categorically Exempt from Constitutional Scrutiny

### A.    SB23-169 is Not Exempt from the *Bruen* Test

The State's first argument is that SB23-169 is categorically exempt from constitutional scrutiny because it is a regulation that

imposes conditions and qualifications on the commercial sale of arms. State Br., 38-41. This argument is based on a fundamental misunderstanding of *Heller* and *Bruen*.

In *Heller*, the Court stated its opinion should not be taken to cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms," which it described as "presumptively lawful." *Id.* 554 U.S. at 626–27 and n.26. The State relies on this language to argue that SB23-169 is exempt from the *Bruen* test. But *Heller's* "presumptively lawful" language must be read in light of *Bruen*, which clarifies the test for assessing all Second Amendment claims, and no part of that test involves presuming lawfulness. *See Bruen*, 597 U.S. at 24. Instead, once the plain text is implicated, it is the Government's burden to prove that the law is consistent with the history and tradition of firearms regulation. *Id.* Nothing in *Bruen* suggests that regulations on commercial sales are subject to a different test. *Bruen* did not alter *Heller*; it simply made clear that *Heller* was only stating that it presumed restrictions of the type it listed would be found lawful to some extent when the proper analysis was conducted. This language

should not be construed to preclude the government from meeting their burden under either prong of the *Bruen* test.

## B.    The State's Argument Proves Too Much

The State's argument that all regulations of commercial firearms sales are exempt from the *Bruen* test surely proves too much because the argument has no limiting principle. The State seems to be under the impression that it has absolute authority to regulate all commercial firearms sales free from any constitutional restraints. If that is so, what prevents the State from enacting a statute that prohibits the commercial sale of firearms on any day except the 30th day of each month? For that matter, what prevents the State from prohibiting the commercial sale of firearms to anyone? Under the State's logic both statutes would be constitutional because they merely regulate commercial sales. As the Ninth Circuit observed in *Teixeira*, "if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" altogether. *Id.* 873 F.3d at 688

(internal citation and quotation marks omitted). Such an overall ban would obviously "be untenable under *Heller*." *Id*. The ban would not be untenable because of the burden it imposes on firearms sellers. Rather, it would be untenable because such a "total prohibition would severely limit the ability of citizens to *acquire* firearms." *Id*. (emphasis added). Thus, the State's argument fails. Yes, the State has the authority to impose conditions and qualifications on the commercial sale of arms. But as *Teixeira* recognized, that authority is not without limits, and it may not be exercised in a way that effectively precludes a class of law-abiding citizens from exercising their right to acquire firearms.

### C.    SB23-169 is Not Primarily a Regulation of Commercial Sales

SB23-169 is not, as the State argues, merely a commercial regulation of the sort contemplated by *Heller*. For one thing, the statute prohibits non-commercial as well as commercial sales. C.R.S. § 18-12-112(2)(e). More importantly, as the Fourth Circuit noted in a similar case, it is not a condition or qualification of "sale."

A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining

transfer records. . . . Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21.

*Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 34 F.4th 14 F.4th 322 (emphasis in original) (citing *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). The district court correctly held that SB23-169 does not base its prohibitions on 18-to-20-year-olds because they are in the business of selling firearms. Order, 30. "Rather, SB23-169 categorically bans an entire group of law-abiding citizens from purchasing firearms based on age." *Id.*

## D.  SB23-169 is not Similar to a "Shall Issue" Licensing Law

In *Bruen*, the Court struck down New York's discretionary licensing statute. 597 U.S. at 71. In doing so, the Court stated that its analysis should not be interpreted to suggest the unconstitutionality of "'shall-issue' licensing regimes because "they do not necessarily prevent '*law-abiding, responsible citizens*' from exercising their Second Amendment right[s]." *Id.* 597 U.S. at 39, n.9 (internal citation omitted; emphasis added). The State cites

footnote 9 and argues that like "shall issue" permitting regimes, SB23-169 merely ensures that only law-abiding, responsible citizens may purchase guns. This argument is meritless.

The State's argument fails because SB23-169 does not merely ensure that only law-abiding responsible citizens can purchase firearms. In Colorado even private sales are subject to background checks. C.R.S. § 18-12-112(1). Thus, SB23-169 bars an 18-to-20-year-old from purchasing a firearm even if they have proved they are law-abiding by passing a background check. SB23-169 is manifestly dissimilar to a shall issue permitting regime because it sweeps into its ambit law-abiding and non-law-abiding 18-to-20-year-olds alike. It prevents all 18-to-20 year olds from exercising their second amendment rights.

To the extent the State is attempting to justify SB23-169 under *Bruen* footnote 9, its argument amounts to an assertion that it is constitutionally permitted to enact a statute that creates an irrebuttable presumption that 18-to-20-year-old adults are not law-abiding or responsible. Nothing in footnote 9 (or anywhere else in

*Bruen*) even remotely hints at the possibility that such a presumption is constitutionally permissible.

### E.    The Cases Cited by the State are not Applicable

The State relies heavily on *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), but that reliance is misplaced. *Vincent* had nothing to do with regulations imposing conditions and qualifications on the commercial sale of arms. Rather, in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), this Court upheld the constitutionality of a ban on convicted felons' possession of firearms, and the issue in *Vincent* was whether *Bruen* abrogated *McCane* in cases involving nonviolent felons. *Vincent*, 80 F.4th at 1200. *Vincent's* sole holding was that *Bruen* did "not indisputably and pellucidly abrogate" *McCane*. *Id.* 80 F.4th at 1202.[4] It is unclear why the State jumps from that holding to a conclusion that this Court held that all regulations of commercial sales are categorically exempt from constitutional scrutiny.

_____

[4] The Court recognized a split of authority on this issue, and it is widely anticipated that the Supreme Court will shed light on the matter when it issues its opinion reviewing *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted* (2023).

