No. 23-1251

# In the
# United States Court of Appeals
# for the Tenth Circuit

◆

JARED POLIS, in his official capacity as
Governor of the State of Colorado,

*Defendant-Appellant,*

v.

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and ADRIAN S. PINEDA,

*Plaintiffs-Appellees.*

◆

Appeal from the United States District Court
for the District of Colorado
No. 23-cv-01077-PAB (Hon. Phillip A. Brimmer)

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION
AND FPC ACTION FOUNDATION IN SUPPORT OF
APPELLEES AND AFFIRMANCE**

◆

JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

**FPC Action Foundation** has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF *AMICI CURIAE* ...........................................................1

CONSENT TO FILE ..................................................................................2

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ...............................................................................................5

   I.   The Second Amendment's plain text covers both 18-to-20-year-olds and the right to acquire arms.................................................5

     A.  18-to-20-year-old adults are among "the people." .......................5

       1.  The Second Amendment protects "all Americans." .................5

       2.  The militia consisted of a subset of "the people," and 18-to-20-year-olds were in the militia......................................6

       3.  "The people" protected by the Second Amendment are the same people protected by other enumerated rights. ...............8

     B.  The right to acquire arms is inherent in the right to keep arms and is also a necessary concomitant of the right. ............10

       1.  The right to keep arms includes the right to acquire arms....10

       2.  The right to acquire arms is a necessary concomitant of the right to keep and bear arms.............................................11

  II.  American tradition proves that 18-to-20-year-olds enjoyed a broad right to keep and bear arms. ...............................................14

     A.  The only firearm regulations that applied to 18-to-20-year-olds in the Colonial and Founding eras *required* them to keep and bear arms...................................................14

       1.  Hundreds of militia mandates required 18-to-20-year-olds to keep and bear arms. ......................................................14

       2.  Numerous mandates unrelated to militia duty required 18-to-20-year-olds to keep and bear arms..............................18

     B.  18-to-20-year-olds regularly possessed and used arms outside of militia service...........................................................22

CONCLUSION ....................................................................................... 26

CERTIFICATE OF COMPLIANCE....................................................... 28

CERTIFICATE OF SERVICE................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................. 12

*Brown v. Bd. of Educ. of Topeka,*
   347 U.S. 483 (1954) ................................................................... 9

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ........................................................... *passim*

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ................................................... 12

*Gamble v. United States,*
   139 S. Ct. 1960 (2019) ............................................................. 15

*Goss v. Lopez,*
   419 U.S. 565 (1975) ................................................................... 9

*Hirschfeld v. BATFE,*
   5 F.4th 407 (4th Cir. 2021) ....................................................... 7

*Jackson v. City & Cnty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ............................................. 12, 13

*Kole v. Vill. of Norridge,*
   No. 11-cv-3871 (N.D. Ill. Nov. 6, 2017) ................................. 13

*Lara v. Comm'r Pa. State Police,*
   91 F.4th 122 (3rd Cir. 2024) ..................................................... 9

*Luis v. United States,*
   578 U.S. 5 (2016) ..................................................................... 12

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ................................................................... 11

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................... 9

iv

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985) ................................................................. 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ......................................................... 5, 9, 13, 14

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
140 S. Ct. 1525 (2020) ......................................................... 12

*Nunn v. Georgia*,
1 Ga. 243 (1846) ..................................................................... 6

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ............................................................... 11

*Teixeira v. Cty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) (en banc) ............................... 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ................................................................. 8

*United States v. Miller*,
307 U.S. 174 (1939) ............................................................... 16

*United States v. Quiroz*,
629 F. Supp. 3d 511 (W.D. Tex. 2022) ................................. 11

## Constitutional Provisions

U.S. CONST. amend. I .......................................................... 3, 8

U.S. CONST. amend. II................................................... *passim*

U.S. CONST. amend. IV....................................................... 3, 8

U.S. CONST. art. I, § 2, cl. 2 .................................................... 9

U.S. CONST. art. I, § 3, cl. 3 .................................................... 9

U.S. CONST. art. II, § 1, cl. 5.................................................... 9

**Statutes and Regulations**

1 Stat. 271 (1792) ....................................................... 15

**Other Authorities**

Alsop, George, A CHARACTER OF THE PROVINCE OF MARYLAND
(Newton D. Mereness ed., 1902) ........................................ 25

AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL
AND REVOLUTIONARY ERA GOVERNANCE, vol. 1 (Jon L. Wakelyn
ed., 2006) ............................................................. 21

Batchelder, Samuel F., *"The Students in Arms"—Old Style*, in
29 THE HARV. GRADUATES' MAG. 552 (1921) .............................. 24, 25

COLLECTED WORKS OF JAMES WILSON, vol. 2 (Kermit L. Hall &
Mark David Hall eds., 2007) ........................................... 18

Cooley, Thomas M., THE GENERAL PRINCIPLES OF CONSTITUTIONAL
LAW IN THE UNITED STATES OF AMERICA (1880) ............................ 8

Di Spigna, Christian, FOUNDING MARTYR: THE LIFE AND DEATH
OF DR. JOSEPH WARREN, THE AMERICAN REVOLUTION'S LOST
HERO (2018) ........................................................... 24

DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS, vol. 3 (Lyman H.
Butterfield ed., 1961) ................................................ 23

Federal Farmer, *Letter XVIII*, Jan. 25, 1788 ........................ 6, 7, 26

Hacker, J. David, et al., *The Effect of the Civil War on Southern
Marriage Patterns*, 76 J. OF S. HISTORY 39 (2010) ..................... 19

Jefferson, Thomas, WRITINGS (Merrill D. Peterson ed., 1984) ........... 24

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1
(4th ed. 1773) ........................................................ 10

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ............................................................................... *passim*

Laws of New Hampshire: Province Period, 1702–1745 (1913) ........... 21

Laws of New Hampshire: Revolutionary Period, 1776–1784 (1916) ...................................................................................... 21, 22

McGrath, Tim, James Monroe: A Life (2020) ...................................... 23

Merriam-Webster's Collegiate Dictionary (10th ed. 1996) .............. 10

Middleton, Richard & Lombard, Anne, Colonial America: A History to 1763 (4th ed. 2011) ........................................................ 19

Morgan, Robert, Boone (2007) .............................................................. 24

Proceedings and Acts of the General Assembly of Maryland January 1637/8–September 1664 (William Hand Browne ed., 1883) .................................................................................................. 19

Randall, Henry S., The Life of Thomas Jefferson, vol. 1 (1865) ........ 24

Random House Webster's Collegiate Dictionary (1995) ................. 10

Ryden, George H., Delaware–The First State in the Union (1938) .. 21

The Compact with the Charter and Laws of the Colony of New Plymouth (William Brigham ed., 1836) ........................................... 20

The Debates and Proceedings in the Congress of the United States, vol. 2 (Joseph Gales ed., 1834) ............................................. 16

The Documentary History of the Ratification of the Constitution, vol. 20 (John P. Kaminski et al. eds., 2004) ........... 6, 26

The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, vols. 1–3 (William Waller Hening ed., 1823) ....... 19, 21

THE WRITINGS OF GEORGE WASHINGTON, vol. 26 (John C. Fitzpatrick ed., 1938) ............................................................. 16

THE WRITINGS OF THOMAS JEFFERSON, vol. 8 (H. A. Washington ed., 1859) ..................................................................... 24

Unger, Harlow Giles, JOHN MARSHALL: THE CHIEF JUSTICE WHO SAVED THE NATION (2014) .................................................. 23

VERMONT STATE PAPERS; BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT (William Slade ed., 1823) ..................................................... 21

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (1828) .................................................................. 11

## STATEMENT OF *AMICI CURIAE*[1]

**Firearms Policy Coalition (FPC)** is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. Since its founding in 2014, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus curiae*.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to inform the public about the importance of constitutionally protected rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amici* and their members contributed money intended to fund its preparation or submission.

freedoms guaranteed by the Constitution are secured for future generations. FPCAF's research and *amicus curiae* briefs have been relied on by judges and advocates across the nation.

This case concerns *Amici* because the challenged law effectively forbids a significant number of adults in Colorado from exercising their Second Amendment protected rights.

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court has demonstrated that the Second Amendment's plain text covers 18-to-20-year-old adults. First, the Court determined that the Second Amendment "belongs to *all* Americans," which includes Americans aged 18-to-20. Second, the Court explained that the traditional militia consisted of a "subset of 'the people,'" and 18-to-20-year-olds were included in nearly every Colonial-era militia as well as every state militia at the time of the Second Amendment's ratification. Third, the Court made clear that the Second Amendment protects the same "people" as the First and Fourth Amendments, which both protect 18-to-20-year-old adults.

