23-1251

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

JARED POLIS, in his official capacity as Governor of the State of Colorado,

Defendant – Appellant,

v.

ROCKY MOUNTAIN GUN OWNERS, TATE MOSGROVE, and ADRIAN S. PINEDA,

Plaintiffs – Appellees,

On Appeal from the United States District Court, District of Colorado
The Honorable Phillip A. Brimmer
Chief District Judge

District Court Case No. 23-cv-01077-PAB-NRN

**DEFENDANT-APPELLANT'S SUPPLEMENTAL BRIEF FOLLOWING**
*UNITED STATES V. RAHIMI*, NO. 22-915

| | |
|---|---|
| PHILIP J. WEISER<br>Attorney General<br>MICHAEL T. KOTLARCZYK *<br>Assistant Solicitor General<br>MATTHEW J. WORTHINGTON*<br>Assistant Attorney General | Colorado Department of Law<br>1300 Broadway, 6th Floor<br>Denver, Colorado 80203<br>Telephone:  720-508-6187<br>E-Mail:  mike.kotlarczyk@coag.gov;<br>matt.worthington@coag.gov<br>*Counsel of Record<br><br>*Attorneys for Governor Polis* |

In *United States v. Rahimi*, an 8-1 majority of the Supreme Court had "no trouble concluding" that a law prohibiting gun possession by individuals subject to a domestic violence restraining order survives a facial challenge under the Second Amendment. 144 S. Ct. 1889, at 1902, 2024 WL 3074728 at *10 (U.S. June 21, 2024). The Court reached this decision despite finding no "identical … founding-era regimes" for the challenged law. *Id.* at 1901. Stating that "some courts have misunderstood the methodology of [the Court's] recent Second Amendment cases," *Rahimi* clarifies that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," not whether it has a precise founding-era match. *Id.* at 1897-98 (emphasis added).

Following *Rahimi*, this Court likewise should have no trouble concluding that Colorado's age-limit on the purchase of guns survives the Plaintiff's facial challenge here. *First*, *Rahimi* directly undermines the district court's preliminary injunction order because it made the same exact errors the Supreme Court identified in the Fifth Circuit's *Rahimi* decision: (a) requiring a historical twin, and (b) not applying precedent regarding facial challenges. *Id.* at 1903. *Second*, the Plaintiffs are not likely to succeed under the Court's clarified *Rahimi-Bruen* test. *Id.* at 1898. At step one, the Plaintiffs have not shown their proposed conduct is within the Second Amendment's scope. At step two, the government has shown that Colorado's age-limit is consistent with principles in our regulatory traditions: access to weapons by children and adolescents may be regulated to limit misuse. Age-limits have been used repeatedly throughout our Nation's history, including

1

widespread state laws in the 19th century prohibiting sales of guns to those under twenty-one. This Court should reverse the district court's preliminary injunction.

I. **The district court made the same legal errors identified in *Rahimi*.**

The Fifth Circuit "made two errors" in *Rahimi*, warranting reversal by the Supreme Court. *Rahimi*, at 1903. The district court below made identical errors when it enjoined Colorado's age-limit on gun purchases.

First, like the Fifth Circuit, the district court "read *Bruen* to require a 'historical twin[.]'" *Id.* The Governor's three expert historians showed our Nation's history of regulating access to weapons by those under twenty-one. Rejecting that evidence, the district court wrote that the Governor did not present evidence of "a total prohibition on the sale of firearms to minors" from the founding-era. Order at 39-40. The Governor was required to show an *identical* law from the founding-era to justify Colorado's age-limit. Without it, the district court said it would not consider other evidence of an age-limit principle, *id.*, like later history or "that states *could have* regulated 18-to-20 year olds [during the founding- era] because they lacked rights as minors." *Id.* at 25 (emphasis added).

*Rahimi* directly rejects this approach. "[T]he Second Amendment permits more than just regulations identical to ones that could be found in 1791," *Rahimi*, at 1897-98. The challenged regulation does not even need to be "an updated model of a historical counterpart." *Rahimi*, at 1925 (Barrett, J., concurring). Instead, the analysis asks "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, at 1898. Courts are instructed to review history with "a wider lens" and

at "the right level of generality" to find "principles that mark the borders of the right[.]" *Rahimi*, at 1925-26 (Barrett, J., concurring).