The State cites two other cases in support of its assertion that age restrictions are "longstanding and presumptively lawful." State Br. 40. Neither case is good law. *Lara v. Evanchick*, 534 F. Supp. 3d 478 (W.D. Pa. 2021) was reversed last month by the Third Circuit in *Lara v. Comm'r Pennsylvania State Police*, 2024 WL 189453 (3d Cir. Jan. 18, 2024). And *Mitchell v. Atkins*, 483 F. Supp. 3d 985 (W.D. Wash. 2020), was "vacated in its entirety" by the Ninth Circuit and remanded for reconsideration in light of *Bruen*. *See* 2022 WL 17420766 (9th Cir. Dec. 2, 2022).

## V.    The Plain Text of the Second Amendment Covers Plaintiffs' Proposed Conduct

### A.    The State's Effort to Shift its History and Tradition Burden onto Plaintiffs Fails

Before beginning their analysis of the "plain text" issue, Plaintiffs will first address the State's effort to shift its burden under the history and tradition test onto them. State Br. 26. The State's attempt to shift its burden fails for the reason recently set forth by the Third Circuit in *Lara v. Comm'r Pennsylvania State Police*, 2024 WL 189453 (3d Cir. Jan. 18, 2024). The court wrote that Pennsylvania's effort to shift its burden onto the plain text analysis failed because:

. . . it supposes that the first step of a *Bruen* analysis requires excluding individuals from 'the people' if they were so excluded at the founding. That argument conflates *Bruen's* two distinct analytical steps. Although the government is tasked with identifying a historical analogue at the second step of the *Bruen* analysis, we are not limited to looking through that same retrospective lens at the first step. If, at step one, we were rigidly limited by eighteenth century conceptual boundaries, 'the people' would consist of white, landed men, and that is obviously not the state of the law.

*Id.* at *5.

It follows that "[i]f there is any argument to be made that the [government] can restrict the rights of 18-to-20-year-olds with respect to firearms, *Bruen* teaches that the [government] must make that argument by showing that such restrictions are part of the nation's historical tradition of gun regulation." *Id.* at *6.

The Third Circuit's point about "eighteenth century conceptual boundaries" bears emphasis. The State argues that the plain text of the Second Amendment does not apply to 18-to-20-year-olds because at the Founding they did not have "full legal rights." State Br. 4. But having full legal rights in 1791 cannot possibly be the standard for inclusion in "the people." *Fraser* explained why this is true:

It is well to recall that, since the early days of the Republic, we have gone from a Nation whose Supreme Court firmly

declared that the free descendants of slaves were not citizens, *Dred Scott v. Sandford*, 60 U.S. 19 How. 393, 406, 19 How. 393, 15 L.Ed. 691 (1857), to one that bestows citizenship regardless of race, U.S. Const. amend. XIV. We have also gone from a Nation where a husband's legal status subsumed his wife's to one where women are treated as full and equal members of society.

*Id.* at *11.

The State has designated Saul Cornell as an expert regarding this issue. In *Fraser* the court rejected Professor Cornell's conclusions. In *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 9 (2021), Professor Cornell wrote that in the Founding era, "[i]n many respects, the situation of minors under twenty-one resembled that of married women under coverture." Yet, he nevertheless argued for an interpretation of the meaning of "the people" that would limit the term to its conceptual boundaries in 1791. *Fraser* wrote that Professor Cornell's conclusion was ironic, because "[m]embership in the political community has grown to include numerous groups – women, minorities, and minors – that were denied inclusion at the time of the Founding." *Id.* at *11. One doubts Professor Cornell would argue the former two groups are not among "the people."

25

To be sure, the plain text step contemplates an analysis of the plain and ordinary meaning of the text at the time of the Founding, and the inquiry is historical in that limited sense. The words and phrases of the Second Amendment "were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (internal citation and quotation marks omitted). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings." *Id.* at 576-77. It follows that dictionaries from that time are useful in determining the normal and ordinary meaning of the text. *Id.* at 581. But this is not license to impose idiomatic definitions that "[n]o dictionary has ever adopted." *Id.* at 586. Plaintiffs are unaware of any dictionary from the Founding era that defines the normal and ordinary meaning of the phrase "the people" to exclude 18-to-20-year-olds. Thus, the State's idiomatic reading of the phrase must be rejected.

That the "plain text" step does not involve an historical inquiry in addition to an inquiry into the normal and ordinary meaning of the text at the Founding is plain from *Bruen* itself. The specific issue under the "plain text" step in *Bruen* was whether the

right to "bear" arms includes the right to bear arms in public. *Id.*597 U.S. at 32. The Court devoted only a few paragraphs of its lengthy opinion to this step. *Id*. at 32-33. The Court cited the dictionary meaning of the operative words and concluded that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. Conspicuously, the Court did not cite any "historical" sources to support this conclusion. Similarly, nothing in the phrase "the people" draws an "above 20/below 21" distinction. Thus, the State's assertion that *Bruen* requires an historical inquiry at the plain text step in addition to an inquiry into the normal and ordinary meaning of the text at the Founding is belied by *Bruen* itself.[5]

### B.    Plaintiffs are Part of "the People"

---

[5] In *United States v. Rahimi*, *supra*, the Fifth Circuit endorsed the view espoused by Plaintiffs here. In determining whether Rahimi was covered by the text (i.e., whether he was included in "the people"), the court held that an approach that "uses history and tradition to identify the scope of the right" as opposed to the scope of a legislature's power to regulate the right  "runs headlong into *Heller* and *Bruen*." *Id.* 61 F.4th at 451–52. Plaintiffs note that it is widely expected that the Supreme Court will provide guidance on this issue in an opinion to be issued in its present term.