It is equally clear that the Second Amendment protects the right to acquire arms. First, the Supreme Court has determined that "keep Arms" in the Amendment's text means to "have weapons," and the plain meaning of "have" encompasses the act of acquisition. Second, the Supreme Court has acknowledged that certain rights are implicit in enumerated guarantees. In the Second Amendment context, four Justices have recognized that firearms training is "a necessary concomitant" of

the right to keep and bear arms. As many lower courts have recognized, acquiring a firearm must be a necessary concomitant as well.

The Governor cannot justify the ban on sales to 18-to-20-year-old adults with tradition because the only regulations that applied to 18-to-20-year-olds at or before the Founding were laws *requiring* them to keep and bear arms. The colonies and states depended on armed 18-to-20-year-olds to serve in the militia, posse comitatus, watch and ward, and hue and cry. Indeed, when the Second Amendment was ratified, virtually every 18-to-20-year-old who had ever lived in America possessed and carried arms.

Moreover, there is a strong tradition of 18-to-20-year-olds keeping and bearing arms without government mandates. Many Colonial- and Founding-era Americans kept and carried arms, even in their youth, including many of the most influential Founders.

## ARGUMENT

**I.  The Second Amendment's plain text covers both 18-to-20-year-olds and the right to acquire arms.**

The initial inquiry in a Second Amendment challenge is whether the Amendment's plain text covers the regulated conduct. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). The Supreme Court conducted the plain text analysis of the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008). The Court's analysis confirms that the plain text covers both 18-to-20-year-olds and the right to acquire arms.

**A.  18-to-20-year-old adults are among "the people."**

**1.  The Second Amendment protects "all Americans."**

Analyzing "right of the people" in the Amendment's plain text, the *Heller* Court concluded with "a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans." *Id.* at 581 (emphasis added). Thus, in *Bruen*, the Court held that "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581) (emphasis added).

The *Heller* Court specifically praised the Georgia Supreme Court's interpretation of the Second Amendment, which defined it as, "'The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description[.]'" 554 U.S. at 612–13 (quoting *Nunn v. Georgia*, 1 Ga. 243, 250 (1846)) (emphasis omitted).

## 2.  The militia consisted of a subset of "the people," and 18-to-20-year-olds were in the militia.

Leaving no doubt that 18-to-20-year-olds are among "the people," the *Heller* Court observed that "the 'militia' in colonial America consisted of *a subset of 'the people'*—those who were male, able bodied, and within a certain age range." 554 U.S. at 580 (emphasis added). That age range, as explained below, included 18-to-20-year-olds. Because 18-to-20-year-olds were among a subset of "the people," they were necessarily among "the people."

The Court's conclusion reflected the Founders' understanding. The influential Antifederalist Federal Farmer straightforwardly explained during the debates over the ratification of the Constitution that "the militia are the people." Federal Farmer, *Letter XVIII*, Jan. 25, 1788, *in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1073 (John P. Kaminski et al. eds., 2004); *see also id.* at

6

1072 ("A militia, when properly formed, are in fact the people themselves").

Moreover, "'Keep arms,'" the *Heller* Court determined, "was simply a common way of referring to possessing arms, *for militiamen* and everyone else." *Id.* at 583 (emphasis modified). In fact, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right . . . was codified in a written Constitution." *Id.* at 599. So, the right was codified to prevent the disarmament of a group that included 18-to-20-year-olds, and "keep Arms" in the Amendment's text secured that group's arms, along with everyone else's. Certainly, that group is among "the people" covered by the Amendment.[2] *See Hirschfeld v. BATFE*, 5 F.4th 407, 429–30 (4th Cir. 2021), *vacated as moot* 14 F.4th 322 (4th Cir. 2021) ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right.").

---

[2] To be sure, the right of 18-to-20-year-olds was not limited to militia service. "[M]ost undoubtedly thought it even more important for self-defense and hunting." *Heller*, 554 U.S. at 599.

In sum, the Court's declaration that the Second Amendment applies to "all Americans" is buttressed by the following syllogism: The militia had the right to keep and bear arms; 18-to-20-year-olds were part of the militia; therefore, 18-to-20-year-olds had the right to keep and bear arms.