Silence on a regulatory issue at the founding also does not demonstrate that the Second Amendment prohibits those regulations. *Rahimi*, at 1898. Doing so would ignore that problems today "are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *NYSRPA v. Bruen*, 597 U.S. 1, 27 (2022). Moreover, it wrongfully "assumes that founding-era legislatures maximally exercised their power to regulate[.]" *Rahimi*, at 1925 (Barrett, J., concurring). Yet, that is what the district court did below. Without an identical state statute setting the age to purchase guns at the founding, the district court held that Colorado could not enact one today – whether that age is twenty-one or two.

Second, like the Fifth Circuit, the district court "did not correctly apply [] precedents governing facial challenges." *Rahimi*, at 1903. The district court correctly held here that "[t]he Individual Plaintiffs raise a facial challenge to SB23-169" because "SB23-169 has not been enforced against any of the Individual Plaintiffs." Order at 17 fn.10. A facial challenge "is the most difficult challenge to mount successfully[.]" *Rahimi*, at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). For Second Amendment facial challenges, "the Government need only demonstrate that [the gun regulation] is constitutional in some of its applications." *Id.*

Colorado's law prohibits gun sales to anyone under twenty-one. App. Vol. 1 at 15. The Plaintiffs do not seriously challenge that the law is constitutional as applied to most people under twenty-one. Answer Brief at 48 ("Obviously, [young children] do not" …

3

"have the same right to keep and bear arms as adults who are over 18."). That should end their facial challenge. Furthermore, Colorado's law is not a ban on acquiring, carrying, or possessing a gun. The law prohibits gun sales while permitting gun transfers by parents. *See* Colo. Rev. Stat. § 18-12-112(6).

Rather than consider circumstances in which SB23-169 was constitutional, the district court focused only on purported scenarios where the law prohibited those over eighteen from purchasing a gun for "self-defense in their homes." Order at 26. Yet, the Plaintiffs presented no evidence that SB23-169 impacted defense of their homes. Despite being "the most difficult challenge," Plaintiffs presented no evidence to support their facial challenge beyond their own declarations. App. Vol. 1 at 85-88. Plaintiffs did not submit any testimony to rebut the Governor's four expert witnesses. Plaintiffs cannot enjoin state law on its face without presenting any evidence, and especially without evidence that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

## II.  Plaintiffs cannot show a likelihood of success under the revised *Rahimi-Bruen* test.

This Court should reverse the preliminary injunction on Colorado's age limit for gun purchases following *Rahimi*. The Court has clarified the two-step test for Second Amendment challenges. At the first step, a court considers whether the plain text of the Second Amendment covers the plaintiff's conduct. *Bruen*, 554 U.S. at 24; *Rahimi*, at 1907 (Gorsuch, J., concurring), at 1932 (Thomas, J., dissenting). If the conduct is covered, the court proceeds to the second step, and asks "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, at 1898. To find these

4

"principles underlying the Second Amendment[,]" a court looks at "relevantly similar … laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). However, modern regulation "does not need to be" identical to past laws. *Id.* at 1901.

>   A.   **Plaintiffs failed to demonstrate that their conduct is covered by the Second Amendment's text.**

In *Rahimi*, the test's first step was not at issue: "no one question[ed] that the law Mr. Rahimi challenge[d]" was covered by the Second Amendment. *Rahimi*, at 1907 (Gorsuch, J., concurring). Nonetheless, there are several key takeaways from *Rahimi* that help inform how to apply the test's first step to this case.

First, the Second Amendment covered Mr. Rahimi's conduct because he challenged a law prohibiting "possessing or using virtually any firearm[.]" *Rahimi*, at 1932 (Thomas, J., dissenting). But Colorado's law is not a ban on possession, carry, or acquisition of guns. App. Vol. 1 at 15. The law prohibits one method of acquisition by children and adolescents (sales), while allowing others (e.g., family transfers). Colorado's law is not the ban on possession covered by the text in *Rahimi* or *Bruen*.

Second, *Rahimi* provides no support for Plaintiffs' implied rights approach. The Plaintiffs have not argued that the plain text covers their conduct. Instead, they argued only that "[t]he right to keep arms necessarily implies the right to acquire arms." App. Vol. 1 at 69. However, *Rahimi* confirms that we look to the historical meaning of the text, rather than creating new rights by implication. *Rahimi*, at 1897 ("the scope of the right beg[ins] with constitutional text and history.") (quotation omitted). That is because "the right was never thought to sweep indiscriminately" and "[a]t the founding, the bearing of arms was

5

subject to regulations." *Id*. Implying rights without historical context fails to get to this nuanced historical understanding of the pre-existing right. *Rahimi*, at 1912 (Kavanaugh, J., concurring) ("[H]istory helps ensure that judges do not simply create constitutional meaning 'out of whole cloth.'"). Plaintiffs have not met their burden by asking this Court to imply a right without presenting any evidence that the plain text covers their conduct.