The district court held that Plaintiffs are part of "the people" protected by the plain text of the Second Amendment. Order, 25. This is clearly correct. In *D.C. v. Heller*, 554 U.S. 570 (2008), the Court noted that the term "the people" as used in the Constitution "refers to all members of the political community, not an unspecified subset." *Id*. at 580. Thus, reading the Second Amendment as protecting only the rights of able-bodied males within a certain age range "fits poorly within the operative clause's description of the holder of the right as 'the people.'" *Id*. at 580-81. Rather, courts "start [] with a strong presumption that the Second Amendment right . . . belongs to all Americans." *Id*. at 581. *Bruen* reaffirmed the broad scope of the Second Amendment, stating that the "Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to reasonable, well-defined

restrictions." 597 U.S. at 70 (*quoting Heller*, 554 U.S. at 581).[6]

*Bruen* also stated that the protections of the Second Amendment extend to "ordinary, law-abiding, adult citizens." 597 U.S. at 31.

In *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), the Third Circuit held that *Bruen* did not alter *Heller's* conception of the phrase. *Id.* 69 F.4th at 101. To be sure, the legislature may constitutionally strip some people of their Second Amendment rights, but this does not mean they were not among "the people" in the first place. *Id.* In other words, "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* 69 F.4th at 102 (internal citation and quotation marks omitted).

---

[6] Obviously, the fact that "the people" includes "all Americans" does not mean that the government does not have the power to deprive some Americans of the right to keep and bear arms. *Lara, supra*, at \*5. For example, as then-Judge Barrett explained, "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). But "[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess." *Id*.

In *Lara*, *supra*, the court applied its reasoning in *Range* in

the specific context of 18-to-20-year-olds, writing:

> It is undisputed that 18-to-20-year-olds are among 'the people'
> for other constitutional rights such as the right to vote (U.S.
> Const. art. I, § 2; *id*. amend. XVII), freedom of speech,
> peaceable assembly, government petitions (*id*. amend. I), and
> the right against unreasonable government searches and
> seizures (*id*. amend. IV). As we recently observed in *Range*,
> there is 'no reason to adopt an inconsistent reading of 'the
> people." 69 F.4th at 102. Indeed, wholesale exclusion of 18-to-
> 20-year-olds from the scope of the Second Amendment would
> impermissibly render 'the constitutional right to bear arms in
> public for self-defense ... 'a second-class right, subject to an
> entirely different body of rules than the other Bill of Rights
> guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v.
> Chicago*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894
> (2010)).

*Id*. at *5.

In *Brown v. Bureau of Alcohol, Tobacco, Firearms &

Explosives*, 2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023), the court

noted that the Second Amendment's omission of an age restriction

is significant when compared to other Constitutional provisions. *Id*.

at *10. Minimum age requirements are constitutionally imposed on

membership in the House of Representatives (25 years of age), the

United States Senate (30 years of age), and the President (35 years

of age). *See* U.S. Const. art I, § 2; art. I, § 3 and art. II, § 1. The

authors of the original Constitution and the Bill of Rights included

age restrictions where they deemed them to be appropriate, and thus the absence of such restrictions in the Second Amendment is telling. *Brown, supra*, at \*10. *See also Worth v. Harrington*, 2023 WL 2745673, at \*7 (D. Minn. Mar. 31, 2023) (18-20-year-olds among "the people"); and *Fraser*, *supra*, at \*10 (E.D. Va. May 10, 2023) (same).

As noted in *Lara*, in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally – the First and the Fourth Amendments – the rights extend to 18-year-olds. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). It would make no sense to interpret the phrase "the people" in the Second Amendment to have a different meaning from the identical phrase in the First and Fourth Amendments.[7]

---

[7] Additionally, in *Heller*, the Court quoted with approval *Nunn v. Georgia*, 1 Ga. 243, 250 (1846), which held that "[t]he right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description . . . shall not be *infringed*, curtailed, or broken in upon, in the smallest degree." *Heller*, 554 U.S. at 612–13 (emphasis in original).

In *Heller*, the court held that logic demands that there be a link between the stated purpose in the prefatory clause and the command in the operative clause. *Heller*, 554 U.S. at 577. In *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. 2022), the court employed this same logic in concluding that 18-to-20-year-olds are among "the people," writing "It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn." Thus, if an individual would have been a member of the "militia," he must have been part of "the people" protected by the Second Amendment. As discussed in detail below, at the Founding the "militia" consisted of all white men over 18. Thus, "any argument that 18-to-20-year-olds were not considered at the time of the founding to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n, Inc. v. BATFE*, ("*NRA II*") 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental).

**C.    The Plain Text of the Second Amendment Protects the Right to Acquire Arms.**

The district court correctly held that the plain text of the Second Amendment covers Plaintiffs' proposed conduct of purchasing firearms for lawful purposes including the defense of their homes. Order 28. In response, the State advances the facially implausible proposition that the right to keep and bear arms does not include the right to acquire arms in the first place. State Br. 17.

As discussed above, the plain text inquiry is guided by the principle that the Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (internal citation and quotation marks omitted). Thus, "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. at 582, 589.

"Commonsense and logic tell us that, unless one is a maker of guns, the right to 'keep'/have a gun necessarily means that one must purchase it, steal it, be given it by another, or find one that another has lost. . . . Thus, given its ordinary, commonsense, and logical meaning the right to 'keep arms' (the right to 'have') of necessity includes the right, inter alia, to purchase arms." *Fraser,*

*supra*, at *7 (concluding that plain text covers right to purchase firearms in context of a ban on purchase by 18-to-20-year-olds).