### 3. "The people" protected by the Second Amendment are the same people protected by other enumerated rights.

The *Heller* Court emphasized that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580; *see also* Thomas M. Cooley, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880) ("[I]n all the enumerations and guaranties of rights" in the Constitution that use "the term *the people*," "the whole people are intended.").

In the First Amendment context, "[s]tudents in school as well as out of school are 'persons' under our Constitution" who "are possessed of fundamental rights which the State must respect[.]" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). And the Fourth Amendment protects "students against [unreasonable searches and seizures] by public school officials." *New Jersey v. T.L.O.*, 469 U.S. 325,

334 (1985). 18-to-20-year-olds have other enumerated rights enjoyed by other adults, such as due process, *Goss v. Lopez*, 419 U.S. 565, 574 (1975), and equal protection, *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954). Therefore, "wholesale exclusion of 18-to-20-year-olds from the scope of the Second Amendment would impermissibly render" the Second Amendment "'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 132 (3rd Cir. 2024) (quoting *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010))).

The Constitution's Framers imposed minimum age requirements when they wanted to. *See* U.S. Const. art. I, § 2, cl. 2 (25 to serve in the U.S. House of Representatives); U.S. Const. art. I, § 3, cl. 3 (30 to serve in the U.S. Senate); U.S. Const. art. II, § 1, cl. 5 (35 to be eligible for the office of President). The Framers did not, however, impose any minimum age requirement for the right to keep and bear arms. Thus, "18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extend." *Lara*, 91 F.4th at 132.

### B.    The right to acquire arms is inherent in the right to keep arms and is also a necessary concomitant of the right.

### 1.    The right to keep arms includes the right to acquire arms.

Looking to Samuel Johnson's and Noah Webster's dictionaries in its plain text analysis, the *Heller* Court determined that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. To "have" something has always included its acquisition. Today, Merriam Webster's defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 533 (10th ed. 1996); *see also* RANDOM HOUSE WEBSTER'S COLLEGIATE DICTIONARY 614 (1995) (defining "have" as "3. to get; receive; take" and "18. to gain possession of"). Likewise, around the Founding era, Johnson's dictionary defined "have" as "5. To obtain; to enjoy; to possess" and "6. To take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[3] Webster's defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH

---

[3] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

LANGUAGE (1828) (unpaginated).[4] Because "the plain meaning of the verbs 'have' or 'possess' include the act of receipt. . . . 'to have weapons' would encompass the past receipt and the current possession of those weapons." *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022).

### 2.　The right to acquire arms is a necessary concomitant of the right to keep and bear arms.

"[T]he [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980); *see also McCulloch v. Maryland*, 17 U.S. 316, 407 (1819) ("A constitution. . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves."). "[F]undamental rights, even though not expressly guaranteed, have been recognized by the [Supreme] Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers*, 448 U.S. at 580.

---

[4] *Heller* relied on Webster to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

When it comes to the Second Amendment, four Supreme Court Justices determined—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 1527 (Kavanaugh, J., concurring) (expressing "agree[ment] with Justice Alito's general analysis of *Heller*"). Another "necessary concomitant" of the right to keep and bear arms is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. . . . The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson* v. *City and County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," *Ezell* v. *Chicago*, 651 F. 3d 684, 704 (CA7 2011). . . . Without protection for these closely related rights, the Second Amendment would be toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

"The right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871),[5] because the "Second

---

[5] *Heller* thrice cited *Andrews* approvingly. 554 U.S. at 608, 614, 629.

Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms," *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quotation marks omitted).

Thus, the Ninth Circuit held that "prohibitions on the sale of ammunition do not fall outside the historical understanding of the scope of the Second Amendment right." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19 (quotation marks omitted). And several district courts have held that restrictions on the purchase of firearms burden the historical understanding of the right, while no court has held otherwise. *See* Appellees' Br. 34–36.

Because "the Second Amendment right . . . to acquire a firearm . . . is implicated by . . . laws directly or functionally banning firearm sales," *Kole v. Vill. of Norridge*, No. 11-cv-3871, at \*21 (N.D. Ill. Nov. 6, 2017), the Governor must justify Colorado's ban on sales to 18-to-20-year-old adults with historical tradition, *Bruen*, 597 U.S. at 24.

13

## II.  American tradition proves that 18-to-20-year-olds enjoyed a broad right to keep and bear arms.

### A.  The only firearm regulations that applied to 18-to-20-year-olds in the Colonial and Founding eras *required* them to keep and bear arms.