*Third*, *Rahimi* reconfirmed *Heller*'s presumptively lawful gun regulations. *Rahimi*, at 1901. The majority wrote that the "presumptively lawful" language in *Heller* was an important limitation on the scope of *Heller*. *Id.* This language demonstrates that *Heller* "never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." *Id.* Colorado's law is presumptively lawful because it imposes "conditions and qualifications on the commercial sale of arms[,]" a category expressly carved out in *Heller*. *D.C. v. Heller*, 554 U.S. 570, 627 (2008). Plaintiffs have not overcome this presumption at the first step of the analysis by demonstrating Colorado's law is being "put toward abusive ends[.]" *Bruen*, 597 U.S. at 39 fn.9.

**B.    Colorado's law is consistent with our Nation's historic principle of regulating children's and adolescent's access to weapons to limit misuse.**

If the Court reaches the second step, *Rahimi* demonstrates that the Governor's evidence was sufficient to justify Colorado's age-limit law. Colorado's law "does not need to be" identical to any past prohibition. *Rahimi*, at 1901. Instead, following *Rahimi*, this Court looks to what "principles" can be derived from our regulatory tradition to inform and "help delineate the contours" of the Second Amendment as applied to modern regulation. *Id.* at 1897-98. The analysis necessarily requires a higher level of generality. The

6

"principle" is derived by looking at past laws "[t]aken together," *id.* at 1901, rejecting the dissent's view that the government must show "a single historical law has both a comparable burden and justification[,]" *id.* at 1944 (Thomas, J., dissenting).

*Rahimi* also helps clarify what history can be used to derive these principles. *Rahimi* again declined to rule that history from the time "when the Fourteenth Amendment was ratified in 1868" must be rejected when interpreting the Second Amendment. *Rahimi*, at 1898 fn.1. But the *Rahimi* majority also looked to mid-19th century case law to help define its principle, *Rahimi*, at 1901, just as *Bruen*, 597 U.S. at 37, and *Heller,* 554 U.S. at 605-19, did so before. *Rahimi* also identified 19th century laws and cases "forb[idding] carrying [of] concealed firearms" as limiting the scope of the Second Amendment. *Id.* Age-limits were often enacted in the 19th century in the same state laws prohibiting concealed carry. App. Vol. 1 at 235, 246-282.

"[P]ostenactment history can be an important tool … to liquidate ambiguous constitutional provisions[.]" *Id.* at 1924 (Barrett, J., concurring) (quotation omitted). Looking only to the founding "assumes that founding-era legislatures maximally exercised their power to regulate[.]" *Id.* at 1925 (Barrett, J., concurring). Post-ratification "history" is just another name for our Nation's "tradition[s]" that help inform the original public understanding of the right. *Id.* at 1916 (Kavanaugh, J., concurring) ("post-ratification history–sometimes referred to as tradition–can also be important for interpreting vague constitutional text[.]"). This is "especially important" when "the text is vague and the pre-ratification history is elusive or inconclusive[.]" *Id.* The Supreme Court has relied on post-ratification history "[f]or more than two centuries[,]" *id.* at 1918-19 (Kavanaugh, J.,

concurring) (collecting cases), making its use to inform the Second Amendment's scope non-controversial.

Applying *Rahimi* to this case, the Governor's evidence demonstrated the following common-sense principle in our regulatory tradition: access to weapons by children and adolescents may be regulated to limit misuse.

A fundamental principle in our Nation's common law at the founding was that it distinguished rights of citizens by age. Those under twenty-one were minors whose affairs were controlled and governed by their parents. App. Vol. 1 at 153. "The historical evidence shows that the founding generation believed parents had absolute authority over their minor children and expected parents to use that authority to direct the proper development of their children." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834, (2011) (Thomas, J., dissenting). "[T]he law imposed age limits on all manner of activities that required judgment and reason." *Id.* The Governor's founding-era expert concluded that the Second Amendment would not have been understood at the founding to limit regulations on those under twenty-one. App. Vol. 1 at 153.