The State insists that no ancillary rights are implied by the Second Amendment. State Br. 25. This is plainly wrong as a matter of general constitutional law. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Thus, the right to keep and bear arms implies a corresponding right to acquire arms and to obtain the bullets necessary to use them. *Id*. "Without protection for these closely related rights, the Second Amendment would be toothless." *Id*. As the Ninth Circuit noted in *Teixeira*, the Second Amendment right to keep and bear arms wouldn't mean much without the ability to acquire arms. 873 F.3d at 677. *See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to possess firearms implies a corresponding right to acquire them); *Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 8361745, at *9 (N.D.W. Va. Dec. 1, 2023) (concluding that plain text covers right to purchase firearms in context of a ban on purchase by 18-to-20-year-olds); *United States*

34

*v. McNulty*, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase, sell, or otherwise transfer firearms in order to keep oneself properly armed."); *Renna v. Bonta*, 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023) ("the right to keep arms, necessarily involves the right to purchase them."), *appeal filed*, No. 23-55367 (9th Cir. April 20, 2023); *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), *reh'g en banc granted, vacated*, 2024 WL 124290 (4th Cir. Jan. 11, 2024) (If one does not already own a firearm, the only way to "keep" and "bear" one is through sale, rental or gift.);[8] *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp. 2d 928, 930 (N.D. Ill. 2014) ("[T]he right to keep and bear arms for self-defense under the Second Amendment ... must also include the right to acquire a firearm."); *Miller v. Bonta*, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (Second Amendment right includes right to acquire firearm); *United States v. Alston*, 2023 WL 4758734, *8

---

[8] Plaintiffs acknowledge that this vacated opinion has no precedential value. Plaintiffs nevertheless cite to *Maryland Shall Issue*'s underlying logic, which is consistent with *Heller* and *Bruen*.

(E.D.N.C., Jul 28., 2023) ("As a logical matter, it is impossible to 'keep' or 'bear' arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition – otherwise, the Amendment would protect nothing at all."); and *United States v. Quiroz*, 629 F.Supp.3d 511, 516 (W.D. Tex. 2022) (right to keep arms includes right to receive arms).

For its part, the State does not point to a single case that holds that the Second Amendment does not protect the right to acquire or purchase firearms.[9]

Finally, the State argues that even if the text covers a general right to purchase firearms, it does not say anything about the right of 18-to-20-year-olds specifically. But in *Rhode v. Bonta*, 2024 WL

---

[9] The State asserts that in *Rocky Mountain Gun Owners v. Polis*, ("*RMGO II*") 2023 WL 8446495 (D. Colo. Nov. 13, 2023), the district court held that the plain text does not cover the right to purchase a firearm. State Br. 29. This is not true. In *RMGO II*, the district court held that the relevant conduct impacted by the waiting period statute challenged in the case was "the receipt of a paid-for firearm *without delay*." *Id*. at *8 (emphasis added). It held that this narrowly defined conduct was not covered by the plain text. But it never held that purchasing firearms generally is not covered by the text.

374901 (S.D. Cal. Jan. 30, 2024), the court rejected this exact "rhetorical device" that "over-describes the alleged constitutional right" and then argues that "the asserted right is not covered by the plain text." *Id*. at *5.

### D.   Summary: Plaintiffs Have Met Their Burden Under *Bruen's* "Plain Text" Step

In summary, Plaintiffs are among "the people" whose rights are protected by the Second Amendment. Moreover, numerous courts have held that the Second Amendment includes the right to acquire firearms in the first place, and the State has not shown authority to the contrary. Hence, Plaintiffs' proposed conduct of purchasing firearms for lawful purposes including the defense of their homes is covered by the plain text of the Second Amendment. Therefore, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Another way of stating this proposition is that SB23-169, which prohibits Plaintiffs' proposed conduct, is presumptively unconstitutional. As set forth in detail below, the State has not rebutted this presumption.

### VI.  SB23-169 is Not Consistent with the Nation's History and Tradition of Firearm Regulation

A.    **The Relevant Timeframe for the *Bruen* Analysis was in 1791 When the Second Amendment was Ratified**

In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 597 U.S. at 36 (citing *Heller*, 554 U.S. at 614). *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id.* 597 U.S. at 37. While noting this debate, the Court nevertheless stated that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* (citations omitted).

In *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023), the panel criticized *Bruen's* analysis and took a different

view. It held that the "appropriate barometer" for understanding the scope of the Second Amendment is the public understanding of the right in 1868 when the Fourteenth Amendment was ratified. 61 F.4th at 1323. The State cites this vacated opinion and urges the Court to follow it. State Br. 58. The State is wrong.

In *Lara v. Comm'r Pennsylvania State Police*, 2024 WL 189453 (3d Cir. Jan. 18, 2024), the Third Circuit rejected the *Bondi* panel's reasoning (*Id.* at *8, n.14) and held that the Second Amendment should be understood according to its public meaning in 1791. *Id.* at *8. The court reached this conclusion for two reasons. First, while not definitively resolving the issue, *Bruen* strongly indicated that the scope of the Second Amendment is pegged to the public understanding in 1791. *Id.* Secondly, under the *Bondi* panel's approach the text of the Second Amendment can mean one thing when applied to federal laws (as in *Fraser, supra* and *Brown, supra*) and the opposite thing when applied to state laws (as in *Bondi*). This would conflict with *Bruen's* admonition that it is "clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment

39

have the same scope as against the Federal Government." *Id*. at \*7 (quoting *Bruen*, 597 U.S. at 37).

Thus, evidence from the second half of the 19th century is not relevant to an inquiry into the original public meaning of the Second Amendment when it contradicts earlier evidence. *Bruen,* 597 U.S. at 66 ("As we suggested in *Heller*, [] late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). *See also Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'") (quoting *McDonald*, 561 U.S. at 765, 130 S.Ct. 3020); *Malloy v. Hogan*, 378 U.S. 1, 10 (1964) ("We have held that the guarantees of the First Amendment, the prohibition of unreasonable searches and seizures of the Fourth Amendment, and the right to counsel

guaranteed by the Sixth Amendment, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.") (internal citations omitted).