#### 1.  Hundreds of militia mandates required 18-to-20-year-olds to keep and bear arms.

No 17th- or 18th-century law restricted 18-to-20-year-olds' rights to acquire, keep, or bear arms.

Over 200 militia statutes enacted during the Colonial and Founding eras required 18-to-20-year-olds to keep and bear militia arms—typically including firearms, edged weapons, ammunition, and accoutrements. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019).[6] The only militia

---

[6] This brief focuses on the Founding-era tradition and the tradition leading up to it because the Supreme Court has demonstrated that the original 1791 understanding of the Second Amendment controls. *See Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Bruen*, 597 U.S. at 28 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it"); *id.* at 34 ("'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'") (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s). Historical evidence from beyond the Founding era may be used only to confirm Founding-era evidence. *See id.* at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what . . . ha[s] already been

14

law from those nearly two centuries that did not have a minimum age of 18 or less was from Virginia, and only from 1738 to 1757. *Id.* at 534.

When the Second Amendment was ratified, every state in the nation included 18-to-20-year-olds in their militias. *Id.* at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 572–73 (Vermont), 583 (Virginia), 585 (Massachusetts), 587 (Georgia), 589 (Connecticut). And the year after the Second Amendment's ratification, Congress enacted the Uniform Militia Act, which governed the militia when called into federal service. The Uniform Militia Act set the ages at 18 to 45. 1 Stat. 271 (1792). Thus, virtually every 18-to-20-year-old in Colonial- and Founding-era America possessed and carried arms.

America's first Secretary of War, Henry Knox, explained that "[t]he period of life in which military service shall be required of the citizens of the United States[] to commence [is] at eighteen," because by that age men possess "such a degree of robust strength as to enable them to

───────────────

established'") (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)).

sustain without injury the hardships incident to the field." 2 THE DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES 2146, 2153 (Joseph Gales ed., 1834). Knox further asserted that "all men of the legal military age should be armed." *Id.* at 2145–46. Representative James Jackson of Georgia declared "that from eighteen to twenty-one was found to be the *best* age to make soldiers of." *Id.* at 1860 (emphasis added). Nearly a decade before George Washington signed the Uniform Militia Act as president, he wrote to Alexander Hamilton that, "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

The Supreme Court explained that militiamen "would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627; *see also United States v. Miller*, 307 U.S. 174, 179 (1939) ("ordinarily when called for service these men were expected to appear bearing arms supplied by themselves"). So, at the time of the

Second Amendment's ratification, nearly every 18-to-20-year-old since the establishment of Jamestown had possessed and carried weapons.

The Governor points to militia laws that "made the parent or guardian responsible for purchasing any gun used for militia participation." Appellant's Br. 20. But these laws were often intended to ease the financial burden on younger militiamen who could not be expected to afford the required arms themselves, instead placing that burden on their parents or guardians. For example, under Pennsylvania's 1676 law, 18-to-20-year-olds who were "freeholders" had to furnish the arms "at their own . . . Charge and Cost," while 18-to-20-year-olds who were financially dependent on their "Parents or Masters" could rely on them to provide the arms. CHARTER TO WILLIAM PENN, AND LAWS OF THE PROVINCE OF PENNSYLVANIA, PASSED BETWEEN THE YEARS 1682 AND 1700, PRECEDED BY DUKE OF YORK'S LAWS IN FORCE FROM THE YEAR 1676 TO THE YEAR 1682, at 39 (Staughton George et al. eds., 1879). The overwhelming majority of militia laws from the Colonial and Founding eras held 18-to-20-year-olds personally responsible for arming themselves and punished the 18-to-20-year-olds for failing to do so. *See* Kopel & Greenlee, *The*

*Second Amendment Rights of Young Adults*, at 533–89. And no law restricted their ability to acquire their own arms.

### 2. Numerous mandates unrelated to militia duty required 18-to-20-year-olds to keep and bear arms.

18-to-20-year-olds were traditionally required to secure community defense by participating in the "hue and cry" to pursue criminals, the "watch and ward" to guard their towns, and the posse comitatus to aid sheriffs in carrying out law enforcement duties. Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, at 534–35.[7]

Many statutes that mandated firearm ownership by women and non-militiamen applied to 18-to-20-year-olds. These laws did not specifically mention age. Rather, they applied to everyone old enough to conduct particular activities, such as keeping house.