Founding-era government intervened especially when those under twenty-one participated in the marketplace independent from their parents. *Id.* at 163. Early courts used common law principles to void contracts entered by those under twenty-one if needed for the minor's own protection. *Id.* The district court rejected this point because the common law was not "directed specifically" at gun sales. Order at 33. But the common law did not need to be directed specifically at guns to reveal principles. In *Rahimi*, the Court found surety regimes persuasive evidence even though they were broad common law regimes not

8

directed specifically at the issue of guns. *Rahimi*, at 1899; at 1939 (Thomas J., dissenting) ("[a]fter providing sureties, a person kept possession of all his firearms").

This principle is further confirmed by looking to the one place in early America where those under twenty-one lived outside direct control of their parents: colleges. App. Vol. 2 at 240-43. Private and public colleges prohibited students from having guns with them starting with Harvard College in 1655. *Id.* Standing alone these college regulations might not be enough. But following *Rahimi*, they must be "[t]aken together" with other evidence. *Id.* at 1901. Combined with common law age-restrictions, college restrictions help confirm a principle at the founding of limiting access to weapons by those under twenty-one.

And this principle was further "liquidated and ascertained" post-ratification. *Rahimi*, at 1917 (Kavanaugh, J. concurring) (quoting The Federalist No. 37, at 229); at 1924 (Barrett, J., concurring) ("postenactment history can be an important tool … [to] reinforce our understanding of the Constitution's original meaning[.]") (quotation omitted). The Governor's historian expert identified over 100 laws from forty-six states that regulated guns with an age-limit by the early 1900s. App. Vol. 2 at 232-33. The most common age limit in these laws was twenty-one. *Id.* at 237. Before the Civil War, Kentucky, Alabama, and Tennessee enacted laws prohibiting gun sales to those under twenty-one. *Id.* at 234-36. Over the next forty years, sixteen states and D.C. enacted similar prohibitions on gun sales to those under twenty-one. *Id.* These laws went unchallenged at the time, except one decision *upholding* Tennessee's law. *State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878). Colorado's age-restriction is a dead ringer for these historical state laws.

Taken together, the historical evidence clearly demonstrates a common principle from the founding to today: access to weapons by children and adolescents may be regulated to limit misuse. Colorado's law fits well within that principle. The "how" and the "why" have always been the same. *Bruen*, 591 U.S. at 29. The laws were enacted to promote public safety in the face of underage gun use. App. Vol. 2 at 236; 371-72. They operate by empowering parents to make decisions about gun use by their children. *Id.* Colorado's law prohibits guns sales while permitting gun transfers by parents, just as 19th century state laws often prohibited gun sales except sales with parental consent, and founding-era common law voided contracts made without parental consent.

This principle also matches the "right level of generality" of the principle announced in *Rahimi*. *Rahimi*, at 1926 (Barrett, J., concurring). The law does not use a "vague term" to describe a class of citizens. *Rahimi*, at 1903. Instead, Colorado's law clearly "distinguishes citizens" – as our Nation has always done – by age. *Id.* at 1902. However, age is ultimately only a "temporary" restriction that everyone ages out of. *Rahimi*, at 1902. There is also a "special danger of misuse" by those under twenty-one. *Id.* at 1901. Guns are now the leading cause of death among this age group. App. Vol. 1 at 115. The Governor presented unrebutted expert evidence on the science behind this special danger among "late adolescents." App. Vol. 2 at 384-85. Plaintiffs chose not to submit any evidence challenging this special danger. Plaintiffs are not likely to succeed at the test's second step.

**III.     Conclusion**

For the above reasons, this Court should reverse the district court's preliminary injunction following *Rahimi*.

Dated: July 16, 2024

        PHILIP J. WEISER
        Attorney General

        /s/ *Matthew J. Worthington*
        *Michael T. Kotlarczyk*, Assistant Solicitor General*
        *Matthew J. Worthington*, Assistant Attorney General*
        1300 Broadway, 6th Floor
        Denver, CO 80203
        Telephone: (720) 508-6124
        Email: mike.kotlarczyk@coag.gov;
        matt.worthington@coag.gov
        *Attorneys for Governor Jared S. Polis*
        *Counsel of Record

## CERTIFICATE OF SERVICE

      I hereby certify that on July 16, 2024, I served a true and complete copy of the foregoing **DEFENDANT-APPELLANT'S SUPPLEMENTAL BRIEF FOLLOWING *UNITED STATES V. RAHIMI*, NO. 22-915** upon all parties herein by e-filing with the CM/ECF system maintained by the court addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs-Appellees*

                                                  *s/ Jennifer Davis-Weiser*
                                                  Jennifer Davis-Weiser