The Court expressed this concept perhaps most forcefully in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), in which Montana pointed out that in the latter half of the 1800s many states (indeed, the majority of states) had enacted no-aid laws like the one at issue in the case. *Id*. 140 S. Ct. at 2259. The Court rejected Montana's argument, holding that "[s]uch a development, of course, cannot by itself establish an early American tradition. … [S]uch evidence may reinforce an early practice but cannot create one. … The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id*. In summary, the founding era, not the second half of the 19th century, is key for understanding the scope of the Bill of Rights. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*

(2022), available at bit.ly/3Xwtgze (last visited January 27, 2024),

in which the author engages in an exhaustive analysis of the

numerous Supreme Court cases regarding this issue.

**B.    The State Cannot Demonstrate That its Regulation is Consistent with the Nation's History and Tradition of Firearms Regulation**

According to an article by the State's own expert, prior to 1791

there were zero laws prohibiting the possession or purchase of

firearms by minors. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History in The United States and Second Amendment Rights*, 80 Law & Contemp.

Prob. 55, 59 (2017). It is therefore unsurprising that in *Lara* the

Third Circuit noted that Pennsylvania was not able to point "to a

single founding-era statute imposing restrictions on the freedom of

18-to-20-year-olds to carry guns." *Lara*, 2024 WL 189453 at *9.

In stark contrast to the complete absence of laws prohibiting

18-to-20-year-olds from purchasing or possessing firearms in the

Founding era stand the early militia laws that *required* men 18

years of age and older to obtain firearms. Congress passed the

Second Militia Act on May 8, 1792, a mere five months after the

Second Amendment was ratified on December 15, 1791. *Lara*, at *9. The Second Militia Act stated that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be *of the age of eighteen years* and under the age of forty-five years (except as herein exempted) shall severally and respectively be enrolled in the militia[.]" Second Militia Act of 1792 § 1, 1 Stat. 271 (1792) (emphasis added). The Act also required each of these 18-year-old militia members to "provide himself with a good musket or firelock ... or with a good rifle[.]" *Id*. § 1.

Shortly thereafter, *every state* revised its existing militia laws to conform with the federal statute, adopted a militia age of 18, and required militia members to arm themselves. *See Fraser*, at *17, n.31 (collecting state militia laws).

Surely there can be no Founding-era tradition of regulations prohibiting 18-to-20-year-olds from acquiring firearms when the laws of the time unanimously imposed on them an affirmative duty to do exactly that.

In *Lara*, Pennsylvania contested the relevance of the militia laws on three grounds: (1) The exception for National Guard

43

members is consistent with them. (2) When the Second Amendment was ratified, nine states set the threshold for militia service at 16. (3) The Second Militia Act of 1792 and similar state statutes often assumed that militiamen younger than 21 did not have the independent ability to acquire firearms, and therefore required their parents to provide them with arms. *Lara*, 2024 WL 189453 at *9.

In response, the court noted that while the duty to possess arms in the militia or the National Guard is distinguishable from a right to bear arms unconnected to such service, the early militia laws are good evidence of the public's understanding at the time of the Second Amendment's ratification that 18-to-20-year-olds could be armed.[10] *Id*. The court dismissed the second concern because although the militia age dipped to 16 in some states in the colonial and revolutionary periods, at the time the Second Amendment was ratified or shortly thereafter the minimum age in every state

---

[10] As *Fraser* noted, because militiamen generally were responsible for providing their own firearms, it is logical to conclude that 18-to-20-year-olds were not prohibited from purchasing them. *Id*. at 15.

became 18. *Id*. Finally, even though some of the Founding-era militia laws required parents or guardians to supply arms to their minor sons, nothing in those statutes prohibited those 18-to-20-year-olds from purchasing or otherwise acquiring guns on their own.[11] *Id*.

Judicial opinions from shortly after the Founding era support the conclusion that 18 was considered the "age of maturity" for the purpose of acquiring and possessing firearms. In 1831, the Supreme Judicial Court of Massachusetts declared: "[w]e think that under our militia laws for all purposes connected with the performance of military service, the age of maturity is eighteen." *In re Dewey*, 11 Pick. 265, 271-72 (Mass. 1831). In 1847, the Supreme Court of Appeals of Virginia wrote:

> We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms; and that it is the military age recognized by the whole legislation

---

[11] It appears that these provisions were adopted out of concern that 18-to-20-year-olds would be unduly financially burdened if required to outfit themselves, not because they were legally prohibited from doing so. *Fraser*, at *18. (*citing* 2 *Annals of Congress* 1851, 1856 (debates of December 16, 1790)).

45

of Congress, and of the State of Virginia, and of all the States of the Union, perhaps without exception.

*United States v. Blakeney*, 44 Va. (3 Gratt.) 405 (1847).

The court expressly rejected the argument advanced by Colorado that the arbitrary line of majority is dispositive regarding the matter of bearing arms:

> It seems to me obvious that the enlistment of a minor capable of bearing arms, does not fall within the general rule of the municipal law, in regard to the incapacity of infants under the age of twenty-one years, to bind themselves by contract. . . . The party is subject to no incapacity by any arbitrary rule in regard to discretion . . .

*Id.* 409–10.

Plaintiffs respectfully direct the Court's attention to David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019), in which the authors conduct an exhaustive survey of the nation's history and tradition regarding the rights of 18-to-20-year-olds to keep and bear arms. At the end of this survey, their conclusion was that "[m]assive and uncontradicted evidence from the Founding Era shows that 18-to-20-year-olds did have the right to keep and bear arms, and indeed were required by law to exercise that right." *Id.* at 603.

Nevertheless, the State insists it can discriminate against 18–20-year-olds in the exercise of their constitutional rights because the common law age of majority was twenty-one at the time of the Founding. This is wrong.