Maryland, in 1639, required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for

---

[7] Just before the Second Amendment's ratification and his appointment to the U.S. Supreme Court, James Wilson explained in 1790 that "No man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from [the posse comitatus]." 2 COLLECTED WORKS OF JAMES WILSON 1017 (Kermit L. Hall & Mark David Hall eds., 2007).

every person within his her or their house able to bear armes one Serviceable fixed gunne." PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8–SEPTEMBER 1664, at 77 (William Hand Browne ed., 1883). A "Housekeeper" was "a man or woman who maintains a family state in a house." 1 Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (unpaginated). Because the "average age at marriage [was] about 20 years for women in the early colonial period," J. David Hacker, et al., *The Effect of the Civil War on Southern Marriage Patterns*, 76 J. OF S. HISTORY 39, 42 (2010); *see also* Richard Middleton & Anne Lombard, COLONIAL AMERICA: A HISTORY TO 1763, at 325 (4th ed. 2011) ("the average marriage age for native-born whites in Somerset County, Maryland between 1670 and 1740 was about 23 for men, and under 19 for women"), it was ordinary for 18-to-20-year-olds to be housekeepers.

Virginia had several laws requiring arms to travel, attend church, work in the fields, and attend court. 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 127 (William Waller Hening ed., 1823) (1624, requiring arms to travel); *id.* (1624, requiring arms to work

19

in the field); *id.* (1624, requiring farmers to possess arms); *id.* at 173 (1632, requiring arms to travel); *id.* (1632, requiring arms to work in the field); *id.* (1632, requiring men to carry arms to church); *id.* at 263 (1643, requiring "masters of every family" to carry arms to church); 2 *id.* at 333 (1676, requiring arms to attend church or court). More broadly, a 1640 law mandated that "ALL persons . . . be provided with arms and ammunition or be fined." 1 *id.* at 226. And laws in 1659 and 1662 required all men capable of bearing arms to own a firearm. *Id.* at 525; 2 *id.* at 126. To the extent that women of any age farmed, traveled, or engaged in other listed activities, the arms mandates applied to them.

A 1632 Plymouth law required that "every freeman or other inhabitant of this colony provide for himselfe and each under him able to beare armes a sufficient musket and other serviceable peece." THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 31 (William Brigham ed., 1836).

To promote immigration, North Carolina issued land grants starting in 1664—but only to settlers who were "armed with a good firelock or matchlock." 1 AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11

(Jon Wakelyn ed., 2006). In 1701, Virginia required recipients of land grants to keep someone between the ages of 16 and 60 armed on the land. 3 THE STATUTES AT LARGE, at 206–07.

Delaware required "every Freeholder and taxable Person" starting in 1741 to "provide himself with . . . One well fixed Musket or Firelock." George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION 117 (1938).

Starting in 1779, "every listed soldier *and other householder*" in Vermont had to "always be provided with, and have in constant readiness, a well fixed firelock." VERMONT STATE PAPERS; BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT 307 (William Slade ed., 1823) (emphasis added).

New Hampshire required every head of household to own firearms in 1718. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1702–1745, at 285 (1913). In 1776, New Hampshire required all males between 16 and 50 *not* in the militia to own firearms. 4 LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, 1776–1784, at 46 (1916). Then in 1780, New Hampshire required males under 70 who were exempt from militia

training to keep militia arms at home, so they could defend the community if attacked. *Id.* at 276.

With hundreds of militia and non-militia laws requiring 18-to-20-year-olds to keep and bear arms, it is implausible to suggest that they did not have the right and ability to acquire arms.

### B. 18-to-20-year-olds regularly possessed and used arms outside of militia service.

The district court properly dismissed the Governor's argument "that minors participating in militias acted under the supervision of adults" and "that militia members possessed firearms in 'coordinated and rigorous military service, distinct from everyday civilian life,'" Order at 35–36 (quoting Docket No. 28 at 16), because in any event, "[t]he Governor's argument . . . does not carry his burden to show an analogous restriction on the sale of firearms to 18-to-20 year olds," *id.* at 36. The Governor's argument—echoed on appeal, Appellant's Br. 4–5—fails for additional reasons.

First, the militia laws required 18-to-20-year-olds to possess the required arms *at all times*—not only during militia musters. *See* Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, at 533–89. Thus, 18-to-20-year-olds possessed the arms during "everyday civilian

life" far more often than during "coordinated and rigorous military service."