First, the State supposes that under common law twenty-one was the age of majority for all purposes. It was not. Rather, at common law, "the relevant age of majority [] depended on the capacity or activity." *Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022) (citing William Blackstone, Commentaries 463–64, 465 (1765)).[12] "In other words, 'the age of majority – even at the Founding – lacks meaning without reference to a particular right,' because, '[f]or example, a man could take an oath at age 12, be capitally punished in a criminal case at age 14, and serve as an executor at age 17.'" *Id.*

Moreover, the State's assertion that the legal threshold of majority status is an absolutely dispositive determinant for when constitutional rights inhere is not supported by any Supreme Court

---

[12] Plaintiffs cite this vacated panel opinion not as precedent but for its cogent logic.

47

case and has been contradicted by numerous cases. As discussed above, minors have constitutional rights.[13] For example, in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), the Court struck down a law that prohibited the sale of violent video games to children. The court held that "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." 564 U.S. at 794 (internal citation and quotation marks omitted).[14]

Plaintiffs are not arguing that young children always have the same right to keep and bear arms as adults who are over 18. Obviously, they do not. Their point is that majority status has never been considered a bright line above which constitutional rights

---

[13] *See* discussion, *supra*, citing cases in which the Court has held that minors are among "the people" who have constitutional rights, citing, inter alia, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) (First Amendment); and *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (Fourth Amendment).

[14] The State's attempt to coopt Justice Thomas's lone dissent in *Brown* (State Br. 45) fails, because it is clear that his concern was not with 18-to-20-year-old adults but with parental authority over young children still subject to their parents' custody and control. *See*, *Id.* at 837.

48

inhere in citizens and below which they do not. Rather, *Brown* stated that "without persuasive evidence that a novel restriction on content is part of a long . . . tradition of proscription, a legislature may not revise the judgment of the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Id.* at 792. It is not a coincidence that *Bruen* used practically identical language: "The Second Amendment is the very product of an interest balancing by the people . . . [and it] is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id.* 597 U.S. at 26. *Brown* and *Bruen* stand for the same proposition: The contours of constitutional rights are shaped by the traditions of the American people, not an arbitrary dividing line such as majority status. And as discussed in detail above, the unambiguous Founding-era tradition of the American people was that 18-to-20-year-olds had a right to acquire firearms.

The State stretches to find analogous regulations by pointing to the fact that certain colleges prohibited firearms on their premises. State Br. 46. But under *Bruen*, the relevant inquiry is

into historical *governmental* regulations, not the rules of institutions, which obviously had more latitude regarding conduct on their premises than the government has in the general exercise of its police powers. Thus, these regulations are not analogous because they are not regulations in the relevant sense at all. None "appears to be the product of a legislative body elected by founding-era voters." *Worth v. Harrington*, 2023 WL 2745673, at *13 (D. Minn. Mar. 31, 2023). The district court correctly concluded that these rules were more comparable to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Bruen*, 597 U.S. at 30, than a prohibition on purchasing firearms applicable to a category of people. *See also Fraser*, *supra*, at *20 ("universities' regulations limiting the ability of students to carry firearms on campus are not 'analogous' to the wholesale prohibition on 18-to-20-year-olds from purchasing firearms").

In addition, these college rules applied to only a tiny fraction of the population. In 1789, there were approximately 1,000 students enrolled in higher education in the United States out of a total population of 3.8 million. Arthur M. Cohen and Carrie B. Kisker,

*The Shaping of American Higher Education: Emergence and Growth of the Contemporary System*, 14 (2d ed. 2010). The State's burden is to demonstrate an "enduring" and "broad" "American tradition of state regulation." *Bruen*, 597 U.S. at 69. It is unclear why the State believes school rules that affected less than 0.03% of the population reflect a broad tradition of firearm regulation in the nation generally. Such "localized restrictions" do not establish a tradition of "broadly prohibiting" 18-to-20-year-olds from acquiring firearms. *Id.* at 66.

Finally, these restrictions on students at universities are inapplicable to the *Bruen* analysis because the basis for these restrictions (i.e., the "why" question mandated by *Bruen*) was not the authority of government to curtail the exercise of constitutional rights but the *in loco parentis* authority of schools charged with the care of their students, a concept that made particular sense at the time given the very young age of the students. *See* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1136 n.5. (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of

age and younger."). In this capacity, schools could require things of their students that would, if commanded by the government outside the *in loco parentis* context, violate their constitutional rights.

These rules were not targeted at students because of their age but because they were students. "Indeed, they would not have prevented a person under the age of 21 who was not a student at one of the schools from possessing or carrying a firearm, and they undoubtedly applied with equal force to students older than 21." *Worth*, 2023 WL 2745673, at *13. For example, the State quotes a University of Virginia rule requiring students to leave their guns, dogs, and horses at home. App. Vol. 1, 170. This actually cuts against the State's argument because the rule assumes the students legally possessed guns, dogs, and horses at home and but for the rule would bring them to campus.

Next, the State points to a few pre-Civil War firearm laws involving minors. State Br. 47-48. These include (1) a law from New York City in 1803 that held parents liable for the unlawful discharge of firearms by minors (App. Vol. 2 at 233–34); (2) laws from cities in Delaware in 1812, South Carolina in 1817, and

Connecticut in 1835 that similarly imposed liability on parents for unlawful discharge of firearms by minors (App. Vol. 2 at 234); (3) laws passed in Kentucky in 1853, 1859, and 1860 that penalized selling gunpowder to those under fifteen without parental consent and selling certain weapons including pistols to minors and to any "slave, or free negro" (*id*.); (4) a law from Alabama in 1856 that fined "anyone who sold, gave or lent a pistol or fighting knife to a minor" (App. Vol. 2 at 235); and (5) a law from Tennessee in 1858 "prohibiting selling, giving, or lending to a minor a pistol, fighting knife or like dangerous weapon." *Id*.

The laws in the first two categories suffer two problems from the perspective of history and tradition. First, laws that are applicable in only a few cities do not "demonstrate a broad tradition of States doing so." *Bruen*, 597 U.S. at 69. Second, as the district court correctly noted, the cities prohibited the general population from discharging firearms within city limits. Order, 38. The only provision concerning minors was to shift liability to parents for minors' tortious use of firearms. *Id*.