Second, no law limited the use of arms kept by militiamen to militia purposes only. Rather, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). Militiamen—including 18-to-20-year-olds—used their arms for militia purposes and all other lawful purposes.

Third, contrary to the Governor's implication that 18-to-20-year-olds used arms only while supervised during militia service, minors in the Colonial and Founding eras regularly possessed and used arms outside of militia service and without adult supervision—including many of the most influential Founders. John Adams, James Monroe, and John Marshall all carried firearms to school—unaccompanied by adults—for protection or hunting. 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257, 258 n.4 (Lyman H. Butterfield ed., 1961); Tim McGrath, JAMES MONROE: A LIFE 9 (2020); Harlow Giles Unger, JOHN MARSHALL: THE CHIEF JUSTICE WHO SAVED THE NATION 14 (2014). Meriwether Lewis and Daniel Boone owned firearms and began hunting alone before age 14. 8 THE

WRITINGS OF THOMAS JEFFERSON 482 (H. A. Washington ed., 1859); Robert Morgan, BOONE 14 (2007). Thomas Jefferson also possessed a firearm by 14 and later in life advised his 15-year-old nephew to "[l]et your gun therefore be the constant companion of your walks." 1 Henry S. Randall, THE LIFE OF THOMAS JEFFERSON 15 (1865); Thomas Jefferson, WRITINGS 816 (Merrill D. Peterson ed., 1984). And Joseph Warren kept a firearm as an 18-year-old student at Harvard. Christian Di Spigna, FOUNDING MARTYR: THE LIFE AND DEATH OF DR. JOSEPH WARREN, THE AMERICAN REVOLUTION'S LOST HERO 49 (2018).

Indeed, many Harvard students kept arms in the 17th and 18th centuries. Although they were often exempted from militia mandates, they participated in training anyway. "[N]o sooner was the College started [in 1636] than the students began to waive their [exemptions] and volunteer to train" with the militia. Samuel F. Batchelder, *"The Students in Arms"—Old Style*, *in* 29 THE HARV. GRADUATES' MAG. 552 (1921) (quotation marks omitted). In 1759, Harvard students petitioned "for Liberty to exercise Themselves in the use of the Fire-Lock," which the faculty granted them permission to do "in the Play-Place." *Id.* at 556. And by 1766, training with firearms "was influencing college life

24

considerably." *Id.* at 557 n.1. Of course, if the students did not possess their own arms, they could not have voluntarily participated in the training or shooting activities.

In fact, much of the Americans' success during the Revolutionary War was attributed to their lifelong use of arms, unrelated to militia service. *See* Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, at 530–33.

Even 18-to-20-year-old indentured servants—who were not free under the law—could sometimes keep and bear arms. In 1666, George Alsop presented a defense of indentured servitude in Maryland. Alsop, who had worked as an indentured servant in Maryland himself, argued that it was best for someone "seventeen or eighteen years old" to go into servitude. George Alsop, A CHARACTER OF THE PROVINCE OF MARYLAND 54–55 (Newton D. Mereness ed., 1902) (1666). He noted that servants could "hunt the Deer, or Bear, or recreate themselves in Fowling" and that "every Servant has a Gun, Powder and Shot allowed him, to sport him withall on all Holidayes and leasurable times, if he be capable of using it, or willing to learn." *Id.* at 59. If 18-to-20-year-old indentured

servants could keep and bear arms for non-militia purposes, surely free Americans of the same age could as well.

The tradition of 18-to-20-year-olds keeping and bearing arms was reflected during the debates over the ratification of the Constitution when Federal Farmer declared, "to preserve liberty, it is essential that the whole body of the people always possess arms[.]" Federal Farmer, *Letter XVIII*, Jan. 25, 1788.

In sum, virtually every 18-to-20-year-old in Colonial- and Founding-era America was required to acquire, keep, and bear arms, 18-to-20-year-olds commonly possessed and carried arms independent of militia duty, and no regulation in Colonial- or Founding-era America restricted the rights of 18-to-20-year-olds to acquire, keep, or bear arms.

## CONCLUSION

Colorado's ban on firearms sales to 18-to-20-year-old adults burdens conduct protected by the Second Amendment and contradicts the nation's tradition of firearm regulation. *Amici* respectfully request that this Court rule in favor of Appellees, declare Colorado's ban unconstitutional, and affirm the district court's judgment.

26

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,009 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2024, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*