As for the last three categories of laws, the district court

aptly agreed with *Fraser,* which stated:

> Thus, by the eve of the Civil War, *only three states* had passed
> any form of restrictions on the ability of minors to purchase
> firearms and each of *these was passed 65 years or more after
> the ratification of the Second Amendment*. This legislation
> therefore tells us nothing about the Founders' understanding
> of the Second Amendment.

*Id.* at *21 (citations omitted; emphasis added). Three isolated laws

passed over six decades after the Founding do not establish a

"broad" national tradition of prohibiting restrictions on 18-to-20-

year-olds' acquisition of firearms. *Bruen*, 597 U.S. at 70.

Finally, the State sets forth a catalogue of laws enacted after

the Civil War.[15] But as discussed above, such laws "which conflict

with the Nation's earlier approach to firearm regulation, are most

unlikely to reflect 'the origins and continuing significance of the

Second Amendment' and [are therefore not] 'instructive.'" *Bruen*,

597 U.S. at 67 (quoting *Heller*, 554 U.S. at 614). For this reason, in

*Lara*, the Third Circuit set aside Pennsylvania's catalogue of late

_____

[15] Not only are the laws temporarily irrelevant, but also, as the
district court correctly noted, they were not particularly analogous
to SB23-169. Order, 39.

54

nineteenth-century laws that were practically the same as the one advanced by the State here. *Id.* at *8.

### C.    Cooley and *Callicutt* Do Not Support the State

The State cites a footnote in Thomas Cooley's treatise, which was published nearly a century after ratification. State Br. 49 (citing Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883) ("[t]hat the State may prohibit the sale of arms to minors"). As authority for this proposition Cooley cited *State v. Callicutt*, 69 Tenn. 714 (1878), which upheld a Tennessee state law that made it illegal for someone to sell, loan, or give a minor a pistol except for the purposes of hunting. First, a passing statement in a footnote written nearly a hundred years after the Founding surely deserves no weight. More importantly, Cooley's only source was a state case applying a state law from decades after ratification. Thus, the law and the case have no value in determining original public meaning. Moreover, the case cited, *State v. Callicutt*, relies on *Aymette v. Tennessee*, 21 Tenn. (2 Hum.) 154, 158 (1840), for the proposition that the Second Amendment only protects a right to bear arms in the militia. *Callicutt*, 69 Tenn.

at 716. *Heller* explicitly rejected this collective view of the Second Amendment, and it also rejected *Aymette* as offering an "odd reading of the right ... [and] not the one we adopt." 554 U.S. at 579–80, 613. Thus, Cooley and *Callicutt* do not support the State's case.

Interestingly enough, Cooley does support Plaintiffs. In a separate discussion of the Second Amendment as an individual right he stated that "[t]he meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880). Thus, Cooley reinforces Plaintiffs' argument that those who were in the militia at the time of ratification (which included 18-to-20-year-olds) had Second Amendment rights.

### D.    The Same Societal Issues Surrounding 18-to-20 Year-Olds Today were Understood by the Founders

*Bruen* noted that the historical inquiry is fairly straightforward in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th

century" and a "lack of a distinctly similar historical regulation addressing that problem [provides] relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* 597 U.S. at 26. The State has singled out 18-to-20-year-olds for differential treatment from other adults because it believes that as a group they are too irresponsible to be trusted with the right to purchase firearms. State Br. 39-40. The State argues that it has done this due to "unprecedented societal concerns." State Br. 51.

This argument borders on the ludicrous. Surely the Founders knew all about the foibles of 18-to-20-year-olds, but they never took any action to disarm them. Indeed, they did just the opposite when they required them to acquire firearms for service in the militia. They never enacted a single "distinctly similar" ban on their acquisition of firearms. In *NRA II*, Jones took notice of this deficiency as follows:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment include[s] individuals eighteen to twenty[.] . . . The members of the first Congress were ignorant of thermal

57

heat imaging devices; *with late teenage males, they were familiar.*

*Id.* 714 F.3d at 342 (Jones, J., dissental) (internal citation omitted; emphasis added).

Thus, the State's argument that the Founders were completely ignorant of the societal issues purportedly addressed by SB23-169 (State Br. 52) does not bear up under analysis.

### E.     The District Court Applied the Correct Standard

The State complains that the district court applied an unduly restrictive standard by requiring the State to show a total prohibition on the sale of firearms to 18-to-20-year-olds at the Founding. State Br. 51. The district court did no such thing. In the cited passage from the Order, the district court noted that the State's total prohibition has no Founding-era analogue of any kind. Order, 39-40. The court never said that it was requiring the State to demonstrate an identical total prohibition from the Founding era. The problem that the State faces is that there were absolutely zero regulations (whether "total" or less than total) on the acquisition or possession of firearms by 18-to-20-year-olds in the Founding era. Thus, it was not able to demonstrate some lesser

58

regulatory burden from the Founding era. If it had found such a lesser burden and the district court had refused to consider it as an analogue, the State would have a valid point. But it hardly makes sense for the State to suggest its burden was too heavy when it was unable to satisfy its burden at all.

### F.    The State's Late Nineteenth Century Evidence Contradicts Founding-Era Evidence

The State's argument that its late nineteenth century evidence of prohibitions is actually consistent with the Founding-era evidence of no prohibitions (State Br. 56) is meritless. The State correctly notes that under *Heller* and *Bruen*, Reconstruction-era evidence that is consistent with and thus confirms the Founding-era tradition is relevant to the inquiry. *See Bruen*, 597 U.S. at 37. But late 19th-century evidence provides no insight on the question of constitutionality when it "contradicts earlier evidence." *Id*. at 66.

Evidence of regulations on 18-to-20-year-olds' acquisition of guns in the late 19th century obviously contradicts the total absence of such regulations in the Founding era and is thus not relevant to the historical inquiry. But the State insists that its late 19th-century evidence does not conflict with the Founding era,

because there were laws generally relating to minors in the Founding era. But that is a red herring. Indeed, *Bruen* warned against this very tactic. *Bruen* stated that at a high enough level of generality "everything is similar in infinite ways to everything else." 597 U.S. at 29 (cleaned up). That is why the government's task is to identify "relevantly similar" regulations, not regulations that relate to the same subject matter at an extremely high level of generality. *Id*.

### G.    Summary: The State Has Failed to Meet its Burden Under Step Two of the *Bruen* Analysis

In summary, as Kopel and Greenlee noted, massive and uncontradicted evidence from the Founding Era shows that 18-to-20-year-olds had the right to keep and bear arms, and indeed, were required by law to exercise that right. *The Second Amendment Rights of Young Adults*, *supra*, at 603. Unsurprisingly, therefore, the State has been unable to demonstrate that SB23-169 is consistent with the Nation's history and tradition of firearms regulation. Thus, the State has failed to carry its burden under step two of the *Bruen* analysis. Accordingly, Plaintiffs have shown that SB-169 is likely unconstitutional.

## VII.  The State's Means-End Analysis is Precluded by *Bruen*

The State says SB23-169 should be upheld because "modern science" has concluded that 18-to-20-year-olds' brains are insufficiently developed to use firearms safely. State Br., 39-40. In other words, the State assures the Court that the means it has chosen (depriving this group of their Second Amendment rights) is justified by the end it seeks to advance (increased public safety).

This is a brick wall and the State has run directly into it by attempting to reintroduce the interest balancing analysis that was emphatically rejected by *Bruen*. The Supreme Court's central holding in *Bruen* was that the government cannot justify a law burdening conduct covered by the Second Amendment's text by "simply posit[ing] that the regulation promotes an important interest." *Id*. 597 U.S. at 17. Rather, such a law will pass constitutional muster *only* if it is consistent with the Nation's historical tradition of firearms regulation. *Id*. And as discussed above, SB23-169 is not consistent with that historical tradition.

## VII.  The State May Not Strip Disfavored Demographic Groups of their Constitutional Rights

The State says it has the right to prohibit the sale of firearms to young adults because that demographic group is overrepresented among those who commit gun violence. State Br. 39-40. But that is both inconsistent with *Bruen* and a dangerous road to trek down.

Once again, the State's argument proves too much. The State does not have *carte blanche* to declare disfavored demographic groups outside the protective scope of the Second Amendment. By the same logic, the State could place discriminatory limitations on African Americans hoping to purchase firearms.[16] Such limitations would be obviously unconstitutional, regardless of how effective Colorado claimed they might be at stopping gun violence. And any argument that entails such a facially  absurd result cannot be correct.

## VIII. The State's Tenth Amendment Argument Fails

The State cites the Tenth Amendment and its general police power for the proposition that it has the right to set the age at which

---

[16] Department of Justice statistics indicate that African Americans are overrepresented among persons arrested for violent crimes. Bureau of Justice Statistics, *Race and Ethnicity of Violent Crime Offenders and Arrestees, 2018* (available at https://bit.ly/48PyzjN).

law-abiding citizens may exercise their Second Amendment rights. State Br. 34-35. This argument misses the point of *Bruen*. No one disputes that in the exercise of its police power the State can set some age limit for the purchase of guns. But it also should be undisputed that the Constitution limits the State's discretion. Thus, the issue is not whether there is a line – surely there is – but where the constitutional line is. SB23-169 is a regulation of conduct covered by the plain text of the Second Amendment. Thus, the State does not have the power to draw the line anywhere it chooses. Rather, whatever line it draws must be consistent with the Nation's history and tradition of firearms regulation. *Bruen*, 597 U.S. at 24. Simply asserting the State's inherent police power to draw regulatory lines will not do.

## IX. The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief

Finally, the balance of harms and public interest factors[17] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and

---

[17] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up).

In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors, courts must be mindful that even if a state is pursuing a legitimate goal (in that case, deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

The State argues that SB23-169 furthers an important governmental interest. But even if the statute did further an

important policy goal, that fact would be irrelevant under *Bruen*. Indeed, such an argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 597 U.S. at 23 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* 597 U.S. at 17.

Last, *Bruen's* unambiguous and emphatic rejection of means-end scrutiny applies equally to the context of a court attempting to grant a remedy for a constitutional violation. In other words, courts may not make an end-run around *Bruen* by engaging in a free-floating policy inquiry that is unrelated to the constitutional right at stake. To do so would impermissibly put the judiciary in the position of weighing the costs and benefits of clear constitutional violations.

## CONCLUSION

This Court should affirm the district court's entry of a preliminary injunction against SB23-169.

65

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves important issues of constitutional law.

Respectfully submitted,


**/s/ Barry K. Arrington**
_____
Barry K. Arrington

**Privacy Redaction Certification**:  No privacy redactions were required.

**Paper Copy Certification**:  The paper copies of this appendix to be submitted to the clerk of the Court are exact copies of the version submitted electronically.

**Virus Scan Certification**:  The digital form of this document submitted to the Court was scanned for viruses using Webroot SecureAnywhere, and according to the program the document is virus-free.

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 7, 2024, he served a true and correct copy of the foregoing document by e-filing it with the CM/ECF system, which will serve the document on:

Michael T. Kotlarczyk
Matthew J. Worthington
Office of the Colorado Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203

**/s/ Barry K. Arrington**
_____
Barry K. Arrington

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7) (excluding the items listed under FedR.App.P.32(f)) because this brief contains **12,939** words.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R. App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface (fourteen-point Century Schoolbook) using Microsoft Word.

Date: February 7, 2024

**/s/ Barry K. Arrington**

_____

Barry K. Arrington